11253. By Mr. SMITH: Petition signed by Mr. A. W. Johnson and 21 other citizens of Buhl, Idaho, protesting against the enactment of compulsory Sunday observance legislation; to the Committee on the District of Columbia.

11254. By Mr. SWING: Petition of residents of San Diego and National City, Calif., protesting against House bill 78, compulsory Sunday observance; to the Committee on the District of Columbia.

11255. By Mr. THURSTON: Petition of W. C. Borrell and others, of Chariton, Iowa, protesting against any change in the present tariff on hides and leather used in the manufacture of shoes; to the Committee on Ways and Means.

11256. By Mr. WOOD: Petition of many citizens of La Fayette, Ind., and vicinity, asking that no changes be made in the present immigration law unless it would be to make them more drastic in their provisions; to the Committee on Immigration and Naturalization.

11257. By Mr. WYANT: Petition of Pittsburgh Wholesale Lumber Dealers' Association, opposing the levying of a duty on timber, lumber, lath, and shingles imported into the United States; to the Committee on Ways and Means.

11258. Also, petition of Retail Lumber Dealers' Association of western Pennsylvania, opposing the levying of a duty on timber, lumber, lath, and shingles into the United States; to the Committee on Ways and Means.

11259. Also, petition of John Brady, jr., Camp No. 84, United Spanish War Veterans, Greensburg, Pa., favoring passage of House bill 14676; to the Committee on Pensions.

---

# SENATE

## SATURDAY, February 16, 1929

### (Legislative day of Friday, February 15, 1929)

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The VICE PRESIDENT. The Senate will receive a message from the House of Representatives.

#### MESSAGE FROM THE HOUSE

A message from the House of Representatives by Mr. Farrell, its enrolling clerk, announced that the House had passed the following bills and joint resolution, in which it requested the concurrence of the Senate:

H. R. 16926. An act granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science;

H. R. 16927. An act to clarify the law relating to the temporary admission of aliens to the United States; and

H. J. Res. 379. Joint resolution extending the benefits of the provisions of the act of Congress approved May 1, 1920, the act of Congress approved July 3, 1926, and the act of Congress approved May 23, 1928, to the Missouri Militia who served during the Civil War.

#### ENROLLED BILLS AND JOINT RESOLUTION SIGNED

The message also announced that the Speaker had affixed his signature to the following enrolled bills and joint resolution, and they were signed by the Vice President:

S. 1281. An act to amend section 7 (a) of the act of March 3, 1925 (43 Stat. 1119), as amended by section 2 of the act of July 3, 1926 (44 Stat. 812), so as to provide operators' permits free of cost to enlisted men of the Army, Navy, Marine Corps, and Coast Guard operating Government-owned vehicles in the District of Columbia;

S. 4441. An act to amend the laws relating to assessment and collection of taxes in the District of Columbia, and for other purposes;

H. R. 5491. An act to amend an act entitled "An act making appropriations for the naval service for the fiscal year ending June 30, 1922, and for other purposes," approved July 12, 1921;

H. R. 8748. An act for the relief of James W. Bass, collector of internal revenue, Austin, Tex.;

H. R. 13795. An act for recognition of meritorious service performed by Lieut. Commander Edward Ellsberg, Lieut. Henry Hartley, and Boatswain Richard E. Hawes;

H. R. 15809. An act to authorize a preliminary survey of Mud Creek, in Kentucky, with a view to the control of its floods;

H. R. 16162. An act to extend the times for commencing and completing the construction of a bridge across the Mississippi River between New Orleans and Gretna, La.; and

H. R. 16301. An act making appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices for the fiscal year ending June 30, 1930, and for other purposes; and

S. J. Res. 110. Joint resolution to provide for accepting, ratifying, and confirming the cessions of certain islands of the Samoan group to the United States, and for other purposes.

#### REPORT OF PERSONNEL CLASSIFICATION BOARD ON SURVEY OF FIELD SERVICES

The VICE PRESIDENT laid before the Senate a communication from the Chairman of the Personnel Classification Board, tentatively reporting, pursuant to law, relative to a survey of positions in the several field services of the Federal Government "exclusive of the Postal Service, Foreign Service, and employees in the mechanical and drafting groups whose wages are now or have heretofore been fixed by wage boards or similar authority," and submitting a preliminary report thereon, which, with the accompanying papers, was referred to the Committee on Civil Service.

#### PHYSICIAN IN CHARGE OF NARCOTICS DIVISION

The VICE PRESIDENT laid before the Senate a communication from the Secretary of the Treasury, recommending the passage of legislation making the physician in charge of the Narcotics Division of the United States Public Health Service, while so serving, an Assistant Surgeon General in that service, etc., which, with the accompanying papers, was referred to the Committee on Finance.

#### FINAL ASCERTAINMENT OF ELECTORS

The VICE PRESIDENT laid before the Senate a communication from the Secretary of State, dated February 12, 1929, transmitting, pursuant to law, an authenticated copy of the certificate of the final ascertainment of electors for President and Vice President, appointed in the State of Mississippi at the election held November 6, 1928, which was requested to be substituted for the certificate transmitted on January 18, 1929, which, with the accompanying papers, was ordered to lie on the table.

#### PETITIONS AND MEMORIALS

Mr. TYSON. I present a resolution adopted at the January term of the Knox County (Tenn.) quarterly court, relative to the location of a summer home for the President of the United States, which I ask may be printed in the RECORD and lie on the table.

There being no objection, the resolution was ordered to lie on the table and to be printed in the RECORD, as follows:

Mr. Chairman and members of the Knox County court, conditions come and go, likewise suggestions that are often made by both high officials and sometimes humble citizens, that have a great deal of merit, but neither the press or the public become impressed or interested and unless the individual making such suggestion is so wedded to the idea to keep it before the public it will soon be forgotten.

This preamble is to get you members to become interested in what I am going to suggest and present to you.

Mr. Chairman and members of the court, some days ago I saw and read a suggestion from the President of the United States, Calvin Coolidge, that the Government should build a permanent summer and rest home for the President. Since that suggestion I have not seen, heard, or read a word of comment; yet it impressed me so deeply that I have thought the idea was one of the wisest suggestions made by a President 16 times of peace for a public improvement or necessity. President Coolidge frankly, wisely, and truthfully stated the facts, and that he could recommend a permanent summer home for the President of the United States without any selfish motive.

He stated that the altitude at Washington was virtually sea level and when the President took an outing on the ocean it was virtually the same altitude, and it did not give the rest and vigor that was needed. I was very much interested and very deeply impressed with the remarks of the President suggesting a permanent out-of-Washington home to be known as The President's Summer Home. With his suggestions carried out, it would forever eliminate the annoyance of the President selecting a palace or cottage donated by some kind citizen where he will spend his vacation. The Government has always maintained the President's Mansion, known as the White House, ever since the founding of our present Capital. Now, to think we have 48 States and not a place provided where the President can go for rest and recreation—such a condition should no longer exist.

At the present time it is more difficult for the President to decide where he is going to spend his vacation than it is whether he will approve or veto a tariff bill.

There are two questions for Congress to consider. First, should there be an isolated home for the President of the United States, where he can go for a rest as well as being isolated from disturbing elements, and where he may be given undisturbed time in the preparation of very important messages to be submitted to Congress?

The second question, if we are going to have a President's summer and rest home, where shall it be located? It seems such a home should

be located on a Government domain and as close and accessible to Washington as possible to get the altitude needed, as suggested by President Coolidge.

Mr. Chairman and members of the court, I do not hesitate to suggest that no other place on the map of our lands could be more ideal for the location of such a home than on the lands of the Great Smoky Mountain National Park. Altitude just right, climate finest of the fine, mountain springs pure as melted snow, the foliage of millions of trees and shrubs, 137 species, with more tints and colors and more gorgeous than could be found in an art gallery. The autumn presented by Old Smoky is the most beautiful picture painted by the hand of nature. Five hundred and sixty-five varieties of wild flowers permeating the air with fragrance. The sweetest of all nature.

This is where we suggest that a summer home be located, a rest resort for a tired and overworked President; where he can dwell and live with nature and enjoy the blessings of an undisturbed day. And when he becomes tired in body he can go to the many tops of Old Smoky and there see the sun of day come riding in on the waves of the Atlantic and emerging through the foliage of the forest dripping with the honeydew of the morning, spreading the smiles of day and kissing with unfelt lips the slumbering and God-loving people whom He has loved and protected through the night from their visions of beauty and dreams of excitement to a day of happiness and joy; and with the dawn of the morning embark on the lap of nature to enjoy the laughter of the day's journey; and from the smiles of the morning to the laughter of the evening behold the most beautiful panorama view stretching from the incoming waves of the Atlantic to the banks of the Father of Waters—the greatest commercial-carrying stream of the world. And at the end of day dip the torch of light into the bosom of the great Mississippi and there pronounce to his people a benediction—sweet visions and dreams. This is the place beneath these trees in the cluster of these shrubs, surrounded by these wild flowers and enrapt with the honeysuckle of fragrance and under the shadows of Old Smoky, where he can enjoy the wild life of the mountains, the developed life of the valleys, surrounded with the protection of a people devoted to liberty, freedom, and peace: Therefore be it

*Resolved,* That we memorialize Congress through our Senators and Representatives to assist in carrying out President Coolidge's suggestion, and then to have said home located in the Smoky Mountain National Park.

Respectfully submitted.

<div style="text-align:right">

SAM HARRISON,
*Justice of the Peace,
Second District, Knox County, Tenn.*

</div>

STATE OF TENNESSEE,
    *County of Knox, ss:*

I, L. M. Kennedy, clerk of the county court for the aforesaid county, do hereby certify that the foregoing is a true and perfect copy of the resolution unanimously adopted at the January term of the Knox County quarterly court, in re: The location of a summer home for the President of the United States, as the same appears of record in my office.

Witness my hand and official seal in Knoxville, Tenn., this 17th day of January, 1929.

[SEAL.]        L. M. KENNEDY,
<div style="text-align:right">

*Clerk of the County Court.*

</div>

Mr. FESS presented the following joint resolution of the Legislature of the State of Ohio, which was referred to the Committee on Interstate Commerce:

Senate joint resolution memorializing the Congress of the United States to distribute radio-broadcasting facilities equitably in accordance with the population of the States

Whereas under General Order No. 40, issued by the Federal Radio Commission on August 30, 1928, and subsequent orders assigning frequencies, powers, licenses, and hours of operation to the broadcasting stations of the United States, Ohio did not receive its equitable share of these facilities in accordance with the letter and spirit of the Davis amendment; and

Whereas the inequalities and injustice which have resulted from the reallocation as promulgated by the Federal Radio Commission are the results of using the arbitrary radio zones of the 1927 act as the basis; and

Whereas no equitable distribution of broadcasting facilities, serving public interest, convenience, and necessity can be brought about so long as equal division among the five arbitrary zones is adhered to: Therefore be it

*Resolved by the General Assembly of the State of Ohio,* That the Congress of the United States be, and is hereby, requested to amend the Federal radio law so as to distribute broadcasting facilities equitably in accordance with the population of the States; and be it further

*Resolved,* That a copy of this resolution be forwarded to both of the United States Senators and each Member of Congress from Ohio.

Mr. WARREN presented the following joint memorial of the Legislature of the State of Wyoming, which was referred to the Committee on Agriculture and Forestry:

Enrolled Joint Memorial 1, Senate, Twentieth Legislature of the State of Wyoming, petitioning the Department of Agriculture of the Government of the United States to open certain lands in the Teton National Forest, in Teton County, Wyo., for the purpose of sheep grazing

Whereas considerably more than 75 per cent of the area of Teton County, Wyo., is embraced within the boundaries of the Teton National Forest and is, therefore, under the administration of the Government of the United States;

Whereas by far the most and better part of the grazing lands of said county are within the boundaries of said national forest, and sheep belonging to the citizens and residents of said county are now by departmental regulation excluded from said forest;

Whereas the citizens and residents of Teton County are thus deprived of the advantages which were enjoyed by the pioneers and settlers of other counties and States to whom the public domain was and is open for the grazing of livestock, and, since they are dependent for their livelihood upon the livestock industry, said citizens and residents of Teton County are consequently suffering a great hardship by reason of the said exclusion of sheep from the said forest;

Whereas the county of Teton and the State of Wyoming are deprived by the said policy of exclusion of a considerable income that would normally be derived from the taxation of largely increased bands of sheep if grazing were permitted in said forest;

Whereas the tract of land hereinafter described offers abundant forage suitable for sheep but not suitable for cattle owing to the presence of larkspur which is poisonous to cattle but nutritious for sheep;

Whereas the opening of said tract would provide a profitable use, in wintering sheep, for the large annual hay crop, grown on said lands, for which there is no present market; and

Whereas the said tract is not now used by elk or game, nor in any manner by tourists, visitors, or campers, being suitable only for sheep: Therefore be it

*Resolved by the Senate of the Twentieth Wyoming Legislature (the House of Representatives concurring),* That the Department of Agriculture of the United States Government be, and it is hereby, most earnestly requested to open the following described tract of land for the grazing of sheep under the rules and regulations of the United States Bureau of Forestry:

All of that portion of the Teton National Forest lying within the boundaries of Teton County, Wyo., south of the south line of Range 42, Wyoming, or its projection westward, and west of the Snake River; Be it further

*Resolved,* That certified copies of this memorial be forwarded to the President of the United States, the Secretary of Agriculture, the Chief Forester of the United States, to each member of the Wyoming delegation in the Congress of the United States, and to the Honorable Vincent Carter, Representative elect.

<div style="text-align:right">

FRANK O. HORTON,
*President of the Senate.*
MARVIN L. BISHOP, Jr.,
*Speaker of the House.*

</div>

Approved at 10.54 p. m., February 11, 1929.
<div style="text-align:right">

FRANK C. EMERSON,
*Governor.*

</div>

Mr. BURTON presented the petition of sundry calf-leather workers of Girard, Ohio, and vicinity, praying for the imposition of a fair tariff duty on imports of finished leather, which was referred to the Committee on Finance.

Mr. ROBINSON of Arkansas presented petitions of sundry members of the parent-teachers' associations of Jonesboro and Arkadelphia, in the State of Arkansas, praying for the passage of the bill (S. 1584) to create a Federal department of education, which were referred to the Committee on Education and Labor.

He also presented a letter in the nature of a petition from W. G. Bate, of Stevens Point, Wis., praying that a route for a new Isthmian canal be selected about 30 miles east of the Panama Canal, from the Gulf of San Blas on the Atlantic side to the Bayana River on the Pacific side, etc., which was referred to the Committee on Interoceanic Canals.

PROPOSED TARIFF REVISION

Mr. WALSH of Montana. Mr. President, I clipped from the Washington Post this morning an editorial from the Philadelphia Public Ledger, presumably of yesterday, stating that the revision of the tariff to take place at the ensuing special session will not be confined to the agricultural schedule, but will be general, and that there will be a general revision upward notwithstanding the views supposed to be entertained by the President elect, Mr. Hoover. The dictatorial character of the edi-

torial is interesting, to say the least. Verily, Mr. President, the hand is the hand of the Public Ledger, but the voice is the voice of Grundy. I ask that the editorial may be incorporated in the RECORD.

The VICE PRESIDENT. Without objection, leave is granted.

The editorial is as follows:

[From the Washington Post, Saturday, February 16, 1929]

REAL TARIFF REVISION DEMANDED

There was in Washington a few days ago much talk that there would be no general tariff revision at the coming special session of Congress. It was said textiles might be given a little help. Possibly steel would be added. Here and there a schedule would be touched up a bit. The farm schedules would be rewritten. The farmers would be given any and every thing they wanted, as they were in the emergency tariff of 1921 and the tariff act of 1922.

But—in the main there was to be no general revision. The theory was that all sweeping changes would wait until the next regular session. There were emphatic intimations that Mr. Hoover wanted to wait. These were strengthened when Senator SMOOT came back from Miami Beach declaring he was opposed to any complete revision.

There is not so much of that talk now. The House Ways and Means Committee is settling the question of whether revision shall be partial or general. It has been in session for weeks. Hundreds of manufacturers have appeared at its hearings. They have shown it is a condition and not a theory that confronts American industry. They have told their story, and the burden thereof is that of insufficient protection against a reviving and vigorous Europe and an ambitious and pushing Orient.

These hearings covered the tariff schedule by schedule. Any doubts that did exist about the necessity of a genuine revision have been swept away.

On or about March 10 the House committee will begin writing the new tariff. This will be ready about May 1. The trend of that measure may now be forecast in a general way.

Changes will not be confined to farm and textile schedules. Not all rates will be lifted, but most of them will be raised. Where an industry is suffering from the pressure of foreign competition it will get further protection.

It is probable that a few articles will vanish from the free list. When revisions are made they will be upward. Practically every schedule will be opened for the changes that the last six years have shown as necessary or imperative.

The revisions proposed are described as "conservative," except in the farm schedules. They may be too "conservative" for the Senate, which is more likely to raise than it is to lower them.

Instead of merely tinkering with the tariff the House committee will offer a new tariff law. Its hearings have shown the stark necessity of action.

Mr. Hoover may wish to wait a while, but the country is not willing. Genuine revision is expected as soon as this can be made. The Republican Party is pledged to it. Protection was its leading issue in 1928. The incoming administration is bound by the pledges made last year, and the Seventieth Congress was chosen upon the question of genuine protection.

This is understood by Congress, and particularly by the House Ways and Means Committee. Its duty is to revise the tariff wherever, in its judgment, changes are necessary. That it is preparing to do. If the special session meets on or about April 15, the committee will have a measure ready within two weeks after it convenes.

And if and when the schedules are opened, revision will be general rather than piecemeal. That is what the country expected as soon as the results of the election of last November were known. It is what both industry and the country assumed would be done. In preparing a bill revising rates generally upward the House committee is carrying out the mandate so clearly expressed in November, 1928. (Philadelphia Public Ledger.)

REPORTS OF COMMITTEES

Mr. COUZENS, from the Committee on Interstate Commerce, to which was referred the bill (S. 3623) to amend section 204 of the act entitled "An act to provide for the termination of Federal control of railroads and systems of transportation; to provide for the settlement of disputes between carriers and their employees; to further amend an act entitled 'An act to regulate commerce,' approved February 4, 1887, as amended, and for other purposes," approved February 28, 1920, reported it with an amendment and submitted a report (No. 1780) thereon.

Mr. McNARY, from the Committee on Agriculture and Forestry, to which was referred the bill (S. 5743) authorizing an appropriation of $50,000 for the purchase of seed, feed, and fertilizer to be supplied to farmers in the flooded sections of Orange County, N. Y., and for other purposes, reported it with amendments and submitted a report (No. 1781) thereon.

Mr. SHIPSTEAD, from the Committee on Agriculture and Forestry, to which was referred the bill (S. 3913) to promote

the better protection and highest public use of lands of the United States and adjacent lands and waters in northern Minnesota for the production of forest products, and for other purposes, reported it with amendments and submitted a report (No. 1782) thereon.

Mr. COPELAND, from the Committee on the District of Columbia, to which was referred the bill (S. 5598) authorizing the acquisition of land in the District of Columbia and the construction thereon of two modern, high-temperature incinerators for the destruction of combustible refuse, and for other purposes, reported it with an amendment and submitted a report (No. 1783) thereon.

Mr. KENDRICK, from the Committee on Public Lands and Surveys, to which was referred the bill (H. R. 479) to authorize the Secretary of the Interior to grant certain oil and gas prospecting permits and leases, reported it with amendments and submitted a report (No. 1784) thereon.

Mr. McMASTER, from the Committee on Public Buildings and Grounds, to which was referred the bill (S. 1896) authorizing the Secretary of the Treasury to amend the contract executed by the Treasury Department for the construction of the Edward Hines, jr., Hospital at Broad View, Ill., reported it with an amendment and submitted a report (No. 1785) thereon.

Mr. HALE, from the Committee on Naval Affairs, to which was referred the bill (H. R. 13884) to authorize the Secretary of the Navy to proceed with the construction of certain public works, and for other purposes, reported it with amendments and submitted a report (No. 1786) thereon.

Mr. DALE, from the Committee on Commerce, to which were referred the following bills, reported them severally with an amendment and submitted reports thereon:

A bill (S. 5583) authorizing the Iowa-Nebraska Amortized Free Bridge Co., its successors and assigns, to construct, maintain, and operate a bridge across the Missouri River at or near Sioux City, Iowa (Rept. No. 1788) ;

A bill (S. 5735) granting the consent of Congress to the city of Wheeling, W. Va., to construct, maintain, and operate a free highway bridge across the east channel of the Ohio River (Rept. No. 1790) ; and

A bill (S. 5758) to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Kansas City, Kans. (Rept. No. 1789.)

Mr. DALE also, from the Committee on Commerce, to which were referred the following bills, reported them each with amendments and submitted reports thereon:

A bill (S. 5045) authorizing Jed P. Ladd, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across Lake Champlain from the town of Alburgh, Vt., to the town of Swanton, Vt., the said right and privilege to extend across Lake Champlain along the shore line 1 mile each way, northerly and southerly from the Central Vermont Railway Co.'s bridge on the Swanton shore and 1 mile northerly from said bridge and southerly from said bridge to the south end of McGregors Point, so called, on the Alburgh shore at a point at or near East Alburgh (Rept. No. 1791) ; and

A bill (S. 5764) granting the consent of Congress to E. T. Franks, his successors and assigns, to construct, maintain, and operate a bridge across the Ohio River approximately midway between the cities of Owensboro, Ky., and Rockport, Ind. (Rept. No. 1792).

Mr. DALE also, from the Committee on Commerce, to which were referred the following bills, reported them severally without amendment and submitted reports thereon:

A bill (S. 5706) authorizing Frank A. Augsbury, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across the St. Lawrence River at or near Morristown, N. Y. (Rept. No. 1793) ;

A bill (S. 5720) authorizing L. L. Thompsen, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across the Red River at or near Montgomery, La. (Rept. No. 1794) ; and

A bill (S. 5774) to extend the times for commencing and completing the construction of a bridge across the Mississippi River at or near Carondelet, Mo. (Rept. No. 1795).

Mr. DENEEN, from the Committee to Audit and Control the Contingent Expenses of the Senate, to which was referred the resolution (S. Res. 303) increasing the limit of expenditure for a survey of Indian conditions in the United States, reported it with an amendment.

He also, from the same committee, to which were referred the following resolutions, reported them each without amendment :

Resolution (S. Res. 308) continuing until the end of the first regular session of the Seventy-first Congress Senate Resolution 79, authorizing a general survey of Indian conditions ; and

Resolution (S. Res. 311) continuing until the end of the first regular session of the Seventy-first Congress Senate Resolution 153, to investigate the choice of postmasters in presidential offices.

ENROLLED BILLS AND JOINT RESOLUTION PRESENTED

Mr. GREENE, from the Committee on Enrolled Bills, reported that that committee presented to the President of the United States the following enrolled bills and joint resolution:

On February 15, 1929:

S. 4257. An act to authorize the payment of certain salaries or compensation to Federal officials and employees by the treasurer of the Territory of Alaska.

On February 16, 1929:

S. 1281. An act to amend section 7 (a) of the act of March 3, 1925 (43 Stat. 1119), as amended by section 2 of the act of July 3, 1926 (44 Stat. 812), so as to provide operators' permits free of cost to enlisted men of the Army, Navy, Marine Corps, and Coast Guard operating Government-owned vehicles in the District of Columbia;

S. 4441. An act to amend the laws relating to assessment and collection of taxes in the District of Columbia, and for other purposes; and

S. J. Res. 110. Joint resolution to provide for accepting, ratifying, and confirming the cessions of certain islands of the Samoan group to the United States, and for other purposes.

BILLS AND JOINT RESOLUTIONS INTRODUCED

Bills and joint resolutions were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. SCHALL:

A bill (S. 5811) for the relief of Adelaide (Ada) J. Walker Robbins; to the Committee on Military Affairs.

By Mr. REED of Pennsylvania:

A bill (S. 5812) to authorize the Secretary of War to lease the United States naval destroyer and submarine base, Squantum, Mass.; to the Committee on Military Affairs.

By Mr. NORRIS (for Mr. HOWELL) :

A bill (S. 5813) for the relief of Charles W. Martin; and

A bill (S. 5814) for the relief of Dr. J. B. Potts; to the Committee on Claims.

By Mr. THOMAS of Oklahoma:

A bill (S. 5815) authorizing the use of tribal moneys belonging to the Wichita and affiliated bands of Indians of Oklahoma for certain purposes; and

A bill (S. 5816) to authorize the establishment of an employment agency for the Indian Service; to the Committee on Indian Affairs.

By Mr. FESS:

A bill (S. 5817) to authorize the unification of carriers engaged in interstate commerce, and for other purposes; to the Committee on Interstate Commerce.

By Mr. HALE:

A bill (S. 5818) granting an increase of pension to Emma A. Gannett; to the Committee on Pensions.

By Mr. BLACK:

A bill (S. 5819) to authorize the erection of a United States veterans' hospital in the State of Alabama and to authorize an appropriation therefor; to the Committee on Finance.

By Mr. FESS:

A bill (S. 5820) to extend the times for commencing and completing the construction of a bridge across the Mahoning River at or near Warren, Trumbull County, Ohio; and

A bill (S. 5821) to extend the times for commencing and completing the construction of an overhead viaduct across the Mahoning River at or near Niles, Trumbull County, Ohio; to the Committee on Commerce.

By Mr. WALSH of Massachusetts:

A bill (S. 5822) granting an increase of pension to Lilla V. Granville; to the Committee on Pensions.

By Mr. CAPPER:

A joint resolution (S. J. Res. 219) to provide for the quartering in certain public buildings in the District of Columbia of troops participating in the inaugural ceremonies; to the Committee on Public Buildings and Grounds.

By Mr. KEYES:

A joint resolution (S. J. Res. 220) to provide for the quartering in certain public buildings in the District of Columbia of troops participating in the inaugural ceremonies; to the Committee on Public Buildings and Grounds.

By Mr. BLAINE:

A joint resolution (S. J. Res. 221) to amend the joint resolution extending the tribal existence and government of the Five Civilized Tribes of Indians in the Indian Territory, approved March 2, 1906; to the Committee on Indian Affairs.

HOUSE BILLS AND JOINT RESOLUTION REFERRED

The following bills and joint resolution were severally read twice by their titles and referred as indicated below:

H. R. 16926. An act granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science; and

H. R. 16927. An act to clarify the law relating to the temporary admission of aliens to the United States; to the Committee on Immigration.

H. J. Res. 379. A joint resolution extending the benefits of the provisions of the act of Congress approved May 1, 1920, the act of Congress approved July 3, 1926, and the act of Congress approved May 23, 1928, to the Missouri Militia who served during the Civil War; to the Committee on Military Affairs.

REIMBURSEMENT OF NEVADA—AMENDMENT TO DEFICIENCY BILL

Mr. ODDIE submitted an amendment proposing to appropriate $595,076.53 to reimburse the State of Nevada the net balance due as certified by the Comptroller General of the United States, etc., intended to be proposed by him to the second deficiency appropriation bill, which was referred to the Committee on the Judiciary and ordered to be printed.

THE AMERICAN FLAG

Mr. HEFLIN. Mr. President, I have received quite a number of letters recently supporting my position on the flag amendment which I offered to the cruiser bill. I send four of them to the clerk's desk and ask that they may be read in my time.

The VICE PRESIDENT. Without objection, the clerk will read.

The Chief Clerk read as follows:

STATE COLLEGE, PA., February 7, 1929.

Senator HEFLIN, of ALABAMA.

MY DEAR SENATOR HEFLIN: In to-day's Philadelphia Inquirer, on the front page, is a news story of the achievement of recognition as a temporal state by the Vatican.

On the back page of the financial section of the same paper is the story of your speech advocating its proper place on our ships for our flag.

You will probably receive thousands of letters commending you upon, and thanking you for, that speech; nevertheless, I wish to add my word of most sincere gratitude and appreciation for your fearlessness and watchfulness.

As a very humble student of our history, I have a feeling that the two news items are the harbingers—even though long ahead in time—of a deadly struggle over the principle of independence of church and state. Protestantism has fought its way free once, and, given a few people like yourself to keep attention focused on threatening dangers, we should be able to keep free.

Again I wish to thank you for your fine, sound American stand on all matters of national policy.

Cordially and respectfully yours,

(Miss) GERTRUDE MASON ADAMS.

READING, PA., February 10, 1929.

Hon. J. THOS. HEFLIN.

DEAR BROTHER AMERICAN: I want to express my appreciation to you for the good work you are doing, and have been doing for years, in behalf of our beloved America.

I hope this very word you speak may sink into the hearts of all who hear you and those who read them, and that your work will bear fruit to the protection and preservation and honor of our country and its principles, the things our earliest forefathers wove into the fiber of this land by much labor and sacrifice and prayer.

To my mind our country has never been in greater danger than it is now. Our past troubles have largely been of temporal and material things, but the present danger threatens the very deepest and most essential attribute that has helped to make America the most honorable of all lands.

The fact that the foes are so insidious makes them extremely dangerous. They use the press and the stage at every opportunity to glorify the priest and humiliate the Protestant minister.

If only our people can be aroused in time. It is disgusting to those of us whose ancestors have been American born for centuries and who have been pioneers in making our country what it is to be asked to step aside now that the hard work is done and let aliens of a few years' residence dominate us.

We live in the Keystone State and are of a different political faith than yours, but at heart you and we are Americans, with the same hopes and fears and allegiance. The last election has made us very proud of the South. She saved the day, God bless her.

Let us ever honor the admonition of Washington to put none but Americans on guard, and heed the words of his Farewell Address, "Beware of foreign influence, one of the most baneful foes of our Government." Let us all stand on Jeffersonian principles. One of Roosevelt's last sayings was, "Carry on." May true Americans of every class and clan carry on; and may God in His mercy and power bless our efforts and grant us victory and deliverance from every foe.

Yours for America,

Mr. and Mrs. HARRY T. MILLER,
*345 North Front Street, Reading, Pa.*

———

BANGOR, ME., *February 8, 1929.*

Senator THOMAS J. HEFLIN,
*Washington, D. C.*

DEAR SIR: Have read the press accounts of your efforts to have the practice suppressed of flying the Roman Catholic Church flag above the Stars and Stripes.

I went over to France for that dear old flag, and though I be but an humble individual, your efforts have my entire approval and moral support.

I only hope you will carry the fight to the country at large.

Yours truly,

WALTER A. PALMER,
*Box 1, R. F. D. 3, Bangor, Me.*

———

FEBRUARY 9, 1929.

MY DEAR SENATOR: Just wish to commend you for your recent speech in the Senate concerning the United States flag. We are proud of "our Tom" and are with you and Alabama is for you. Clipping is from the Montgomery Advertiser—the dirtiest sheet in the United States.

Best wishes to you.

Yours truly,

G. W. LAWRENCE,
*493 Martha Street, Montgomery, Ala.*

Mr. HEFLIN. There is one more letter which I wish to have read in my time, which came to me from a retired naval officer.

The VICE PRESIDENT. Without objection, the letter will be read.

The Chief Clerk read as follows:

WASHINGTON, D. C., *February 9, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senate, Washington, D. C.*

MY DEAR SENATOR HEFLIN: Confirming our conversation, I have to say that I entered the Naval Academy in 1887. As late as that and a few years thereafter I do not believe it was the universal and traditional practice or requirement on board vessels of the Navy, during divine service, to partially lower the national flag and display the Navy church pennant above the national flag. The above may have been the custom on some vessels, but, also, it is my recollection that on some vessels this was not done, and during divine service on board the national flag remained at the peak or flagstaff and the church pennant was also conspicuously displayed. I think the present specific requirement was placed in the signal instructions in the nineties.

In my opinion, reverence for Almighty God does not require the partial lowering of the national colors and the placing of the church pennant above. Honor and respect on national anniversaries and other occasions of honor, respect, or reverence, require the national flag when displayed to be displayed with no other flag above it, and such display of the national flag is in itself a mark of honor and respect in such observance. It does not appear to me that any other display of the national flag would be an equal mark of honor or respect for the occasion or for the national flag.

By decision of the Supreme Court, the United States is a Christian Nation. I do not believe any nation—and I have visited many of them—worships God more truly or more devoutly than does the United States of America, but in order that we may know just what is required of us in order to show proper respect and reverence when we acknowledge God our Supreme Being in the Senate and House of Representatives—that is, during the invocation there—I might ask that an amendment be offered to some bill, and such an amendment should be germane to any bill, that the national flags flown above the Senate and House Chambers be partially lowered and that the church pennant be displayed above the national flags above referred to during such invocations.

The national colors on a man-of-war or anywhere else is an emblem of the state. Let church—the church, any church, and all churches—remain separate.

Very sincerely,

B. B. BIERER,
*Captain, United States Navy, Retired.*

Mr. HEFLIN. I ask unanimous consent to print in the RECORD, following the letters just read, other letters which I have on my desk. This batch contains a sample of a vast number of letters received from Alabama and other States. I will just print a few of them now.

The PRESIDING OFFICER (Mr. SACKETT in the chair). Without objection, it is so ordered.

The letters referred to are as follows:

528 EAST MAIN STREET,
*Schuylkill Haven, Pa.*

DEAR SIR: Kindly mail me a copy of your speech delivered in the Senate on February 6, 1929, on to prevent the flying of a chaplain's flag above the American emblem on battleships during church services at sea. Keep the good work going. We 100 per cent Americans like you at Washington. If you have a copy of the CONGRESSIONAL RECORD left for February 6, 1929, mail me one.

Yours truly,

RAYMOND C. ROEDER.

———

ATHENS, ALA., *February 9, 1929.*

Hon. THOMAS HEFLIN,
*Washington, D. C.*

MY DEAR SIR: Have read with pleasure in CONGRESSIONAL RECORD what you had to say in regard to the flag on our ships.

Mighty proud to know we have one man in the Senate who is not afraid of Rome. Keep the fight up. You have thousands of admirers.

I just wonder since the Pope has been restored to temporal power what will be the stand of those Senators who opposed you in regard to a foreign ruler's flag floating above the Stars and Stripes. In fact, how can that flag be there at all now since he is a civil ruler?

Very truly,

JOHN HAYES.

———

JOHNSON COUNTY KLAN No. 82, REALM OF INDIANA,
*Franklin, Ind., February 11, 1929.*

Hon. J. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SIR: Johnson County Klan No. 82, and the Woman's Klan No. 7, voted unanimously to send letters of indorsement and congratulations to you and the 10 men of the Senate for the stand to uphold our flag regulations, that no banner or emblem be placed above it.

We are wondering how our Indiana Senators happened to be off duty at that time and place.

Very respectfully,

COMMITTEE,
J. V. DEER, *Chairman.*

———

PORTLAND, OREG., *February 7, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senator from Alabama.*

DEAR MR. HEFLIN: I have noticed your wonderful efforts upon the floor of the United States Senate to have the papal rag placed below the American flag. God bless you; stay with this idea until you accomplish your undertaking.

Continue to take the hide off the "Pope's tools" and stretch it over the peninsula of Maryland where the gulls can roost on it.

I have my ear close to the ground in my own little environment and everything you say is O. K'd by all true Americans. Some sleepy "Protestants" haven't awoke as yet. * * * They are a hindrance to the great American cause.

Please hold to your great courage, stay right at the helm, and steer the old ship of state where she belongs. I am confident you are swamped with letters and telegrams of encouragement for your wonderful work. May I have a copy of your speech of the last two days on the floor of the Senate referring to the papal rag above the American flag on our Navy? Thanking you and wishing the best there is on this earth for good men like you, I beg to remain,

Very truly yours,

E. A. EASLEY,
*295 Montgomery Street, Corner Fifth.*

———

WAYCROSS, GA., *February 9, 1929.*

Hon. THOMAS J. HEFLIN,
*United States Senator, Washington, D. C.*

DEAR SIR: The members of Waycross (Ga.) Klan No. 78, in konklave assembled Thursday evening, February 7, 1929, extend to you a rising vote of thanks and appreciation for the fight you are making, and especially the speech you made Wednesday, February 7, before the Senate.

We have so few public men who are willing to fight Rome, and we want you to know that while you are making your fight we are with you and that we feel that it is going to take men of your courage and convictions to stay the hand of the Harlot of the Tiber in these United States of America.

May the God of Justice give you strength to "carry on" and help you to be prepared every time the monster raises its head to give such

argument as will convince and awaken our people from their slumber is our prayer for you and for those who are standing by your side.

WAYCROSS KLAN No. 78,
REALM OF THE INVISIBLE EMPIRE,
KNIGHTS OF THE KU-KLUX KLAN,
WAYCROSS, GA.

By C. M. PITTMAN, E. C.
W. O. LEA, *Kaligraph.*

WASHINGTON, D. C., *February 11, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senate, Washington, D. C.*

DEAR SENATOR: It was John C. Calhoun, I believe, who said:

"I know but one road to political success, my duty, and where that path leads me I shall follow though I go alone." He, in my humble opinion, was exactly right in this, as well as other things.

* * * I am, indeed, delighted to say a word in commendation of the stand you are now taking.

Do what you believe to be right, even though you "go alone."

With kindest regards, I remain

Yours fraternally,

HOWARD LLOYD, *Chevy Chase, D. C.*

MIDDLETOWN, DEL., *February 7, 1929.*

Senator THOMAS J. HEFLIN.

HONORABLE SIR: Thanks for your efforts to keep the papal flag where it belongs. A Protestant flag would put God at the head of our Nation, too. Neither should be above our national emblem, if we would keep church and state separate.

We will fight the fight to the bitter end.

Yours in unfailing bond,

G. HARRY DAVIDSON.

NEW YORK CITY, *February 7, 1929.*

Hon. THOMAS J. HEFLIN,
*United States Senate,*

DEAR SIR: I have read with much interest your speeches on the flag incident and trust that you will keep up your fight against the Senators who failed to support your amendment to the cruiser bill.

The news from Rome this morning should furnish you with material for further action on your part in defense of the flag.

Is the world coming back to a medieval status? I should not be surprised to see the inquisition revived in Italy during the "reign" of the dictator—Mussolini.

Yours sincerely,

EDWARD BARNES,
*61 West Eighty-seventh Street.*

NEW YORK, N. Y., *February 7, 1929.*

Senator HEFLIN,
*Washington, D. C.*

DEAR SENATOR HEFLIN: The truth was never so well, truthfully, and fearlessly spoken. May God bless you, and may you live forever in the hearts of true Americans.

Very truly yours,

W. D. RUSE,
*115 Washington Place.*

PROTESTANT LEGION OF AMERICA,
*North Attleboro, Mass., February 9, 1929.*

Mr. J. T. HEFLIN,
*United States Senator.*

DEAR SIR AND FOREMOST AMERICAN: I have followed your words of wisdom for a long time. * * * You have taken the right stand on the flag question, the Stars and Stripes above all others. I congratulate you on your noble stand for Americanism.

May God bless and keep you.

Truly yours,

JOHN M. SCHRICKER.

FAIRFIELD, ALA., *February 8, 1929.*

Hon. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SENATOR: We Americans who want America for Americans are proud of you and Senator BLACK.

Keep a bold front and work for your country and its people.

The foreign element has grown so strong in this country while its people have been tolerant until it has gotten to where they attack you whenever you try to pass any law that will benefit Americans.

It is getting to where an American can't get work around the big shops for the foreign element, and they are not all Catholics that are working against us.

Best wishes to you and all our true-blue American Senators.

Yours truly,

HARRY H. PHILLIPS,
*649 Maple Street.*

P. S.—You can always count on me for support.

FEBRUARY 9, 1929.

Senator THOMAS J. HEFLIN,
*Congress Hall, Washington, D. C.*

MY DEAR SENATOR: I thank God for a man like you in the Senate.

What is the trouble when Protestant Senators, elected by the Protestant votes, quake at the rustle of priestly robes and hasten to do their bidding? I sincerely hope that your prediction to the effect that they will be replaced in the Senate by loyal Protestant men will come true.

Those Protestant Senators who voted "nay" on your American flag amendment on Tuesday deserve the everlasting scorn of their constituents, who have every right to expect that their best interests will be protected within that august body.

Senator ————'s remarks on the subject were particularly obnoxious to me, and in view of which I wrote him a letter expressing my opinion of his stand in no uncertain terms, a copy of which I inclose herewith.

I am happy to take sides with you and can say "amen" to every statement you have made in your fight for the absolute supremacy of the American flag within our own domain.

Very respectfully,

ALLEN F. TITUS,
*Quartermaster Sergeant, United States Marine Corps,*
*1100 South Broad Street, Philadelphia, Pa.*

BENTON, ARK., *February 8, 1929.*

Hon. J. TOM HEFLIN,
*Washington, D. C.*

DEAR SIR: If not asking too much please send me copy of your bill to prohibit raising Italian flag above the Stars and Stripes in the Navy.

Wishing you much success in your noble fight for American principles, I am,

Very truly,

R. REID ADAMS.

JUNIOR ORDER UNITED AMERICAN MECHANICS,
PORTSMOUTH COUNCIL, No. 38,
*Portsmouth, Ohio, February 7, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senate, Washington, D. C.*

DEAR SIR AND BROTHER: Portsmouth Council, No. 38, of the Junior Order United American Mechanics, wishes to extend to you their most hearty congratulations and appreciation on your stand in behalf of the American flag. We feel that we have at least one 100 per cent American in the Senate that is not afraid to defend our flag when abused.

*   *   *   *   *   *   *

Wishing you the best of success, I beg to remain,

Yours fraternally,

G. W. CASEY,
*Box 144, Portsmouth, Ohio.*

ROX, PA., *February 7, 1929.*

Hon. J. THOMAS HEFLIN.

DEAR SIR: I am writing you these few lines to congratulate you on the way you spoke on the flag question in the Senate.

There need be no flag flying over the Stars and Stripes.

We know God is over all the Nation, for He made it, and we need no emblem to show it, and there are millions of others who think the same way.

God bless and keep you.

Yours very truly,

ARNOLD VAN FOSSEN,
*227 Lemonte Street, Rox, Philadelphia, Pa.*

WILKES-BARRE, PA., *February 7, 1929.*

To the Hon. SENATOR HEFLIN,
*Washington, D. C.*

MY DEAR SENATOR: I am one of thousands of ordinary citizens watching your fight regarding Old Glory and the Roman flag.

May God give you health and strength to finish the glorious task you have begun to a successful conclusion.

Thank God for real men like you, I remain,

Most respectfully yours,

J. G. SCHLOSSER, *Audubon, N. J.*

AUBURN, N. Y., *February 7, 1929.*

Hon. J. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SIR: Reading in the daily papers of your bill to prevent the hoisting of the chaplain's flag with the "Roman cross" above the Stars and Stripes, I wish to say the boys in Auburn are with you to a man.

Yours for America first,

E. M. FRIES,
*282 North Street.*

PITTSBURGH, PA., *February 6, 1929.*

Hon. J. THOMAS HEFLIN,
*Senate Building, Washington, D. C.*

DEAR SIR: I wish to congratulate you upon the introduction of your amendment to the cruiser bill, in reference to the papal flag being flown above Old Glory on our ships.

I think our American flag is sufficient to be flown during religious services as it stands for God, home, and native land.

I wish we had more such sturdy Protestant gentlemen as you in the United States Senate.

Yours,

MALVERN E. FUHS.

———

HOLDREGE, NEBR., *February 9, 1929.*

Hon. J. THOMAS HEFLIN,
*Senate Office Building, Washington, D. C.*

DEAR SENATOR: I have followed you on your flag amendment of last Tuesday and Wednesday, and wish to say that I am surprised at the number of Senators that voted against it. But I think you stated the facts to that body Wednesday in your remarks.

There are a great many people out here in Nebraska that are for you and your flag amendment.

•    •    •    •    •    •

Again I want to congratulate you on the fight you are putting up against political Romanism.

Very sincerely yours,

M. L. HAUSNER.

———

CLAREMONT, N. H., *February 12, 1929.*

Hon. J. THOMAS HEFLIN,
*Senate Office Building, Washington, D. C.*

DEAR SIR: Would it be possible for you to send me one or two copies of your addresses given before the Senate last week?

I have read with interest what the newspapers say you said and would like to know just what you did say. I have found that they don't always tell the whole story.

Thanking you, I remain, yours truly,

LEON E. NEVERS,
*40 West Terrace Street.*

———

SOMERVILLE, IND., *February 11, 1929.*

DEAR SENATOR: I just had to send you a few words of congratulations on your brave stand for America and the Protestant cause.

I was just reading a Catholic-owned newspaper's account of your amendment to the cruiser bill. These accounts, as you know, were just ridicule.

I don't think the good people of Indiana will soon forget how our own Senators stood on this.

I would like to have the names of the Senators who voted with you, as I have failed to find it in any paper.

If it is possible, I would be glad to get the CONGRESSIONAL RECORD for the time your amendment was in discussion. Just keep up the good work. You are the only one who has the nerve.

Yours for great success,

ROY GREEN, *Somerville, Ind.*

———

DETROIT, *February 6, 1929.*

Senator THOMAS HEFLIN, *of Alabama.*

DEAR SIR: I have noted your most recent encounter with Senator BRUCE, as reported in our papers, and I must say I greatly admire your stand. I would like to see many more Senators like yourself, and want you to know that I wish you the best of luck always.

Sincerely,

G. MONGOLD,
*8738 Crocuslawn Avenue.*

———

[Telegram]

ENSLEY, ALA., *February 8, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senate, Washington, D. C.:*

Ensley Council 27, Junior Order of United American Mechanics, congratulates you on your stand concerning our flag. Keep up the good work.

G. L. BARTON, *Secretary.*

———

COURTLAND, VA., *February 10, 1929.*

Senator HEFLIN, *of Alabama,*
*United States Senate, Washington, D. C.*

MY DEAR SENATOR: I can not refrain from sending you a few lines of congratulation on your stand in connection with the flag of the Catholic Church floating above the American flag.

Do not give up your fight. Millions of American citizens are with you, even though they may not be members of the Ku-Klux Klan.

I am well acquainted with the aims and purposes of the Roman Church, having spent my life in social and religious work among people coming from foreign lands to this country, bringing with them a bigoted adherence to a religion and civilization which is anything but American. I am of foreign extraction and have known intimately the workings of the Papal Church and what it has accomplished in Catholic countries.

We must fight that church in this country, and you are a man who dares to do it. Your followers will back you up in your effort.

Yours very truly,

B. K. BASHO.

———

[Telegram]

UPLAND, IND., *February 7, 1929.*

Senator HEFLIN:

Your speech all right. No flag should go above American flag.

Rev. S. E. POLOVINA.

———

MASONVILLE, N. J., *February 6, 1929.*

Hon. J. THOMAS HEFLIN,
*Senator from Alabama, Senate Building, Washington, D. C.*

DEAR SIR: Permit me, as a humble American citizen, the son of an American citizen, and the grandson of an American citizen, the latter having served the Stars and Stripes as a marine in the sixties, I having served my country to the best of my ability in the World War, to offer you a humble but sincere word of appreciation and encouragement in your endeavors to guard our great, united Nation from the influences of a foreign politico-religious organization.

Your great work, while bringing down upon your head the wrath of Rome, has been of undeterminable influence upon those Americans who through indifference and carelessness have not been as watchful as were our forefathers, who guarded closely the institutions which they founded by their sweat and blood.

We in New Jersey who are not aligned with the forces of alienism are in a hopeless minority, but we can applaud the representative of the great Commonwealth of Alabama for his courageous convictions and heroic actions while deploring and condemning the actions of the representatives of our own Commonwealth.

Therefore the grandson of a "Yankee" who bore arms in the sixties, and who himself bore arms in 1917 in common with the grandsons of Lee, extends to you, sir, the appreciation of an American who admires real courage, such as it takes to espouse the cause of real Americanism against the wiles and intrigues of such a master organization as the Romanist movement.

May you live long to continue such service, and may your voice ever be raised in opposition to anything not strictly 100 per cent American, and when the time shall have arrived whereby you will no longer be able to do so, may the sovereign State of Alabama raise up another of similar caliber, and may you find that peace, contentment, and happiness which always comes to him who has done his duty faithfully and well, and who is conscious of that fact.

It has been my pleasure to listen to addresses which you have made—once in the Senate and once or twice at gatherings of patriotic citizens—and I have been convinced that a man who fears not the wrath of either Rome or Tammany is the kind of man worthy of the confidence and esteem of all good citizens, and therefore we, the honest citizenry of New Jersey, feel that our sister Commonwealth of Alabama made no mistake in its choice of Senator, and wish we could say as much for our own State.

With the constant prayer that the Almighty will continue to be with you and that your efforts to free our Nation from Romanist intrigues will be unceasing, I am,

Sincerely and respectfully yours,

R. C. BOUGHER,
*P. O. Box 215, Maine Highway.*

———

INDIANAPOLIS, IND., *February 7, 1929.*

Hon. Senator HEFLIN,
*Washington, D. C.:*

I am writing you to let you know that I have appreciated beyond words the brave and gallant fight you made for the flag, Protestantism, and America; and while you were laughed at by some in the United States Senate, millions of patriots throughout the Nation lisped your name in prayer that same night. You will have their scalps hanging at your belt in less than one year from now. The American public is with you.

•    •    •    •    •    •

Rev. WILLIAM H. BRIGHTMIRE,
*Room 11, No. 7 North Alabama Street.*

———

PHILADELPHIA, PA., *February 7, 1929.*

Hon. Senator HEFLIN,

MY DEAR SIR: I read with interest your speech in the Senate protesting against the flying of a papal flag above the Stars and Stripes, and I want to write you these few lines expressing my appreciation and my admiration for your stand in this matter and for the 10 other gentlemen who stood with you. And should you put this issue up to the country through the States, I pledge you my support. I am only a hotel

worker, but would gladly do what I could to support such a cause that I consider of such vital interest to our country. I regret that there are not a great many more such men as yourself. * * *

Very sincerely yours,

JOSEPH M. HOPKINS,
*5727 Haverford Avenue.*

---

BENTON HARBOR, MICH., *January 11, 1929.*

Hon. Senator HEFLIN,
*Washington, D. C.*

MY DEAR MR. HEFLIN: I wish to thank you very kindly for your brave and noble work you are doing. I deeply regret and feel sorry for you when you are attacked so unjustly on the Senate floor.

Mr. HEFLIN, I certainly admire you for your brave stand and also the way you are able to defend yourself against men that ought to have more brains and character than they have shown. You show that you are capable of handling any situation that may arise on the Senate floor.

Remember, Mr. HEFLIN, all great leaders, especially men that have exposed Rome's plot, have always been fiercely attacked throughout the world's history, so naturally a great man like you makes no exceptions. Pay no attention and don't lose any sleep over what some tools of Rome may say. * * * I for one will follow your advice and start early enough before the next election of Senators and Representatives and do my part in throwing some of them out of office.

* * * Although thousands upon thousands of people are thankful for your noble work, I don't imagine there are many that think letting you know how thankful they are.

May good health and happiness be yours in years to come, and may you some day be richly rewarded for your Christian work in defending this Protestant Nation from the evil forces. May God be with you.

Very sincerely yours,

ONE OF THE MANY ADMIRERS YOU HAVE,
*Benton, Harbor.*

---

COL. THEODORE HYATT COUNCIL, NO. 573 O. OF I. A.,
*Chester, Pa., February 12, 1929.*

Senator J. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SIR: At a regular meeting of the above council held February 11, 1929, an article under date of February 7, pertaining to an address you made in the United States Senate, concerning the flying of flags above the American flag during religious services on board Navy vessels, was read and I, as secretary, was instructed to write you commending your stand and reminding you of your promise to introduce a bill forbidding the flying of "any flag" above the "American flag."

Again commending you on your stand, we, the brothers of above council, remain,

Yours sincerely,

JAY W. HONNOR, *727 Maple Terrace.*

---

BIRMINGHAM, ALA., *February 12, 1929.*

DEAR TOM: I attach hereto an editorial from the News dated February 11; also from Age-Herald dated February 12.

The News admits that you are right, so does the Age-Herald, although reluctantly.

May you never weaken.

W. T. AVERY,
*3408 North Thirteenth Avenue.*

---

OIL WELL SUPPLY CO.,
*Bradford, Pa., February 8, 1929.*

Hon. J. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SIR: Your recent fight for the American flag to be flown over all flags is to be commended.

In this country, where the state and church are separate, the flag of the state should always be at the top.

If the Catholics insist on flying a flag during their service, why not the following argument: Have a flag adopted by the Navy to be called a church flag, if there is none, and then when church is being held aboard ship have the flags flown, with the Stars and Stripes at the top; below that the church flag and below that the Catholic flag. That would indicate to anybody that it was an American ship holding church and that the services were Catholic. If there is a Protestant flag let that be put in the place of the Catholic flag when the service changes; and a Hebrew flag, if there be one, to be used in the same way if they hold Hebrew services aboard ship.

Hoping that you are successful in carrying this point some day, I am

Very sincerely yours,

R. A. SMITH,
*62 Pleasant Street, Bradford, Pa.*

---

FEBRUARY 7, 1929.

Hon. J. THOMAS HEFLIN,
*Washington, D. C.*

DEAR SENATOR: With great interest we have read excerpts in the press from your wonderful, courageous talk of yesterday. "More power to you."

Desiring to read the speech in full, I ask that you kindly have mailed to me the RECORD containing same.

Thanking you in advance,

Yours truly,

W. A. SCHMIDT,
*New Jersey State Hospital, Greystone Park, N. J.*

---

GREEN BAY, WIS., *February 6, 1929.*

Hon. Senator THOMAS HEFLIN,
*Washington, D. C.*

DEAR SIR: I am pleased to advise that myself and family have been following very closely your mighty efforts to curb the Roman Catholic Church in their efforts to gain control of our Federal Government. I am writing this letter to extend to you our sincere appreciation of your good work and hope you continue the fight. Wishing you success, I am,

Very respectfully yours,

C. D. BARBER.

---

DETROIT, MICH., *February 7, 1929.*

DEAR SIR: I just read in this morning's paper your brilliant speech of yesterday in the Senate, and I couldn't help writing to you and complimenting that masterpiece of oratory. It is a pleasure to know that at least one Senator has nerve enough to get up and speak what he thinks, one who can not be scared into saying one thing and wishing he could say another.

Now, Senator, is it true that that church is seeking to control the United States? * * * I know you are fighting an up-hill battle and standing almost alone. We admire a man who will battle to the last ditch for his convictions. Thanking you again, I remain,

Yours truly,

THOMAS J. VANDERVEN,
*1596 Hillger Avenue.*

---

Senator J. THOMAS HEFLIN,
*United States Senate Chamber, Washington, D. C.*

DEAR SENATOR: Smoke them out. Why should it be necessary to raise the flag question at all? What other church or organization prefers to force recognition by any such tactics? You seem to be equal to the whole Rome-controlled Senate. You and the people more than matched them in the November election, and so far I hear of no retreats and believe there will not be any. They are, of course, chafing with that overwhelming majority piled up on them, or against them. The Pope can issue his own currency and print his own stamps in Rome, but he can't put it over us without a fight. We lost one Tom who defied them, but, thanks, we have another and we are with him. I congratulate you.

Truly,

J. J. BRIDGES, *East Atlanta, Ga.*

---

DUBUQUE, IOWA, *February 11, 1929.*

Senator HEFLIN,
*Washington, D. C.*

DEAR SIR: I read with much interest recently your remarks in the Senate in which you objected to the flying of the church emblem above the United States flag during services at sea. You are reported to have attacked the Roman Catholic Church. I can understand the flying of a plain white flag representing God or religion in general over the American flag, but to fly the emblem of any particular church in that position is to place church above state.

May I express my admiration of your fighting qualities?

Respectfully,

H. A. BAUMHOVER,
*Ninth and Main, Dubuque, Iowa.*

---

NEWPORT NEWS, VA., *February 8, 1929.*

Mr. J. THOMAS HEFLIN.

DEAR FRIEND TOM: I owe you thanks of my life for the good stand you are making for the United States of America, and I am praying God will reward you in the sweet heaven by and by. I can not explain the good feeling I have for you, unless love for you.

*    *    *    *    *    *    *

Yours truly,

ALEX KEMP,
*114 Eighteenth Street, Newport News, Va.*

SORENTO, ILL., *February 7, 1929.*

Hon. J. THOMAS HEFLIN,
*United States Senate, Washington, D. C.*

HONORABLE SIR: We, the undersigned members of Kessinger Post, No. 713, American Legion, and ex-service men of past wars in which the United States has taken part * * * commend you for your stand in regard to the floating of other emblems over the Stars and Stripes as mentioned in your address before the Senate.

With all respect to and without prejudice toward any form of religion, and realizing that God is all supreme and should be placed above all else, let us not forget that His kingdom is spiritual while any country of the earth is earthly, and wherein the placing of an emblem, not of the Roman cross but of Christ, above the flag would be proper provided all works of the Army, Navy, and the entire United States were spiritual. However, since the United States is earthly then our flag, the Stars and Stripes, should ever wave above all else as the beloved emblem of our country.

We who have fought and those who have died that our country may stand supreme, have given of our lives the best we had that our flag may not ever suffer defeat; those of us making up the populace of the country who though not having served carry in our hearts that loyalty born in us for our country join hands with them.

Our country and its flag are the greatest of all earthly things, and so let us not desecrate our beloved flag or country by placing over it any emblem of any country, creed, religion, or faction; let us keep her clean, fearless, and true—the greatest of all countries and the most beloved flag of the universe.

We urge that your stand may be upheld and a bill passed that will forever keep the American flag floating above all emblems on all our ships, forts, buildings, and flagpoles of every description in use in this country. * * *

Yours sincerely,
R. E. Pierce, post commander, G. H. Sorthoff, L. V. Livesey, Charles F. Griffiths, Homer Garland, W. Earle Davis, James File, H. H. Harper, N. Cowen, Julia Pierce, Cora Grigg, Albert A. Reed, Edward A. Plappert, George J. Whiteworth, Aaron R. Steele, Irene Griffiths, Ruth Soalhoff, Mabel Johnson, Mary Kirchner, Elton Redding, N. Cowen, jr., E. W. Halford, D. E. McMeaken, Stacy Neal, Theodore Pope, W. W. Duncan, and J. D. Lindly, all of Sorento, Ill.

FEBRUARY 6, 1929.

Hon. J. THOMAS HEFLIN:
Senator, I congratulate you on your stand for introducing amendment to haul down the Pope's emblems from our ships. I would refuse to go to war in defense of our country flying anything above the Stars and Stripes.

* * * * * * *
Respectfully,
W. N. PEARS,
*1123 East Forty-third Street, Chicago, Ill.*

MARSHALL, ILL., *February 7, 1929.*

United States Senator HEFLIN.
DEAR SIR: I have been reading your speeches since last spring and I congratulate you on the fight you are making for the Stars and Stripes. If all the Protestant Senators and Congressmen had the nerve that you have we would have a better country. * * *
Sincerely yours,
H. K. LANDRELK.

EVERGREEN, ALA., *February 6, 1929.*

Hon. J. THOMAS HEFLIN,
*Washington, D. C.*
DEAR SIR: We thank you for your earnest effort to preserve the honor and dignity of our glorious flag. Your noble work is not in vain, although the measure received a small vote it did a wonderful work in smoking out the weak kneed. It will give the voters a better conception of their duty in the next election.

* * * * * * *
Yours faithfully,
F. M. WRIGHT.

HUTCHINSON, KANS., *February 6, 1929.*

Senator HEFLIN (Alabama),
*Washington, D. C.*
DEAR SENATOR: You are right. Stay with it. * * *

* * * * * * *
I am a Republican. But it makes no difference to me whether a man is Republican or Democrat, so as he "stands by" the traditions of the best country on earth, the first good government the world has ever seen. * * * I watch the careers of public men very carefully, and I want you to know how fully I indorse you as a man who stands up fearlessly for his country.
Very truly yours,
W. B. WAITS.

LIBERTYVILLE, ILL., *February 7, 1929.*

Hon. Senator J. THOMAS HEFLIN,
*Washington, D. C.*
HONORABLE SIR: I noticed with interest your proposal before the Senate of February 5 to forbid the flying of any flag or pennant above the Stars and Stripes, for which I commend you most highly.

If we had fewer weak-kneed Senators, this measure should and would prevail.

I am with you, and millions of true Americans feel just as I do. Keep up the good work.
Most truly yours,
THOMAS H. KERN.

NEW YORK, N. Y., *February 8, 1929.*

Senator HEFLIN,
*Washington, D. C.*
MY DEAR SENATOR: I want to congratulate you on your defense of the American flag. I do hope your bill will pass.

In the face of the making of history in the Italian Government, with its background of Catholicism and Fascism, we must be ever active and alert to the future in keeping America safe for Americans.

* * * * * * *
I am, very sincerely,
(Mrs.) CLARA T. HILLMAN,
*175 Claremont Avenue.*

NEW YORK, *February 6, 1929.*

Hon. J. THOMAS HEFLIN.
DEAR SENATOR: As an American citizen, a man of five generations or more, 67 years of age, a Republican most of the time, but voted for Wilson the first time he ran. And when you say no flag should be hoisted above the American flag on an American battleship, I say you are absolutely right. God was the instigator of our American flag and of this country. I look upon the American flag as God's flag, even when they hold religious service on a battleship.

You have done a wonderful work. A Christian work for the good of this great country.
Yours most respectfully,
EDWARD MARTIN.

P. S.—May God bless and take care of you. If I am classed as a "bigot" because I believe in our Constitution, I want to be classed that way. In the name of our Lord and Savior Jesus Christ, amen and amen.
EDWARD MARTIN,
*50 West Forty-seventh Street.*

NATIONAL MILITARY HOME, KANS.,
*February 7, 1929.*

To the Hon. TOM HEFLIN:
I congratulate you on the speech you made in the Senate the other day. Several of us old soldiers that are 100 per cent Americans were very much pleased, and we said we wished there were more Senators in the Senate who would come out and say what they think as you do.

* * * * * * *
We don't want the Pope to put his flag above Betsy Ross's United States flag on our ships.

Hoping that you will dig into the weak-kneed Senators, I remain, as ever,
Yours very truly,
JOSEPH F. SMITH,
*Box 874.*

WILSON, N. C., *February 7, 1929.*

Senator HEFLIN,
*United States Senator, Washington, D. C.*
DEAR SENATOR: I want to tell you that all of us down here are right with you in your fight against the Pope of Rome.

Carry on. Keep up the fight; you are right, and in the end right will prevail.

I don't know what would become of us if it wasn't for you and our own beloved Senator SIMMONS.
Very respectfully,
O. C. DAVIS,
*200 Court Street, Edenton, N. C.*

INDIANAPOLIS, *February 5, 1929.*

Hon. THOMAS HEFLIN,
*United States Senator, Washington, D. C.*
DEAR SENATOR: I see they have been giving you h—— again. Well, every knock is a boost. The red-blooded Americans who don't care a "rap" for the Pope are for you.

Perhaps you will not be appreciated rightly until after you are dead; such is life and history. This country needs a leader that will stand foursquare against this damnable Romanized propaganda that is con-

stantly being foisted on it, and the real fools are the weak-kneed Protestants who go about with their eyes shut.

Christ was a lot more unpopular than you, and his name lives, while most of his traducers are long since "dead, rotten, and forgotten." * * * The thinking patriots are back of you.

Fraternally,

OMER S. WHITEMAN,
110 West Thirtieth Street.

Hon. THOS. J. HEFLIN,
Washington, D. C.

CLINTON, S. C., February 6, 1929.

DEAR SIR: I must congratulate you on the fine stand you have taken as a good American citizen. May God in his wisdom lead and guide you for the good of mankind. Fight on—there are multitudes of patriots behind you.

I wish every Senator had the guts that you have to stand for what is right regardless of cost or consequences.

I have not nor will I swallow anything that has to do with that gang that has ruined the great old Democrat Party. * * *

Yours for God and country,

P. S. JEANES.

MISSOULA, MONT., February 7, 1929.

Senator TOM HEFLIN,
United States Senate, Washington, D. C.

DEAR MR. HEFLIN: I glory in your valor and in your battle against the dominance of Rome. We will battle on. * * *

The Pope's flag (Roman cross) has no right near Old Glory, either above or below.

Cordially yours,

FRED D. WHISLER,
Suite 27, Higgins Block.

BOYD COUNTY COMMISSIONERS,
Ashland, Ky., February 7, 1929.

Hon. Senator J. THOMAS HEFLIN,
Washington, D. C.

DEAR SENATOR: Just read in this morning Huntington, W. Va., paper, the Herald Despatch, your stand in regards to the flying of the so-called religious flag, the cross of Rome, over the beloved flag of our country. Let me congratulate you on your noble and patriotic stand. May you be kept in good health to keep up the good fight for our own United States. Nothing should be above the Stars and Stripes, except the blue canopy of heaven. I trust that you will be able to arouse the American people to the dangers that threaten us from Rome.

Respectfully yours,

WILLIAM H. CARP,
Commissioner Second District, Ashland, Boyd County, Ky.

WORMHOUDT LUMBER CO.,
Ottumwa, Iowa, February 7, 1929.

Senator HEFLIN, Washington, D. C.

DEAR MR. HEFLIN: I want to congratulate you for the fight you put up to keep the Roman Catholic flag from flying above our own beloved American flag. There are millions of red-blooded Americans that will back you to the limit. Keep up the fight and may God help you to keep our country free. How did the Senators from Iowa vote on your amendment?

One person said this morning that if Al Smith had been elected President he would have tried to lower the immigration bars and then he would want a person who had been in this country only six months to have the vote. I think a foreigner should live in the United States at least 15 years before he can become a citizen. Our own boys have to be 21.

I have been a member of the county Republican central committee for the past eight years, and while the Catholics howl about the Anti-Saloon League and Ku-Klux Klan, etc., I know that the Knights of Columbus are organized from township posting up, and we need men like yourself with the courage to stand for what is right, and keep them from putting their schemes over at Washington.

Congratulating and thanking you for your gallant fight for our country, I remain

Yours for a free America,

W. A. PARSONS,
1005 Chester Avenue.

LOGAN, W. VA., February 7, 1929.

Hon. J. THOMAS HEFLIN,
Washington, D. C.

DEAR SENATOR: Having followed with great interest your fight in the Senate against the using of the religious flag above the Stars and Stripes on our battleships, as it is reported in the press, I wish to offer at this time my sincere approval of your position in the matter and congratulate you and thank you for the courage and faithfulness you have shown.

* * * * * * *

I am sure that all real Democrats join with you in spirit in demanding that Raskob's alien influences must be divorced from the Democratic Party before we can expect the people of this Nation to ever support us again.

Again thanking you for your good work, and wishing you success in your war against alienism, and health and prosperity for years and years, I am,

Sincerely yours,

C. F. HALL,
Post-Office Box 1024.

BUFFALO, N. Y., February 7, 1929.

Hon. Senator J. THOMAS HEFLIN,
Senator from Alabama.

DEAR SIR: I have followed your work and speeches while you have been a Senator at Washington, and have come to the conclusion that you are one of the greatest Senators that has ever been in the Senate, and Alabama ought to be proud of you. And I guess they are because they have put you into office until 1931; and it gives me pleasure to write to you.

I am interested in the Senate and I am very much interested in the Government of these United States. This is the home of Americans, and I pray to God it will always be so.

I am 16 years old, Mr. HEFLIN, and am a loyal supporter of you. * * * I hope you continue to have success and happiness for the rest of your life.

An American, and a believer in American rights.

I remain,

FREDERICK G. ROOK,
125 Chenango Street, Buffalo, N. Y.

PHILADELPHIA, PA., February 6, 1929.

Hon. J. THOMAS HEFLIN,
Washington, D. C.

DEAR SIR: I wish to congratulate you on the introduction of the amendment to the cruiser bill which you offered on the floor of the Senate yesterday.

Thank you, we have some one in Washington that will stand by our flag and will fight for our American principles. Keep up the fight and you will find many thousands of real Americans backing you to the very last.

Cordially yours,

E. B. CLEMSON,
1227 North Allison Street.

FOUNTAIN INN, S. C., February 7, 1929.

Senator J. THOMAS HEFLIN,
Washington, D. C.:

DEAR MR. HEFLIN: As I took up the morning's paper I was attracted by your stand on the American flag. It is not every man who will stand up for his convictions. We have some who will stand for our American rights, and I feel that you are one of them. * * * Keep up the good fight. There are many who are backing you and will continue to back you. In my humble way I will do what I can in backing a man who has such ideals as yours.

Truly yours,

R. FURMAN CHILDRESS.

CORYDON, IND., February 9, 1929.

Hon. J. THOMAS HEFLIN,
United States Senate, Washington, D. C.

DEAR TOM: As an ex-service man, as a veteran of the World War, as a disabled soldier of the World War, I salute you. I have just read an article in the Birmingham (Ala.) Post that stirs me up.

If there is any man in this Nation who has a perfect right to express himself, then it is a veteran of the World War. You carry the great fight that you, have alone started on the floor. I firmly believe HUGO BLACK and many others are with you to a fighting finish.

* * * * * * *

With kindest personal regards, I am sincerely yours,

CHARLIE C. CROWE,
Kintner Building.

P. S.—TOM, don't slack up. Just let us boys back you up. Keep up the good fight.

BOSTON, MASS., February 7, 1929.

Hon. J. THOMAS HEFLIN,
Washington, D. C.

DEAR SIR: Am glad to see you on the "job" at Washington. There is no doubt but that some of those Senators who voted against your flag

amendment will receive the same dose that BRUCE, of Maryland, got last fall. * * *

Millions of Americans are with you in this battle for Americanism and will go the limit with you.

With regards to you and family, I am sincerely yours,

EDWIN L. MARSHALL.

———

ST. PAUL, IND., *February 11, 1929.*

Hon. J. THOMAS HEFLIN,
    *Washington, D. C.*

DEAR SIR: Referring to your amendment relative to a certain class carrying a chaplain's flag above "Old Glory." Those Senators who turned you down knew they were wrong. * * * They are afraid of the Roman boycott and don't realize that Americans are waking up and are going to demand, as George Washington said, "that only Americans be put on guard." If good old Alabama will only keep "Fighting Tom" in the Senate it won't be many years until all Senators will follow your American policy or some of them will be forgotten and real Americans will fill their seats. May God speed the day.

*        *        *        *        *        *        *

With best wishes,

BURLEY EVANS.

———

CRAFTON, PA., *February 7, 1929.*

Hon. THOMAS HEFLIN,
    *United States Senator, Washington, D. C.*

MY DEAR SIR: Let the newspapers and young TYDINGS say what they please, there are thousands of people in these United States of America who will applaud your sentiment that no flag should ever float above the Stars and Stripes. I have been much among patriotic societies in the last 25 years, and I know whereof I speak. What occasion is there for any kind of an emblem over a prayer meeting, except to flaunt a certain type of religion in the faces of other people. I was raised entirely among Protestants, but I am entirely willing that any man may practice this, that, or any other creed as he pleases. The Catholics are the only ones who wear their creed on their hat band, so as to be seen of men. After the hard slap they got last November one would think they would be a little more modest. But from the Catholic press I see that instead of reading the handwriting on the wall they attribute their defeat to "bigotry." Well, those of us who read history now and then may prefer to be bigoted rather than blind. Isn't Papa fighting just now to save a little of his prestige in Italy? Haven't the priests and nuns been scattered like sheep in Mexico? Isn't England seething with revolution? Wasn't England obliged to bar Roman Catholics from the succession? Have we forgotten Tetzel and Torquemada, Bruno and Galileo, the thumb-screw and the inquisition, the Huguenots and the Albigenses? TYDINGS talks of placing "God above our country." Our Constitution recognizes God, and the Stars and Stripes are its appropriate emblem. The Virgin Mary is not God and the flag they run up should be red and black, not white. This would be more truly emblematic of Pope, priest, religion, and more in accord with history. Let the Presbyterians, Methodists, or Baptist adopt some distinguishing emblem and float it above our own flag and every Catholic editor, priest, and bishop in the country would cut their lungs out.

More power to you and the nine who voted with you. You have the same stuff in you as the seven bishops who risked their lives rather than surrender their rights.

Very truly yours,

M. H. STEVENSON,
    *40 Maplewood Avenue.*

———

[From the Pittsburgh Press, February 6, 1929]

HEFLIN TAKES WORST LASHING OF LONG CAREER—BITTERLY FLAYED AS "FOOL," FINDS SELF SHOUTED DOWN AND OPPOSED, 68 TO 9

By Ray Tucker, Scripps-Howard staff writer

WASHINGTON, February 6.—Senator HEFLIN was smarting to-day under the worst tongue lashing and legislative licking he has suffered in all his 22 years in House and Senate.

During the stormy war years he was knocked over a House bench by raw-boned ex-Representative Pat Norton, of Minnesota. He was formally castigated in a committee report for insinuations that certain Senators were attending a gambling house where German bribe money was being slipped into their palms.

But not until young Senator TYDINGS, of Maryland, arose to defend Senator BRUCE, of the same State, against the Alabama Member and denounce his activities as designed to foment religious prejudices had HEFLIN ever heard himself called a "damn fool." Both HEFLIN and the Senate gasped at the Marylander's audacity, but there was no word of protest against the language as unparliamentary.

REPLY DROWNED OUT

When HEFLIN arose to reply to TYDINGS cries of "vote" drowned him out, and the ballot was taken so hurriedly as to silence him. Previously there had been an insistent demand that a roll call be taken on HEFLIN's proposal, apparently in order to dispose of it and him once and for all. The Heflin proposition consisted of an amendment

barring any flag or emblem from the same staff with the Stars and Stripes. HEFLIN has often characterized the emblem flown with the flag on naval vessels as "a Roman cardinal's colors."

With obvious anger in their voices 68 Senators—Republicans, Democrats, and Progressives—voted against HEFLIN. Only nine supported him. They were BLACK of Alabama, BROOKHART of Iowa, HALE of Maine, HARRIS of Georgia, MAYFIELD and SHEPPARD of Texas, SWANSON of Virginia, THOMAS of Oklahoma, and TRAMMELL of Florida.

REED of Pennsylvania interrupted TYDINGS to suggest that the people of every State agreed with those of Maryland in condemning the spirit alleged to be behind HEFLIN's amendment. BORAH of Idaho was another who demanded the opportunity to vote directly on the Heflin proposal.

BITTERLY FLAYED

But it was TYDINGS, a comparative newcomer, who administered the rebuke before crowded galleries.

"I am tired," he said, "of the so-called Christian element that would crucify their fellow men. It is the product of an ignorant mind, of a brain that has been hidden from the sunlight during all the years when mankind has been struggling upward. It is the same thing that was brought here a year ago by a Member of this body. It is the klansman's klan against God's klan.

"I recognize that under the rules and the Constitution every man has a right to make a damn fool of himself. For my part I hope we will always place our God before our country, and if that be unpatriotic let them make the most of it."

HEFLIN gripped the sides of his chair with both hands, but made no protest.

Mr. HEFLIN. Now I ask that the clerk may read in my time an article, which is not very long, from the New Leader entitled "The American Appeal." It is headed "Mussolini's American Intrigues—Fascist Terrorization Extends Its Sway to Citizens of the United States."

The PRESIDING OFFICER. Without objection, the clerk will read.

Mr. HEFLIN. I trust that all Senators will give close attention to the reading of this article in order that they may learn what foreign influences are at work in the United States that perhaps they did not know about.

The Chief Clerk read as follows:

[From the New Leader (the American Appeal), Saturday, February 16, 1929]

MUSSOLINI'S AMERICAN INTRIGUES—FASCIST TERRORIZATION EXTENDS ITS SWAY TO CITIZENS OF THE UNITED STATES

Italian Fascism extends to the United States and American citizens of Italian birth are regarded as the subjects of Mussolini. Fascist bands operate on American soil and terrorize Italians and Italian-Americans who fail to swear allegiance to Mussolini. Fascist dictatorship is taught and attempts to enforce it are made through the boycott, intimidation, and the use of physical force. Italian business houses, Italian banks, and Italian professional men are compelled to support Fascism or face ruin. The official organizer of Italian Fascism has traveled freely in the United States, instructing his Fascist bands in the technique of dictatorship.

Why this strange toleration of Fascism by Government officials? If Moscow were to openly send an organizer of the Communist International to this country he would not be admitted. Piero Parini, secretary-general of Mussolini's Fascist Organizations in Foreign Lands, has been in the United States for several weeks. A protest was filed with the Labor Department against his admission, but Parini continued his work without molestation. Having looked after his force squads, he sailed for Italy on February 8. Fascist dictatorship was strengthened by the toleration shown Parini by the officials at Washington.

While Parini was at work in this country his bands in New York City were doing an important job. There is one anti-Fascist daily in the world, Il Nuovo Mondo, published in this city. Mussolini has ordered its destruction. It has been raided by Fascist bands a number of times. On February 5 it was again raided, its machines damaged, and the plant crippled. Since its establishment several years ago this paper which has refused to bow to the brute who rules Italy has been the victim of raids, intimidation, boycott, and terror. Did Parini order this latest raid on Il Nuovo Mondo four days before he returned to his master? Who knows?

LINCOLN VERSUS MUSSOLINI

We have just been celebrating the birthday of Abraham Lincoln. Compare the Emancipator with Mussolini. * * * Compare Lincoln with Mussolini, organizer of massacres, director of the murder of Matteotti, assassin of Italian liberty, the paranoiac who sneers at democracy, who has destroyed popular elections, and who has transformed Italy into a slave state. One man the liberator and the other an enslaver. While we pay our tribute of affection to Lincoln, Mussolini's force squads do the work of Fascism in the heart of New York City.

Nor is this all. Italian Fascism openly demands the allegiance of Italian-Americans to the dictator of Italy. Italians in this country,

whether American citizens or not, are regarded as colonies of the Fascist Government. They must swear allegiance to Mussolini and to Fascism. An Italian in the United States may be enrolled as a Republican, a Democrat, or a Socialist, but this does not have any significance for Mussolini. The Italian-American is enrolled as a subject of the Fascist Government. Terror dogs his heels if he does not agree.

Here is an example of this amazing insolence. Mr. Santo Modica is secretary of the Italian hospital at 617 East Eighty-third Street, New York City. He is an American citizen and enrolled as a member of the Republican Party. He is the head of the New York section of the Sons of Italy and as such he refused to send a telegram of allegiance to Mussolini. For that act of "disloyalty" to the Italian dictators Fascists have threatened him with injury and have tried to drive him out of office.

FASCISTS THREATEN VIOLENCE

Il Grido della Stirpe is a Fascist organ published in this city. It supports the whole creed of Fascist dictatorship. It has waged war against Modica and its columns have been devoted to inciting violence against him. "Fascism has been too lenient and generous," declared this organ with reference to Modica. "We hoped that things would change without resorting to extreme measures."

Evidently the force squads of Mussolini regard themselves as an extension of the police department of Rome. Modica and other Italian-American citizens must obey this force agency of Mussolini or be prepared to accept "extreme measures." In all our history we have never had such brazen insolence. The next step of the force bands will be to insist that Italian-American citizens pay dues to the Fascists to show their allegiance to Mussolini.

No claim has been made that Modica is not an efficient official. His sole offense is "disloyalty" to the Italian dictator. All groups of Italians in this country, whether they have become citizens or not, are called "colonies." The Italian may be an American voter, he may be a good citizen and comply with every requirement of American citizenship and yet he lives in fear of his life if he does not agree with the castor-oil bandit who rules Italy. If this is to continue the State Department at Washington should at least make this extension of Fascist power to this country legal by treaty with Mussolini. Having done that the next thing in order is to prohibit celebration of Lincoln's birthday and make the castor-oil bandit our ideal of democracy.

LABOR OPPOSES FASCISM

Labor organizations in this country without any exception whatever are recorded against extension of this police, spy, and terror activities of Italian Fascism. The American Federation of Labor news service of February 9 points out that the "property of any Italian living abroad is seized in the event that he opposes the Fascist in his adopted country." Relatives of Italian-Americans who live in Italy are also victims of the terror if Fascism is opposed here. Such relatives in Italy are practically hostages who may be struck down or be imprisoned because of any "disloyalty" here.

The American Federation of Labor news service goes on to say:

"The Fascists use honeyed words in this country to conceal their philosophy. They assure Americans that their party is no different than the Democratic or Republican Party, when, in fact, the Fascist control Italy. They have seized the Italian Government, abolished free press, speech, and popular assemblage, made Parliament a puppet, and supplanted trade unions by Fascist labor organizations controlled by the state. No Italian can be a candidate for Parliament without the approval of the Fascist grand council."

Labor, the weekly publication of the railroad labor organizations, carries a story of the astonishing indifference of the Federal Government to the activities of Parini in the United States, and an Italian trade unionist, makes the following observations in its columns:

"Our Government must know what Mussolini's agents are doing in this country. The dictator takes the position that the Italian who becomes an American citizen still owes allegiance to Italy, or rather to Mussolini himself. He even insists that American-born children of Italian parents are Italians and not Americans.

"Fascist organizations in this country have only one object—to spread a propaganda which is hostile to our scheme of government.

"Secretary of State Kellogg would get terribly excited if the chief propaganda agent of Bolshevism were to attempt to get in, but he will not raise a finger to bar Parini, whose work seriously menaces the peace and happiness of Italians who are citizens of this country and love its institutions."

It is time that Congress made a thorough investigation of the activities of the Fascist bands in the United States. They have become a scandal and a disgrace. If Italian-Americans are to be terrorized for support of the democracy of Lincoln against the dictatorship of Mussolini it is time that we should have some official confirmation of this policy. We are inclined to think that an investigation will show that the trail of Fascist activities leads directly to the door of the Italian Ambassador. It is certain that no representative to a foreign government will be appointed by Mussolini who is not in full accord with the despotic creed of Fascism.

Fascism is reversion back to the sad days of absolutism. It prostitutes the whole intellectual life of a people to the will of murderous fanatics. It is a crime in Italy for the human mind to function. Italian journalism has become a brothel. Administration of justice simply legalizes Fascist lynching. Political parties have been destroyed by force. The club and castor-oil bottle have become the symbols of sovereignty. Labor organizations and cooperatives have been conscripted to the service of fanatics. Italian Fascism has become a monstrous Caliban that must be quarantined as we quarantine healthy communities against leprosy.

Congress owes a duty to the American people to investigate this hateful and unspeakable thing or admit that Italian-American citizens have no rights that are higher than the will of the bandit who rules Italy.

Mr. HEFLIN. Mr. President, to follow the article which has just been read, I ask to have read a short editorial from the Washington Post of Friday, February 15, 1929, entitled "Italy's Novel Experiment."

The PRESIDING OFFICER. Without objection, the clerk will read, as requested.

The Chief Clerk read as follows:

ITALY'S NOVEL EXPERIMENT

Interest in the pact between the Italian Government and the Vatican, which at first centered on the fact that the 60-year-old controversy had ended in establishment of an independent state for headquarters of the Roman Catholic Church, has now swung to the possible moral effect of the agreement on the Italian people.

\*     \*     \*     \*     \*     \*     \*

Strict censorship of motion pictures will be enforced; literature which is looked upon with disfavor from the Vatican will be suppressed, and the newspapers will have to be even more circumspect in the publication of sensational stories than they have been under Mussolini's censorship.

Dispatches indicate that Protestant, Greek Orthodox, and Jewish sects will be tolerated in Italy, but will no longer be able to carry on religious propaganda. This appears to be a renunciation of the principle of religious freedom which has gained a strong foothold throughout the civilized world. All nations will be interested in the experiment and its results. It remains to be seen whether a people can be forced into righteousness through legislation and curtailment of religious liberties under a dictatorial form of government.

Mr. HEFLIN. Mr. President, I have had these two important articles read for the purpose of giving some Senators who do not appear to be apprised of the insidious efforts that are being made by certain dangerous influences in America to overthrow this Government. I have had those two articles read for the purpose of getting them in the RECORD, so that they may go out into every State in the Union, where the people back home may be informed as to what is being done to the hurt and injury of this great Republic. I do that for the purpose that they may begin to write to their Senators who seem to be either asleep or deaf and dumb on this subject.

I saw some of them a few days ago vote against their flag being first and uppermost on its own staff. I saw them vote deliberately to lower it every time some one wants to fly the Roman cross above it. By a vote of 68 to 10 in the greatest deliberative body in the world certain Senators went on record to do that, while Catholic priests in the gallery smiled their hearty approval.

Mr. President, that was a sad day to me, for a great many of these Senators are good men, and I believe, in the main, are good Americans; but it is a fact that we have got a lot of men in public life who are afraid of the political influence of the Catholic machine in the United States, and we have got to meet that question; and the sooner we do it openly and determinedly the better it will be for all who really love our country.

Every Catholic reporter in the press gallery has attacked me most viciously since my speech the other day in behalf of the American flag. I showed here on a former occasion testimony to the effect that Catholic newspaper reporters had been instructed to "go after HEFLIN," and they are still carrying out their Catholic instructions.

They and other Catholic agencies are still carrying on their false and vicious propaganda against me. They have marked me for political slaughter, and they have threatened to number me. I receive insulting and threatening letters from them now, written by unprincipled persons who are too cowardly to sign their names to them. They have resolved and they have badly boasted that they are going to pick out a candidate to oppose me for the Senate in Alabama in 1930. I welcome the opportunity to discuss before the people of Alabama the issues that threaten free Government in America. I am willing to go to the mat with whoever they select and fight it out with him.

Mr. President, I feel that it is the duty of every Senator to tell the Senate and the country of anything and everything that concerns the welfare of this country. I repeat what I said here the other day: I do not object to the Catholic having the religion of his choice. But I do object to the secret and insidious activities of the Roman Catholic political machine. That political machine is the vehicle used by Roman Catholic leaders to carry forward into governmental affairs the Roman Catholic purpose to bring this Government under Catholic control. That that church has its program already laid out to capture America, no discerning man doubts, and that their plan is to control at an early day the United States, no informed citizen can doubt for a moment.

But you have a situation in the United States, and right here at this Capitol, that is alarming and dangerous. When a measure comes up affecting the Catholic political program Senators and Members of the House are besieged. And somehow or other they always have somebody in this body to speak for them.

A few days ago, when I raised the question here of permitting the United States flag to remain on its own hoist, majestically alone, proudly flying at the top of the staff, when I said there was no excuse for lowering it to fly anybody's pennant or banner above it, the Senator from Maryland [Mr. BRUCE] rose in this body and asked me what flag is now permitted to fly above it? "Oh," I said, "I am not discussing any particular flag. I do not want any flag or banner to fly above it." The Senator said, "Is it not a fact that the Catholic flag is the only one that flies above it?" I said, "That is the only one that I have seen fly above it." I exhibited a picture here of the battleship *Florida* that showed that to be the case, and, following that disclosure, you voted to continue that practice.

The issue is plain and you can not dodge it, Senators. I respect you all and am fond of many of you, personally, but this American issue must be met. We can not afford to be asleep any longer. The American people must be aroused to a full sense of the danger that threatens.

It is now admitted that the cross that flies above our flag is the cross of St. George, and he was a Roman Catholic. It is admitted even by some of these Catholic pen pushers in the press gallery that it is a Latin cross. The churches of the United States have never agreed upon any particular pennant to fly above the United States flag on our battleships during religious services, and yet when Protestants and Jews aboard our ships have service now, under your vote the other day, they have to pull down the American flag and fly the Roman cross.

Senators, the day is not far distant when you are not going to be afraid to look a Roman Catholic in the face and tell him that you are against his plan and purpose to Catholicize America and place this Government under Catholic rule.

I told you a year ago what was going to happen in Italy. Perhaps some of you do not remember it. I will remind you of what I said then. I told you that Mussolini was a crook. I told you that he was an unscrupulous scoundrel, and that he was playing into the Roman Catholic Pope's hands, and that he would deliver that Government to him before he was through; and now he has done it. I told you that the Rome newspaper reports to the effect that Mussolini and the Pope were not on good terms was all a hoax. I told you that that was the impression they wanted to make until the day of delivery should come; and now, since Italy has been beaten to her knees and all her independent, fighting, patriotic forces are prone upon the ground and her free speech and free press and right of public assembly have been destroyed, and Masons have been butchered like hogs in the market place, and the grand master of that order put in prison, Mussolini, like a thief in the night, slips over and delivers the Government of Dante and Garibaldi into the control of the Roman Catholic Pope, who is now a king, a Roman Catholic king, extending his canon law all over the Government of Italy; and now the Roman press over there tells us that Mussolini and the Pope have been good friends ever since Mussolini took control of Italy.

It is plain and simple now; everybody can understand it. Now, what have we right here in the United States? We have this dangerous, tyrannical dictator of the Italian Government, with his agents in the United States operating and terrorizing the people in various places, and particularly in Chicago; his Fascist bands are holding up the people there; and I bid Godspeed to the able Senator from Illinois [Mr. DENEEN], who is leading the fight against the bandits and the outlaws in Chicago.

Senators, did you know that the Fascist organization in the United States had their national convention a few months ago at Philadelphia and wired their compliments and congratulations to Mussolini and expressed to him their allegiance—citizens of the United States? Did you get the full meaning of that article read from the desk about an Italian-American—a Republican, too, if you please—who refused to send a telegram of allegiance to Mussolini, and Mussolini had ordered his newspaper plant in New York destroyed; that Fascists, Mussolini's followers in the United States, had gone there and attacked him in person two or three times; they had injured his printing press, and they have sworn that he shall be driven out of business?

Senators, wake up—you Senators who are sitting around here sound asleep on this question. You may not be willing to consider it here; but, thank God, you are soon going into an open forum where you will have to consider it. The people out yonder are coming to know about these dangerous, un-American activities and they are going to demand that you wake up.

I have received probably 2,000 letters—maybe 3,000—from men and women all over this country since this flag issue was up in the Senate a few days ago.

I have eliminated the references to Senators in letters from their States; but you may get an idea how the people back home feel about this from the parts of the letters that I have printed this morning, just a few out of the thousands of letters I have received from 26 or 27 States of this Union. I will print some of the letters from the other States later. I am not attacking the individual Catholic. Let the Catholic have his religion. God knows I would not deprive him of it. I want him to be permitted to approach the throne of grace as he pleases to do it. If it suits him to confess to a priest, let him do it; but, Mr. President, I want to tell you that the history of Roman Catholic rule all over this world is the history of intolerance, persecution, bloodshed, and murder.

Look what happened the other day in Mexico! Obregon—one of the strongest men Mexico has ever produced; upstanding, brave, fearless—he and his friend Calles gave stability to that country, brought it out of darkness and chaos and put it upon its feet, and delivered Mexican peons out of the bondage of Roman Catholic slavery. Four hundred years of Catholic rule had benighted and enslaved them. They were groping ignorantly and helplessly in the dark gloom of Catholic rule, and Calles and Obregon stretched forth the healing rod and gave that land deliverance. Still the country is cursed with Catholic intrigue and murder. The Catholic Church leaders, the priests, and nuns are seeking to overthrow the present constitutional Government in Mexico; and how are they going about it? When Obregon was elected President recently they sent a cowardly cur, a Mexican Roman Catholic, to the dining room where Obregon was taking his meal, and they had the Catholic assassin feign as an artist who was pleading for an opportunity to exhibit pictures to President Obregon; and Obregon, the brave, big-hearted man that he was, wanting to encourage the boy in his work as an artist, said, "Yes; I will be glad to look at his pictures and help him along."

He comes around with his pictures and with that deadly weapon laid away, draws it, and shoots Obregon to death at the table where he was eating his meal. While he was shooting him Catholic band players were playing the band so loud that some of the people in the dining room never heard the shots. When that cowardly and miserable wretch, scum of the earth and vagabond, was cornered by Mexican officers of the law, he confessed that a Catholic nun and a Catholic priest inspired that dastardly deed; and finally, when they got him ready to march him out and shoot him, as they should have shot him, against the wall, the Catholics paraded him in the newspaper columns as a martyr, and the Catholic-controlled press of Mexico City deliberately tried to use the incident as propaganda to stir up opposition to the Mexican Government. Why, they described him as marching forth calmly, when the fact is that he was scared to death when he heard the noise of the mob outside. They had him saying to the barber, "Come, go over my face again; it is still a little rough," just like he was some great spirit; that is what they would have us think he was. He did not care. They would have us believe he was calm and serene—drunk on the whisky they had given him, perhaps! Why, even that part of the report said he drank half a pint of cognac brandy. He could not tell whether there were any whiskers left on his face or not after that. But, Mr. President, after he was shot, sent down to death for murdering the President of the Mexican Republic, the Catholic press played up a Roman Catholic priest going in to the dead assassin with his handkerchief and dipping it into his blood to preserve it as a sacred relic, a memento of a martyred Catholic! Think of it! It is all shocking and sickening.

Senators, this Nation is in for trouble with that same unscrupulous and ambitious power; and the United States, this

young giant of the western world, is the world's hope to preserve religious liberty. America, in her determination to preserve civil and religious liberty, fears no foreign pope or potentate. America is not afraid of the Catholic assassin, although three of them have killed three American Presidents.

If ever such a thing occurs again in our country there must be a house cleaning in the high places of those who bring it about.

Just recently, when President-elect Hoover was visiting in this God-loving and God-fearing country, down in the sunny land of Florida, amongst as fine people as live, represented by two as fine Senators as ever sat in this body, Senator FLETCHER and Senator TRAMMELL, two Italian Catholics saw him, and one of them said, "I don't like the looks of that guy; let's throw a bomb under him," and talked about assassinating a President as they would talk about killing a housefly. Is it not time that we were taking stock of the un-American groups in our country? In the name of Washington and Jefferson and Lincoln and Lee, what are we coming to in the United States? Let us say to the Catholic, "You will not be disturbed in your religious worship. Nobody has any desire to disturb you in that regard. But we are not going to permit you to teach to Catholic children in the United States the union of church and state and we are not going to permit you to strike down religious freedom and set up the Catholic state in the United States."

The Roman Catholic political machine can not deceive true Americans by displaying a religious banner and harping on religious intolerance, while underneath its cloak it has a deadly dirk for religious freedom for all American denominations that do not accept a Roman Catholic Italian Pope as God's exclusive representative on earth. Go read the History of Civilization, by Buckle, and you will find he tells that when Spain reached the climax and crowning glory of her civilization she was pulled down and destroyed by Roman Catholic priests. Go read Gibbons' Decline and Fall of Rome and you will find that the fall of Rome was helped and hastened by the doings and the teachings of Roman Catholic priests. Yet some of you seem to be sound asleep. When this question was broached the other day two or three veteran Senators rose up and trembling said they would have to vote against the flag because somebody had injected the Catholic religious issue.

Senators, how long, how long will it take us who are here to defend and safeguard the rights and interests of this Republic to wake up to the dangers that threaten it? Roger Williams, the heroic leader of religious freedom in the early days in the United States, a Baptist, was set aside the other day to give place to some Catholic in Baltimore, and the Senator from Rhode Island, Mr. GERRY, permitted it to be done. He did not defend him.

I want to know if you are going to follow the voice of the dead or the voice of the living. The main ones of those who championed that movement the other day to continue to fly the Roman cross—the Pope's cross—above the American flag were two Senators who had been defeated. They are going out. And you who sit here supposed to represent your people, misrepresented them on that day, as my letters indicate. It would open your eyes to read some of my letters, and some of them are so strong regarding some of you that I will not publish them, but the people are talking about what they are going to do regarding you when they get you before the electorate again.

Mr. President, the Senator from Maryland injected the religious question when my flag amendment was before the Senate. Many Senators have said to me since, "You did not inject the religious question; Senator BRUCE did it." I said, "Of course he did." But, as I said the other day, that was the signal. Word had already been passed around. These priests had not been sitting around here so thick for nothing, poking out their necks and peeking about in this body. My amendment had been printed for a week; they knew it was going to be offered at the proper time at the end of the bill. When that time came I was utterly surprised; I have never been so astounded in my life that an American Senate would stand up and order, by their vote, that our flag be pulled down, to fly above it the Roman cross—the Catholic king's cross.

After I finished my speech here you went on record in a way that you will wish to God you never had gone; I am telling you now, and you see if I am not right; the people will not permit that kind of subserviency to the Roman Catholic political power in the United States; and that is what it is. It is not religious power; it is political power. It is a double-headed thing. One part calls itself religion and the other is a bold and brazen political serpent; and some of you are as afraid of it as you are of death.

I have had Senators talk to me, and Members, too, at times—and this has been going on some time—about having Catholics in their districts at home; and that they would punish a fellow

and vote against him if he did or did not do certain things. That is all true; they will. But I want the Americans who read my speech and who get what I am saying here to-day to learn—I pray to God they may—and whenever the Catholics threaten a Protestant Senator and tell them they will beat him if he does not do the bidding of the Roman Catholics, I want them to rise up and say, "We American Protestants and Jews, American Italians and other Americans, will punish you for raising that question and trying to control this country." That is what is going to happen, and you are going to hear from it. My letters indicate that very strongly every day.

I ask that the clerk read the letter which I send to the desk. I have stricken the name and the address of the person writing it from the letter.

The PRESIDING OFFICER (Mr. PHIPPS in the chair). Without objection, the clerk will read.

The Chief Clerk read as follows:

FEBRUARY 11, 1929.

Senator THOMAS HEFLIN,
    *United States Senate, Washington, D. C.*

DEAR SENATOR: I am now in business and no longer in newspaper work, so that I can speak frankly. * * * and I wish to say that I am sure you express in the Senate what a great many Protestants think. There are more men behind you than you dream of * * * and yours is the voice thousands—millions—welcome.

There is one point I wish to present. Do you realize that the tremendous demonstrations at the execution of Obregon's murderer in Mexico was fostered by the Catholics? Did you read the Associated Press account of where the priest dipped his handkerchief in the murderer's blood? This is propaganda pure and simple, and it follows naturally that the Catholics promoted and (or) incited the attempt on President Gil's life in the bombing of his train.

Isn't it strange, too, that the treaty giving the Pope temporal power and including the church "canons" in the civil law of Italy should come after our own presidential campaign? No! This merely is part of the Catholic set-up. You can see this and I can see this. You are in touch, doubtless, with influential Protestants. Please, for the cause you so admiringly represent and which affects millions of true Protestants in this country, do something to counteract this Roman propaganda. Millions are looking to you to speak their minds. Don't fail in this immediate emergency.

Yours sincerely,

———————

Mr. HEFLIN. Mr. President, I omitted publishing the name of that splendid former newspaper man because of what I feared would happen to him. He is a northern man.

Mr. President, a year ago I received a letter from a man in Massachusetts commending my course, and it was printed in the RECORD. As soon as the CONGRESSIONAL RECORD could reach that place a newspaper man came to my office and wanted to see the original of that letter. My secretary told me about it, and I told him not to let him see it. I said, "The Roman Catholics are after making trouble for that man." This man was in business, and the Catholics were threatening to boycott him, and the man signed a statement to them that he had not written me a letter, but that somebody had written it and signed his name to it.

Senators, in the name of God, what are we coming to in these United States? A Protestant or Jew can not write a Senator who is seeking to have the Constitution of the United States observed and the flag upheld without having Roman Catholics pouncing on him and seeking to punish him for doing what he has a right to do as an American citizen. That man was in business, and they were going to punish him because he wrote me that letter; and when he signed a statement saying he had not written it, they sent that newspaper man back to my office to see the other letter and compare the signatures, and I would not let him see it. They wanted to punish him and make an example of him in the community and intimidate other Americans into silence.

Think of it! And, as I have said before, this is the land where Washington led his Continental Army—barefooted, half clad, and half fed—over the frozen ground at Valley Forge, fighting for American liberty. This is the land where southern men and northern men died on the battle fields in order to fix and determine for all time the status of constitutional government in the United States. And some of their sons, a pampered race of men, seem to have dwindled down until half the men in public life to-day at the Capitol act as if they have no American courage at all. Many of them stand in fear and trembling before a Roman Catholic priest, and they shudder in their shoes when threatened with the opposition of the Roman Catholic political machine.

Senators, did you get the point made in the letter just read? Why did they not crown the Pope King last fall when Alfred

Smith, the Pope's annointed, was running for President of the United States? They said, "Oh, no; if you pull that thing off now, you will help defeat Smith." God knows they did not need any help to defeat Smith. Six and a half million majority, with six million and a half Democrats, voting against him. He polled but 3,000,000 Democratic votes in the South and West, North and East.

These six or seven million Catholic votes he got are not real Democrats and will not be cast for the Democratic ticket if anything is said by anybody on the ticket which the Catholic leaders do not like. That is plain talk, but you know it is the plain truth, and the time has come to talk the plain truth.

What did we say here in the debate last year, or, rather, what did I say? You did not take any part. I am going to relate to you again a startling thing in the life of our Nation, and not one of you over there commented on it. I presented a case where three hundred and odd Catholics, American citizens, in the State of Rhode Island, who had been robbed by a Catholic bishop and a Catholic priest; that is what they said had happened to them. They had collected hundreds of thousands of dollars from Roman Catholics generally up there, and 300 of them had the courage to march into open court in Rhode Island and demand that that bishop and priest be brought in for an accounting. They were brought in. The case was started, the trial commenced, and then there was a postponement, a court adjournment; and what has happened in the meantime? While that case was pending, under the Stars and Stripes, in a sovereign State of the United States of America, that Catholic bishop and that Catholic priest took those 300 names and went to Rome with them and tried those men in their absence before a college of cardinals, a Catholic Church court, condemned them, repudiated them, and excommunicated them, and, so far as they could, consigned their souls to hell.

What happened? One of them was the editor of a paper in Rhode Island, Degnault, and in that decree rendered by a foreign potentate, while the case was pending in the United States, where American citizens had a right to have the case tried and settled, they said that that American citizen's paper must not be published another day, and ordered Catholics not to support it. All this in the face of our constitutional provision which says that no citizen can be deprived of his property without due process of law. I brought that to your attention, and not one of you commented on it.

Again, I say, what are we coming to in the capital of this Republic? Here were American citizens induced by a bishop and priest of their church to bow down and give them money, and then when it was not spent for the purposes they said they wanted it for, these men wanted to go into an American court of justice, and the Catholic bishop and priest took the case out of court, as it were, and carried it over to Rome and tried it in a foreign country, condemned those citizens, insulted our flag, challenged our sovereignty, and you have not discussed it yet in this body.

What is it that causes that situation to exist here? Put none but Americans on guard! will again become a slogan in the United States. You are going to hear more of that from now on until this question is settled.

I know what they think they can do. They think they can fool many of you and continue to deceive you and deceive the folks at home until they get strong enough to do to you what Mussolini did to Italy the other day. What did that Post editorial say? It said that in Italy Protestants will not be allowed to carry on their religious propaganda. Do you know what that means?

Religious liberty in Italy lies dead at the feet of Mussolini, the cowardly dictator. The Greek Orthodox Church can not carry on as of yore. The Jewish people can not do it. And yet all of those non-Catholic religious groups are taxed to pay the salaries of the Roman Catholic priests of Italy.

The concordat itself provides that non-Catholic churches can not carry on their religious propaganda. Do Senators know what that means? It means that they can not invite a man or woman to join their church. They can not praise their church and what it stands for and the good it has done and is doing. They can creep in and crouch in their churches—that is, those who are already members—under leave or permit of the Catholic Pope, and they can whisper their petitions to God; but they can not tell anybody about it and try to get them to join their church or they will be lashed with the whip of Catholic persecution in the hands of the tyrant Mussolini.

Senators, last year I read to you from a book printed recently in the United States by Doctor Ryan. He is an appointee of the Catholic Pope and king right here. He is the Catholic king's dean of the Catholic University here in Washington. He wrote this book called "State and Church," and in it he said

that when the Catholic Church is strong enough here to do it they are going to proscribe other denominations. Some of the language used is just like the language used in the Pope's recent concordat. He said, "We will proscribe other denominations. We will not permit them to carry on the general propaganda. We will set up the Catholic state." Then he asks, "What chance would they have against the Catholic state?"

Mr. President, what chance have the Protestants and the Greek Orthodox people and the Jews against the Catholic state with Mussolini standing over their prone bodies with a tyrant's dirk in his hand? We are told by an appointee of the Pope—Doctor Ryan, a Catholic priest—that that is what they will do here when they get strong enough. Now you can begin to understand why they did not pull off this tyranny last fall.

It would have hurt Mr. Alfred Smith's chances. The American people would have been brought face to face with the truth, and they would have been frightened. They would have said: "Look what happened in Italy. They are going to do that to us when they get strong enough to do it." And I feel it my duty to tell you that when they are strong enough they will do it; but they are not going to be strong enough to do such a thing in the United States. The Congress has got to legislate on certain questions, and I am in favor of a law that will expel from the Government of the United States every Fascist who is shown to have expressed his allegiance to Mussolini and his régime in Italy.

Mr. President, America has got to be kept safe for Americans. Mr. Hoover is going to have a great opportunity to serve and preserve American ideals and institutions, and he is going to meet some trying and difficult problems. If he deals frankly, wisely, and courageously with this threatening and dangerous Roman Catholic political question, he will in all probability be reelected in 1932. But if he dallies and plays with it, the issue in 1932 will not be a political question submitted by two political parties, but it will be the question of Roman Catholic control of the Government of the United States. Mr. President, I am hoping that Mr. Hoover will not be deceived, misled, or controlled by that insidious and dangerous influence in the United States.

Mr. President, that is all I care to say to-day.

Mr. BROOKHART and Mr. BINGHAM addressed the Chair.

The PRESIDING OFFICER (Mr. FESS in the chair). The Senator from Iowa.

Mr. BINGHAM. Will the Senator from Iowa yield to me for about five minutes?

Mr. BROOKHART. It will take me just about five minutes, when I myself will be through.

The PRESIDING OFFICER. The Senator from Iowa will proceed.

### FEDERAL OFFICES IN GEORGIA

Mr. BROOKHART. Mr. President, I desire especially to call the attention of the Senator from Georgia [Mr. GEORGE] to the investigation of post-office patronage in some of the Southern States. He was the author of the resolution under which the subcommittee of which I am chairman have been acting. We have found some things that fully warranted the investigation in several of the States. As we have proceeded with the investigation from time to time, incidentally we have touched upon Federal patronage generally. There seems to be quite as bad a condition there with reference to post offices. This morning, from the State of Texas, a strong suggestion came to the committee to investigate Federal patronage generally. Of course the committee has no authority to do so, as the resolution was passed, but the Senator from Georgia had an original resolution that would have been broad enough before it was amended. I wanted to ask him if there would be any move made to enlarge the authority in that regard?

Mr. GEORGE. Mr. President, if the Senator will yield to me——

Mr. BROOKHART. Certainly.

Mr. GEORGE. The resolution to which the Senator has referred was introduced in the name of my colleague and myself jointly. At the time of the introduction of the resolution it directed inquiry into the distribution of Federal patronage generally and the use of money to influence appointment to Federal office generally. The resolution was confined to the State of Georgia; that is, it directed the inquiry to be made in that State. The suggestion was made that if the investigation were confined to an inquiry into the appointment of postmasters and carriers there would be no opposition offered. I accepted the suggestion and agreed to the resolution as reported out by the Committee on Post Offices and Post Roads for the reason that postal appointments in the State of Georgia were the ones in which we were primarily interested, and contented myself

with an investigation of postal appointments about which I had reliable information. On the floor of the Senate the resolution was amended so as to extend the inquiry into all States; that is to say, it was so amended as not to confine or limit the investigation to the State of Georgia.

I have kept as closely in touch with the committee's investigation as possible. The Senator from Iowa has now stated to the Senate that in the investigation thus far made the committee is constantly developing the use of money or at least developing evidence which would tend to show that the same practices have gone on with reference to Federal patronage generally as I originally said was the case and as my colleague and I knew to be the case in Georgia in postal appointments.

I have no information outside of the evidence the committee has developed touching other offices, but I shall be glad to amend the resolution and ask that the investigation be extended to the use of money and exactions made of appointees to Federal office generally.

Mr. WALSH of Massachusetts. Mr. President——

The PRESIDING OFFICER. Does the Senator from Iowa yield to the Senator from Massachusetts?

Mr. BROOKHART. I yield.

Mr. WALSH of Massachusetts. I think the Committee to Audit and Control the Contingent Expenses of the Senate reported this morning a resolution extending the time of the present committee to make the investigation to which the Senator refers.

Mr. GEORGE. I understand so, but the committee is confined under the resolution to inquiries into postal appointments.

Mr. WALSH of Massachusetts. So I understand.

Mr. GEORGE. The chairman of the subcommittee [Mr. BROOKHART] has called the attention to the fact that in their investigation they have discovered evidence tending to show that the same practices and condition exist in other instances outside the scope of the committee's authority. I shall be pleased to reintroduce the resolution making it broad enough to cover the whole field, but I must say that the resolution as originally introduced was based upon facts or what we believed to be the facts in postal matters particularly. The splendid service of the committee thus far rendered justifies the grant of the additional power suggested.

### THE AMERICAN FLAG

Mr. BINGHAM. Mr. President, when the Senator from Iowa [Mr. BROOKHART] declined to yield to me a few moments ago I felt a little annoyance that there was no opportunity to reply immediately to the long address of my very good friend, the distinguished Senator from Alabama [Mr. HEFLIN]. But in view of the colloquy which has just ensued between the Senator from Iowa [Mr. BROOKHART], the Senator from Georgia [Mr. GEORGE], and the Senator from Massachusetts [Mr. WALSH], I do not know but that it was a very fortunate thing that the Senator from Iowa did not yield to me. Now, those who read the RECORD may see that the effect of this long tirade against those who believe in a religion different from that of my friend from Alabama was not to arouse the Senate to anything more than a consideration of post-office matters and was not taken seriously.

Mr. President, the people of the United States who read the RECORD are sometimes at a loss to know why, when a long argument has been presented with great vehemence on a certain matter, there is no reply to it. Many of them are led to believe that it is because there is no reply, and they are confirmed in their belief that what has been said is unanswerable.

Mr. President, I rose to say that in the first place I have the very kindliest feeling personally for the Senator from Alabama. As a citizen and as a Member of the Senate I am very fond of him. But I regret extremely to see him led astray, as he was this morning, by a misinterpretation of a simple act that has been performed in the Navy out of respect to Almighty God for a great many years and without the slightest regard for any particular branch of the Christian religion or any denomination.

The Senator from Alabama by continually repeating it has come to believe sincerely that the church pennant used for nearly 100 years in the Navy is the Roman Catholic flag. That is not the case any more than that any other pennant in the Navy, which may resemble a foreign flag in its color or its arrangement, is a foreign flag. The church pennant is a pennant raised by the Navy to show that there is on board that ship a service of divine worship, which may be Protestant or Catholic. It is a Navy flag and not a church flag.

It is not a Roman Catholic flag. It is for that reason that so large a majority of the Senators the other day voted against the wishes of the Senator from Alabama as an indication of their belief that he was mistaken. No one in the Senate would vote to put the pennant or flag of any particular denomination above the American flag. The Senate expressed its belief at that time that there was nothing derogatory in the slightest degree to our love of our country by doing as we have done for a great many years and acknowledging, by placing the church pennant above the flag, that we were at that moment engaged in worshiping the Supreme Being.

Mr. President, the Senator from Alabama has accused some of us of cowardice because we have not hitherto spoken on this matter and I am not sure but what personally, so far as I myself am concerned, he is right. Repeatedly, when listening to his arguments, which are intended to stir up religious bigotry in this country——

Mr. HEFLIN. I deny that.

Mr. BINGHAM. I am glad to hear the Senator say that.

Mr. HEFLIN. I denounce it as incorrect, inaccurate, and untrue.

Mr. BINGHAM. Very well, Mr. President, I withdraw it. Instead of saying "intended to stir up religious bigotry," I will say arguments which do stir up religious bigotry. I did not intend to use the phrase which I did use in the sense in which he took it, and I apologize to the Senator for implying that he intended to do that. I ask his pardon.

The fact remains, Mr. President, however, that speeches of that kind do stir up the feeling of people who are not familiar with all the circumstances; they arouse those passions in the human breast which from time immemorial have led to bloody conflicts, produced the most disgraceful pages in human history, and led to a misunderstanding of the nature of man and of his religion.

Mr. President, I am a Protestant; I come of a long line of Protestants; so far as I know, none of my ancestors since the Reformation has been anything but a Protestant. There are no members of my family who are not Protestants. Furthermore, I am a Mason. The Senator from Alabama has frequently referred to the Masonic order. I believe in that order, and I believe that it has accomplished a great deal of good. As a Protestant, as a Mason, Mr. President, and as a Senator of the United States, I wish to protest against the use of this forum for the stirring up of religious hatred in this country; and I wish to adjure those not within the sound of my voice but who read the pages of the CONGRESSIONAL RECORD, and who have been influenced by the speeches of the Senator from Alabama, to believe that the great majority on the floor of this Senate, as I know from personal conversation, are not in accord with the sentiments expressed by the Senator from Alabama, and do not believe that he should use this floor for the purposes for which he has just used it.

Mr. HEFLIN. Mr. President, I challenge the Senator from Connecticut to meet me in joint debate in the auditorium in this city sometime during the month of March. We will then discuss the question of the propriety of the discussions of the kind that I have made here—the matter of calling to the attention of the Senate and the country the dangers that threaten American liberty, the dangers that threaten religious freedom in the United States, and the question of denying to any State through its Senators the right to bring to this forum any question that affects the welfare, the highest and best interests of the American people. I challenge the Senator from Connecticut to meet me in debate on that subject. We will control the matter of seating the audience, and at the conclusion of our speeches we well let the audience decide whether or not an American Senator is still permitted to discuss anything in the Senate of the United States that is offensive to the Roman Catholic hierarchy, the political machine of the Roman Catholic Church.

I challenge the Senator from Connecticut to answer my speech here. He has not answered my speech; he has not even started to answer it. He has proved what I said throughout my speech, that there is always somebody to get up and defend that side. When they have not got a Roman Catholic to do it, they get some Protestant to do it. There are some mighty weak-kneed Protestants around this country, and there are some mighty weak-kneed Masons.

We have another evil under the sun. I told Senators a moment ago about how they treated American citizens in Rhode Island. They took them out of an American courthouse and carried them to Rome and tried them in their absence. They did not take them, but they took their names in their absence and tried them before a foreign potentate. They punished them, they took them away from an American court, and came right back here during Al Smith's campaign when people were circulating what purported to be the oath of the Knights of Columbus, submitted in a contested election in the House of Representatives. I was a Member of that body in 1913 when it was printed in the CONGRESSIONAL RECORD. People were circulating it and stating where it came from; but busy Catholic politicians prosecuted them and took them before Catholic judges in the

United States who inflicted punishment on them for circulating that oath. So they are playing both ends against the middle; they are taking our citizens over to Rome to try them when the church wants it done, and when they have got a case that the church can not reach, they bring it into the American courts and make our courts carry out the edict of the political machine of the Catholic Church. What is that done for? That is done to scare anybody to death when Al Smith runs again and keep them from circulating that oath.

An American judge—think of it—convicting a man on the statement of three Masons—and I myself am a thirty-second degree Mason and a Shriner—convicting a man on a statement of three Masons—poor, pitiful fellows—who said they had examined the books of the Knights of Columbus and that oath was not their oath. Think of that! On that evidence American citizens who are Protestants are convicted and put in the penitentiary or lodged in jail because they circulated something they got out of the CONGRESSIONAL RECORD, and which was submitted in an election contest in the State of Pennsylvania.

Mr. President, what the Senator from Connecticut has stated is a forerunner of what will happen when more men whom the Catholics can control get into this body. He has voiced the sentiments of a few who, somehow, consciously or unconsciously, are under that influence. The Senator may not know it, but his Masonry does not shine very clearly here to-day. I am not invoking it. It is a lofty order. George Washington was a Master Mason. The members of his staff were Masons. Many of those who followed him in the Continental Army were Masons. He laid the corner stone of this Capitol as a Mason. I have had the trowel in my hand which he used; I have sat in the chair that he occupied as worshipful master; I have seen his Masonic jewel, God bless it, and I have reveled in all the things they stood for who were Masons. The thing I talked about to you to-day was the killing of Masons in Italy, and the Senator from Connecticut comes to the rescue. One hundred and thirty-seven Masons were murdered in one night by Mussolini's Fascisti mob. The grand master of the Italian Masons is in prison now. Masonry is dead in Italy; that is, they will not permit them to assemble and have their meetings. Think of that, Senators of the United States!

The Senator from Connecticut suggests that he is tired of my using this forum to give our people warning of what is to come here. What has happened in Italy? What has happened in Mexico? What is now happening in Spain? They are persecuting Masons in Spain to-day; they have some of the most prominent Masons in Spain behind prison bars, and, before God, with their hands lifted up, they say they do not know why they are in prison. And the Senator from Connecticut invokes his Masonry to deliver a lecture to me. I spurn that kind of Masonry. That sort of Masonry—

Mr. BINGHAM. Mr. President, I think I have sat still about long enough listening to the Senator charging me with invoking Masonry against him and accusing me of not defending this, that, and the other. I have listened to the Senator very patiently now for a long time. I did not accuse him of doing anything except using this floor for the purpose of making a speech that would inspire religious hatreds.

Mr. HEFLIN. The Senator said he was getting tired of what I was doing in my right as a Senator from my State, and I resent it. I have a right to say what I want to say, if I do not transgress the rules and am responsible to my people, and I am. I thought the Senator would be sorry that he went as far as he did.

Mr. BINGHAM. Mr. President, I am not sorry at all; but I regret that the Senator insists on making misstatements, let me say while the Senator is so kind as to suffer an interruption in his speech.

Mr. HEFLIN. I suffer it.

Mr. BINGHAM. Mr. President, we all have suffered this morning.

Mr. HEFLIN. We are going to suffer more—some of us.

Mr. BINGHAM. The Senator has implied, in the first place, that somebody asked me to do this. In that he is incorrect, because I have stood it as long as I could stand it and spoke of my own volition. I speak as an American whose family have lived here since the beginning of the settlement of America, since the earliest days of the arrival of the Pilgrims. My people have believed in religious liberty and in freedom to other religions and to worship God unhampered and unashamed in public. I trust the Senator will desist from his effort to stir up further bad feeling among those who do not understand this situation, but who may think because the Senator is not answered more often by other Senators that they agree with what he has to say.

Mr. HEFLIN. The Senator says that nobody has spoken to him, and I accept his statement; but that makes his case worse,

because if nobody has spoken to him he has done this of his own accord, and I am disappointed in him.

Mr. BINGHAM. Mr. President, it does not take four or five thousand letters to induce me to make a speech. If I believe there is anything going on that is wrong, I stand it as long as I can, and then, at the risk of bringing down the wrath of my friend the Senator from Alabama on my head I say what I have to say in a few words. I say again that I feel it is wrong to use this forum to stir up religious hatred.

Mr. HEFLIN. Mr. President, I am not doing that; if I know my own heart such a thing is foreign to my purpose. I have no desire to do that. I am calling attention to a question that vitally affects all loyal Americans, a question which the Senator from Connecticut will have to meet in his own State, and every Senator in this body will have to meet in the future, and the best interest of the country demands that they should meet it. I am responsible for what I am saying. I am doing my duty as I see it, and I have no apology to make to anybody.

The Senator's lecture amounts to this: That hereafter when I want to make a speech I must submit it to him or to some of those who influence him, so that they may tell me whether or not it is appropriate or permissible to say it. We know that is the parliamentary system and practice in vogue in Italy. A man can not even run for office in Italy without getting Mussolini's O. K.

No member of Parliament there can rise and speak against Mussolini and his beastly and inhuman program. If he antagonizes Mussolini, he loses his head.

Now, here comes an effort to destroy free speech in the United States Senate. I challenge the Senator from Connecticut to put it to an issue in the Senate as to whether it is improper to discuss the political activities of the Roman Catholic hierarchy or church in the United States Senate when they do things detrimental to religious liberty—the liberty of the citizen and the welfare of the American Republic. I am willing for the Senator to put it to a test, and I will have a roll call and let every Senator who wants to vote to kill free speech in this body at the behest of the Roman Catholics go on record.

I challenge the Senator from Connecticut to answer that article which I had read from the New Leader of New York about Fascist activities in the United States.

I challenge him to answer that editorial from the Washington Post which says that in Italy now the Protestants can not carry on general religious propaganda, nor can the Jews and the Orthodox Greeks. I challenge him to answer my statement about what occurred in a sister State to his State, namely, Rhode Island, where 300 American citizens, Catholics, if you please, are lashed by the political power of the Roman Catholic Church, and in doing it they assaulted and repudiated the American flag. Have I got to desist and refrain from telling these truths here? You can not get a big national newspaper to publish them. Mr. President, did you not hear that letter read from that former newspaper reporter? He said, "I am no longer in the newspaper business, and I can speak frankly."

My God! What a pitiful thing is the hampering of an able and courageous newspaper man! Some of them are fearless and honest and clean and will not be controlled. Many of them are absolutely controlled. They shape their creed to their cravings and swallow their American convictions for Roman dollars. This man said, "I am now free, and I can speak my mind "; and he is appealing to me to bring this matter to the attention of patriotic Protestants in America, and I am doing it, and bringing it to the attention of patriotic Jews and Italians. And now the Senator from Connecticut rises and says he is getting weary of these discussions that involve the political activities of Roman Catholics, which activities, I think, are harmful to the United States.

Mr. President, I brought to the attention of the Senate last year a periodical mailed to every Senator here. It was written by a Catholic priest, in which he told these Senators how the Roman Catholics suppressed a free press right here in this Capital City.

When a white girl in a Catholic Good Shepherd Home was killed and a local newspaper demanded an investigation, this priest boasted in that article that they organized the Catholics of Washington to destroy the paper; that they sent a message to every news stand in the city that if they handled that paper any more they would boycott everything they sold. They boasted that they sent their Catholic agents to merchants in Washington—Protestants and Jews and everybody—and told them that if they advertised in that paper they would punish them by not trading with them. Finally they wound up by saying, " In three weeks' time we had reduced the subscribers 40 per cent, and the newspaper's representative came to us and told us if we would let up they would never publish anything else that was ob-

jectionable to the Catholics." Think of that, if you please. There is your free press killed in the capital that George Washington founded, where Thomas Jefferson lived and announced his philosophy of political and religious freedom that will live until time shall fold his weary wings and lay his scepter down—that is, if we have men who are not afraid to speak, who can be permitted to speak without being censured and lectured as the Senator from Connecticut has undertaken to do with me here to-day.

How will that read in the CONGRESSIONAL RECORD? Why, the people back home will say, "Instead of trying to scold and lecture Senator HEFLIN you should take his speech up line by line, subject by subject, and answer him if you can"; and that is what I challenge him to do. I challenge any other Senator here who takes issue with me to do it. You accomplish nothing by trying to lecture me, and in telling me that I am stirring up religious prejudice. That does not get you anywhere.

Why, this forum is about the only place now left where we can discuss this and all other questions. You have not heard a speech made on this subject in the House. You have not seen a vigorous attack made on these efforts to destroy America in a single daily newspaper except the Fellowship Forum and the New Age, the Protestant, the Menace, the Rail-splitter, and such papers as those, that are not afraid. You do not see it.

I told you about that priest's article, where he boasted how they had practically destroyed that paper in Washington, when the manager of the paper apologized. So they frighten the papers to death; and now, if you fix it so that a Senator can not bring these things to the attention of the Senate, it will be only a little while until they can do with this Government what Mussolini did the other day with the Italian Government when he betrayed it into the hands of the political machine that has wrecked every government where it has had controlling power.

Mr. President, I invite the Senator from Connecticut to read the pages of history. Read the brief history of the Popes of all time. Read how they have intrigued to overthrow one king and put in another king, how they have become the political masters, how the people have risen up and overthrown them, how bloodshed and murder have followed, how the people's rule has been destroyed, how governments have gone down under their blighting, deadening touch; and here in this great, free western world, America—the greatest Government of all the tide of time, a Government that ought to stand for all time as a light upon the mountain, that other governments might see its good works and be constrained to follow in its footsteps—some are getting up and daring to suggest in this Chamber that free speech be suppressed; that a man be put upon the speech of a Senator who makes a suggestion that is not approved by the Roman Catholic priests who sit in yonder gallery.

Mr. President, I welcome that challenge from this Republican Senator from New England [Mr. BINGHAM]. If he wants to put that question to the test, let him do it; and we will take it to the country next year in the election of every Republican and Democratic Senator who goes out before the people and asks to have his commission renewed. Free speech throttled in the Senate? Nobody but puny political weaklings suggest such things. They are people who can not stand up against the truth; who can not stand up in the fierce light of history. They must flee and run to cover. Some are like the lightning bug that flashes its little lantern in the night time, and, when the sun rises in the morning folds its wings and crawls into a dark place under a piece of bark on a dark and decaying log. Come out in the open and discuss this question with me! I will discuss this question with the Senator in the Auditorium here in Washington in the month of March, and we will let the people here decide whether we will suppress free speech in this body on this subject.

O, Mr. President, if the suggestion to suppress free speech here is not enough to arouse every American patriot, what would it take to do it—when they can not even answer the ponderous facts that are set out in that New York paper, the New Leader, and the statement in the Washington Post, and the facts revealed in those letters, one of them from a retired naval officer, and get up and say, "Mr. President, I am getting tired of having these matters discussed here. They are liable to stir up religious feeling." You ought to put an apron and a bonnet on such a fellow and make him queen of the festival. [Laughter.]

Why, you would not even hear such a feeble suggestion like that coming from a women's sewing circle. The women are with me in this fight. Thank God, they are doing good service. Men and women throughout the country may suffer for a time the affliction of having men here who are afraid to speak for them, but it is not long until they can change that situation.

Mr. President, the Senator suggests that this is not the Roman cross. I assert that it is. Why, even this little pudding-headed, mush-mouth Japan representative, Frederic William Willensky, known now as Frederick William Wile, admits that it is the Latin cross. I do not know who told that muttonhead about it, but he admits that it is the Latin cross; and others writing to me say that it is the cross of St. George, and he was a Catholic, of course. I said that all of our churches had never agreed on any particular pennant; but that was not the question. The question was whether you would even fly that pennant somewhere else instead of over the American flag, and you chose to fly it over the flag, instead of letting the same pennant be flown at another place when religious services were being held. You can not get away from this issue; and I challenge you to meet me in debate on it. Come out in the open, and bare your breast, and fight like a man! If I am wrong, answer me at the judgment bar of this body, and at the judgment bar of the American people. Do not stand up and whine like a child and say, "I wish he would quit and let this question alone. I have been here a long time." Yes; some of you have been here too long and much longer than you are going to be here. [Laughter.]

Mr. President, I had a conversation with a retired naval officer. I said, "How did this custom start anyhow?" He said, "They used to fly a pennant alongside the flag; sometimes they flew it under the flag," and his recollection was that three Roman Catholic chaplains suggested flying it above the flag, and there it is, and there is where you voted the other day to keep it.

No wonder you are getting tired of it! You are like the negro in my State who was being tried before old Judge Carmichael. The judge was winding up the docket on Friday afternoon, so that he could go home on the late afternoon train. He thought he had sentenced all of those that had been convicted. Turning the docket leaves, he looked down there and saw a little negro humped up, and he said, "Yes, yes, yes"—the old judge talked in a rather positive but peculiar way—he said, "Yes, yes, yes; stand up there! What have you got to say why the sentence of the law should not be pronounced on you?" He said, "Nothing, judge, except I ain't been convicted of nothing yit." "Oh, yes; that's right," the judge said; "the jury is out on your case now." He said, "Well, Sam, you and I might dispose of this thing while we are here all alone. What would you like to do?" Sam said, "Jest betwixt us, Judge, I would like to drap it right where it is." [Laughter.]

And that is what the Senator from Connecticut would like to do. Drop it where it is, when Mussolini's agents are working like bees through the United States to-day; while his Fascist leaders here are wiring him allegiance and congratulations on his betrayal of the Italian Government. But I am told we must not discuss these things in the Senate, because somebody—that means some Roman Catholic—will be offended. Away with that talk! Let us talk about anything and everything here that concerns the safety and well-being of this Republic. If anything is said here that is not true, if any argument is made here that is not sound, let somebody, for truth's sake, have the courage to stand up and try to answer it, and not dodge and evade by trying to deliver a lecture to the man who made the speech. Let the American people who read this RECORD pass judgment on the question. We are their servants, and this is their Government.

Mr. WALSH of Massachusetts subsequently said: Mr. President, I request, without comment but for the purpose of having the truth known on the subject, to have printed in the RECORD following the debate of this morning an interview given to Mrs. George F. Richards, one of the most reliable members of the Senate press gallery, by Chief Chaplain Dickins, of the Navy, explaining the use and custom of displaying the chaplain's flag during religious service.

The PRESIDING OFFICER. Is there objection?

There being no objection, the article was ordered to be printed in the RECORD, as follows:

NAVY WORSHIP FLAG DEFINED—CHIEF CHAPLAIN, DENYING PENNANT IS SYMBOL OF SECT, POINTS OUT PRACTICAL PURPOSE SERVED—GIVES INFORMATION TO OTHER VESSELS

(Special dispatch to the Gazette)

WASHINGTON, February 8.—The Navy Department made clear the status of the church flag used on United States ships during the holding of a religious service on board. Chief Chaplain Dickins, of the Navy, said:

"The church pennant of the Navy is not the pennant of any church or denomination. It is absolutely nonsectarian and undenominational. It flies only during divine service and indicates to near-by ships and other vessels that religious worship is being conducted on board and

that all persons should conduct themselves accordingly, to the end that the service may not be interrupted.

"Thus it serves a practical purpose. It flies on a separate halyard from the American flag, which is lowered about 2 feet from the top of the staff. At the end of the service the church pennant is drawn down.

"The same church pennant of white with a blue Latin cross is flown during all religious services, whether the clergyman conducting the service is a priest of the Roman Catholic Church, a Presbyterian minister, or a rabbi. That it is entirely nonsectarian is proved by the fact that the Corps of Army Chaplains is composed of members of every one of the recognized major religious denominations. At present the corps comprises 80 members, of whom 11 are Roman Catholics, 18 Presbyterians, 15 Methodists, 10 Episcopalians, 2 Congregationalists, 2 Lutherans, 4 Disciples of Christ, 2 Christians, 1 Reform, and 3 rabbis. All conduct services under the same flag according to their own church customs.

"All first-class battleships and some cruisers carry chaplains, and they are also stationed at all foreign stations, where they use the same flag and carry out the forms of worship of their own church.

"The claim that the Navy church pennant is the symbol of any specific denomination is absolutely without foundation."

RICHARDS.

Mr. HAWES subsequently said: Mr. President, we have had some more discussion this morning of the flag. For my own information, and to secure the proper historical background of the pennant which has been used in the Navy for so many years, I communicated with the chief of chaplains of the Navy, Capt. C. H. Dickins, who has served the Navy in that capacity for over 20 years. I ask that his letter to me be inserted in the body of the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

NAVY DEPARTMENT,
BUREAU OF NAVIGATION,
Washington, D. C., February 11, 1929.

MY DEAR SENATOR: In response to your telephone message asking for as specific information as possible relative to the church pennant used in the United States Navy, I am herein sending you all the definite information I have been able to secure after two years of research.

The United States Navy church pennant, the meaning of which, and origin, and its use, which seems to have been the subject of so much discussion for and against, is a white triangular field charged with a blue Latin cross (this is not a Roman cross). Its length is three times that of its perpendicular height. The blue cross in length is one-third the length of the pennant, and the total width of the cross one-half of this length. The ordinary pennant is 6 feet in length and 2 feet in width; therefore, the blue cross would be 2 feet in length and 1 foot in width.

According to the Navy Code and Signal Book, this pennant "is to be hoisted at the peak or flagstaff at the time of commencing, and kept hoisted during the continuance of divine service on board vessels of the Navy." This cross is not, nor has it ever been, the distinct copyrighted property of any denomination, but has been used for many centuries by the great Christian family throughout the world. The oriental or Greek cross used by the Eastern Orthodox Church differs from the Latin cross in that the arms and staff are of equal length, and is known to us in America in this form as the Red Cross, which, of course, was copied from the cross used by Switzerland.

After careful research, I am of the opinion that the church pennant used in the United States Navy was copied somewhat from the church flag in the British Navy. The British church pennant in use to-day differs from the American church pennant in the following particulars: It is triangular in shape, similar to ours. In the first third of the pennant is placed the cross of St. George, and the other two-thirds of the pennant is broken up into three horizontal bars of red, white, and blue. During divine service on board a British man-of-war this church pennant is run up alongside the Union Jack at the stern of the ship or is flown from the peak, in practice somewhat similar to our own, with the exception that the Union Jack of the British Navy is not lowered.

The tradition regarding the use of the church pennant carries us back to the organization of the Navy. I have been unable to discover any instructions, regulations, or references relative to the church pennant prior to 1836. In 1836 the church pennant is mentioned as one of the articles making up a ship's allowance list, and this is again mentioned in 1844. From that time on there is practically no reference to the church pennant up till 1868, when in the Code and Signal Manual of the Navy it definitely states what evidently had been the practice of the Navy for many years prior to that, i. e., that "the church pennant shall be flown above the national ensign during divine service."

One of the earliest definite references in regard to the display of the church pennant is that found in an order issued by Admiral Farragut, as follows:

UNITED STATES FLAGSHIP HARTFORD,
Off the City of New Orleans, April 26, 1862.

Eleven o'clock this morning is the hour appointed for all officers and crews of the fleet to return thanks to Almighty God for His great goodness and mercy in permitting us to pass through the events of the last two days with so little loss of life and blood.

At that hour the church pennant will be hoisted on every vessel of the fleet and their crews assembled will, in humiliation and prayer, make their final acknowledgment therefor to the Great Dispenser of all human events.

D. G. FARRAGUT,
Flag Officer, Western Gulf Blockading Squadron.

This certainly establishes the use of the church pennant without any question back to that date, but the fact that the pennant was a part of the ship's allowance of every vessel in the fleet and that its use was so commonly known, indicates that the custom is not a new one. In a French book of flags, published in 1850, we find among the cuts of flags of the United States the church pennant exactly as we have it to-day.

Desirable as it might be, were we to attempt to trace the origin of the many customs which color our life of to-day, that attempt would end in mystery. So general have they been—even though far-reaching in their effect—no one has thought it necessary in the past to carefully set down the reason or origin of these customs. So it is with the use of the church pennant in the Navy. In the pioneer days of our Navy, much as we probably disliked and distrusted our mother country, we did incorporate many of her naval customs in our naval service, too numerous to mention in this communication, but one of them undoubtedly was the use of the church pennant, and its use has been so much a matter of common knowledge as not to need statement of origin.

Before 1836, when we find the first mention of the church pennant, I doubt if there were many regulations of any kind in the service; consequently it should not be considered strange that explicit instructions have not been written in our naval logs relative to the church pennant and its use, for the same point might be raised regarding many other happenings or customs in the Navy. It should be considered sufficient to establish the fact that the use of the church pennant in the Navy is of very early origin in our service, due to the fact that it was well known as far back as 1836, and again was spoken of by Admiral Farragut, showing its position of importance in connection with divine service in the Navy.

When a United States naval vessel is at sea, in company with other vessels of the fleet, or at anchor in port, on Sunday morning, church call is usually sounded at 10 o'clock, and immediately the Stars and Stripes are lowered just sufficiently to permit the church pennant to be run to the peak over it, and there it remains until the completion of divine service when it is run down and the Stars and Stripes are again run to the peak of the flagstaff as before. This is the only service in connection with which the church pennant is hoisted. When a funeral occurs on board the church pennant is not used. The Stars and Stripes are half-masted and remain so during the service and until the body has left the ship or has been buried at sea, when the colors are then run to the peak. If a United States vessel is operating alone at sea and not in sight of other vessels, neither the United States colors or the church pennant are hoisted. The service is simply carried on without these outward evidences.

To quiet the misunderstandings and misconstructions being placed upon this church pennant by overzealous, though perhaps seriously minded, members of Protestant Christianity, it may be interesting to note that this pennant had long been in use in the United States Navy by Protestant chaplains prior to the appointment of the first Roman Catholic chaplain in 1888. This chaplain was the Rev. Charles H. Parks. He was the first Roman Catholic chaplain to be appointed in the United States Navy, and it is my belief that for over 80 years prior to this appointment our treasured church pennant had been in use in the Navy. It may also be interesting to note in connection with this that the first chaplain regularly commissioned in the United States Navy was the Rev. William Balch, a Congregationalist. He received his commission, No. 1 in the Chaplains' Corps, in 1799, and I have no doubt the church pennant was flung to the breeze during the time of his holding divine service.

As Chief of Chaplains attached to the Bureau of Navigation, Navy Department, Washington, D. C., a clergyman of the Episcopal Church who has seen service in the Navy for over 30 years, I feel a deep sense of gratitude to the gentlemen of the Senate who, during this past week, definitely indicated their stand in regard to the perpetuity of this simple Christian acknowledgment—the display of the church pennant—of our dependence upon Almighty God, through His Son Jesus Christ. To-day its use may be somewhat governed by old naval custom, but it is my earnest hope that the day be not far distant when—if it be thought necessary to allay all feeling of misunderstanding—definite action shall be taken by the Congress to perpetually provide for the use of this simple acknowledgment of our dependence upon the great Architect of the Universe in both branches of our military service, and to assure our millions of Christian people that this cross-emblazoned

flag is not the flag of any foreign potentate or any creed or race, but simply an evidence that we all are believers in and followers of the Man of Galilee.

Long may it wave and point us to the way of a better and holier living in His name!

Sincerely yours,

C. H. DICKINS,

*Captain, Chaplain Corps, United States Navy.*

Hon. H. B. HAWES,

*United States Senate, Washington, D. C.*

### WAR MINERALS RELIEF ACT (S. DOC. NO. 224)

Mr. ODDIE. Mr. President, at the first session of the present Congress the junior Senator from Georgia [Mr. GEORGE] submitted a resolution, Senate Resolution 263, calling on the Department of the Interior for copies of the rules, regulations, and promulgations followed by the Department of the Interior in the administration of "An act to provide relief in cases of contracts connected with the prosecution of the war and for other purposes," which I had the honor of introducing and which was approved as amended on March 2, 1919. I now ask that the rules, regulations, and promulgations which have been furnished by the Department of the Interior in response to said resolution be printed as a Senate document.

The PRESIDING OFFICER. Is there objection?

Mr. JONES. Mr. President, this looks like quite an extensive document. Has the Senator any estimate as to what the cost will be? As I understand, there is some limit as to the cost of printing.

Mr. ODDIE. It is not extensive. It is just as it came from the Department of the Interior. It will be of great benefit in the presentation of these claims to the district court.

Mr. JONES. I have no objection to it, except that I know there is a limit of about $200 on the cost of these matters. If it will cost more than that, it will have to go to the Joint Committee on Printing, I understand.

Mr. ODDIE. If that is found to be the case, I will bring the matter before the committee. I hope that the order can be given now to have the matter printed as a Senate document.

The PRESIDING OFFICER. Without objection, it is so ordered.

### GILLIAM GRISSOM

Mr. SIMMONS. I ask unanimous consent, out of order, to report back favorably, without amendment, from the Committee on Finance, Senate bill 2695, for the relief of Gilliam Grissom. I send the bill to the desk and ask unanimous consent for its immediate consideration.

The PRESIDING OFFICER. Without objection, the report will be received. Is there objection to the present consideration of the bill?

Mr. JONES. If it will not lead to debate I have no objection.

Mr. SIMMONS. It will lead to no debate. It is just a small matter.

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill, which was read, as follows:

*Be it enacted, etc.,* That the Comptroller General of the United States is hereby authorized and directed to allow credit in the account of Collector of Internal Revenue Gilliam Grissom, North Carolina district, in the sum of $567.63 to cover disallowance due to overpayment of subsistence to Deputy Collector A. S. Mitchell, which was incurred in the months of March, April, May, June, and July, 1926.

The bill was reported to the Senate without amendment, ordered to be engrossed for a third reading, read the third time, and passed.

### RELIEF OF STORM SUFFERERS

Mr. SIMMONS. Mr. President, I wish to advert to a notice I gave a few days ago of a motion to reconsider the vote by which the Senate agreed to certain House amendments to Senate Joint Resolution 182, providing for certain farm relief in the Southern Atlantic States.

I have not changed my opinion with reference to those amendments, which I think were inadvertently agreed to by the Senate. I think they so emasculate the resolution as it passed the Senate as will make it practically of no benefit to the sufferers whom it is intended to relieve.

The more I have considered the matter the worse I have found it to be. For instance, one of the amendments provides for a limitation of the amount which may be loaned for fertilizer and seeds for cotton and tobacco to the meager sum of $8 per acre. That will not pay one-half or one-third of the expense of seeds and fertilizers for tobacco. It might possibly pay the expense of fertilizer for cotton in that section of the country where the land is of such character as to require but very small fertilization.

There is another limitation which is of material importance to the people concerned. It applies to all crops except tobacco and cotton, and as to all other crops of whatsoever character only $3 an acre can be loaned under the amendment of the House to the joint resolution.

Florida, probably of all the States involved, was the greatest sufferer. Florida probably suffered more from the storms of last year than did any State in the Mississippi from the terrible flood that swept over the lower reaches of that great stream. In one section of Florida not only were the crops utterly destroyed but I think in that particular section over a hundred people were drowned. I will ask the Senator from Florida if I am correct about that.

Mr. FLETCHER. Mr. President, over 2,000 people were drowned.

Mr. SIMMONS. In the State.

Mr. FLETCHER. In that section.

Mr. SIMMONS. Over 2,000. It was worse than I thought it was.

Mr. FLETCHER. If the Senator will allow me, under the provisions of this measure I can not see how any possible benefit can come to the people of Florida. Certainly, when it comes to providing nursery stock for groves that were devastated, and fertilizer and seed for potatoes, and other crops $3 an acre will not be worth anything, because it does not provide anything near enough.

Mr. SIMMONS. Three dollars per acre for potatoes would hardly be more than one-tenth of the cost of the seed.

Mr. FLETCHER. Precisely. If the Senator will allow me further, I want to say that I can not see, to be perfectly frank about it, that this joint resolution is worth three cents to the people of Florida. I do not believe it is worth anything. I do not think a single loan will be made in the State under it. I think we are in the attitude of asking Federal aid and getting nothing absolutely, and we are in the attitude of having received Federal aid or some consideration from Congress, because of the great disaster that visited our section, and getting nothing absolutely. I would rather not have taken any step whatever looking to any Federal relief than to have had this sort of performance.

Mr. SIMMONS. I spoke in reference to Florida because the whole country knows that Florida was the greatest sufferer among all the States mentioned in the joint resolution, and it was the conditions existing in Florida, I think, more than anything else that led us almost unanimously in the Senate to agree to an authorization of an appropriation of $15,000,000 for the relief of Florida and two or three other States near by. The House has cut the amount down to $6,000,000.

Florida is a State in which very little tobacco and very little cotton is raised. The people there can not get the benefit of the $8 per acre. They raise vegetables and fruit, and $3 an acre, as I have said, would probably not amount to more than one-tenth of the cost of the fertilizer and seeds. So, as the Senator from Florida has said, I am quite sure that that State will get no benefit from the joint resolution.

So far as my State is concerned, it is chiefly the tobacco growers who are interested, and they can get no benefit from the joint resolution, because the cost of the fertilizer and seeds for tobacco would reach probably not less than $35 an acre. That is a crop that has to be highly fertilized. They can get only $8, just about one-fourth of the actual cost of the seed and the fertilizer.

In order to get that amount they have to give the Government a first lien upon their crops, making it difficult, certainly very much more difficult, for them to make additional advances for the other three-fourths of the cost of seeds and fertilizer, and making it difficult for them to get advances to supply their families while they are making the crop.

The people who are to be benefited by this are supposed to have lost their crops last year. They are mostly poor people and they must have help, not only in the matter of fertilizers and seeds but they must have help in order to secure the necessary means of living during the year.

In my State I am quite sure there will be but few, if any, applications for aid under the measure. But I am told that in South Carolina, and probably in Georgia and Alabama, where they plant cotton extensively, where they do not have to fertilize very heavily, the resolution may be of benefit, and that appeals to me, because I know they suffered there greatly. But more than that, I am told, Mr. President, and am convinced after pretty thorough investigation that if the joint resolution should be reconsidered and recommitted to the conference com-

mittee, the House would refuse to recede from its position, and there would be no legislation of any kind upon this subject.

Responding to the appeals of some Senators who represent cotton States, where, they say, the people may get some benefit, I am constrained to withdraw my motion for a reconsideration of the vote of the Senate agreeing to the House amendments to the joint resolution which passed through this body for the relief of the sufferers in the South Atlantic section.

The PRESIDING OFFICER. The motion will be withdrawn.

## MIGRATORY BIRD REFUGES

Mr. DILL. Mr. President, a few days ago there appeared in the Washington Star a news item to the effect that Dr. E. Gilbert Pearson, of New York, president of the National Association of Audubon Societies, had gone to the White House with the Senator from South Dakota [Mr. NORBECK] and Representative ANDRESEN in the interest of the migratory bird bill, and the article went on to set out the great interest the Audubon Societies had in that legislation, and it would give the impression that these societies had been supporting this kind of legislation all the time.

The truth of the matter is that the bill which the Audubon societies and the affiliated organizations tried to cause Congress to pass was a bill which would have made out of the bird refuges parks to be used for the slaughter of the birds that had gathered in the refuges.

The bill which came to the Senate provided for a license on every hunter in America who wanted to shoot migratory birds, and also provided that a part of the grounds which were set aside for the birds to have as refuges could be used as places for slaughter. It was only through the efforts of some of us in the Senate who held up the bill and fought those provisions of the bill until they were finally eliminated, much to the discomfort and to the displeasure of our colleagues, that it was made possible to have a real migratory bird law enacted.

I wanted to say this because I did not wish anyone to get the impression that the real migratory-bird legislation that has passed Congress was due to the efforts of the Audubon societies or those affiliated with them, particularly the gun manufacturers and the ammunition makers of this country, who had primarily in mind the amount of guns and ammunition they would sell as a result of it.

The bill which has finally passed the Congress is a real conservation measure, a measure which I am proud to have had some part in having passed; but had the other bill passed that was supported by those societies, particularly the Audubon societies, I should have been ashamed that the Government would spend money or would use its offices in that way.

I ask unanimous consent to have printed in the RECORD at this point an editorial from the Washington Post, under date of February 14, 1929, on this subject.

The PRESIDING OFFICER. Is there objection?

There being no objection, the article was ordered to be printed in the RECORD, as follows:

## BIRD PROTECTION

Delay in getting legislation through Congress is generally conceded to be one of the necessary evils of representative government. But the tendency to prolong debate and to hold up measures with amendments and reconsideration is not always to the disadvantage of the public. The bill for the protection of migratory birds which has finally been approved by the Senate offers an example of delay justified by what was accomplished.

For years Congress has been considering this subject without being able to agree upon any measure. In the controversy the objectionable features of the bill have been eliminated, and it will become a law for the preservation of wild-bird life rather than a regulatory measure for shooting grounds. Manufacturers of guns and munitions have been trying to drive through Congress a bill in the interest of hunters, and not for the protection of birds. Congress has done well to substitute a plan for establishment of sanctuaries in place of a scheme to regulate slaughter of wild life.

The bill authorizes the Secretary of Agriculture to acquire inviolable sanctuaries for migratory birds and to develop these areas with the cooperation of local authorities. Birds will not only be protected from hunters in these refuges but precaution will be taken against pollution of water about breeding places, and dikes will be constructed to provide suitable environment for aquatic birds. The Department of Agriculture plans to establish at least 125 sanctuaries, with at least 1 in every State. Expenses of this program will be met with appropriations amounting to $200,000 for 1931, $600,000 for 1932, and $1,000,000 for each of the seven succeeding years. Present plans call for completion of the preserves within 10 years.

Such protection is much needed in this country. Several important species of birds which once inhabited America are now extinct, and others are seriously threatened. The movement has been supported chiefly by the lovers of birds, but its economic value to the country at large should not be overlooked. As it stands the measure justifies all delay in its enactment.

## NATIONAL INSTITUTE OF HEALTH

Mr. RANSDELL. Mr. President, I wish to call the attention of the Senate very briefly to two extremely interesting editorials in support of Senate bill 4518, to create a national institute of health. One of them appears in the New York Herald-Tribune of yesterday, and the other appears in the Boston Transcript of yesterday. They are brief, and I wish to read the extracts from both of them. The first is as follows:

## FOR FEDERAL HEALTH RESEARCH

The only obstacle to passing the Ransdell bill for the creation of a national institute of health seems to be senatorial inertia. It is possible that Senators are bored with the voluminous indorsements of the measure by distinguished men of science and by medical and other organizations. Few bills of any description have had such a wealth of expert backing. The institute proposal might have come to a vote before this if there had been anything in it to excite serious opposition.

The plan is to enlarge the present Hygienic Laboratory in Washington to a national health institute, under the control of the Surgeon General, "which shall be devoted to scientific research in the problems of the diseases of man and matters pertaining to health." Such expenditure as may be necessary for this purpose is authorized. Also the Treasury Department is authorized to accept gifts unconditionally for study, investigation, and research by the institute. Another provision is for a system of fellowships in scientific research by which the institute may encourage men and women of marked proficiency in research relating to disease.

Scarcely a dissenting voice has been raised against this program to enable the Government to promote human health as sedulously as it does that of animals and plants.

I call that sentence particularly to the attention of all Senators:

To promote human health as sedulously as it does that of animals and plants. The scheme calls for no new bureau; it is to use existing Government machinery more fruitfully than heretofore. One or two Senators have pricked up their ears with quite valid curiosity at the indefinite cost of the institute, supposing that private donors do not come forward. Secretary Mellon, however, who finds the principles of the Ransdell bill wholly meritorious, has heard from the Bureau of the Budget that "the proposed legislation is not in conflict with the financial program of the President." The Senate has a heap of business on hand, but it would take only a few minutes to pass this much-commended bill for the Federal advancement of health research.

Senators, that editorial is from the Herald-Tribune of New York City, one of the greatest newspapers in the country.

Now I wish to read briefly from an editorial which appeared in the Boston Transcript of yesterday afternoon. It is entitled "Why Should Congress Delay?" and reads as follows:

Surgeon General Hugh S. Cumming, of the United States Public Health Service, has warned the country that, although the influenza epidemic appears to have abated, its return may be expected, and it may prove more virulent than before. Deaths from cancer show no signs of diminution, pneumonia is taking its toll about as usual, and many other deadly scourges are cutting off men and women in their prime because science has not yet uncovered the secret of their source. Yet the Ransdell bill for the establishment of a national institute of health, which encounters no opposition whatever, except from one western senator, noted as an objector on general principles, hangs fire in the United States Senate, and, in fact, has not yet found a place on the calendar.

Of course that is a slight error. It is on the calendar, but we have not yet been able to get it up for consideration.

It is unanimously reported from the Committee on Commerce, and it is indorsed by the Secretary of the Treasury, within whose jurisdiction the administration of the institution would fall.

This measure aims to prevent disease by authorizing, without creating any new bureaus or commissions, a great cooperative scientific organization, under the direction of the Surgeon General, which will bring together leading experts in every branch of science, for the study of disease and the application of preventive measures in advance of its outbreak.

Senators, think how important that is—the study of disease and the application of preventive measures in advance of the outbreak.

Its three main provisions would utilize the Public Health Service for much broader researches than are now possible and enlarge the Hygienic Laboratory, authorize acceptance by the Treasury Department of private gifts for the furtherance of the study of disease, and institute a system of fellowships in scientific research, for the purpose of securing the most

efficient personnel. It contemplates a national drive against disease and for health, along the broadest possible lines and with the most efficient equipment.

It seems strange, with the country continually visited with costly epidemics, that Congress should hesitate to enact, or even to consider, this subject, when a measure so admirably framed and so unanimously favored should lie under its hand. Especially is this true when it is recalled that the Democratic party is formally committed to support of this project, through a plank in its platform adopted at Houston last June, and is in duty bound to see that the measure is brought up for action. An attempt to place the bill on the calendar will be made next Monday, we understand, and it would seem to be assured backing enough to find a place there.

And this is the concluding sentence:

Congress can hardly afford to assume the responsibility of trifling with the public health.

Mr. President and Senators, if we do not pass the bill at the present session, in my judgment we will be trifling with the public health.

Mr. NEELY. Mr. President, I ask unanimous consent that there may be printed in the RECORD an editorial from the Charleston Gazette, entitled "National Health Institute," and I call particular attention to the paragraph in the editorial in which a former Member of this body, Hon. William E. Chilton, expresses his appreciation of the great work the senior Senator from Louisiana [Mr. RANSDELL] is doing in behalf of the health of the people, reading as follows:

Senator RANSDELL's work in building a national institution which has mastered leprosy is enough monument to achievement for any one life. It gives him the right to a place among the great who have made the world better by having lived.

He is now pleading with Congress to pass Senate bill 4518, the purpose of which is to create a national institute of health. Every citizen ought to read the bill and Senator RANSDELL's clear, forcible speech in the RECORD of February 6. The purpose of this bill is to put the brains and money of the Government behind a national organization to preserve the health of the people. This is a work beyond the means of local governments and private hospitals.

I ask that the entire editorial may be printed in the RECORD. The PRESIDING OFFICER. Without objection, the editorial will be printed in the RECORD, as requested.

The editorial is as follows:

[From the Charleston (W. Va.) Gazette February 15, 1929]

NATIONAL HEALTH INSTITUTE

We have in mind a public servant whose name is not as much on the front page as others, though he has the ability to put it there when so disposed.

It is Senator JOSEPH E. RANSDELL, of Louisiana, who has been continuously in public life for many years. Modestly he has performed his duties, caring little for the limelight. But few things of great importance get through to the President's signature to which he has not contributed something useful in the way of investigation and thought. When he speaks in the Senate his colleagues know that his words come from an honest heart and a trained mind ever seeking the truth, and that he is truly devoted to the cause of justice and to the public good.

The other day he read to the Senate a letter from Dr. C. P. Munday, of the Carville Leprosarium. Do you know what and where that is? Unfortunately few do. It is in Louisiana. It was hard to find a place to locate a sanitarium for the dreaded leper that, 1,900 years ago, all feared to touch save Jesus.

But through the work of Senator RANSDELL his State turned over the leper refuge, which the State of Louisiana, in the breadth of its Christian spirit, has provided, to the Federal Government. There the Government proceeded to study this disease which has baffled the medical profession through the centuries of civilization. By the slow, tedious processes of experiment a cure has been found in chaulmoogra oil. The results have been as astounding as they are gratifying. Forty-two victims have been discharged as cured and but one had to be returned for further treatment.

The letter of Doctor Munday is really a report on the work of this leprosarium. There is deep human interest in the following selection from that letter:

"One bright Sunday morning late last summer eight of the patients at Carville, the largest number paroled at one time in the 34 years of the colony's history, packed their simple belongings, made their religious devotion, bade their gallant colony friends farewell, and began a joyous little procession of departure. One who had come as a young girl 33 years before, who had been away but one short week in those long, near-hopeless years, turned aside to say farewell words to the medical officer in charge. She bore scars of a brave fight against relentless disease, but her face held a light of joy no actress could hope to simulate as she tried vainly to make mere words express her gratitude. In the lines of Father Ryan, poet-priest of the Southland, many times she had 'shrouded her griefs in a smile,' but now at the moment of victory she 'wept when her heart was the gladdest.' Then she rejoined the others as they went around the little chapel, over the lawn, under the drooping moss-fringed live oaks to the waiting friends of the outside world."

Senator RANSDELL's work in building a national institution which has mastered leprosy is enough monument to achievement for any one life. It gives him the right to a place among the great who have made the world better by having lived.

He is now pleading with Congress to pass Senate bill No. 4518, the purpose of which is to create a national institute of health. Every citizen ought to read the bill and Senator RANSDELL's clear, forcible speech in the RECORD of February 6. The purpose of this bill is to put the brains and money of the Government behind a national organization to preserve the health of the people. This is a work beyond the means of local governments and private hospitals.

It is more important than tariff, prohibition, primaries, cruisers, farm relief, flood control, Boulder Dam, or the oil scandal. When science can master smallpox, tuberculosis, and leprosy, what is not possible with brains, organization, and money? The governments of the earth 20 years ago would have gladly given billions for what the world now knows of tuberculosis, leprosy, diphtheria, and hookworm.

Rockefeller's contribution to mankind is an outstanding service which shows not only a good heart but a comprehending mind. Experiments with disease must follow causes and effects, even to the ends of the earth. Such work requires life work, consecrated devotion and purpose, and a purse that has no bottom. Rockefeller has contributed to humanity in his efforts to master disease sums beyond the ability of cities, counties, and States, and many times more than any other one person who has ever lived. Yet his greatest contribution is the lesson how to go about health work to get results. But what he has done will be at the disposal of the national institute of health. All sanitariums, hospitals, and public and private institutions to cure and prevent disease can be in touch with this institute. It will become the object of the interest and affection of the people. The United States has conquered leprosy, tuberculosis, and other dread diseases largely through the philanthropy of private citizens, chief among whom is Rockefeller. What an instrument of peace! How much more so when the smaller nations, and the larger ones in the East, who suffer so much from diseases which they can not master will point to the United States as the merciful benefactor of mankind, which has created a health institute which defies the word "incurable." To have the United States occupy such a position, to have it within the scope of its constitutional powers the benevolent friend and protector, the intelligent investigator and powerful quarantine guard against disease, is a noble ambition.

Private capital and private institutions may not be enduring. The work of preserving health and preventing disease is never ending, and a nation whose wealth is four hundred billions has even the selfish interest in doing this work in the only effective way possible.

AMENDMENT OF NATIONAL PROHIBITION ACT

The Senate, as in Committee of the Whole, resumed the consideration of the bill (S. 2901) to amend the national prohibition act as amended and supplemented, the pending question being on the first amendment of the Committee on the Judiciary, on page 1, line 3, after the word "prescribed," to insert "in a criminal prosecution," so as to read:

That wherever a penalty or penalties are prescribed in a criminal prosecution by the national prohibition act, as amended and supplemented, for the illegal manufacture, sale, transportation, importation, or exportation of intoxicating liquor, as defined by section 1, Title II, of the national prohibition act, the penalty imposed for each such offense shall be a fine not to exceed $10,000 or imprisonment not to exceed five years, or both.

Mr. BLEASE. Mr. President, on yesterday I made a few remarks with reference to the bill now pending before the Senate. I did not want to encroach at that time upon the time of the Senator from Connecticut [Mr. BINGHAM], but I wish now to repeat what I said at that time in reference to the extraordinarily severe penalties provided in the bill. I want to cite an instance that may possibly give some information to those who are pressing the prohibition proposition to the extent they are now doing.

In the State of South Carolina there was established in the nineties what was known as the State dispensary system for the handling of intoxicating liquors. In my opinion that is the best solution that has ever been offered to man upon this question. I shall not say why at this time, nor shall I discuss the reason for its destruction further than to say that at the time it was adopted it was very bitterly opposed by a certain element of people in my State.

There was a riot in one of the counties because of the manner in which the law was enforced. The governor of the State at that time, who was afterwards United States Senator Tillman, ordered out the State militia to protect the men who were sent to enforce the law. Several of the militia companies declined to go and gave up their commissions. The farmers of the State

voluntarily went to Columbia, formed themselves into organizations and announced themselves ready and prepared to defend the law.

As I said, between the militia, the enforcement officers, and certain people in the State, there was a riot at Darlington, S. C., in which several people were injured and several killed. But that law became so popular in South Carolina that any man who ran for office and did not say that he was in favor of the State dispensary system was easily defeated. Men in favor of the law were elected governor, others were elected to other State offices, and others were sent to the United States Senate and to the body at the other end of the Capitol. It was the most popular law the State had.

When the prohibition-enforcement officers started to go into private homes they would search private homes; they would go into a lady's bedroom, go through her trunk, go through the wardrobes and bureaus, throw everything around. They kept up that kind of enforcement until a revulsion of feeling resulted. The penalties provided for violation of the law were similar to those provided in this bill. That fact, with one or two other things, one of which I wish frankly to admit was that some of those in charge of the office became corrupt and resulted in that law being absolutely abolished long before the advent of national prohibition. Instead of being the most popular law in the State, instead of people being ready to fight to enforce it, it actually became a stench in the nostrils of the decent people of my State.

I say this simply to throw out a warning to those who are attempting to go too far. You may drive people after a while to resentment. I firmly believe that two-thirds of the crime in the United States to-day may be charged to resentment on the part of the people because of the action of Congress and State legislatures in depriving them of their privileges and their rights. Lawlessness is bred by oppression not only by State legislatures but by the National Congress. I repeat that I believe two-thirds of the crime in this country at present is the result of resentment against the oppression which has been put on them by the passage of sumptuary laws and the punishment provided for their violation.

Another thing, Mr. President. Some Senator has stated that the judges will not take advantage of certain conditions. Well, they do take advantage of them. Judges are human; they have the same desires, the same passions, the same hates, and the same prejudices that other men have. They can not help it. I will repeat what I said yesterday afternoon as to what may happen in the case of two boys who are taken into court and convicted of a some crime.

One of them has some influential friends; possibly he comes from a good family; somebody is sorry for his good old mother. Judges will permit men of influence, they will permit the friends of prisoners to come into their private chambers, into their rooms at the hotels, and will listen to pleas of mercy. Those friends may say, "You should impose a light fine; you should let this man off with a small fine, or," they may say, "you should let him off with a short sentence of imprisonment." The judge is influenced by those statements. I know it, and I have practiced it in the criminal courts. If I shall live until next June it will be 40 years since in the practice of law I first defended a man for the commission of a crime. I have practiced almost entirely in the criminal court and the damage-suit court. I have defended men for every crime known to the decalogue.

Mr. WHEELER. Were they all guilty?

Mr. BLEASE. They might have all been guilty, but most of them were acquitted.

On the other hand, as to the other boy, who has nobody to speak for him, who has not anybody to go to the judge and put up a private appeal, the judge, while he will be light on the boy who has influence behind him, will give a severe sentence to the little fellow who has no influence behind him. He will give him a terrible raking over about having violated the law and what an example he is going to make of him and how he is going to show people that the law must not be violated. That boy goes off to the penitentiary possibly, while the other boy pays a very small fine.

The same thing applies to the colored race in very many instances. Colored people are given severe sentences for committing the very same crime for the commission of which a white man is let off with a fine or a mild punishment, while, on the contrary, the white man should receive the heavier fine or imprisonment because of the fact that, with his opportunities and advantages, he should know better than to commit the offense that has been committed by the colored man.

We can drive this law through, but, mark my prediction, that when 12 men in a jury room—12 ordinary human beings that are picked up off the street and brought in from their occupations—are told, as the lawyer has a right to tell them in his argument, "If you convict this man for carrying a half pint of liquor or for buying a quart of liquor, this judge will sentence him to the penitentiary for five years or can fine him $10,000," we are going to find men sitting on juries in this country who are going to refuse to convict. So, instead of having the law regarded and upheld, as Senators think this bill will accomplish, it is going to result in turning loose men who are guilty of violating the law.

As I said yesterday, we have instances of that every day. In this city and all over the country juries go out, especially in States where the judge passes the sentence and the jury has not anything to do with it, and return with verdicts of acquittal when they know from the evidence the man is guilty.

I have actually known of cases where juries sent the foreman out to ask the judge if they should convict a certain person what would his punishment be. Of course, the judge properly sent the foreman back and said, "This is my prerogative and I decline to say"; but I have known of a jury in such a case coming back with a verdict of not guilty after they had agreed that the man was guilty, because they did not propose to put a man who had committed merely some slight offense in the hands of a judge who would give him a very severe punishment.

I believe, Mr. President, that judges should have some discretion; I am not saying anything against that; but I repeat that if we go too far and make the penalties too severe we are going to find guilty men deliberately turned loose by juries because those juries do not propose to see the infliction of such heavy punishment.

Mr. President, I am in favor of the prohibition law; it is all right with me; and, to tell the truth, I do not see why anybody makes a fuss about it, as conditions are at present. The man who does not want liquor does not have to have it, and the man who wants it does not have any trouble in getting it. So I do not see what either side keeps on raising the devil about. It seems to me that both sides ought to be satisfied. If anyone wants whisky, it is the easiest thing in the world I know of to get.

Mr. TYDINGS. Where can you get it?

Mr. BLEASE. It is all around. The newspapers advertise every day where it is. They provide advertisements for the places where liquor may be obtained, the best advertisement of which I know. I do not know of any better way to help the liquor traffic than to advertise in the newspapers that a drink can be bought in a certain place.

Mr. TYDINGS. Mr. President, will the Senator permit me to interrupt him?

Mr. BLEASE. With pleasure.

Mr. TYDINGS. I want to say that if the names and addresses of the particular places where liquor can be obtained should be sufficiently advertised, it would be one way to enforce prohibition, because the supply would soon be depleted.

Mr. BLEASE. I wish to say to the Senator that, so far as I am personally concerned, I would not report one of them if I saw a man selling it, delivering it, and taking the money. If I go to a man's home or his store and he should give me a drink, I would sever my right hand before I would be a low enough dog to go out and tell it.

I think the lowest dog in the world is the man who will go into another man's home and enjoy his hospitality—I do not care whether he is an officer or not—he is a low dog if he will eat a man's bread and then bite him. That is my individual opinion, and I do not propose to report anybody for selling liquor. As I have said, if I should see anyone selling it, I would not report him. That is not my job. I was not sent up here to represent or try to represent the people of my State in the United States Senate. I was not sent up here to be a spy. If I were down home, and saw anybody hauling liquor or selling it, I would not tell on him, for that is none of my business, and I hope that a lot of Senators here would not take advantage of that kind of a situation, for if they should I am sure some of the blind tigers would be in bad shape. [Laughter.]

Mr. President, as I have said, I am in favor of the prohibition law, and I am in favor of the strictest enforcement of it. I think if it were really strictly enforced as affecting white people, black people, rich, and poor alike it would be only a few years until we would see it repealed. That is the truth about it. If the proper officials will enforce it against the foreign embassies, we will stop some people drinking who are afraid to drink any liquor unless they get it from such places. They are afraid to drink it unless it comes from there because they are afraid that the kind made in bathtubs is not very good. There is another element who should not be permitted to have it, and that is the class who drink it and then get up and preach and holler prohibition, all the time drinking in secret. It would stop some other people who sit up in the amen corner of the churches and take a drink before they go to church and one or two after

they get back from church, so that they may be able to stand the sermon. [Laughter.] Take theirs away from them, and by the time all these classes become hitched together they would repeal the law. But, of course, Mr. President, you know and I know that the law is not fairly enforced. You know and I know that the big man has liquor whenever he wants it; the rich man has his whenever he wants it, and it is only the poor little fellow, the working man and the poor man, against whom the law is enforced. If they get a rich man in court charged with violating the law, they just let him pay a sufficient fine as a license and permit him to go on selling it. That is going on all over this country. The judge will fine him just about what the license would be.

In some of our towns and cities, where the "blind tigers" are running, the police go and raid them perhaps once or twice in a month and take those charged with the offense before the city court or some other court, where they are allowed to pay just about a sufficient fine to amount to a license and then are turned loose to go on with their business. What is the use of deceiving ourselves about it?

I say if we do not watch this bill, instead of providing what we think we are providing we will be simply making matters worse. I do not believe that because a man commits a little crime he should be put in jail for the remainder of his life. I do not believe in the doctrine that because a man commits any crime, with the exception of two or three, he ought to be put in the penitentiary and kept there all his life.

Mr. TYDINGS. Mr. President, will the Senator yield?

Mr. BLEASE. I yield.

Mr. TYDINGS. I should like to observe that sometimes we get a little out of balance in connection with the penalties which the law provides. There have been some frauds committed against the Government where millions of dollars have been stolen. In some cases the culprit has been convicted, and in a certain case was sentenced to two years in the penitentiary, although he had been a highly respected official of the United States Government. It seems to me that in formulating penalties for breach of the prohibition law we should take into consideration the fact that the man who violates the prohibition law does not deprive someone else of his property, but usually it is a question between two individuals. Yet it seems to be the tendency in this hour of turmoil to hang the man who violates the prohibition law, while one who robs the United States Government, who violates the obligations of high office in the country, may only get a couple of years, and public opinion does not seem to care. It will be a big mistake if we are going to be influenced by the propaganda of a small group of people who really want to hang and shoot down and kill off those who violate the prohibition law.

For my part, while I shall vote for adequate law enforcement, I shall not vote for any law that is so uncivilized and so barbaric as to make a mere breach of a moral law, and not a legal wrong, punishable by an extreme penalty. It is a serious reflection on the civilization of our country to have such laws as that on the statute books. I do not think we ought to listen to different groups who are blinded in their fanaticism for the enforcement of a single law, but should take into consideration the enforcement of all the laws and not provide this penalty outside of the general penalties we provide.

Mr. BLEASE. Mr. President, I do not expect to be tried for either murder or selling whisky, but if I had to be tried for either I should prefer to be tried for murder. If you go into court and are tried for murder, you have some chance of being acquitted. If, however, you go into court and are indicted on a liquor charge, it does not make any difference whether you are guilty or not, the very fact that that charge is brought against you makes you guilty in the eyes of some people, and there is an influence and a prejudice around the courthouse trying to convict you whether you are guilty or not, driving you to the wall every minute, trying to intimidate your attorney by telling him, "Oh, yes; you are defending blind tigers"; trying to influence the judge to charge the jury in the most extreme language he could use for the purpose of convicting the defendant. On the other hand, if you go into court charged with murder, nine-tenths of the world sympathizes with you, and the longer the dead man is dead the fewer friends he has and the easier it is for you to get out. That is why lawyers plead for delay.

Everybody in this country knows that that is true, Mr. President. As I said and repeat, I do not believe in putting men in jail and treating them cruelly and being mean to them, even if they are guilty of a crime. If they are guilty, I do not believe in giving them any extreme, harsh punishment. Every man in this country is made in the image of his God, and as long as there is any part of that image of his God left there is something good in him. Instead of taking a man by the hand and trying to help him to be a better man, possibly putting him in

prison for a while to teach him a lesson and then giving him another chance in life, some so-called Christians and some so-called ministers of the gospel—God save the mark!—are just as deeply in the mire of these cruel practices as anybody else.

Mr. COPELAND. Mr. President, will the Senator yield?

The PRESIDING OFFICER. Does the Senator from South Carolina yield to the Senator from New York?

Mr. BLEASE. I do.

Mr. COPELAND. Is not the Senator concerned about the present situation among the young of our country? I am very much disturbed about this bill, because it leaves wholly in the hands of the Federal judge the question of what he will do with the prisoner. If we may depend upon the testimony of reliable persons, there are many school children in this city who are now indulging in the evils of strong drink.

Mr. BLEASE. That is true.

Mr. COPELAND. If one of these little girls or little boys should be arrested for unlawful possession of whisky under this law which is proposed, if the Federal judge were so inclined he could send that child to prison for five years, or impose a fine of $10,000, which, of course, could not be paid. I can not believe that the ardent friends of prohibition can quite see the possible cruelties and inequalities and outrages that might be perpetrated by this law.

I join with the Senator; I would impose the greatest penalty that could be written into law upon the vile bootleggers who distribute poison to the people of the United States; but when I think about boys and girls in high school and boys and girls in colleges and doctors who might have possession of whisky for the lawful practice of medicine, but yet not acquired under the technicalities of the law, it is distressing to me to realize that one of these children, one of these college students, or a physician could be sent to jail for five years if the judge were so inclined. I think we have lost our sense of perspective, if I may say so to the Senator, in that we are imposing penalties which reach persons who ought not to be brought under the operations of criminal law, and are failing in our legislation to reach those evil persons who are bootlegging, and making fortunes out of the business, and killing persons by the hundred in our country.

That is the view I take of the matter.

Mr. TYDINGS. Mr. President, will the Senator yield again?

Mr. BLEASE. In just a minute.

I thank the Senator from New York very much for his suggestions. I had thought along the lines on which he has spoken; but I think probably I am a little bit old-timy, and I do not care to discuss some of the things I see boys and girls doing in this day and time.

When I was a boy, if I had seen a young lady take a drink of whisky, I would have been astonished. If I had seen a young lady light a cigarette and smoke it, I certainly never would have associated with her any more. But times have changed. I see a good many young ladies drinking whisky now. I was very much astonished recently in a certain hotel. A gentleman invited me to go up to his room with him. I did not know exactly what he wanted, but I had a pretty good idea, and I went up to his room with him. His wife was in there, one of his daughters was in there, and there were two other young ladies attending college with his daughter who were in there. To my utter astonishment and surprise, knowing the man as I did, he set out a bottle of fine whisky, and his wife, his daughter, those two young ladies, and he all took a drink. I was surprised, but it only proved to me what the Senator from New York has just said.

I know another case recently where there was a dance in a hotel. Four girls from as good families as there are in America before 1 o'clock in the morning were removed from that ballroom because they were too drunk to dance. I can call names, but, of course, as I say, I am not going to do it; but I see that going on. Those girls, for instance, under this bill could have been dragged into court, and if some judge did not like their father, or possibly if he was prejudiced against young ladies taking a drink, he could have sent them to the penitentiary for five years, which would have been an outrage not only upon the law but upon decency and humanity.

Mr. President, I did not rise for the purpose of discussing the merits or demerits of the prohibition law. If I wanted to see guilty men acquitted, I would vote for this bill, because I believe, I repeat, that it is going to do more harm to the prohibition law than good, and that the result is going to be as I have stated, that men are going to be turned loose who otherwise would be convicted.

Mr. President, I have talked longer than I had intended to. It has been with great pleasure, however, that I have been able to yield to other Senators to have business in which they were interested transacted.

I was known in my State as a friend of the prisoner, and I am proud that I was. I issued pardons and paroles to about 1,755 prisoners in the four years I was Governor of South Carolina, and if I could go back I would not change one act along that line. I repeat, they deserve fair treatment, they deserve proper consideration; they should be reasonably punished, not only to reform them, but as a lesson to others.

I ask to have inserted as a part of my remarks three letters of transmittal of paroles and pardons to the Legislature of South Carolina during the years 1911, 1912, and 1913.

The PRESIDING OFFICER. Is there objection?

There being no objection, the matter was ordered to be printed in the RECORD, as follows:

LETTER OF TRANSMITTAL

STATE OF SOUTH CAROLINA,
EXECUTIVE DEPARTMENT.

*To the Honorable the Members of the State Senate of South Carolina.*

GENTLEMEN: It being, by some constructions of the constitution, my duty to make a report to you of the number of pardons, paroles, and commutations given by me during the year, I take pleasure in accepting the construction of the constitution, which is, that I should make such report, and I take the greatest delight in saying that I have pardoned, paroled, and commuted 317 people during the time that I have been Governor of South Carolina. Nothing has given me more genuine pleasure than the privilege of exercising the power of forgiveness and of saying to down-trodden humanity, "Arise, cast off your shackles, look up, remember that there is a God, and that there is a future; remember that you are made in the image of that God; remember that you have a soul to save which was given to you by that God; I propose to give you another chance in life; I propose to give you another opportunity to make a man of yourself, to make a good citizen for your State, and, above all, the opportunity to save the soul which your God has given you." I did this because I have been taught from my childhood, and I have learned more thoroughly among mankind, to be merciful, and I believe from the depth of my soul that some time I, myself, must ask for pardon, and I want it said to me, "For, inasmuch as you did it unto the least of these, you did it also even unto me." Had the doctrine of forgiveness not been followed, how would many of the vilest of sinners in Bible character have been forgiven and given the opportunity to rise and become such grand and glorious characters? Shall I for one act in a young man's life condemn him to an everlasting prison cell—the fittest type of an earthly hell? No, gentlemen, I believe firmly and strongly in the plan of salvation, and I believe that that plan is based upon the forgiveness of God; and, some who are condemning to-day the use of the parole and pardon, if it were not for the pardoning power of God would themselves be in hell. Some men go to their churches and are invited by their ministers in the words, "Ye, who do truly repent of your sins and are in love and charity with your neighbor, come forward." They go, and accept the communion of the Lord Jesus Christ and pray at that altar, "Forgive us as we forgive those who trespass against us," and, right then, if they had the power, would place their enemies in prison cells, or possibly would drive a dagger into the breast of the man who is next to him, if they knew that they would never be discovered.

I love all men (but the ways of some I despise); although one may have fallen low, yet I love him, because he is one of God's children, and we all should gladly stoop to raise him and endeavor to make him better, show him the error of his way, and give him the opportunity to go forth and do honor to God, for however low he may have fallen he is made in the image of his God and there is something good in him. We go into our churches to-day and we hear the command—it is continually drummed into our ears—" Do unto others as you would have them do unto you." We hear it thundered from the pulpits, "Love the Lord thy God with all thy heart and thy neighbor as thyself." We are taught these doctrines and others of the Christian churches, and yet some are so low after confessing these doctrines as to stand upon the street corners and other places and abuse that man who shows mercy and who looks his God in the face and says, "Not that mercy I would to others show, that mercy show to me; but that mercy I have to others shown, that mercy show to me."

In my opinion there will be more souls in hell for hypocrisy than all the other crimes in the Decalogue, and I firmly believe that there are men in prison cells to-day who will enjoy the highest blessings of heaven, while some living high and honorable, so called, here will be in hades for their treatment of their fellow beings in this world.

You hear from your pulpits and from your platforms the cry, " Help the heathens; save the cannibals "; and yet when one helps a fellow countryman and attempts to give him another trial and bring out the good that is in him and give him another chance in life the same platform or pulpit shouter will yell, " Pardoning too many people "; but if you will give $100 to foreign missions, to be carried into lands to those who know not, you will hear them shout, "Good! glory hallelujah, God loveth a cheerful giver." We know the man here, our closest neighbor, and to which should we first lend help,

our own people or the heathens? But you say our man has committed a crime. Yes; and the very one you are sending your money to perhaps committed or helped murder and possibly helped eat one of our own countrymen. It is easy to criticize; it is easy to talk; but if you will look into your prisons, into your penitentiary, and into your chain gangs, and make personal inspection, as I have done, surely you will reach the conclusion that these are the people that were spoken of in the expression "the least of these." They can sing, and rightly:

"A charge to keep I have;
A God to glorify;
A never-dying soul to save
And fit it for the sky."

If all men who are guilty of crime or of violating the statute laws of our State were brought into court and tried, ah, gentlemen, men in high places might be removed to prison cells. If God in His all-wise providence, some dark night at the hour of 12, should let the broad sunlight burst out with all its beauty upon the earth, what stumbling and hustling there would be from dens of vice in order to keep the eyes of man from seeing. Yet they are not deceiving God, and you know it. But, we are taught, and wisely taught, to be as "wise as serpents and as harmless as doves."

I have been told—and it has been said by some little sniffling editors—that the governor should not pay any attention to petitions. The Constitution of our State, and of the United States, gives the people the right to petition, and no man, or set of men, have a right to deprive them of or oppose that privilege, and I am one that believes that the governor is the servant of and not the boss of the people and that it is my duty to obey petitions, to obey the will of the people, and I expect to do so as long as I am governor, and I present to you here, in a short and concise form, my reasons for granting the pardons, paroles, and commutations I have. The original papers are all on file in my office. I most respectfully ask of you and each of you that if there is any case in which you are interested or in which you would like information, that you come to the office and it will be our pleasure to furnish you with all of the original documents. Possibly I have erred; but if so, it has been on the side of mercy. When you say to a man that he is paroled, you do not turn him loose upon the world, but you throw around him the very strongest of safeguards, because he knows that if he is not of good behavior, that if he commits another crime, he does not run the risk of acquittal by jury; he knows that if he violates his parole he must go back into prison and serve the remainder of the sentence. Therefore, in my opinion, it is better in many cases to have a man under a parole than to let him serve his full sentence, because if he is a bad man and serves his sentence he goes out into the world to do as he pleases, runs the risk of being caught again, has the opportunity to employ counsel and go to the jury, and make a fight through the courts for his freedom; but, if he is under a parole, no such bright opportunities are before him. He must go at once and be reimprisoned, and this makes him better and holds his evil passions in check.

Gentlemen, my record along this line has been made; I am going to go before the people of my State, face to face, man to man, and give an account of my stewardship, and if the people of this State are the Christians that they profess to be, I have no fear of the results; and, if they are not Christians, I am very much mistaken in my knowledge of my people. I fear no harm from the fact that I have shown mercy to my fellow men, but I do expect a reward, not only here but hereafter, because I believe that there is a God; I believe that he is my God; I believe that but for His help I would have never been Governor of South Carolina. I will answer to Him for all my acts; to my people for my acts as governor, and I have no apologies to make to any man or set of men for a single parole, pardon, or commutation that I have granted, for I place myself firmly upon the foundation that " Self-love is the enemy of benevolence. It is far more noble to pardon than to be avenged. It is a part of the animal man to retaliate an injury. It is only God and the sons of God that have the magnanimity to forgive."

And the constitution of my State, section 12, Article IV, which reads, " He shall take care that the laws be faithfully executed in mercy."

" Some one committed a murder last night,
But hundreds of thousands were kind,
For the wrong that is done is forever in sight,
To the good we are fearfully blind;
Some one deserted his children to-day,
But millions of fathers are true;
The bad deeds are not such a fearful array
Compared to the good that men do.

" Somebody stole from his brother last night,
But millions of honest men live;
Some one was killed in a murderous fight,
But thousands are glad to forgive
Their brothers the wrongs that were fancied or real;
The crimes that we hear of each day
Compared to the good deeds that we could reveal
Make not such a fearful array.

"I would answer the men who stand up and declare
    That the world is much given to vice,
That the sum of man's crimes every day everywhere
    Can't compare with man's sweet sacrifice.
That for every black soul there are thousands pure white,
    The sum of the sinners is few.
And I know in my heart that the world is all right
    When I think of the good that men do."

Very respectfully,

              COLE L. BLEASE, *Governor.*

COLUMBIA, S. C., *January, 1912.*

---

LETTER OF TRANSMITTAL

STATE OF SOUTH CAROLINA,
EXECUTIVE DEPARTMENT.

*To the Honorable the Members of the State Senate of South Carolina:*

GENTLEMEN : Twelve months ago, when I stated in my message to you conveying the list of pardons, paroles, and commutations which I had granted, "I take pleasure in accepting the construction of the constitution, which is that I should make such report * * *," some people criticized me by saying that I had to make such report to the general assembly, and that that language in my message was useless.

I beg leave to call your attention, however, to section 11, Article IV, of the constitution, which reads : "It shall be his duty to report to the general assembly, at the next regular session thereafter, all pardons granted by him," and does not require of me to present any reasons for the paroling, reprieving, or commuting any prisoner by me; but I set forth then, as I am doing now, my reasons not only of the pardons, as required by the constitution, but of the paroles, commutations, and reprieves, because I want all of my acts as Governor of South Carolina to be known to the public; and, as I said then, I repeat now, I am not afraid of them, for the indorsement which I received from 72,243 of my white fellow citizens is pretty strong proof of the fact that my administration was indorsed, and if the machine had given me all the votes that were cast for me, and my opponents had not used money, whisky, and intimidation, instead of being 72,243 it would have been at least 90,000, as I predicted at the beginning of the campaign, and as a very large number of my fellow citizens now believe, fully feeling that I was not given all of the votes which were cast for me besides the ones which were taken from me for the reasons just above mentioned.

I furthermore said in my said letter of transmittal : "I fear no harm from the fact that I have shown mercy to my fellow men, but I do expect a reward not only here but hereafter, because I believe that there is a God; I believe that He is my God; I believe that but for His help I would have never been Governor of South Carolina." I was not disappointed, for my people gave me my reward—a second term as governor of my State—and I believe that my reward hereafter will come in due season, for I still believe that only by the help of God Almighty could I have won my first race, and I know positively that only by His help could I have defeated the unholy organization that was formed against me last summer by men of two different factions, which hated each other then and who hate each other now, but were willing to lie down and swap odors in order to defeat BLEASE.

Think of it—many preachers, nearly all the newspapers of the State, the corporations; that is, the leading officials thereof; the lawyers, almost in a body; a large majority of the legislature; nearly all the State officials; a large majority of the delegates to the State convention in May; all the moneyed interests; a large majority of the commercial travelers, commonly called "drummers"; some of the women, praying; some of the old-line so-called reformers; some of the old-line so-called conservatives; many of the Haskellites; the Cubans; the Spaniards and the mixed breeds; a majority of the State executive committee; a large majority of the county executive committee; and all of the election machinery—what a combination, and yet I beat it. Therefore I know that God heard the prayers of myself and my friends; and I repeat that had it not been for Him I could not have won such a victory; and once again I sing "Praise God, from whom all blessings flow." And, as I said and repeat now, "I will answer to Him for all my acts; to my people for my acts as governor; and I have no apologies to make to any man or set of men for a single parole, pardon, or commutation that I have granted," or for a single act that I have done since I have been Governor of South Carolina, or for a single word I have spoken, whether in the State or outside of it, firmly believing that my pardon record for the past two years had more to do with causing my reelection than any other one thing, because my Heavenly Father has said that He would show mercy to those who themselves showed mercy, and my people, my friends, all over the State, when I would give my reasons for pardoning, would holler "Well done," and when I would say, "I am not done yet," in defiance of the Cuban mixed breeds and others of a like stripe, my friends would holler back, "Turn them out," "Go on, boy, you are right," and on the 27th day of August, 1912, they proceeded to turn out of your body and out of the house of representatives many of those who had been loud-mouthed hollerers, "pardoning too many people," some had to change front or profess to have done so to keep also from going out.

I said on the stump, "If you don't want people pardoned, don't sign petitions; for if proper petitions are presented, I am going to turn more out, and you can't help it."

I am still doing business at room No. 1, Statehouse, Columbia, S. C., and though it hurts some folks mighty bad, they can't help it.

Make some one else happy; why be grouchy, mean, stingy, selfish? Wake up, man, and do something yourself and quit complaining about somebody else who is busy and moving forward in good deeds.

"Jest do your best and praise or blame that follers that counts just the same.

I've allus noticed grate success is mixed with trouble more or less.

An' it's the man that does the best that gets more blame than all the rest."

Your constitution says, in speaking of the governor : "He shall take care that the laws be faithfully executed in mercy," and I see and know of no grander way to apply this than to follow the rule, "That mercy I would to others show, that mercy show to me," but I reverse it somewhat, because I expect to say, when I appeal for mercy, "That mercy I have to others shown, that mercy show to me."

Your Code of Laws, Volume II, section 988, reads : "In any case that may be deemed proper by the governor, he may suspend sentence or parole any prisoner upon such terms or conditions that he may deem just in the exercise of executive clemency." Now, with that section of the statutes and the section just quoted from the constitution, it is a matter within the discretion of the governor as to how this mercy shall be extended, and as to when he thinks it just and proper and upon what conditions the parole of a prisoner should be granted, consequently, before any fair man or any gentleman will criticize the governor of his State for exercising this discretion, he will first make himself acquainted with the facts and conditions upon which the parole was granted, and not simply, from political prejudice, write an editorial or preach a sermon, or stand on the street corner and criticize, when he knows nothing of the reasons governing the governor in performing the duties laid out for him so plainly under the constitution and the statute law of his State. But those who are blinded by prejudice, or those who have a wicked and mean heart, for political purposes, proceed to condemn without knowing one thing of the conditions or one thing of the petitions, or one thing of the reasons governing the governor in his acts. Hence, when the matter was presented to the people as a body, being a Christian people, they slapped the faces of those who from a malicious heart or political prejudices had maligned the governor and said to him, "Well done, thou good and faithful servant, thou shall be our ruler for two more years," and the other crowd sneaked into their holes and hollered "fraud," "fraud," and appointed a little committee to investigate. And it—the little committee—although very brazen at first, laid down their arms, quietly sneaked off to their homes and said, "Nothing doing," and the whole crowd feel cheaper and meaner than if they had abided, as good Democrats should do, by the majority and not made a laughing stock of themselves, not only in their own State but outside of it.

Some people may say this is harsh language, that I ought not to use it ; yet, the newspapers, notwithstanding the fact that after the primary election I sat quietly, said nothing, and took all that was heaped upon me, continued their abuse, their vituperation, and their slanders, and published with great headlines and great glee the misrepresentations of a speech that I made in Richmond, Va. Day after day they carried articles copied from Yankee hoodlums and little newspaper pimps, and then when they were furnished with numbers of papers and offered hundreds of telegrams and letters commending the course of the Governor of South Carolina, they absolutely failed and refused to publish them ; and, when other papers speak of the governor in disrespectful terms, without either saying "mister" or "governor" but headline "BLEASE"—for which I care nothing, because the people of the State have shown the newspapers that they make asses of themselves when they bray and reelect to office those whom they fight—yet even the News and Courier goes further ; not content in striking me, they headline to the world "The Bleases," including even my wife ; and yet people say that I should be quiet, should say nothing, be easy, let it pass. Yes, gentlemen, I have let it pass, lo these many days, but how long before patience will cease to be a virtue is a matter that rests in the hands of my God.

Herewith I hand you a full statement of all the paroles, commutations, reprieves, and pardons granted by me since my last message to the general assembly in January, 1912. If you are pleased with these commutations, etc., I am pleased. If my friends are pleased, I am overjoyed with delight. If my enemies are not pleased, they can not help it, as I told them on the stump, and their sweating and fuming will avail them naught. So it is; so let be.

I exercised my power in paroling, for I consider the parole system the best system ever devised for the handling of convicts. Now, for instance, you parole a man during good behavior who possibly has

served more than half of the sentence imposed upon him—sometimes they have been paroled when they only had three or four more months to serve—you do not turn him loose, but say to him, go forth, make a man of yourself, for if you do not, and you are ever convicted again, you have to go back and serve the remainder of the sentence imposed. Now, if these men had gone ahead and served out their sentences, they would be foot-loose to do as they please, and no restraint placed upon their actions. Even a life prisoner may be paroled; it is simply giving him another chance in life; and how many men who profess to be great Christians would be living and enjoying the blessings of this life had not God forgiven them and given them another chance?

The parole during good behavior means what? Good behavior means that he shall not violate any of the criminal laws of this State, because men are bound over to keep the peace or good behavior. If they violate any of the criminal laws of their State, they are not of good behavior, and they can be recommitted to the penitentiary without trial to serve the remainder of their sentences. The system I have now established in South Carolina will be followed hereafter by other governors; possibly not so many will be paroled, but the system itself will be kept in vogue. The same system is being tried in other States; some going even further and allowing a man to work himself out by his good behavior in the penitentiary. Take one case particularly; a negro had been in the penitentiary for 18 years for killing another negro, which I consider a most unusual and severe punishment for his crime; he is paroled during good behavior; he is given another opportunity to live. If he disturbs the peace or violates any of the criminal statutes of this State, he goes back to the penitentiary for life; that condition hangs over him, and he knows that if he is not of good behavior he goes back to serve the remainder of his sentence. Another instance, a white man sentenced to the penitentiary for a long term for a crime committed while under the influence of liquor; parole him on the condition that he take not another drop of liquor. If he does, and thereby violates this parole, he goes back to serve the balance of his sentence.

Therefore how any man who professes to be a Christian can object to this system is something beyond my comprehension; and when one does do it I am forced to the conclusion inevitably that he is a deep-dyed hypocrite; that he is not what he professes; and when he stands before his God on the final judgment day that he will be condemned and will hear the words, "Depart from me, ye accursed"; and he will be confined to the everlasting fires of hell for his hypocrisy and will then be reminded that, "For inasmuch as he did it not unto the least of these, he did it not unto his God"; and I beg to quote you right here, from an article published in the Columbia State, dated December 1, 1912, written by that great Christian man—oh, that South Carolina had thousands more like him—the Rev. J. S. Moffatt, D. D., president of Erskine College, in which he says:

"It would follow also that in the prison life there should be brought to bear all possible forces for the restoration of the unfortunate ones. Let their surroundings be such, and the agencies that influence them be such, and the methods of dealing with them be such as will influence them to higher personal and social ideals. The indeterminate sentence and a system of parole are to be considered as inspiring the condemned to higher ideals and larger hopes. Above all, let the gospel of Jesus Christ, that greatest of all agencies for the transformation of human life and character, come into the lonely cell with its love and light, brought by loving and yearning hearts. The prison house may become to some a Bethel."

I am proud that I have been able to extend this mercy to my fellow man, because it was right that it should have been done; it was my duty to do it, and for these two reasons alone I did it, regardless of consequences or results, remembering that:

"That man may last, but never lives
Who much receives and nothing gives;
Whom none can love; whom none can thank;
Creation's blot; creation's blank.

"But he who marks from day to day,
In generous acts his radiant way,
Treads the same path the Savior trod,
The path to glory and to God."

Very respectfully,

COLE L. BLEASE, Governor.

COLUMBIA, S. C., January, 1913.

LETTER OF TRANSMITTAL

STATE OF SOUTH CAROLINA,
EXECUTIVE CHAMBER.

GENTLEMEN OF THE SENATE: I herewith transmit to you reasons for the pardons, paroles, and commutations granted since your session of 1913.

I am glad to have had the opportunity to help these unfortunates. Some of them may fall by the wayside, but if I have made one good citizen and saved one soul, I will have done a good work.

"We are sitting in the shadow
Of a long and lonely night,
Waiting till some gentle angel
Comes to lead us to the light.
For we know there is a magic
That can give eyes to the blind,
O well-filled hands be generous!
O pitying hearts be kind!

"Help stumbling feet that wander
To find the upward way;
Teach hands that now lie idle
The joys of work and play.
Let pity, love, and patience
Our tender teachers be,
That, though the eyes be blinded,
The little souls may see.

"Your world is large and beautiful,
Our prison dim and small;
We stand and wait, imploring:
'Is there not room for all?
Give us our children's garden,
Where we may safely bloom,
Forgetting in God's sunshine
Our lot of grief and gloom.'

"A little voice comes singing,
O listen to its song!
A little child is pleading
For those who suffer wrong.
Grant them the patient magic
That gives eyes to the blind!
O well-filled hands be generous!
O pitying hearts be kind."

Very respectfully,

COLE L. BLEASE, Governor.

COLA., S. C., February 5, 1924.

Read over several of these this day, at dinner hour, and confirm each of them, and am glad that I did it.

COLE L. BLEASE.

Mr. TYDINGS. Mr. President, to show you to what extent many people who are in favor of rigid enforcement will go, I should like to recite to the Senate two instances that happened in the State of Maryland.

Lawrence Wenger, who lived in Harford County, was a farmer about 20 years of age, a very honest and highly respected young man. He went out to drive in his cows one day, and it happened that some prohibition agents were searching through the woods in the vicinity of his farm. They had discovered a still, and those who were operating the still had run away. These agents saw Wenger and thought he was one of the men who had been operating the still; whereupon, without any words whatsoever, they raised their shotguns and shot him nearly to death. Then, realizing that they had made a mistake, they let 15 or 20 minutes go by, while he was dying, while they held a consultation. Then they put him in an automobile and drove 14 miles to a doctor, although there were many doctors that could have been obtained in the immediate vicinity. He died a few moments after they reached the doctor's office.

The people of my county who have some vestiges of civilization were very much incensed at the treatment by these prohibition officers of this young man after he was shot. They authorized our State's attorney to institute proceedings against these four prohibition officers. They were indicted for murder, but they could not be tried in our court because the United States Government stepped into the scene, and the case was transferred to the United States district court in Baltimore City, where the United States district attorney, Mr. Woodcock—a fine gentleman—became the counsel for these men, and defended them at the trial. They were acquitted, though not without some remarks from those in charge of the trial as to their overzealousness, and sympathy for the grave mistake that had been made.

That is one case.

John Bongori was an ex-service man of Italian extraction. He had a creditable record in the World War. Two prohibition agents came to Harford County on another occasion, got in touch with Bongori and asked him if he could obtain some liquor for them. He told them that he had none, and did not know where he could get any. They said they needed it very much, and they would appreciate it so much if he would do this. After considerable persuasion Bongori secured somewhere a pint of gin, which he took to these two prohibition agents and turned over to them, receiving in payment therefor, at

least as far as we know, the exact amount of money which he had paid to some one else to obtain the liquor.

They then attempted to put him under arrest. He was a young man about 26 or 27 years of age, and he started to run from these men. It was Saturday, at 12 o'clock in the day. He ran down into the business section of Havre de Grace, where there were any number of scores of people on the street doing their Christmas shopping; and as he ran they called to him to halt, and as he did not halt they drew their revolvers and shot at him; and it was only an act of Providence that several women who were down there doing their Christmas shopping were not killed. Finally a bullet did hit Bongori, and killed him instantly.

Bear in mind, all that this man had done under the Federal prohibition act was to commit a misdemeanor. He had not committed a felony, but a mere misdemeanor. Now, I take it that if an individual happened to be riding down the streets of Washington exceeding the speed limit, and a traffic officer should come up and ask the individual to halt, and the individual did not halt, and finally the traffic officer should shoot at the individual and kill him, the Senate and the country and the citizens of Washington would be very much incensed at the man who would take a life for the mere commission of a misdemeanor.

Strange to say, the good people who in many other ways have some kindness and charity in their souls were not greatly stirred at the killing of Bongori. Those prohibition agents were indicted for murder in my home county, and again the Federal Government came in and transferred the cases to the United States District Court in Baltimore. There the United States district attorney became the defendant's counsel, and our own county officers had to do the prosecuting.

I cite these two instances to show that it hardly made a ripple of excitement in the minds of the people. I believe that when the history of prohibition enforcement, as we know it in many cases is written, fifty or a hundred years from now, those who are studying in the public schools will wonder what in the name of common sense was the state of civilization in the United States of America at the outset of prohibition enforcement.

Senators, the mere buying of a pint of gin or the selling of a pint of gin is a violation of the law, and, of course, it should be punished, if the evidence shows that the law has been violated, but what Senator would be in favor of putting a person in the penitentiary for life whose only crime had been that on four separate occasions a certain person had been detected committing four separate misdemeanors? The proposed punishment is out of proportion to that for burglary, arson, murder, manslaughter, mayhem, and what not.

We have simply gone mad on this question. We certainly have a little bit of the philosophy of Jesus Christ left in us, or is it absolutely extinct? Have we no hearts at all for the errant brother, as the good Methodist ministers are prone to say? Do we want to crucify him, to crush him, to exterminate him? Shall our penitentiaries and our penal code be operated to make scrap heaps of mankind, or shall we keep in mind that we can perhaps be to some extent the repair shop for erring humanity?

We certainly are not going to run wild on this question, are we, and have no regard at all for the triviality of simply buying or selling a pint of alcohol by an individual? No one is wronged in the legal sense of the word. The matter is purely voluntary. No one is held up and made to buy it or made to sell it. It is not like robbery, it is not like murder, it is not like embezzlement, it is not like larceny, because in those cases the crime is one of force and coercion, and some one's liberty or property is taken from him; but in this transaction it must be solely voluntary between two individuals.

It seems to me that that being the case, the penalty should not be any greater than in the case of arson, and there is practically not a State in the Union that has a more severe penalty for arson than that proposed in the bill now pending before this body. There are very few States in the Union that have a more severe penalty for embezzlement or larceny, breach of trust, or the taking of property illegally.

I want to vote, and will vote, for any rational, well-balanced, humane enforcement of the prohibition act, and am ready to subscribe to proper penalties, but I do not believe that it is either right, nor is it in the interest of common sense, nor will it help the future of the country or contribute to its civilization for us to provide such inhumane penalties as seem to be in the minds of certain people who are very much interested in passing this particular bill.

May I say just one more thing before I conclude, to clear up a misunderstanding? It is frequently said that the State of Maryland has not come in line on national prohibition. Sen-

ators, in 23 counties out of 23 counties in the State of Maryland, there are upon the statute books to-day laws comparable to the national Volstead Act, making it a crime to sell liquor, and prescribing penalties for violation of the law.

The fact is that there is only a very small area in the entire State of Maryland that now has no enforcement law. Practically every county in the State was dry before national prohibition, and the laws in those counties are still on the statute books. So that those people who say that we have not enforced the legislation in Maryland perhaps are well meaning, perhaps they mean to state the facts, but they are not stating them, and I would be glad to read here, if time permitted, the enforcement act for one county after another, drawn along the lines of the general philosophy of the Volstead Act.

CONSTRUCTION AT MILITARY POSTS

Mr. REED of Pennsylvania submitted the following report:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H. R. 13825) to authorize appropriations for construction at military posts, and for other purposes, having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate, and agree to the same with an amendment as follows: In lieu of the matter to be inserted by the Senate amendment insert the following:

"That there is hereby authorized to be appropriated not to exceed $17,185,610, to be expended for the construction and installation at military posts of such buildings and utilities and appurtenances thereto as may be necessary, as follows:

"Albrook Field, Canal Zone: Dispensary, $30,000.
"Corundu, Canal Zone: Barracks, $357,500.
"France Field, Canal Zone: Barracks, $360,000; noncommissioned officers' quarters, $324,000; officers' quarters, $427,200; dispensary, $30,000.
"Schofield Barracks, Hawaiian Department: Noncommissioned officers' quarters, $100,000; officers' quarters, $300,000.
"Wheeler Field, Hawaiian Department: Noncommissioned officers' quarters, $111,000; officers' quarters, $150,000; dispensary, $40,000.
"Porto Rico: Barracks, $144,000; noncommissioned officers' quarters, $119,000; officers' quarters, $396,250; nurses' quarters, $36,000; headquarters building, $20,000; chapel, $20,000; recreation hall, $10,000; storehouse, $15,000; garage and repair shop, $40,000; stables, $40,000; hay and forage shed, $3,000; wagon shed, $6,000; incinerator, $5,000; flagstaff, $500; hospital, $10,000.
"Henry Barracks, P. R.: Barracks, $352,000; noncommissioned officers' quarters, $39,000; officers' quarters, $192,500; hospital, $35,000; stables, $24,000; hay and forage shed, $3,000; wagon shed, $4,000; guardhouse, $10,000; post exchange, $10,000; chapel, $20,000; headquarters building, $15,000; recreation hall, $10,000; storehouse, $15,000; maintenance building, $7,500; fire house, $7,500; bakery, $12,000.
"Philippine Department: Signal depot warehouse, $49,000.
"Camp Devens, Mass.: Noncommissioned officers' quarters, $36,000; officers' quarters, $164,000.
"Provided, That so much of the act entitled 'An act to authorize appropriations for construction at military posts, and for other purposes,' approved February 25, 1927 (44 Stat. 1235), as authorizes an appropriation of $300,000 for hospital, Camp Devens, Mass., be, and the same is hereby, amended so as to authorize at Camp Devens, Mass., the construction and installation of buildings and utilities and appurtenances thereto as follows:
"'Hospital, toward completion, $35,000; for officers' quarters, $180,000; for noncommissioned officers' quarters, $14,400; for bakery, $15,000; for fire house, $10,000; and for stables, $45,000; in all, $300,000: Provided, That there is hereby authorized to be made available for the purposes of this act $300,000 of the amount contained in the first deficiency act, fiscal year 1928, approved December 22, 1927, for military posts.'
"Fort Jay, N. Y.: Hospital, $400,000: Provided, That no new construction shall be built on that part of Governors Island west of a line running in a northwest and southeasterly direction across the island and paralleling the eastern face of the regimental barracks building at a distance of 300 feet.
"Mitchel Field, N. Y.: Noncommissioned officers' quarters, $216,000; officers' quarters, $600,000; hospital, $150,000.
"Fort Monmouth, N. J.: Noncommissioned officers' quarters, $100,000; officers' quarters, $250,000.
"Plattsburg barracks, N. Y.: Barracks, $45,000; addition to hospital, $55,000.
"Raritan Arsenal, N. J.: Noncommissioned officers' quarters, $42,000; hospital, $50,000.

" Fort Slocum, N. Y.: Barracks, $180,000.

" Fort Wadsworth, N. Y.: Barracks, $50,000; noncommissioned officers' quarters, $30,000.

" Aberdeen Proving Ground, Md.: Hospital, $60,000.

" Carlisle Barracks, Pa.: Mess hall and kitchen, $110,000.

" Fort Humphreys, Va.: Noncommissioned officers' quarters, $274,000.

" Langley Field, Va.: Barracks, $764,160; noncommissioned officers' quarters, $216,000; officers' quarters, $480,000; hospital, $175,000; construction of a sea wall and for necessary fill, $200,000.

" Fort Leonard Wood, which shall hereafter be known as Fort George G. Meade, Md.: Noncommissioned officers' quarters, $50,000; nurses' quarters, $40,000; officers' quarters, $210,000.

" Fort Monroe, Va.: Officers' quarters, $200,000.

" Fort Benning, Ga.: Noncommissioned officers' quarters, $525,000; officers' quarters, $114,000; dispensary, $80,000.

" Fort Bragg, N. C.: Noncommissioned officers' quarters, $144,000; nurses' quarters, $80,000; officers' quarters, $496,000; hospital, $100,000.

" Maxwell Field, Ala.: Officers' quarters, $300,000; barracks, $178,000; noncommissioned officers' quarters, $188,150; quartermaster warehouse, $45,000; quartermaster maintenance building, $15,000; garage, $40,000; fire station, $15,000; guardhouse, $20,000; post exchange, $25,000; ordnance magazine, $15,000; hospital, $75,000; stables, $20,000; railroad spur, $5,000; telephone and telegraph system, $31,250.

" Camp McClellan, Ala.: Hospital, $100,000.

" Fort Benjamin Harrison, Ind.: Noncommissioned officers' quarters, $54,000; service club, $50,000.

" Erie ordnance depot, Ohio: Hospital, $75,000.

" Selfridge Field, Mich.: Officers' quarters, $465,000; construction of a sea wall, and for necessary fill, $230,400.

" Fort Leavenworth, Kans.: Hospital ward, $75,000.

" Marshall Field, Kans.: Barracks, $125,000; noncommissioned officers' quarters, $144,000; officers' quarters, $300,000.

" Fort Riley, Kans.: Noncommissioned officers' quarters, $150,000: nurses' quarters, $50,000.

" Fort Snelling, Minn.: Officers' quarters, $54,500.

" Camp Normoyle, Tex.: Barracks, $180,000.

" Fort Sam Houston, Tex.: Noncommissioned officers' quarters, $150,000; officers' quarters, $250,000.

" Randolph Field, San Antonio, Tex.: Noncommissioned officers' quarters, $61,200; officers' quarters, $600,000; completion of hospital, $50,000.

" Fort D. A. Russell, Wyo.: Officers' quarters, $56,000; noncommissioned officers' quarters, $56,000; barracks, $40,000.

" Letterman General Hospital, California: Hospital ward, $150,000.

" Camp Lewis, Wash.: Noncommissioned officers' quarters, $93,000; officers' quarters, $215,000.

" March Field, Calif.: Noncommissioned officers' quarters, $100,800; hospital, $150,000.

" Rockwell Field, Calif.: Noncommissioned officers' quarters, $108,000; officers' quarters, $150,000.

" Army medical center, District of Columbia: Completion of Army Medical School, $840,000; addition to power plant, $50,000.

" Walter Reed General Hospital, District of Columbia: Nurses' quarters, $300,000; chapel, $12,000, to be erected as supplementary to or in connection with the nonsectarian chapel, the erection of which was authorized by the act approved February 2, 1928; observation, tuberculosis, and infectious disease wards and a laboratory and morgue, and the reconstruction of the third floor of the main building into an operating room, and for the necessary corridors, roads, walks, grading, utilities, and appurtenances thereto, $90,000.

" Bolling Field, D. C., or at a point on a military reservation in the vicinity of the District of Columbia to be selected by the Secretary of War: Radio and communication center, $30,000.

" Sec. 2. That the Secretary of War is hereby authorized and empowered to acquire by purchase or condemnation real estate adjacent to Bolling Field, Washington, D. C., for extension and development of said flying field; and there is authorized to be appropriated out of any money in the Treasury not otherwise appropriated, a sum not to exceed $660,000 for that purpose.

" Sec. 3. That there is hereby authorized to be appropriated not to exceed $5,552,842, to be expended for the construction and installation at military posts and at airports and landing fields of such technical buildings and utilities and appurtenances thereto as may be necessary, as follows:

" Panama Canal Department, Albrook Field: Paved runways, $51,000.

" France Field: Gas and oil storage system, $10,000; paint, oil, and dope warehouse and appurtenances to hangar, $13,016;

paved runway from hangars, $52,000; 6-inch gasoline pipe line from Coco Solo, $20,000; bombing range, $3,555.

" Hawaiian Department, new site: Improvement to landing field, $623,000.

" Hawaiian Department, air bases, $22,000.

" Wheeler Field: Hangars and field shop, $79,000.

" Boston Airport, East Boston, Mass., moving and reerecting technical buildings, $15,000.

" Mitchel Field, Long Island, N. Y.: Hangars, field shops, field warehouse, $141,000; armament and parachute buildings, $5,000; central heating plants, $75,000.

" Middletown Air Depot, Pa.: Replacing roofs upon warehouses $6,000; tiling walls and replacing floors and platforms in warehouses, $16,015; hard-surfaced apron in front of hangars, $17,376; supply office and stock room, $5,607; ceiling four bays in engineering shop building, $4,402: Provided, That the $38,500 heretofore appropriated for concrete floors in warehouse at Middletown Air Depot (Public, No. 181, 70th Cong.) is hereby canceled.

" Bolling Field, D. C.: Hangars, $90,000; field shop, $60,000; central heating plants, $50,000; parachute and armament building $15,000; photographic building, $36,000; radio building, $10,000; paved runways and aprons, $53,700.

" Langley Field, Va.: Hangars, $524,590; field warehouse, $100,000; headquarters and operations building, $80,000; photo, radio, parachute, and armament buildings, $76,000; central heating plants, $100,000; gas and oil storage system, $10,000; paint, oil, and dope warehouse, $5,000; improvement of landing field, $85,000; paved runways, $122,698.

"Air Corps Tactical School, Maxwell Field, Montgomery, Ala.: Hangars, $210,500; field shop, $19,000; field warehouse, $60,000; armament and parachute building, $5,000; paved runways, $50,000; gas and oil storage system, $5,000; school building, $100,000.

" Shreveport, La. (attack wing): Hangars, $200,000; field shop, $50,000; field warehouse, $45,000; headquarters and operations buildings, $85,000; radio, parachute, and armament buildings, $25,000; gas and oil storage system, $10,000; improvement to landing field, $135,000: Provided, That the Secretary of War is hereby authorized, when directed by the President, to accept in behalf of the United States, free from encumbrances and without cost to the United States, the title in fee simple to such land as he may deem necessary or desirable, in the vicinity of Shreveport, La., approximately 25,000 acres, more or less, as a site for an aviation field.

" Bowman Field, Louisville, Ky.: Hangar, $50,000; radio, photographic, and shops, $20,000; operations and administration building, $20,000; gas and oil storage system, $5,000; paved runways, $13,000.

" Fairfield Air Depot, Fairfield, Ohio: Hangars, $120,000; headquarters building $40,000; central heating plant, $20,000; paint, oil, and dope warehouses, $20,000.

" Chicago Municipal Airport, Chicago, Ill.: Completion of Army Air Corps hangar, $20,986.

" Selfridge Field, Mich.: Hangars and field shop, $122,000; central heating plants, $60,000; paved runways, $51,000; improvement of landing field, $125,000.

" Fort Leavenworth, Kans.: Completion of hangar, field shop, headquarters building, $35,000; central heating plants, $20,000.

" Marshall Field, Fort Riley, Kans.: Completion of hangars, shops, and technical buildings, $55,000; central heating plant, $30,000.

" Fort Crockett, Tex.: Night-flying lighting system, $3,775; paved runways, $10,775: Provided, That the $10,775 heretofore appropriated for dope and paint house and lean-to for boiler room at Fort Crockett (Public, No. 181, 70th Cong.) is hereby canceled.

" Dryden, Tex.: Gasoline and oil storage system, $2,821; operations building, $5,000.

" Duncan Field, San Antonio, Tex.: Hangars and depot shop building, $220,000; oil-reclamation house, $13,000: Provided, That the $5,497 heretofore appropriated for instrument, engine repair, and cleaning building at the San Antonio air depot (Public, No. 181, 70th Cong.) is hereby canceled.

" Lordsburg, N. Mex.: Operations building, $5,000; gas and oil storage system, $2,821.

" Randolph Field, Tex.: Hangars, $220,000; field shops, $38,000; paved runways, $232,500.

" Tucson, Ariz.: Operations building, $5,000; paved floor in hangar, $1,705.

" Yuma, Ariz.: Operations building, $5,000.

" March Field, Riverside, Calif.: Hangars, field shops, field warehouse, $75,000; gasoline and oil storage system, $10,000; paved runways, $104,000: Provided, That the $50,000 heretofore

appropriated for radio and school building at March Field (Public, No. 181, 70th Cong.) is hereby canceled.

"Rockwell Field, Calif.: Hangars and field warehouse, $45,000; field shop, $100,000; construction of paved runways, $50,000.

"SEC. 4. That the Secretary of War be, and he is hereby, authorized to transfer to the Petersburg National Military Park such portion of the Camp Lee Military Reservation, Va., as in his discretion may be required in connection with the establishment of the Petersburg National Military Park, as authorized by the act of Congress approved July 3, 1926.

"SEC. 5. That the Secretary of War be, and he is hereby, authorized, in his discretion, to sell, upon such terms and conditions as he considers advisable, to the Fishers Island Corporation, or its nominee, a tract of land containing one and one-fifth acres, more or less, said tract now forming the extreme northeasterly corner of the Fort H. G. Wright Military Reservation, situate on Fishers Island, in the State of New York, which said tract is no longer needed for military purposes, and to execute and deliver in the name of the United States and in its behalf, with and to the said the Fishers Island Corporation, or its nominee, any and all contracts, conveyances, or other instruments necessary to effectuate such sale, the proceeds of the sale of the property hereinbefore designated to be deposited in the Treasury to the credit of the fund known as the military-post construction fund: *Provided,* That the Secretary of War shall have the said tract surveyed and appraised at the expense of the Fishers Island Corporation: *And provided further,* That the Secretary of War shall not sell said tract for a less consideration than the appraised value hereinbefore referred to.

"SEC. 6. That the Secretary of War is hereby authorized to acquire, by purchase or otherwise, two tracts of land on the Atlantic seaboard with necessary rights of way as may, in his discretion, be necessary in the proper defense of the Atlantic coast, and the sum of $20,000 is hereby authorized to be appropriated from any funds in the Treasury not otherwise appropriated, which sum shall remain available until expended.

"SEC. 7. That there is hereby authorized to be appropriated, out of any money in the Treasury of the United States, not otherwise appropriated, the sum of $125,000 for the construction of a cannon-powder blending unit at Picatinny Arsenal, Dover, N. J., to replace the one destroyed by fire on July 31, 1928."

And the Senate agree to the same.

<div style="text-align:center">

DAVID A. REED,
FRANK L. GREENE,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*
JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*

</div>

Mr. ROBINSON of Arkansas. Mr. President, does this represent a complete agreement?

Mr. REED of Pennsylvania. A complete agreement, without dissent from any conferee.

Mr. ROBINSON of Arkansas. The adoption of the conference report will result in the passage of the bill?

Mr. REED of Pennsylvania. Yes, Mr. President.

Mr. ROBINSON of Arkansas. What is the effect of the House amendment agreed to?

Mr. REED of Pennsylvania. The Senate took the bill of the House and made its amendments, consolidating a number of separate bills which the House had sent to the Senate. In effect, the entire program approved by the Senate is acquiesced in by the House, with the single exception that there was inserted in the Senate an amendment providing for a joint inquiry into coast defense by airplanes, providing for a joint commission of the House and Senate. Inasmuch as that is now pending in the Rules Committee of the House, the House conferees represented that they were utterly unable to get the House to agree to the amendment, and on that the Senate conferees have been forced to yield.

Mr. ROBINSON of Arkansas. The conference report is signed by all the conferees?

Mr. REED of Pennsylvania. It is signed by all the conferees.

The report was agreed to.

## EQUALIZING RANK OF CERTAIN OFFICERS IN THE ARMY AND NAVY

Mr. REED of Pennsylvania submitted the following report:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H. R. 9961) to equalize the rank of officers in positions of great responsibility in the Army and Navy having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate, and agree to the same with an amendment as follows: Instead of the language of the amendment of the Senate insert the following: "appointment as such and shall both take rank above all other officers on the active list of the Army and Navy: *Provided,* That nothing in this act shall have the effect of changing the relative rank of the present Chief of Staff and the present Chief of Naval Operations"; and agrees to the same.

<div style="text-align:center">

DAVID A. REED,
FRANK L. GREENE,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*
JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House of Representatives.*

</div>

Mr. ROBINSON of Arkansas. Will the Senator from Pennsylvania explain the effect of this agreement?

Mr. REED of Pennsylvania. The effect of the agreement is that the Chief of Staff of the Army and the Chief of Naval Operations will take rank between themselves in accordance with the dates of their respective appointments, excepting that, with the concurrence of General Summerall and Admiral Hughes, this act shall not affect the relative rank of the two present incumbents during the balance of their service.

Mr. ROBINSON of Arkansas. It will end the war of precedence?

Mr. REED of Pennsylvania. It ends the war of precedence and gives these two officers rank above all other officers of the Army and Navy. It does not seem very important to Members of the Senate, including myself, but apparently it seems very important to the officers of the two services. I move the adoption of the report.

The report was agreed to.

## OUACHITA NATIONAL PARK, ARK.

Mr. BRATTON. From the Committee on Public Lands and Surveys I report back favorably with amendments the bill (S. 675) to establish the Mena National Park in the State of Arkansas, and I submit a report (No. 1787) thereon. I call the attention of the senior Senator from Arkansas [Mr. ROBINSON], the author of the bill, to this report.

Mr. ROBINSON of Arkansas. Mr. President, the bill provides for the creation of a national park in the western part of the State of Arkansas. It is in a beautiful scenic region, and will serve the purposes and desires of the people of some six or seven States. The subject matter has been under consideration for a prolonged period in both this body and in the body at the other end of the Capitol.

The PRESIDING OFFICER. Is there objection to the consideration of the bill?

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill, which had been reported from the Committee on Public Lands and Surveys with amendments.

The amendments were, on page 1, line 7, before the words "National Park," to strike out "Mena" and insert "Ouachita"; to strike out section 2 in the following words:

SEC. 2. All lands included within the exterior boundaries of that part of the Arkansas National Forest being in township 2, 3, 4, and 5 south; in ranges 25, 26, 27, 28, 29, 30, and 31; all west of the fifth principal meridian in the State of Arkansas.

And to insert:

All lands included within the exterior boundaries of that part of the Ouachita National Forest being in the following land divisions and subdivisions: Sections 35 and 36, township 2 south, range 31 west; east half township 3 south, range 31 west; sections 1, 2, 12, 13, and 24, township 4 south, range 31 west; township 3 south, range 30 west; north half of township 4 south, range 30 west; sections 19, 20, 21, 22, 23, 24, 27, and 28, township 4 south, range 30 west; south half of township 3 south, range 29 west; sections 17 and 18, township 3 south, range 29 west; north half of township 4 south, range 29 west; sections 19, 20, 21, 22, 23, 24, 25, and 26, township 4 south, range 29 west; south half of township 3 south, range 28 west; township 4 south, range 28 west; sections 1, 2, 3, 4, and 5, township 5 south, range 28 west; south half of township 3 south, range 27 west; township 4 south, range 27 west; sections 1, 2, 3, 4, 5, and 6, township 5 south, range 27 west; sections 31 and 32, township 3 south, range 26 west; sections 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 30, 31, 32, and 33, township 4 south, range 26 west; sections 4, 5, and 6, township 5 south, range 26 west; sections 7, 18,

and 19, township 4 south, range 25 west; all of said lands being in the State of Arkansas and west of the fifth principal meridian in said State.

On page 2, line 4, to change the section number from 3 to 2; in line 5, before the words "National Park," to strike out "Mena" and insert "Ouachita"; in line 10, to change the section number from 4 to 3; and in line 15, after the word "land," to strike out the period and insert a colon and the following proviso:

*Provided,* That this act shall become effective to create the area herein described as a national park only when the title to all of the lands within such area and now privately owned shall have been vested in the United States, and the Secretary of the Interior is hereby authorized to pass upon and accept title to said privately owned lands on behalf of the United States: *Provided further,* That the United States shall not purchase, by appropriation of public moneys or otherwise, any land within the aforesaid area, but that such land shall be secured by the United States only by public or private donation.

So as to make the bill read:

*Be it enacted, etc.,* That there is hereby reserved and withdrawn from settlement, occupancy, or disposal under the laws of the United States and dedicated, set apart, and established as a public park for the benefit and enjoyment of the people, under the name of the Ouachita National Park, the tract of land in the State of Arkansas particularly described by and included within metes and bounds as follows, to wit:

All lands included within the exterior boundaries of that part of the Ouachita National Forest being in the following land divisions and subdivisions: Sections 35 and 36, township 2, south, range 31 west; east half township 3 south, range 31 west; sections 1, 2, 12, 13, and 24, township 4 south, range 31 west; township 3 south, range 30 west; north half of township 4 south, range 30 west; sections 19, 20, 21, 22, 23, 24, 27, and 28, township 4 south, range 30 west; south half of township 3 south, range 29 west; sections 17 and 18, township 3 south, range 29 west; north half of township 4 south, range 29 west; sections 19, 20, 21, 22, 23, 24, 25, and 26, township 4 south, range 29 west; south half of township 3 south, range 28 west; township 4 south, range 28 west; sections 1, 2, 3, 4, and 5, township 5 south, range 28 west; south half of township 3 south, range 27 west; township 4 south, range 27 west; sections 1, 2, 3, 4, 5, and 6, township 5 south, range 27 west; sections 31 and 32, township 3 south, range 26 west; sections 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 30, 31, 32, and 33, township 4 south, range 26 west; sections 4, 5, and 6, township 5 south, range 26 west; sections 7, 18, and 19, township 4 south, range 25 west; all of said lands being in the State of Arkansas and west of the fifth principal meridian in said State.

SEC. 2. That the administration, protection, and promotion of said Ouachita National Park shall be exercised under the direction of the Secretary of the Interior by the National Park Service, subject to the provisions of the act of August 25, 1916, entitled "An act to establish a National Park Service, and for other purposes."

SEC. 3. That nothing herein contained shall affect any valid existing claim, location, or entry under the land laws of the United States, whether for homestead, mineral, right of way, or any other purpose whatsoever, or shall affect the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land: *Provided,* That this act shall become effective to create the area herein described as a national park only when the title to all of the lands within such area and now privately owned shall have been vested in the United States, and the Secretary of the Interior is hereby authorized to pass upon and accept title to said privately owned lands on behalf of the United States: *Provided further,* That the United States shall not purchase, by appropriation of public moneys or otherwise, any land within the aforesaid area, but that such land shall be secured by the United States only by public or private donation.

Mr. JONES. Does the bill authorize any appropriation?

Mr. ROBINSON of Arkansas. No; it does not; and as I understand it, an amendment also requires that the title to the private lands within the area shall be procured without expense to the Government of the United States.

Mr. OVERMAN. Does the bill provide for the setting aside of public lands for a park?

Mr. ROBINSON of Arkansas. It sets aside public lands for the purpose of a national park and provides that the privately owned lands within the park district shall be procured without expense to the Government of the United States.

Mr. JONES. What can the Senator tell as about the area of the proposed park?

Mr. ROBINSON of Arkansas. It will contain about 163,000 acres, 35,000 of which are privately owned land.

The PRESIDING OFFICER. The question is on agreeing to the amendments.

The amendments were agreed to.

The bill was reported to the Senate as amended, and the amendments were concurred in.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

The title was amended so as to read: "A bill to establish the Ouachita National Park in the State of Arkansas."

Mr. ROBINSON of Arkansas subsequently said: Mr. President, in connection with my remarks on the bill creating the Ouachita National Park, I ask leave to have printed in the RECORD the report of the Senator from New Mexico [Mr. BRATTON].

There being no objection, the report was ordered to be printed in the RECORD as follows:

[S. Rept. No. 1787. 70th Cong. 2d sess.]

MENA NATIONAL PARK, ARK.

FEBRUARY 15 (calendar day February 16), 1929.

Mr. BRATTON, from the Committee on Public Lands and Surveys, submitted the following report, to accompany S. 675 (by Mr. ROBINSON of Arkansas):

The Committee on Public Lands and Surveys, to whom was referred the bill (S. 675) to establish the Mena National Park in the State of Arkansas, having considered the same, report thereon with recommendation that it pass with the following amendments.

AMENDMENTS

No. 1. On page 1, line 7, strike out the word "Mena" and insert in lieu thereof the word "Ouachita."

No. 2. Strike out all following the colon after the word "to wit," on page 1, line 9, down to and including line 3 on page 2, and insert in lieu thereof the following:

"All lands included within the exterior boundaries of that part of the Ouachita National Forest being in the following land divisions and subdivisions: Sections 35 and 36 of township 2 south, range 31 west; the east half of township 3 south, range 31 west; sections 1, 2, 12, 13, and 24 of township 4 south, range 31 west; township 3 south, range 30 west; north half of township 4 south, range 30 west; sections 19, 20, 21, 22, 23, 24, 27, and 28 of township 4 south, range 30 west; south half of township 3 south, range 29 west; sections 17 and 18 of township 3 south, range 29 west; north half of township 4 south, range 29 west; sections 19, 20, 21, 22, 23, 24, 25, and 26 of township 4 south, range 29 west; south half of township 3 south, range 28 west; township 4 south, range 28 west; sections 1, 2, 3, 4, and 5 of township 5 south, range 28 west; south half of township 3 south, range 27 west; township 4 south, range 27 west; sections 1, 2, 3, 4, 5, and 6 of township 5 south, range 27 west; sections 31 and 32 of township 3 south, range 26 west; sections 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 30, 31, 32, and 33 of township 4 south, range 26 west; sections 4, 5, and 6 of township 5 south, range 26 west; sections 7, 18, and 19 of township 4 south, range 25 west; all of said lands being in the State of Arkansas and west of the fifth principal meridian in said State."

No. 3. In line 5 of page 2 strike out the word "Mena" and insert in lieu thereof the word "Ouachita."

No. 4. On page 2, line 15, following the word "land," strike out the period, insert a colon, and add the following:

"*Provided,* That this act shall become effective to create the area herein described as a national park only when the title to all of the lands within such area and now privately owned shall have been vested in the United States, and the Secretary of the Interior is hereby authorized to pass upon and accept title to said privately owned lands on behalf of the United States.

"*Provided further,* That the United States shall not purchase by appropriation of public moneys, or otherwise, any land within the aforesaid area, but that such land shall be secured by the United States only by public or private donation."

No. 5. On page 2, line 4, after the word "Sec.," strike out the figure "3" and insert in lieu thereof the figure "2."

No. 6. On page 2, line 10, following the word "Sec.," strike out the figure "4" and insert in lieu thereof the figure "3."

No. 7. Amend the title to read: "A bill to establish the Ouachita National Park in the State of Arkansas."

RÉSUMÉ OF FACTS SUPPORTING PASSAGE OF THE BILL

The area to be included in the proposed park is about 35 miles in length by about 12 miles in width and contains approximately 163,000 acres, all of which is now the property of the United States, being a part of a forest reserve, except approximately 28,000 acres. Under the terms of the bill, as amended, the 28,000 acres now in private ownership must be acquired, without expense to the United States, before the act becomes operative, thus absolving the Government from any financial obligation incident to the establishment of the park.

The site is situated in the southwestern part of the State of Arkansas, the nearest point being about 15 miles from the city of Hot Springs, a famous health resort. It is believed that the proposed park will serve to an excellent advantage in connection with the health and recreational

facilities at Hot Springs. There are no other national parks in that region of the United States, except a small one, containing less than 1,000 acres, at the city of Hot Springs. The Ouachita Park, by reason of short distances and splendid highways, will be easily accessible to many people residing in Arkansas, Texas, Louisiana, and other adjoining States. Many of these people, on account of long distances and other factors, will be denied the advantage and enjoyment of park facilities if this park is not created. The region described in the bill is mountainous and rugged. Some of its peaks reach an altitude of approximately 2,600 feet, while the adjacent country is slightly above sea level, thus affording a cool and attractive climate in the park even during midsummer. The entire region is interspersed with streams and forests. Its scenic beauty is said to compare favorably with the Swiss Alps.

In view of the urgent need of an adequate national park in that part of the country and the peculiar fitness of this area for that purpose, it is the belief of the committee that the bill, with the proposed amendments, should pass.

The relevant departmental correspondence is attached hereto:

<div align="center">INTERIOR DEPARTMENT,<br>Washington, December 23, 1927.</div>

Hon. GERALD P. NYE,
  *Chairman Committee on Public Lands and Surveys,*
    *United States Senate.*

MY DEAR SENATOR NYE: I have your request of December 15, 1927, asking for an opinion as to the merits of S. 675, a bill to establish the Mena National Park in the State of Arkansas.

It is shown by the records of this department that the area described in this bill was inspected by representatives of the Forest Service of the Department of Agriculture and the National Park Service of this department on May 7, 1926. From a joint report rendered by the representatives of these bureaus it would appear that this area should not be made a national park for the reason that there are no distinctive scenic or other features comparable with the standard set for the establishment of national parks, and that the area contains nothing of outstanding or national significance which would warrant placing it in a national-park category. Of the entire area of 163,000 acres contemplated in the bill, 128,000 acres are under Government ownership and 35,000 acres in private ownership; the existence of such a large area in private holdings within a proposed park, even though the area measured up scenically to national-park standards, would also be unsatisfactory from an administrative standpoint.

For these reasons I can not recommend the approval of the bill.
  Very truly yours,

<div align="center">E. B. FINNEY, *Acting Secretary.*</div>

## AMENDMENT OF NATIONAL PROHIBITION ACT

The Senate, as in Committee of the Whole, resumed the consideration of the bill (S. 2901) to amend the national prohibition act as amended and modified.

The PRESIDING OFFICER. The hour of 3 o'clock having arrived, the Chair reminds the Senate that, under the unanimous-consent agreement previously entered into, the order for the limitation of debate is now in effect.

Mr. BRUCE. Mr. President, I was very glad to enter into an agreement to limit the time for the discussion of the pending bill, because, so far as most of the thoughts that are suggested to me by it are concerned, I have so frequently given expression to those thoughts that it would be a waste of time for me to give expression to them again.

There is obviously very strong opposition in this Chamber to the passage of the bill, and yet I entertain but little doubt—though I hope I may be mistaken—that it will pass. I feel this way because I have never known, since I have been a Member of the Senate, the Anti-Saloon League to ask for the enactment of any legislative measure by the Senate that the measure was not enacted. In other words, I have never known the Anti-Saloon League to crack its lash that the Senate did not jump through the hoop. Indeed, so true is this that on the occasion when it was requested by the Anti-Saloon League to apply the Federal merit system of appointment to the selection of the field force of the prohibition system, it promptly applied it, though never on any other occasion since I have been a Member of this body has it ever, so far as I can remember, been induced to extend the Federal merit system of appointment to any branch of the Federal service.

Of course, this bill is but another link in the chain of galling, imbecile tyranny that prohibition has been forging for the people of the United States ever since the adoption of the eighteenth amendment.

To-day we are asked to pass a bill crowded with drastic, excessive penalties, utterly devoid of any true perspective or sense of proportion. To-morrow the Senate will be asked to pass a bill making any violation of the Volstead Act a felony. That will be the next step. Then later on perhaps it will be asked to adopt the cruel, almost incredible example of the State of Michigan, and to provide that for the fourth felonious violation

of the Volstead law the offender shall be imprisoned for life. Of course, in my humble judgment, prohibition would be no nearer enforcement after the enactment of all that extreme legislation than it is now.

Then, consequently, would come the last step that prohibition tyranny could take, and that is upon the strength of information furnished by faithless servants, or by estranged relations, or by malicious neighbors, to enter the private home. Already the way for this has been paved by the Goff bill introduced some time ago into this body, which provides an opportunity for the prohibition agent, under the guise of entering a private residence for the purpose of seeing whether any commercial still is confined in it, to enter it for the purpose of finding what is fermenting in the wine cask or the wine barrel in the owner's cellar. That, as I have previously pointed out, is the stage of desperation to which prohibition has already been driven in Finland, one of the four countries in the world that has not yet revoked its prohibitory legislation.

So, first of all, before the Senate gives its assent to this bill, I ask it to bear clearly in mind the place that it, if enacted into law, will occupy in the vast, elaborate, and highly organized system of prohibition tyranny of which it is intended to be a part.

Passing now to a particular examination of the bill, I say that it could not have been possibly drafted except by the hand of indiscriminate fanaticism. All colors are the same to a man in the dark. All degrees of crime, so far as the Volstead Act is concerned, are the same to a prohibition fanatic. Put this bill into effect as a law and it would be in the power of a Federal judge—and just as likely a judge who had been vised by the Anti-Saloon League, because a large part of the judges that have been appointed in recent years have been so vised—to impose a term of five years or a maximum fine of $10,000 not only upon the bootlegger but upon some innocent youth or maid, say, guilty of the offense of transporting a flask to a youthful party.

I ask the Members of the Senate to pause and to ponder well this bill. There are some of them who have young sons who might well in their heedless youth commit some comparatively petty violation of its provisions, with the result that he might be incarcerated in the penitentiary for five years or fined $10,000.

Mr. BROUSSARD. Or both.

Mr. TYDINGS. It might be both.

Mr. BRUCE. Yes; it might be both. No matter who drafted the report accompanying this bill, I am bound to say that I can not understand how he could possibly expect us seriously to accept some of the statements that he makes about the bill in it. The report says:

> It will be observed that the maximum punishment for a first offense for the manufacture or sale of liquor is a fine of $1,000 or imprisonment not exceeding six months. In the other cases, aside from manufacture and sale, as prescribed by this section, the penalty for a first offense is a fine not to exceed $500. These penalties are adequate where the commercial element is not present, but they are absolutely inadequate when applied to professional bootleggers and other large-scale operators. This fact makes advisable an amendment to the prohibition act. Such amendment should not operate harshly upon the casual violator. Its object is to reach the professional commercial operators who profit financially by their criminal defiance of the law.

What right has the author of that report to use such language? He knows that the wording of the pending bill, without any discrimination whatsoever as respects classes of offenses, applies to the manufacture, possession, importation, or exportation of intoxicating liquor. In other words, it would apply not only to such a malefactor as the conspicuous bootlegger Remus, who was sentenced to the Atlanta Penitentiary from Ohio some years ago, but it would apply also to any man who happens to be discovered with a flask of whisky or a bottle of wine in his possession when in transit, for instance, between Washington and Baltimore or between Washington and Alexandria.

To use another illustration, it would apply not only to the bootlegger, big or small, engaged in illicit commercial operations, but it would apply to any householder who might set a small amount of wine to fermenting to the intoxicating point in his cellar. It would apply, too, I should say, to any purchaser who had bought a drop of liquor under circumstances involving the process of transportation. It would apply to any man who went to Bermuda or over our northern boundary into Canada and came back with a bottle of whisky in his bag.

I recollect that some years ago a friend of mine returned from Bermuda and passed out as rapidly as he could from his ship to an automobile with a bottle or so of liquor under a heavy overcoat. He thought that he was entirely safe, but, to his surprise, he found that his footsteps had been dogged by a

Federal officeholder, who approached him, and, to his intense relief, exclaimed only, "You have some bottles of whisky in that overcoat of yours. You will have to give me one of them." [Laughter.] The possessor of those bottles could under this bill have been fined $10,000 or been sent to the penitentiary for five years, or been both so fined and imprisoned.

I was told of another individual who about the same time returned from Canada with several bottles of whisky in his bag. When the time came for the inspection of the bag at the border, he left his bag open, after putting a bottle of whisky on top of its contents with a card on it saying: "This is for the inspector." He then turned his back on his bag and when he returned he found that the inspector had inspected its contents and had gone, after turning the card over and writing on the reverse side, "You are a perfect gentleman." [Laughter.]

The PRESIDING OFFICER. The time of the Senator on the bill has expired. The Senator from Maryland now has 10 minutes to speak on the amendment.

Mr. BRUCE. And the owner of that bag, too, might have been fined $10,000 or been sentenced to the penitentiary for five years, or been both fined and imprisoned.

Mr. JONES. Mr. President, if the Senator from Maryland will pardon me, I desire to inquire is there an amendment pending?

The PRESIDING OFFICER. There is.

Mr. JONES. That is one of the committee amendments?

The PRESIDING OFFICER. Yes. The Senator from Maryland has 10 minutes on the amendment.

Mr. BRUCE. So it is absolutely untrue that this bill applies only to individuals engaged in the commercial manufacture and sale of liquor. It is, as I read it, wholly undiscriminating in its application to all classes of offenders under the Volstead Act and to all offenses under that act—the prettiest as well as the most heinous. Never did I hear of such a law—one so utterly disregardful of all the fundamental distinctions based on relative degrees of guilt that have been heretofore supposed to underlie punitive justice. All I have to say to the Members of the Senate is, if the Senate shall pass such a measure as this, look out not only for your own safety but for the safety of your children. As to the latter—such have been the ghastly consequences of prohibition in this country—that I have been told of at least two fathers who are in the habit when their daughters are leaving their homes for youthful parties to supply them with a small amount of spirits that they know to be pure rather than have them go to such parties and run the deadly risk of drinking some lethal distillate.

Equally as anomalous, so far as sound principles of criminal justice are concerned, are the provisions of the pending bill which at one single stroke wipe out all the ordinary distinctions between first offenses and second offenses—distinctions that have been recognized by the criminal law ever since there was a criminal law—and place the offender who has yielded to the first access of temptation, and may never yield to another after a single punishment, on exactly the same footing as some hardened miscreant who has over and over again defied the majesty of the law. What sort of a law is that? The present Volstead law at least has the good sense in every line of its penalty clauses to recognize the difference between the gravity of a first offense and the gravity of a second offense.

These fanatics, I repeat—such fanatics as the world has rarely known in any hour of extreme madness in its history—come along and set a net with meshes designed to take in indistinguishably the vilest and most hardened violators of the Volstead Act, the beardless youth, the immature girl, and, generally speaking, everyone whom the author of the report relating to this bill is at least discerning enough to term "casual violators," as distinguished from habitual bootleggers.

If this bill shall be properly amended, I am prepared to vote for it. I have never failed to vote for any reasonable legislation looking to the enforcement of prohibition, and if I were to remain here I should continue to vote for every such measure of legislation until I felt that this country had had conclusive reason to believe, as the result of prolonged and exhaustive experimentation, that prohibition is so at war with human nature and the human reason as to be an unenforceable thing under any and under all circumstances, no matter what Constitution or statute may vainly declare.

The Senator from Washington [Mr. JONES] has stated that it is impossible to discriminate in this bill between the commercial bootlegger and the casual offender. Well I know it is impossible for him to do it because of his intensely sincere conviction in favor of prohibition, which I have no desire to impugn. With great respect to him, I say that he is incapable of doing it. And perhaps it is only fair for me to say that my opposing convictions are so intense that I too would hardly be fit to undertake the task. But some one else could readily take this bill

and by proper amendments draw the proper distinctions between bootleggers and other graver violators of the Volstead Act and much milder classes of offenders. In other words, this bill puts on the same footing precisely a member of such an infamous gang, bred by prohibition, as that which in Chicago a day or so ago stood up seven or eight human beings against a wall and shot their lives out——

The PRESIDING OFFICER. The time of the Senator from Maryland has expired.

Mr. BRUCE. I believe I still have some time on the amendment, have I not?

The PRESIDING OFFICER. No; the time of the Senator on the amendment has expired.

Mr. BRUCE. Very well.

Mr. BROUSSARD. Mr. President, I had not expected to say anything about this bill, but I have just read the report of the committee which has suggested to me a thought which I desire to express on this subject.

When the Volstead law was first put into effect a great many people throughout the country, and I think most of the periodicals, protested against the practice of the United States Government in the prosecution of prohibition cases of assessing what was tantamount to a license for conducting the business for which offenders were arrested and prosecuted. Of course, everyone knew that if those who were engaged in selling liquor applied for a license, no license would be issued for, under the Constitution, none could be issued by any constitutional grant of the Congress. However, in order to add to the punishment which might be inflicted, even from the first day the act was put into effect and before the cry arose that the punishment was inadequate, I recall that offenders haled before the courts were not only fined for violating the Volstead law, but they were accused in three or four counts of transportation and possession, and then they were haled before a State court and again tried there, and in some cases they were tried for a third time in a municipal court.

Then the United States Government, through its internal-revenue officials, would send to the offender a bill for a license for conducting the liquor business, and then assess damages against him for having failed to obtain such a license. They insisted upon collecting such assessments, and wherever they could make good by levying against the property of the offender they did so. It occurred to me, as well as to a great many others, that this was purely tyrannical, and was unwarranted under the Constitution, and not intended by the Volstead law.

Another practice which has grown up is not to make charges against offenders under the terms of the prohibition law, but to charge conspiracy under section 37 of the Criminal Code. That is done for the purpose of avoiding a trial by jury and so that heavier fines and penalties may be imposed.

Mr. President, we are told that under this proposed amendment to the Volstead Act we need not fear an increase of the minimum penalty imposed, and we are asked to put our trust in the Federal judges. Let me read to you, Mr. President, the reason why I fear to trust the Federal judges in this matter. In the report of the committee, accompanying the bill, there is incorporated the testimony of Mrs. Willebrandt. Commenting upon this bill, she says:

I have become convinced, not only by my own experience but by the recommendations of scores of Federal judges and hundreds of Department of Justice law-enforcement officials, such as United States attorneys, marshal, and the like, that the maximum penalties of the Volstead Act for the violation of things which violate the Constitution as well as substantive law are entirely inadequate.

So, Mr. President, we have the information, presented to us by a committee of the Senate through Mrs. Willebrandt, that the Federal judges themselves would like to impose upon violators of the Volstead law such a penalty as $10,000 and five years' imprisonment. Therefore, if they are asking for this amendment in order to increase these penalties and fines and imprisonments, we ought to be very careful in granting them the power that they are asking beforehand in order that they may be permitted to exercise it.

Mr. President, we have claimed, as I stated a while ago, that these fines or penalties were being imposed for selling liquor without a license, and forcing people to pay for a license; that the authorities were circumventing the law by not prosecuting under the Volstead law, but prosecuting under section 37 of the penal statutes; and Mrs. Willebrandt comes here and admits all of that. I should like to have Senators pay attention to this. It shows how those charged with the enforcement of the prohibition law believe that the only law on the statute books is the eighteenth amendment and the Volstead law.

Mrs. Willebrandt describes what the enforcement officials, from the judges down, have been doing, including the prohibi-

tion enforcement officers, the United States district attorneys, and the marshals. She says:

> They have resorted to the old internal revenue laws relating to the violation or evasion of various kinds of liquor taxes, and the Supreme Court of the United States—

And this is a surprising thing—

> has upheld the use of those old internal revenue laws. However, it is only the occasional case that has evidence so prepared that in honesty a prosecution can be grounded under the internal revenue laws rather than the Volstead Act.

Mr. BRUCE. Mr. President, may I interrupt the Senator for just a moment?

Mr. BROUSSARD. I yield.

Mr. BRUCE. Notwithstanding what Mrs. Willebrandt says about her desire to get away from this indirection of resorting to the old internal revenue laws and to the conspiracy statute for the purpose of securing penalties adequate to prohibition enforcement, if this bill were passed it would still be entirely possible to resort to this conspiracy statute for the purpose of punishing the possession of liquor to which the incident of transportation was attached.

Mr. BROUSSARD. And it would still be possible for them to add it to the greater fine and imprisonment, as they do now, to the existing fine and imprisonment.

Mr. BRUCE. That is true; so it is just a hollow pretense.

Mr. BROUSSARD. Mrs. Willebrandt continues:

> The other statute that they have popularly resorted to for grave, serious, widespread violations of the liquor laws, instead of grounding the offense under the national prohibition act, is the conspiracy statute, section 37 of the Penal Code.

Here is a confession on her part that our contention heretofore has been correct.

> In my estimation, section 37 has been strained beyond all reach in grounding liquor law prosecutions under it.

So, Mr. President, realizing that the Federal judges, or many of them, are asking that this bill be passed, that the existing law be amended and the penalties increased, I have no doubt that they intend to inflict those punishments; and the assurance given us that we should rely upon those judges is not one which I am willing to trust. Therefore I shall oppose the bill.

Mr. BRUCE. Mr. President, may I interrupt the Senator just once more?

The PRESIDING OFFICER (Mr. COUZENS in the chair). Does the Senator from Louisiana yield to the Senator from Maryland?

Mr. BROUSSARD. I do.

Mr. BRUCE. In that connection, I am sure the Senator recalls the judge who was brought on from Texas a short time ago to the city of New York to sit there in the trial of Volstead Act cases as well as other cases, whose conduct and deportment was so outrageously partisan and extreme in a case involving a violation of the Volstead Act that one of the attorneys in the case addressed a formal protest to the Bar Association of the State of New York, or to the judicial authorities of New York, I forget which at this moment.

Mr. BROUSSARD. Yes.

Mr. BRUCE. I mention that just as an illustration of how dangerous it would be to lodge such a fearful discretion as this in the hands of judges, especially when the fact is borne in mind that these judges have been largely appointed after being—to use an expression I employed at an earlier stage of the debate—vised by Wayne B. Wheeler or other representatives of the Anti-Saloon League.

Mr. BROUSSARD. That is very true.

Mr. JONES. Mr. President, just a moment on the amendment that is pending.

On yesterday reference was made to several statutes that imposed certain penalties, with the idea of trying to impress the Senate that the penalties imposed here are too extreme. I hold in my hand some criminal statutes of the United States that I want to call to the attention of Senators.

> Section 44 of the crimes statutes, chapter 4: Whoever shall willfully trespass upon * * * any * * * harbor-defense system owned * * * by the United States shall be fined * * * $5,000, or imprisoned not more than five years, or both.

In other words, if a citizen of the United States should walk over on to a fortification where there was a trespass sign, or where there was not, he would be technically guilty of trespass on United States property; and a United States judge could give him a 5-year penitentiary sentence.

Mr. BRUCE. Mr. President, may I interrupt the Senator for a moment?

Mr. JONES. In just a moment.

Mr. BRUCE. That might be a spy whose inspection would be fatal to the very life of the Nation.

Mr. JONES. Oh, it might be; and it might also be a good, honest, patriotic American citizen in Maryland.

> Section 46: Whoever shall rob another of any kind or description of personal property belonging to the United States * * * shall be fined not more than $5,000, or imprisoned not more than 10 years, or both.

In other words, if an agent of the United States should be carrying a spike belonging to the United States Government, and the Senator from Maryland should take that spike away from him and carry it off, he would be liable to a fine of $5,000 and imprisonment of 10 years in the penitentiary.

Mr. JOHNSON. Mr. President, are the absurdities to which the Senator refers justification for a further absurdity?

Mr. JONES. I do not think these are absurdities.

Mr. JOHNSON. The Senator thinks those punishments would be perfectly legitimate under the circumstances he has detailed, does he?

Mr. JONES. I do not think they would ever be imposed by any Federal judge. That is what I think.

Mr. JOHNSON. I would not give him the power, even, to impose them.

Mr. JONES. But he has the power.

Mr. JOHNSON. I would not give it to him if I had the opportunity.

Mr. JONES. There are many other statutes here of the same kind. I cite these merely as illustrations. No one has ever heard of any Federal judge exercising such power as is given here. I am citing these statutes merely as a sort of answer to the suggestions made here that because a judge has the power to impose a 5-year penalty he will impose it on a man who may have a pint of liquor in his possession, or in his home, or something of that sort. I do not fear anything of that kind myself upon the part of the Federal judges of the country.

Mr. REED of Missouri. Mr. President, does the Senator say that he does not know of any penalties of this atrocious character that have been inflicted upon people by Federal judges?

Mr. JONES. No; I did not say that I did not know of any such penalties. I do not know of judges inflicting such penalties for trivial offenses.

Mr. REED of Missouri. But, of course, according to the Senator's theory and the theory of many gentlemen, the possession of liquor is not a trivial offense. That is an offense against God and reason and nature.

Mr. JONES. No; the Senator has absolutely no reason to think that the Senator from Washington suggests anything of that kind.

Mr. REED of Missouri. I am going by what the Senator suggests in his bill.

Mr. JONES. The Senator has not heard very much of this discussion, or very much that has been presented here with respect to it.

Mr. REED of Missouri. I do not need to.

Mr. BRUCE. Mr. President, may I interrupt the Senator for a moment?

The PRESIDING OFFICER. The Senator from Washington has used all his time.

Mr. REED of Missouri. Mr. President, I had intended to address myself to this bill and to the general subject of prohibition.

Mr. BLAINE. Mr. President, will the Senator yield? I desire to present an amendment. I do not like to present the amendment in the absence of most of the Senators; and, if the Senator does not object, I will suggest the absence of a quorum.

The PRESIDING OFFICER. The Secretary will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Deneen | Hayden | Reed, Mo. |
| Barkley | Dill | Heflin | Reed, Pa. |
| Bayard | Edge | Johnson | Robinson, Ark. |
| Bingham | Fess | Jones | Robinson, Ind. |
| Black | Fletcher | Kendrick | Sackett |
| Blaine | Frazier | Keyes | Schall |
| Blease | George | King | Sheppard |
| Borah | Gerry | McNary | Shipstead |
| Bratton | Gillett | Moses | Shortridge |
| Brookhart | Glass | Neely | Simmons |
| Broussard | Glenn | Norbeck | Smith |
| Bruce | Goff | Norris | Smoot |
| Burton | Gould | Nye | Steck |
| Capper | Greene | Oddie | Steiwer |
| Caraway | Hale | Overman | Stephens |
| Copeland | Harris | Phipps | Swanson |
| Couzens | Harrison | Pine | Thomas, Idaho |
| Curtis | Hastings | Pittman | Thomas, Okla. |
| Dale | Hawes | Ransdell | Trammell |

Tydings      Wagner      Warren      Wheeler
Tyson      Walsh, Mass.      Waterman
Vandenberg      Walsh, Mont.      Watson

Mr. BLAINE. I desire to announce that my colleague [Mr. LA FOLLETTE] is unavoidably absent. I ask that this announcement may stand for the day.

Mr. NORRIS. My colleague the junior Senator from Nebraska [Mr. HOWELL] is unavoidably detained from the Senate by illness.

Mr. JONES. I wish to state that the Senator from South Dakota [Mr. McMASTER] is detained in committee.

The PRESIDING OFFICER. Eighty-six Senators having answered to their names, there is a quorum present.

Mr. CURTIS. Mr. President, will the Senator from Missouri yield while I submit a unanimous-consent agreement?

Mr. REED of Missouri. I will yield with the understanding that it does not come out of my little allotment of time.

Mr. CURTIS. It will not be taken out of the Senator's time.

THE RADIO COMMISSION

The PRESIDING OFFICER. The clerk will read the proposed agreement.

The Chief Clerk read as follows:

*Ordered, by unanimous consent,* That on Tuesday, February 19, 1929, at not later than 6 o'clock p. m., the Senate take a recess until 8 o'clock p. m., and that at the evening session, which shall not continue later than 11 o'clock p. m., the Senate proceed to the consideration of the bill (S. 4937) continuing the powers and authority of the Federal Radio Commission under the radio act of 1927, and for other purposes.

Mr. VANDENBERG. Mr. President, I would like to inquire whether that bill has the sanction at this point of the steering committee of the Senate, which, I learned on Thursday, is of very high authority in this body?

Mr. CURTIS. The evening session arranged for is for a special purpose. The radio bill is not on the list, but ought to be disposed of by the 21st, I think, and the steering committee would put it on the list, I dare say, at the next meeting; but we would like to have a night session to consider it. All sides have agreed to the proposal.

Mr. VANDENBERG. I wonder if I might inquire of the Senator whether we might not hope for some night sessions to do some of the other things we ought to do?

Mr. CURTIS. I really hoped for some night sessions beginning next week, but I wanted to get this bill out of the way first.

Mr. VANDENBERG. There may be an anticipation of other night sessions?

Mr. CURTIS. Yes.

The PRESIDING OFFICER. Is there objection? The Chair hears none, and the unanimous-consent agreement is entered into.

AMENDMENT OF NATIONAL PROHIBITION ACT

The Senate, as in Committee of the Whole, resumed the consideration of the bill (S. 2901) to amend the national prohibition act, as amended and modified.

Mr. REED of Missouri addressed the Senate. After having spoken in all for 25 minutes——

The PRESIDING OFFICER. The time of the Senator from Missouri has expired.

Mr. BRUCE. Mr. President, I move that the Senator be allowed to proceed. Soon the Senate will hear that entrancing voice no more.

Mr. REED of Missouri. The Senator can not do that.

Mr. JONES. Mr. President, I shall have to make the point of order against the motion. It is contrary to the unanimous-consent agreement.

Mr. REED of Pennsylvania. Mr. President, has the Chair ruled on the point of order?

The PRESIDING OFFICER. It is sustained.

Mr. HARRISON. Mr. President, I ask unanimous consent that the Senator from Missouri may proceed for 20 minutes.

Mr. JONES. Mr. President, I am sorry that the request is made. The Senate has entered into a solemn agreement with reference to this measure. If we extend the time for one, we must do it for others, so I shall have to object.

The PRESIDING OFFICER. Objection is made.

Mr. BLAINE. Mr. President, will the Senator yield?

Mr. REED of Pennsylvania. I yield to the Senator for a question.

Mr. BLAINE. I want to repeat the unanimous-consent request proposed by the Senator from Mississippi [Mr. HARRISON] and to say that the larger portion of the time to-day was taken up by others upon a question which was not before the Senate. If Senators are going to insist upon depriving a Senator of the right to debate under these circumstances, I want to serve notice now that as long as I am in the Senate there will never again be unanimous consent granted to such an agreement proposed.

Mr. BORAH. Mr. President——

The PRESIDING OFFICER. Does the Senator from Pennsylvania yield to the Senator from Idaho?

Mr. REED of Pennsylvania. First, I want to say that I have not the slightest objection to the request for unanimous consent, and would be glad to yield the floor for that purpose. I do want, however, before this bill is voted on to speak for about five minutes. Now, I yield to the Senator from Idaho.

Mr. BORAH. I merely want to make a suggestion. The debate upon this matter has opened up in a way now that has become interesting. I do not wish to interfere with the program, but at the same time I should like to ask unanimous consent that the unanimous-consent agreement be vacated and that we have an opportunity on Monday to go into this question and discuss it as it ought to be discussed.

The PRESIDING OFFICER. Is there objection to vacating the unanimous-consent agreement?

Mr. JONES. Mr. President, there was the opportunity all of yesterday afternoon to discuss this amendment; there was the opportunity to do so for three hours to-day. There is much other legislation that is pressing and on which it is very desirable to secure action before the session shall close. I dislike very much to be in this position, but as the one in charge of the bill I feel that I shall have to object.

The PRESIDING OFFICER. Objection is made.

Mr. HARRISON. Mr. President, will the Senator from Pennsylvania yield so that I may ask the Senator from Washington a question.

Mr. REED of Pennsylvania. I very gladly yield.

Mr. HARRISON. The unanimous-consent agreement only limits the time of speeches. Would not the Senator agree to modify the unanimous-consent agreement provided consent could be obtained to vote at a fixed time on Monday?

Mr. BORAH. I would not like to agree to that. If the bill is going to be debated, let us have a full debate, what they call in England a "dress-suit" debate.

The PRESIDING OFFICER. Objection is made.

Mr. REED of Missouri. Mr. President, I desire to say this, if the Senator from Pennsylvania will yield.

Mr. REED of Pennsylvania. I gladly yield.

Mr. REED of Missouri. Yesterday afternoon I had an important committee meeting, and I inquired of the Senator from Washington [Mr. JONES] whether he expected to get a vote yesterday afternoon. He said he did not. I then said that I wanted to make some remarks on the bill, but at that time I was obliged to attend to my committee work. I was utterly surprised to find that, without any roll call or without any notice, this unanimous-consent agreement had been made, although I was in the building in company with the other members of the committee. I do not want, however, to present any petition, only I should like at some time to finish what I have to say.

Mr. JOHNSON. Mr. President, I rise to a parliamentary inquiry.

The PRESIDING OFFICER. The Senator from California will state his parliamentary inquiry.

Mr. REED of Pennsylvania. Certainly.

Mr. JOHNSON. I should like to ask how the Chair construes the unanimous-consent agreement? It provides, apparently, that each Senator may speak for 15 minutes upon the pending bill, and not more than once nor longer than 10 minutes upon any amendment proposed thereto. Does that mean 10 minutes upon each amendment?

Mr. JONES. Yes.

Mr. JOHNSON. Necessarily it does. If that be true, how long a time did the Senator from Missouri occupy?

The PRESIDING OFFICER. The Senator from Missouri has occupied 15 minutes on the bill, and 10 minutes on the pending amendment. He has more time on any other amendment which may come before the Senate.

Mr. JOHNSON. Then, Mr. President, as there is no other amendment before the Senate, I am going to offer such an amendment.

Mr. JONES. There can be but one amendment pending at a time.

The PRESIDING OFFICER. There is a pending amendment before the Senate not as yet disposed of.

Mr. JOHNSON. The Senator from Missouri does not need to confine himself in his 10 minutes to one single amendment. I can move to amend the pending amendment, and in that fashion the Senator from Missouri will have the right to speak 10 minutes longer. Then some other Senator can repeat the process until the Senator from Missouri gets an opportunity to conclude his speech. It does not make any difference whether

we agree with the Senator from Missouri or not, he ought to have the opportunity to present his views and to debate the question, and I think that we in this body ought not to be guilty of shutting the Senator off from adequately presenting his views upon the question.

Mr. BRUCE.  Mr. President——

Mr. REED of Pennsylvania.  Mr. President, before I yield further, I desire to ask may I not yield the floor?  I have not said a word upon the pending bill.  May I not yield the floor, with the understanding that it will not prejudice my right to be heard later?  I have not made a speech, and I do not want to inject a speech into the middle of somebody's else speech, but I do want to speak for five minutes before the final vote.

Mr. BRUCE.  I rise to a point of order.  Are there not two committee amendments pending or is but one amendment pending?

The PRESIDING OFFICER.  Only one amendment is pending at this time.

Mr. JOHNSON.  If there were two amendments pending, may I inquire would the Senator from Missouri then have a right to proceed 10 minutes longer upon the pending amendment?

The PRESIDING OFFICER.  There can be only one amendment pending at a time.

Mr. JOHNSON.  Very well.  If a substitute were offered for the amendment, or an amendment to it, upon that substitute or amendment, would the Senator from Missouri have the right to proceed?

The PRESIDING OFFICER.  He would.

Mr. JOHNSON.  Very well.  What is the pending amendment, please?

The PRESIDING OFFICER.  The pending amendment is on page 1, line 3, to insert the words "in a criminal prosecution."

Mr. JOHNSON.  That is, the italicized words "in a criminal prosecution"?

The PRESIDING OFFICER.  That is the pending amendment.

Mr. JOHNSON.  I move to amend that by adding after the word "prosecution" the words "after the first offense."

The PRESIDING OFFICER.  The Senator from Missouri may speak on that amendment.

Mr. GLASS.  Mr. President, it does seem to me that the Senator ought not to be put to such subterfuges as have been suggested.  The Senator from Washington will recall that I apprehended there might arise just such a situation as this when he proposed his unanimous-consent agreement yesterday.  I asked for a roll call, but the response was that there was no necessity under the usage for a roll call, because no time was fixed for a final vote.  The whole matter may be simplified if the Senator from Washington will not persist in his objection, for it is not going to accomplish anything, as can readily be seen from the proposition of the Senator from California [Mr. JOHNSON], and there will be other substitutes, doubtless, and other amendments, and so we will go on under that process of subterfuge.

Mr. JONES.  Mr. President, there is no one that I enjoy hearing speak more than I do the Senator from Missouri.  I would have made the same objection to anyone else whether on this side of the Chamber or the other, whether for prohibition or against it.  If the Senate, knowing the situation that confronts us, desires to abrogate the unanimous-consent agreement which we made in the usual and customary way, I do not feel that I should set myself up against the judgment of the Senate.  If, therefore, we can now reach a unanimous-consent agreement that will be observed in the future and that will give us more time and will be satisfactory, I shall not object to it.

Mr. FESS.  Mr. President——

Mr. JONES.  I yield to the Senator from Ohio.

Mr. FESS.  Mr. President, I shall object to vacating the unanimous-consent agreement, but, in view of the fact that the Senator from Missouri did raise the question—and I was in the chair when it was raised—as to what the purpose was and whether a vote would be had, and he left the Chamber and was out while the suggestion was made to limit debate, I think that we ought to make a modification to the extent of permitting the Senator from Missouri to conclude his speech.

Mr. BORAH.  Mr. President, there is no reason why, if we are going to have debate, that the debate should not be had under such circumstances as that every Senator will feel free.  The Senator from Missouri, if he is going to discuss the matter, ought not to be interrupted every few minutes to be told that his time has expired, and neither should other Senators.  I think that there has been raised a question which will justify debate, and perhaps it is as important as some other measures which might be postponed by reason of such debate.  I suggest, therefore, that we vacate the unanimous-consent agreement, and take a recess until 12 o'clock on Monday.

LXX——227

Mr. HEFLIN.  Mr. President, may I suggest to the Senator from Washington that, rather than pursue that course, we allow the Senator from Missouri to have 20 minutes additional—certainly I have no objection to that—and then allow any Senator who wishes to reply to him to have an opportunity to do so.  If the Senator from Idaho should like to speak, let him have 20 minutes additional.  He would have 15 minutes on the bill under the agreement as it stands and 10 minutes on the amendment.

Mr. GLASS.  But other Senators might want an additional 20 minutes.

Mr. HEFLIN.  Other Senators could speak 15 minutes on the bill and 10 minutes on the amendment.  I think that would settle the wrangle we are in, without abandoning the unanimous-consent agreement.

Mr. BLEASE.  Mr. President, will the Senator yield?

Mr. JONES.  Just a moment.  Mr. President, I have certainly not thought of taking snap judgment against anybody.  I conferred with the Senator from Maryland [Mr. BRUCE] and the Senator from Wisconsin [Mr. BLAINE] on yesterday before submitting the request, and they were the only two so far as I knew who expected to speak on the bill.  The Senator from Missouri did speak to me, as he said, but I did not gather from the conversation whether he intended to speak on the bill.

I myself do not propose to take advantage of anybody.  If we can reach some agreement as to a time when we might proceed under the 10-minute rule again, I am perfectly willing, if the Senate so desires, to vacate the unanimous-consent agreement we have made, if that can be conditioned on taking a recess to-night until Monday.

Mr. BLEASE.  I merely wish to make a suggestion, if the Senator will permit me.

Mr. JONES.  I yield.

Mr. BLEASE.  The unanimous-consent agreement went into effect at 3 o'clock this afternoon.  The Senate met at 12 o'clock, and I presume every Senator thought that the debate was going to be continued on the pending bill; but the distinguished Senator from Alabama delivered an address, which was very entertaining, for possibly an hour and a half; after that the Senator from Connecticut made some remarks.  The result was that nearly the entire time up to 3 o'clock was taken up with foreign matter, and Senators who desired to discuss the pending measure were deprived of an opportunity of doing so.  When the hour of 3 o'clock arrived, the unanimous-consent agreement went into effect.  It seems to me that at least the two hours and a half which were consumed in the discussion of other subjects should be added to the time when the limitation of debate went into effect.

I say now that if the Senator from Missouri shall not be permitted to go on, so far as I am concerned, if I am here—and I hope to be—there will be no other unanimous-consent agreements entered into at this session up to 12 o'clock on the 4th day of March.

Mr. HEFLIN.  Mr. President, I should like to say a word further.

Mr. JONES.  Mr. President, I wish to submit a request for unanimous consent.  I ask that the existing unanimous-consent agreement may be vacated; that when the Senate concludes its business to-night it shall take a recess until 12 o'clock on Monday; and that after 4 o'clock p. m. on Monday next debate on the bill and any amendment thereto shall be limited to 10 minutes to each Senator.

The VICE PRESIDENT.  Is there objection?  The Chair hears none, and it is so ordered.

Mr. REED of Missouri.  Mr. President, I inquire of the Senator from Washington if it is his desire now to take a recess?

Mr. JONES.  Oh, no.  I should like to have the Senator from Missouri proceed.

Mr. WATSON.  The understanding is that the Senator from Missouri will proceed now.

Mr. REED of Missouri resumed his speech.  After having spoken for some time he said:

Mr. President, I do not want to conclude my remarks to-night if the Senator from Washington [Mr. JONES] is willing to take a recess at this time.

Mr. REED of Pennsylvania.  Mr. President, without meaning to take the Senator from the floor, and with his permission, I should like to make a report on a privileged matter from the Committee on Military Affairs.

Mr. REED of Missouri.  May I just make one statement before I conclude for to-day?  I shall ask the privilege of the floor when the Senate reconvenes on Monday to continue my remarks.

The PRESIDING OFFICER.  Without objection, it is so ordered.

[The speech of Mr. REED of Missouri is published entire beginning on page 3637.]

Mr. VANDENBERG. Mr. President, in connection with this particular day's debate I ask unanimous consent to have printed in the RECORD an editorial from to-day's Baltimore Sun; and I desire to read just two sentences from it:

The Senate is trifling with a matter of grave importance when it sidetracks reapportionment for a bill to increase penalties for violation of the Volstead law. Complaint over the disrespect shown for dry laws comes with ill grace from a legislative body which has refused session after session to obey a plain mandate of the Constitution.

I ask to have the entire editorial printed in the RECORD.

There being no objection, the matter referred to was ordered to be printed in the RECORD, as follows:

REAPPORTIONMENT

The refusal of the Senate thus far to take up the reapportionment bill bodes ill for that measure. Once before a bill designed to obey the Constitution in the matter of reapportionment was killed in the upper body after passage by the House.

This present danger is more regrettable because of the great opposition in the House to decrease of representation in that body from several States lagging in population. It was only under the demand of determined voters from States which now suffer gross discrimination in representation in Congress that the House was induced to pass the bill. To have overcome that unwillingness to obey the Constitution and do justice, and then find the Senate indifferent to its duty, is one of the most unfortunate developments of this session. Whenever the subject has arisen in the Senate that body has assumed an apologetic attitude for its previous refusal to agree to reapportionment, and has given every indication that it would not make the same mistake again. But the indifference now shown in the matter is more significant than all the words that have been uttered.

The Senate is trifling with a matter of grave importance when it sidetracks reapportionment for a bill to increase penalties for violation of the Volstead law. Complaint over the disrespect shown for dry laws comes with ill grace from a legislative body which has refused session after session to obey a plain mandate of the Constitution. Continued opposition to passage of the bill by the Senate would be a gross betrayal of its sworn duty.

ARMY PROMOTIONS

Mr. REED of Pennsylvania. Mr. President, for the past two years the Senate has heard rumbles of a disagreement in the Committee on Military Affairs over what is known as the promotion situation growing out of the hump in the promotion list created at the close of the World War because 6,000 officers were all taken in at once with substantially the same amount of commissioned experience. The Senator from Alabama [Mr. BLACK] represented a school of thought which was quite contrary to that which seems to me and some other members of the committee to be the proper way of dealing with the matter. There have been for more than a year on the calendar of the Senate two bills, one representing his thought and reported out by a scant majority of the Military Affairs Committee, and one representing what the rest of us thought was right, also reported out by a scant majority.

It was perfectly evident that our opposition to one another's ideas was going to prevent relief to that great throng of officers who, when they came into the Army, were rightfully encouraged to look for reasonable promotion during their service. Matters reached such an impasse that finally the Secretary of War came before us to appeal to us to drop all of our smaller differences and try to agree upon some proper measure of promotion based upon length of service, and not upon waiting for one's predecessor on the promotion list to die or resign or retire.

I want to say on behalf of the Senator from Alabama [Mr. BLACK] and those Senators who agreed with him that they have met us most fairly, and I am happy now to be able to report unanimously to the Senate from the Committee on Military Affairs amendments to the amendments of the House to the bill (S. 3269) providing for the advancement on the retired list of the Army of Hunter Liggett and Robert L. Bullard, major generals, United States Army, retired.

The amendments reported by the Committee on Military Affairs to the amendment of the House of Representatives to Senate bill 3269 were read, as follows:

That the aggregate number of commissioned officers of the Regular Army and Philippine Scouts on the active list shall not exceed the number now or hereafter expressly authorized by law, and all such officers, except officers of the Medical Department, chaplains, and professors, shall be designated as promotion-list officers. The number of promotion-list officers in each of the grades below brigadier general shall be such as results from the operation of the promotion system prescribed in this act, and shall not be otherwise limited: Provided, That except as otherwise in this act prescribed, the aggregate number

of promotion-list colonels and lieutenant colonels shall not exceed 15 per cent, and the number of promotion-list field officers shall not be less than 26 per cent, of the maximum aggregate number of promotion-list officers authorized by law.

SEC. 2. That all promotions under this act shall be subject to such examination as shall have been required by authority of law. Promotion-list officers in the grades of second lieutenant, first lieutenant, captain, major, and lieutenant colonel shall, except as otherwise prescribed in this act, be promoted to the respective next higher grade when their names appear first in their grade upon the promotion list, and when, under provisions of this act, they are credited with 3, 10, 15, 20, and 26 years of service, respectively. The promotion of majors credited with 20 years of service shall be deferred so long as necessary to prevent the limitation of 15 per cent hereinbefore prescribed for the combined grades of colonel and lieutenant colonel being exceeded, and no officer shall be promoted to the grade of colonel until he shall have served at least two years in the grade of lieutenant colonel: Provided, That promotion-list officers not promoted from the grade of major under the foregoing provisions shall be promoted to the grade of lieutenant colonel when, under provisions of this act, they are credited for promotion purposes with not less than 20 years of service and are also not less than 52 years of age, and officers so promoted under this proviso shall be promoted to the grade of colonel when credited with 26 years of service, or as soon thereafter as they shall have served not less than two years in the grade of lieutenant colonel and shall be additional numbers in the grades of lieutenant colonel and colonel and shall not be counted in computing the maximum percentage hereinbefore prescribed for such grades: Provided further, That in the application of the foregoing proviso each United States Military Academy class shall be treated as a unit as of the average age of the members of the class. In so far as necessary to maintain the prescribed minimum of field officers, captains credited with less than 15 years of service shall be promoted in the order of their standing upon the promotion list.

SEC. 3. That flying officers commissioned in the Air Corps in the grades of first lieutenant and captain shall be promoted to the respective next higher grades when credited for promotion under provisions of this act with 7 and 12 years of service, respectively. When promotion as hereinbefore prescribed in this and preceding sections of this act fails to provide the Air Corps with the per cent of colonels, lieutenant colonels, and majors hereinafter specified flying officers commissioned in the Air Corps shall be promoted in the order of their relative standing on the promotion list so that the number of Air Corps officers in the grade of colonel shall be 3 per cent, in the grade of lieutenant colonel 4 per cent, and in the grade of major 18 per cent, respectively, of the total number of officers commissioned in the Air Corps, fractions being disregarded in computing said numbers. Flying officers of the Air Corps promoted to the grades of lieutenant colonel and colonel under provisions of this section shall be additional numbers therein and shall not be counted in computing the maximum percentage for such grades hereinbefore prescribed in this act. Any flying officer of the Air Corps promoted under provisions of this section who may become surplus in the grade of major, lieutenant colonel, or colonel by reason of a subsequent decrease in the total number of officers commissioned in the Air Corps shall be an additional number in his grade in the Air Corps until absorbed. The term "flying officer" as used in this act shall be construed to mean a flying officer as defined by section 13a of the national defense act as amended.

SEC. 4. Length of service for promotion under this act shall be computed as follows:

First, each promotion-list officer originally commissioned in the Regular Army prior to July 2, 1920, without prior Federal commissioned service, whose active commissioned service shall have been continuous since acceptance of original commission, shall be credited with the full period from the date of such original commission;

Second, each promotion-list officer commissioned in the Regular Army or Philippine Scouts prior to July 2, 1920, who is not included in the category defined in the preceding subparagraph shall be credited with a length of service equal to that accredited to the officer of said category whose name appears nearest above his on the promotion list;

Third, each promotion-list officer originally commissioned in the grade of second lieutenant in the Regular Army or Philippine Scouts after July 1, 1920, shall be credited only with the period of service from the date of such original commission: Provided, That each promotion-list officer not included in any of the foregoing categories and each officer of said categories whose original relative position on the promotion list shall have been changed or affected by sentence of court-martial, by special enactment, by discontinuity of his active service, or by suspension from promotion, shall be credited with such length of service for promotion as the Secretary of War shall determine to be appropriate to his relative position on the promotion list.

SEC. 5. That all prior statutory provisions governing the termination of active service of officers shall, except as otherwise specifically prescribed in this act, continue in full force and effect and be administered as now provided by law: Provided, That, excepting section 190, Revised Statutes of the United States, all laws or parts of laws restricting the freedom of persons on the retired lists of the Regular Army, who are otherwise eligible to accept any civil office or employment, or affecting

their retired status or retired pay on account of holding any civil office or employment and receiving the compensation thereof, are hereby repealed in so far as they apply to said persons; and any such person who may be employed in any civil office or position under authority of the United States shall be entitled to receive the full compensation allotted to such office or position without regard to such person's retired pay: *Provided further,* That when any officer of the Regular Army or Philippine Scouts shall have served 35 years or more, including all service counted toward eligibility for voluntary retirement under existing laws, including this act, he shall, if he makes application therefor to the President, be retired from active service and placed upon the unlimited retired list: *Provided further,* That when any officer of the Regular Army or Philippine Scouts shall have served 40 years as a commissioned officer in active service in the Army of the United States, or is 60 years old, he may, without action of a retiring board, be retired from active service at the discretion of the President, and placed upon the unlimited retired list: *Provided further,* That in computing eligibility for voluntary retirement of officers of the Army each officer shall, in addition to all service now credited under existing laws, be credited with additional constructive credit equal to one-half the time, if any, that he shall have been actually detailed to duty involving flying, except in time of war: *Provided further,* That flying officers of the Air Corps who become physically disqualified for all flying duty shall be eligible for retirement for physical disability.

SEC. 6. That during each fiscal year promotion-list officers who were originally appointed in the Regular Army or Philippine Scouts prior to July 1, 1920, or as of that date, may file applications to be transferred from the active list in the manner hereinafter provided and the President is hereby authorized, on or before June 30 of each fiscal year, to designate for transfer from the active list from among such applicants who shall have been recommended for such transfer by a board of general officers such number as shall not exceed 1 per cent of the maximum authorized number of promotion-list officers of all grades.

Officers designated for transfer from the active list under provisions of this section shall be ordered to their homes as soon as practicable after such designation and, upon expiration of such leave of absence with full pay as may be granted under existing law, shall be transferred to the unlimited retired list with retired pay at the rate of 2½ per cent of active pay, multiplied by the number of complete years of service, but not exceeding 30 years, with which credited for pay purposes, excepting non-Federal service: *Provided,* That each computation of service and pay of an officer designated for transfer from the active list under this section shall be as of the date of such designation: *Provided further,* That any officer originally appointed in the Regular Army as of July 1, 1920, at an age greater than 45 years, may if he so elects, in lieu of retired pay at the rate hereinbefore provided, receive retired pay at the rate of 4 per cent of active pay for each complete year of commissioned service in the United States Army, not exceeding 75 per cent of active pay.

Officers designated in any fiscal year for transfer from the active list shall, for purposes of computations under provisions of this act, be deemed to have been transferred from the active list during the fiscal year in which designated, notwithstanding the deferment of separation as herein authorized.

SEC. 7. That on and after the date of the passage of this act, Hunter Liggett and Robert L. Bullard, major generals, United States Army, retired, shall have the rank of lieutenant general on the retired list of the United States Army, and shall receive pay and allowances determined as provided by law for other officers on the retired list, and based upon the active pay and allowances provided for lieutenant generals during the World War. Said Hunter Liggett shall also be entitled to receive an amount equal to the difference between such pay and allowances and the pay and allowances of a major general, retired, from March 21, 1921, to the date of the passage of this act. Said Robert L. Bullard shall also be entitled to receive an amount equal to the difference between such pay and allowances and the pay and allowances of a major general, retired, from January 15, 1925, to the date of the passage of this act.

SEC. 8. That the President of the United States be, and he is hereby, authorized to nominate and, by and with the advice and consent of the Senate, to appoint any commissioned officer of the Army who served in the Army of the United States during the World War, whose service during that war was creditable, and who has been or hereafter may be retired according to law, a rank on the retired list at the highest rank held by him during the World War, but, except as otherwise specified in section 7 of this act, not above the rank of major general: *Provided,* That no increase of retired pay and allowances shall result from the provisions of this section.

SEC. 9. That except as specifically provided in this act, nothing therein shall be held or construed to discharge any officer from the Regular Army or to deprive him of the commission which he holds therein, or to reduce the rank or pay, active or retired, of any officer therein. All laws and parts of laws, in so far as the same are inconsistent herewith or are in conflict with any of the provisions hereof, are hereby repealed.

Amend the title so as to read: "An act to regulate promotion in the Army, and for other purposes."

Mr. REED of Pennsylvania. While it is a unanimous report that is submitted to the Senate, the Senator from Connecticut [Mr. BINGHAM] has a further amendment which he asks to offer to add to the bill, and upon which further amendment I shall speak very briefly when he offers it.

In reporting this as a privileged matter—because it is an amendment to an amendment of the House and would not in any way displace the unfinished business—I move that the Senate agree to the amendment of the House with the amendment reported by the Senate Committee on Military Affairs.

Mr. ROBINSON of Arkansas. Mr. President, may I ask the Senator from Pennsylvania if the amendment is a lengthy one?

Mr. REED of Pennsylvania. It is about eight pages long.

Mr. ROBINSON of Arkansas. Will the Senator make a brief analysis of it, so that those of us who are interested in the bill may understand what is effected by its terms? As the Senator will recall, I was formerly a member of the Committee on Military Affairs of the Senate and was greatly interested in the subject and had prepared a bill relating to it.

Mr. REED of Pennsylvania. It was a matter of great regret to all of us when the Senator from Arkansas withdrew from that committee.

Mr. ROBINSON of Arkansas. I thank the Senator.

Mr. REED of Pennsylvania. Mr. President, to begin with, this bill does not propose to increase the aggregate of officers of the Army. That aggregate is now fixed at 12,000 officers. This bill does not propose to increase it. The bill does not increase the pay of the several ranks; it leaves the pay act of 1922 unchanged. It provides a system of promotion by length of commissioned service, including in that commissioned service the period between the armistice and the going into effect of the national defense law of 1920, because we did not want to discriminate among officers in accordance with the rapidity of demobilization.

The bill provides that a second lieutenant whose service is otherwise creditable shall be promoted to first lieutenant after 3 years of commissioned service; to captain after a total of 10 years of commissioned service; to major after 15 years of commissioned service; to lieutenant colonel after 20 years of commissioned service; and to colonel after 26 years of commissioned service. There is no throttle in that system of promotion except after the grade of major. It is obviously necessary, in order to prevent the whole Army from being colonels, to put a throttle on somewhere.

Mr. NORRIS. It is necessary to have a few privates.

Mr. REED of Pennsylvania. We have got to have privates; ours is not the kind of an Army where all can be generals.

So with the recommendation of the War Department—and I might say this bill meets the full approval of the War Department—the throttle is put on between major and lieutenant colonel. It is provided that the total number of promotion-list colonels and lieutenant colonels shall not in the aggregate exceed 15 per cent of the total commissioned strength of the Army. The junior Senator from Alabama [Mr. BLACK] very properly called attention to the unfairness that that would work upon the older captains who were taken in from the World War Army and who were commissioned in 1920. He pointed out that that throttling provision would operate to prevent their ever getting their colonelcy, and probably their lieutenant colonelcy, before they were retired at 64 years of age. So, in collaboration with him, a proviso was worked out that majors who had the requisite 20 years' service should, if they had reached the age of 52, be promoted to lieutenant colonel and carried as extra numbers; that they should not dislodge any officer ahead of them on the promotion list, but would get permanent appointments as extra numbers; and, similarly, after 26 years of service and after a minimum of 2 years as lieutenant colonels, they should get their colonelcy and be carried as extra colonels.

Mr. ROBINSON of Arkansas. Will that affect a large number of officers?

Mr. REED of Pennsylvania. It will affect, I think, approximately 800. The Senator from Alabama will correct me if I am wrong. That took care of the officers in the general branches of the Army, but still left unsolved a serious problem in the Air Corps, because the Air Corps, according to its tables of organization, needs a considerable number of colonels and lieutenant colonels, and yet almost all of Air Corps officers are youngsters who came into the Army in the war time and in the natural course of events would not get to be field officers for a good many years.

In the first place, it was somewhat of an injustice to the Air Corps officers, although they are young, and, in the next place, it was a very serious injustice to the Air Corps as a unit because it deprived it of the higher commands that were necessary, and we should see such spectacles as majors in the Air Corps exercising commands that were appropriate for colonels,

and in charge of millions of dollars of Government property, and very large bodies of men. It was right that some method be devised to take care of them. So we did it in two ways:

First, by accelerating their promotion from captain to major, and allowing that to occur at the end of 12 years' service instead of 15 years; and next allowing promotion from first lieutenant to captain at the end of 7 years instead of 10 years, as for the remainder of the Army.

Then, further, we provided that for the Air Corps there should be 3 per cent of its officers in the grade of colonel, and if they did not reach that grade naturally, as a part of the whole promotion list, then they should be promoted to it and be carried as extra numbers, but their appointment would be permanent and not temporary; and, similarly, that 4 per cent of the Air Corps officers should be lieutenant colonels and 18 per cent should be majors.

Then, having reached that point, we allowed in the computation of service for retirement, and other purposes in the field, time and a half for such time as flying officers were actually engaged in flying duty. That was an effort by the committee to recognize the increased hazard of flying in peace times over the hazard that confronts the other branches of the service.

Furthermore, in order to avoid injustices in retirement, we have provided that any officer of the Army may retire at any time during his commissioned service, but, instead of getting full 75 per cent retired pay, he will receive 2½ per cent of his base pay for each year of his commissioned service with a maximum of 75 per cent.

We have also provided that officers with 35 years' experience may voluntarily retire on their own application, receiving the full 75 per cent retired pay.

We have also provided that after an officer reaches the age of 60 he may be retired on the order of the President for unfitness or general disability. The present limit is 62 years. We have dropped that limit two years and given the President the power to order retirement, with the idea of increasing the attrition in the promotion list, speeding up the flow of promotions and helping the junior officers.

Then, Mr. President, we have carried in the bill the provision that was in the original bill as it passed the Senate giving Gen. Hunter Liggett and Gen. Robert L. Bullard, the only two commanders of American field armies in battle, the permanent grade of lieutenant general, which they held during the time they actually commanded those battle armies. It is worth while, I think, to call attention to the fact that both General Liggett and General Bullard had under their command in the World War more men than the American Nation ever had under any command at any time in any previous war of its history.

Finally, we have embodied as an additional section the essential provisions of a bill introduced by the Senator from Tennessee [Mr. TYSON], which was passed by the Senate some time ago, allowing a brevet title, without any increase in pay to those officers who have been retired or may in the future retire, the brevet title to be the same as the highest rank they held during the World War. The Senate can scarcely understand—I myself can scarcely understand—the importance attached to that by these officers. It is a mere title; it is a mere reminder of the command they exercised during the war; it does not bring them one penny in pay or allowances, but to them it is more important than a considerable increase in the money reward which they receive from their Government.

Mr. BLACK. Mr. President, will the Senator yield at that point?

Mr. REED of Pennsylvania. I am glad to yield to the Senator from Alabama.

Mr. BLACK. A question has been asked me as to whether or not the carrying of extra numbers would increase the expense. I think probably it would be wise for the Senator to explain as to that.

Mr. REED of Pennsylvania. I am glad to do so. Under the pay act of 1922 the compensation of a lieutenant colonel and a colonel and, indeed, a major is substantially the same for those who have had the periods of service specified here for promotion. I had a particular application of it in the case of a lieutenant colonel of my acquaintance, who told me while this subject was under consideration that he would be benefited by the bill and would get his promotion immediately to colonel. I asked him, "Just what difference will that make to you in a money way?" He replied, "It will make a difference of exactly $1.95 a month." That resulted from some detail in connection with the matter of allowances; but the essential base pay of the officer is just the same whether he gets the promotion or does not. So, on behalf of the committee, I want to assure the Senate that the cost of this amendment which we

report will be practically nothing; it will be so slight that it is not worth paying attention to.

Mr. President, I move that the Senate agree to the amendment reported by the committee to the amendment of the House. If that motion shall be agreed to I will then move that the House amendment be agreed to.

The PRESIDING OFFICER (Mr. SMITH in the chair). The question is on the motion of the Senator from Pennsylvania.

Mr. BINGHAM. Mr. President, I desire to offer an amendment. As was stated by the Senator from Pennsylvania——

The PRESIDING OFFICER. Let the Chair inquire of the Senator if the amendment which he proposes to offer will not be in order after the vote shall be taken on the amendment proposed by the Senator from Pennsylvania on behalf of the committee?

Mr. BINGHAM. The amendment I desire to offer is an amendment to the committee amendment, and I think should be voted on first.

Mr. REED of Pennsylvania. I think the Senator is right in that, Mr. President.

Mr. BINGHAM. Mr. President, my amendment is that section 1 of the House amendment shall be included in the bill at the proper place. I will state briefly just what that does. Section 1 of the House amendment provides a separate promotion list for the Air Corps. That is virtually all that it does.

For many years the Air Corps has been earnestly striving to secure a separate promotion list. Casualties in the Air Corps from accident are ten times greater than those in any other branch of the Army. It is true that the other portion of the amendment as reported by the committee will correct the situation in regard to the securing of promotion after a certain length of years and without regard to the number of senior officers ahead of a particular officer, and it also provides a certain amount of benefit for the Air Corps; but it does not recognize the fact that the Air Corps in peace time labors under an entirely different kind of hazard than that under which the other branches of the Army labor. To grant them a separate promotion list would have this advantage, I believe, so far as the general psychology of the whole Army is concerned: Under the amendment as recommended by the committee, where the Air Corps is left in with the rest of the service, a captain in the Air Corps would continue alongside of a captain in the Regular Army for a period of 12 years, and then the captain in the Regular Army would continue as a captain for three years more until he became a major, whereas the man who had been alongside of him on the promotion list all these years would be suddenly advanced to the grade of major.

In other words, every time an Air Corps officer gets the advantage of this bill in the shortened length of service and the counting of flying time, it disrupts the promotion list, it makes hard feelings, it shows the rest of the Army that this man is being promoted over their heads, because the man who is interested in his own promotion studies the list and sees upon it the fact that he, Mr. C, is between Mr. B and Mr. D; and that goes on for a certain numbers of years until suddenly the man below him disappears and goes up to a higher grade.

I believe that that will have a bad effect on the Army and will cause hard feeling between the branches, whereas if we make a separate promotion list, retaining the other features of the bill, then Mr. C will not know that Mr. D has been promoted ahead of him unless he happens to be familiar with that particular case, because the lists will be separate, and when he looks for his own place in the list he will find as he goes up with the other officers that he retains exactly that place during all the years. For that reason, it seems to me that it is for the benefit of the entire Army, and it is also in line with what the Air Service has been seeking for a great many years, and which I believe it is entitled to.

I may say, for the benefit of the Senate, that this section of the bill has been approved repeatedly by the meetings of the National Aeronautic Association and by the convention of the American Legion.

Mr. REED of Pennsylvania. Mr. President, I am sorry to have to oppose this amendment, but I believe that it is very wrong in principle.

Down to the Spanish War, and for a short time afterwards, we had separate promotion lists for every regiment, and it worked out most unjustly. Classmates at West Point found themselves two grades apart simply because there had been more resignations or deaths in one regiment than in another. They were equally meritorious; and so, back about 1900, a system of promotion by branch, with separate promotion lists in each

branch, was instituted. Then it was found that as the types of war changed one branch came to be very greatly increased, like the Field Artillery, and another one did not increase, like the Cavalry, and classmates at West Point found themselves with just as much disparity as before, through no fault of one or merit of the other; and when the national defense act was passed it was decided to consolidate into one promotion list all the officers of the Army in combatant or staff service—that is, all except chaplains and doctors and dentists and veterinarians.

It was pointed out, of course, that the officer on duty with mounted troops was in greater danger, and probably had more accidents, and died more often, than the officer who was a quartermaster officer, sitting in the War Department; and yet, after a great deal of thought, Congress followed the advice of the War Department not to take that into account, but to prevent the greater injustices by consolidating all the officers into one branch.

This, I think—and the majority of the Military Affairs Committee agrees with me—would be a distinct step backward. It is dangerous, of course, to fly an airplane in peace time, but it is not exactly safe to go on with a battery of Field Artillery at a gallop. I have done both, and I think I felt in greater danger with the galloping battery than with the smoothly flying airplane. I think I was more scared at one time than the other, although I was properly scared at both times, and always will be. But you can not make separate lists just because of some differences in degree of danger; and, furthermore, they do not need it in the Air Corps in view of the provisions we have put in this bill that allow them this promotion as extra numbers.

That was the recommendation of the Secretary of War, so as to provide that within their own branch they should always have a supply of officers going forward to keep up their full percentage of field grades.

In substance, it is nothing more than a sentimental gesture to give them this separate promotion list. The practical benefits of it are all included in the committee amendment intentionally, purposely, so that they should have those practical benefits, but whatever we might do sentimentally to please the Air Corps by creating a separate list would do far greater damage to the rest of the Army by giving the impression that the Air Corps had been picked out for favoritism.

Therefore I hope the amendment will be rejected.

Mr. BINGHAM. Mr. President, I should just like to call attention to the fact that the rest of the bill certainly does pick out the Air Corps for favoritism, in that it permits promotion to go faster in the Air Corps than in the rest of the Army; and the argument which the Senator has used about two classmates at West Point will apply in his amendment more bitterly than it will apply in the amendment which I have proposed, because those two classmates will be in separate lists, and will not know it when they get separated.

Mr. REED of Pennsylvania. That is true, Mr. President; but it will be cured as time goes on.

The PRESIDING OFFICER. The question is on the amendment proposed by the Senator from Connecticut [Mr. BINGHAM] to the amendment of the committee.

The amendment to the amendment was rejected.

The PRESIDING OFFICER. The question now is on the amendment reported by the committee to the House amendment.

The amendment was agreed to.

The PRESIDING OFFICER. Without objection, the House amendment, as amended, is agreed to.

The title was amended so as to read: "An act to regulate promotion in the Army, and for other purposes."

Mr. REED of Pennsylvania. I move that the Senate insist upon its amendments and request a conference with the House, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to; and the Presiding Officer appointed Mr. REED of Pennsylvania, Mr. GREENE, and Mr. FLETCHER conferees on the part of the Senate.

### MISSOURI RIVER BRIDGE, IOWA-NEBRASKA

Mr. NORRIS. Mr. President, on behalf of my colleague [Mr. HOWELL], who is ill, I desire to ask the Senate to take up and pass a bill which has been unanimously reported, which simply extends the time for building a bridge that has been heretofore authorized. The bill has received the unanimous approval of the committee and of the department. It is Senate bill 5664.

Mr. ROBINSON of Arkansas. I know of no objection to the request.

The PRESIDING OFFICER. Is there objection to the request of the Senator from Nebraska?

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill (S. 5664) to extend the times for the commencing and completing the construction of a bridge across the Missouri River between Council Bluffs, Iowa, and Omaha, Nebr., which had been reported from the Committee on Commerce with an amendment, on page 2, line 1, after the word "from," to strike out "the date of the approval hereof" and insert "May 24, 1929," so as to make the bill read:

*Be it enacted, etc.,* That the times for commencing and completing the construction of the bridge across the Missouri River, between Council Bluffs, Iowa, and Omaha, Nebr., authorized to be built by the city of Council Bluffs, Iowa, and the city of Omaha, Nebr., or either of them, by the act of Congress approved May 24, 1928, are hereby extended one and three years, respectively, from May 24, 1929.

SEC. 2. The right to alter, amend, or repeal this act is hereby expressly reserved.

The amendment was agreed to.

The bill was reported to the Senate as amended, and the amendment was concurred in.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

### RECESS

Mr. JONES. Mr. President, pursuant to the unanimous-consent agreement, I move that the Senate take a recess, the recess being until 12 o'clock on Monday.

The motion was agreed to; and (at 5 o'clock and 40 minutes p. m.) the Senate, under the order previously entered, took a recess until Monday, February 18, 1929, at 12 o'clock meridian.

# HOUSE OF REPRESENTATIVES

### SATURDAY, *February 16, 1929*

The House met at 12 o'clock noon.

The Chaplain, Rev. James Shera Montgomery, D. D., offered the following prayer:

O Father everlasting, Thou who makest the mornings and the evenings to rejoice together, open for us the deeper and the broader meanings of life. We ask for the very essence of that blessing that cometh through faith and for the fullness that cometh through knowledge. Thou art not an absentee God, far, far away, but an imminent Father of love and wisdom, still at work in the hearts of Thy children. Quicken our understanding, touch our weakness, and let us even dare to chant the songs of lives which transcend their mortal years. O Thou let the ebbing tides of the week leave us better men, more thoroughly devoted to the needs of our country and with purer passions of the human heart. May we have a restful to-morrow. Through Christ our blessed Saviour. Amen.

The Journal of the proceedings of yesterday was read and approved.

### MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate had passed without amendment bills of the House of the following titles:

H. R. 12809. An act to permit the United States to be made a party defendant in a certain case.

The message also announced that the Senate had passed bills and a joint resolution of the following titles, in which the concurrence of the House is requested:

S. 2695. An act for the relief of Gilliam Grissom;

S. 5749. An act authorizing the presentation of the distinguished flying cross to Capt. Benjamin Mendez; and

S. J. Res. 216. Joint resolution to establish a joint commission on airports.

The message also announced that the Senate agrees to the reports of the committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to bills of the following titles:

H. R. 9961. An act to equalize the rank of officers in positions of great responsibility in the Army and Navy; and

H. R. 13825. An act to authorize appropriations for construction at military posts, and for other purposes.

### MONTANA STATE COLLEGE

Mr. LEAVITT. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 11510) for the relief of Montana State College and agree to the Senate amendment.

The SPEAKER. The Clerk will report the bill and Senate amendment.

The Clerk read the title of the bill, as follows:

An act (H. R. 11510) for the relief of Montana State College.

The Senate amendment was read.

The SPEAKER. Is there objection?

There was no objection.

### F. STANLEY MILLICHAMP

Mr. LEAVITT. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill H. R. 11064, with a Senate amendment, and agree to the Senate amendment.

The SPEAKER. The gentleman from Montana asks unanimous consent to take from the Speaker's table the bill H. R. 11064, with a Senate amendment, and agree to the Senate amendment.

The Senate amendment was read.

The SPEAKER. Is there objection?

There was no objection.

### COLLECTION OF FEES FROM ROYALTIES ON PRODUCTION OF MINERALS FROM LEASED INDIAN LANDS

Mr. LEAVITT. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill (H. R. 8831) to provide for the collection of fees from royalties on production of minerals from leased Indian lands, disagree to the Senate amendment, and ask for a conference.

The Clerk read the title to the bill and the Senate amendment.

Mr. HASTINGS. Mr. Speaker, the gentleman has asked unanimous consent to send it to conference, and I am obliged to object.

Mr. SNELL. Mr. Speaker, is it not proper to have the Senate amendment reported?

The SPEAKER. The Clerk will report the Senate amendment.

The Senate amendment was read.

The SPEAKER. The gentleman asks unanimous consent to disagree to the Senate amendment and ask for a conference.

Mr. HASTINGS. Mr. Speaker, I renew my objection.

### QUARTERING OF TROOPS IN CERTAIN PUBLIC BUILDINGS

Mr. ELLIOTT. Mr. Speaker, I ask unanimous consent for the present consideration of House Joint Resolution 418, to provide for the quartering in certain public buildings in the District of Columbia of troops participating in the inaugural ceremonies.

The SPEAKER. The Clerk will report the resolution.

The Clerk read the resolution, as follows:

#### House Joint Resolution 418

*Resolved, etc.,* That the Director of Public Buildings and Public Parks of the National Capital is authorized to allocate such space in any public building under his care and supervision as he deems necessary for the purpose of quartering troops participating in the inaugural ceremonies to be held on March 4, 1929, but such use shall not continue after March 6, 1929. Authority granted by this resolution may be exercised notwithstanding the provisions of the legislative, executive, and judicial appropriation act for the fiscal year ending June 30, 1903, approved April 28, 1902, prohibiting the use of public buildings in connection with inaugural ceremonies.

The SPEAKER. Does the gentleman from Indiana regard this as an emergency matter?

Mr. ELLIOTT. I do.

Mr. SNELL. This is the usual resolution passed under such circumstances?

Mr. ELLIOTT. It is.

The SPEAKER. Is there objection?

Mr. GARRETT of Tennessee. Reserving the right to object, Mr. Speaker, and I do not think I shall object, I understand the sole purpose of this is to care for troops that will be here during inauguration?

Mr. ELLIOTT. Yes; National Guard troops from the different States.

Mr. GARRETT of Tennessee. It is not expected that any part of the public buildings will be set aside for any other purpose?

Mr. ELLIOTT. No.

Mr. LOZIER. Reserving the right to object, Mr. Speaker, I want to call the attention of the House to some regulations by the District of Columbia Commissioners which in effect prohibit owners of homes allowing guests to view the procession from their windows and premises. I call attention to it in order to indicate the reckless disregard of public and private rights the District Commissioners are attempting to exercise in connection with the inauguration, evidently for the benefit of persons who have concessions for places from which the parade may be viewed.

The SPEAKER. Is there objection?

There was no objection.

The House joint resolution was ordered to be engrossed and read a third time, was read the third time, and passed.

### HOSPITAL FOR DISABLED MINERS, UTAH

Mr. COLTON. Mr. Speaker, I ask unanimous consent to take from the Speaker's table H. R. 15732, making an additional grant of lands for a miners' hospital for disabled miners of the State of Utah, and for other purposes, with a Senate amendment thereto, and agree to the Senate amendment.

The SPEAKER. The gentleman from Utah asks unanimous consent to take from the Speaker's table the bill H. R. 15732, with a Senate amendment thereto, and agree to the Senate amendment. The Clerk will report the bill and the Senate amendment.

The Clerk reported the bill and the Senate amendment.

The SPEAKER. Is there objection?

Mr. CRAMTON. Mr. Speaker, reserving the right to object, and I do not intend to do so—I objected before when the matter came up principally because I do not like this method of legislation, which is the insertion of an amendment in the Senate that is not germane. I am not disposed to press that further, but I was desirous of knowing that the acceptance of this amendment would not be ground for a precedent for similar appropriation of public lands in a number of States. I am advised now that the conditions in Arizona, as well as in Utah, are exceptional, and that this bill does not establish a precedent for all public-land States. I do not object.

Mr. BLACK of Texas. Mr. Speaker, will the gentleman yield?

Mr. CRAMTON. Yes.

Mr. BLACK of Texas. How are the conditions in Arizona exceptional to those that prevail in other States?

Mr. CRAMTON. Under the terms of the enabling act, when the Territory became a State.

Mr. BLACK of Texas. In what particular were they different?

Mr. COLTON. Mr. Speaker, all of the other institutions in Arizona, as well as in Utah, were granted at least 100,000 acres of land when the States were admitted to the Union. In this particular instance, for some unexplainable reason, only 50,000 acres of land were granted, and it is not sufficient to carry out the purposes of the grant. Mining is one of the leading industries in both States.

The SPEAKER. Is there objection?

Mr. GARNER of Texas. Mr. Speaker, may I make a suggestion with reference to these unanimous-consent requests, and the question put by the Speaker? I did this once or twice before but it seems that we have gotten back to the old habit again. I think it would be much better for the membership of the House, speaking for their individual records, if in instances of this kind they would ask unanimous consent to take the bill from the Speaker's table and consider the amendment, and that the Speaker then should put the amendment, and the RECORD then would show that it was taken up by unanimous consent, and considered and agreed to. Instead of that the Journal will show that the Member asked unanimous consent to take the bill from the Speaker's table and agree to the amendment, and the RECORD will show that the amendment was agreed to by unanimous consent. It is just as easy for the RECORD to show that it was agreed to by the House, and that it was taken up by unanimous consent. I think that would be a much better procedure in the House than the one that we are following.

Mr. SNELL. That is practically the same request that the gentleman from Utah made.

Mr. GARNER of Texas. Oh, no; it is not. He asked to take it up and agree to the amendment.

Mr. SNELL. Is not that practically the same thing that the gentleman stated?

Mr. GARNER of Texas. No; it is not. We may give unanimous consent to take it from the Speaker's table and consider it, but it is another question as to whether we will agree to it.

The SPEAKER. The Chair is inclined to think that the request involves two affirmative propositions, one to take it up, and the other to agree to the amendment.

Mr. GARNER of Texas. That is correct.

The SPEAKER. Is there objection to the request of the gentleman from Utah.

There was no objection.

The SPEAKER. Without objection, the Senate amendment will be considered as having been agreed to.

There was no objection.

### EXPORTATION OF ARMS, ETC., IN VIOLATION OF PACT OF PARIS

Mr. KORELL. Mr. Speaker, I ask unanimous consent to have House Joint Resolution 381, to prohibit the exportation of arms, munitions, or implements of war to nations violating the pact of Paris, withdrawn from the House Committee on the Judiciary to which it has been referred, and have the same referred to the Committee on Foreign Affairs. The chairmen of both committees have consented to the withdrawal and the rereference.

Mr. SNELL. Mr. Speaker, a parliamentary inquiry.

The SPEAKER. The gentleman will state it.

Mr. SNELL. Was the resolution properly referred in the first place? I think that is the important thing to be considered on a rereference of these matters.

The SPEAKER. The Chair at the time this resolution was before him was in some doubt, because while this refers definitely to the question of the exportation of arms, and so forth, there is a section in it which imposes a very severe penalty upon anyone who violates it. It imposes a penalty of a fine of not exceeding $10,000 and imprisonment of not exceeding two years. The Chair thought that was so important that it ought to be considered by the Committee on the Judiciary rather than by the Committee on Foreign Affairs. It appears that a number of similar resolutions, however, have gone to the Committee on Foreign Affairs.

Mr. SNELL. Then, it is a "border-line" proposition.

The SPEAKER. The Chair thinks it is a very close question, but inasmuch as both chairmen have agreed to the suggestion of the gentleman from Oregon [Mr. KORELL] the Chair has recognized him to make this request.

Mr. SNELL. I think as a general proposition that bills and resolutions which have been properly referred in the first place, ought not to be rereferred, but with a "border-line" proposition like this, there may be exceptions.

Mr. GARRETT of Tennessee. Yes. It is a very close question.

Mr. GARRETT of Tennessee. Mr. Speaker, does the matter go any further than merely an agreement between the two chairmen, or is it done with a knowledge of some other members of the respective committees?

Mr. SNELL. I understand that the Foreign Affairs Committee has already taken it up and have had a hearing upon it with the Secretary of State.

The SPEAKER. The Foreign Affairs Committee has a similar bill before it on which they have had hearings, but not a bill which imposes such severe penalties as this resolution.

Mr. GARRETT of Tennessee. I am reluctant to object; but I think that with bills of this nature, of large public import, where it is desired to have a rereference, the minority members should have an opportunity at least of knowing that such a plan is in progress. I understand it is satisfactory to the Committee on Foreign Affairs, and I was wondering in regard to the Committee on the Judiciary. I do not know.

Mr. MONTAGUE. The gentleman mentioned the number of the resolution; I do not know the title.

Mr. GARRETT of Tennessee. It is a bill, I will say to the gentleman from Virginia, providing an embargo on the exportation of munitions of war under certain circumstances.

The SPEAKER. The title of the bill is "To prohibit the exportation of arms, munitions, or implements of war to nations violating the pact of Paris." Clearly that subject is within the jurisdiction of the Committee on Foreign Affairs. The only reason the Chair referred it to the Committee on the Judiciary was because there was such a heavy penalty for the violation of the statute.

Mr. GARRETT of Tennessee. Mr. Speaker, I shall not object to the request; but may I make this public statement, that I hope in the future that gentlemen who are desirous of securing these transfers from one committee to another will give the minority some notice of it before making the request, at least. If gentlemen will be kind enough to give me notice, I will try to get in touch with the minority members so that it can be taken up with the minority members before the request is ever made. I shall not object to this.

The SPEAKER. Is there objection to the request of the gentleman from Oregon that this bill be rereferred——

Mr. DYER. I will ask the gentleman if he will not withdraw the request temporarily, so the committee may have an opportunity to look at it on Monday?

Mr. KORELL. I will be glad to do so.

FEDERAL RADIO COMMISSION

Mr. SNELL. Mr. Speaker, I present a privileged report from the Committee on Rules.

The SPEAKER. The gentleman from New York presents a privileged report, which the Clerk will report.

The Clerk read as follows:

House Resolution 321

*Resolved,* That upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of H. R. 15430, a bill continuing the powers and authority of the Federal Radio Commission under the radio act of 1927, and for other purposes. That after general debate, which shall be confined to the bill and shall continue not to exceed two hours, to be equally divided and controlled by those favoring and opposing the bill, the bill shall be read for amendment under the 5-minute rule. At the conclusion of the reading of the bill for amendment the committee shall rise and report the bill to the House

with such amendments as may have been adopted, and the previous question shall be considered as ordered on the bill and the amendments thereto to final passage without intervening motion except one motion to recommit.

The SPEAKER. Referred to the House Calendar and ordered printed.

LOAD LINES FOR AMERICAN VESSELS

Mr. SNELL. Mr. Speaker, I present another similar resolution.

The SPEAKER. The Clerk will report the resolution.

The Clerk read as follows:

House Resolution 322

*Resolved,* That upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of S. 1781, an act to establish load lines for American vessels, and for other purposes. That after general debate, which shall be confined to the act and shall continue not to exceed one hour, to be equally divided and controlled by those favoring and opposing the act, the act shall be read for amendment under the 5-minute rule. At the conclusion of the reading of the act for amendment the committee shall rise and report the act to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on the act and the amendments thereto to final passage without intervening motion except one motion to recommit.

The SPEAKER. Referred to the House Calendar and ordered printed.

EXTENSION OF REMARKS

Mr. CRAMTON. Mr. Speaker, I ask unanimous consent to extend my remarks with reference to the proposed $24,000,000 appropriation for prohibition enforcement, and in doing so I desire to include a letter to me from Bishop Cannon. As I referred in my remarks to the bishop, in accordance with his request, I desire to insert the letter in the RECORD, and also I desire to insert a statement from Dr. Clarence True Wilson on the same subject.

The SPEAKER. Is there objection?

Mr. SCHAFER. Reserving the right to object, are the gentlemen in favor of the $24,000,000?

Mr. CRAMTON. There is some slight difference of opinion between them.

Mr. UNDERHILL. Mr. Speaker, I think that comes within the class of requests to which I have consistently objected, and unless the gentleman can convince me to the contrary I shall be obliged to object.

Mr. CRAMTON. I will say to the gentleman I do not think this is within the class to which the gentleman has objected.

Mr. HOWARD of Oklahoma. But it comes within the class to which I object.

The SPEAKER. Objection is heard.

EXTENSION OF HATCH AND SMITH-LEVER ACTS TO ALASKA

Mr. HAUGEN. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill H. R. 13882, with a Senate amendment, and concur in the Senate amendment.

The SPEAKER. The gentleman from Iowa asks unanimous consent to take from the Speaker's table the bill H. R. 13882, with a Senate amendment, and concur in the Senate amendment. The Clerk will report the bill and the Senate amendment.

The Clerk read as follows:

A bill (H. R. 13882) to extend the benefits of the Hatch Act and the Smith-Lever Act to the Territory of Alaska.

The Senate amendment was read.

The SPEAKER. Is there objection?

Mr. BEGG. Reserving the right to object, Mr. Speaker, what is the parliamentary status of that bill?

The SPEAKER. It is a House bill with a Senate amendment. The request of the gentleman from Iowa is to take the bill from the Speaker's table and concur in the Senate amendment.

Mr. BEGG. What is the Senate amendment?

Mr. HAUGEN. It is to strike out the word "and."

The SPEAKER. Is there objection?

There was no objection.

The SPEAKER. The question is on concurring in the Senate amendment.

The Senate amendment was concurred in.

QUESTION OF PRIVILEGE

The SPEAKER. The Chair will recognize the gentleman from Tennessee [Mr. REECE] on a matter of very great importance to the House.

Mr. REECE. Mr. Speaker, the Committee on Military Affairs directed me to make a favorable report to the House on H. R. 8305. I made the report yesterday and I notice that no

mention of it appears in the RECORD this morning. If any parliamentary reason has presented itself to the Speaker as to why the report should not be accepted I should like opportunity to discuss the question.

The SPEAKER. The Chair will be glad to hear the gentleman.

Mr. CRISP. Is it a matter of privilege?

The SPEAKER. It is a parliamentary inquiry as to why the Speaker has not referred the bill to the Union Calendar.

Mr. CRISP. Would not the best way to present the matter to the Speaker be for the gentleman from Tennessee to rise to a question of the privilege of the House?

The SPEAKER. That would not involve the privilege of the House.

Mr. CRISP. I understand this is a matter of privilege in the House itself. If he rises to a question of privilege in the House and presented the matter the Speaker ought to bring it before the House for consideration.

The SPEAKER. The Chair thinks that in presenting a question of personal privilege the Member is not required, in the first place, to make a motion, but must state the reason which would give him general privilege.

Mr. CRISP. Does not that apply to a case of personal privilege?

The SPEAKER. It is specifically held that it does not apply in the case of personal privilege, but it does apply to a privileged resolution. I read from section 734 of the Manual:

In presenting a question of personal privilege the Member is not required, in the first instance, to make a motion or offer a resolution, but such is not the rule in presenting a case involving the privilege of the House.

Mr. BEGG. Mr. Speaker, is it a parliamentary inquiry that is propounded to the Speaker as to why he did so?

The SPEAKER. The Chair thinks so. Of course, it is the duty of the Chair to refer bills to the appropriate calendar if they are regularly reported from the committee. In this case the Chair has some doubt and has not referred the bill to the Union Calendar. The Chair will be glad to hear a discussion of the matter, as the Chair regards it as of much importance, on which there are no precedents.

Mr. REECE. Mr. Speaker, the Committee on Military Affairs met in the regular committee room on Thursday, which was the regular meeting day of the committee.

The committee for a period of years has held out Tuesdays and Thursdays as regular meeting days of the committee, and by mutual understanding of the membership these are our regular days, and that information is carried in various publications.

The Congressional Directory lists a number of committees and states their regular meetings day, under the remark—

Committees other than those mentioned meet upon the call of the chairman.

In this list occurs the Committee on Military Affairs, listing its regular meeting days as Tuesdays and Thursdays. The Committee on Military Affairs also publishes a little pamphlet which contains the names of the members of the committee and the various subcommittees, and on the front page of the pamphlet appears the following under the head, " Regular meetings ":

Tuesdays and Thursdays at 10.30 a. m. and on the call of the chairman.

Accordingly, on Thursday, last, the committee assembled in its committee room. A quorum was present and the chairman was absent. The ranking member of the committee called the meeting to order. I think it may be well for me at this place to read for the information of the Speaker the minutes of the committee. I read:

The Committee on Military Affairs met in regular session Thursday, February 14, in the appointed committee room. The meeting was called to order by Mr. WURZBACH, the ranking majority member, presiding in the absence of the chairman. The roll was called, and the following members answered to their names:

Mr. Wurzbach, Mr. Reece, Mr. Speaks, Mr. Wainwright, Mr. Hoffman, Mr. Quin, Mr. Fisher, Mr. Wright, Mr. Boylan (proxy), Mr. Garrett, Mr. McSwain, Mr. Hill, and Mr. Chapman.

The chairman announced, 13 members having answered to their names, a quorum was present, and the meeting opened for the consideration of business.

Mr. REECE was designated as acting secretary to record the proceedings of the meeting, the regular clerk being absent. On motion, a committee of three members was appointed to notify the chairman that a quorum was present in the committee room, this being the regular meeting day of the committee; that there was business to be transacted by the committee; and that the chairman be requested to preside. This

committee reported, after repairing to the office of the chairman, that he was not there, but that his secretary was advised of the object of the committee's visit, and the chairman's secretary stated she would endeavor to get in communication with him. She later advised she had done so and that he was on his way to the office. The chairman did not appear in the committee room during the meeting.

The following bills were favorably reported by unanimous vote:

H. R. 15703, H. R. 11105, H. R. 17095, H. R. 16408, H. R. 17034, H. R. 12960, H. R. 15562, H. R. 14449, H. R. 12333, S. 4461, H. R. 15209, H. R. 9258, H. R. 12674, H. R. 13652, H. R. 13872, H. R. 14021, H. R. 1437, H. R. 14723, H. R. 15405, H. R. 15655, H. R. 15056, H. R. 15680, H. R. 16364, H. J. Res. 339, H. J. Res. 362, H. R. 16258, H. R. 16291, H. R. 16685, H. R. 16732, H. R. 17017, H. R. 4824, and H. R. 9520.

Mr. WURZBACH then relinquished the chair to Mr. REECE, the next ranking majority member, and moved to reconsider the motion by Mr. HILL to report H. R. 8305, with the recently submitted recapture amendments, without recommendation, which had been adversely acted upon by the committee on February 7. The secretary called the roll. The following members voted " aye ":

Ayes, 11: Mr. Wurzbach, Mr. Reece, Mr. Speaks, Mr. Wainwright, Mr. Hoffman, Mr. Fisher, Mr. Wright, Mr. Garrett, Mr. Hill, Mr. Chapman, and Mr. Boylan (proxy).

The following member voted " nay ":

Nay, 1: Mr. Quin.

Whereupon the Chair declared the motion to reconsider had prevailed. Mr. QUIN then made the point of order that two-thirds were required to reconsider the motion. The Chair overruled the point of order. Mr. WURZBACH resumed the chair.

Mr. REECE moved that the committee report H. R. 8305 with the amendments agreed upon by the Muscle Shoals subcommittee and the recently submitted recapture amendments, as amended, to the House with a favorable recommendation. The roll was called on Mr. REECE's motion, and the following members voted " aye ":

Ayes 11: Mr. Wurzbach, Mr. Reece, Mr. Speaks, Mr. Hoffman, Mr. Fisher, Mr. Wright, Mr. Garrett, Mr. McSwain, Mr. Hill, Mr. Chapman, and Mr. Boylan (proxy).

The following Members voted " nay ":

Nays 2: Mr. Wainwright and Mr. Quin.

The Chair declared the motion carried.

The committee directed Mr. REECE to submit the report on H. R. 8305 to the House.

The committee, upon motion of Mr. WAINWRIGHT, voted to have hearings on H. R. 14038 and the war history bill by Mr. ANDREWS at its next regular meeting, Tuesday, February 19, at 10.30 o'clock. Thereupon the committee adjourned.

B. CARROLL REECE,
*Acting Secretary.*

The above three pages is a correct report of the proceedings of the committee, and the original copy is signed by 11 of the 12 members present. The other member, I understand, agrees that the proceedings are correctly reported.

Mr. COOPER of Wisconsin. Will the gentleman yield?

Mr. REECE. Yes.

Mr. COOPER of Wisconsin. I notice in that report a statement that one or two members were present by proxy. Just what is meant by "proxy"? What do you mean by members voting by proxy in a committee meeting?

Mr. REECE. Only one member was present by proxy, and in accordance with the rules of the committee he had submitted a proxy in writing and handed it to one of the members, the proxy stating how his vote should be cast. The member holding the proxy submitted it to the acting chairman to have it properly recorded before the committee.

Mr. COOPER of Wisconsin. Was there a quorum present?

Mr. REECE. There was a quorum present without it; there were 12 present without the proxy, 11 being required to make a quorum.

Mr. GARRETT of Texas. If the gentleman from Tennessee will permit, the practice in the committee for at least 12 years has always been, when bills have been considered and hearings had, and a member desired to leave the city to go home or elsewhere, who had his mind made up on that particular legislation, that the committee has always granted him the right to leave his written proxy with the chairman of the committee, directing some member to cast his vote for or against, which was done in this case, some having voted for and some against the former action taken in the consideration of this bill.

Mr. DYER. That can only be done by the unanimous consent of the committee, under the rules of the House.

Mr. REECE. There was no objection raised to the proxy, I might add incidentally.

Mr. COOPER of Wisconsin. Suppose a proxy were given to a man to vote in his discretion. Would that be proper under your rule?

Mr. REECE. It would, under our form of procedure.

Mr. COOPER of Wisconsin. In other words, if a member of the committee were not there at all but was in the city of New York, and he handed over to another member of the committee in writing authority to vote in his discretion, that would be legal under your rules?

Mr. REECE. That would be legal. Of course, as a matter of fact, there is always a direction as to how the vote shall be cast.

Mr. TILSON. Mr. Speaker, I do not wish to interpose a point of order, but it seems to me that the question of a proxy does not enter into this question at all, and it simply befogs the issue. Since the question of a proxy has nothing to do with the point to be decided it should not be discussed at this time.

Mr. LUCE. Will the gentleman yield?

Mr. REECE. Yes.

Mr. LUCE. Has this committee actually met on each Tuesday and Thursday during the session?

Mr. REECE. It has met on a majority of these days. I am not prepared to say that it has met on every one.

Mr. LUCE. The matter is of such vital consequence to other committees that I would ask the gentleman to correct us if we are wrong in supposing that there must be a call?

Mr. GARRETT of Texas. Let me say to the gentleman that the practice in the Committee on Military Affairs for the past 12 years has been to meet on Tuesdays and Thursdays unless by unanimous consent those days were passed over. If the committee met on Tuesday, and it were desired not to have a meeting on Thursday, by unanimous consent the Thursday meeting was passed over until the next Tuesday.

Mr. HUDSON. Will the gentleman yield?

Mr. REECE. I prefer to complete my statement, if the gentleman will permit me to do so.

Mr. HUDSON. I desire to ask a short question. During this session has the committee ever met on any of these days without a call by the chairman?

Mr. REECE. The custom has been for the clerk to send out notice of the meeting. I have one of the notices in my hand. The card which is sent out is captioned:

Notice of meeting of the Committee on Military Affairs. The Committee on Military Affairs will meet at a certain hour on a certain day. By direction of the chairman.

The card is signed by the clerk. That is not a call but merely a notice that the committee is going to meet on those days.

Mr. HOWARD of Nebraska and Mr. HUGHES rose.

Mr. HOWARD of Nebraska. Will the gentleman yield?

Mr. REECE. I should prefer to go ahead.

Mr. HUGHES. I would like to ask the gentleman a short question.

Mr. REECE. I would like to go on with my statement, and I will ask that I be permitted to do so. Strange to say there are few precedents on this question. There is one, however, of which doubtless the Speaker is aware, which is very nearly parallel to the situation presented here. This appears in Hinds' Precedents, Volume IV, paragraph 5488:

On June 7, 1906, Mr. James A. Tawney, of Minnesota, proposed to report from the Committee on Appropriations a bill to supply a certain deficiency in an appropriation.

Mr. John J. Fitzgerald, of New York, made the point of order that the report was not properly authorized.

It appeared in debate, by the undisputed statement of Mr. Tawney, that the committee was not formally called together, but that a majority of the committee were present at the time and authorized the report.

On this statement the Speaker overruled the point of order.

Mr. Speaker Cannon was in the chair.

Mr. Oscar W. Underwood, of Alabama, having appealed, the appeal was laid on the table.

There are other precedents dealing with a report being submitted when some question of irregularity was charged, but so far as I have been able to ascertain the questions involved in these precedents are not on all fours with the one involved here. There is a drift in all the rulings toward permitting the report to be filed when it was authorized by a majority of the members of a committee meeting in the committee room.

Mr. NEWTON. Will the gentleman yield there?

Mr. REECE. Yes.

Mr. NEWTON. In this particular case, however, Mr. Tawney was the chairman of the committee, was he not?

Mr. REECE. He was chairman of the committee, but I can not understand how the presence or the absence of the chairman would affect the validity of the meeting of the committee.

Mr. MAPES. Will the gentleman yield?

Mr. REECE. Yes.

Mr. MAPES. In the case of the meeting of the Military Affairs Committee were the absent members notified of the meeting?

Mr. REECE. They were not notified in writing, but, according to my understanding, it was generally known there was going to be a meeting on this day, it being the regular meeting day of the committee. The clerk, however, did not notify the committee members.

Mr. MAPES. As far as the gentleman knows did the absentee members have notice of the meeting and have a chance to exercise the privilege of attending or not as they saw fit?

Mr. REECE. They had constructive notice, this being the regular meeting day of the committee.

Mr. BACON. Will the gentleman yield?

Mr. REECE. Yes.

Mr. BACON. What is the usual time of meeting of the committee in the morning?

Mr. REECE. Ten thirty.

Mr. BACON. What time did the committee meet at this time?

Mr. REECE. We met at 10.30. We were called to order at 10.30 or approximately that time.

Mr. STOBBS. Will the gentleman yield?

Mr. REECE. Yes.

Mr. STOBBS. On all your other regular meeting days the card which the gentleman has referred to has gone out as a notice, and on this particular day this card did not go out?

Mr. REECE. No; I am not prepared to say it has gone out on all occasions, but ordinarily it has gone out.

Mr. STOBBS. In other words, the custom is to have that card go out to each member of the committee, even if it is a meeting on a regular meeting day; is that true?

Mr. REECE. Yes; that is the general custom.

Mr. LAGUARDIA and Mr. BEGG rose.

Mr. LAGUARDIA. Can the gentleman state on how many Tuesdays and Thursdays during the present session of this Congress no meeting was held and no notice sent out?

Mr. REECE. There have been but few, if any, Tuesdays and Thursdays when we have not had meetings, except very early in the sessions.

Mr. LAGUARDIA. As a matter of fact, would not the records of the committee show that you had meetings on 10 of the regular days where the notice was sent out, and nine of these days, no notice having been sent out, and on three of these days the rooms of the committee were occupied by subcommittees, thereby making 10 of these days regular meetings of the committee on proper notice and 12 of these days no meetings of the full committee and no notices sent out?

Mr. REECE. I am not prepared to verify that statement.

Mr. BEGG. Will the gentleman yield for a question right on that point?

Mr. REECE. I yield to the gentleman and then I shall yield the floor.

Mr. HOWARD of Nebraska. I do not want to be persistent, Mr. Speaker.

Mr. BEGG. I should like to ask the gentleman this question: What was the reaction on the minds of the members of the committee if they received no notice on this particular day of a committee meeting? What was the customary reaction if they received no notice?

Mr. REECE. Of course, I can not give the reaction on any Member's mind except the Member speaking, and I have always—

Mr. BEGG. I will make the question easier.

Mr. REECE. No; I will answer the gentleman.

Mr. BEGG. Did the committee member report at the meeting room if there was no notice to find out if there was going to be a meeting? What has been the custom?

Mr. REECE. I have gone on the assumption that there was going to be a meeting of the Committee on Military Affairs on Tuesdays and Thursdays. If I received no notice, I assumed the responsibility to check up and see if there was going to be a meeting. I think a majority of the Members have done likewise.

Mr. BEGG. Was that the common practice, that committee members if they failed to get a notice either by telephone or personal appearance at the committee room showed up just the same?

Mr. REECE. The assumption has been we would have a meeting on the designated days unless the committee had ordered otherwise.

Mr. BEGG. Then why the notice?

Mr. REECE. Merely to call the attention of the Members to the meeting of the committee, that they may not overlook it. It is on the same principle, in my judgment, as the ringing of

the bells 15 minutes before the House convenes. The bells are rung merely to call the attention of the Members of the House to the fact that the House is about to convene; but the House would convene in regular session even though the bells should not be rung.

Mr. HOWARD of Nebraska and Mr. LaGUARDIA rose.

Mr. LaGUARDIA. Will the gentleman yield further?

Mr. REECE. I yield first to the gentleman from Nebraska.

Mr. HOWARD of Nebraska. I would like to ask the gentleman from Tennessee to state whether the committee report which he has been divulging was a report of an executive meeting of the committee.

Mr. REECE. I presume this was an executive session.

Mr. HOWARD of Nebraska. I am not raising the point of order.

Mr. REECE. I feel this action would meet with the approbation of the members of the committee, and that the Members of the House are entitled to the information.

Mr. HOWARD of Nebraska. I am not raising the point of order, but I may, however, if you do not give me a chance. I simply desire to call the attention of the gentleman and the Members of the House generally to the fact that once upon a time I stood here and inadvertently, perhaps, divulged a little bit of the secrecy of an executive meeting of my committee. I was called to order and the Speaker properly rebuked me and took me off the floor momentarily, but he let me back again pretty soon. I am not going to make the point of order, but I merely wanted to call attention to it.

Mr. BEGG. One more question, if the gentleman will yield. Did any member of the committee get notice by telephone or a request by telephone or otherwise to attend the meeting?

Mr. REECE. That I can not state.

Mr. LaGUARDIA. Can the gentleman tell us at what time this alleged meeting actually commenced doing business?

Mr. REECE. I can not state the exact time. It was between 10.30 and 11 o'clock; I think it was very shortly after 10.30.

Mr. LaGUARDIA. What time did it adjourn?

Mr. REECE. It adjourned before 12 o'clock.

Mr. LaGUARDIA. This was on Thursday—was there a meeting of the committee the Tuesday preceding?

Mr. REECE. A quorum was not present, and the chairman adjourned the meeting.

Mr. LaGUARDIA. Any business done?

Mr. REECE. Not officially, except some of the subcommittees held meetings.

Mr. LaGUARDIA. Any bills reported out on Tuesday?

Mr. REECE. A majority of the members assembled in the committee room after the committee was adjourned, and the subcommittees reached an agreement with reference to the bills that were before them.

Mr. LaGUARDIA. As a matter of fact, did the meeting of members who remained in the room after the adjournment of the regular meeting—did they report any bill?

Mr. REECE. None were reported to the House.

Mr. LaGUARDIA. Did that meeting of members which remained in the room after the regular meeting adjourned recess to meet on Thursday?

Mr. REECE. There is some doubt about the discussion that took place on that question, but members were generally agreed that the committee having been formally adjourned it would be best not to undertake to transact business on that day but wait until Thursday, the next regular meeting day, when the committee would reassemble.

Mr. LaGUARDIA. When I asked the question my colleague from Texas nodded his head.

Mr. WURZBACH. If the gentleman will yield, I think this is a fair statement. On Tuesday the chairman of the committee [Mr. Morin] at 10.30 o'clock came into the committee room and announced that there was no quorum present and adjourned the meeting. Within five minutes thereafter, after the chairman announced that there was no quorum present, members came in; and my impression is that there was a quorum present within 15 or 20 minutes after the chairman had left the room. It is my recollection that at this meeting the secretary of the committee being present was directed to notify members to be present at the meeting to be held on Thursday.

Mr. LaGUARDIA. That was after the regular meeting had adjourned?

Mr. WURZBACH. After Mr. Morin had left the hall.

Mr. LaGUARDIA. Could you tell me if the personnel of the committee who met on Thursday was the same as those who remained in the room on Tuesday?

Mr. REECE. Additional members were also present. Permit me to add that the committee on Thursday met as a new committee meeting and not as after a recess.

Mr. LaGUARDIA. Can the gentleman state how many bills besides the bill that this question was raised on were reported out during the Thursday meeting?

Mr. REECE. About 30 bills. I might say that these were mostly private bills which had been passed upon by the subcommittees.

Mr. MORIN. Mr. Speaker, when my colleague began his statement I thought that the point was raised on the legality of the alleged meeting that met in the committee room on Thursday, but by the questions propounded by the gentleman from New York [Mr. LaGUARDIA], referring to the meeting on Tuesday, I am compelled to make some explanation to the House as to what was done on that day.

I appeared at the committee room at 10.30 Tuesday morning, for the reason that on Monday afternoon members of the committee had asked me on the floor of the House if we were to have a meeting on Tuesday. I informed them that there was no business that I knew of to bring before the committee, and therefore I did not see the necessity of calling the committee together on Tuesday.

Mr. JOHNSON of Indiana. Mr. Speaker, will the gentleman yield?

Mr. MORIN. In just a minute. Later in the day, or in the evening, I heard that a member of the committee had called up other members by telephone and had told them that there would be a meeting on Tuesday. I decided then that while it was not called according to the established custom of 16 years, during which I have been a member of the committee, and notwithstanding that on the day previous Mr. GLYNN, chairman of one of the subcommittees, had made arrangements with the chairman of the Military Affairs Committee to use the committee room that day for a subcommittee meeting, I concluded that I would appear, and that if there were a quorum of members present I would telephone the remaining members, and if they desired a meeting I was willing to have it.

There was no one present when I appeared in the room at 10.30 o'clock. I walked across the room to my private office, looked at a letter; then I returned to the committee room. At 10.35 o'clock Mr. GLYNN came in. Mr. WURZBACH came in also. At a quarter of 11 I asked Mr. GLYNN if he had anything particular on his mind and he said that he would like to have the committee room for a meeting of his subcommittee. I then said, "Well, there is no quorum present, and it looks as though there will not be." I then called the committee to order and requested the clerk of the committee to make a note of those who were present. As there was not a quorum present I declared the committee adjourned, and turned the room over to Mr. GLYNN for a meeting of his subcommittee. I had an appointment with the chairman of the Senate Committee on Military Affairs, to make arrangements for conferences on seven bills we had in conference.

Mr. WRIGHT. Mr. Speaker, will the gentleman yield right there?

Mr. MORIN. No; I will not yield now. I went to see Senator REED and remained at his office until about 10 minutes of 12 o'clock. I then came back to the House, and after transacting some business in the House returned to my office and was informed that after I had left that morning another subcommittee had come in and held hearings. At 20 minutes of 12 the subcommittees concluded their work, and those present decided to organize a meeting of the committee with Mr. WURZBACH acting as chairman. At 15 minutes of 12 o'clock Mr. GLYNN, chairman of the subcommittee that had a large number of bills before it, left the room.

I did not ask him whether there were any bills reported before he left or not. At 10 minutes of 12 Mr. CHAPMAN left the room. So the committee organized then in a few minutes, according to the minutes which the Speaker has in his hand, and reported out 21 bills. At 5 minutes of 12 there was a discussion as to whether or not they would take the Muscle Shoals bill up at the next meeting, and the minutes will show that on motion of a member present they agreed to recess. The motion was made by Mr. WRIGHT that the meeting recess until 10.30 o'clock Wednesday morning. After the discussion of that motion Mr. WRIGHT amended his motion to have the committee meet at 10.30 o'clock Thursday morning.

When I saw the minutes of the meeting I wrote to the Speaker making a formal protest against any of the bills reported by this meeting being placed on any calendar of the House. Now, as to the meeting on Thursday: No request was made to me by any member of the committee to have a meeting on Thursday, as has been the custom in the committee for the 16 years that I have been a member of that committee. I had knowledge of this meeting only as being a continuation of the illegal meeting by a group of committee members. I did not

get to my office until about a quarter to 12 o'clock, having important matters to attend to elsewhere. In the belief that the meeting in the committee room was a continuation of the illegal meeting of Tuesday, of course, I decided not to appear in the committee room and take part in what I fully believed to be an illegal meeting.

I have been a member of the Committee on Military Affairs for 16 years. There has never been a meeting of that committee except by the call of the chairman, regardless of what days are set for regular hearings. The gentleman stated it has been the custom to meet on regular meeting days, Tuesdays and Thursdays, for 10 or 12 years. I shall refer to the minutes of the meetings that run back for 10 or 12 years, having examined them carefully, and give this information to the House.

In the Sixty-seventh Congress the regular meeting days were set for Tuesdays and Thursdays, and were not observed. In the second session of the Sixty-seventh Congress, beginning December 6, 1921, the chairman stated the committee would meet regularly and only meet on call. On December 7, 1922, in the Sixty-eighth Congress, it was agreed that the chairman should call all meetings. No meeting days were set, but we met always on the call of the chairman. In the Sixty-ninth Congress, when we organized the committee, and I became chairman, I presented some rules that I wished the committee to adopt by means of which I thought we might expedite business and have the members become more interested in the committee hearings. I shall refer to those later. At the first committee session in the Seventieth Congress no mention is made in the committee minutes of any fixed regular meeting days. When I became chairman of the committee at the first session of the Sixty-ninth Congress in December, I outlined my policies to the committee and asked if they would not approve and adopt them, and I shall ask the Clerk to read the minutes of that meeting.

The SPEAKER. Without objection, the Clerk will read.

The Clerk read as follows:

FRIDAY, December 18, 1925.

The first meeting of the Committee on Military Affairs of the House of Representatives in the Sixty-ninth Congress was held this date in the committee room. The committee was called to order by the new chairman, Hon. JOHN M. MORIN, of Pennsylvania, at 10.40 with all the members present with the exception of Mr. Hill, of Maryland, Mr. Frothingham, and Mr. McSwain. The chairman made a short statement outlining his policy as chairman, and asking the cooperation of every member. He also asked each subcommittee would be given an opportunity to consider the bills referred to each one, and would be expected to take care of any bill reported to the House when it came up for consideration.

H. F. Sedgwick was appointed clerk, William E. Murray, assistant clerk, and Raymond L. Franklin, janitor for the committee, on motion of Mr. Fisher and unanimous vote. The chairman of the various subcommittees were named as follows: Mr. MORIN, No. 1; Mr. JAMES, No. 2; Mr. RANSLEY, No. 3; Mr. Hill of Maryland, No. 4; Mr. Frothingham, No. 5; Mr. WURZBACH, No. 6; Mr. REECE, No. 7; Mr. SPEAKS, No. 8; and Mr. WAINWRIGHT, No. 9.

The chairman asked the members to notify the clerk of the committee ahead of time when it was expected to bring up any measure for consideration by the committee.

It was agreed the committee should meet on Tuesdays and Thursdays at 10.30 o'clock, on call of the chairman. The motion was made by Mr. JAMES and carried unanimously.

On motion of Mr. JAMES, agreed to by the committee, the following resolution regarding the reporting of private bills was adopted: "Resolved, That private bills which were reported favorably by the Committee on Military Affairs and placed on the calendar during the Sixty-eighth Congress and failed to become law, and which have been reintroduced at the present session of the Congress, be, and the same are hereby, again reported by the said committee, the new reports to be made by the members of the subcommittees having charge of private bills, and to be named by the chairman of the said subcommittee."

Mr. DYER. Will the gentleman yield for a question?

Mr. MORIN. Let me complete my statement.

Mr. DYER. Just one question coming out of the minutes.

Mr. MORIN. One question.

Mr. DYER. The minutes say the committee shall meet on a certain day of the week on the call of the chairman. Does the chairman of the Committee on Military Affairs claim that that committee could not meet on those days or any other day unless the chairman called the meeting?

Mr. MORIN. I do not know of any rule by which they could, and I have been a member of the committee for 15 years, and there have been no meetings of the Committee on Military Affairs, to my knowledge, either on regular or irregular days, without a call from the chairman.

Mr. REECE. Will the gentleman yield——

Mr. DYER. And if he never called it they never could meet.

Mr. REECE. Is it the gentleman's view that if the chairman, because of illness or some other reason, failed or refused to call a meeting of his committee that committee would be helpless to consider legislation during the Congress?

Mr. MORIN. I think the chairman would assign somebody else to call the meeting. I would under those circumstances.

Mr. HILL of Alabama. Will the gentleman yield?

Mr. MORIN. Let me finish my statement.

Mr. SPEAKS. Will the gentleman yield for a brief question on that very point?

Mr. MORIN. I refuse to yield at this particular time. For information of Members of the House I read from minutes of the present Congress beginning in December the number of committee meetings held and the days on which they were held.

On the following regular meeting days of this session of Congress falling on a Tuesday or a Thursday no meetings were held by the Military Affairs Committee: December 4, December 6, December 13, December 18, January 3, January 5, January 15, and January 24—eight regular meeting days.

On the following days of this session of Congress falling on a Tuesday or a Thursday meetings were held by the full committee on the call of the chairman: December 11, December 20, January 8, January 17, January 22, January 29, January 31, February 5, and February 7—nine so-called regular meeting days.

On the following regular meeting days of this session of Congress falling on a Tuesday or a Thursday meetings were held by subcommittees of the Committee on Military Affairs: December 18, Subcommittees Nos. 3 and 5; January 15, Subcommittee No. 2; and January 24, Subcommittees Nos. 2 and 4.

On the following days of this session of Congress meetings were held by the Committee on Military Affairs on the call of the chairman on January 11, January 25, February 1, February 2, February 4, and February 7, these dates not falling on a Tuesday or a Thursday.

Now, the gentleman from Tennessee has referred to a call. The only evidence he seems to have that there are regular meeting days on this committee in the Seventieth Congress is the record of a previous Congress. Of course that can not be relied upon, because the Congressional Directory of the Sixty-eighth Congress——

Mr. WRIGHT. Mr. Speaker, will the gentleman yield there?

Mr. MORIN. I can not yield just now.

It is evident that it was just copied from some previous book. Before each issue of the directory is published the Joint Committee on Printing send a query to the clerk of each committee. So far as the Military Affairs Committee of the House is concerned, the clerk gives the meeting days as Tuesday and Thursday as a matter of form. As to the meeting days of the committee and the meeting days of the subcommittees in the Sixty-ninth Congress, the Congress in which we did designate Tuesdays and Thursdays on the call of the chairman, the regular meeting days are not stated except on the back: "Regular meeting days on Tuesdays and Thursdays."

Now, as to the meeting held on Thursday, I will say to the Members of the House that no request was made of me to call a meeting on that day, or to have a meeting.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. MORIN. Yes.

Mr. MICHENER. Was the regular committee clerk present at this so-called "rump" meeting?

Mr. MORIN. On Tuesday?

Mr. MICHENER. Yes. Were the records of that meeting reported in the regular minute book?

Mr. MORIN. They were noted by the clerk and a memorandum of the same was handed to the Speaker.

Mr. MICHENER. And did the chairman read those minutes before the meeting of the committee here complained of?

Mr. MORIN. I did.

Mr. MICHENER. Then, the chairman had knowledge that his committee was to meet on the regular committee meeting day in the regular committee room, at the regular meeting hour, and purposely absented himself from the meeting?

Mr. MORIN. No. The only knowledge I had of any meeting was that a recessed meeting of the meeting on Tuesday, which I considered was illegal, was to be held, and I declined to take any part in it. I did not absent myself intentionally.

Mr. MICHENER. The majority of the committee met and attempted to get a meeting of the whole committee. They served notice on the chairman on that date?

Mr. MORIN. No; they did not.

Mr. MICHENER. The chairman's clerk was present.

Mr. MORIN. The chairman's clerk was not present.

Mr. MICHENER. They reported the minutes to the chairman. The chairman read the minutes. He then had notice that the committee would meet on Thursday—the regular?

Mr. MORIN. The minutes of Tuesday?

Mr. MICHENER. Yes.

Mr. MORIN. - Yes; that is right.

Mr. MICHENER. They decided that the majority of the committee had business and wanted a committee meeting. The chairman was then present in the city?

Mr. MORIN. I was at the adjourned meeting of the regular meeting at a quarter of 11.

Mr. MICHENER. The gentleman was in the city and was present and knew that the majority of the committee wanted to meet on the regular committee day?

Mr. MORIN. No.

Mr. MICHENER. And they determined to meet on the regular committee meeting day?

Mr. MORIN. No. I did not know that there was any person in the committee room except the subcommittee until I came back to my office at 1 o'clock that afternoon.

The SPEAKER. In order that there may be no dispute as to the facts, the gentleman from Tennessee said specifically that this meeting was not the result of a rump meeting, but it was a regular meeting on the regular day at the regular time.

Mr. MORIN. If we follow the rules of the committee during the Sixty-ninth Congress, Tuesdays and Thursdays were agreed upon as regular meeting days, but by the call of the chairman; no regular meeting days were designated for the Seventieth Congress. There have been no meetings held and no group of members has attempted to have a meeting on Tuesday or Thursday except by call of the chairman until last Tuesday.

Mr. HOWARD of Oklahoma. Mr. Speaker, will the gentleman yield for a question?

Mr. MORIN. Yes.

Mr. HOWARD of Oklahoma. Does the gentleman maintain that there have not been any meetings of this committee during the Seventieth Congress except by his call? In what way did the gentleman issue his call?

Mr. MORIN. Notices were sent out by the chairman not later than the day before, notifying the members of the committee that there would be a meeting on a certain date and certain hour.

Mr. HOWARD of Oklahoma. Is not that the practice of all the committees of the House?

Mr. SPEAKS rose.

The SPEAKER. For what purpose does the gentleman from Ohio rise?

Mr. SPEAKS. For the purpose of making an observation, which I feel should appear in the RECORD. It is unfortunate that many facts and circumstances bearing upon the question at issue have not been clearly presented for the Speaker's consideration and for the information of Members of the House.

The gentleman from Pennsylvania [Mr. MORIN], chairman of the Military Committee, holds the view that the committee could not meet for the transaction of business without his authorization. If this position is correct, could not the chairman prevent consideration of any bills referred to his committee? This is practically the only question involved in the controversy.

Mr. GARRETT of Tennessee. Mr. Speaker, before the Chair rules, I would like to make this inquiry: The inquiry of the gentleman from Tennessee [Mr. REECE] was addressed wholly to the question of the proceedings on last Thursday, was it not?

The gentleman from Tennessee [Mr. REECE] made no inquiry as to the proceedings of the preceding Tuesday, but that matter was brought into the RECORD by inquiries made by other gentlemen upon the floor. I should like to inquire if under those circumstances the Chair would feel inclined to extend the parliamentary inquiry to both days and define the status of the proceedings on both days?

The SPEAKER. The Chair intends to refer to both days and the preceding Thursday as well.

The Chair has given a great deal of thought to this question, and he has had the advice and cooperation of a number of the leading parliamentarians of the House—the gentleman from Connecticut [Mr. TILSON], the gentleman from New York [Mr. SNELL], the gentleman from Tennessee [Mr. GARRETT], the gentleman from Georgia [Mr. CRISP], and others, and, of course, the advice and cooperation of our very competent parliamentarian, Mr. Deschler.

It seems rather extraordinary that we have been unable to find any precedent directly in point. Apparently, this situation has not occurred in the last 100 years. There are some conflicting decisions, but none of them touch precisely the same point raised here.

On Thursday of last week, at a meeting of the Military Affairs Committee, the legality of which is not in dispute, a motion was made to report the so-called Muscle Shoals bill to the House without recommendation; that motion failed. Now, it becomes significant, in view of the motion to reconsider made on Thursday of this week, as to whether that motion was legal or not. First, however, the Chair wants to lay down what he thinks is a sane and sensible rule—there being none in existence that the Chair knows of—as to the legal status of a meeting of a committee. The gentleman from Pennsylvania states that in his recollection there have been no meetings of the Committee on Military Affairs except those called by the chairman. The Chair would be very loth, though, to hold that it is necessary for any legal meeting of a committee that it should be called by the chairman. The Chair believes there must be some other method of securing legality. Therefore the Chair would not want to take the extreme position of holding that a meeting of a committee to be legal must have been held at the call of the chairman; on the other hand, he would not want to accept the other horn of the dilemma as laid down in section 26 of Jefferson's Manual, which provides:

A committee meet when and where they please, if the House has not ordered time and place for them, but they can only act when together, and not by separate consultation and consent—nothing being the report of the committee but what has been agreed to in committee actually assembled.

The Chair would not want to hold that a committee might meet and transact business at any time or place.

In this case the Chair understands it to have been for many years, at least 20, the practice to carry this language in the Congressional Directory, under the heading:

Meetings days of House committees: Committees other than those mentioned meet upon call of the chairman.

And there, among other committees, it is stated that the meeting days of the Committee on Military Affairs are Tuesdays and Thursdays. In the pamphlet containing the subcommittees of the Committee on Military Affairs it appears, on the first page:

Regular meetings, Tuesdays and Thursdays, at 10.30 a. m., and on call of the chairman.

Query: If a majority of the committee assembled at 10.30, approximately, on Tuesday or Thursday morning and acted together as a committee—a quorum always being present—is their action legal or otherwise? There is no question in the Chair's mind about the illegality of the proceedings of the Committee on Military Affairs on last Tuesday. It appears that the chairman of the committee came to the committee room at approximately 10.30 a. m. He found only two other members present, and in about a quarter of an hour, having waited for a quorum, adjourned the meeting on the ground that there was no quorum present.

The rest of the proceedings taken from that point on, in the opinion of the Chair, are entirely illegal, whether a quorum was in fact present or not. The Chair would think from the facts that a quorum was not present until the time when action was taken by that committee, but whether that be true or not, in the opinion of the Chair there could be no legal meeting of that committee following the adjournment for lack of a quorum.

Now, we come to Thursday of this week. It seems to be undisputed that 12 members of that committee assembled in the regular committee room at 10.30, the time noted as being the regular time for a meeting on Thursday, and proceeded to do business. Query: Was their action legal or not? Now, another question comes in there, which is a little perplexing. Was the motion to reconsider the vote by which the Muscle Shoals bill failed to be approved in order on Thursday, a regular meeting day having occurred between? There is no rule the Chair can find governing the motion to reconsider in committees, and yet it can be conceived that it might be of very great importance. The Chair thinks that there being no rule the rule of the House should apply as to motions to reconsider in committees, and we all know that a motion in the House to reconsider must be entered either upon the day or the day following the legislation to which it refers. The Chair would think, applying by analogy to that a motion to reconsider must be made on the day of the committee meeting or the next committee meeting in order to be valid. Now, was Tuesday a day which should be counted in determining the days elapsing since the action by the committee?

The Chair is not absolutely certain whether a motion to reconsider in this case was necessary and does not feel it incumbent upon him to decide the point; but for the purposes of

the argument, the Chair proposes to assume that that motion was necessary in order to make in order the next proposition to report a bill favorably, as the committee did, a quorum being present in all legal form.

The Chair thinks that so far as a business meeting was concerned, that the meeting on Tuesday was on a dies non—that it meant nothing. Had anybody been present who desired to make a motion to reconsider, he could not have done it, because there was not a quorum present.

Therefore the Chair is of the opinion that Tuesday must not be counted as a day according to the rules in the House, but the motion to reconsider was valid on Thursday, although a meeting had been held between.

Now, that motion having been legal, was the action taken by the committee, under those circumstances in reporting the Muscle Shoals bill and other bills, legal? In the opinion of the Chair it was, as applied to last Thursday, of course.

The precedents are conflicting. The decision cited by the gentleman from Tennessee [Mr. REECE] was specifically overruled some years later by Chairman Campbell, who held, on July 18, 1921, RECORD, 4016, that the majority members of a standing committee having met informally, a quorum of the committee having been present and authorized certain committee amendments, that since the meeting had not been regularly called, the action taken by the informal meeting was invalid.

The Chair does not think that this is a sensible and sane way of solving the question of the legality of committee meetings of the House. The Chair does not think it is necessary that the meetings should be called by the chairman provided the custom of that committee has been for many years to fix a definite day or days for meeting and a time for meeting.

The Chair would prefer to follow in this case the decision of Speaker Cannon, who overruled a motion to outlaw proceedings taken under those circumstances. He would prefer to follow this decision rather than the decision of Mr. Campbell, and the Chair is not quite certain that that decision is in direct point, because it occurred during the consideration of a tariff bill where the Ways and Means Committee was in perpetual session practically and was offering something like 200 committee amendments to the bill.

So the Chair thinks that 12 members of the committee having assembled on a regular day at the regular time stated, were competent to act in this instance.

Under the circumstances the Chair will refer the bills reported on Thursday, the Muscle Shoals bill and the other bills, to the appropriate calendar, but the Chair will hold that all proceedings had on Tuesday were illegal and will not refer any of those bills to the calendar.

Mr. GARRETT of Tennessee.   Mr. Speaker, I venture to suggest, if I may, that it would be proper for them to go in the RECORD in connection with the ruling of the Speaker, because I apprehend this is going to be a very important precedent—the provisions of paragraph 3 of rule 10, which reads as follows:

At the commencement of each Congress the House shall elect as chairman of each standing committee one of the members thereof; in the temporary absence of the chairman the member next in rank in the order named in the election of the committee, and so on, as often as the case shall happen, shall act as chairman; and in case of a permanent vacancy in the chairmanship of any such committee the House shall elect another chairman.

The SPEAKER.   The gentleman suggests that the decision be put following this paragraph?

Mr. GARRETT of Tennessee.   Yes; or that it be put somewhere in connection with the decision.

The SPEAKER.   The Chair will state that the parliamentarian will in all probability include this decision in the new edition of the House rules and manual.

Mr. TILSON.   Mr. Speaker, this is a decision of considerable importance.   I therefore ask unanimous consent that the Speaker may have permission to elaborate his decision and buttress it by precedents as he may see fit in giving his ruling.

The SPEAKER.   Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. DENISON.   Mr. Speaker, I desire to submit a parliamentary inquiry.

The SPEAKER.   The gentleman will state it.

Mr. DENISON.   Is it proper practice in meetings of committees of this House for members who are not present in person to authorize others to vote for them in the transaction of the business of the committee?

The SPEAKER.   Only by unanimous consent of the committee itself.   When the Chair was a member of the Ways and Means Committee that was very often done, because it was rather necessary to have record votes on various matters that came up, but no member was permitted to cast his vote in the form of a proxy except by unanimous consent of the committee itself.

Mr. DENISON.   And that should be made of record, of course.

The SPEAKER.   Yes.

Mr. McSWAIN.   Mr. Speaker, a parliamentary inquiry.

The SPEAKER.   The gentleman will state it.

Mr. McSWAIN.   Mr. Speaker, I have personal knowledge that on Thursday, about 12.30, I filed a report from this committee session that has been under discussion, with regard to a bill of which the gentleman from North Carolina [Mr. BULWINKLE] is the author.   The author of the bill is very anxious that that bill should appear on the Consent Calendar on Monday, if possible.   I rise to ask whether or not the bill having been filed within the time, it will have been on the Consent Calendar three days by the Monday session.

The SPEAKER.   Was that a bill considered on Tuesday?

Mr. McSWAIN.   It was considered on Thursday.

The SPEAKER.   The bill was not considered on Tuesday at all?

Mr. McSWAIN.   I do not think so.   It had only one consideration.

The SPEAKER.   Did the committee order the bill reported on Thursday?

Mr. McSWAIN.   Yes.

The SPEAKER.   At what time?

Mr. McSWAIN.   It was about 11 o'clock.   I am not sure exactly what time it was, but it was during the session—after we met and before we adjourned.

The SPEAKER.   The Chair thinks that bill would be legally on the calendar, but no bill or resolution that was reported out at the alleged meeting on Tuesday has any standing whatever.

Mr. COOPER of Wisconsin.   Mr. Speaker, owing to some confusion here I could not understand the reply of the Speaker to the question of the gentleman from Illinois [Mr. DENISON] as to proxies.   Was it the Speaker's ruling that a member of a committee can give a general proxy to another member of the committee?

The SPEAKER.   Not at all.   The Chair is not called upon to rule upon that, but the Chair is of the opinion that a proxy on one particular vote must have the unanimous consent of the committee.

Mr. COOPER of Wisconsin.   Can a member of that committee appoint a proxy orally, or is he required to make the appointment in writing and have it recorded?

The SPEAKER.   The custom in the Ways and Means Committee was for some member of the committee to ask unanimous consent that another member who was absent might be permitted to vote by proxy.

Mr. COOPER of Wisconsin.   Suppose the member whose vote has been recorded by proxy comes in afterwards and says that his position was misunderstood and a mistake made.   Ought not the proxy to be in writing and copied into the minutes of the committee?

Mr. SNELL.   Mr. Speaker, does the Chair mean to make this a ruling on proxies?

The SPEAKER.   The Chair has made no ruling, it is merely a matter of opinion.   It is entirely a question for the House.

Mr. CHINDBLOM.   Mr. Speaker, when the Chair says "committee," it is assumed by the Speaker that a majority, or quorum, of that committee is present?

The SPEAKER.   Of course, a proxy could not be counted in making up a quorum.

Mr. LUCE.   Mr. Speaker, as a member of a committee during my service here, which has a stated meeting day, and said meeting day having been perfectly perfunctory, never having been observed, would it be possible for the Chair in elaborating his admirable ruling to qualify the responsibility of a member of such committee as to whether he is to be put on notice by the publication of a meeting without a call from the chairman?

The SPEAKER.   The Chair has not gone to the full extent of that; he thinks that wherever the circumstances are such that members of the committee feel it necessary to procure legislation and they have a quorum present, that that meeting is legal if it occurs in the committee room on the regular day of the meeting.

Mr. LaGUARDIA.   I hope the inquiry propounded by the gentleman from Massachusetts will not limit the liberal ruling of the Speaker.

PREVENTION OF INFLUENZA

Mr. EDWARDS.   Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on one of the bills that I have introduced.

The SPEAKER. Is there objection to the request of the gentleman from Georgia?

There was no objection.

Mr. EDWARDS. Mr. Speaker, I appeared and was heard before the Appropriations Committee this morning on the following bill:

A bill (H. R. 15339) to combat and prevent influenza in the United States

*Be it enacted, etc.,* That there is hereby appropriated the sum of $25,000,000, or so much thereof as may be necessary, out of any money in the Treasury not otherwise appropriated, to be immediately available, to be expended by the Surgeon General of the Public Health Service, in an effort to combat and prevent an epidemic of influenza in the United States, which now threatens our country, with full authority to the Surgeon General of the Public Health Service to add to his force as great a number of physicians and other personnel as in his judgment may be necessary and to work in conjunction with the various State, county, and municipal health authorities throughout the country in an effort to check the spread of this disease and in getting up, printing, and distributing bulletins to the people on how to prevent and treat influenza.

A hearing was requested by me on this bill at the time of its introduction. The committee to which it was referred is one of the hardest-worked committees of the House and has been quite busy in the short session, so this is the first time I have had an opportunity of being heard before the committee in question on my bill.

At the hearing I made a statement which in effect is the same as I am now making. I am anxious that my views on this matter be known to the Members of the House and for that reason I have sought this opportunity to get them in the RECORD.

My bill seeks an appropriation, as stated therein, with which to study the flu and with which to try to prevent flu epidemics and with which to try to find a cure.

You are all as familiar with this subject as I am. It is your cause, as it is mine. The epidemic came in 1918, and we will never know what an awful toll it took in life and cost of money. We were told then there would be a recurrence of it in about 10 years. The cycle ran true to form, and we had another epidemic of the flu in 1928–29. The last or present epidemic, while nothing like as bad as the one in 1918, was terrible and from newspaper articles and estimates from what seem to be good authorities there were approximately 30,000 deaths as a result of the flu. I have not seen an estimate as to what it has cost thus far in dollars and cents and in lowered vitality and loss of production. It will run into the hundreds of millions of dollars.

Despite the fact that we were told in 1918 there would be another epidemic in 10 years of the flu, we were not prepared for the epidemic that struck the country the latter part of last year. While the wave has reached its crest and it is on the wane, there is still considerable of it over the country yet. "What is everybody's business is nobody's business." The matter was left to the medical profession, without concert of action and without funds for the specific purpose with which to make research, tests, and experiments, and the result is there is not much more information on the subject than before.

I am in no sense criticizing the doctors. Many of them, no doubt, have found how to successfully treat it, while, perhaps, many more have not. The point is that the people ought to know something about it and how to prevent and treat it. When this last epidemic occurred the idea occurred to me that I would get ten or fifteen thousand copies of a bulletin on the "flu" and send them out to people in my district that they might learn something of it, but those bulletins could not be gotten from any bureau, folding room, document room, or department of the Government. There were plenty of books and bulletins on hog cholera, horse colic, the bolt weevil, hollow horn, and other diseases of cattle, horse, and swine, but I was unable to get a single bulletin on the "flu." I did manage to get 25 or 50 copies on the common cold, or some such subject, from the Public Health Service. This is in no sense a criticism of the Public Health Service nor any of the other health services of the Government. If on any body, the criticism is on Congress itself for not providing money for this long 10 years ago with which to make exhaustive studies and to make available data and literature that could be had by the people on the subject. No appropriation, as I understand it, has as yet been made by the Congress for this subject. What is of more importance, and what should be of more concern to a nation, than the health and happiness of its people?

From yesterday's Star I clipped an article which states that German scientists have discovered a plant in Mexico from which a cure for "flu" can be made. What is this plant? Can it be grown in this country? What efforts are being made by our country in that direction except by privately endowed institutions? Why not the Government establish the most modern laboratories in the world, attract the most able doctors and scientists that can be had and set them to work at the cost of the Government on efforts to discover the cause of "flu" and its cure? The same thing can be followed to great advantage with respect to all diseases of mankind, and the aid would be of great help to the doctors and scientists generally. No greater body of men can be found than the doctors, but what they need is money and an agency through which to work.

Visualize, if you can, what an army of 30,000 people is? Suppose it is found, as it possibly will be, that flu is a preventable disease. Suppose it is found that it is an easily curable disease. Then we will look back over the epidemics of 1918 and 1928 and wonder why it was we had not bestirred ourselves sooner, especially when we wake up to the fact that a great many of those who died in those epidemics could have been saved in the first place from having the flu and, in the second place, that many of those who developed and died of it could have been cured and saved to their loved ones and to society. But more important than looking back after the water has gone over the wheel is to look forward. We are told that within 8 or 10 years we will have another outbreak of the flu. We have occasional outbreaks of it in localities, but we have had only the two general epidemics. Let us look ahead and try to work out something that will solve not only this disease and prevent and stop it, but let us wake up the fact that the Government is not doing half enough to help the medical men in their noble work. Many doctors give up their lives fighting disease. It costs a great deal of money and time to become a doctor. Generally they are men of small means, many of them poor. They are often unable to dig into matters, make investigations and researches. The Government, through a central head, such as the Public Health Service, ought to have a corps of doctors, scientists, and chemists working all the while, with plenty of funds behind them, to ascertain and print more about diseases, their prevention, cure, and eradication. Much, with the limited means that have been allowed, has been done. Every once in a while we read of where some foundation or individual has offered a reward for a cancer cure. What is the Government doing? We have the examples of Walter Reed and others who have sacrificed and died that others might live, and, as I have said, great progress has been and is being made. The idea I have in mind is, why not speed up this important thing and make more certain discoveries and cures.

Some will say: "This is paternalism." I say it is no more paternal than to study plant diseases and to combat them at Government expense; nor is it any more paternal than to study and combat the diseases of cattle, sheep, hogs, and other animals. It is no more paternal than the study of chicken diseases, and to work out and disseminate cures for sorehead, mites, pip, and the like, with which the fowls are afflicted; and by far it is more important than bird refuges, and we just passed a bill a few days since to establish a bird and wild-life refuge in every State of the Union. It will cost $10,000,000 in about six or eight years, to save the quail, and the like, for the sportsman's pleasure. It was argued in that it would be well also for our people as it would give them "the great outdoors." It will all help; but we better realize before it is too late that such legislation for the preservation of "woodpeckers" and other birds, while called "wise conservation," is not the very highest conservation that we can effect. The conservation of human life, of health, and of happiness is the most important thing on that subject we can address our thoughts to.

Only recently, a doctor wrote me in an effort to secure a copy of a medical article printed in the Philippines on the treatment of malaria. I understand good results have been gotten by the treatment he wanted this article on. I tried to get a copy of that particular article, and the only one I was able to find in my search is in the library of the Surgeon General of the Army and, of course, he would not let that go out, and properly so. Now, if we had funds available whereby the Public Health Service could have such publications printed in bulletin form and available to be sent on request, great good would come from it. In fact, as I have said, there should be a recognized, established governmental health service, and it in turn should have the name and address of every doctor and medical student in the United States; and as a matter of interest, a new discovery, a new and successful treatment develops, a bulletin on the subject should be sent them. Then the bulletins on flu and other diseases, their prevention and treatment, should be available for distribution to the people. There are many sections in the rural parts of the country where there are no doctors. If the people knew there was a bureau or governmental service from which literature on such subjects could be gotten, they

would seek the information and I believe would profit by it. Those behind the book and magazine trusts will oppose this idea and, of course, call it paternalism. If it is paternalism to save thousands of lives from preventable diseases then paternalism of that kind is worth while.

This medical or health service I am trying to give you an idea about ought also to be able to get from other doctors many good ideas. Some of the very best doctors in the world are to be found in the country sections, practicing in rural parts of the country.

Useful information should be gotten regardless of where it comes from, and they ought to be able to draft the best talent that can be found and put it to work for the benefit of our population, in trying to stamp out disease, and in trying to find cures and treatments. To my mind, there is nothing more important than this very thing. If we depend upon some rich fellow to leave a foundation, just to perpetuate his name, we will go along like we have been going. Great good has been done in this way, but this is the business of the Government, and while bequest and foundations should be encouraged, we just as well be frank about it and admit we are not making the progress we should. We all know that more can be done and we likewise know it should be done.

The present epidemic, we are told, is about over, so it is probably too late for this particular epidemic, but let us prepare for the epidemic that is certainly ahead. Something should be done in advance of these epidemics. It is no use to lock the stable door after the horse has been stolen. An ounce of prevention is worth a pound of cure. Let us act and obtain all the information we can get on the flue as well as on other preventable diseases and get it in such shape that it can be disseminated to the people that they may in turn protect themselves and families as far as possible. It will save thousands of lives and millions upon millions of dollars in cost incident to illnesses and deaths. Let us try the use of a little prevention as well as try to work out some cures. It can and should be done.

APPROPRIATIONS FOR CONSTRUCTION AT THE MILITARY ACADEMY, WEST POINT

Mr. MORIN. Mr. Speaker, I call up the conference report on the bill (H. R. 11469) to authorize appropriations for construction at the United States Military Academy, West Point, N. Y.

The Clerk read the conference report.

The conference report and statement are as follows:

CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 11469) to authorize appropriations for construction at the United States Military Academy, West Point, N. Y., having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendments of the Senate numbered 1, 2, and 3, and agree to the same.

Amendment numbered 4: That the House recede from its disagreement to the amendment of the Senate numbered 4, and agree to the same with an amendment as follows: Insert in lieu of the language stricken out by the Senate the following: *"Provided,* That the new cadet barracks heretofore authorized to be constructed shall be erected on the site of the old cadet mess hall, the street face of the said barracks to be in prolongation of the street face of the west academic building, leaving an open area on the north side of said barracks so that the said barracks can be supervised from the present south cadet guardhouse: *And provided further* "; and the Senate agree to the same.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*
DAVID A. REED,
W. H. McMASTER,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*

STATEMENT

Amendments Nos. 1, 2, and 3, made by the Senate, have been agreed to by your conferees because a further investigation of this matter discloses the fact that the primary need at West Point is for quarters for the officers and noncommissioned officers who are now inadequately provided for, rather than for a veterinary hospital and the alterations to the west academic building. It is the opinion of your conferees that these latter projects can be postponed until some future date. The amend-

ment to the Senate amendment numbered 4, which your conferees proposed and the Senate conferees agreed to, has for its purpose more clearly defining the original intention of Congress when, in the act approved February 18, 1928, it was provided for the razing of the old cadet mess hall and otherwise preparing the site for the new cadet barracks. Since the passage of the above-mentioned act, a difference of opinion has arisen as to the exact location intended by Congress in the act of February 18, 1928. In order to clear up this matter and make it definitely certain that the new cadet barracks shall be located in exact accordance with the intention of Congress as disclosed in the hearings before the Committee on Military Affairs, the amendment to the Senate amendment numbered 4 was agreed to by the conferees.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*

The conference report was agreed to.

DEFINING THE TERMS "CHILD" AND "CHILDREN"

Mr. MORIN. Mr. Speaker, I call up the conference report on the bill (H. R. 12449) to define the terms "child" and "children" as used in the acts of May 18, 1920, and June 10, 1922.

The Clerk read the conference report.

The conference report and statement are as follows:

CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 12449) to define the terms "child" and "children" as used in the acts of May 18, 1920, and June 10, 1922, having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendments of the Senate numbered 1 and 2, and agree to the same.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*
DAVID A. REED,
FRANK L. GREENE,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*

STATEMENT

The amendments of the Senate to this measure are merely to clarify the meaning of the language and thereby make definite the intention of Congress as respects this legislation. Therefore your conferees agreed.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*

The conference report was agreed to.

MORRIS FOX CHERRY

Mr. MORIN. Mr. Speaker, I call up the conference report (H. R. 12538) for the benefit of Morris Fox Cherry.

The Clerk read the conference report.

The conference report and statement are as follows:

CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 12538) for the benefit of Morris Fox Cherry having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate, and agree to the same with an amendment as follows: In lieu of the amendment of the Senate insert the following: " That no back pay or allowances shall accrue by reason of the passage of this act "; and the Senate agree to the same.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*
DAVID A. REED,
FRANK L. GREENE,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*

## STATEMENT

This is a private bill passed by the House without the usual proviso providing that no back pay, pension, bounty, or allowance shall be held to have accrued prior to the passage of the act. The Senate added the amendment, and because of the fact the bill is for the benefit of a World War veteran your conferees agreed to an amendment without the words "pension" or "bounty."

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*

The conference report was agreed to.

BATTLE FIELDS OF BRICES CROSS ROADS, MISS., AND TUPELO, MISS.

Mr. MORIN. Mr. Speaker, I call up the conference report upon the bill (H. R. 8736) to provide for the inspection of the battle fields of Brices Cross Roads, Miss., and the battle field of Tupelo, or Harrisburg, Miss., and move its adoption.

The SPEAKER. The gentleman from Pennsylvania calls up a conference report upon the bill H. R. 8736, which the Clerk will report.

The Clerk read the conference report.

The conference report and statement are as follows:

### CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 8736) to provide for the inspection of the battle field of Brices Cross Roads, Miss., and the battle field of Tupelo, or Harrisburg, Miss., having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate numbered 1, and agree to the same.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*
DAVID A. REED,
FRANK L. GREENE,
DUNCAN U. FLETCHER,
*Managers on the part of the Senate.*

### STATEMENT

In the report of the Secretary of War of a study and investigation of battle fields in the United States for commemorative purposes, together with his recommendations for further operations, as provided for in section 2 of the act of Congress approved June 11, 1926, there is recommended for the battle fields placed in class 11B the following:

With respect to the battle fields in this classification, the area to be included need be only sufficient to suitably contain a marker tablet, or monument, and detailed surveys are not required until such time as the acquisition of the land is undertaken. If Congress determines that any battle in this classification should be commemorated, the proper method would be to erect a monument, tablet, or marker to indicate the location of the battle field, to fence the land required, and to build an approach thereto. Twenty-seven battles, engagements, and campaigns in this classification have been studied and investigated, and as a result the following information is furnished with respect to each. It will be noted that the estimated cost of commemoration varies widely. This variation is made because it is felt that distinctions in this class may be fittingly indicated by the type of memorial.

Brices Cross Roads, Miss. (reference, H. R. 8736 and 10866, 70th Cong.):

| | |
|---|---|
| Method of commemoration | Marker. |
| Land required | 1 acre. |
| Cost of land required | Free of cost to the United States. |
| Estimated cost of commemoration | $5,000. |
| Estimated annual maintenance cost | $250. |

Attitude of local community: The owner of the land in question states that he will be willing to cede to the United States free of cost the amount of land required.

Tupelo, Miss. (reference, H. R. 8736 and H. R. 10868, 70th Cong.):

| | |
|---|---|
| Method of commemoration | Marker. |
| Land required | 1 acre. |
| Cost of land required | Free of cost to the United States. |
| Estimated cost of commemoration | $5,000. |
| Estimated annual maintenance cost | $250. |

Attitude of local community: The land is owned by the United Daughters of the Confederacy at Tupelo, Miss., who will cede to the United States, free of cost, the required amount of land.

The conferees, believing these recommendations should be followed, have agreed to the amendments of the Senate bringing the measure within the purview of the said recommendations.

JOHN M. MORIN,
W. FRANK JAMES,
JOHN J. McSWAIN,
*Managers on the part of the House.*

The SPEAKER. The question is on agreeing to the conference report.

The conference report was agreed to.

PERMISSION TO ADDRESS THE HOUSE

Mr. SEARS of Florida. Mr. Speaker, I ask unanimous consent to address the House for 10 minutes.

The SPEAKER. The Chair will recognize the gentleman later. There is a special order for this morning.

ORDER OF BUSINESS

The SPEAKER. The Chair recognizes the gentleman from Massachusetts [Mr. CONNERY] for 30 minutes under a special order of the House.

Mr. CONNERY. Mr. Speaker, in arising at this time to discuss a question of momentous importance to the industries of our country, a question of vital importance to the workers of our country especially, I trust the Members of the House will bear in mind that I am here representing a constituency made up almost exclusively of industrial workers, many of whom have been unable to find employment at their chosen trade or vocation for long periods of time. Their present plight is due almost entirely to our present tariff legislation.

I speak not as a Democrat nor as a Republican. During the last election both parties honored me with their nomination for Congress. Therefore I can truthfully appeal to the membership of both parties and ask that they bear in mind that my speech is not delivered for political effect or political advantage to either party.

The workers of my district—the shoe workers of Lynn, the textile workers of Lawrence, and the leather workers of Peabody—all have suffered the loss of an opportunity to earn a livelihood for, in some cases weeks and in many cases months, due entirely to the heavy importations of foreign-made goods which can and are being imported under our present tariff and landed in our country at costs which are in many cases less than one-half the actual labor costs of making the same commodities in America. We can and we should make these commodities in America.

During the recent national election both political parties promised that the present tariff law would be changed and that the workers of America would be protected in their opportunity of securing employment.

The Democratic platform dealing with the tariff, in part, read:

Actual difference between the cost of production at home and abroad, with adequate safeguards for the wage of the American laborer.

And the Republican platform, in part, read:

We realize fully that there are certain industries which can not now successfully compete with foreign producers because of lower foreign wages and a lower living cost abroad, and we pledge the next Republican Congress to a revision of these schedules to the end that American labor in these industries may again command the home market, may maintain its standard of living, and may count upon steady employment in its accustomed field.

The Ways and Means Committee are now hearing those who are appealing for protection to American industries. Manufacturers and workers meet upon a common ground. The American manufacturer, with his capital invested, in many cases the accumulation of a lifetime, is asking for tariff legislation which will permit him to sell the products of American labor in competition with the cheaply produced goods of Europe and Asia. The representatives of the workers are appearing before the same committee asking that tariff legislation be enacted which will permit the members of their organizations to obtain and to retain much needed employment.

The workers fully realize that unless the manufacturer can sell the products of American labor that the American workers will be unable to find employment.

We hear considerable talk of our foreign trade. What does it consist of so far as manufactured goods go? Do you realize that we consume more than 90 per cent of our own products? We have a foreign trade in so far as manufactured goods go of less than 10 per cent of what we produce, and were much of what we are now importing shut out I do not believe that we would have any great trouble in consuming almost 100 per cent of the manufactured goods which we produce.

The other day one of my constituents, in writing me about the fact that neither he nor his two brothers had been able to

obtain employment—and they are all skilled tradesmen—inclosed in his letter a cartoon drawn by a former Member of this body, former Congressman John Baer, which tells the story in a very few words.

This cartoon shows that we in America consume 92 per cent of the goods we manufacture and we export only 8 per cent. If our workers had steady employment, they could consume a large part of this 8 per cent.

During the last decade the inventive genius of America has made available to America and to the world labor-saving devices which make possible the turning out by 2 or 3 men or women what years ago it took 20 or 30 and sometimes 50 men to turn out in the same length of time.

And, while I am referring to machine production, bear in mind that the latest and most up-to-date machinery is now in use by most of our European and Asiatic competitors.

Yet even with the handicap of machine production the American workers, differing somewhat from the attitude in past years of the workers of other countries, have hailed the new labor-saving machinery as a godsend, as in many cases it has made the work of the tradesmen a bit easier.

To-day, and for the past few years, we have in America an army of unemployed workers.

America, perhaps the richest country in the world, with some of our citizens rolling in wealth and with many of them able to spend fabulous sums of money to bring to America the art treasures of the world, yet we have in our country to-day millions of skilled American tradesmen who are unable to find employment, and therefore many millions of American families are to-day in want or the recipients of charity.

The American workers are not charity seekers. They believe that it is holier to give than to receive. Yet our people must live. The mouths of the little ones must be fed and our children must be sheltered.

The shoe workers of my home city of Lynn, skilled workers of which there are no better any place in the world, find that their American market is taken away from them, due to the fact that our present laws permit the importation of shoes from Czechoslovakia and France, and the sale of the product of the labor of those countries in distributing houses less than 10 miles from Lynn at prices which are less than the labor costs of producing the same shoes in my home city.

Does such a condition permit the statement that we in Congress are playing fair with our American workers? Does such a condition permit the statement by Members of this House, irrespective of what party we may belong to, that we are carrying out the pledges which we made to the workers of our country during the last national election?

During the year 1923, the first full year under the present tariff law, the total importation of women's shoes from all countries was about 115,000 pairs. Last year the importations of women's shoes from Czechoslovakia alone was more than 1,500,000 pairs. In addition to the women's shoes which we imported from Czechoslovakia, we imported also another million pairs of shoes from other European countries.

A sinister condition. Thousands of competent and highly skilled shoe workers of Lynn and other American cities out of employment, and we import 1,500,000 pairs of women's shoes from Czechoslovakia alone.

And why are these shoes imported instead of being made here?

They are imported because they can be delivered to the distributing houses of our country at prices which are much less than even the labor costs of similar shoes made in America.

Last year a shoe manufacturer, with a plant in Czechoslovakia employing more than 12,000 shoe workers, shipped into America more than 1,000,000 pairs of shoes. The head of this foreign shoe company holds membership in the Chamber of Commerce of Lynn and some years ago he, together with several of his associates, were employed in the shoe factories of my home city, where they learned how to make good shoes efficiently.

The workers in this Czechoslovakia shoe factory receive wages per week ranging from $13.50 down to less than $5. While these wages may be looked upon as low in America they will average with what skilled workers receive in Czechoslovakia.

On the other hand the shoe workers of Lynn, who are not paid any too much, receive in wages from four to six times the wages paid shoe workers in Czechoslovakia.

In addition to the more than 2,600,000 pairs of women's leather shoes, which last year were imported from European countries, we also imported more than 1,000,000 pairs of shoes, the chief value of which was in the uppers composed of materials other than leather.

LXX——228

These shoes are women's shoes and we all know that when we purchase women's shoes to-day that we pay prices which would permit the manufacturer to employ American workers in the production of the shoes. These shoes, because the uppers are composed of materials other than of leather, are taxed under our present tariff law at 35 per cent upon their foreign value. And what is the value the foreign manufacturers of these shoes place on these shoes? An average value, according to the Government's own figures, of less than 30 cents per pair. Is it any wonder that skilled American shoe workers are unable to find employment at their trade?

That which is true of women's shoes is also true of men's shoes. As an instance of what the makers of American men's shoes are up against, let me cite you the case of a prominent shoe manufacturer, formerly operating a shoe plant in Brooklyn, and who is now manufacturing shoes in England and selling these shoes to those who formerly purchased the shoes which he produced in Brooklyn.

This manufacturer was no novice. His family had been making shoes in America for three generations and his name was a byword with American shoe retailers as a producer of first-class men's shoes.

When he found that he could not compete against the product of foreign labor producing all-leather shoes, which under our present laws are admitted free of any duty, he closed down his factory, and without much thought eliminated from their jobs some three or four hundred highly skilled American shoe workers.

He leased a factory in the shoe-manufacturing center of northern England at a rental so small that it makes one laugh, and he then proceeded to employ English shoemakers to make shoes according to his specifications for the American market. He did not bother with the English market, even though the shoes were made in England.

After having some samples made he hied himself to America and proceeded to offer his shoes to the American retailers at prices which were less than he himself had been able to manufacture them for in his own factory in Brooklyn. To-day he is exporting to America thousands of pairs of first-class shoes at prices which are lower than our American shoe manufacturers can compete with. Of course, the shoe retailer gets the shoes cheap, but I have not yet been able to find that the saving through the lesser cost of the shoes is passed on to you and me when we make our purchases.

The English shoe workers have profited, but what about the American shoe workers who are unable to find employment as a result of many such cases as I have just referred to?

The city of Lawrence, which is in my district, is located on the banks of the Merrimack River only 26 miles from the city of Boston, and the cost of carting wool to Lawrence is almost as great as is the cost of transporting the finished textiles from foreign countries to Boston and New York.

There are about 25,000 textile-mill workers living in Lawrence, all of whom are dependent upon the mills of that city for employment. When fully employed, while a thrifty and a saving class of people, realizing the need of providing for the rainy day, they earn an average of something like $25 a week. Lawrence is one of the 100 largest cities in our country, and the living costs in a city, as you all know, are greater than the cost of living in a small town or mill village.

Not only are the mill workers dependent upon the operating of the mills for their employment, but many other industries in Lawrence are dependent upon the prosperity of the mill workers for their own prosperity.

Surely assistance is needed when you find a city with less than 100,000 residents which has more than 500 vacant stores and with some 2,500 tenements empty.

I do not need to call your attention to the fact that our relief department has had many calls upon it under the conditions which exist at this time.

The workers of Lawrence are not responsible for the conditions which prevail. They have only their labor to sell and they are entitled to an opportunity of disposing of their labor under conditions which will permit them to live properly.

Surely, if they have no employment and they have no income because the employment which they previously had, and through which they had a weekly income, has been transferred to workers in foreign countries it does not make for better feelings toward the Government or those officials of the Government who, through the passage of laws which deprived the workers of employment, brought about this pitiful condition.

The textile workers of Lawrence, where we have the finest mills and most up-to-date equipment the market affords, have suffered to such an extent that in the hearings before the Ways

and Means Committee it was testified that at least 4,500 mill operatives have left that city. The textile workers of Lawrence are conceded by manufacturers to be as competent and as proficient as any in the world; and yet these workers for the past four or five years have been unable to secure employment for more than two and three days per week.

While the textile workers of Lawrence receive an average of less than $25 per week when employed, the product of their labor comes in competition with the product of the labor of England, Germany, Czechoslovakia, and Italy, where the wages paid to the textile mill workers are from one-half to one-sixth what the workers of Lawrence receive.

Let me cite you as an illustration some of the wages paid to mill workers in England and Germany:

| | |
|---|---|
| England: Wool spinners, men | $11.00 |
| Germany: | |
| Wool spinners, men | 10.00 |
| Wool spinners, women | 6.80 |
| England: Wool weavers, men | 9.00 |
| Germany: | |
| Wool weavers, men | 10.26 |
| Wool weavers, women | 9.14 |
| England: Worsted spinners | 7.71 |
| Germany: | |
| Worsted spinners, men | 11.26 |
| Worsted spinners, women | 6.28 |

Since the passage of the present tariff law, no less than three large cotton mills in Lawrence have closed their doors, and their workers have been forced to look for work in some other industries.

The wages paid to the cotton-mill workers of Lawrence will run from three to five times the wages paid to cotton-mill workers in those countries from which millions of yards of cotton cloth is being imported at the present time, due to the fact that these foreign-woven cotton cloths can be laid down in the storehouses of American merchants for less than the cost of producing comparable American-made cotton goods.

The mill workers of Lawrence realize that the present tariff law is not protective, and their knowledge comes from the fact that since the passage of the present tariff law the importations of fine woven woolens have each year exceeded by almost 50 per cent the importations of these line woolens in those years immediately preceding the enactment of the present law.

Peabody, one of the centers of the tanning industry of our country, is also located in my district, and there is hardly a day passes that I do not receive at least 10 or 15 letters asking when will Congress pass a tariff bill which will protect American workers in their employment.

The wages of the tannery workers of Peabody will average better than 60 cents per hour, and the product of their labor competes in the markets of America with the product of European labor, where the wages paid will run from as low as 10 cents an hour in Czechoslovakia and Rumania to 15 and not more than 25 cents per hour in France, Germany, Holland, and Belgium.

For instance, the importations of calf and kip leather have increased from less than $3,000,000 in 1923 to more than $14,-000,000 in 1928, an increase of more than 400 per cent.

The tannery workers of Peabody and other leather centers have been denied an opportunity to secure employment. Why? Simply because the users of these goods can secure them cheaper in foreign countries and place them in their factories in America for less than the same goods can be manufactured for in America.

Finished calf skin had some protection from 1846 up to the passage of the tariff act of 1913, and since then it has been on the free list. It may interest you to know that the total importations the year this commodity was first placed on the free list amounted to less than $130,000. Last year the importations amounted to more than $14,000,000. Is it any wonder that the workers of Peabody are praying for some action on the part of Congress?

What is the cure for this intolerable condition? The cure is for Congress to enact as speedily as possible a tariff law which will protect the employment opportunity of American workers.

Some may contend that the American people should purchase the product of American labor in preference to the products of foreign labor.

However, we are living in a world where selfishness prevails to an extent beyond any reasoning on the part of many. We find that the buyers seek to secure what they want at the lowest possible figure. Even our Government, under the false cry of economy, purchases what it needs, even for our Army and Navy, in foreign countries if the foreigners will quote a price lower than the American manufacturer.

And, yet, it is the American manufacturer and the American workers who pay the taxes which support this same Government.

It is only a few years ago since our Government in purchasing airplane cloth awarded a contract to an English manufacturer because of the fact that the price which he quoted for the same material was a few dollars less than the price quoted by a manufacturer operating a large textile plant in the city of Lawrence.

In my investigation of the imports of shoes and the value placed upon them by the foreign producers I came across something which startled me.

We, here in Congress, are charged with legislating in the interests of the American people. And yet I found that the shoes which are imported from foreign countries, and which, because of the fact that they are made wholly of leather, come in duty free, were valued by the foreign shoe manufacturers at an average value of more than $2 per pair. The shoes of which the uppers are composed of materials other than leather, and upon which there is a tariff protection of 35 per cent, were imported at an average value of less than 30 cents per pair.

Upon inquiry I found that while these shoes are imported into America for sale in America when the Government places the duty on these shoes the duty is placed on the foreign value of these shoes. Without hesitancy I can say that it is impossible for American shoe workers to compete with shoes, with cloth uppers, produced for anything like 30 cents per pair plus any duty which might be imagined if that duty is based upon a value of 30 cents per pair.

That which is true of shoes is also true of the textiles produced in Lawrence and the tanned leather of Peabody.

The result of this system of foreign valuation is, to my mind, that the Government is defrauded of the taxes which it should collect, the workers are deprived of their opportunity of securing work because they can not compete with the products of foreign labor on the basis of foreign value of the product, and the American manufacturer is denied an opportunity of operating his plant and employing American workers. In America we can not produce these commodities where labor costs form a large part of the total costs unless adequate and proper tariff protection is afforded the products of American labor.

In looking through the past actions of the House on tariff legislation I noticed that when the present tariff act was adopted the House, upon recommendation of the Ways and Means Committee, based the duties on the basis of the American valuation instead of the foreign value.

When the bill was finally adopted in the Senate the American valuation was eliminated and duties were continued on the basis of the foreign value—that is, all of those commodities which were imported into America were made dutiable on the basis of their value in the country where they were produced except in so far as the law applied to the products of the chemical dyestuff industry, and, in the importations of these commodities, the importers had to pay duty based upon the value of comparable American-made goods—American valuation.

As to whether or not the system recommended by the Ways and Means Committee and adopted by the House was a proper one, it will interest you to know that I had the pleasure while attending the hearings of the Ways and Means Committee recently to hear a representative of the cotton-fabric glove industry make the flat-footed statement to the committee that had the same phraseology been written into that section of the tariff which dealt with cotton-fabric gloves as had been inserted into the section covering chemical dyestuffs, that the American cotton-fabric glove industry would to-day be in a flourishing condition similar to that of the chemical-dyestuff industry instead of being almost eliminated.

I noticed that the representatives of every labor organization affiliated with the American Federation of Labor, when presenting their case before the Ways and Means Committee, demanded and have explained why, if the workers of America are to receive real protection, the duties must be based upon the American valuation system.

To my mind there is no logical reason why we should give special privilege to one industry, as has been done in the protection afforded to the chemical industry, and deny similar protection to our other industries.

The records furnished by the Government show that the chemical industry is one of the few industries which during the past years has had almost complete control of the American market and which, since the passage of the present tariff act, has been able to build up a vast export trade.

We are Americans and we presumably are interested in American workers and American industries whether they be industrial or agricultural.

I trust that when the Ways and Means Committee make their recommendations to this House that we may have the privilege of adopting a tariff bill which will really protect the employ-

ment opportunities of American workers, and that the rates which they see fit to recommend will be based upon the value of the articles in America—American valuation.

Let us take care of America. Those in control of the destinies of our competitors seem to be able to take pretty good care of themselves. [Applause.]

Mr. JOHNSON of Washington. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. I yield.

Mr. JOHNSON of Washington. The gentleman referred to employment conditions in his district. Does the gentleman know that with the very limited immigration that we are now getting from European countries. about 1,000 a month from England, Scotland, and Germany, settle in New England, there to find no employment? That is to say, with the limited immigration, New England factory cities can not take care of those who arrive and settle in those sections.

Mr. CONNERY. That is true at present. There is no work to be had for them in Lawrence, Lynn, or Peabody.

Mr. McCORMACK. Mr. Speaker, will the gentleman yield to me there for a moment?

Mr. CONNERY. Yes; I am glad to yield to my distinguished colleague from Massachusetts, who delivered such a wonderful speech on the national-origins clause the day before yesterday.

Mr. McCORMACK. Might not that condition be caused by the fact that American capital is being sent over to Europe and is subsidizing European capital to compete with American capital?

Mr. CONNERY. My colleague's statement is absolutely correct. Mr. Speaker, I repeat again, on a pair of shoes on which there is no duty, the valuation that is put on is $2 a pair foreign valuation. On a pair of shoes on which there is a duty, shoes with uppers other than leather, the foreign valuation is 30 cents a pair. How can American manufacturers compete with labor costs and overhead on shoes which are brought in at the foreign valuation of 30 cents a pair? That is what we mean when we say that we are striving for an American valuation of goods so that the American manufacturers and American labor may be protected against this unfair foreign competition.

Mr. BUSBY. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. BUSBY. The gentleman spoke a moment ago about the unemployment of the textile workers in New England in his section of the country?

Mr. CONNERY. Yes.

Mr. BUSBY. Does the gentleman know that the average spindle hour for New England is about 5½ active hours per spindle per day, while in the South the average active spindle hour is about 12½ per spindle each day?

Mr. CONNERY. Yes; and in Massachusetts we have a 48-hour law, and if the southern mills would follow that we would not be so much troubled with foreign competition. We do not work women and children in Massachusetts over 48 hours a week.

Mr. BUSBY. We do not work women down there. Our men work and are not idle.

Mr. CONNERY. The gentleman knows they work far more than 48 hours in the southern mills.

Mr. BUSBY. They use three shifts.

Mr. CONNERY. I talked with a gentleman who just came back from the South, who made a tour of the mill sections, and he said that he saw them coming in and going out, and that they worked sometimes as long as 60 hours, without three shifts.

Mr. BUSBY. Let me explain to the gentleman that those special investigators who go South to find out a certain condition never report any condition when they go back except the condition that they went there to see, and the facts do not come out in those reports.

Mr. CONNERY. The gentleman to whom I referred merely went on a visit to the South, and is not in the wool business, cotton business, nor connected with them at all. He told me about living conditions in the South, and he said that the people in Lawrence and Lynn and Peabody could not live on the food that those mill workers in the South get as a result of the cheap wages and long hours they work.

Mr. MORGAN. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. MORGAN. Is it not a fact that the destructive competition in the textile industry is due to the cloth that is imported from Italy, and that is the main trouble with your woolen mills?

Mr. CONNERY. Yes; some from Italy and some from England, Germany, and other countries of Europe.

Mr. MORGAN. The gentleman is, therefore, in favor of protection?

Mr. CONNERY. Oh, yes. I am in favor of protecting the workers and industries of my district against destructive foreign competition.

Mr. BUSBY. Will the gentleman let me follow up the thought that he suggested?

Mr. COOPER of Ohio. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. I yield to the gentleman from Ohio. I will be glad to yield later to my friend from Mississippi [Mr. BUSBY].

Mr. COOPER of Ohio. The gentleman from Massachusetts has made a fine speech, as he always does, a logical speech.

Mr. CONNERY. I thank the gentleman.

Mr. COOPER of Ohio. The gentleman comes from a great manufacturing district where they make a lot of shoes. I fully approve of everything that he has said. While I have no shoe manufacturers in my district we have some leather manufacturers. I am going to go along with the gentleman on shoes, but I am wondering if he will go along with us for a tariff on leather?

Mr. CONNERY. I certainly will. I read in my statement facts showing where at Peabody, in my district, one of the greatest leather centers in the country, the tanners were being practically driven out of the business by foreign competition in leather.

Mr. JONES. Will the gentleman yield?

Mr. CONNERY. I will.

Mr. JONES. Would the gentleman vote for a tariff on hides?

Mr. CONNERY. I will say to the gentleman—and I believe that I am voicing the sentiments of the shoe workers and manufacturers of my district—that we would prefer, if it were possible, free hides; but first of all we believe that a duty on hides inures to the benefit of the packers only and not the farmers. But if the Congress considers that there should be a duty on hides for the benefit of the farmers every shoe manufacturer and the workers in my district are willing to have a duty placed upon hides if Congress will give us a compensatory tariff on shoes.

Mr. JONES. The gentleman does not think that the packers get all the benefit?

Mr. CONNERY. The gentleman knows the packers get the hides.

Mr. JONES. They, of course, buy the animal in many instances, but as one of the parts of the animal it affects the price paid the producers.

Mr. CONNERY. Bought on the hoof. The gentleman is not going to tell me the farmer gets the benefit of the tariff on hides.

Mr. JONES. There is no tariff on hides. In many instances the animal is skinned on the farm or ranch. Besides, in other instances the animal is slaughtered locally. But even when sold to the packer, a tariff would go into the price.

Mr. CONNERY. I think the gentleman realizes that it will inure to the benefit of the Chicago packers alone. What I want to say is that if the Congress wishes to put a tariff on hides, we are not going to find fault. We favor the farmer getting a tariff on the farm products which he sells. I am not standing here saying, Give me justice and nothing for the rest of the country. That is not our principle. My constituents are out of work, they are hungry, their children are hungry, and if Congress wants to put a protection on hides in the belief that it helps the farmer, I am not going to object.

Mr. JONES. Does not the gentleman think that if we are going to have a tariff law it should be a uniform tariff—one on articles which come through the customhouse——

Mr. CONNERY. Yes; I do.

Mr. JONES. On raw products as well as on the finished articles? It should not be a special-privilege tariff.

Mr. CONNERY. I think that we should have a tariff that will protect every manufacturer and every worker and every farmer in the country who needs protection.

Mr. JONES. On jute, hides, and all raw material?

Mr. CONNERY. On everything which really needs protection.

Mr. SEGER. We have mills in the district I have the honor to represent that are going South on account of cheaper taxation and lower wages. The gentleman comes from Brooklyn, does he not?

Mr. CONNERY. From Brookline? No; I come from Lynn.

Mr. SABATH. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. SABATH. The gentleman has given the House valuable information relative to the importation of shoes from Czechoslovakia and Yugoslavia and other countries of Europe. Can the gentleman give us the number of shoes exported to those countries from this country?

Mr. CONNERY. The number is almost negligible that we export. It is not worth putting in the text. There is no export of shoes to Czechoslovakia and Yugoslavia that amounts to anything worth putting in the RECORD.

Mr. YON. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. YON. There is one question that I would like to ask of the gentleman. I have been a shoe man—not a manufacturer, but a dealer—and I am sympathetic with the shoe industry. While I was in Boston not long ago one of the big leather men outlined the situation relative to the supply of leather. He said that the supply had decreased from 1920 from 13,000,000 down to less than 2,000,000 of the available supply. The urgent requirement at that time was to stop low-cut shoes. They were bringing in substitutes for leather, and at the same time they were asking protection on shoes, all the while knowing that when they asked protection on shoes the producers of hides and leather are entitled to protection on hides.

Mr. CONNERY. If the gentleman will examine the record, he will find that the 1,500,000 pairs of shoes that came in last year from Czechoslovakia paid no tariff at all. There was no duty on them at all.

Mr. YON. I understand that those shoes are made where a great deal of extra work is placed upon them, and those shoes so made carry duty; and the majority of the shoes manufactured are of that general character of manufacture. As I say, I want to do the fair thing and believe in doing the fair thing for the shoe manufacturer.

Mr. CONNERY. I will say to the gentleman that I believe firmly that if Congress does not put a tariff on boots and shoes the shoe industry in my city will be wiped out within the next five years. I am not saying that for effect. I know what I am talking about.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. SCHAFER. In the district that I have the honor to represent we have a great many shoe manufacturers and tanneries. I want to have a tariff which will protect these industries and labor employed therein from unfair competition of foreign products. I will, however, oppose a tariff on shoes if the shoe manufacturers keep up their propaganda for a tariff on shoes and opposition to a tariff on hides and finished leathers.

Mr. CONNERY. Every shoe manufacturer that I have talked with has hardly mentioned the question of hides. If you will ask them about it, you will find they will say to the Committee on Ways and Means when they appear before it next week, "If you see fit to put a duty on hides, and we ask is to have a compensatory tariff placed on shoes." I will say to the gentleman that the propaganda that he mentions certainly does not come from my district.

Mr. MORGAN. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. MORGAN. If we destroy the shoe factories and the tanneries, will not the hide market be wiped out ultimately?

Mr. CONNERY. Yes; because there will be nobody to buy hides.

Mr. McCORMACK. Does the gentleman know where the capital comes from that is put into the manufacture of these shoes in Czechoslovakia?

Mr. CONNERY. I believe that the capital that is behind the Czechoslovakia shoe manufactures comes from the United States. The manufacturers here have put money into business over there, because they say they can not compete here, and with cheap labor costs over there they can, and thereby throw thousands out of employment in the United States. That is admitted by business men in New York.

Mr. LOZIER. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. LOZIER. Is it not a fact that in the last few years millions of dollars of American money have been loaned to countries in Europe in order that European industry may come in competition with domestic products here?

Mr. CONNERY. I understand so.

Mr. MORGAN. Does the gentleman stand on the Democratic platform, where protection is demanded?

Mr. CONNERY. I certainly stand on the Democratic platform, which demands that our industries be protected.

But, of course, the Democratic platform says we should have protection. I have no argument with my distinguished friend from Texas on that point.

Mr. JONES. The occasion for my question was this: I received a printed letter—and I am sure all the Members received it—from the National Boot & Shoe Manufacturers' Association urging a tariff on boots and shoes and urging free hides. Now, it seems to me it is going pretty far to ask the ranchmen and farmers who produce hides to sell their products in a free market and at the same time compel them to buy their supplies in a protected market. Does the gentleman think that is fair?

Mr. CONNERY. No; I do not. And, I repeat, I believe a tariff on hides will only inure to the benefit of the packers, and

I am not interested at all in the packers; I am interested in the farmers. I want to see the farmers protected.

Mr. JONES. I want to say in that connection that the farmer sells the whole animal to the packer. The packer in turn sells to others. The packer is an intermediate agent. If he can get more for the hides, he can pay more for the animal. That is elemental.

Mr. CONNERY. And when the packers get the animal they skin him and dispose of the hide.

Mr. JONES. I want to say to my friend that hides can be brought in free from other places. These packers have big plants in other countries—in South America and elsewhere—and they can bring hides in free of duty. The same is true of other concerns which use hides.

The SPEAKER pro tempore. The time of the gentleman from Massachusetts has expired.

## DEPORTATION OF ALIENS

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill S. 5094, with Mr. BACON in the chair.

The Clerk read the title of the bill.

Mr. JOHNSON of Washington. Mr. Chairman, before we proceed with the reading of the bill, I ask unanimous consent that I may be permitted to address the committee for three minutes.

The CHAIRMAN. The gentleman from Washington asks unanimous consent to proceed for three minutes. Is there objection?

There was no objection.

Mr. JOHNSON of Washington. Mr. Chairman and gentlemen, when the committee was about to rise last night an agreement was reached by which we agreed to proceed with Senate bill 5094 to-day in accordance with the rule under which we were operating. As we were about to rise, it was apparent that amendments would be offered to provide for a paragraph which would include violators of certain parts of the liquor laws. They would be alien violators, of course. One or more Members had sent to the Clerk's desk amendments to that effect, and your Committee on Immigration, after surveying the situation and feeling rather of the opinion that an amendment of some kind along that line would be voted, met this morning and perfected an amendment. I think, in fairness to the gentleman from Georgia [Mr. TARVER], who was claiming recognition at the time we made the agreement, that his proposed amendment might as well be read, after which the chairman of the committee will offer the committee amendment as a substitute.

Mr. EDWARDS. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. EDWARDS. Is the proposition the committee has agreed on, in effect, the amendment as offered by the gentleman from Georgia?

Mr. JOHNSON of Washington. I think it is rather more embracing.

Mr. BRIGGS. It relates not only to violations of the prohibition laws but to other violations?

Mr. JOHNSON of Washington. In order to save time I will read the amendment. It will add one more classification, and it will be as follows:

(5) An alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one year or more, or who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act.

Mr. LOZIER. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. LOZIER. In other words, the language makes the terms cumulative; that is, adds one to the other?

Mr. JOHNSON of Washington. Yes; cumulative for liquor violations and separating them from general violations. With that explanation, I will ask that the Clerk read the bill.

Mr. TARVER. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Georgia offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. TARVER: Amend by adding a new paragraph to be numbered "2–A" after line 7, on page 3, as follows:

"2–A. An alien who hereafter violates or conspires to violate any statute of the United States or of the several States by manufacturing or selling intoxicating liquors for beverage purposes, and is convicted of such offense in a court of record when such conviction is for a second offense of the same character."

Mr. TARVER. Mr. Chairman and gentlemen of the committee, the purpose of this amendment, of course, is to authorize the deportation of those who have manufactured or sold intoxicating liquors in violation of the laws of the United States. It does not affect any other class of violators of our prohibition laws. It provides that conviction must be had in a court of record and not only that but it must be a second conviction. It does not have anything to do with the length of the sentence that may be imposed, and I respectfully submit to you that an amendment such as was described by the chairman of the committee, the gentleman from Washington, will not have the effect of authorizing the deportation of a large majority of these alien violators of our prohibition laws, for the reason that in those sections of the country where such violations are most rampant and where there are the largest number of alien violators of the prohibition laws the judges who customarily pass upon such cases do not impose sentences of the length of one year for the offense of selling intoxicating liquors or for the offense of manufacturing intoxicating liquors, in the vast majority of cases.

The penalties imposed by the judges, range from a small fine to a few days in jail. The minimum punishment for a first offense under the law may be as small as one day in jail or a penny fine. For a second offense, it may be as small as 30 days in jail or a fine, I believe, of $200.

Now, I contend that an alien who has engaged in the business of manufacturing or selling intoxicating liquors to the extent that he has been twice caught and twice convicted in a court of record has no right to insist upon his being allowed to remain in this country.

The bill as it is at present, without the amendment of the gentleman from Washington [Mr. JOHNSON], would require not merely one year's sentence but two years, and the amendment changes that condition to some extent, if it should be adopted, but only to the extent of requiring that the aggregate sentences shall be one year; and I submit to you that in those sections of the country, the large cities, where these aliens ply their illegal trade, it would be a long, long time before you would find sentences in very many cases imposed by the judges in those jurisdictions aggregating 12 months.

The question is, Do you consider an alien who engages in the business of violating the Constitution of the United States and the laws enacted in pursuance of the Constitution of the United States, a desirable citizen of the United States? If you do not, then you ought to vote down the committee substitute and adopt this amendment.

Mr. SCHAFER. Will the gentleman yield?

Mr. TARVER. No; I have not time to yield, I am sorry to say to the gentleman. I only have five minutes.

The gentleman from Texas [Mr. Box] on yesterday made some statement to the effect that the reason for not including a provision of this kind was because it would result in placing in the deportable class such a large number, in addition to those already authorized to be deported, that they might not be properly handled under the appropriations which are now available. The same objection would apply to every other provision of this bill. It is admitted that there are at least several hundred thousand aliens in the United States subject to deportation under our laws who can not be deported for lack of sufficient appropriation. If the gentleman's argument is correct, then why should we add any number to that class?

The CHAIRMAN. The time of the gentleman from Georgia has expired.

Mr. TARVER. Mr. Chairman, I ask unanimous consent to proceed for five minutes.

The CHAIRMAN. The gentleman from Georgia asks unanimous consent to proceed for five additional minutes. Is there objection?

There was no objection.

Mr. TARVER. This bill, gentlemen of the committee, provides that an alien who is guilty—not convicted in a court of record, but who is guilty of any sort of a violation of the laws of the United States against the handling of narcotics—shall be subject to immediate deportation upon order issued by the Commissioner General of Immigration.

Why should there be such a tremendous distinction between the violator, in a small way, of the narcotic laws, who may be deported even without trial or conviction, and the violators of the prohibition laws of the country?

My amendment, as I have said, provides it shall apply only to two classes of cases, those who manufacture and those who sell, and that it shall not apply to them unless there shall have been two convictions for the same offense.

I submit this presents to the committee the sole question of whether or not they believe aliens who have twice violated and been convicted of violating the prohibition laws of the country are desirable residents of the country and ought to be permitted to remain here.

Mr. SCHAFER. Will the gentleman now yield?

Mr. TARVER. I yield to the gentleman.

Mr. SCHAFER. Why not also include those who are found guilty of buying and transporting?

Mr. TARVER. So far as I am concerned, I believe that violators of the prohibition laws of the character indicated by the gentleman should be included, but I have sought to put this amendment in such form as that any man who even pretends to believe in prohibition and in the enforcement of prohibition could give it his support.

I want to say to the House, in explanation of my own position, that I am sincerely an advocate of prohibition. I am offering this amendment as a friend of prohibition. I believe that the eighteenth amendment to the Constitution of the United States is the best legislation enacted by this Congress in the last 50 years, and I do not believe that the wholesale violation of it in certain sections of this country any more calls for its modification or repeal than that the wholesale machine-gun murders which we have been reading about, occurring in the city of Chicago, require the repeal of the laws against murder, and I believe that if you pass this amendment and write it into law, it will go a long way toward effectively enforcing the prohibition statutes of this country, and it will rid the country of some of the foreigners who have been carrying on this illegal business in a wholesale way in certain sections of the country.

If you adopt the amendment of the committee, adopted by the committee since yesterday afternoon in order to prevent your adoption of a more vigorous amendment, you leave the matter almost where it is now, because there will be very few cases in which the aggregate penalties will be as much as 12 months in those sections of the country which stand most in need of legislation of this character. [Applause.]

Mr. JOHNSON of Washington. Mr. Chairman, I desire to be recognized in opposition to the amendment.

Gentlemen, this is quite a serious matter. The gentleman from Georgia has made a very earnest statement. We ought to analyze it. We are dealing with aliens, even though the words of his amendment have been reduced to two or three phases—transporting and manufacturing—the facts remain that if an alien should be fined once $5 for a violation in a court of record, and then again fined $5 you have provided that he must be deported provided the Secretary of Labor thinks him an undesirable citizen.

Mr. TARVER. If the gentleman will yield, the police courts are not courts of record.

Mr. JOHNSON of Washington. Is the gentleman sure? How about the State of California?

Mr. TARVER. I think there is no question but that police courts are not courts of record in any State.

Mr. JOHNSON of Washington. They have a different system in California.

Mr. EVANS of California. If the gentleman will yield, I want to say that the police court in California is not a court of record.

Mr. JOHNSON of Washington. Then I am mistaken. It is agreed, however, that many of these offenses are punished by imprisonment for 30 days or 60 days, and with fines in proportion. You must understand that we are creating one or two additional classes of aliens who commit crimes of a serious nature, and they must be proceeded against by the Secretary of Labor. This amendment which has been proposed would confer so much possibility of a burden in the name of deportation that the Department of Labor would be greatly interfered with and would have to have a third branch of the Government for this phase of prohibition enforcement.

Mr. CRAIL. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. CRAIL. As I understand the amendment, the alien would first have to be determined to be an undesirable citizen——

Mr. JOHNSON of Washington. That would come after he was convicted.

Mr. CRAIL. If he is an undesirable citizen, would it not be better to deport him on a minor offense than to wait until he has committed a felony?

Mr. JOHNSON of Washington. If you carried it out in that detail, the Department of Labor would not be able to function at all. The work and burden on the department would be terrible. I will ask the House to vote down the amendment offered by the gentleman from Georgia and vote up the substitute which I shall offer as a committee amendment.

Mr. GIFFORD. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. GIFFORD. Considering the various paragraphs, when it comes to deportation to Russia, we not having recognized the Government in that country, what is the attitude of the department in that respect?

Mr. JOHNSON of Washington. We would be unable to deport.

Mr. SABATH. Mr. Chairman, the gentleman from Georgia is a prohibitionist and believes in the enforcement of the law, but, unfortunately, he is under the impression that all the violations of the law are committed by aliens. Now, I will say that many aliens are arrested; they have no one to intercede for them; they have no influence, and when they are arrested they are fined. On the other hand, the influential citizen, in the gentleman's State of Georgia, or any other State, do the same thing; they make it; they sell it; they consume it, to a much greater extent than many of the aliens, but they very seldom are convicted or even arrested.

What I want to bring home to you is that we have very stringent provisions in the present deportation act which provides for the deportation of aliens committing any kind of an offense, whether it is violation of the Volstead Act or whether it is larceny, robbery, or any other offense or crime. Now, why should we have a special provision in the act applicable to those who happen to violate the Volstead Act, a thing which has been made illegal only a few years and which up to the time before hysteria had taken possession of our legislative bodies, was recognized to be legal all over the United States. Lo and behold, to-day we must have a special law which must be much stronger than the law which applies to a man guilty of robbery, larceny, or any kind of a real crime against the laws of the States. It is to be regretted that people go or are carried away by blind prejudice to such an extent and can not see the situation as it really should be seen by sane and sensible men.

I feel that the present-day hysteria and intolerance on the part of certain organizations and individuals should cease, and that we should legislate sanely as men and not be overlorded by an organization simply because a few years ago it was powerful, but which now is fast disintegrating. It is to be regretted that its accredited officials still come down here or by a word of influence Members of Congress who are elected by the people to believe that they must do as this organization tells them, regardless how vicious, otherwise the organization will bring about their defeat. We ought to be big enough to say to all such organizations and their agents that we are men who are sworn to uphold the Constitution of the United States, and who at the same time have the right and privilege to cast our votes according to the dictates of our conscience and not according to the dictates of these prohibition leaders or people who really do not know what it is all about, and are being misled and used by the professional prohibitionists on one hand, and, on the other, the restrictionists, who are about as narrow-minded and bigoted, and who are forcing the legislation now before us.

Unlike the gentlemen from Georgia, Florida, Washington, or Maine I am frank enough to admit that there are many violations of the prohibition law in my State and in my city.

I exceedingly regret to say that there are many bootleggers, and many killings among these bootleg gangs, something that was unheard of before prohibition, and for which the prohibition law is responsible. This, however, the professional prohibitionist, or the prohibitionists on the floor of this House, dislike to concede, notwithstanding that it is a fact, and is recognized by those who are not blinded with prejudice or who are not crazed on the question of prohibition.

In a measure, I do not blame certain gentlemen in trying to secure a special provision in this act, applicable to aliens guilty of violating the Volstead Act. I take it they want that lucrative business to be solely conducted by and be in the hands of native-born Americans.

In view of the tremendous importation of liquors, it does not affect the price of their native manufactured white mule and moonshine, because the greater importation of these liquors the lesser the price of white mule and moonshine, but surely they can not maintain that aliens are guilty of violating the prohibition law in their respective States, because there are no aliens there, and, notwithstanding that fact, the records will show, that there are as many stills confiscated as there are in any other section in the United States.

I grant that there are not as many arrests made, but we know, and it can not be denied, and, in fact, it has been demonstrated and proven on the floor of this House, that the prohibition law is not being enforced in the South, and that the same southern hospitality of old still prevails.

Mr. LaGUARDIA. Mr. Chairman, I move to strike out the last word. I can understand the attitude of the gentleman from Georgia [Mr. TARVER] in presenting his amendment. After all, in these days of tariff revision and protection of American industry, it is natural and logical that America's greatest and most profitable industry should be reserved to citizens of the United States. [Laughter.] The gentleman states that there are thousands of bootleggers. Of course, we have not had the benefit of the Census Bureau in classifying these bootleggers as to citizens and noncitizens, but again I want to point out to the House and to repeat at the risk of becoming tiresome, that you would not have thousands of bootleggers if you did not have millions of drinkers. It is because of the great demand for liquor that you have this large number of bootleggers. Just how the gentleman from Georgia [Mr. TARVER] is going to differentiate between the alien bootlegger and the native consumer, I do not know. There can be no serious objection to the gentleman's amendment. In fact, I rather welcome it, because it will answer a great many of the charges based upon misinformation, that the bootlegging industry is in the control of aliens. I assure the gentleman from Georgia that in his State, and in many of the States of the Union, business is too good to be left in the hands of aliens.

Mr. TARVER. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. TARVER. The gentleman on previous occasions has made statements of this character concerning my State upon the floor of the House, and I rise to inform the gentleman now that in my district in Georgia the prohibition laws are enforced, and if the gentleman will take the trouble on some occasion to visit my district, as I hope he will, he will discover that to be true. He will find that his charges made against my State at least are not correct.

Mr. LaGUARDIA. I shall permit the records of the gentleman's own State to speak for themselves, and if the gentleman will consult them he will find an alarming increase in violation of both the Federal and the State prohibition laws, and I believe that the conditions in the State of Georgia as to violation of the liquor law is such that this House can take judicial and legislative notice of it.

Mr. McCORMACK. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. McCORMACK. Might I also call to the gentleman's attention the fact that in the report of the provost marshal general to the Secretary of War on the operations of the selected-service system, to December 20, 1918, one of the States mentioned where forcible resistance to the draft existed was the State of Georgia.

Mr. LaGUARDIA. That has nothing to do with this, but I want to say this about the State of Georgia in all fairness, that the State of Georgia in so far as liquor conditions are concerned is no worse than other States of the Union.

Mr. TARVER. May I ask the gentleman a question?

Mr. LaGUARDIA. Certainly.

Mr. TARVER. The statement of the gentleman made with reference to violation of the liquor laws in Georgia was based upon the records, I presume, indicating the number of distilleries seized?

Mr. LaGUARDIA. And the number of arrests and convictions.

Mr. TARVER. The fact that the law is enforced and that violators of the law are arrested is no evidence to sustain the gentleman's charge. The fact that in some sections of the country violators go unpunished and no arrests are made does not sustain the contention that the law is not violated there.

Mr. LaGUARDIA. I refuse to yield further and say as to the gentleman's very clumsy innuendo as to my State, that he will find that in comparison to population, the conditions in the State of New York are better than in his State.

Mr. JOHNSON of Washington. Mr. Chairman, I call for the reading of my amendment, which I offer as a substitute for the amendment offered by the gentleman from Georgia.

The CHAIRMAN. The Clerk will report the substitute.

The Clerk read as follows:

Substitute offered by Mr. JOHNSON of Washington for the amendment offered by Mr. TARVER: Page 4, after line 9, and after line 3 already inserted by the committee amendment, insert a new subsection (8) to read as follows:

"(9) An alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one years or more; or who is convicted of manufacturing,

selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act."

Mr. TARVER. Mr. Chairman, I make the point of order against the amendment when it is offered as a substitute. The amendment which I propose is to page 3 of the bill after line 7, adding a new paragraph to follow subsection 2 of section 1. The amendment proposed by the committee through its chairman is to page 4 of the bill, and an entirely different part of the bill, and can not be properly considered as a substitute for my amendment. There ought to be a vote upon my amendment, and then a vote upon the gentleman's amendment.

The CHAIRMAN. Both the amendment and the substitute are offered to the same section, and the Chair thinks the substitute is clearly germane and overrules the point of order.

Mr. JOHNSON of Washington. I think this matter has been fully debated and the committee has looked as carefully as it could and given consideration to this. I think we should now have a vote and proceed with the reading of the bill.

Mr. EDWARDS. Mr. Chairman, ladies, and gentlemen of the committee, it is unfortunate that in the consideration of matters here we should at any time legislate with respect to what has happened in this State or that State. We should, at least, be broad enough to approach legislative matters in the interest of the whole country. Every once in a while slurs are made at some State. The gentleman from Massachusetts, very unkindly, so far as the statement that Georgia resisted the draft, put it in the RECORD that Georgia resisted the draft. He read and quoted from some War Department report. I do not care where that statement emanates from, it does our great State an injustice. In the name of the great State I have the honor to, in part, represent, I brand it as false. We just as well have this thing out now as later. The statement is not true. There were, perhaps, men in Georgia, as there were men in Massachusetts, as well as other States, who objected to the draft, but the citizens of the great State of Georgia were as loyal to the Stars and Stripes as were those of the great State of Massachusetts. [Applause.]

It is unbecoming a Member of this House to make these nasty digs and mean slurs at any of the States. As a Representative of the State that has thus been insulted, I resent the remarks, and whether they come from the War Department, or wherever they came from, I denounce them as unkind and unfounded. [Applause.] The people of a whole State ought not be indicted by the War Department report because of the attitude of some of its citizens. I claim no superior patriotism for Georgians but they are patriotic, and the State of Georgia is one of the great sovereign States of this Union, and is entitled to proper respect here and elsewhere.

Mr. BLACK of New York. Mr. Chairman, I rise in opposition to the amendment.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section and all amendments thereto close in five minutes.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section and all amendments thereto close in five minutes. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman and gentlemen of the committee, supplementing the remarks of the gentleman from Georgia [Mr. EDWARDS], I want to say that we saw in New York City a great number of men of alien blood march forth to the war and perform nobly, as did those living in other cities and States. When the leaders of the immigration restrictionist movement and the drys get together they can furnish a melting pot that would satisfy a witch burner. This amendment is another tower to hypocrisy in America.

I am surprised that the chairman of this Committee on Immigration and Naturalization has capitulated to the drys. This matter has nothing whatever to do with the immigration bill. The committee refused to leave anything to do with it at first, but they are now panic-stricken when the gentleman from Georgia [Mr. TARVER] offers his amendment, so that immigration is going to be tainted with the corruption of prohibition. But I am not much surprised. I think the Labor Department is one of the best departments in Washington; and if there is any gravy in this thing, I think they ought to have some of it. That department will be as much corrupted as any other department with which the prohibition fanatics have come in contact.

Who in this day and generation is going to say that the bootlegger is undesirable? How are you going to get by common sense on this proposition? I am not surprised that the gentleman from Georgia [Mr. TARVER] should offer his amendment. He speaks of violations of the Volstead Act as being on a par with violation of the narcotic act. Quite evidently there is a great difference. Narcotics poison the minds of American people, and the bootleggers are catering to the ordinary appetites of Americans. This amendment can not only affect the violators; it affects their families also. It affects thousands of men because they happen to sell booze a couple of times and get caught. Here is an American citizen buying liquor from an alien bootlegger. The alien bootlegger goes into the business in order to support his family. You give three cheers for the American violator. I suppose this amendment will prevail, although it is nonsense on the face of it. The House was off its feed when by its vote it turned down the $24,000,000 additional appropriation for prohibition enforcement. I congratulate all the dry gentlemen on once more answering "present" when the captains of the drys demand it. [Applause.]

The CHAIRMAN. The question is on the substitute offered by the gentleman from Washington for the amendment offered by the gentleman from Georgia.

The question was taken, and the substitute was agreed to.

The CHAIRMAN. The question now occurs on the amendment as amended.

The question was taken, and the amendment as amended was agreed to.

Mr. SABATH. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will report the amendment offered by the gentleman from Illinois.

The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 3, line 18, after the word "false," strike out the words "or misleading," so that paragraph 5 will read as follows:

"(5) The alien who hereafter willfully enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by the willfully false representation or the willful concealment of a material fact."

Mr. SABATH. That is the amendment I submit.

Mr. JOHNSON of Washington. Mr. Chairman, I believe that the debate has closed on all amendments to this section.

The CHAIRMAN. The gentleman from Washington is correct. The question is on the amendment of the gentleman from Illinois.

The question was taken, and the amendment was rejected.

The CHAIRMAN. The Clerk will read.

Mr. HUDSON. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. HUDSON. The House has adopted an amendment of the committee. Would it now be proper to offer an amendment to that amendment adopted by the committee?

The CHAIRMAN. The Chair thinks not.

Mr. HUDSON. It is part of the section, is it not, and would it not be in order to amend it?

The CHAIRMAN. The gentleman should have offered an amendment to the amendment when it was pending. It is too late now. The Clerk will read.

Mr. SABATH. Mr. Chairman. I offer the following amendment: On page 4 strike out the "ten" and substitute "five" for it.

Mr. JOHNSON of Washington. Mr. Chairman, that amendment was offered yesterday and voted down.

Mr. EDWARDS. Mr. Chairman, I make the point of order that there is no amendment pending. The gentleman has not sent it to the desk in writing.

The CHAIRMAN. The point of order is sustained. The Clerk will read.

The Clerk read as follows:

SEC. 2. For the purposes of subsections (6) and (7) of section 1—

(a) No conviction shall serve as a basis for deportation proceedings unless such conviction is in a court of record and the judgment on such conviction has become final;

(b) In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall be considered the term for which sentenced; and

(c) An offense of which an alien, after conviction, has been unconditionally pardoned, shall not be considered an offense.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.

The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.

The Clerk read as follows:

Committee amendment offered by Mr. JOHNSON of Washington: On page 4, line 10, strike out "(6) and (7)" and insert in lieu thereof "(6), (7), (8), and (9)."

The committee amendment was agreed to.

The Clerk read as follows:

SEC. 3. (a) If any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen.

(d) So much of section 3 of the immigration act of 1917 (U. S. C. title 8, sec. 136(j)) as reads as follows: "persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission" is amended to read as follows: "persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Secretary of Labor has consented to their reapplying for admission."

(e) So much of section 18 of the immigration act of 1917 (U. S. C. title 8, sec. 154) as reads as follows: "or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof" is amended to read as follows: "or knowingly to bring to the United States at any time such time as such alien may be lawfully entitled to reapply for admission to the United States." The amendment made by this subsection shall take effect on the expiration of 60 days after the enactment of this act, but the provision amended shall remain in force for the collection of any fine incurred before the effective date of such amendment.

Mr. SABATH. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Illinois offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 4, line 24, strike out all after the word "deported," on line 24, all of line 25, and up to and including the word "or," in line 1, page 25, so that provision (a), section 3, will read as follows:

"SEC. 3. (a) If any alien has been arrested and deported after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony, and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."

Mr. SABATH. Mr. Chairman, I hope the chairman and the members of the committee will agree to this amendment. I feel they are interested in drafting a law that will be upheld by the courts. As this section is now drafted there is no question that it is a retroactive provision, because it provides for the punishment of those who have committed offenses, long before the adoption of this act. My amendment provides for the same deportation but for offenses committed by those who have been deported since the adoption of this law or this act, so as to make it lawful, and make it legal, and so the courts will uphold it.

I do not believe it should be the policy of this House to pass laws that are retroactive or exposte facto, laws which the courts have frequently held are void. For that reason I am hopeful the chairman and the committee will agree to this amendment. It will strengthen the provision; it will make it absolutely legal, and I feel justice requires that we should not enact legislation, as I have stated, which is retroactive.

Mr. BURTNESS. Will the gentleman yield?

Mr. SABATH. Yes.

Mr. BURTNESS. What offense committed in the past does the gentleman claim is punishable by this section?

Mr. SABATH. It provides for deportations which took place before the enactment of this act.

Mr. BURTNESS. But the act which is punishable is the attempt to come in again, is it not?

Mr. SABATH. No; that is not the fact. This is the provision, that if at any time a man has been deported, for instance, for overstaying his leave, we will say, three, four, or five years before this law was enacted, he should not be punished under this act. I say that such a stringent provision should not apply to him in view of the fact that when he was ordered deported, years ago, this was not the law of the land. That is my position.

Mr. BLANTON. Will the gentleman yield?

Mr. SABATH. Yes.

Mr. BLANTON. There are thousands of Mexicans who have come across the line unlawfully and who are now within the United States. Has not the Congress the right to pass a law to deport them?

Mr. SABATH. There is no question about that.

Mr. BLANTON. Is that ex poste facto?

Mr. SABATH. No.

Mr. BLANTON. Can not Congress provide for the deportation of any certain class of people?

Mr. SABATH. Yes.

Mr. BLANTON. It is not ex poste facto if it applies to a whole class.

Mr. SABATH. I agree with the gentleman that there are many of them here in violation of the law and that they should be deported. We have embodied such a provision in this act and that is being taken care of. There is no question about that.

Now, I am again going to appeal to the gentlemen of the committee to grant my request for an amendment of paragraph 5 of section 2, which I believe should be eliminated.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.

The question was taken, and the amendment was rejected.

The Clerk read as follows:

SEC. 6. Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917; but no proceedings based on subsection (6) or (7) of section 1 of this act shall be begun after the expiration of three years after the termination of the imprisonment.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.

The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.

The Clerk read as follows:

Committee amendment offered by Mr. Johnson of Washington: Page 7, line 20, strike out "(6) or (7)" and insert in lieu thereof "(6), (7), (8), or (9)."

The committee amendment was agreed to.

Mr. CROSSER. Mr. Chairman, I ask unanimous consent to return to section 5 to offer an amendment striking out the word "of," in line 14, and inserting the word "to."

The CHAIRMAN. The gentleman from Ohio asks unanimous consent to return to section 5, for the purpose of offering an amendment. Is there objection?

Mr. JOHNSON of Washington. Mr. Chairman, I object, pending a statement as to what the amendment is.

Mr. CROSSER. It is for the purpose of correcting the language, changing the word "of," in the last part of line 14, and making it "to." It is not good English as it stands.

Mr. JOHNSON of Washington. I will have to object to that, Mr. Chairman. The last several bills contain that language.

Mr. CROSSER. If they do contain such language in like connection, they were wrongly phrased, and I insist that the English at least should be proper. There is no reason why we should use wrong phraseology or bad grammar merely because there are other matters in dispute.

Mr. JOHNSON of Washington. Let us avoid diction and grammar in this connection.

Mr. CROSSER. But the diction in this case is important.

Mr. JOHNSON of Washington. I object, Mr. Chairman.

Mr. COOPER of Wisconsin. Mr. Chairman, I ask unanimous consent to return to subparagraph (6) of section 1, on page 3, because it seems to me, from a reading of the two or three lines there, that there is a contradiction. It provides that one of the aliens who may be deported is—

An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry).

If this provision were enacted into law to-day, the alien could not be convicted, under the first language, unless the offense was committed after to-day; but the next language provides that he shall not be convicted unless his offense is "committed after the enactment of this act and at any time after entry." Suppose he came in a year ago?

Mr. TILSON. The gentleman will notice that the language is inclusive. Two distinct things must take place. The offense must be committed after the enactment of this act and it must be committed after entry.

Mr. COOPER of Wisconsin. Then say so, and leave out the words "at any time," because his entry may have been a year ago, and "any time after entry" means any time within that year.

Mr. TILSON. It provides "at any time after entry" and something else—"after the enactment of this act."

Mr. COOPER of Wisconsin. It is a direct contradiction in language to say "after enactment of this act and at any time after entry."

The CHAIRMAN. The gentleman from Wisconsin asks unanimous consent to return to subparagraph (6) of section 1, on page 3. Is there objection?

Mr. JOHNSON of Washington. I shall have to object, Mr. Chairman.

The CHAIRMAN. Objection is heard.

Mr. SABATH. Mr. Chairman, I did not have the time to prepare the amendment I desired, so I move to strike out the last word, and I fully recognize it matters not how carefully the amendment might be prepared, it will not receive much consideration to-day. Still, I want to bring it to your attention for just a few moments.

Section 6 provides:

Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917.

The present law provides when these deportations can be had. This proposed law says, regardless of the time that the alien may have resided in the United States, he should be deported. Now, there may be men who have resided here for 12, 15, 18, or 20 years. He may be a married man, and may have three, four, or five children born in the United States, and he may be guilty of making a little home brew at home, yet some neighbor who does not like his looks reports him, and he is convicted, and then is convicted, perhaps, a second time, for taking a drink with a friend. Under this provision of the bill it matters not whether that be ascertained 3, 5, or 10 years hence, or whether it has occurred 10 years ago, he can be apprehended and deported. I just want you to know what you are voting on to-day.

Mr. BLANTON. Mr. Chairman, I rise in opposition to the pro forma amendment. There is one good thing the bill does, and that is that some Mexicans who have come into the United States unlawfully within the last five years may be deported if the department can get enough money to apprehend them. But how about those who came in six, seven, or eight years ago? There were thousands that came across the border unlawfully. You can go up and down the Mexican border in Texas for 10 and 15 miles and you will not see a house, and sometimes you will not see an immigration agent for 40 miles. They can wade across the river in lots of places. They come into Texas by hordes all of the time. If you take the Texas & Pacific Railroad, that runs from Texarkana to El Paso, 900 miles, you will find that practically every section hand is a Mexican. Take the hotels close to the border, and practically all the employees who work in the hotels are Mexicans. Take many of the stores, and the employees are Mexicans because they can get them for a stipend by the month. They are taking away jobs from American citizens. I am surprised that this committee would permit that to exist any longer.

I know that my friend Judge Box has been making a just fight against this situation for years. He gets a little hand-out now and then from the committee, but it does not help him much. Why could not the committee have put a provision in here, and why could not the Appropriations Committee give the department enough to apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there? Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs and many Mexicans are to be without jobs until another cotton crop comes in.

Mr. SABATH. Will the gentleman yield?

Mr. BLANTON. I yield.

Mr. SABATH. Mexicans can come over here by the thousands—they do not come illegally, they come because there is no quota against them; they could come in by the thousands or 5,000 a day. They are not here illegally, because they come under the law and because there is no restriction against them. There is no quota.

Mr. BLANTON. What about the head tax? They do not pay the head tax required by law.

Mr. SCHAFER. Will the gentleman yield?

Mr. BLANTON. I yield to the gentleman from Wisconsin.

Mr. SCHAFER. These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor.

Mr. BLANTON. Why does not the energetic, enterprising 300-pound Member from Wisconsin put some of his energy into action along that line and stop it?

Mr. SCHAFER. If the gentleman will read the hearings he will see that I appeared before the Immigration Committee in behalf of the Box bill, which would put the nationals of Mexico under the quota restrictions.

Mr. LAGUARDIA. Even the payment of the head tax would not disturb this influx for the reason that the sugar-beet growers and the railroads would pay the head tax in order to get the Mexicans in. You have got to stop it.

Mr. BLANTON. Why does not the committee stop it?

Mr. LAGUARDIA. Because the influence of the sugar-beet growers and the railroads is too strong.

Mr. JOHNSON of Washington. Does the gentleman know why it has not been stopped?

Mr. BLANTON. Yes.

Mr. JOHNSON of Washington. In my opinion, the employment of a quota on both borders and contiguous territory in South America and in Central America is inevitable, but you have not the laws in accord with it that will permit it without several preliminary amendments.

Mr. BLANTON. If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges——

Mr. JOHNSON of Washington. I have been to several of them.

Mr. BLANTON. And stand there, he will see the hordes that come across the bridges with no intention of ever going back, coming across to get jobs of Americans, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

Mr. LAGUARDIA. And a bringing down of a standard of wages.

Mr. BOX. Mr. Chairman, I move to strike out the last word.

Mr. JOHNSON of Washington. Will the gentleman yield to me for a moment?

Mr. BOX. Yes.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate upon this section and all amendments thereto close in five minutes.

The motion was agreed to.

Mr. BOX. Mr. Chairman and gentlemen of the committee, you have been discussing for a few minutes a matter with which I as one member of the committee have been wrestling for some years. I have not been inclined to inject that question into this debate because it is not the question at issue, but the situation pointed out by gentlemen during this debate exists. It is a very serious condition. It seriously embarrasses the whole purpose of the immigration law. There are conditions created by the incoming of people from Mexico and other American countries which it was and is the purpose of the immigration laws to prevent. The law is poorly enforced, mainly because the appropriations made for the border patrol are not adequate. There are great sections that under present provisions can not be adequately guarded. There are many interested in the importation of these poor peons. They are often imported and left in pitiful condition. They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment now. They are raising a serious race question. During this month a riot occurred at a point in Texas where a crowd of white men who had been superseded by Mexicans, and who, after having notified the Mexicans to leave, fired into the camps of the Mexicans. This Congress ought to have statesmanship enough in it to look over the past and see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of people essentially different

from us in character, in social position, and otherwise. We are breeding another one of those great race questions. We are degrading labor, we are defeating all of the essential purposes of the immigration laws. These facts explain why I have worked so hard in committee and before this House and everywhere else to get this subject adequately dealt with. Seeing this big question, while I have the honor to remain one of you and on this committee, I shall continue to press it on you for attention. We have the opposition of the classes mentioned.

Practically every big beet-sugar manufacturer in the country opposes it, and every Class A railroad except one in the United States appeared before your committee and opposed the passage of this bill because they want their cheap subservient labor. Many other selfish and powerful influences have arrayed themselves against the restriction of this immigration. As against such influences, a few men, thinking only of the public welfare, are not strong enough to get action even when they have justice and patriotic considerations of every kind on their side.

Mr. W. T. FITZGERALD. Mr. Chairman, will the gentleman yield?

Mr. BOX. Yes.

Mr. W. T. FITZGERALD. Another feature I suggest to the gentleman is from a moral standpoint. They are poisoning the American citizen. They are of a class that come across the line which are very undesirable from that standpoint alone.

Mr. BOX. The gentleman from Ohio is correct. I had the privilege of making a statement covering several hours before the committee. And I tried to place before the committee some of the facts that have come to my knowledge. They are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals; they work for lower wages; they are objectionable as immigrants when tried by the tests applied to other aliens. Of course I am not talking about the better class of people of our neighboring countries, but I am talking about the poor unfortunate beings who are poverty stricken and drifting about the country hunting for work at any price. Quite often they are induced to come here by our own people, who employ them for a while and then leave them to drift from one place to another, the victims of all kinds of suffering and mistreatment. We will correct this evil some time, perhaps after it is too late, though I hope we will deal with it in time to remedy the situation before it becomes much worse than it now is.

The CHAIRMAN. The time of the gentleman from Texas has expired. All time has expired, and the Clerk will read.

The Clerk read as follows:

SEC. 7. If any alien is liable to deportation upon any ground specified in any paragraph of this act, he shall be deported whether or not he is liable to deportation upon a ground specified in any other paragraph of this act or in any other law, and any alien who is liable to deportation upon a ground specified in any law other than this act shall be deported whether or not he is liable to deportation upon a ground specified in this act.

Mr. FREE. Mr. Chairman, I move to strike out the last word. Mr. Chairman and members of the committee, a great deal has been said in the last few moments about the situation on the Mexican border. Since we have adopted the quota plan of immigration we have watched the borders on the Pacific coast and on the Atlantic coast very thoroughly, and it is, indeed, difficult for the aliens to get through those borders, but we have not looked after the borders to the north or south. It is not the fault of the Department of Labor. I think we have a fine a lot of men along those borders as we could possibly get, but we have not enough, nor do we provide enough money to enable the department to protect those borders. The question of Mexican immigration has been mentioned here to-day. I would like to see the laws we have at the present time enforced. Mexican immigrants are subject to the following provisions to-day:

That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy; anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States, or of all forms of law, or who disbelieve in or are opposed to organized gov-

ernment, or who advocate the assassination of public officials, or who advocate or teach the unlawful destruction of property; persons who are members of or affiliated with any organization entertaining and teaching disbelief in or opposition to organized government, or who advocate or teach the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States or of any other organized government, because of his or their official character, or who advocate or teach the unlawful destruction of property; prostitutes, or persons coming into the United States for the purpose of prostitution or for any other immoral purpose; persons who directly or indirectly procure or attempt to procure or import prostitutes or persons for the purpose of prostitution or for any other immoral purpose; persons who are supported by or receive in whole or in part the proceeds of prostitution; persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written, or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled; persons who have come in consequence of advertisements for laborers printed, published, or distributed in a foreign country; persons likely to become a public charge (this clause excluding aliens on the ground likely to become a public charge has been shifted from its position in section 2 of the immigration act of 1907 to its present position in section 3 of this act in order to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons and with a view to overcoming the decision of the Supreme Court in Gegiow v. Uhl, 239 U. S. 3 (S. Rept. 352, 64th Cong., 1st sess.)); persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission; persons whose tickets or passage is paid for with the money of another, or who are assisted by others to come, unless it is affirmatively and satisfactorily shown that such persons do not belong to one of the foregoing excluded classes; persons whose ticket or passage is paid for by any corporation, association, society, municipality, or foreign government, either directly or indirectly, stowaways, except that any such stowaway, if otherwise admissible, may be admitted in the discretion of the Secretary of Labor. (See rule 3, subdivision O.)

In addition to the aliens who are by law now excluded from admission into the United States, the following persons shall also be excluded from admission thereto, to wit:

All aliens over 16 years of age, physically capable of reading, who can not read the English language, or some other language or dialect, including Hebrew or Yiddish (see rule 3, subdivision N) : Provided, That any admissible alien, or any alien heretofore or hereafter legally admitted, or any citizen of the United States, may bring in or send for his father or grandfather over 55 years of age, his wife, his mother, his grandmother, or his unmarried or widowed daughter, if otherwise admissible, whether such relative can read or not ; and such relative shall be permitted to enter.

In addition the Mexican is required to pay a head tax of $8. I believe we could keep out most Mexicans to which objection has been made to-day if we simply enforced the laws above mentioned. [Applause.]

Mr. EDWARDS. Will the gentleman yield?

Mr. FREE. I will.

Mr. EDWARDS. Would the passage of the Box Act accomplish what the gentleman has in mind?

Mr. FREE. No sir. Unless we provide the money to enforce it. The reason I took my feet to-day is this. We have a feeling here that by passing a law you will stop immigration. Unless you back it up with the money for enforcement and the protection of your borders it will not mean a thing. We are not enforcing the laws we have to-day on the northern and southern borders of our country.

Mr. EDWARDS. Why not? We have the money.

Mr. FREE. The committee has been criticised because we have not done anything in reference to this situation. We have been appealing to this House for eight years to my personal knowledge for money to protect the borders. We had an increase of a million dollars in the last Congress, but why pass another law when we do not enforce those we already have on our statute books?

Mr. EDWARDS. How much will it take?

Mr. FREE. Several million dollars in addition to what we have at the present time.

Mr. EDWARDS. Why not put it up to the Appropriations Committee?

Mr. NEWTON. Will the gentleman yield?

Mr. FREE. I will,

Mr. NEWTON. What the gentleman has said about the borders is also true of getting rid of undesirables—we ought to have more money to deport them.

Mr. FREE. Absolutely. We have investigated, and there are over 200,000 people in this country who should be deported. We only deport a few and from the places where they can be easily found.

Mr. HUDSON. Will the gentleman yield?

Mr. FREE. I will.

Mr. HUDSON. Does the gentleman not recognize that if we can have a coordination of the enforcement departments that have to do with enforcement laws we might have sufficient money to enforce those laws, but as long as we have a system that puts four different groups of enforcement officers on the borders, each one to do a litle particular thing while allowing the violation of any of the other laws, we will have the very conditions suggested.

Mr. FREE. That would help a great deal. I want to say concerning the men along the border, that they have been cooperating to a remarkable degree, and they are a fine lot of men, and they are doing the job as best they can; but we need more of them and more authority to cooperate.

Mr. HUDSON. I am not complaining about the inefficiency of these gentlemen. I am simply complaining of the fact that from the deviousness of the law their activities are made inefficient. The law makes them inefficient. A man in one department of the service has not a right to arrest a man for doing something that does not come within his jurisdiction. The whole thing is wrong in theory and in practice.

Mr. FREE. I agree with the gentleman.

Mr. SABATH. Mr. Chairman, it is believed from what we hear that we receive a tremendous immigration from Mexico. I have been asked by a number of Members how it is that our present restriction of immigration admits only 165,000, and, notwithstanding that, over 300,000 arrived last year? There is no restriction, no quota, on Mexico, Canada, Central and South America, Cuba, and the West Indies, and for that reason they can come in in as large numbers as they desire. But they should be, and they are, subject to the literacy test and to the provisions of the law of 1917. I agree that if the law is rigidly enforced on the Mexican border hundreds of thousands could not have qualified or have been admitted.

But do not lose sight of this fact: What applies to Mexico in a great measure applies also to Canada. Why, last year alone we received from Canada—though our total immigration from entire Europe was but 165,000—81,506 of which a record is made. So it is not only immigration from Mexico, but also from Canada, because what the gentleman from Massachusetts said a moment ago is true; there are thousands of our own people unemployed in Massachusetts, and why should we permit that tremendous number to come in here without the quota from Canada and Mexico?

I introduced, three times, and advocated unsuccessfully, a bill placing Mexico, South and Central America, Canada, Cuba, and the West Indies under quota as it is applicable to European immigration. We need a few more men on our border line. I know the chairman of the Committee on Immigration and Naturalization has tried to secure larger appropriations, and he did. I have advocated the proposition of the gentleman from Michigan [Mr. HUDSON], who spoke a little while ago on the centralization of our forces and activities along the border line. I do not know why we should have a revenue patrol, and an immigration patrol, and a prohibition patrol on the border, one not cooperating with the other. They can be merged into one, and then we would have efficient control, and that would control not only immigration but also prohibition and revenue violations and other violations that are going on. I hope, therefore, that the chairman will be strong enough to convince the Treasury Department and the Department of Labor and other officials, who have the power, to bring about unification that it be done.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section be now closed.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section be now closed. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

SEC. 8. Upon the final conviction of any alien of any offense in any court of record of the United States or of any State or Territory it shall be the duty of the clerk of the court to notify the Secretary of Labor, giving the name of the alien convicted, the nature of the offense of which convicted, the sentence imposed, and, if imprisoned, the place of imprisonment, and, if known, the place of birth of such alien, his nationality, and the time when and place where he entered the United States.

Mr. BLACK of New York. Mr. Chairman, I move to strike out the last word.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman, I want to make a very friendly suggestion to the men from the border States, which I hope will be taken in good part. For about six years you have been passing legislation to regulate conditions in New York City, telling us how to raise a family, what to eat and what to drink, and when to eat with a knife and when to eat with a fork. In the meantime you have been neglecting your own doorsteps. I say, keep you hands off New York for a while and see that you enact a little good, wholesome national legislation for the benefit of your own constituents. [Applause.]

The CHAIRMAN. The Clerk will read.

The Clerk resumed and completed the reading of the bill.

The CHAIRMAN. The question now is on agreeing to the substitute to the Senate bill as amended.

The committee substitute for the Senate bill was agreed to.

The CHAIRMAN. Under the rule, the committee automatically rises and reports the bill to the House.

Accordingly the committee rose; and Mr. TILSON, as Speaker pro tempore, having assumed the chair, Mr. BACON, Chairman of the Committee of the Whole House on the state of the Union, having under consideration the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, reported that that committee had directed him to report the same back to the House with an amendment, with the recommendation that the amendment be agreed to and that the bill as amended do pass.

The SPEAKER pro tempore. Under the rule, the previous question is ordered, and the question is on agreeing to the amendment.

The amendment was agreed to.

Mr. JOHNSON of Washington. Mr. Speaker, I ask that the title be amended.

The SPEAKER pro tempore. That can be done after the passage of the bill. The question is on the third reading of the Senate bill.

The Senate bill was ordered to be read a third time, and was read the third time.

Mr. LAGUARDIA. Mr. Speaker, I offer a motion to recommit.

The SPEAKER pro tempore. Is the gentleman opposed to the bill?

Mr. LAGUARDIA. I am.

The SPEAKER pro tempore. The gentleman from New York offers a motion to recommit, which the Clerk will report.

The Clerk read as follows:

Mr. LAGUARDIA moves to recommit the bill to the Committee on Immigration with instructions to report back the bill forthwith with the following amendments:

Page 3, line 20, after the word "offense," insert "involving moral turpitude."

On page 4, line 3, after the word "offense," insert "involving moral turpitude."

Mr. JOHNSON of Washington. Mr. Speaker, I move the previous question on the motion to recommit.

The previous question was ordered.

The SPEAKER pro tempore. The question is on agreeing to the motion of the gentleman from New York to recommit the bill with instructions.

The question was taken, and the motion to recommit was rejected.

The SPEAKER pro tempore. The question is on the passage of the bill.

The question was taken, and the bill was passed.

On motion of Mr. JOHNSON of Washington, a motion to reconsider the vote by which the bill was passed was laid on the table.

The SPEAKER pro tempore. Without objection, the title will be amended.

There was no objection.

Mr. SABATH. Mr. Speaker, I ask unanimous consent to extend and revise the remarks I have made from time to time.

The SPEAKER pro tempore. The Chair is informed that all Members have that right for six days.

DRY VALLEY ROAD—CONFERENCE REPORT

Mr. WAINWRIGHT. Mr. Speaker, I present a conference report on the bill (S. 3881) to provide for the paving of the Government road, known as the Dry Valley Road, commencing where said road leaves the La Fayette Road, in the city of Rossville, Ga., and extending to Chickamauga and Chattanooga National Military Park, constituting an approach road to said park, for printing under the rule.

EQUALIZATION OF THE RANK OF OFFICERS IN THE ARMY AND NAVY—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 9361) to equalize the rank of officers in positions of great responsibility in the Army and Navy for printing under the rule.

CONSTRUCTION AT MILITARY POSTS—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 13825) to authorize appropriations for construction at military posts, and for other purposes, for printing under the rule.

MINORITY VIEWS

Mr. NEWTON. Mr. Speaker, I ask unanimous consent to submit the views of the minority of the Committee on Interstate and Foreign Commerce on Senate bill 3723, to amend and reenact subdivision (a) of section 209 of the transportation act, 1920.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Minnesota?

There was no objection.

HOSPITAL CONSTRUCTION LEGISLATION

Mr. LUCE. Mr. Speaker, I ask unanimous consent to address the House for three minutes in order to give it certain helpful information.

The SPEAKER pro tempore. The gentleman from Massachusetts asks unanimous consent to proceed for three minutes. Is there objection?

There was no objection.

Mr. LUCE. Mr. Speaker, various Members of the House are receiving letters and telegrams in considerable number expostulating because of the failure of the Committee on World War Veterans' Legislation to present a hospital construction program. It may be of service to Members if I very briefly explain the situation. This Congress has within a month appropriated $8,000,000 for new hospital construction and $3,250,000 for extensions, alterations, repairs, et cetera, making a total of $11,250,000 available for construction purposes in the coming fiscal year. The Veterans' Bureau informs us that this is as much as it can wisely expend in the 12 months onward from the 1st of July next. Additional authorizations now, therefore, would not result in the expenditure of a dollar more of money before July 1, 1930; on the other hand, it might do harm to the welfare of the soldiers themselves, in view of the probability of favorable action within a year on a measure which has been under consideration this week by the Committee on Expenditures in the Executive Departments, the measure contemplating the turning over of the soldiers' homes to the Veterans' Bureau. There are 10 of these, each with large tracts of land, and there would be great economy to the Government if it could take advantage, in the further construction of veterans' hospitals, of the land in question, together with the water, sewerage, lighting systems, and other necessities that need not be freshly provided or built new from the ground up. It is estimated roughly that by adding to these homes or building upon their lands we can get twice as many beds for the same money as if we built absolutely new hospitals. In view, then, of the strong probability that this change in the organization of the agencies for serving the soldiers of all wars will be brought about by next winter, and will make possible a considerable revision of the building program of the Veterans' Bureau, greatly to the advantage of all concerned, we will do well to make haste slowly.

Since nothing whatever is to be accomplished in the way of practical results by immediate action, it seems reasonable that we await the changed situation of affairs a year from now and then provide the money that is needed and that is certain to be provided in ample time. No veteran will suffer by this delay but, in my judgment, many veterans will gain.

The SPEAKER pro tempore. The time of the gentleman from Massachusetts has expired.

Mr. LUCE. Mr. Speaker, I ask unanimous consent to proceed for one additional minute.

The SPEAKER pro tempore. Without objection it is so ordered.

There was no objection.

Mr. LUCE. I desire also to state that of the money we have recently appropriated $2,000,000 has not been allocated, and that gentlemen concerned with particular exigencies, feeling there is pressing need for immediate action, have open to them the doors of the Federal Board of Hospitalization. That board with the money already at its command can take care of the needs which seem to be most urgent.

It may be useful to add that there were hospitalized December 31, 1925, 21,899 service-connected cases; December 31, 1926,

19,267 such cases; January 31, 1928, 17,829; and September 30, 1928, 16,253. Hospital construction now under way will provide 1,690 beds within the next 12 months. Additional construction for which the money has been appropriated will provide in excess of 2,000 more. No name, with residence, of any veteran shown to be suffering from an injury or ailment resulting from service in the war that calls for hospitalization, who is unable to get it, is brought to our attention.

The SPEAKER pro tempore. The time of the gentleman from Massachusetts has expired.

Mr. RANKIN. Mr. Speaker, I ask unanimous consent to address the House for five minutes.

Mr. ALLGOOD. Will the gentleman from Massachusetts yield for a question?

Mr. LUCE. Will the gentleman from Mississippi allow me to answer the question first?

Mr. RANKIN. Yes; if the gentleman has the time.

Mr. ALLGOOD. Do I gather from what the gentleman has said that we do not need any more legislation to secure the needed hospitals?

Mr. LUCE. No legislation is necessary to secure the allotment of $2,000,000 now at the command of the Veterans' Bureau.

The SPEAKER pro tempore. The gentleman from Mississippi asks unanimous consent to address the House for five minutes. Is there objection?

Mr. IRWIN. Mr. Speaker, reserving the right to object, I am going to ask unanimous consent to take up the Private Calendar for one hour this afternoon, and while I do not want to object—

Mr. RANKIN. I submit with all deference that the gentleman ought not to shut me off. I have only asked for five minutes.

Mr. IRWIN. I am not going to object.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Mississippi?

There was no objection.

Mr. RANKIN. Mr. Speaker, I do not agree with the views of the gentleman from Massachusetts [Mr. LUCE]. On the other hand, I thoroughly agree with the veterans' organizations that are asking for the passage of this bill for the further construction of hospitals which they deem necessary, and which I deem necessary, for taking care of our disabled ex-service men.

As to the proposition of waiting until the Congress takes over the old soldiers' homes, I desire to say that in the first place that is merely a remote probability, because the Grand Army of the Republic opposes our taking over those homes, and the chances are it will be a good many years before we arrive at that point.

Mr. LUCE. Will the gentleman yield?

Mr. RANKIN. Yes.

Mr. LUCE. The gentleman is in error in his statement, I think, about the Grand Army of the Republic. It favors the taking over of the hospitals.

Mr. RANKIN. Oh, well, we thought that before, at least you people did. We men from the South did not agree with you, but you brought it in on one bill and the representatives of the Grand Army of the Republic managed to have it stricken out, and they will do it again in all probability.

Besides, a great deal of this hospital need is in a section of the country that has no old soldiers' homes and where we could not use them, even if you were to take them over. So I submit that if we are going to take care of these men as they should be we ought not to delay this proposition but should call the Veterans' Committee together, take this bill up, and report it out, and pass it at this session of the Congress.

Oh, they say it would be some time before we could spend the money. Why, the American Legion of the State of Kentucky came before our committee three or fours years ago and some of us got behind them to help them get a hospital. They have just now decided on its location and perhaps purchased the ground on which to place it. So the longer you delay providing for the appropriation of the money for the building of these hospitals, the longer you are going to defer the day when these men will be properly cared for.

I can not agree with the conclusion reached by the gentleman from Massachusetts [Mr. LUCE], and I want to serve notice now that I shall continue to insist that the Veterans' Committee be called together and that this bill be reported out and passed at this session of the Congress. [Applause.]

APPROPRIATIONS FOR THE INTERIOR DEPARTMENT

Mr. CRAMTON. Mr. Speaker, I present a conference report on the bill (H. R. 15089) making appropriations for the Department of the Interior for the fiscal year ending June 30, 1930, and for other purposes.

### GEORGE WASHINGTON MEMORIAL BUILDING

Mr. FISH. Mr. Speaker, I ask unanimous consent to address the House for three minutes in order to make an announcement.

The SPEAKER pro tempore. The gentleman from New York asks unanimous consent to address the House for three minutes. Is there objection?

There was no objection.

Mr. FISH. Mr. Speaker, the Hon. Charles Evans Hughes is to make a radio address on Washington's Birthday at 7.30 next Friday evening soliciting funds for the erection of the George Washington memorial building here in Washington.

The site on the Mall, as you know, was donated by the Congress and the foundations have already been built. It is now proposed to raise $7,000,000 from the American people in order to have the building finished by 1932, the two hundredth anniversary of George Washington's birth.

The American Legion originally did not look with much favor on the project because it believed it might interfere with the raising of the $5,000,000 American Legion fund for the disabled soldiers and the orphans. So far as I know, there would be no objection on the part of the American Legion at the present time, although I am not authorized to speak for the Legion. I am very glad to indorse the project personally and to help in any way within my power to further the construction of the George Washington memorial building by 1932.

I have been requested to make the following statement and take this opportunity to call attention to current plans for completing the erection in the city of Washington of the memorial edifice to George Washington:

As you will recall, in 1913 Congress donated a suitable and desirable tract of land on which, according to the terms of the bill giving the site, was to be erected an edifice in honor of George Washington. The work of planning and erecting the building was intrusted to a group of well-known Americans who formed themselves for that purpose into a corporate entity known as the George Washington Memorial Association.

The members of this association have labored long and well at their task. In 1921, with elaborate ceremonies in which the then President of the United States played the leading part, the corner stone was laid, and at the present time the foundations are completed.

It is particularly interesting to note that in determining exact plans for the memorial edifice the association accepted as its guide a desire expressed by George Washington himself. In various messages to Congress and in other public pronouncements and by a statement in his will, Washington urged the establishment of an institution for the general diffusion of knowledge, and also recommended the promotion of science, literature, and art.

With the foregoing in mind, the association plans to have an auditorium in the edifice which will seat 11,000 people and be available, under the administration of the Smithsonian Institution, for use by conventions of all groups of people and for all purposes, whether patriotic, commercial, political, social, and educational.

Thus the expressed wish of Washington will find fulfillment in this memorial, and also the auditorium with its large seating capacity, will supply a long-felt need in the city of Washington. Such a large meeting place is especially needed at this time in a connection to which I will later refer.

It is also planned to house permanently in the George Washington memorial a collection of priceless mementoes, documents, records, and trophies associated not only with Washington personally, but with all phases of the history of the United States. This museum which the memorial will contain will become of national importance.

Public interest in this George Washington memorial project is widespread at this time, because it is now evident that such a building as this memorial will be vitally needed in 1932 in order that the international and great celebration which will be held on Washington's Birthday in that year may be contained within its spacious rooms and in the midst of its most appropriate surroundings. February 22, 1932, will be the two hundredth anniversary of the birth of Washington, and it is expected that the celebration of that day will far exceed any memorial exercise ever held anywhere. Foreign devotees of Washington will join with our own American patriots in paying honor to the memory of our first President.

A plan has been devised by the George Washington Memorial Association for going ahead with the construction of the edifice so as to have it completed by February, 1932. The Hon. Charles Evans Hughes will deliver a radio address at 7.30 p. m., Friday next, which is Washington's Birthday, over a nationwide chain of stations. I understand that Mr. Hughes will explain details of the memorial and will also point out that public

support and public subscription to the fund is necessary in order that the seven or more millions of dollars needed may be made quickly available.

I believe most sincerely that no project has ever been called to public attention that will so readily find sympathy and response as will this proposition to suitably honor the memory of George Washington. I have made this statement here to-day in order that you ladies and gentlemen will know about the project, and I take this opportunity to urge the entire American people to learn more of this plan from Mr. Hughes on Friday evening next. [Applause.]

### THE PRIVATE CALENDAR

Mr. IRWIN. Mr. Speaker, I ask unanimous consent to take up the Private Calendar for one hour and consider such bills as are not objected to, the bills to be considered in the House as in Committee of the Whole.

The SPEAKER pro tempore (Mr. TILSON). The gentleman from Illinois asks unanimous consent to take up for not exceeding one hour bills on the Private Calendar unobjected to, consider them in the House as in Committee of the Whole, beginning at the star, or where the call last left off. Is there objection?

Mr. HUDSON. Reserving the right to object, and I shall not object, I want the RECORD to show that we have not the bills before us for proper objection, if there are any objectionable features.

Mr. RANKIN. Reserving the right to object, Mr. Speaker, I do not have anything on the Private Calendar, but it does not seem to me that we ought to take up the calendar at 4 o'clock in the afternoon on Saturday, when none of the Members of the House have been notified. However, I am not going to object.

The SPEAKER pro tempore. The Chair will state that it is the desire of every Member, especially the chairmen of the committees who have bills in charge, that all of their bills shall be considered. The gentleman from Illinois, the chairman of the Committee on Claims, has made this request. Is there objection?

There was no objection.

### ROBERT O'HAGAN

The first bill on the Private Calendar was the bill (H. R. 13812) for the relief of Lieut. Robert O'Hagan, Supply Corps, United States Navy.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection?

Mr. SEARS of Florida. Reserving the right to object, I ask that the bill be read.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Comptroller General is authorized and directed to credit to the accounts of Lieut. Robert O'Hagan, Supply Corps, United States Navy, in the amount of $716.70, representing certain payments made by such officer and disallowed on final settlement of his accounts, as follows: All items listed in statement of differences No. M–23393–N, dated August 13, 1927, except (1) item No. 40, first quarter, 1924; (2) items Nos. 2, 8, and 45, second quarter, 1924; (3) items Nos. 198, 264, 278, and 281, first quarter, 1925; (4) items Nos. 2, 8, and 9, first quarter, 1926; (5) item No. 15, second quarter, 1926; and (6) partial refund in the sum of $21 of item No. 69, first quarter, 1924.

The SPEAKER pro tempore. Is there objection?

There was no objection.

The bill was ordered to be engrossed and read the third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### GILPIN CONSTRUCTION CO.

The next business on the Private Calendar was the bill (S. 1530) for the relief of the Gilpin Construction Co.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection?

Mr. SCHAFER. I object to the consideration of this bill.

Mr. McDUFFIE. Will the gentleman reserve his objection?

Mr. SCHAFER. A bill involving $80,000 of the people's money ought not to be called up and considered in this way. I object.

### ARTHUR WALDENMEYER

The next business on the Private Calendar was the bill (S. 2439) to amend the military record of Arthur Waldenmeyer.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of the pension laws or any laws conferring rights, privileges, or benefits upon persons honor-

ably discharged from the United States Army, Arthur Waldenmeyer shall be held and considered to have been honorably discharged as a private, Company F, Second Regiment Infantry, United States Army, on March 21, 1900; but no pension, pay, or bounty shall be held to have accrued prior to the passage of this act.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

The title was amended.

### JULIUS VICTOR KELLER

The next business on the Private Calendar was the bill (H. R. 12767) for the relief of Julius Victor Keller.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers Julius Victor Keller, who was a member of Company C, Seventh Regiment United States Infantry, and formerly assigned to Company G, Third Regiment United States Infantry, United States Army, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private and member of Company C, Seventh Regiment United States Infantry, on the 12th day of October, 1878, he having enlisted as Julius Keller: *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### HOMER C. RAYHILL

The next business on the Private Calendar was the bill (H. R. 4953) for the relief of Homer C. Rayhill.

The Clerk read the title of the bill.

Mr. HUDSON. Mr. Chairman, I ask unanimous consent that the bill go over without prejudice.

There was no objection.

### JOHN LAWLER

The next business on the Private Calendar was the bill (H. R. 12708) for the relief of John H. Lawler.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of the pension laws John H. Lawler shall hereafter be held and considered to have been honorably discharged from the military service in Hospital Corps, United States Army: *Provided,* That no pension shall accrue prior to the passage of this act.

With the following committee amendments:

Line 6, after the word "Army," insert "March 26, 1899," and strike out all of line 7 and insert "That no back pay, bounty, pension, or allowance shall be held to have accrued prior to the passage of this act."

The committee amendments were agreed to and the bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### JOSEPH BRATTEN

The next bill on the Private Calendar was the bill (H. R. 13546) for the relief of Joseph Bratten.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Joseph Bratten, who was a member of Company F, Sixth Regiment United States Infantry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a private of that organization on the 26th day of April, 1899: *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### PHILIP A. SCHOLL

The next business on the Private Calendar was the bill (H. R. 14110) for the relief of Capt. Philip A. Scholl, Finance Department, United States Army.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Comptroller General of the United States be, and he is hereby, authorized and directed to credit the account of Capt. Philip A. Scholl, Finance Department, United States Army, on account of the loss of public funds for which he was responsible amounting to $225.22, and which represents payments made in good faith to enlisted men of the Regular Army, and are now determined to have been erroneous; the enlisted men so paid are no longer in the service of the United States, and collection from them after numerous attempts has failed.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### GEORGE EVANS

The next business on the Private Calendar was the bill (H. R. 2818) for the relief of George Evans.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of the compensation laws and laws conferring rights and privileges upon honorably discharged soldiers, sailors, marines, etc., their widows and dependent relatives, George Evans shall hereafter be held and considered to have been honorably discharged from Company M, Eleventh Regiment United States Infantry, as a private on November 27, 1902.

With the following committee amendment:

Line 9, after the figures "1902," insert ": *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act."

The committee amendment was agreed to and the bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### MRS. ANNIE GAFFNEY

The next business on the Private Calendar was the bill (H. R. 12325) to authorize and direct the United States Employees' Compensation Commission to pay compensation to Mrs. Annie Gaffney for the death of her son, William Leo Gaffney.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. HUDSON. Mr. Speaker, reserving the right to object, I wish the chairman of the committee handling this bill would give some explanation of this matter of compensation.

Mr. IRWIN. Mr. Speaker, the facts in the case are that William Gaffney was employed at Hog Island, Pa., by the laid-up fleet. On August 2, 1925, he was on duty. This was on Sunday. He had to report for duty in the morning. He was not permitted to leave the yard or the ship, but the weather was very warm, and the officer permitted him to go in swimming. He was on duty. He was not permitted to go outside because he was on duty for the purpose of looking after fires and the menacing of shipping.

Mr. HUDSON. Then he was not on furlough?

Mr. IRWIN. He was on active duty.

Mr. DARROW. Is it not true also that they encouraged these boys there to engage in these activities because they were required to be there in case of emergency?

Mr. IRWIN. That is true. They encouraged them to enter into a little swimming contest and things of that kind. The gentleman from Pennsylvania is correct. The officers encouraged the boys to get out and play baseball and go in swimming, but they were on duty all of the time.

Mr. HUDSON. I am sure that the gentleman has made the record clear that this man was on duty at this time. I withdraw the reservation of objection.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. Without objection, the Clerk will read the amendment, which strikes out all after the enacting clause.

There was no objection.

The Clerk read as follows:

Strike out all after the enacting clause and insert:

"That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Annie Gaffney, the sum of $55 per month for 96 months from the date of death of her son, William Leo Gaffney, who was accidentally drowned on August 2, 1925, at the Hog Island Shipyard, Philadelphia, Pa., while on duty as a reserve watchman in the laid-up fleet, said monthly payments to be paid through the United States Employees' Compensation Commission."

The committee amendment was agreed to; and the bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

The title was amended to read: "A bill for the relief of Annie Gaffney."

### J. D. BALDWIN

The next business on the Private Calendar was the bill (H. R. 13132) for the relief of J. D. Baldwin, and for other purposes.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. SCHAFER. Mr. Speaker, reserving the right to object in order to state that I reported this bill as chairman of a subcommittee. We amended the bill by reducing the amount from $100 to $80. I now find that the $20 we thought would be paid to this undertaker will not be paid to him because the father of the dead man would have a prior claim, so I am going to ask that the amount provided in the committee amendment be increased from $80 to $100. I am giving this notice to the House before the bill passes the objection stage.

The SPEAKER pro tempore. The Clerk will report the bill.

The Clerk read as follows:

Be it enacted, etc., That the sum of $100 be, and the same is hereby, appropriated to cover bill rendered by J. D. Baldwin (undertaker), 1522 Richmond Street, Brunswick, Ga., for services in the preparation and shipment of the body of J. D. Harrell, who died while working on the Government dredge Banyard, and which funeral expenses were incurred at the request of the captain of said dredge.

The committee amendment was read, as follows:

Page 1, line 3, strike out all of lines 3 down to and including the word " by " in line 4 and insert in lieu thereof :

" That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, and in full settlement against the Government the sum of $80 to."

Mr. SCHAFER. Mr. Speaker, I move to strike out the $80 in the committee amendment and insert in lieu thereof $100.

The SPEAKER pro tempore. The Clerk will report the amendment.

The Clerk read as follows:

On page 1, line 8, amend the committee amendment by striking out " $80 " and inserting in lieu thereof " $100."

The amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### MEADOW BROOK CLUB

The next business on the Private Calendar was the bill (H. R. 14823) for the relief of the Meadow Brook Club.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill? [After a pause.] The Chair hears none.

The Clerk read as follows:

Be it enacted, etc., That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated and in full settlement against the Government, to the Meadow Brook Club the sum of $2,700.11, the same being the amount necessarily expended by it in repairing damages to one of its stables resulting from the crashing of an Army Air Service airplane on or about June 8, 1928.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

Mr. HUDSON. Mr. Speaker, I ask unanimous consent that the House return to Calendar No. 809.

The SPEAKER pro tempore. Is there objection to the request of the gentleman? [After a pause.] The Chair hears none.

Mr. HUDSON. I objected and I asked it be laid over a moment ago, as I did not have the bill before me. I now have the bill and I have no objection.

The SPEAKER pro tempore. The Clerk will report the bill.

The Clerk read as follows:

A bill (H. R. 4953) for the relief of Homer C. Rayhill

Be it enacted, etc., That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Homer C. Rayhill, late of Twenty-second Battery, United States Field Artillery, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private of said battery of the United States Field Artillery on the 26th day of April, 1902: Provided, That no bounty, pension, pay, or allowances shall be held as accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### CHARLES ROBERT CONROY

Mr. JENKINS. Mr. Speaker, I ask unanimous consent to return to the first bill back of the star, Calendar No. 759. It is Mr. Murphy's bill (H. R. 15000) who is in the hospital. I think there was only one objection to it before, and I think that objection has been satisfied, and I will be glad to have unanimous consent for that purpose.

The SPEAKER pro tempore. The gentleman from Ohio asks unanimous consent to return to Calendar No. 759, the first bill back of the star. Is there objection to the request of the gentleman?

Mr. SCHAFER. Reserving the right to object, have all the objectors to the bill on that occasion withdrawn their objections?

Mr. HUDSON. I was the objector, as Mr. Murphy was not on the floor.

Mr. SCHAFER. Has the gentleman looked into the matter and withdrawn his objection?

Mr. HUDSON. I do.

Mr. SCHAFER. I shall not object.

The Clerk read as follows:

Be it enacted, etc., That the Secretary of War be, and he is hereby, authorized to reinstate Charles Robert Conroy as a cadet in the United States Military Academy in the class of 1932: Provided, That this shall not operate to increase the corps of cadets at said academy as now authorized by law.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

### MARY L. ROEBKEN AND ESTHER M. ROEBKEN

The next business on the Private Calendar was the bill (S. 200) for the relief of Mary L. Roebken and Esther M. Roebken.

The title of the bill was read.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

Be it enacted, etc., That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $2,500 to Mary L. Roebken and Esther M. Roebken, in full settlement of all claims for damages growing out of a collision of an Army ambulance, operated by the United States, with a Ford car in which said Mary L. Roebken and Esther M. Roebken were riding on Sixteenth Street, in the city of Washington, D. C., on July 20, 1924.

SEC. 2. That no part of the amount appropriated in this bill in excess of 8 per cent thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys, on account of services rendered or advances made in connection with said claim. Any person or persons violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in any sum not exceeding $1,000.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

The SPEAKER pro tempore. The Clerk will report the next bill.

FREDERICK D. SWANK

The next business on the Private Calendar was the bill (S. 584) for the relief of Frederick D. Swank.

The title of the bill was read.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury is hereby authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Frederick D. Swank, his heirs or assigns, the sum of $22,000 for extra time and services required and materials furnished by him in removing oil residue from the wreck of the oil tanker *Alden Anderson*, and the sum of $250 for services and materials furnished in maintaining lights upon the wreck during the period of his contract with the United States for the removal of such wreck. The acceptance of such sums shall be in full satisfaction of all claims against the United States with respect to such removal of oil residue and maintenance of lights.

SEC. 2. That jurisdiction is hereby conferred upon the District Court of the United States for the Northern District of California to hear, determine, and render judgment upon the claim of said Frederick D. Swank against the United States for the reasonable value of all services and materials furnished by him for which the United States is found legally liable under his contract with the United States for the removal of the wreck of the oil tanker *Alden Anderson;* except that there shall be deducted from any such judgment all sums paid prior to the approval of this act to said Frederick D. Swank with respect to such removal. Such claim shall be instituted prior to January 1, 1930. Appeals from any judgment rendered upon such claim shall be had as in the case of claims over which such court has jurisdiction under paragraph 20 of section 24 of the Judicial Code, as amended.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

The SPEAKER pro tempore. The Clerk will report the next bill.

CAPT. WILL H. GORDON

The next business on the Private Calendar was the bill (S. 2821) for the relief of Capt. Will H. Gordon.

The title of the bill was read.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Capt. Will H. Gordon, of Plattsburg Barracks, N. Y., the sum of $472, in full compensation for stoppage against pay of said Capt. Will H. Gordon, covering the loss of 20 pistols for which he was held pecuniarily responsible in accordance with investigation and recommendation of the inspector general.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

The SPEAKER pro tempore. The Clerk will report the next bill.

LUCILE SCARBOROUGH

The next business on the Private Calendar was the bill (H. R. 13582) authorizing and directing the Secretary of the Interior to issue a patent to Lucile Scarborough.

The title of the bill was read.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

*Be it enacted, etc.,* That the Secretary of the Interior is hereby authorized and directed to issue a patent to Lucile Scarborough, upon the payment of $1.25 per acre, for all of section 29, township 26 south, range 37 east, New Mexico principal meridian, the lands embraced in her homestead application 038429, filed in the Roswell (N. Mex.) land office on May 7, 1917.

With committee amendments as follows:

Page 1, strike out lines 9 and 10.

On page 2, strike out lines 1 and 2.

The SPEAKER pro tempore. The question is on agreeing to the committee amendments.

The committee amendments were agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

Amend the title so as to read: "A bill to authorize and direct the Secretary of the Interior to convey title to Lucile Scarborough for section 29, township 26 south, range 37 east, New Mexico principal meridian, upon the payment to the Government of $1.25 per acre."

The SPEAKER pro tempore. The Clerk will report the next bill.

ANNIE E. SPRINGER

The next business on the Private Calendar was the bill (H. R. 16406) to repeal a provision of law granting a pension to Annie E. Springer.

The title of the bill was read.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

*Be it enacted, etc.,* That so much of the act entitled "An act granting pensions and increase of pensions to certain soldiers and sailors of the Civil War and certain widows and dependent children of soldiers and sailors of said war," approved May 24, 1928, as reads "The name of Annie E. Springer, widow of William Springer, late of Company G, Second Regiment West Virginia Volunteer Cavalry, and pay her a pension at the rate of $30 per month," is hereby repealed.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

JAMES J. WELSH ET AL.

Mr. WARREN. Mr. Speaker, the bill S. 1500, the last bill on the calendar, I objected to, Calendar No. 753, for the purpose of further study. I would like to withdraw my objection and ask to return to that bill.

The SPEAKER pro tempore. The gentleman from North Carolina asks unanimous consent to return to the bill S. 1500, Private Calendar No. 753, back of the star. Is there objection?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill by title.

The Clerk read as follows:

A bill (S. 1500) for the relief of James J. Welsh, Edward C. F. Webb, Francis A. Meyer, Mary S. Bennett, William McMullin, jr., Margaret McMullin, R. B. Carpenter, McCoy Yearsley, Edward Yearsley, George H. Bennett, jr., Stewart L. Beck, William P. McConnell, Elizabeth J. Morrow, William B. Jester, Josephine A. Haggan, James H. S. Gam, Herbert Nicoll, Shallcross Bros., E. C. Buckson, Wilbert Rawley, R. Rickards, Jr., Dredging Co.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The SPEAKER pro tempore. The Clerk will report the bill for amendment.

The Clerk read as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay to James J. Welsh, $1,168.62; Edward C. F. Webb, $5,480; Francis A. Meyer, $1,375.83; Mary S. Bennett, $1,366.67; William McMullin, jr., $361.75; Margaret McMullin, $334; R. B. Carpenter, $108.33; McCoy Yearsley, $746.67; Edward Yearsley, $746.67; George H. Bennett, jr., $388.55; Stewart L. Beck, $3,142.25; William P. McConnell, $7,300; Elizabeth J. Morrow, $827.50; William B. Jester, $698.50; Josephine A. Haggan, $1,327.09; James H. S. Gam, $605.44; Herbert Nicoll, $200; Shallcross Bros., $4,060; E. C. Buckson, $100; Wilbert Rawley, $7,382.70; R. Rickards, Jr., Dredging Co., $2,200, out of any money in the Treasury not otherwise appropriated, by reason of the losses and damages caused, respectively, to the said James J. Welsh, Edward C. F. Webb, Francis A. Meyer, Mary S. Bennett, William McMullin, jr., Margaret McMullin, R. B. Carpenter, McCoy Yearsley, Edward Yearsley, George H. Bennett, jr., Stewart L. Beck, William P. McConnell, Elizabeth J. Morrow, William B. Jester, Josephine A. Haggan, James H. S. Gam, Herbert Nicoll, Shallcross Bros., E. C. Buckson, Wilbert Rawley, R. Rickards, Jr., Dredging Co. resulting from the flooding of the lands of said claimants during the

years 1924, 1925, and 1926, owing to the settlement and breaching of a dike erected by the Federal Government near the southeasterly entrance of the Chesapeake & Delaware Canal in New Castle County, in the State of Delaware.

With a committee amendment as follows:

Page 1, line 4, after the word "pay," insert "out of any money in the Treasury not otherwise appropriated, and in full settlement against the Government."

The SPEAKER pro tempore. The question is on agreeing to the committee amendment.

The committee amendment was agreed to.

The bill as amended was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

The SPEAKER pro tempore. The Clerk will report the next bill.

### LOTTIE A. BOWHALL

The next business on the Private Calendar was the bill (H. R. 16407) to repeal the provision of law granting a pension to Lottie A. Bowhall.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That so much of the act entitled "An act granting pensions and increase of pensions to certain soldiers and sailors of the Civil War and certain widows and dependent children of soldiers and sailors of said war," approved December 23, 1924, as reads " The name of Lottie A. Bowhall, widow of Nathan Bowhall, late of Company E, Twentieth Regiment New York Volunteer Cavalry, and pay her a pension at the rate of $30 per month," is hereby repealed.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### JOSEPH FRANKLIN

The next business on the Private Calendar was the bill (H. R. 2255) for the relief of Joseph Franklin.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers and dependents, Joseph Franklin, who was a member of Company K, Eighth Regiment United States Infantry, and transferred to Troop D, Seventh Regiment United States Cavalry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a member of the latter organization on the 24th day of November, 1899 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### GILPIN CONSTRUCTION CO.

Mr. HAWLEY. Mr. Speaker, I ask unanimous consent to return to Calendar No. 804, Senate bill 1530, for the relief of the Gilpin Construction Co.

The SPEAKER pro tempore. The gentleman from Oregon asks unanimous consent to return to Calendar No. 804. Is there objection?

Mr. SCHAFER. Mr. Speaker, reserving the right to object, I objected to this bill a few moments ago. Since that time I have had an opportunity to obtain my records and get certain information. I shall not object.

The SPEAKER pro tempore. Is there objection?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Navy be, and is hereby, authorized and directed to pay to Gilpin Construction Co., of Astoria, Oreg., $112,990.32, out of any money in the Treasury not otherwise appropriated, and in full settlement of any and all claims against the United States arising out of and/or in connection with Navy Department Bureau of Yards and Docks Contract No. 4615, dated February 17, 1923, for the furnishing of all labor and materials and the construction of four timber piers, one timber bulkhead, two brush bulkheads, a railroad track, and for the dredging of the channel and turning basin at the Navy submarine and destroyer base at Astoria, Oreg., and as com-

pensation for any and all services, labor, and materials furnished thereunder or extra thereto.

With the following committee amendment:

Strike out all after the enacting clause and insert the following: "That the Secretary of the Treasury be, and he is hereby, authorized to pay to Gilpin Construction Co., of Astoria, Oreg., out of any money in the Treasury not otherwise appropriated, the sum of $104,747.75, in full settlement under Navy Department Bureau of Yards and Docks Contract No. 4615, dated February 17, 1923, for the furnishing of all labor and materials and the construction of four timber piers, one timber bulkhead, two brush bulkheads, a railroad track, and for the dredging of the channel and turning basin at the Navy submarine and destroyer base at Astoria, Oreg., said sum to include liquidated damages assessed, reservations withheld, and compensation for any and all services, labor, and materials furnished thereunder or extra thereto."

The committee amendment was agreed to.

The bill as amended was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### FRANK FANNING

The next business on the Private Calendar was the bill (H. R. 3282) for the relief of Frank Fanning.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Frank Fanning, who was a member of Troop B, Fifteenth Regiment United States Cavalry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a private of that organization on the 27th day of August, 1901 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### FRANCIS X. CALLAHAN

The next business on the Private Calendar was the bill (H. R. 15220) for the relief of Francis X. Callahan.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. WARREN. Mr. Speaker. I object.

Mr. WAINWRIGHT. Mr. Speaker, I understand that is only an objection to the consideration of the bill.

Mr. WARREN. That is all.

### ANNIE M'COLGAN

The next business on the Private Calendar was the bill (H. R. 2425) for the relief of Annie McColgan.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay to Annie McColgan, of Philadelphia, Pa., widow of Peter McColgan, who, while a civilian employee of the Ordnance Department, United States Army, in the discharge of his duties and without fault or negligence, was killed by the explosion of fuzes at the Frankford Arsenal, Philadelphia, Pa., on February 5, 1903, the sum of $7,500, being the sum recommended to be paid her by the board of officers appointed to investigate said explosion by the commanding officer at Frankford Arsenal on February 6, 1903.

With the following committee amendment:

Page 2, line 1, strike out "$7,500" and insert in lieu thereof "$5,000."

The committee amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### CLARA E. WIGHT

The next business on the Private Calendar was the bill (H. R. 7417) for the relief of Clara E. Wight.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Clara E. Wight, the sum of $5,000 in full compensation for the death of her son, Ralph L. Wight, who was a civilian employee of the Navy, and was overcome by gas and burned while working in submarine *S–5* at the navy yard, Portsmouth, N. H., on January 10, 1919, as a result of which he died January 15, 1919.

With the following committee amendment:

Page 1, line 6, strike out "$5,000" and insert in lieu thereof "$3,360."

The committee amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### VIKTOR PETTERSSON

The next business on the Private Calendar was the bill (H. R. 8253) for the relief of the heirs of Viktor Pettersson.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. SCHAFER. Mr. Speaker, I object to the consideration of this bill at the present time.

### W. J. SHIRLEY

The next business on the Private Calendar was the bill (H. R. 10197) for the relief of W. J. Shirley.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to W. J. Shirley the sum of $100 in reimbursement for value of his personal property destroyed by fire in the military service of the United States at Brest, France, on the 21st day of July, 1919, and for which loss he was in no wise responsible.

With the following committee amendment:

Page 1, line 6, strike out "$100" and insert "$60.77."

The committee amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### GROVER ASHLEY

The next business on the Private Calendar was the bill (S. 1121) for the relief of Grover Ashley.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. SCHAFER. Mr. Speaker, reserving the right to object, I would like to get a little information on this bill. Can the gentleman in a few words give us the reasons this bill has been favorably reported?

Mr. PEAVEY. Mr. Speaker, I will say to the gentleman that the report covers all of the reasons why the committee acted favorably upon this bill.

Mr. SCHAFER. I mean brief reasons. We are taking up the Private Calendar without much notice and I have not had a chance to read the report of 11 pages. Has the War Department favorably recommended it?

Mr. PEAVEY. A board of officers passed upon this question favorably.

Mr. SCHAFER. And the Secretary of War, too?

Mr. PEAVEY. Yes.

Mr. SCHAFER. I shall not object.

The SPEAKER pro tempore. Is there objection?

There was no objection.

The Clerk read the bill, as follows:

Whereas Grover Ashley was a private in the Eightieth Field Artillery, American Expeditionary Forces; and

Whereas, while under arrest, he was relieved of a sum of money amounting to $815.15 by officer of the day, Second Lieut. Charles S. Allen; and

Whereas said officer either stole said money, or permitted it to be stolen : Therefore

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized to pay, out of any money in the Treasury of the United States not otherwise appropriated, to Grover Ashley the sum of $815.15.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### THEODORE J. HILLMAN

The next business on the Private Calendar was the bill (H. R. 6613) for the relief of T. J. Hillman.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, T. J. Hillman, who was a member of Company C, Third Regiment United States Infantry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private of that organization on the 23d day of December, 1898 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### CHRISTOPHER COTT

The next business on the Private Calendar was the bill (H. R. 10250) for the relief of Christopher Cott.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Christopher Cott, who was a private in Company G, Third Regiment Pennsylvania Volunteer Infantry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private of said company on the 5th day of August, 1901 : *Provided,* That no bounty, back pay, or allowances shall be held as accrued prior to the passage of this act.

With the following committee amendment:

Page 1, line 5, strike out "Company G, Third Regiment, Pennsylvania Volunteer Infantry" and insert "Company M, Ninth Regiment United States Infantry."

The committee amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

### S. W. GREER

The next business on the Private Calendar was the bill (H. R. 10999) granting an honorable discharge to S. W. Greer.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Samuel W. Greer, private, who was a member of Company M, Third Regiment Kentucky Volunteer Infantry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a private of that organization on the 16th day of May, 1899 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

With the following committee amendment:

Page 1, line 9, strike out "16th day of May, 1899," and insert "1st day of December, 1898."

Amend the title.

The committee amendment was agreed to.

The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

Amend the title so as to read, "A bill for the relief of S. W. Greer."

## OLIVER ELLISON

The next business on the Private Calendar was the bill (H. R. 11614) for the relief of Oliver Ellison.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection?
Mr. WARREN. I object.

## CHARLES W. BENDURE

The next business on the Private Calendar was the bill (H. R. 11715) to correct the military record of Charles W. Bendure.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection?
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Charles W. Bendure, who was a member of Company K, Fourteenth Regiment United States Infantry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a private of that organization on the 10th day of July, 1902: *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.
A motion to reconsider the vote was laid on the table.
Amend the title so as to read: "A bill for the relief of Charles W. Bendure."

## SAMUEL SLIS

The next business on the Private Calendar was the bill (H. R. 12053) to correct the military record of Samuel Slis.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection.
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Samuel Slis, who was a private in Company G, Thirtieth Regiment United States Infantry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private of said organization on March 2, 1904 : *Provided,* That no bounty, pension, pay, or allowance shall accrue prior to passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.
A motion to reconsider was laid on the table
The title was amended.

## DENNIS H. SULLIVAN

The next business on the Private Calendar was the bill (H. R. 14197) for the relief of Dennis H. Sullivan.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection?
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Dennis H. Sullivan, who was a member of Company M, Thirtieth Regiment United States Infantry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a private of that organization on the 13th day of November, 1902: *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.
A motion to reconsider was laid on the table.

## JAMES P. CORNES

The next business on the Private Calendar was the bill (H. R. 5264) for the relief of James P. Cornes.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection?
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, James P. Cornes, late of Company C, Twenty-second Regiment New York Volunteer Cavalry, shall hereafter be held and considered to have been duly enlisted and discharged honorably from the military service of the United States as of the dates of enlistment and discharge of said company and regiment.

With the following committee amendment:

Strike out all after the enacting clause and insert:
" That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, James P. Cornes, who was a member of Company K, Twenty-second Regiment New York Volunteer Cavalry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a second lieutenant of that organization on the 30th day of September, 1865 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act."

The committee amendment was agreed to.
The bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.
A motion to reconsider was laid on the table.

## DENNIS W. SCOTT

The next business on the Private Calendar was the bill (H. R. 13737) for the relief of Dennis W. Scott.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection?
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the act for the relief of Dennis W. Scott, approved April 21, 1928, be amended to read as follows: That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Dennis W. Scott, who was a member of Company B, Thirty-second Regiment United States Infantry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States as a private of that organization on the 30th day of March, 1901: *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read the third time, was read the third time, and passed.
A motion to reconsider was laid on the table.

## GEORGE O. PRATT

The next business on the Private Calendar was the bill (H. R. 7282) for the relief of George O. Pratt.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection to the present consideration of the bill?
Mr. WARREN. Mr. Speaker, I object.

## HENRY E. THOMAS, ALIAS CHRISTOPHER TIMMERMAN

The next business on the Private Calendar was the bill (H. R. 9001) to correct the military record of Henry E. Thomas, alias Christopher Timmerman.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection to the present consideration of the bill?
There was no objection.
The Clerk read as follows:

*Be it enacted, etc.,* That in the administration of any laws conferring rights, privileges, and benefits upon honorably discharged soldiers, Henry E. Thomas, alias Christopher Timmerman, who was a member of Company F, Forty-first Regiment New York Volunteer Infantry, shall hereafter be held and considered to have been discharged honorably from the military service of the United States as a member of that organization on the 9th day of December, 1865 : *Provided,* That no bounty, back pay, pension, or allowance shall be held to have accrued prior to the passage of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.
A motion to reconsider the vote by which the bill was passed was laid on the table.
The title was amended to read : "A bill for the relief of Henry E. Thomas, alias Christopher Timmerman."

## WILLIAM H. JOHNS

The next business on the Private Calendar was the bill (H. R. 12263) for the relief of William H. Johns.
The Clerk read the title of the bill.
The SPEAKER pro tempore. Is there objection to the present consideration of the bill?
There was no objection.
The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to William H. Johns, of Gettysburg, of the county of Adams, and the State of Pennsylvania, the sum of $887, the estimated cost of restoring to their former condition after being vacated by the United States Army certain tracts of land which

were occupied by the United States Army under leases from claimant dated July 1, 1918, as a part of Camp Colt, near Gettysburg, Pa., during the World War.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

#### GEORGE W. POSEY

The next business on the Private Calendar was the bill (H. R. 15493) for the relief of George W. Posey.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in the administration of the pension laws George W. Posey, late of Company A, Twentieth Regiment, and of Company E, Thirty-fifth Regiment Wisconsin Volunteer Infantry, shall hereafter be held and considered to have been honorably discharged from the military service of the United States: *Provided,* That no pension shall accrue prior to the passage of this act.

With the following committee amendments:

Line 8, after the word "States," insert "the 24th day of July, 1865." Also strike out "That no pension shall accrue prior to the passage of this act " and insert "That no back pay, bounty, pension, or allowance shall be held to have accrued prior to the passage of this act."

The committee amendments were agreed to and the bill as amended was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

#### BRITISH STEAMSHIP "KYLEAKIN"

The next business on the Private Calendar was the bill (H. R. 16117) to authorize the payment of an indemnity to the owners of the British steamship *Kyleakin* for damages sustained as a result of a collision between that vessel and the U. S. S. *William O'Brien.*

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, directed to pay to Chr. Salvesen & Co., 29 Great Bernard Street, Leith, Scotland, care of the British Embassy, Washington, D. C., the sum of $3,484.35, or so much thereof as may be required to purchase exchange not to exceed the amount of £715 sterling 19 s. 8 d., in full and final settlement of the claim of the said Chr. Salvesen & Co. for damages sustained by the British steamship *Kyleakin* in a collison with the U. S. S. *William O'Brien* in Barry Roads, Cardiff, Wales, on November 26, 1917; and there is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, a sufficient sum to carry out the purpose of this act.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

#### MARGARET W. PEARSON AND JOHN R. PEARSON

The next business on the Private Calendar was the bill (S. 1618) for the relief of Margaret W. Pearson and John R. Pearson.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Is there objection to the present consideration of the bill?

Mr. SCHAFER. Mr. Speaker, I object.

Mr. WARREN. Mr. Speaker, I object.

Mr. ACKERMAN. Mr. Speaker, will the gentleman reserve his objection?

Mr. SCHAFER. Yes; but there is an adverse report from the Secretary of War.

Mr. ACKERMAN. I understand that an amendment has been added which obviated that.

Mr. SCHAFER. Does the amendment which has been incorporated meet all of the objections of the Secretary of War?

Mr. ACKERMAN. I understand that it did. This is merely a bill to give the parties an opportunity to be heard in the Court of Claims. No money is appropriated in the bill. It is simply a right to try the matter out before the Court of Claims.

Mr. SCHAFER. Yes; but we do not always send every claim that comes knocking at the door of Congress to the Court of Claims. I notice that the Secretary of War in the final paragraph in his letter states:

The circumstances surrounding this entire case do not appeal to me as justifying a favorable recommendation from the War Department upon the contemplated legislation, and I therefore recommend that the bill be not favorably reported by your committee.

Mr. HUDSON. And does not the bill also take away one of the defenses from the Government?

Mr. SCHAFER. It does.

Mr. STRONG of Kansas. But the report of the committee does not waive that defense in the bill. We strike that out, so that there is no objection upon the part of the War Department, except as to the statute of limitations. We have stricken out their right to waive that defense.

Mr. SCHAFER. Does the gentleman from Kansas [Mr. STRONG], chairman of the War Claims Committee, believe that the objection of the Secretary of War as contained in his letter of January 7, 1929, appearing in the report, has been overcome by the incorporation of the committee amendment?

Mr. STRONG of Kansas. I do in everything except the waiving of the statute of limitations, and of course you have to waive that if it is sent to the Court of Claims.

Mr. SCHAFER. I will not object in view of that statement.

The SPEAKER. Does the gentleman from North Carolina insist upon his objection?

Mr. WARREN. I withdraw my objection.

The Clerk read as follows:

*Be it enacted, etc.,* That the Court of Claims of the United States be, and hereby is, given jurisdiction to hear and determine the claim of Margaret W. Pearson and John R. Pearson, her husband, of Jacksonville, Fla., and to render judgment against the United States for compensation for the use, occupancy, and possession of a tract of land belonging to the said Margaret W. Pearson and John R. Pearson, her husband, situated in Duval County, Fla., during the period from December 10, 1920, to November 5, 1921; and for waste or damage to the inheritance, if any, attributable to the United States while in possession of said land.

SEC. 2. Said claim shall not be considered as barred because of any existing statute of limitations with respect to suits against the United States; nor because of any tort committed by any agent of the United States resulting in damage or waste to the inheritance; nor because of noncompliance with section 3744, Revised Statutes.

The committee amendment was read as follows:

Page 2, after the word "States" strike out the remainder of line 6, all of line 7, and part of line 8 down to and including the word "inheritance."

The question was taken and the amendment was agreed to.

The bill as amended was ordered to be engrossed and read the third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

The SPEAKER pro tempore. The time the House authorized for the consideration of these claims has expired.

#### ANNIVERSARY OF THE DESTRUCTION OF THE BATTLESHIP "MAINE"

Mr. LEAVITT. Mr. Speaker, yesterday, at Fort Myer, the observance of the anniversary of the sinking of the *Maine* was held, and I ask unanimous consent to extend my remarks in the RECORD by including a short oration delivered by the Cuban ambassador on that occasion.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Montana?

Mr. EDWARDS. Mr. Speaker, reserving the right to object, has the gentleman the remarks of the other speakers on that occasion?

Mr. LEAVITT. I have not.

Mr. EDWARDS. I have no objection.

Mr. LEAVITT. Mr. Speaker, yesterday at Fort Myer there took place the annual observance held on the anniversary of the sinking of the battleship *Maine.* It was an observance held under the leadership of the veterans of the war with Spain and was attended by Col. Orestes Ferara, the ambassador from Cuba, and Commander in Chief Col. W. L. Grayson, of the Spanish War Veterans.

Colonel Ferarra, who was a distinguished soldier in the army of his country when the United States engaged in that war in the cause of humanity, and who has continued to serve Cuba with distinction and signal honor as her ambassador to our Republic, delivered an oration worthy of the occasion, of his country, and of the heroes of the *Maine,* in whose memory our two friendly nations thus joined in tribute.

I ask that as a mark of our appreciation the address of Ambassador Ferara may be printed in the RECORD:

ADDRESS OF COL. ORESTES FERARA, CUBAN AMBASSADOR TO THE UNITED STATES, AT FORT MYER, VA., FEBRUARY 15, 1929, THE THIRTY-FIRST ANNIVERSARY OF THE DESTRUCTION OF THE BATTLESHIP "MAINE"

This event, which year after year we assemble to commemorate, far from losing with the passing of time its hallowed significance, actually grows in importance and forms a bond, ever stronger and more intimate, between the United States and Cuba.

When in history such a transcendent event occurs to a nation, augmenting its prestige, enhancing its power, bringing it greatness in many fields—such an event in time assumes majestic proportions. And the consequences which derive from it influence profoundly the deed which caused them.

In Habana Harbor, on the 15th of February, 1898, a formidable man-of-war, beautiful and severe in its sheath of armor, was destroyed by a terrible explosion. With it, on that tranquil and smiling Tropic night, many lives were sacrificed to the honor and glory of their country. There was weeping for the dead, and the sighing of bereaved mothers was heard over the southern seas. With the martyrs to duty, as their mortal remains were borne to their last resting place, went the benediction of two peoples, Cuban and American.

The necessities of the moment compelled severe measures. An armed struggle between two nations ensued, which settled once and for all a colonial conflict that had been impoverishing two peoples—one, the colonizer, Spain; the other, Cuba, which, having reached its majority, aspired to liberty and self-government.

Victory came soon.

Out of the trials of war the United States emerged more powerful and more united than ever. Cuba achieved to freedom, her people happy and grateful. The world had seen something strange and new—and great because of its disinterestedness. A nation had shed the blood of its citizens without aspirations of conquest, without greed of territory, without a wish for aggrandizement. The cause of civilization triumphed in many ways—in the creation of a power able to join force with justice; in the birth of a new nation; in an example to the world of altruism and of virtue.

These results constitute a magnificent epitaph to those whose lives were wiped out by the terrible explosion. The blood that was spilled yielded a rich benefice. More, even though for 31 years those heroes have been figures of glory and immortality, a new felicity yet rises from their sacrifice.

The Americas to-day are united in growing amity, in a continuing labor of peace and love. This hemisphere has listened to the imperative command imposed by the tradition of more than a century; has realized that it is consecrated to liberty and concord; and that the setting of an example of public virtue, the forging of international bonds inspired by morality and strengthened by right, is an act of the highest nobility.

The Americans are creating new principles of friendship among nations; are carrying to the distrustful field of international interests the definitions of standards of good and of evil, of justice and of injustice—and this in spite of opportunism and of self-interest. New precepts are being written; moral obligations are being assumed; manifestations, not of alliances, but of solidarity, are being made; codes are being drafted to resolve the conflicts always possible among groups; laws to resolve difficulties are being voluntarily accepted. That which yesterday seemed the tightly inclosed field of national justice is entering into the vast dominion of international justice.

The shadow of the tragedy of the Maine spreads beneficently over these noble efforts.

The victims of the Maine were a sacrifice to the independence of Cuba. Had it not been for their supreme gift, who knows what would have been the course of events?

Cuba, becoming independent with the aid of the United States and by the will of American statesmen and the American people, is a living proof that force need not be feared when it is animated and controlled by right. That a nation overpoweringly strong need not be regarded with suspicion, if it does not abuse its power, resort to violence, or give way to selfishness.

Many times in the past had the United States helped to independence other American nations, and these services had been remembered with infinite gratitude. But the love of country, like all the loves which turn into passions, caused many to think, as was natural: What would happen when the great Nation of the North, with its tremendous power, unchallengeable in the field of force, should have a justified excuse for expanding to the south? Would it hold back, denying itself the fruits always conceded to victory? Could it resist the enthusiasms of the moment, the aspirations of the multitude excited by military triumphs?

Could prudence, reflection, and a high concept of duty, of a duty never lived up to before, dominate the great Nation when its combined forces, military and economic, should have within its grasp the destinies of another?

These questions, not mere manifestations of suspicion, but of proper foresight, were an obstacle to American harmony. The extraordinary greatness of the United States was a cause of admiration, doubtless, on the part of other sister republics, but at the same time inspired anxiety. Accustomed to see by the example of millenniums that the strong did not recognize the rights of the weak, it was not irrational to think that in a difficult hour we should once more see the triumph of self-interest over right, of ambition over justice.

The situation in Cuba, which was produced in 1898 and which had its epilogue in 1902, came as a triumphant answer to all these doubts. The island of Cuba, since the time of Jefferson, had been the object of much thought by the United States. Its geographical situation throughout a century and a half had been considered as essential to the defense of the United States. Nevertheless, in the moment when the United States could have taken Cuba, annexing her as booty of war, it did not do so. And listening to the voice of its inhabitants the United States helped Cuba to freedom, guided her first steps, nurtured her economic life, and, routing the unbelievers, left Cuba as free in her own government as she is free geographically, as free as nature made her by giving her no other frontiers than the sea.

This noble deed has echoed in the minds of the statesmen of the Americas and in the hearts of its peoples, and ever since there has been forming, with the natural slowness with which collective beliefs are created, a spirit which breathes confidence, security, and friendship.

This explains the recent great successes of Pan Americanism, the late conference at Habana and at Washington, and their results. Because of this there awaits us a future, not alone of concord but of political and economic understandings. Because of this this hemisphere will point the way for the world; not easy, certainly, but indispensable to progress, to human solidarity.

The dead of the 15th of February, 1898, are sponsors for these benefices. That tragic night has been transformed into a radiant day for civilization.

Reverently we salute the memory of those who died to create a new America and to better the destinies of men.

I thank you.

CONFERENCE REPORT—EAST TAWAS, MICH.

Mr. HAUGEN. Mr. Speaker, I present a conference report on the bill (H. R. 10374) for printing under the rules.

The SPEAKER pro tempore. The Clerk will report the bill by title.

The Clerk read as follows:

A bill (H. R. 10374) for the acquisition of lands for an addition to the Beal Nursery at East Tawas, Mich.

SENATE BILL REFERRED

A bill of the Senate of the following title was taken from the Speaker's table and under the rule referred as follows:

S. 5514. An act for the relief of E. Gellerman, doing business under the name of the Lutz-Berg Motor Co., at Denver Colo.; to the Committee on Claims.

ADJOURNMENT

Mr. IRWIN. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 5 o'clock and 13 minutes p. m.) the House adjourned until Monday, February 18, 1929, at 12 o'clock noon.

## COMMITTEE HEARINGS

Mr. TILSON submitted the following tentative list of committee hearings scheduled for Monday, February 18, 1929, as reported to the floor leader by clerks of the several committees:

COMMITTEE ON WAYS AND MEANS

(10 a. m. and 2 p. m.)

Tariff hearings as follows:
Sundries, February 18, 19.
Free list, February 20, 21, 22.
Administrative and miscellaneous, February 25.

COMMITTEE ON THE JUDICIARY

(10 a. m.)

Proposing an amendment to the Constitution to exclude aliens in counting the whole number of persons in each State for apportionment of Representatives among the several States (H. J. Res. 102 and H. J. Res. 351).

COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE—SUBCOMMITTEE ON BRIDGES

(10 a. m.)

Authorizing the city of Wheeling, W. Va., to construct, maintain, and operate a free highway bridge across the Ohio River at or near Wheeling, W. Va. (H. R. 16981).

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of Rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

858. A letter from the Secretary of the Navy, transmitting proposed draft of a bill to authorize the President to fix the clothing allowance for enlisted men of the Navy; to the Committee on Naval Affairs.

859. A letter from the Secretary of the Treasury, transmitting draft of a proposed bill providing that the physician in charge of the Narcotics Division of the United States Public Health Service shall while so serving be an Assistant Surgeon General in that service; to the Committee on Interstate and Foreign Commerce.

860. A letter from the chairman of the Personnel Classification Board, transmitting report of the Personnel Classification Board on the survey of the field service (H. Doc. No. 602); to the Committee on Printing and ordered to be printed.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. SNELL: Committee on Rules. H. Res. 321. A resolution providing for the consideration of H. R. 15430. A bill continuing the powers and authority of the Federal Radio Commission under the radio act of 1927, and for other purposes; without amendment (Rept. No. 2551). Referred to the House Calendar.

Mr. SNELL: Committee on Rules. H. Res. 322. A resolution providing for the consideration of S. 1781. An act to establish load lines for American vessels, and for other purposes; without amendment (Rept. No. 2552). Referred to the House Calendar.

Mr. DARROW: Committee on Naval Affairs. S. 2410. An act to amend section 1440 of the Revised Statutes of the United States; without amendment (Rept. No. 2553). Referred to the Committee of the Whole House on the state of the Union.

Mr. ELLIOTT: Committee on Public Buildings and Grounds. H. R. 17129. A bill to authorize the sale of the Government property acquired for a post-office site in Binghamton, N. Y.; without amendment (Rept. No. 2554). Referred to the Committee of the Whole House on the state of the Union.

Mr. REECE: Committee on Military Affairs. H. R. 8305. A bill to authorize and direct the Secretary of War to execute a lease with Air Nitrates Corporation and American Cyanamid Co., and for other purposes; with amendment (Rept. No. 2564). Referred to the Committee of the Whole House on the state of the Union.

Mr. McSWAIN: Committee on Military Affairs. H. R. 14449. A bill to establish a national military park to commemorate the Battle of Kings Mountain; without amendment (Rept. No. 2565). Referred to the Committee of the Whole House on the state of the Union.

Mr. WRIGHT: Committee on Military Affairs. S. 4461. An act to provide for the policing of military roads leading out of the District of Columbia; without amendment (Rept. No. 2566). Referred to the Committee of the Whole House on the state of the Union.

Mr. WRIGHT: Committee on Military Affairs. H. R. 15656. A bill to provide for the erection of monuments at Dalton, Resaca, Cassville, and New Hope Church, in the State of Georgia, in commemoration of these historic points and battle fields of the Sherman-Johnston campaign in 1864, and to provide for the erection of markers at other points of historic interest along the Sherman-Johnston line of march; without amendment (Rept. No. 2567). Referred to the Committee of the Whole House on the state of the Union.

Mr. DALLINGER: Committee on Expenditures in the Executive Departments. S. 5621. An act to repeal paragraphs 127 and 128 of the act entitled "An act to discontinue certain reports now required by law to be made to Congress," approved May 29, 1928; without amendment (Rept. No. 2575). Referred to the Committee of the Whole House on the state of the Union.

Mr. GRAHAM: Committee on the Judiciary. S. J. Res. 196. A joint resolution authorizing and requesting the President of the United States to take steps in an effort to protect citizens of the United States in their equitable titles to land embraced in territory to be transferred from the State of Oklahoma to the State of Texas and from the State of Texas to the State of Oklahoma as per decree of the Supreme Court of the United States in the case of Oklahoma against Texas (1926, 272 U. S. 21, p. 38), and to give the consent of Congress to said States to enter into a compact with each other and with the United States relating to such subject matter; with amendment (Rept. No. 2576). Referred to the House Calendar.

Mr. MILLER: Committee on Naval Affairs. S. 5544. An act to increase the membership of the National Advisory Committee for Aeronautics; without amendment (Rept. No. 2577). Referred to the Committee of the Whole House on the state of the Union.

Mr. GAMBRILL: Committee on Naval Affairs. S. 150. An act for the relief of former officers of the United States Naval Reserve Force and the United States Marine Corps Reserve who were released from active duty and disenrolled at places other than their homes or places of enrollment; with amendment (Rept. No. 2578). Referred to the Committee of the Whole House on the state of the Union.

Mr. HALE: Committee on Naval Affairs. H. R. 17128. A bill to amend section 11 of the act approved February 28, 1925, entitled "An act to provide for the creation, organization, administration, and maintenance of a Naval Reserve and a Marine Corps Reserve"; without amendment (Rept. No. 2579). Referred to the Committee of the Whole House on the state of the Union.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. IRWIN: Committee on Claims. H. R. 4813. A bill for the relief of Clara Thurnes; with an amendment (Rept. No. 2555). Referred to the Committee of the Whole House.

Mr. UNDERHILL: Committee on Claims. H. R. 4801. A bill for the relief of Jack Mattson; without amendment (Rept. No. 2556). Referred to the Committee of the Whole House.

Mr. IRWIN: Committee on Claims. H. R. 14952. A bill to reimburse the estate of Mary Agnes Roden; with an amendment (Rept. No. 2557). Referred to the Committee of the Whole House.

Mr. UNDERHILL: Committee on Claims. S. 5453. An act authorizing the payment of Government life insurance to Etta Pearce Fulper; without amendment (Rept. No. 2558). Referred to the Committee of the Whole House.

Mr. SINCLAIR: Committee on War Claims. H. R. 10912. A bill to reimburse or compensate Capt. John W. Elkins, jr., for part of salary retained by War Department and money turned over to same by him; without amendment (Rept. No. 2559). Referred to the Committee of the Whole House.

Mr. LOWREY: Committee on War Claims. H. R. 13801. A bill for the relief of John Bowie; with an amendment (Rept. No. 2560). Referred to the Committee of the Whole House.

Mr. PEAVEY: Committee on War Claims. H. R. 15424. A bill for the relief of Dr. W. H. Parsons; without amendment (Rept. No. 2561). Referred to the Committee of the Whole House.

Mr. BUSHONG: Committee on Claims. H. R. 8097. A bill for the relief of Gilliam Grissom; without amendment (Rept. No. 2562). Referred to the Committee of the Whole House.

Mr. GARRETT of Texas: Committee on Military Affairs. H. R. 17034. A bill for the relief of James Albert Couch, alias Albert Couch; without amendment (Rept. No. 2563). Referred to the Committee of the Whole House.

Mr. SPEAKS: Committee on Military Affairs. H. R. 12674. A bill authorizing the President of the United States to present in the name of Congress a congressional medal of honor to Capt. Edward V. Rickenbacker; without amendment (Rept. No. 2568). Referred to the Committee of the Whole House.

Mr. WURZBACH: Committee on Military Affairs. H. R. 16291. A bill for the relief of Stephen Cole, alias Steven Cole; without amendment (Rept. No. 2569). Referred to the Committee of the Whole House.

Mr. SPEAKS: Committee on Military Affairs. H. R. 16732. A bill to correct the military record of Thomas W. Bath; with amendment (Rept. No. 2570). Referred to the Committee of the Whole House.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of Rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. COOPER of Ohio: A bill (H. R. 17140) to extend the times for commencing and completing the construction of a bridge across the Mahoning River at or near Warren, Trumbull County, Ohio; to the Committee on Interstate and Foreign Commerce.

Also, a bill (H. R. 17141) to extend the times for commencing and completing the construction of an overhead viaduct across the Mahoning River at or near Niles, Trumbull County, Ohio; to the Committee on Interstate and Foreign Commerce.

By Mr. BRITTEN: A bill (H. R. 17142) to authorize the President to fix the clothing allowance for enlisted men of the Navy; to the Committee on Naval Affairs.

By Mr. PORTER: A bill (H. R. 17143) making the physician in charge of the narcotic division of the Bureau of the Public

Health Service an Assistant Surgeon General; to the Committee on Interstate and Foreign Commerce.

By Mr. KORELL: Joint resolution (H. J. Res. 422) to prohibit the exportation of arms, munitions, or implements of war to nations violating the pact of Paris; to the Committee on Foreign Affairs.

By Mr. CHINDBLOM: Joint resolution (H. J. Res. 423) to postpone the taking effect of the national-origins provisions of the immigration act of 1924, as amended; to the Committee on Immigration and Naturalization.

By Mr. LEAVITT: Resolution (H. Res. 323) to provide for the printing as a public document certain communications and a report with reference to the relations of forestry to the control of floods in the Mississippi Valley; to the Committee on Printing.

## MEMORIALS

Under clause 3 of Rule XXII, memorials were presented and referred as follows:

Memorial of the Legislature of the State of Wyoming, petitioning the Department of Agriculture of the Government of the United States to open certain lands in the Teton National Forest, in Teton County, Wyo., for the purpose of sheep grazing; to the Committee on the Public Lands.

Memorial of the Legislature of the State of Texas, urging Congress to take action relative to the feasibility of a 10-year cooperative program for the control of predatory animals within the United States; to the Committee on Agriculture.

Memorial of the Legislature of the State of Ohio, favoring the distribution of broadcasting facilities equitably in accordance with the population of States; to the Committee on the Merchant Marine and Fisheries.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of Rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. CORNING: A bill (H. R. 17144) granting an increase of pension to Julia Mackintosh; to the Committee on Invalid Pensions.

By Mr. CULKIN: A bill (H. R. 17145) granting a pension to Lillian B. Miner; to the Committee on Invalid Pensions.

By Mr. ROY G. FITZGERALD: A bill (H. R. 17146) granting a pension to Joseph B. Turner; to the Committee on Pensions.

By Mr. FULMER: A bill (H. R. 17147) granting a pension to Dixie L. Powell; to the Committee on Pensions.

Also, a bill (H. R. 17148) granting a pension to A. G. Magruder; to the Committee on Pensions.

By Mr. HOPE: A bill (H. R. 17149) granting an increase of pension to Caroline Bartz; to the Committee on Invalid Pensions.

By Mr. MAPES: A bill (H. R. 17150) granting a pension to Bertha Gokey; to the Committee on Invalid Pensions.

By Mr. MORGAN: A bill (H. R. 17151) granting a pension to Sarah C. Cunningham; to the Committee on Invalid Pensions.

By Mr. MURPHY: A bill (H. R. 17152) granting an increase of pension to Jessie Virginia Ridgley; to the Committee on Invalid Pensions.

By Mr. SIMMONS: A bill (H. R. 17153) granting a pension to J. Phillip Horn; to the Committee on Pensions.

By Mr. ZIHLMAN: A bill (H. R. 17154) granting a pension to Mamie Hershberger; to the Committee on Invalid Pensions.

Also, a bill (H. R. 17155) granting a pension to Amanda E. Wagner; to the Committee on Invalid Pensions.

Also, a bill (H. R. 17156) granting a pension to Ella E. Smith; to the Committee on Pensions.

Also, a bill (H. R. 17157) granting a pension to Bertie Cleveland; to the Committee on Invalid Pensions.

By Mr. BEERS: A bill (H. R. 17158) granting an increase of pension to Elizabeth A. Deaver; to the Committee on Invalid Pensions.

## PETITIONS, ETC.

Under clause 1 of Rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

11260. By Mr. Adkins: Petition of retail shoe dealers of Sullivan, Ill., protesting against any change in the present tariff on hides and leather used in the manufacture of shoes; to the Committee on Ways and Means.

11261. By Mr. BULWINKLE: Petition of the Christian Church, Gastonia, N. C., with 140 present, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided

in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia.

11262. Also, petition of the Ninth Avenue Baptist Church, Charlotte, N. C., with 2,000 present, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia.

11263. Also, petition of the superintendent, faculty, and students of the public school of Bessemer City, N. C., 877 present, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia.

11264. Also, petition of the principal, faculty, and students of Bessemer City Public School, Bessemer, N. C., with 421 present, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia.

11265. Also, petition of the North Carolina Conference of Congregational Churches, representing 15,000, in session in Charlotte, N. C., September 27, 1928, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia

11266. Also, petition of the pastor and 235 (present and voting) members of the Maylo Methodist Episcopal Church, of Gastoria, N. C., urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78) or similar measures; to the Committee on the District of Columbia.

11267. By Mr. W. T. FITZGERALD: Memorial of Lima Camp, No. 38, Spanish War Veterans, recommending the enactment of legislation granting increased pensions; to the Committee on Pensions.

11268. By Mr. O'CONNELL: Petition of the American Wire Weavers Protective Association, makers of Fourdrinier wire cloth, favoring a 90 per cent ad valorem duty; to the Committee on Ways and Means.

11269. Also, petition of American Federation of Labor, Washington, D. C., favoring the passage of Senate bill 1462, providing for final surveys and investigation of all matters connected with the proposed Columbia Basin reclamation project; to the Committee on Irrigation and Reclamation.

11270. By Mr. JOHNSON of Texas: Petition of A. Burr Jones, of Marquez, Tex., indorsing House bill 14676 and urging its passage; to the Committee on Pensions.

11271. By Mr. LINDSAY: Petition of Montizona Copper Co., New York City, urging protection for commercial manganese industry; to the Committee on Ways and Means.

11272. Also, petition of Douglas I. McKay, commander, American Legion, New York State Department, urging meeting of full membership of veterans' committee in order that prompt and favorable reporting of American Legion's hospital bill, authorizing funds for hospital in New York State, be made; to the Committee on World War Veterans' Legislation.

11273. By Mr. LUCE: Petition of Milford Chamber of Commerce, Milford, Mass.; to the Committee on Ways and Means.

11274. By Mr. McCORMACK: Petition of President William Green, American Federation of Labor, Washington, D. C., urging early and favorable consideration of Senate bill 1462, providing for final surveys and investigation of all matters connected with the proposed Columbia Basin reclamation project, so that construction of this project may start at an early date, thus releasing much private capital for investment in the Northwest, with attending employment for men and women; to the Committee on Irrigation and Reclamation.

11275. By Mr. VINCENT of Michigan: Petition of citizens of Ithnen and Owosso, Mich., protesting against any change in the present tariff on hides and leathers used in the manufacture of shoes; to the Committee on Ways and Means.

11276. By Mr. WELCH of California: Petition of retail shoe dealers of San Francisco, Calif., protesting against any increase in the tariff duties on hides and leathers; to the Committee on Ways and Means.

11277. By Mr. WHITTINGTON: Petition of the Board of Supervisors of Coohoma County, Miss., asking that the open hunting season for wild duck, wild geese, and other wild migratory wild fowl should be extended from February 1 to February 15 of each year in the zone of which Coohoma County, Miss., is a part; to the Committee on Agriculture.