Case 3:19-cr-00407-SI   Document 34   Filed 10/19/20   Page 1 of 66

3074. By Mr. THURSTON: Petition of 155 citizens of Clarinda, Iowa, and vicinity, protesting against the passage of House bill 78, or the compulsory Sunday observance bill; to the Committee on the District of Columbia.

3075. By Mr. TILSON: Petition of James D. Black, M. H. Keleher, John D. Bower, and other residents of the State of Connecticut, protesting against the passage of Senate bill 1667, introduced by Senator BROOKHART, relating to the distribution of motion pictures; to the Committee on Interstate and Foreign Commerce.

3076. By Mr. WEAVER: Petition of citizens of McDowell and Burke Counties, N. C., protesting against the Lankford Sunday observance law (H. R. 78) ; to the Committee on the District of Columbia.

3077. By Mr. WILLIAMS of Missouri: Petition of Nancy Thomas et al., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

# SENATE

## FRIDAY, *February 3, 1928*

(*Legislative day of Wednesday, February 1, 1928*)

The Senate reassembled at 12 o'clock meridian, on the expiration of the recess.

The VICE PRESIDENT. The Senate will receive a message from the House of Representatives.

### MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Haltigan, one of its clerks, announced that the House had disagreed to the amendments of the Senate to the joint resolution (H. J. Res. 131) providing for a commission to investigate and report upon the facts connected with the sinking of the submarine *S–4* and upon methods and appliances for the protection of submarines; requested a conference with the Senate on the disagreeing votes of the two Houses thereon, and that Mr. SNELL, Mr. BURTON, and Mr. POU were appointed managers on the part of the House at the conference.

### ENROLLED BILLS AND JOINT RESOLUTION SIGNED

The message also announced that the Speaker had affixed his signature to the following enrolled bills and joint resolution, and they were thereupon signed by the Vice President:

H. R. 5657. An act granting the consent of Congress to the Board of Supervisors of Monroe County, Miss., to construct, maintain, and operate a bridge across Tombigbee River at or near Aberdeen, Monroe County, Miss.;

H. R. 9142. An act to amend section 71 of the Judicial Code, as amended, by changing time of holding court at El Dorado and Harrison, Ark.; and

H. J. Res. 93. Joint resolution for the appointment of Paul E. Divine, of Tennessee, as member of the Board of Managers of the National Home for Disabled Volunteer Soldiers.

### VOTE ON YESTERDAY'S CONFIRMATION

Mr. BINGHAM. Mr. President, in the RECORD to-day there occurs the roll call taken in executive session yesterday. It appears that it was printed by unanimous consent.

Senators will remember that ever since I have been a Member of this body I have uniformly objected to the printing in the RECORD of a roll call taken in secret, following a debate held in secret. I have taken the position that where the reasons for or against candidates or for or against treaties were given in secret session and were not available, the roll call following the discussion should not be printed.

After the roll call was taken in executive session yesterday I inadvertently left the Chamber, and while I was absent unanimous consent was obtained, through no fault of anyone except my own. I merely desire to have the RECORD state that had I been present I should have objected.

Mr. LA FOLLETTE. Mr. President, that roll call was made public upon my request. I desire to state for the information of the Senator from Connecticut that I made the request immediately following the announcement of the result, and there was no effort on my part to delay the request until he had left the Chamber. I made the request, and I should have made it if he had been present; and if he had been present and objected, I should have moved to make the roll call public.

### CALL OF THE ROLL

Mr. CURTIS. Mr. President, I suggest the absence of a quorum.

The VICE PRESIDENT. The clerk will call the roll.

The legislative clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Ferris | McKellar | Sheppard |
| Barkley | Fess | McLean | Shipstead |
| Bayard | Fletcher | McMaster | Shortridge |
| Bingham | Frazier | McNary | Smith |
| Black | George | Mayfield | Smoot |
| Blaine | Gerry | Metcalf | Steck |
| Blease | Gillett | Moses | Steiwer |
| Borah | Gooding | Neely | Stephens |
| Bratton | Gould | Norbeck | Swanson |
| Brookhart | Greene | Norris | Thomas |
| Broussard | Hale | Nye | Trammell |
| Bruce | Harris | Oddie | Tydings |
| Capper | Harrison | Overman | Tyson |
| Caraway | Hawes | Phipps | Wagner |
| Copeland | Hayden | Pine | Walsh, Mass. |
| Cousens | Heflin | Pittman | Walsh, Mont. |
| Curtis | Howell | Ransdell | Warren |
| Cutting | Johnson | Reed, Mo. | Waterman |
| Dale | Jones | Reed, Pa. | Watson |
| Deneen | Kendrick | Robinson, Ark. | Wheeler |
| Dill | Keyes | Robinson, Ind. | Willis |
| Edge | King | Sackett | |
| Edwards | La Follette | Schall | |

The VICE PRESIDENT. Ninety Senators having answered to their names, a quorum is present.

### REPORT OF THE AMERICAN WAR MOTHERS

The VICE PRESIDENT laid before the Senate the report of the American War Mothers for 1926 and 1927, which was referred to the Committee on Military Affairs.

### REPORT OF THE NATIONAL ACADEMY OF SCIENCES

The VICE PRESIDENT laid before the Senate a communication from the president of the National Academy of Sciences, transmitting the report of that academy for the fiscal year ended June 30, 1927, which was referred to the Committee on the Library.

### PANHANDLE CRUDE PETROLEUM

The VICE PRESIDENT laid before the Senate a communication from the chairman of the Federal Trade Commission, transmitting a report of the commission on Panhandle crude petroleum, dealing with the prices, transportation facilities, and quality of crude petroleum of the Panhandle oil field of Texas, which was referred to the Committee on Manufactures.

### PETITIONS AND MEMORIALS

Mr. McLEAN presented a petition of the Women's Auxiliary, National Federation of Post Office Clerks of the State of Connecticut, praying for the passage of the so-called Dale bill, providing increased annuities for retired Government employees, which was referred to the Committee on the Civil Service.

He also presented a resolution adopted by Harmony Council, No. 12, Junior Order United American Mechanics, of Bridgeport, Conn., protesting against the repeal of the national origin provisions of the existing immigration law, which was referred to the Committee on Immigration.

He also presented memorials of sundry citizens of New Haven, Conn., protesting against the passage of the so-called Brookhart bill, relative to the distribution of motion pictures in the various motion-picture zones of the country, which were referred to the Committee on Interstate Commerce.

Mr. BINGHAM presented memorials of sundry citizens of New Haven, Conn., remonstrating against the passage of the so-called Brookhart bill, relative to the distribution of motion pictures in the various motion-picture zones of the country, which were referred to the Committee on Interstate Commerce.

He also presented resolutions adopted by Bridgeport Council, No. 6, and Harmony Council, No. 12, Junior Order United American Mechanics, of Bridgeport, Conn., protesting against the repeal of the national-origin provisions of the existing immigration law, which were referred to the Committee on Immigration.

He also presented the memorial of Varden Lodge, No. 257, Sons of Norway, of New London, Conn., remonstrating against the retention of the quota provisions of the existing immigration law and also against the passage of legislation decreasing the immigration quotas of the Scandinavian countries, which was referred to the Committee on Immigration.

Mr. BRUCE presented a petition of sundry citizens of Baltimore, Md., praying for the passage of legislation granting increased pensions to Civil War veterans and their widows, which was referred to the Committee on Pensions.

Mr. ROBINSON of Arkansas presented a resolution adopted by the Arkansas Division of the Izaak Walton League of America, at Little Rock, Ark., favoring the creation of the proposed Ouachita national park in Polk and Montgomery Counties, Ark., which was referred to the Committee on Public Lands and Surveys.

Mr. COPELAND presented a petition of 60 citizens of the State of New York, being immigrant inspectors stationed at Ellis Island, praying for the passage of the so-called Reed bill (S. 2370) to amend section 24 of the immigration act of 1917

(relative to salaries of immigrant inspectors), which was referred to the Committee on Immigration.

He also presented memorials numerously signed by sundry citizens of New York, N. Y., remonstrating against the passage of legislation providing for compulsory Sunday observance in the District of Columbia, which were referred to the Committee on the District of Columbia.

He also presented a resolution adopted by the Brooklyn (N. Y.) Chapter of the American Institute of Architects, favoring the making of an appropriation for carrying out in its entirety the McKim plan for the treatment of the base of the Washington Monument and to insure its completion by January, 1932, in which year will be celebrated the two hundredth anniversary of the birth of George Washington, which was referred to the Committee on the Library.

He also presented resolutions adopted at the annual meeting of the Nassau-Suffolk Engineers (Inc.), of Garden City, N. Y., stating practical objections to the passage of the bill (H. R. 7480) to authorize the transfer of the geodetic work of the Coast and Geodetic Survey from the Department of Commerce to the Department of the Interior, and for other purposes, which were referred to the Committee on Commerce.

He also presented resolutions adopted at a mass meeting of citizens held under the auspices of the Anti-National Origins Clause League at Detroit, Mich., protesting against the national-origins method of determining immigration quotas and favoring the prompt passage of legislation to eliminate the national-origin provisions from the existing immigration law, which were referred to the Committee on Immigration.

He also presented a resolution adopted at a meeting of the Near East Democratic Organization, of New York, N. Y., commending leaders of the Democratic Party in the Senate for their opposition to the so-called Lausanne treaty between the United States and Turkey, which was referred to the Committee on Foreign Relations.

Mr. LA FOLLETTE presented the following joint resolution of the Legislature of the State of Wisconsin, which was referred to the Committee on Interstate Commerce:

*Joint Resolution 5, memorializing Congress to investigate the coal strike*

Whereas a coal strike affecting nearly all of the great bituminous coal-producing areas of the country was started in April, 1927, by the attempt of the operators to reduce wages; and

Whereas while this strike has been settled in Illinois, Indiana, and some other fields by agreements continuing the old wage scale, it is still in progress in Ohio, Pennsylvania, West Virginia, and elsewhere; and

Whereas there is intense suffering among the miners and their families in these fields after nearly 10 months of strike; and

Whereas there are complaints, which impartial newspaper investigators have found to be well founded, that the operators in these fields have imported negroes by the thousands and employed gunmen and detective agencies to break this strike, have ruthlessly evicted the families of the striking miners from their homes in the dead of winter, and through injunctions, unwarranted arrests of union organizers, and similar methods have set at naught the constitutional rights of these workingmen; and

Whereas it is charged that the obstinate refusal of the operators to meet the miners in conference or even to discuss terms of settlement with the conciliators of the United States Department of Labor is due to a great conspiracy inspired and supported by the railroads, the Steel Trust, and nonunion business interests bent upon destroying all trade-unions: Now therefore be it

*Resolved by the senate (the assembly concurring),* That the Legislature of Wisconsin hereby respectfully memorializes the Congress of the United States to create a special committee to thoroughly investigate the coal strike in all its phases; be it further

*Resolved,* That properly attested copies of this resolution be transmitted to the presiding officers of both Houses of Congress and to each Wisconsin Member thereof.

HENRY A. HUBER,
*President of the Senate.*
O. G. MUNSON,
*Chief Clerk of the Senate.*
JOHN W. EBER,
*Speaker of the Assembly.*
C. E. SHAFFER,
*Chief Clerk of the Assembly.*

Mr. LA FOLLETTE also presented the following joint resolution of the State of Wisconsin, which was referred to the Committee on Commerce:

*Joint Resolution 9, memorializing the Congress of the United States to enact necessary legislation for a survey of the Wisconsin-Fox Rivers waterway*

Whereas competent and disinterested engineers report that the nearest feasible connecting link between the Mississippi River and the Great Lakes is a direct route from Green Bay, Oshkosh, and Portage to the Gulf of Mexico; and

Whereas even a casual inspection of a map of this proposed route will show its many great natural advantages. It is a waterway already in existence and navigable for large boats for most of the route. From Green Bay to Portage there is a total distance of 156 miles and from Portage to Prairie du Chien of 117 miles. Between the Fox and Wisconsin Rivers at Portage there is a canal of 2¾ miles. In the Fox River portion of this route there are now 27 locks and 16 United States dams. There is no existing project for the improvement of the Fox River, which provides for a channel 6 feet deep from De Pere, near Green Bay, to Montello, and 4 feet deep from Montello to Portage. At Portage a new lock was ordered constructed in 1927 at a contract price of $163,700. In the Wisconsin River at a point 28 miles below Portage, in 1915, a power dam, which contains a lock, was completed, which makes the Wisconsin River navigable between these points, with the exception of about 6 miles. Six other dams are needed to make the entire distance to the mouth of the Wisconsin navigable, even in low-water stages. The construction of these dams, it is estimated, will produce 350,000,000 kilowatt-hours of water power, which will greatly reduce the net cost of this improvement; and

Whereas a great deal of tonnage has moved over the Fox River and big boats have traversed these waters by way of Green Bay, Oshkosh, and Portage, and a great deal more would be moved if the Government would build the necessary dams and complete the unfinished projects; and

Whereas the Government gets very little, if any, returns from the investments already made, because they do not represent a comprehensive program of improving the entire route; and

Whereas less than the cost of one Government battleship would be required to build the dams needed to make this route a success: Therefore be it

*Resolved by the senate (the assembly concurring),* That the Wisconsin Legislature respectfully memorializes the United States Congress to authorize and direct a full survey of the Wisconsin-Fox Rivers waterway and to enact such legislation as will result in the completion of such waterway; and be it further

*Resolved,* That copies of this resolution, properly signed by the presiding officers of both houses and attested by the chief clerks thereof, be sent to the Presiding Officers of the Senate and House of Representatives of the United States and to each Senator and Member of Congress from Wisconsin.

HENRY A. HUBER,
*President of the Senate.*
O. G. MUNSON,
*Chief Clerk of the Senate.*
JOHN W. EBER,
*Speaker of the Assembly.*
C. E. SHAFFER,
*Chief Clerk of the Assembly.*

[Subsequently duplicates of the foregoing joint resolutions of the Legislature of the State of Wisconsin were presented by the Vice President and referred to the same committees.]

SESQUICENTENNIAL OF AMERICAN INDEPENDENCE

Mr. COPELAND. Mr. President, I ask the attention of the chairman of the Committee on Printing. I hold in my hand the report of the Sesquicentennial of American Independence and the Thomas Jefferson Centennial Commission of the United States. It will be recalled that last year this commission was appointed and the report is now presented. I ask that it be referred to the Committee on Printing. I am doing this in the hope and expectation that the report will come back and that it may be printed as a public document.

The VICE PRESIDENT. Without objection, the report will be referred to the Committee on Printing.

SALE OF PRINTING INK

Mr. COPELAND. I would like to say further to the chairman of the Committee on Printing that I have had a number of letters of complaint about the business of the Government Printing Office selling printing ink to other Government departments. Many of my constituents are objecting seriously to this practice and think it is an invasion of a private field. I hope the Senator, who is chairman of the Committee on Printing, will feel free to make some explanation of this practice.

Mr. BINGHAM. Mr. President, may I say, in answer to the remark of the Senator from New York, that I also have received sundry objections from manufacturers of ink and have submitted the matter to the Public Printer. I have received from the Public Printer a letter in explanation of the entire matter, which shows that it is in accordance with the Public Act 222 of the Sixty-ninth Congress. In order not to take the time of the Senate at this late hour, I ask that the letter of the

Public Printer be printed in the RECORD as a part of my remarks.

The VICE PRESIDENT. Without objection, it is so ordered.

The letter is as follows:

JANUARY 21, 1928.

MY DEAR SENATOR: This will acknowledge receipt of your letter of January 18, inclosing a communication from Charles Eneu Johnson & Co. relative to the supplying of printing inks to the Government departments by the Government Printing Office. Similar letters have been received from several other ink manufacturers.

The authority for the furnishing of printing inks manufactured by the Government Printing Office to other Government departments is contained in the legislative act (Public Act 222) of Sixty-ninth Congress, as follows:

"*Provided,* That inks, glues, and other supplies manufactured by the Government Printing Office in connection with its work may be furnished to departments and other establishments of the Government upon requisition and payment made from appropriations available therefor."

This office does not bid in competition with commercial plants. The ink is furnished at cost to Government departments, which, under a Comptroller General's decision of July 30, 1926, must purchase from the Public Printer such inks and other supplies which the Government Printing Office manufactures and is in a position to furnish. A catalogue, listing the inks manufactured by this office and stating the cost of same, is issued from time to time for the guidance of the departments, and inks not listed may be procured in the open market.

The cost of all work handled by the Government Printing Office, whether a printing job or the furnishing of supplies, is based upon definite methods of cost accounting, which includes labor, material, and proportionate overhead charges. All articles manufactured, whether printed matter or printing supplies, are required by law to be supplied to Government departments at cost. However, it is reasonable to suppose a substantial profit is added by the commercial manufacturer to his cost of material, labor, and overhead.

The total quantity of ink manufactured by the Government Printing Office in 1927 for its own use and other Government establishments amounted to 147,589 pounds. The quantity of printing ink supplied to the various Government departments is but a very small percentage of the total output of the Government Printing Office ink plant, as most of the production is required for use in the Government Printing Office.

During the year 143,073 pounds of ink-making ingredients, including varnishes, oils, and pigments, were purchased from commercial manufacturers at a cost of $21,182.91. This statement is submitted to show that commercial firms have a worth-while financial interest in the inks produced in the Government Printing Office, many of the ingredients being purchased from ink manufacturers.

The Government Printing Office and also the Bureau of Engraving and Printing have manufactured their own printing inks for many years. These plants have had to manufacture printing inks because of inability to secure inks of satisfactory and uniform quality from commercial manufacturers by competitive bids and the excessive prices previously charged for the same.

The Government has found that by the manufacture of its own printing ink a more uniform quality has resulted, the quality can be better controlled, and that it is the more economical and satisfactory procedure. The furnishing of ink by this office to the other Government departments has also resulted in a substantial saving to the Government. Beyond any doubt the Government Printing Office has the right to make inks for its own use, and it seems only fair and proper for this office to offer any and all benefits that may come from its work to other branches of the Government service.

The Government Printing Office is as much and as essential a part of the Government as any other branch of the service, and it is manifestly unfair for the ink manufacturers to deny this office the right to serve other branches of the Government with inks and other supplies as well as with printed products. Their argument against the making of inks, if sustained, would apply likewise against any and all work done by the Government Printing Office, and would tend eventually to the ending of all work by the Government on its own behalf. But it is absurd to say that the Government must cease printing for itself any more than it must stop all work that might be undertaken by private concerns, and thus dismantle all the great Government industries, including the navy yards and many industrial activities of other branches of the Government service. I believe that the best interest of the public and the vast majority of taxpayers should be given first consideration, and not the personal and private profits of a few individuals such as the ink manufacturers.

This office also manufactures all press rollers, glue compositions for adhesive purposes, and various type-metal alloys for its linotype, monotype, stereotype, and electrotype work. Considerable economy results

from this procedure. It would be impossible to maintain uniform quality of any of these materials except by costly technical and practical tests if the same were purchased from commercial sources or supply by competitive bids.

Many large commercial printing concerns also manufacture their own printing inks and rollers because of the economy and uniform quality resulting therefrom. This procedure on the part of the Government is therefore not unusual in any way. In fact, the making of ink by printers has been an established custom since before the days of Ben Franklin, who was a notable maker of the inks used in his famous printing office.

I am of the opinion, therefore, that the complaint of the ink manufacturers is wholly unfounded and should not be given any consideration. Their purpose is entirely selfish and, if accomplished, would seriously interfere with the proper functioning of this office as a Government establishment, and would result in greatly increasing the cost of its operation to the taxpayers of the country.

Very truly yours,

GEORGE H. CARTER,
*Public Printer.*

Mr. COPELAND. I shall be glad to read the letter, and if there is any further question I shall be free to call upon the Senator at a later time.

Mr. SMOOT. Mr. President, the statute applies not only to ink but to other items which the Government purchases.

## SURVIVORS OF MEXICAN WAR

Mr. SHEPPARD. Mr. President, in further reference to the five survivors of the Mexican War to whom I directed the attention of the Senate yesterday, I send to the desk the following brief letter and ask that it be read.

The VICE PRESIDENT. Without objection, the clerk will read.

The Chief Clerk read as follows:

UNITED STATES DEPARTMENT OF THE INTERIOR,
BUREAU OF PENSIONS,
*Washington, February 2, 1928.*

Hon. MORRIS SHEPPARD,
*United States Senate, Washington, D. C.*

MY DEAR SENATOR SHEPPARD: Complying with your telephone request, I am listing below the names and ages of Mexican War survivors who are still on the pension roll:

|  | Years of age |
|---|---|
| William F. Buckner | 109 |
| Owen Thomas Edgar | 96 |
| Urich Gassway | 97 |
| Richard A. Howard | 96 |
| Samuel Leffler | 98 |

I am also inclosing a copy of my annual report for the fiscal year ended June 30, 1926, which contains the above information on pages 8 and 9.

Very truly yours,

WINFIELD SCOTT, *Commissioner.*

Mr. KING. Mr. President, do I understand the Senator from Texas to offer that as the reason for the Democratic convention going to Houston, because people are so long lived down in Texas?

Mr. SHEPPARD. That is one reason among many others. Only one of those survivors is a resident of Texas, I may say.

## REPORTS OF COMMITTEES

Mr. DILL, from the Committee on Interstate Commerce, to which was referred the bill (S. 2317) continuing for one year the powers and authority of the Federal Radio Commission under the radio act of 1927, reported it with amendments and submitted a report (No. 226) thereon.

Mr. BINGHAM, from the Committee on Printing, to which was referred the bill (S. 1168) to amend an act entitled "An act to authorize the collection and editing of official papers of the Territories of the United States now in the national archives," approved March 3, 1925, reported it with amendments and submitted a report (No. 227) thereon.

Mr. NORRIS, from the Committee on Agriculture and Forestry, to which was referred the joint resolution (S. J. Res. 46) providing for the completion of Dam No. 2 and the steam plant at nitrate plant No. 2 in the vicinity of Muscle Shoals for the manufacture and distribution of fertilizer, and for other purposes, reported it without amendment and submitted a report (No. 228) thereon.

## BILLS INTRODUCED

Bills were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. BAYARD:

A bill (S. 2997) granting an increase of pension to Elizabeth M. Hayden (with accompanying papers); to the Committee on Pensions.

Exhibit F    Page 3 of 66

By Mr. STECK:

A bill (S. 2998) granting double pension in all cases where an officer or enlisted man of the Navy or Marine Corps dies or is disabled as the result of a submarine accident; to the Committee on Pensions.

By Mr. MOSES:

A bill (S. 2999) to amend the act of February 28, 1925, fixing the compensation of employees in post offices; to the Committee on Post Offices and Post Roads.

By Mr. SMOOT:

A bill (S. 3000) to amend the interstate commerce act as amended to permit common carriers to give free carriage or reduced rates to State commissions exercising jurisdiction over common carriers; to the Committee on Interstate Commerce.

By Mr. NORBECK:

A bill (S. 3001) to revise the boundary of the Yellowstone National Park in the States of Montana and Wyoming, and for other purposes; to the Committee on Public Lands and Surveys.

A bill (S. 3002) for the relief of Mina Bintliff; to the Committee on Claims.

A bill (S. 3003) granting a pension to Antoine Claymore (with accompanying papers) ; and

A bill (S. 3004) granting a pension to Gus W. Peterson (with accompanying papers) ; to the Committee on Pensions.

By Mr. NEELY:

A bill (S. 3005) granting an increase of pension to Nancy C. Clayton; to the Committee on Pensions.

By Mr. McNARY: .

A bill (S. 3006) for the relief of the Indians of the Klamath Reservation in Oregon; to the Committee on Indian Affairs.

By Mr. BRATTON:

A bill (S. 3007) to authorize the Secretary of the Interior to issue a patent to the Bureau of Catholic Indian Missions for a certain tract of land on the Mescalero Reservation, N. Mex.; to the Committee on Indian Affairs.

A bill (S. 3008) to authorize the erection of 'a Veterans' Bureau hospital at Albuquerque, N. Mex., and to authorize appropriations therefor; to the Committee on Finance.

By Mr. SCHALL:

A bill (S. 3009) for the retirement of employees of the Panama Canal and the Panama Railroad Co. on the Isthmus of Panama who are American citizens; to the Committee on Interoceanic Canals.

By Mr. COPELAND:

A bill (S. 3010) for the transportation of foreign mails of the United States, to promote commerce, and for other purposes; to the Committee on Post Offices and Post Roads.

By Mr. REED of Pennsylvania (by request) :

A bill (S. 3011) for preventing the manufacture, sale, or transportation of adulterated, mislabeled, or misbranded linseed oil, turpentine, or paint; to the Committee on Manufactures.

CONGRESSIONAL MEDAL FOR COL. CHARLES A. LINDBERGH

Mr. ROBINSON of Arkansas. Mr. President, I ask leave to introduce a bill to authorize the Secretary of the Treasury to prepare a medal with appropriate emblems and inscriptions commemorative of the achievements of Col. Charles A. Lindbergh, for reference to the Committee on the Library. There are a number of precedents for the bill.

The bill (S. 2996) to authorize the Secretary of the Treasury to prepare a medal with appropriate emblems and inscriptions commemorative of the achievements of Col. Charles A. Lindbergh was read twice by its title and referred to the Committee on the Library.

CONSTRUCTION AT MILITARY POSTS

Mr. CURTIS submitted an amendment intended to be proposed by him to the bill (H. R. 7009) to authorize appropriations for construction at military posts, and for other purposes, which was ordered to lie on the table and to be printed.

SETTLEMENT OF ALIEN PROPERTY CLAIMS

Mr. McKELLAR submitted an amendment intended to be proposed by him to House bill 7201, the so-called alien property claims settlement bill, which was referred to the Committee on Finance and ordered to be printed.

SARATOGA RECLAMATION PROJECT

Mr. PHIPPS submitted an amendment intended to be proposed by him to the bill (S. 1135) to provide for the storage for diversion of the waters of the North Platte River and construction of the Saratoga reclamation project, which was referred to the Committee on Irrigation and Reclamation and ordered to be printed.

CASPER-ALCOVA RECLAMATION PROJECT

Mr. PHIPPS submitted an amendment intended to be proposed by him to the bill (S. 1136) to provide for the storage for diversion of the waters of the North Platte River and construction of the Casper-Alcova reclamation project, which was referred to the Committee on Irrigation and Reclamation and ordered to be printed.

INVESTIGATION OF SINKING OF SUBMARINE "S–4"

The VICE PRESIDENT laid before the Senate the action of the House of Representatives disagreeing to the amendments of the Senate to the joint resolution (H. J. Res. 131) providing for a commission to investigate and report upon the facts connected with the sinking of the submarine S–4, and upon methods and appliances for the protection of submarines, and requesting a conference with the Senate on the disagreeing votes of the two Houses thereon.

Mr. HALE. I move that the Senate insist upon its amendments, accede to the request of the House for a conference, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to; and the Vice President appointed Mr. HALE, Mr. ODDIE, and Mr. SWANSON conferees on the part of the Senate.

MAJOR GENERAL VON STEUBEN AND GERMAN BLOOD IN THE UNITED STATES

Mr. COPELAND. Mr. President, I hold in my hand a brief article which gives a sketch of the Steuben Society and of General von Steuben. It is entitled "German blood in the United States potent factor in building Nation," and is by Frederick Boyd Stevenson. I ask unanimous consent to have it printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

GERMAN BLOOD IN THE UNITED STATES POTENT FACTOR IN BUILDING NATION—18,000,000 GERMANS HERE IN 1900 DIFFUSE THE STOCK THROUGHOUT THE COUNTRY—STEUBEN SOCIETY OF AMERICA STANDS FIRST OF ALL FOR AMERICANISM

" We have the greatest nation in the world.

" We have a right to be proud of it.

" Every racial stock that forms a part of the population of the United States of America has due cause for being proud of it.

" So, all good Americans should appreciate the efforts of the Steuben Society of America in impressing upon the many millions of Americans with German blood flowing through their veins that first of all they are Americans and first of all they should stand for Americanism."

(By Frederick Boyd Stevenson)

When we understand the different nationalities that make up our population of 115,000,000 people in these United States, the better progress we shall make with the various types of people representing those various races.

In the course of time all bloods will be more or less blended into a common blood that will be designated as American.

To be sure, the bloods of many different races will form that American blood. Some will be more in evidence than others, depending upon the greater proportions of certain bloods over other bloods that have been diffused and are to-day being diffused in this country.

I am going to write now specifically of the German blood in the United States, because that special question has been lately revived by the Steuben Society of America, one of the strongest and most progressive German organizations in this country.

The Steuben Society of America was organized in the city of New York in May, 1919, by a small group of men who decided to arouse the citizens of German descent in this country to a greater sense of their political duties and rights.

BARON STEUBEN, TRAINER OF AMERICAN FORCES IN OUR REVOLUTIONARY WAR

The German element in the United States had been frequently criticized for its lack of interest and participation in public affairs. In this connection, however, it should be realized that as a racial stock in this Nation the Germans have not come from one country alone, but from many countries. As a matter of fact, they have come from every continent on the globe. They have lived under various forms of government. They follow their religious beliefs under various faiths.

The idea of the Steuben Society of America was to unite all the American citizens with German blood in their veins in the common cause of their race and in " loyalty and progressive usefulness as citizens of the United States of America."

The name for the society was suggested by a United States Senator not of German blood. He suggested the name of that eminent German, Baron Friedrich Wilhelm von Steuben, major general and inspector general of the Continental Army in the Revolutionary War. He was the drillmaster of our American forces. He made soldiers out of the raw patriot militia.

Case 3:19-cr-00407-St Document 34-6 Filed 01/19/20 Page 5 of 66

Baron Steuben met Benjamin Franklin in Paris, and Franklin induced him to come to the aid of the Revolutionists. The baron came as a volunteer, ready to perform any duty to which he might be assigned by the commander in chief of the American Army. Commissions for his aids and the payment of his actual expenses were the only stipulations asked. And you need only to read your history to learn of the incalculable help furnished to struggling Americans by the Germans in those years of revolution.

Here are the five outstanding principles of the Steuben Society:

First. To foster a patriotic American spirit among all citizens.

Second. To guard the Nation's political liberty by maintaining an honest equality of citizenship, regardless of birth, origin, or religion of any citizen or class of citizens.

Third. To uphold the Constitution of the United States.

Fourth. To maintain the traditions of the Nation, to keep alive the memory of the achievements of the pioneers of this country, and to enlighten the citizens on the important part played by the Germanic element in the making of America.

Fifth. To guide our citizens through the intricacies of public policies, to warn them against political intrigues, and to oppose alien-influenced government.

So you see the Steuben Society means the acme of patriotism to the United States.

THOUSANDS OF PROMINENT GERMAN-AMERICANS TO WHOM HONOR IS DUE

But the name of Baron Steuben is not the only German name that will be ever honored in this country since the foundations of it were laid by patriots.

In Washington, D. C., there is a fine monument to Steuben erected by the Congress of the United States. And there are thousands and thousands of other Germans who have eternal monuments in the hearts of American citizens.

I can not name them all, because their names are legion, but a few will bring vividly to your minds the debt we owe to German immigration to this country.

Such men as Carl Schurz, educator and loyal citizen, and Theodore Thomas, born in Essen, whose orchestra thrilled millions, and Thomas Nast, the famous cartoonist, originator of the Republican elephant and the Tammany tiger, real founder of the cartoonist art, who was born in Landau, in the Bavarian Palatinate, and William H. Rinehart, the great sculptor, son of a German farmer, and the representative German-American writers of German descent—Bryard Taylor, Joaquin Miller, Nordhoff, Timrod, Saxe, Wistee—and so I could go on and fill this page with names of famous Germans in this country alone.

The Steuben Society of America has done constructive work for all Americans in pointing out to us what we owe to the German people. It has shown this clearly and logically in its book, The German Element in the United States, by Albert Bernhardt Faust.

It is a lesson with which all Americans should become familiar.

HOW GERMAN IMMIGRATION STEADILY INCREASED IN THE UNITED STATES

It has been estimated that before the Revolutionary War there were 225,000 Germans in the territory of North America. For the most part they had settled on the frontiers extending from the Mohawk in New York to Georgia, then the most southern colony.

The German immigrants to this country were among the first to go to Kentucky and Tennessee from Virginia and the Carolinas, and they were the first to enter the Ohio Valley. In this State the Germans settled in parts of Dutchess, Ulster, Greene, Columbia, Montgomery, Fulton, Schoharie, Oneida, Herkimer, Schenectady, and Saratoga.

While several estimates as to the number of Germans in this country before 1776 are higher than the number mentioned, probably some of them are too high. According to the conservative estimate given those Germans were distributed as follows:

| | |
|---|---:|
| New England | 1,500 |
| New York | 25,000 |
| Pennsylvania | 110,000 |
| New Jersey | 15,000 |
| Maryland and Delaware | 20,500 |
| Virginia and West Virginia | 25,000 |
| North Carolina | 8,000 |
| South Carolina | 15,000 |
| Georgia | 5,000 |
| **Total** | **225,000** |

In the nineteenth century there was another great German immigration to the United States far outnumbering the steady flow during the previous hundred years, reaching a total for the century of more than 5,000,000. During the nineteenth century the German immigration to this country outnumbered that of any other foreign nation. The figures show this comparison:

| | |
|---|---:|
| Germany | 5,009,280 |
| Ireland | 3,871,253 |
| England, Scotland, Wales | 3,024,222 |
| Norway, Sweden, Denmark | 1,439,060 |
| Canada and Newfoundland | 1,049,939 |
| Italy | 1,040,457 |
| Austria-Hungary | 1,027,195 |
| Russia and Poland | 628,902 |
| All other countries | 1,726,913 |
| **Total** | **19,115,221** |

Previous to 1850 the immigration here from Ireland exceeded that from Germany, but from 1851 to 1860 that from Germany exceeded that from Ireland and all other countries, until the last 10 years of the nineteenth century, when it was less than the Italian and Slavic immigrations, although still higher, than the Irish and English.

The heaviest German immigration, however, did not come until the years between 1831 and 1840, during which period more than 152,000 came here. From that time on there was a steady stream of immigrants from the fatherland, 57,500 arriving here in one year; the figures reached 215,000 in 1854. These large numbers were due to the revolutionary troubles in Germany in 1848 and the years following, during which period we received such great liberty-loving Germans as Sigel, Hecker, Bleuker, and our beloved Carl Schurz.

BOCKH ESTIMATED 18,000,000 GERMANS IN THIS COUNTRY IN THE YEAR 1900

That a large part of our fine American stock is the result of German blood flowing in the veins of American citizens there is no doubt. Just how far that blood flows can never be satisfactorily answered. The Steuben Society of America takes up the question, but does not pretend to completely answer it.

It shows that the most painstaking attempt to reach a conclusion in that regard was made by Emil Mannhardt in his Deutsch-Amerikanische Geschichtsblatter in 1903, but this work was reviewed by the German statistician, Richard Bockh, of the University of Berlin, who proved that Mannhardt's estimate of 25,000,000 was inaccurate.

Bockh placed the population in the United States with German blood in their veins at 18,000,000.

But even at this lower estimate, which was made about 1903, there has been of necessity a far wider diffusion of the German blood in this country during the last 24 or 25 years, owing to intermarriage and the propagation of species.

Then the Steuben Society of America in its latest edition of its book, The German Element in the United States, published recently, goes on to elucidate the question with the aid of the best American statisticians who have worked on the subject of alien populations in this country.

The society takes as a basis the Twelfth Census of the United States, which was taken in 1900. That gave a total of 6,244,107 of white persons of German parentage.

In addition there is given a total of 1,585,574 white persons in the United States with one parent German and the other native. The society, however, states that in order to be fair and to avoid counting of German blood twice, this number should be divided by two, thus giving 792,787. The total of white persons having one parent born in Germany and the other born in some other European country is given as 410,560. The society reasons, we may assume, that mixed marriages were far more often contracted between persons of the same blood and speaking the same language than otherwise. For instance, a person born in Germany would marry an Austrian or Russian when that person was of German blood and spoke the German language. The fraction one-half would therefore not accurately represent the German blood in this class.

LOGICAL AND SCIENTIFIC ANALYSIS SHOWS WHERE GERMAN BLOOD FLOWS

Bockh carefully analyzes the figures furnished by the United States Immigration Commission and goes into detail, but for the purposes of this article it will only be necessary to give his deductions in general.

He shows that while 151,118 Germans came here from the German Empire during 1898–1904, more than twice that number—that is, 315,744 Germans (including 20,303 Dutch and Flemish) came from other countries, the largest contingents coming from Austria-Hungary, Russia, Switzerland, and the Netherlands. He points out that the Germans of Switzerland, Belgium, and some of the border provinces have immigrated in far greater numbers to the United States than the French contingent of those populations.

The German Provinces of Austria he takes to be completely German, and the total of white persons, with both parents born in Austria, living in the United States in 1900, was 408,560. Those with one parent born in Austria and one in the United States totaled 26,450, of whom one-half—13,225—should be added to the total Americans with German blood in their veins. Then there were 55,225 persons born here who had one parent born in Austria and the other in some other foreign country, which by his method of claiming one-third of pure German blood in such cases would give 18,520.

In the same manner he takes up other immigration here from other foreign countries. Poland, he says, in the German Provinces contains from 45 to 75 per cent of German stock. Seventy per cent of the population of Switzerland is of German blood. Holland, he says, is of as pure German (low German) stock as that of any part of the former German Empire. The German population of Belgium, he says, is about four-sevenths of the total number of inhabitants.

He finds that the number of descendants of the German immigrations to the United States between 1790 and 1900 not enumerated as a foreign element in the census report of 1900 was 3,370,000.

By these methods he computes that there were 18,406,000 persons of German blood in the United States in 1900.

GREAT CHANGES IN 27 YEARS, BUT GERMAN BLOOD TO THE FRONT

But that was 27 years ago.

During those years many of the pure-stock Germans in this country have died. Their descendants still carry on, but while the number of descendants is constantly increasing and adding to the population, as they increase the German blood becomes more and more diffused with the blood of other nationalities.

The only way that blood could be kept pure German would be by marriages between persons of pure German blood. The pure German stock that has been added to this country in those 27 years is by immigration. In that period 778,547 German immigrants were admitted to the United States. Those immigrants added to the 18,-184,547 persons of pure German stock said to have been here in 1900 would make a total for 1928 of 19,184,547, if none of them had died.

So logical estimates of the number of persons of pure German blood in the United States to-day can not be made with any degree of accuracy. An up-to-date special census would be the only means of correctly ascertaining that fact.

But the big point is here: The German blood is widely diffused throughout the people of the United States to-day, and it has had a potent effect in making this country one of the finest and most efficient of this great earth.

EFFECT OF MONROE DOCTRINE

Mr. SHORTRIDGE. Mr. President, I ask unanimous consent to have printed in the RECORD an article by Col. Sidney Story, appearing in the Gaelic American, of New York, under date January 21, 1928, entitled "Monroe doctrine preserved the independence of the South American countries—European propaganda tries to poison minds of the southern nations against the United States—Papers are subsidized by the jealous English traders—The Civil War and the Maximilian fiasco—Field for genuine American diplomacy." I take the liberty of commending this article to the thoughtful attention of the Senate.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

MONROE DOCTRINE PRESERVED THE INDEPENDENCE OF THE SOUTH AMERICAN COUNTRIES—EUROPEAN PROPAGANDA TRIES TO POISON MINDS OF THE SOUTHERN NATIONS AGAINST THE UNITED STATES—PAPERS ARE SUBSIDIZED BY THE JEALOUS ENGLISH TRADERS—THE CIVIL WAR AND THE MAXIMILIAN FIASCO—FIELD FOR GENUINE AMERICAN DIPLOMACY

By Col. Sidney Story

The Chicago Tribune of January 2, 1928, refers editorially to "President Coolidge and the new Americanism."

The Monroe doctrine, as the Tribune well states, has been a blessing to the Western Hemisphere. It has stood like a flaming sword at the gateways of the Americas and warded off the attempts of ambitious, selfish, and land-grabbing nations from exploiting the small and weaker nations of the western continent. This policy, initiated by the Monroe administration, has for a century withstood the envy, jealousy, and attacks of the Old World. In spite of the refusal of European nations to acknowledge the Monroe doctrine as international law, yet have they been forced to respect it.

Both England and Germany tried to trample it under foot, but in language most emphatic President Cleveland brought England to her senses, and so did President Roosevelt at a later period Germany.

European propaganda in South as well as in North America has sought to belittle the doctrine in an effort to impress upon the North American mind that it was a hurtful policy and ought to be abandoned, and on the Latin-American mind that it was a big club which the arrogant and selfish land-gobbling Yankees held ready at every opportunity to beat them into submission so as to rob them of their territory.

There have been and are still a few people in North America who innocently fall for this stuff, just as there are people in North America who are saturated with European sophistry and who are always ready to agree with our Old World commercial rivals and political antagonists that whatever move America makes, or whatever policy she initiates, Uncle Sam is always wrong.

OLD AND NEW WORLD DIPLOMACY

The difference between the diplomacy of the Old and New World is that the new is of the shirt-sleeve order. It crudely but openly advocates its policies, whilst the Old World for centuries immemorial has been accustomed to the Machiavellian school, which uses sophistry, deception, and whatnot on the theory that the "end justifies the means."

The writer, in his travels throughout Latin America, was agreeably surprised to note that in spite of the daily attacks on North America by the subsidized European press in Latin America, that the people of the Republics of Central and South America held the United States in high esteem and admiration. One thing in particular impressed him with astonishment, and that was the realization that the leading classes in South America are not only as a rule better educated than the average North American but have more polish, more respect for family,

flag, and country and a better knowledge of world history than the average North American. Their statesmen and diplomats, as a rule, can give ours cards and spades and beat them at the game, and, as in the case of the Monroe doctrine, the Latin American understands better than we do international law and the multitudinous phrases of world diplomacy.

A BULWARK OF PEACE

The people and governments of Latin America have not only a better understanding of the Monroe doctrine than the average North American, but he holds the doctrine to be a cardinal principle of Latin America's policy. Why? Because he knows, in spite of the average North American attacks of European land-grabbing politicians, that the Monroe doctrine has been a bulwark of peace for the nations of the Western Hemisphere and an impregnable barrier against the selfish land-grabbing proclivities of the Old World nations. In proof whereof, at every Pan American conference on this hemisphere, whether held in North, Central, or South America, the nations of Pan America have at every session reaffirmed the abiding faith in the Monroe policy, and have at each meeting pledged over and over again their adhesion to it as well as their right, if need be, to protect it and to insure its observance and perpetuity.

Brazil, in the city of Rio de Janeiro, her federal district at the junction of the Beira-Mar and the Avenida Rio Branco, the two most prominent boulevards of that nation's federal capital, has erected, at a cost of over a million dollars, the Palaccio Monroe, a palace or temple dedicated to the Monroe doctrine; and to the proposition that this doctrine, in spite of European propaganda to the contrary, is the fundamental policy of Pan America. The European subsidized press in Latin America and in North America has sought to mislead the public mind. There are certain nations in Europe who pay well for such propaganda because the Monroe doctrine halts them from grabbing territory in the New World.

They have tried time and again to grab, but they were warned off when the Eagle screamed and showed its talons.

THE MAXIMILIAN FIASCO

During the Civil War in America, 1861–1865, the European nations took advantage of our troubles and France was urged by them to invade Mexico and there establish the throne of Maximilian on the ruins of the Mexican Republic. Had the Southern Confederacy succeeded, our North American Union would have been broken and scattered, and in due time France, England, Germany would have gradually absorbed Central and South America and eventually the weakened States of the North.

All this is known to the high-minded people and statesmen of Central and South America and, therefore, when we read in a Spanish or Portuguese Latin-American newspaper venomous tirades against North America on the Monroe doctrine, we must first ask ourselves the questions: What is this paper and who owns it? Ninety-nine instances in a hundred you will discover it is owned by European capital, and it is the mouthpiece or propaganda of this or that prominent and aggressor European nation, who looks with envy, jealousy, and apprehension on the ever increasing trade relations and social and political cordiality existing between the nations of the Latin Americas and Uncle Sam.

Such is international politics and rivalry. It is a fight for trade and for existence. This is a convincing reason that whilst talking peace, humanity, and civilization we must keep our powder dry, for were it not that behind us is force to protect what rights are also our we would be kicked, cuffed, and robbed, just as is defenseless, peace-loving, and altruistic China.

PROPAGANDA IN SOUTH AMERICA

In every Latin-American country European nations have newspapers published in Spanish and Portuguese, and those newspapers are supported by the governments and exporters of Europe to continue the fight for European and financial interests and to keep out the North American rival, even, if necessary, to fabricate stories to prejudice Latin America against Uncle Sam.

What is necessary to foster the spirit of Pan Americanism is for exporters and shipping interests in the United States of America to encourage the development of American publications in Spanish and Portuguese for the purpose of acquainting Latin America with the truth concerning our feelings and benevolent policies, so as to neutralize the vast amount of anti-American propaganda which for the past 25 years has sought to prejudice and inflame the Latin-American people against the United States.

Since the World War another more vicious brand of propagandists has arisen and developed unopposed against not only North America but against the social, religious, and political institutions of the Latin-American nations. The propaganda I refer to is the Moscow poison, which seeks to subvert the governments of the Western Hemisphere and to substitute for our representative form the autocracy or dictatorship of the mob, such as has made of Russia a nightmare of blood and destruction.

The red activities in Argentina, Brazil, Bolivia, and Paraguay at the time of the Sacco-Vanzetti incident, the Mexican Calles documents published in the Hearst papers are the warnings to all lovers of liberty,

Case 3:19-cr-00407-SI   Document 34-6   Filed 10/19/20   Page 7 of 66

law, and order to cooperate and prepare to not only meet the powers of evil and destruction, but to drive them out of this Nation as well as to assist our brothers in European and Spanish America to do the same.

Moscow sovietism is an insidious enemy which has all the suavity of the devil, the cunning of the fox, the fawning of the spaniel, and the venom of the rattlesnake.

The Monroe doctrine was launched for the purpose of enfolding all the Americans in the protecting arms of pan Americanism against the Old World ambitions.

The Holy Alliance, formed after the Napoleonic wars, was for the purpose of restoring Spanish misrule by conquest over the Latin-American nations, which they had thrown off under the leadership of Bolivar, St. Martin, and Sarmiento, names written in letters of gold alongside of Washington's and Franklin's upon the starry scroll of immortality.

### THE LOGICAL FIELD

Latin America is the logical field for North America to expand its commerce and extend its brotherly influence. It behooves us to cultivate closer friendship with our sister republics to the south by the study of the history customs, as well as requirement, and to use every effort in the way of high-class publicity to prove to them that we are not the land-grabbing sort which those who are envious and jealous of us would have them believe. Prove to them that our vast North American aren is yet not 10 per cent developed, and that it will suffice for all our needs and expansion for a thousand years to come. Our motto is "Live and let live," and all propaganda such as referred to is intended to disrupt the cordial relationship between Uncle Sam and the Latin Americas, so as to furnish certain nations an excuse to exploit the Portuguese and Spanish Republics of this continent and absorb their territory, as they did in the past.

To the Latin American our Government should accredit statesmen of the broadest vision, and our consular and diplomatic servants should at all times be supported and encouraged in their work, and we should not permit European chancellors to outwit us in those Latin-American fields by discrediting our representatives, as has often been the case.

All Latin-American countries should be encouraged to send their young men to study in our colleges, and we should also urge as many of our young men to go to the colleges of South American and perfect themselves in the study of those nations, their languages, customs, traditions, economics, religion, and transportation.

Last, though not least, we must develop more and more an adequate and efficient mail, passenger, and cargo service by sea, rail, and air between North, Central, and South America.

We must also develop our cable and wireless service absolutely under our control, and not through the territory and under the supervision of the Europeans, our rivals in trade, and who in a great measure, because of their propaganda against the United States, are responsible for some of the ill feeling that creeps up now and then.

Our diplomacy with the Latin-American countries, as with most of the world, is still crude and of the kindergarten class.

When we cut loose from certain European diplomatic entanglements and run our own diplomacy irrespective of whether it steps on this or that so-called European cousin the more will the Latin Americans cuddle up to Uncle Sam, in spite of the red propaganda from Russia or the offensive tactics and publicity of our so-called European cousins.

### DISTRIBUTIONS TO STOCKHOLDERS BY CORPORATIONS

Mr. ROBINSON of Arkansas. Mr. President, one of the principal controverted provisions of the pending revenue bill relates to the distributions made by a corporation to its stockholders out of earnings or profits accumulated prior to March 1, 1913. I desire to have printed in the RECORD in connection with my remarks a brief on this subject by Mr. A. L. Burford. I am satisfied that the brief will prove very helpful to those who study section 115 of the bill as it passed the House of Representatives. Let it also be referred.

There being no objection, the brief was referred to the Committee on Finance and ordered to be printed in the RECORD, as follows:

### DIVIDENDS UNDER THE REVENUE ACT OF 1928

#### Brief by A. L. Burford

Section 115 of the bill passed by the House and now pending in the Senate repudiates a principle expressly recognized in all prior revenue bills from 1916 to 1926, inclusive. Distributions made by a corporation to its stockholders out of earnings or profits accumulated prior to March 1, 1913, are now to be taxed as income to the stockholders. Previous statutes exempting such distributions have only been a recognition by Congress of the fundamental principle that property owned on March 1, 1913, when the income-tax amendment became effective, is not converted into income by mere transfer or delivery. The proposition now is that all accumulated surplus and accrued increase in value owned by a corporation March 1, 1913, is capital to the corporation only, but taxed as income to the stockholders when distributed. The proposed change is shown below:

| Present provisions revenue act 1926 | Proposed revenue bill 1928 |
|---|---|
| SEC. 201. (a) The term "dividend" when used in this title (except in paragraph (9) of subdivision (a) of section 234 and paragraph (4) of subdivision (a) of section 245) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913. | SEC. 115. (a) Definition of dividend: The term "dividend" when used in this title (except in section 203 (a) (4) and section 208 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits. |
| (b) For the purposes of this act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 204. | (b) Source of distributions: For the purposes of this act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. |

The 1926 act above quoted, with one exception, is but an elaboration and a reenactment of a similar provision contained in all revenue acts passed since 1913.

Revenue act 1916 (39 Stat. L. ch. 463, p. 756, sec. 2 (a)).
Revenue act 1917 (40 Stat. L. ch. 63, p. 300, sec. 31 (a) (b)).
Revenue act 1918 (40 Stat. L. ch. 18, p. 1057, sec. 301 (a) (b)).
Revenue act 1921 (42 Stat. L. ch. 136, p. 227, sec. 201 (a) (b)).
Revenue act 1924 (43 Stat. L. ch. 234, p. 253, sec. 201 (a) (b)).

The provision that every distribution "is made out of earnings or profits and to the extent thereof, and from the most recently accumulated earnings or profits," was first contained in the act of 1917, made retroactive to August 6, 1917.

Not since 1916 has any such assault been made on the principle first definitely announced in the act of that year.

The purpose of the 1928 act is not to limit the principle involved, as has sometimes been done since 1916 in connection with the provision quoted, but to eradicate it entirely from the law.

Two questions are presented:

(1) What purposes and reasons prompted the elimination; and
(2) What will be the effect of the change?

This radical departure from all prior revenue acts was not discussed in any of the hearings of the Ways and Means Committee. No advocate was heard in its support. No notice was given that any such change was contemplated. The provision as now written appeared for the first time in the bill reported to the House and those affected by it have had no opportunity to present their objections thereto.

The purposes and reasons actuating the modification of the existing law are only shown in the report submitted to the House with the bill. On page 20 of the report is the following:

"SECTION 115.—DISTRIBUTIONS BY CORPORATION

"Under previous revenue acts corporate distributions from surplus accumulated prior to March 1, 1913, were exempt from tax. There appears to be no reason for continuing this exemption indefinitely. Over 14 years have elapsed since March 1, 1913, and most corporations have distributed the surplus accumulated by then prior to March 1, 1913. It seems an appropriate time (particularly in view of the resulting simplification) to eliminate this exemption."

The first sentence in this part of the report is, of course, correct. It is then stated that there appears no reason for continuing the exemption indefinitely. No attack is made on the principle underlying the exemption. It is not contended that such principle is unsound. Two far different reasons are given: (a) That over 14 years have elapsed since March 1, 1913, during which period most corporations have distributed the surplus accumulated by them prior to that time; and (b) that the change will result in simplification.

The first of these reasons in effect admits the soundness of the exemption and expressly says that most corporations have taken advantage of it. Only stockholders in corporations that have been dilatory and in those unable to make distributions are to be taxed. If it was ever fair and just to exempt these distributions—and Congress has expressly so stated on six different occasions—it is now unjust to tax such stockholders, many of whom have had no voice in the matter.

The report intimates that corporations have had over 14 years within which to make distribution. This is hardly correct. In the act effective March 1, 1913, no reference was made to this question. The Treas-

ury Department ruled that profit or loss on a sale or other disposition of capital assets should be determined by comparing the price received with the original cost, even though such acquisition antedated 1913. It also held that all dividends, irrespective of the source, were taxable to the stockholders. Much litigation followed, none of which had been finally decided when Congress came to consider the 1916 act, and it then definitely settled the controversy by incorporating into that act the principle that property on March 1, 1913, was capital and not income. It also announced at that time the further principle that accumulated earnings and surplus of a corporation on March 1, 1913, was capital of the stockholders and not income to be taxed when distributed.

The period of 14 years mentioned in the report has been further shortened, to some extent, by the provision of the 1917 act, forbidding the distribution of surplus and earnings accumulated prior to March 1, 1913, until all earnings subsequent to that date had been distributed. This provision became effective as of August 6, 1917.

But has 10 years been a sufficient time for corporations to distribute this prior surplus and accumulated profits? Speaking for the lumber companies I represent, and for many other lumber companies with which I am familiar, this has been entirely impossible. Such companies and other corporations manufacturing natural resources such as lumber, limited in amount, occupy a very different status from the ordinary manufacturing or trading corporation. In a sense the first class may be called "wasting corporations," while the latter class are more or less perpetual. When the natural resources of the one are exhausted it must necessarily cease business. Its existence is limited.

In the case of lumber companies it was necessary for them long prior to 1913 and before any income tax was in existence to acquire standing timber to prolong their operations. Practically all the earnings of many such companies were used for this purpose, and so used until all timber available to their plants had been secured. Their surplus and undivided profits were then so invested when the income-tax amendment became effective, and has only become available for distribution since that date as the timber has been converted into lumber and sold. In most cases these companies have done this as rapidly as possible, but the fact is that the majority of all lumber companies of any sizable investments acquired their timber holdings prior to 1913, and it has been physically impossible since that time to manufacture and convert same into distributable assets.

Furthermore, as above stated, it has been impossible for any corporation to distribute this pre-1913 surplus until all earnings and profits accumulated subsequent to August 6, 1917, had been distributed.

The second reason given in the report is that the change will simplify procedure. No data is given in support of this statement. Its correctness has been challenged and is now challenged. I have been informed from sources I consider reliable that the Treasury Department is not of this opinion.

Since the bill passed the House and opposition has been voiced to this provision it has been said that the change will make valuations of property owned on March 1, 1913, comparatively unimportant. Of course this is not correct. As a matter of fact, these valuations are now almost if not entirely complete. The timber of all lumber companies that I know anything about has been valued by the department and valued at a figure considered in most instances at less than its actual value. These values have been set up on the books so that it is not only a mathematical calculation to determine whether a distribution is from property owned on March 1, 1913, or earnings since that date.

But if the provision is unsound, unjust, or inequitable, even if it be admitted that it simplifies procedure, surely this is not justification for its final passage.

Coming to the next question, the unjust and unfair effect of the change is obvious. A concrete example will show it.

Three individuals formed a partnership in 1900 and invested $200,000 in timber. Later they invested $100,000 in a mill and equipment and began the manufacture of this timber. Prior to March 1, 1913, out of earnings they had invested $50,000 in additional timber; and on that date the timber owned had increased in value so that their property was, when the income tax amendment took effect, of the actual value of $400,000. Under the law now, and as it has existed since 1916, these partners are not taxed on any part of this surplus or any part of the increased value of their timber. They are only taxed on earnings and profits subsequent to March 1, 1913.

On the other hand, if the same individuals had formed a corporation and through this agency had carried out the same plan, the result, under the section now proposed, would be radically different. Under the section as it now reads in the 1928 act, distributions of this surplus and undivided profits is taxable to the stockholders, who will have to pay surtaxes on the entire amount when it is distributed.

Congress has heretofore had occasion to consider the injustice of the change now proposed. It has also properly protected the Government by provisions now in the law.

At the time the act of 1921 was before the Senate, attempts were made to amend or modify the 1918 act, which was substantially as the 1916 law, with reference to distributions of March 1, 1913, surplus. The amendments then proposed contemplated no such drastic action as is now done. While not adopted in 1921, the amendment, in substance, was adopted in 1924 and is now in the act of 1926 as subdivision (b) of section 201, and provides:

"but any such tax after distribution shall be applied against and reduce the basis of the stock provided in section 204."

During the period this amendment was being considered by the Senate the Solicitor of Internal Revenue, by Ruling No. 1873, construed the act of 1918 as permitting distributions to be made tax free out of realized earnings and profits prior to March 1, 1913, but as taxing distributions out of increase in value prior to that date. This question was debated in the Senate at some length, and the debate is found in the CONGRESSIONAL RECORD, volume 61, part 7, pages 7290–7295. The result was that the Senate, by a decisive vote, overruled an amendment carrying out the solicitor's ruling and adopted the amendment exempting from taxation "increase in value of property accumulated."

In so far as Congress may have been said to have a fixed policy, it would appear that since 1916 it has been its policy to exempt from taxation surplus and profits accumulated prior to March 1, 1913. No valid reason has been advanced why this policy should now be completely reversed. Certain it is that many stockholders, with entire justification, have relied on it since 1916. It has been impossible for others to adopt a different course, even had they been so disposed. The injustice of the proposed change is apparent from a simple application to concrete cases. The proportion of the entire revenue to be raised by the 1928 act which will be paid under this provision is small, and the tax on individual stockholders in corporations manufacturing lumber will be great. Surely no small class of taxpayers should be singled out and made to pay more than their proportion of taxes.

Respectfully submitted,

A. L. BURFORD.

## NEW LAWYERS' CREDO

Mr. COPELAND. Mr. President, I have also a short article from today's New York World relating to an address made yesterday by Justice Joseph M. Proskauer, of the appellate division of the Supreme Court of New York on a "New lawyers' credo." It struck me as being such a splendid article that I felt every Senator would like to read it. I ask to have it printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

NEW LAWYERS' CREDO URGED BY PROSKAUER—JUSTICE SUGGESTS OATH TO MAKE LAW'S MACHINERY RUN SMOOTHLY

Justice Joseph M. Proskauer of the appellate division of the supreme court, addressing the bar association on law reform last night, proposed the following credo for members of the legal profession, to be supported on oath in much the same manner as a physician now takes the Hippocratic oath:

"I will join with my adversary in waiving a jury trial wherever and whenever it can possibly be done without the sacrifice of a fundamental right. I will join with my adversary in supporting a trial justice in fair comment upon the evidence and reasonable direction to a jury on the facts. I will join with my adversary in fair concession of undisputed facts. I will not put an adversary to his proof in respect to facts whose existence my client admits. I will refrain from merely formal or technical objection to the admission of evidence. I will cooperate with the trial justice and my adversary to secure a speedy, prompt, and complete presentation of the facts of the case. I will neither make nor oppose interlocutory motions unless they are of real and practical importance. I will take no appeal unless I am satisfied that substantial error has been committed and that a new trial should reasonably give a different result."

Justice Proskauer added that he profoundly believed "that there is no one within sound of my voice who does not know that if we were called upon to take an oath to support this credo, as the physician takes the Hippocratic oath, the machinery of justice would once more run smoothly."

He proposed that bar and bench organize to bring this about and to translate this new spirit into their everyday lives.

He expressed the opinion that workable law reform would not be accomplished merely by specific change in statute and rule, but that it must rest largely upon a fundamental change in the group psychology of the legal profession toward its function and of the lay psychological attitude toward the administration of justice.

"I disclaim any intent to attack bench or bar," he said. A great difficulty in the effectuation of law reform has always been a tendency of organs of public opinion to describe every constructive effort of a member of the profession as an attack upon his fellows.

Judge Proskauer maintained that the system of jury trial in civil contract cases "had been transformed from a useful process into a wasteful, ineffective, and outworn fetish." He contended there was no more practical reason for persistence in jury trial in this type of case than there would be for the continuance of trial by battle, and characterized it as the survival of an organism which has ceased to be useful, a "kind of political vermiform appendix."

He also suggested a sweeping change in the attitude toward the law of evidence. "The law of evidence," he said, "is not an end in itself, and we should cease making it our objective."

Furthermore, Justice Proskauer maintained that the profession must restore to the judge his power to function as a minister of justice and not as a mere presiding officer. And finally he criticized the tendency of lawyers to appeal.

"The overcontentiousness of the profession," he said, "is seen again in the number of appeals generally. We are appeal mad in this country. There is no disposition on anybody's part to let well enough alone. An appeal on the off chance that some error may somewhere be found is a matter of course."

### INDEPENDENT OFFICES APPROPRIATIONS

The Senate, as in Committee of the Whole, resumed consideration of the bill (H. R. 9481) making appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices for the fiscal year ending June 30, 1929, and for other purposes.

The VICE PRESIDENT. The Senator from Wisconsin [Mr. BLAINE] is entitled to the floor.

Mr. WARREN. I understand the Senator from Wisconsin wishes to address himself to the appropriation bill which is now before the Senate.

Mr. BLAINE resumed the speech begun by him yesterday. After having spoken for some time,

Mr. KING. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER (Mr. OVERMAN in the chair). The clerk will call the roll.

The legislative clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Fess | McLean | Shipstead |
| Barkley | Fletcher | McMaster | Shortridge |
| Bayard | Frazier | McNary | Smith |
| Bingham | George | Mayfield | Smoot |
| Black | Gerry | Metcalf | Steck |
| Blaine | Gillett | Moses | Steiwer |
| Blease | Gooding | Neely | Stephens |
| Borah | Gould | Norbeck | Swanson |
| Bratton | Greene | Norris | Thomas |
| Brookhart | Hale | Nye | Trammell |
| Broussard | Harris | Oddie | Tydings |
| Bruce | Harrison | Overman | Tyson |
| Capper | Hawes | Phipps | Wagner |
| Caraway | Hayden | Pine | Walsh, Mass. |
| Copeland | Heflin | Pittman | Walsh, Mont. |
| Couzens | Howell | Ransdell | Warren |
| Curtis | Johnson | Reed, Mo. | Waterman |
| Cutting | Jones | Reed, Pa. | Watson |
| Dale | Kendrick | Robinson, Ark. | Wheeler |
| Deneen | Keyes | Robinson, Ind. | Willis |
| Dill | King | Sackett | |
| Edge | La Follette | Schall | |
| Ferris | McKellar | Sheppard | |

The PRESIDING OFFICER (Mr. SACKETT in the chair). Eighty-nine Senators having answered to their names, a quorum is present. The Senator from Wisconsin will proceed.

### PROPOSAL FOR A PAN AMERICAN POLICY

Mr. BLAINE resumed and concluded his speech, which is entire as follows:

*Thursday, February 2, 1928*

Mr. BLAINE. Mr. President, upon entering the Chamber a few moments ago I heard a suggestion made by the Senator from Utah [Mr. KING] with respect to standing by the President. I submit that if we knew just where the President stands upon our international questions, and particularly in reference to Central and South America, then we might be in a position to determine whether or not we should stand by the President. But I have observed that the administration on this question is very much at sea. It is a craft without a rudder and without a captain.

I had hoped that the President of the United States, when he had that splendid opportunity to advise America and advise the world of exactly what is the American policy with respect to our southern neighbors, might take advantage of the situation and do this. He signally failed to indicate in his address before the Pan American Conference at Habana even the suggestion of a hope that we might have a policy. I want to quote to the Senate briefly a few statements coming from the administration as the President spoke before that conference. Here the whole world was his audience. Men, women, and children were awaiting a voice from America that might offer some hope for peace in the world, and what did they get?

A determination to adjust differences among ourselves, not by a resort to force, but by the application of the principles of justice and equity, is one of our strong characteristics.

So said the President at Habana. With Haiti and San Domingo in the background, the President uttered those words at the moment when, without the consent of Congress, he was maintaining an army in the field to crush a nation with which we are not at war.

The other day in a colloquy upon the floor of the Senate, when I questioned the President's great desire and great consideration for the Senate with respect to the S–4 inquiry and his lack of confidence in Congress with respect to the Nicaraguan question, a Senator said in effect, "Why, if the President had sent an army to Nicaragua, that would not be authorized, as the sending of an army would be an act of war and would require the consent of Congress. But he sent the marines." Ah, wherein is the distinction? Here were war vessels carrying all the implements necessary for war. Upon those war vessels were men in the panoply of war.

They were put upon the shores of this weak, defenseless, disordered country, armed with field guns, machine guns, and airplanes, and then it is said that that is not an act of war. I can see no distinction whether those armed forces be the Army, the militia, the Navy, or the marines. It is idle to undertake to defend the President's course in this particular instance by saying that the sending of the marines to Nicaragua was perfectly proper and that had he sent the Army that would have been contrary to the mandates of our Constitution.

Another paragraph from the President's address:

To-day—

He said, speaking at the opening of the Pan American Conference—

To-day Cuba is her own sovereign. Her people are independent, free, prosperous, peaceful, and enjoying the advantages of self-government.

"Independent" under the Platt amendment and a treaty with respect to Cuba which forbids her full sovereignty and her independence. "Free!" The United States reserves the right to intervene for the preservation of her so-called freedom. "Peaceful" she has to be, or the United States marines will step in, as they have stepped in heretofore. Cuba has not her sovereignty; it is denied to Cuba, although she has made efforts to withdraw herself from the guardianship of the United States.

Mr. SHORTRIDGE. Mr. President, may I ask the Senator a question?

Mr. BLAINE. I am sorry not to yield, but I will say to the Senator from California that I have learned a very splendid lesson from him, and that is not to permit interruptions during the course of my remarks.

Mr. SHORTRIDGE. I can ask the question and the Senator from Wisconsin can answer it later on.

Mr. BLAINE. I must charge the Senator from California with the responsibility for my attitude, and I must, therefore, decline to yield.

Another sentence of beautifully spun phrases from the voice of the President at that conference, I quote:

But we have put our confidence in the ultimate wisdom of the people. We believe we can rely on their intelligence, their honesty, and their character. We are thoroughly committed to the principle that they are better fitted to govern themselves than anyone else is to govern them.

What are the facts? We relied on the intelligence of the Haitian people to such a degree that we did not allow them to choose between two colored slips—ballots—at the time the Haitian constitution was adopted, but had the marines hand them a slip of the proper color. Yes; we believe they are fitted to govern themselves, but Haiti has not had a congressional election since the adoption of that same constitution, a constitution written by the representatives of the armed forces of America and jammed down the throats of the people of Haiti at the point of a gun. If such an election had been held in America for a United States Senator, and such Senator had come to the Senate knocking for admission, the Senate would have said: "No. There was no free election; military force controlled the polls; the people did not have an opportunity to express that free choice to which they are entitled under our Constitution, and therefore the election is void"; and, indeed, it would have been void. No election is valid unless it is a free election; and there can be no free election where force is in evidence. There must be that untrammeled freedom of the individual, where he may express his choice according to the dictates of his own judgment, without the intervention of coercion. Again said the President:

It is better for the people to make their own mistakes than to have some one else make their mistakes for them.

And this the President said in face of the fact that his representative in Nicaragua, Mr. Stimson, a special envoy, speaking to the Nicaraguans, said:

I have the honor to inform you—

He was speaking to both parties down there—

that I am authorized to say that the President of the United States intends to accept the request of the Nicaraguan Government to super-

Case 3:19-cr-00407-CAB Document 34 Filed 10/19/20 PageID.3 Page 10 of 66

vise the elections of 1928; that the retention of President Diez during the remainder of his term is regarded as essential to that plan and will be insisted upon; that a general disarmament of the country is also regarded as necessary for the proper and successful conduct of such election; and that the forces of the United States will be authorized to accept the custody of the arms of those willing to lay them down, including the Government, and to disarm forcibly those who will not do so.

And yet there are those who claim that America is in Nicaragua by the invitation of the Government of Nicaragua, an invitation extended, sir, under pressure of armed force.

Mr. SHORTRIDGE. Mr. President, will the Senator relent and allow me to interrupt him?

Mr. BLAINE. I must decline to yield. I appreciate that the Senator has served long and faithfully, and I am trusting to the good advice that he gave us a few days ago with respect to his own position regarding interruptions during the course of his remarks. So I must decline to be interrupted.

The PRESIDING OFFICER (Mr. JONES in the chair). The Senator from Wisconsin declines to yield.

Mr. SHORTRIDGE. I observe that he declines to yield.

Mr. BLAINE. There will be sufficient time afforded the Senator from California to answer, as he challenged me the other day and said he would answer me at some length at some future time.

Mr. SHORTRIDGE. I did not understand the Senator was going to make this address. I made no challenge to the Senator, and at the moment I merely wished to ask a simple question whether or not both parties—

Mr. BLAINE. I prefer not to be interrupted at this time.

The PRESIDING OFFICER. The Senator from Wisconsin declines to yield.

Mr. BLAINE. I will be very glad to answer the Senator's question when I have concluded my remarks.

Mr. SHORTRIDGE. I wish to say that I did not challenge the Senator. The Senator, I am sure, will say that I did not challenge him.

Mr. BLAINE. If that is what the Senator says, I withdraw the suggestion, but I understood him to say that at some future time he would reply at length.

Mr. SHORTRIDGE. Oh, that is granted; that I would speak on the subject.

Mr. BLAINE. That he would reply to my suggestions, and I took that as a challenge.

Mr. SHORTRIDGE. I did not challenge the Senator.

Mr. BLAINE. I informed the Senator privately that I accepted the challenge and that I expected to address myself at some future time at length to this question. It was a perfectly friendly suggestion on the part of the Senator from California.

Mr. SHORTRIDGE. Of course, there is no feeling.

Mr. BLAINE. I appreciate that.

Mr. President, here is another quotation from the President's address at the Pan American Conference at Habana:

It is a high example that we have set for the world in resolving international differences without resort to force.

In the last quarter of a century the example of America—and it has not been the heart of America that has spoken; it has been those who have represented America temporarily—has been a history of force, unrelenting force, imposed on small and weak nations unable to defend themselves. I am going to discuss that feature before I conclude.

It is a high example that we have set for the world in resolving international differences without resort to force.

Yet, during the last 25 years some 14 out of the 20 republics to the south of us have had the hand of force placed upon their ambitions, their governments, their sovereignty by those who were our temporary rulers.

I say it is not the voice of America that has spoken in the words of force but the voice of those who, under the changed conditions of commercial intercourse, have taken the position that commerce is more precious than liberty, who have not been willing to take a position in accordance with the traditional history of America, a tradition which had kept this country at peace and amity with all her neighbors for over a hundred years.

We have heard much about the Monroe doctrine as though it were a mere abstraction, something that was said by a President at some time that had relation to only one situation. I am not going to discuss the Monroe doctrine from that standpoint. I wish to discuss, however, the principles underlying the Monroe doctrine, which form the background of that doctrine. Mr. President, the principles of the Monroe doctrine, a vital force for over a hundred years of America's history, were supplemental to the doctrine of inherent fairness and justice that the

strong must not ride down the weak. That is the Monroe doctrine, no matter what interpretation may be applied to it by this administration. The circumstances under which those principles were announced did not limit their application. These principles were not unknown to the centuries of the past. Their essence was self-preservation inherent in individuals and in groups of individuals, whether organized under a tribal system or as a governmental unit. They have neither a beginning nor an end, for they antedate all governments and will project themselves into the future so long as there may be a human being needing self-protection.

The misconstruction placed on these principles in modern times and their maladjusted enforcement do not limit them. They are unlimited by time or circumstance.

Latter-day statesmen have abused them, as have been abused the finer sentiments of all mankind. In their name tyranny has been practiced, and injustices and wrongs have prevailed. The doctrine of inherent fairness and justice has been a shield, and on other occasions it has been used as an instrumentality for usurpation. It has struck down innocence and exalted greed. Misguided men have quoted and twisted the doctrine as the devil has quoted and twisted the Scriptures, and to the same purpose.

In America in the last quarter of a century its misconstruction and its modernized maladjustment are a betrayal of our traditional policy. We have departed from it as our own protective measure, and it has ceased to be our shield, and is rapidly becoming an engine of mischief if not of destruction.

The repudiation of this fundamental Americanism which brought to us peace, happiness, and prosperity finds America's diplomacy and international policy a drifting one. In fact, America has no policy except such as may be the passing whim of a President or a Secretary of State, or their ill-conceived notions. Such lack of policy promises nothing for the future but the possibility of wars in which we should have no concern, but into which we are dragged without the consent of the American people acting through their Congress.

Loyalty to the cause of America, to her tied traditions, finds no place in the dealings of our rulers with the weak or disordered States of the Western Hemisphere. Oil, metals, landed estates, plantations, concessions, foreign loans, protectorates are the only language in the lexicon of those whom we have trusted with America's destiny. Loyalty to a proud past, adherence to fundamental Americanism, no longer prompt those who are guiding America to a destiny of imperialism instead of independence.

A brief review of the principles of the Monroe doctrine as they have been conceived and officially proclaimed by the Presidents who knew them and had the courage to enforce them is not out of place here.

Washington foresaw the struggle for oil, for plantations, for concessions. He pointed to our duty to guard against acts of our own citizens which might tend to disturb peace with other nations. He said:

Observations on the value of peace with other nations are unnecessary. It would be wise, however, by any provisions, to guard against those acts of our own citizens which might tend to disturb it, and to put ourselves in a condition to give that satisfaction to foreign nations which we may sometimes have occasion to require from them.

President Monroe, in enunciating the Monroe doctrine, emphatically declared that we should consider any attempt on the part of a European power "to extend their system to any portion of this hemisphere as dangerous to our peace and safety." He proposed that no European nation should interpose for the purpose of oppressing any government upon the Western Hemisphere, and declared against the controlling of their destiny in any manner. He said:

We owe it, therefore, to candor and to the amicable relations existing between the United States and those powers to declare that we should consider any attempt on their part to extend their system to any portion of this hemisphere as dangerous to our peace and safety. With the existing colonies or dependencies of any European power we have not interfered and shall not interfere. But with the Governments who have declared their independence and maintained it, and whose independence we have, on great consideration and on just principles, acknowledged, we could not view any interposition for the purpose of oppressing them, or controlling in any other manner their destiny, by any European power in any other light than as the manifestation of an unfriendly disposition toward the United States.

He was not talking about political control alone. He proposed that no European nation should use any manner or means to control the destiny of the people to our south. President Monroe broadened his language to exclude every pretense of any European nation from gaining a foothold upon this hemi-

sphere in any manner. He declared that it is equally impossible that we should behold any interposition by European governments in any form with indifference.

President John Quincy Adams knew of the temptation of a strong nation to bulldoze, to beat down and to subjugate weaker peoples, and declared that the cornerstone of all of our future relations with the southern Republics was "disinterestedness"; the next was "cordial good will to them"; the third was a claim of "fair and equal reciprocity." He left it to those Republics to regulate as to them shall seem fit those concerns which are "the prerogative of their independence."

President Jackson, courageous and independent, referred to the long-standing claims of our citizens against governments to the south as sources of dissatisfaction and complaint, and recited a long list of irritating circumstances, though he never hinted that force should be interposed, and proclaimed that "With Brazil and all our neighbors of this continent we continue to maintain relations of amity and concord."

President Polk, in a message to the Senate on April 22, 1850, said:

If there be any who desire to seize and annex any portion of the territories of these weak sister Republics to the American Union, or to extend our dominion over them, I do not concur in their policy; and I wish it to be understood in reference to that subject that I adopt the views entertained, so far as I know, by all my predecessors.

I respectfully call to the attention of our State Department President Fillmore's declaration that "the great law of morality ought to have a national as well as a personal and individual application." There ought to be emblazoned over the entrance to the White House, to the Department of State, to the Commerce Department, in letters that even officials who may be blinded by the "almighty dollar" could read, President Fillmore's challenge at any attempt to veer from the course pursued by America for then over half a century. I quote the salient portions of his message. Had this message been read by our President before he went to Habana, the prayers of the people of the world for some step toward peace might have been answered.

President Fillmore said:

Among the acknowledged rights of nations is that which each possesses of establishing that form of government which it may deem most conducive to the happiness and prosperity of its own citizens, of changing that form as circumstances may require, and of managing its internal affairs according to its own will. The people of the United States claim this right for themselves, and they readily concede it to others. Hence it becomes an imperative duty not to interfere in the government or internal policy of other nations; and although we may sympathize with the unfortunate or the oppressed everywhere in their struggles for freedom, our principles forbid us from taking any part in such foreign contests. We make no wars to promote or to prevent successions to thrones, to maintain any theory of a balance of power, or to suppress the actual government which any country chooses for itself. We instigate no revolutions—

Fillmore could not have said that in the beginning of this century truthfully; but he said it as the then policy of America as it had been observed for over half a century.

We instigate no revolutions, nor suffer any hostile military expeditions to be fitted out in the United States to invade the territory or provinces of a friendly nation. The great law of morality ought to have a national as well as a personal and individual application. We should act toward other nations as we wish them to act toward us, and justice and conscience should form the rule of conduct between governments, instead of mere power, self-interest, or the desire of aggrandizement.

A quite different message from that we had in the year 1928 at Habana? I read further from President Fillmore:

It has been the uniform policy of this Government, from its foundation to the present day, to abstain from all interference in the domestic affairs of other nations.

But it is now said by some that this policy must be changed.

The same cry is made to-day as was heard back in Fillmore's time. He recognized it—he denounced any attempt to interfere in the affairs of other nations.

(At this point Mr. DILL suggested the absence of a quorum, and the roll was called.)

Mr. BLAINE. Mr. President, I had been quoting from a message of President Fillmore, and I want to continue to read a few more paragraphs from that great patriot, that man who looked into the future, not for a generation but for centuries. He thought of his country and not of commerce.

The truth is that the course which they—our forefathers—pursued was dictated by a stern sense of international justice, by a statesman-like prudence and a far-seeing wisdom, looking not merely to the present necessities but to the permanent safety and interest of the country.

Our policy is wisely to govern ourselves, and thereby to set such an example of national justice, prosperity, and true glory as shall teach to all nations the blessings of self-government and the unparalleled enterprise and success of a free people.

To-day "dollar diplomacy" gives the lie to President Fillmore.

No longer is there "a stern sense of international justice"; "statesmanlike prudence and a far-seeing wisdom" are lost in the scuffle for oil, for plantations, for concessions, for foreign loans. "Permanent safety and interest of the country" are no longer the end. Modern American diplomacy is the foundling of immoral intrigues, to be protected and perpetuated by force. Are the slimy worms that crawled over the pages of our domestic history in the last few years to become, through a system of metamorphosis, the vermin of international immorality?

If the present policy of this administration is to determine the policy of America for the future, then America has ceased to have the character given to her by our forefathers, so eloquently and patriotically expressed by President Fillmore.

President Pierce advocated territorial aggression in this hemisphere, and he points out how easy it would be for America to annex and absorb new territory, and even suggests that such might be justified, but even he, with all his zeal for aggrandizement, recognized the fact that "we have abstained from doing it, in obedience to considerations of right, not less than policy."

Even President Buchanan was restrained from embarking upon an imperialistic policy, though his messages and recommendations contained little of value.

President Johnson, exhibiting on so many occasions either fits of madness or even less honorable characteristics, struck out boldly for territorial acquisition. I know of no historian, no teacher, no patriot ever presenting the life of President Johnson as one to be emulated by young America.

President Grant, than whom there was no greater on the field of battle, was promptly rebuked for his imperialistic attempts on San Domingo by Senator Charles Sumner, in offering his resolution expressing Congress's opposition to the military invasion in San Domingo.

Let me say here in passing that the other day Mr. Hughes, a distinguished American citizen, as evidence of America's desire to withdraw from South American countries, as proof of our desire to withdraw from that territory, pointed to our conduct in San Domingo. There has been intermeddling or an attempt to intermeddle in San Domingo for nearly 60 years, and we are still in San Domingo, as I shall presently observe.

Following President Hayes there came to the Presidency Grover Cleveland. I shall endeavor to be nonpartisan on this question. I am merely reviewing the history of America. I propose to review that history honestly and correctly and where credit is due I propose to give credit.

Grover Cleveland was the first national success of his party since prior to the Civil War. He brought to the office of President well-ripened judgment, vast experience, and coming, as he did, from the ranks of those who believed in America and America's traditions and history and policies, he reflected in a high degree the intelligent opinion of our people as a whole. He was confronted with an international situation more potential for mischief than was the international situation under President Monroe. The principles of the Monroe doctrine were challenged as they had never been challenged before. When President Cleveland spoke, it was as though the zero hour in America's diplomatic dealings in the Western Hemisphere had struck, and President Cleveland spoke as only a man of his sturdy character could speak. He revived and buttressed and strengthened the Monroe doctrine, without adding thereto or detracting therefrom. I wish our President might have read this message before he went to Habana.

These are the words of Cleveland:

When citizens of the United States voluntarily go into a foreign country they must abide by the laws there in force and will not be protected by their own Government from the consequences of an offense against those laws committed in such foreign country; but watchful care and interest of this Government over its citizens are not relinquished because they have gone abroad, and if charged with crime committed in the foreign land a fair and open trial, conducted with decent regard for justice and humanity, will be demanded for them. With less than that this Government will not be content when the life or liberty of its citizens is at stake.

He reaffirms, clinches, and rivets down the Monroe doctrine under the white heat of patriotic fervor and loyalty to international morality. While President Fillmore spoke in terms of

the Golden Rule, Cleveland denounced international immorality as odious. I quote him:

> I mistake the American people if they favor the odious doctrine that there is no such thing as international morality, that there is one law for a strong nation and another for a weak one, and that even by indirection a strong power may with impunity despoil a weak one of its territory.

When the internecine strife in Cuba was at its height, with a demand for war against Spain, Cleveland said:

> The United States has, nevertheless, a character to maintain as a nation, which plainly indicates that right and not might should be the rule of its conduct.

President McKinley followed Cleveland, and, lacking the courage and frankness of Cleveland, as a milder character, he could not resist the temptations against which he inveighed when he said:

> We want no wars of conquest; we must avoid the temptation of territorial aggression.

But when the war with Spain was over the successes of the strong nation demanded and received the island of Porto Rico and other islands in the West Indies, and one to be selected in the Ladrones, and the administration offered as an excuse for the aggrandizement of the Philippines that we paid pauper Spain $20,000,000, and all the beautiful phrases and noble sentiments were dissipated like the mists before the golden splendor of the rising sun.

At this point I can not forego the drawing of a line of demarcation between the bluster and fury of a Roosevelt and the moral and political courage of a Cleveland. The one, when confronted with problems that would test America's sincerity of purpose and allegiance to the inherent doctrine of fairness and justice, yielded under the influences that put our Nation on its way to imperialism. He discussed chronic wrongdoing on the part of nations and their impotency, but he had in mind the weak nations, not the strong ones. Herein lies the difference between that which actuated President Cleveland and that which influenced President Roosevelt in his second administration.

When Cleveland talked about international immorality and chronic wrongdoers he had reference to the nation that was superior in naval force to America. Cleveland said that America has a character to maintain as a nation, and he said it in the teeth of the then world's strongest combination of force. When he said that a strong power may not with impunity despoil a weak nation, he said it, not to the weak and disordered neighbors to the south, but he said to Lord Granville, of Great Britain, that—

> We are not without concern as to whatever may affect the interests of a sister Republic of the American continent and its position in the family of nations.

Secretary of State Gresham, in Cleveland's Cabinet, Secretary of State Blaine, under President Harrison, and Secretary of State Olney, under Cleveland's second administration, exerted their good offices to bring about diplomatic intercourse with Great Britain. Cleveland, speaking through his Secretary of State, announced:

> The Monroe doctrine rests upon facts and principles that are both intelligible and incontrovertible.
> * * * whether moral or material interests be considered, it can not but be universally conceded that those of Europe are irreconcilably diverse from those of America, and that any European control of the latter is necessarily both incongruous and injurious. * * *
> The States of America, South as well as North, by geographical proximity, by natural sympathy, by similarity of governmental constitutions, are friends and allies, commercially and politically, of the United States.

When the time came for the last word, President Cleveland messaged to Congress these words:

> I am, nevertheless, firm in my conviction that while it is a grievous thing to contemplate the two great English-speaking peoples of the world as being otherwise than friendly competitors in the onward march of civilization and strenuous and worthy rivals in all the arts of peace, there is no calamity which a great nation can invite which equals that which follows a supine submission to wrong and injustice and the consequent loss of national self-respect and honor, beneath which are shielded and defended a people's safety and greatness.

Cleveland did not say these words to Haiti, to San Domingo, to Colombia, to Nicaragua.

I have contrasted the political and moral courage of President Cleveland with that of President Roosevelt. In fairness to President Roosevelt it should be acknowledged that when he came to the Presidency on the death of President McKinley he emulated the courageous character of Cleveland. In 1902 Germany, England, and Italy proposed a naval demonstration against Venezuela for the purpose of forcing recognition of the validity of claims of subjects of the three great powers. One claim was for interest seven years past due on 5 per cent bonds for which Venezuela customs were pledged. Another was for 7 per cent dividends guaranteed by the Venezuelan Government on the capital stock issued for the building of a railroad by German subjects, at a cost of about $20,000,000. There were other claims aggregating about $400,000 for forced loans and military requisitions.

I call the attention of the Senate to these details for the purpose of contrasting the policy of America as it had been declared up to and including the first administration of President Roosevelt with the policy of the present administration. Here were claims for interest due on bonds for which the Venezuelan customs were pledged; here were dividends guaranteed to foreign investors by the Venezuelan Government; here were other claims for forced loans and military requisitions, identically of the same character as have furnished the excuse for the last 25 years for sending marines and the Army and the Navy into these smaller and weaker countries in order to force them to acknowledge some alleged indebtedness to foreign governments or private parties, and the assertion is made that that policy has become necessary in order that America may protect these smaller and weaker governments against invasion by European nations. What was Roosevelt's answer to that same claim?

The German ambassador declared that the German Government had—

> no purpose or intention to make even the smallest acquisition of territory on the South American Continent or the islands adjacent.

The whole purpose, of course, was to test the Monroe doctrine and therefore the disclaimer. The British Government's demands went to the question of the settlement of claims for the destruction of property and the mistreatment and imprisonment of British subjects, due to the revolutions and civil wars in Venezuela, and including as well a settlement of the foreign debt.

Here were all the elements typical of all the claims that have brought about our modern doctrine of force, which makes America the collecting agency of alien and foreign peoples and foreign governments, at the sacrifice of America's honor, which calls upon America's manhood to make sacrifices, to give its blood, even its life, to enforce against weak and disordered nations the collection of claims, whether held by foreign governments or foreign subjects or by American exploiters or adventurers. That is the policy of the present administration, a policy denounced by Sumner on the floor of the Senate as "the dance of blood." What did Roosevelt do?

The claims presented by the three great powers involved, as I have said, practically every question that has presented itself to the American Government in respect to our southern neighbors for the last quarter of a century or more. The three European governments proposed to collect their demands by force. President Roosevelt knew full well that such force would mean the seizing of the customhouses and the administration of the customs receipts, and that meant territorial acquisition by a foreign power. That territorial acquisition might have been temporary only, but the seizing of the customhouses and the control of the ports of Venezuela meant nothing short of territorial acquisition in permanency or temporarily.

President Roosevelt knew, as anyone would know, that an exhibition of force, a naval demonstration by the three great European powers, meant something more than a gesture; that fear alone would not induce the Venezuelan Government to make a declaration recognizing the correctness of the European governments' demands, and it was also known that if even such a recognition were made its fulfillment was impossible unless the three European nations took possession of the ports and the customhouses of the Venezuelan Government.

Recognizing the fact that the use of force by any nation in attempting to collect a debt due its subjects from another nation meant immediate possession, an acquisition of territory for such purposes at least, and the very possible resultant permanent occupancy and possession, the President very properly let it be known that Admiral Dewey's force would be instructed to sail to the Venezuelan coast and thus prevent the taking of possession of Venezuelan territory, and by that fact itself preventing the powerful European nations from collecting their alleged debts by force.

In 1916, speaking of the incident, Colonel Roosevelt, in an address said:

> I asked, on behalf of the Nation, the things to which we were entitled. I was as courteous as possible. I not only acted with justice, but

with courtesy toward them. I put every battleship and every torpedo boat on the sea under the American flag, and Dewey with instructions to hold himself ready in entire preparedness to sail at a moment's notice.

Mr. President, I am willing that all America's battleships upon the seas shall be employed to beat back European aggression against the Western Hemisphere as a means of self-preservation, but I am opposed to using armed force in the neighboring Republics to the south for the collection of debts of exploiters and adventurers, whether they be foreign or domestic. I am opposed to commanding America's young manhood to endure the sacrifice of death for the sake of enforcing the collection of a debt against a weaker power.

Unfortunately President Roosevelt's declarations were not made a part of the written diplomacy of his administration. The result of the arbitration proceedings following the President's demands clearly demonstrates the injustice of coercive measures for the collection of pecuniary claims. The total demands of foreign governments, including that of the United States, were a little over 163,000,000 bolivars, while the arbitration commission awarded about 30,000,000 bolivars. In other words, while the demands aggregated approximately $32,700,000, the award amounted only to about $5,000,000.

Under the present policy, however, the policy of coercion and force, the pound of flesh would have been demanded at the point of the bayonet. When arbitration was brought into play by President Roosevelt justice was done toward our southern neighbor, and America still retained the character for fair dealing, which she had always possessed.

While President Roosevelt contended that the coercion of an American state was not contrary to the Monroe doctrine provided that it did "not take the form of acquisition of territory by any non-American power," he effectually denied to European governments any resort to measures of coercion for the purpose of collecting their debts or the debts of their subjects.

Herein lies the paradoxical position of America. President Roosevelt talked about the golden rule being the guiding rule of conduct but not forbidding the exercise of power and force, and out of the womb of a self-contradictory philosophy the imperialistic policy of America was born.

That imperialistic policy did not have its inception, however, in any contest with any nation equal to ours. It was begun against our weak and disordered neighbors to the south, and it relies upon our power, our armies, and our navies to enforce the new conception of the Monroe doctrine. I again quote President Roosevelt:

Our own Government has always refused to enforce * * * contractual obligations on behalf of its citizens by an appeal to arms. It is much to be wished that all foreign governments would take the same view. But they do not; and in consequence we are liable at any time to be brought face to face with disagreeable alternatives.

Expediency displaced the inherent doctrine of fairness and justice.

Is there any distinction between the initial acquiring of territory by force and the ultimate acquiring of territory by receivership in the collection of a debt? If we are justified in preventing European territorial aggrandizement by one method, we are justified in preventing such aggrandizement by the other method. To prevent European expansion in the Western Hemisphere, to prevent even temporary occupancy or acquistion of a single foot of territory in this hemisphere by any method or by any means, and for any purpose, is necessary to our peace and to the peace of this hemisphere; yes—and of the world.

It seems to me that it makes no difference what method a foreign government may use to promote its ambitions for expansion or what the means of aggression may be. President Monroe said that foreign nations should not control in any manner the destiny of a single nation on our western continents, and any attempt to acquire control can be treated by America in no other light than "as the manifestation of an unfriendly disposition toward the United States."

The new conception of the Monroe doctrine grows upon the mistaken idea that America is to be the wet nurse for alien governments, money lenders, adventurers, and concession grabbers in their career of expansion, extension, or exploitation.

It is true that America will, from time to time, be brought face to face with disagreeable alternatives; but that does not change and should not change the character of America. Expediency, when we are brought face to face with disagreeable alternatives, will not justify a violation of the inherent and the immutable doctrine of fairness and right and justice.

To enthrone expediency, and even to admit of alternatives in the application of the doctrine of inherent fairness and justice that the strong must not ride down the weak, is nothing short of a compromise with evil.

But international morality must be discarded and the character of the United States as formulated for over a hundred years submerged, that might and not right be proclaimed the rule of conduct. Thus we have turned the Monroe doctrine into an agency for mischief for America, not for her protection or the protection of weaker nations and peoples.

Just a brief review of later history:

Under President Taft dollar diplomacy was frankly established. There was one characteristic that stood out with President Taft. Disagree with him as you might, he was always frank; and frankness always promotes honesty.

He said:

The diplomacy of the present administration has sought to respond to modern ideas of commercial intercourse. * * * It is an effort frankly directed to the increase of American trade upon the axiomatic principle that the Government of the United States shall extend all proper support to every legitimate and beneficial American enterprise abroad.

He frankly repudiates the traditional American policy, and taboos such traditional policy as "outworn dogmas of the past."

President Wilson, in language at least, assented to the traditional American policy.

Mr. President, I ask permission to insert in the RECORD in connection with my remarks the message by President Cleveland when the revolution in Hawaii took place. Shortly before the close of President Harrison's administration the then President transmitted to the Senate a treaty providing for the annexation of Hawaii to the United States. Mr. Cleveland, when coming to the office of President, repudiated the whole transaction relating to the proposal for the annexation of Hawaii and refused to submit the treaty to the Senate. He sent a special message on December 18, 1893, and in that message discussed the very question under consideration. I ask that that message be inserted at this point in the course of my remarks.

The PRESIDING OFFICER (Mr. ODDIE in the chair). Without objection, it is so ordered.

The matter referred to is as follows:

While naturally sympathizing with every effort to establish a republican form of government, it has been the settled policy of the United States to concede to people of foreign countries the same freedom and independence in the management of their domestic affairs that we have always claimed for ourselves, and it has been our practice to recognize revolutionary governments as soon as it became apparent that they are supported by the people. * * *

As I apprehend the situation, we are brought face to face with the following conditions:

The lawful Government of Hawaii was overthrown without the drawing of a sword or the firing of a shot by a process every step of which, it may safely be asserted, is directly traceable to and dependent for its success upon the agency of the United States, acting through its diplomatic and naval representatives.

But for the notorious predilections of the United States minister for annexation, the committee of safety, which should be called the committee of annexation, would never have existed.

But for the landing of the United States forces under false pretexts respecting the danger to life and property, the committee would never have exposed themselves to the pains and penalties of treason by undertaking the subversion of the Queen's Government. * * *

Believing, therefore, that the United States could not, under the circumstances disclosed, annex the islands without justly incurring the imputation of acquiring them by unjustifiable methods, I shall not again submit the treaty of annexation to the Senate for its consideration, and in the instructions to Minister Willis, a copy of which accompanies this message, I have directed him to so inform the provisional government.

But in the present instance our duty does not, in my opinion, end with refusing to consummate this questionable transaction. It has been the boast of our Government that it seeks to do justice in all things without regard to the strength or weakness of those with whom it deals. I mistake the American people if they favor the odious doctrine that there is no such thing as international morality, that there is one law for a strong nation and another for a weak one, and that even by indirection a strong power may with impunity despoil a weak one of its territory.

By an act of war, committed with the participation of a diplomatic representative of the United States and without authority of Congress, the Government of a feeble but friendly and confiding people has been overthrown. A substantial wrong has thus been done which a due regard for our national character as well as the rights of an injured people requires we should endeavor to repair. * * *

The law of nations is founded upon reason and justice, and the rules of conduct governing individual relations between citizens or subjects of a civilized state are equally applicable as between enlightened nations. The considerations that international law is without a court for its enforcement and that obedience to its commands practically depends upon good faith instead of upon the mandate of a superior

Case 3:19-cr-00407-CAB-JLB   Document 1   Filed 01/31/19   PageID.14 of 66

tribunal only give additional sanction to the law itself and brand any deliberate infraction of it not merely as a wrong, but as a disgrace. A man of true honor protects the unwritten word which binds his conscience more scrupulously, if possible, than he does the bond a breach of which subjects him to legal liabilities, and the United States, in aiming 'to maintain itself as one of the most enlightened nations, would do its citizens gross injustice if it applied to its international relations any other than a high standard of honor and morality. On that ground the United States can not properly be put in the position of countenancing a wrong after its commission any more than in that of consenting to it in advance.

Mr. BLAINE. I want to observe, with respect to that message, that President Cleveland sent a commission to Hawaii. Afterwards the Hawaiian Republic was recognized. After recognition, and after the people of Hawaii became the voice of Hawaii, Hawaii was annexed, not by treaty, because it was impossible to obtain the constitutional ratification of a treaty by this body, but was annexed by a joint resolution adopted by a majority in each House of Congress. Why? It was at a time when Admiral Dewey's fleet was hard pressed in Manila Bay. When the people of Hawaii came to the United States they came as petitioners, exercising the freedom of petition, not by force of arms, not at the 'point of the bayonet, but as men and women desiring to associate themselves with the American Republic.

I want to say, Mr. President, to my colleagues, that subjects that are forced never can become good citizens, but when other people who freely petition without coercion, without inducements other than the fundamentals of our Government, equal to the inducements to every citizen of the United States, come into association with America, then you have happy and satisfied subjects, if you choose to call such people subjects.

I desire to insert in the RECORD, without reading, in the course of my remarks at this place the conception of this doctrine of fairness and justice as understood by one of the greatest authorities on international questions, the former Minister of Foreign Relations of Argentina, Drago. On the occasion of the Venezuelan question that arose in connection with Great Britain, Italy, and Germany, he set forth the South American view in a memorandum addressed to the Argentine minister at Washington. That memorandum is worthy of consideration; and I ask unanimous consent to incorporate it in the course of my remarks at this place.

The PRESIDING OFFICER. Without objection, it is so ordered.

The matter referred to is as follows:

I have received your excellency's telegram of the 20th instant concerning the events that have lately taken place between the Government of the Republic of Venezuela and the Governments of Great Britain and Germany. According to your excellency's information, the origin of the disagreement is, in part, the damages suffered by subjects of the claimant nations during the revolutions and wars that have recently occurred within the borders of the Republic mentioned, and in part also the fact that certain payments on the external debt of the nation have not been met at the proper time.

Leaving out of consideration the first class of claims, the adequate adjustment of which it would be necessary to consult the laws of the several countries, this Government has deemed it expedient to transmit to your excellency some considerations with reference to the forcible collection of the public debt suggested by the events that have taken place.

At the outset it is to be noted in this connection that the capitalist who lends his money to a foreign state always takes into account the resources of the country and the probability, greater or less, that the obligations contracted will be fulfilled without delay.

All governments thus enjoy different credit according to their degree of civilization and culture and their conduct in business transactions; and these conditions are measured and weighed before making any loan, the terms being made more or less onerous in accordance with the precise data concerning them which bankers always have on record.

In the first place the lender knows that he is entering into a contract with a sovereign entity, and it is an inherent qualification of all sovereignty that no proceedings for the execution of a judgment may be instituted or carried out against it, since this manner of collection would compromise its very existence and cause the independence and freedom of action of the respective government to disappear.

Among the fundamental principles of public international law which humanity has consecrated, one of the most precious is that which decrees that all states, whatever be the force at their disposal, are entitled in law, perfectly equal one to another, and mutually entitled by virtue thereof to the same consideration and respect.

The acknowledgment of the debt, the payment of it in its entirety, can and must be made by the nation without diminution of its inherent rights as a sovereign entity, but the summary and immediate collection at a given moment, by means of force, would occasion nothing less than

the ruin of the weakest nations and the absorption of their governments, together with all the functions inherent in them, by the mighty of the earth. The principles proclaimed on this continent of America are otherwise. "Contracts between a nation and private individuals are obligatory according to the conscience of the sovereign, and may not be the object of compelling force," said the illustrious Hamilton. "They confer no right of action contrary to the sovereign will."

The United States has gone very far in this direction. The eleventh amendment to its Constitution provided in effect, with the unanimous assent of the people, that the judicial power of the Nation should not be extended to any suit in law or equity prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state. The Argentine Government has made its Provinces indictable, and has even adopted the principle that the nation itself may be brought to trial before the supreme court on contracts which it enters into with individuals.

What has not been established, what could in no wise be admitted, is that, once the amount for which it may be indebted has been determined by legal judgment, it should be deprived of the right to choose the manner and the time of payment, in which it has as much interest as the creditor himself, or more, since its credit and its national honor are involved therein.

This is in no wise a defense for bad faith, disorder, and deliberate and voluntary insolvency. It is intended merely to preserve the dignity of the public international entity which may not thus be dragged into war with detriment to those high ends which determine the existence and liberty of nations.

The fact that collection can not be accomplished by means of violence does not, on the other hand, render valueless the acknowledgment of the public debt, the definite obligation of paying it.

The state continues to exist in its capacity as such, and sooner or later the gloomy situations are cleared up, resources increase, common aspirations of equity and justice prevail, and the most neglected promises are kept.

The decision, then, which declares the obligation to pay a debt, whether it be given by the tribunals of the country or by those of international arbitration, which manifest the abiding zeal for justice as the basis of the political relations of nations, constitutes an indisputable title which can not be compared to the uncertain right of one whose claims are not recognized and who sees himself driven to appeal to force in order that they may be satisfied.

As these are the sentiments of justice, loyalty, and honor which animate the Argentine people and have always inspired its policy, your excellency will understand that it has felt alarmed at the knowledge that the failure of Venezuela to meet the payments of its public debt is given as one of the determining causes of the capture of its fleet, the bombardment of one of its ports, and the establishment of a rigorous blockade along its shores. If such proceedings were to be definitely adopted they would establish a precedent dangerous to the security and the peace of the nations of this part of America.

The collection of loans by military means implies territorial occupation to make them effective, and territorial occupation signifies the suppression or subordination of the government of the countries on which it is imposed.

Such a situation seems obviously at variance with the principles many times proclaimed by the nations of America, and particularly with the Monroe doctrine, sustained and defended with so much zeal on all occasions by the United States, a doctrine to which the Argentine Republic has heretofore solemnly adhered.

Among the principles which the memorable message of December 2, 1823, enunciates, there are two great declarations which particularly refer to these Republics, viz, "The American continents are henceforth not to be considered as subjects for colonization by any European powers," and " * * * with the governments * * * whose independence we have * * * acknowledged, we could not view any interposition for the purpose of oppressing them or controlling in any other manner their destiny by any European power in any other light than as the manifestation of an unfriendly disposition toward the United States."

The right to forbid new colonial dominions within the limits of this continent has been many times admitted by the public men of England. To her sympathy is due, it may be said, the great success which the Monroe doctrine achieved immediately on its publication. But in very recent times there has been observed a marked tendency among the publicists and in the various expressions of European opinion to call attention to these countries as a suitable field for future territorial expansion. Thinkers of the highest order have pointed out the desirability of turning in this direction the great efforts which the principal powers of Europe have exerted for the conquest of sterile regions with trying climates and in remote regions of the earth. The European writers are already many who point to the territory of South America, with its great riches, its sunny sky, and its climate propitious for all products, as, of necessity, the stage on which the great powers who have their arms and implements of conquest already prepared are to struggle for the supremacy in the course of this century.

The human tendency to expansion, thus inflamed by the suggestions of public opinion and the press, may, at any moment, take an aggressive direction, even against the will of the present governing classes. And it will not be denied that the simplest way to the setting aside and easy ejectment of the rightful authorities by European governments is just this way of financial interventions—as might be shown by many examples. We in nowise pretend that the South American nations are, from any point of view, except from the responsibilities of all sorts which violations of international law impose on civilized people. We do not nor can we pretend that these countries occupy an exceptional position in their relations with European powers, which have the indubitable right to protect their subjects as completely as in any other part of the world against the persecutions and injustices of which they may be the victims.

The only principle which the Argentine Republic maintains and which it would with great satisfaction see adopted, in view of the events in Venezuela, by a nation that enjoys such great authority and prestige as does the United States, is the principle already accepted, that there can be no territorial expansion in America on the part of Europe, nor any oppression of the peoples of this continent, because an unfortunate financial situation may compel some one of them to postpone the fulfillment of its promises. In a word, the principle which she would like to see recognized is that the public debt can not occasion armed intervention nor even the actual occupation of the territory of American nations by a European power.

The loss of prestige and credit experienced by states which fail to satisfy the rightful claims of their lawful creditors brings with it difficulties of such magnitude as to render it unnecessary for foreign intervention to aggravate with its oppression the temporary misfortunes of insolvency.

The Argentine Government could cite its own example to demonstrate the needlessness of armed intervention in these cases.

The payment of the English debt of 1824 was spontaneously resumed by her after an interruption of 30 years, occasioned by the anarchy and the disturbances which seriously affected the country during this period, and all the back payments and all the interest payments were scrupulously made without any steps to this end having been taken by the creditors.

Later on a series of financial happenings and reverses completely beyond the control of her authorities compelled her for the moment to suspend the payment of the foreign debt. She had, however, the firm and fixed intention of resuming the payments as soon as circumstances should permit, and she did so actually some time afterwards, at the cost of great sacrifices, but of her own free will and without the interference or the threats of any foreign power. And it has been because of her perfectly scrupulous, regular, and honest proceedings, because of her high sentiment of equity and justice so fully demonstrated, that the difficulties undergone, instead of diminishing, have increased her credit in the markets of Europe. It may be affirmed with entire certainty that so flattering a result would not have been obtained had the creditors deemed it expedient to intervene with violence at the critical financial period, which was thus passed through successfully. We do not, nor can we, fear that such circumstances will be repeated.

At this time, then, no selfish feeling animates us. Do we seek our own advantage in manifesting our desire that the public debt of states should not serve as a reason for an armed attack on such states. Quite as little do we harbor any sentiment of hostility with regard to the nations of Europe. On the contrary, we have maintained with all of them since our remembrance the most friendly relations, especially with England, to whom we have recently given the best proof of the confidence which her justice and equanimity inspire in us by intrusting to her decision the most important of our international questions, which she has just decided fixing our limits with Chile after a controversy of more than 70 years.

We know that where England goes civilization accompanies her, and the benefits of political and civil liberty are extended. Therefore we esteem her, but this does not mean that we should adhere with equal sympathy to her policy in the improbable case of her attempting to oppress the nationalities of this continent which are struggling for their own progress, which have already overcome the greatest difficulties and will surely triumph—to the honor of democratic institutions. Long, perhaps, is the road that the South American nations still have to travel. But they have faith enough and energy and worth sufficient to bring them to their final development with moral support.

And it is because of this sentiment of continental brotherhood and because of the force which is always derived from the moral support of a whole people that I address you, in pursuance of instructions from His Excellency the President of the Republic, that you may communicate to the Government of the United States our point of view regarding the events in the further development of which that Government is to take so important a part, in order that it may have it in mind as the sincere expression of the sentiments of a nation that has faith in its destiny and in that of this whole continent, at whose head march the United States, realizing our ideals and affording us examples.

Mr. BLAINE. Secretary of State John Hay sent to the minister of Argentina, in reply to Drago's communication of December 29, 1902, a memorandum in which he stated, without expressing assent to or dissent from the propositions set forth in the note of the Argentine Minister of Foreign Relations, the general position of the Government of the United States. Secretary Hay concluded his memorandum in these words; and I ask unanimous consent that they be inserted in the RECORD in the course of my remarks at this place.

The PRESIDING OFFICER. Without objection, it is so ordered.

The matter referred to is as follows:

Advocating and adjusting in practice in questions concerning itself to the resort of international arbitration in settlement of controversies not adjustable by the orderly treatment of diplomatic negotiations, the Government of the United States would always be glad to see the questions of the justice of claims by one state against another growing out of individual wrongs or national obligations, as well as the guarantees for the execution of whatever award may be made, left to the decision of an impartial arbitral tribunal before which the litigant nations, weak and strong alike, may stand as equals in the eye of international law and mutual duty.

Mr. BLAINE. President Wilson, in language at least, assented to the doctrine of inherent justice and fairness that the strong should not ride down the weak.

Mr. President, I desire also to insert in the RECORD excerpts from the messages and papers of President Wilson at this place in the course of my remarks.

The PRESIDING OFFICER. Without objection, it is so ordered.

The matter referred to is as follows:

The Department of State at Washington is constantly called upon to back up the commercial enterprises and the industrial enterprises of the United States in foreign countries, and it at one time went so far in that direction that all its diplomacy came to be designated as "dollar diplomacy." It was called upon to support every man who wanted to earn anything anywhere if he was an American. * * * If American enterprise in foreign countries, particularly in those foreign countries which are not strong enough to resist us, takes the shape of imposing upon and exploiting the mass of the people of that country, it ought to be checked and not encouraged. I am willing to get anything for an American that money and enterprise can obtain except the suppression of the rights of other men. I will not help any man buy a power which he ought not to exercise over his fellow beings.

* * * I hold it as a fundamental principle, and so do you, that every people has the right to determine its own form of government; and until this recent revolution in Mexico, until the end of the Diaz reign, 80 per cent of the people in Mexico never had a "look in" in determining who should be their governors or what their government should be. Now, I am for the 80 per cent. It is none of my business and it is none of your business how long they take in determining it.

* * * Do you suppose that the American people are ever going to count a small amount of material benefit and advantage to people doing business in Mexico against the liberties and the permanent happiness of the Mexican people? Have not European nations taken as long as they wanted and split as much blood as they pleased in settling their affairs, and shall we deny that to Mexico because she is weak?

* * * This was our guiding principle; that property rights can be vindicated by claims for damages, and no modern nation can decline to arbitrate such claims; but the fundamental rights of humanity can not be.

Mr. BLAINE. Before the Southern Commercial Congress in 1913 President Wilson said:

You hear of " concessions " to foreign capitalists in Latin America. You do not hear of concessions to foreign capitalists in the United States. They are not granted concessions. They are invited to make investments. The work is ours, though they are welcome to invest in it. We do not ask them to supply the capital and do the work. It is an invitation, not a privilege, and the States that are obliged, because their territory does not lie within the main field of modern enterprise and action, to grant concessions are in this condition, that foreign interests are apt to dominate their domestic affairs—a condition of affairs always dangerous and apt to become intolerable. * * * They [the Latin American states] have had harder bargains driven with them in the matter of loans than any other people in the world. Interest has been exacted of them that was not exacted of anybody else, because the risk was said to be greater, and then securities were taken that destroyed the risk—an admirable arrangement for those who were forcing the terms.

* * * Human rights, national integrity, and opportunity as against material interests—that is the issue which we now have to face. I want to take this occasion to say that the United States will never again seek one additional foot of territory by conquest. She

Case 3:19-cr-00040-TCB Document 340 Filed 10/19/20 Page 16 of 66

will devote herself, to showing that she knows how to make honorable and fruitful use of the territory she has, and she must regard it as one of the duties of friendship to see that from no quarter are material interests made superior to human liberty and national opportunity.

If it were not drawing so close to 8 o'clock, when the Senate goes into executive session, as I understand, it would be worth while to read the messages of President Wilson where he outlines most eloquently and most patriotically the position of America for over a century, as I have endeavored to interpret that history, though he failed in practice to observe our traditional policy in his treatment of Haiti. I will not discuss that failure at this time. The Senator from Utah [Mr. KING] this afternoon portrayed the consequences that flow from the acts of tyranny that have prevailed in Haiti and in San Domingo for these many years.

Turning to a later President, I find in a campaign speech at Marion, Ohio, in August, 1920, that Mr. Harding declared:

If I should be elected President * * * I will not empower an Assistant Secretary of the Navy to draft a constitution for helpless neighbors in the West Indies and jam it down their throats at the points of bayonets borne by United States marines, nor will I misuse the power of the Executive to cover with the veil of secrecy repeated acts of unwarranted interference in the domestic affairs of the little republics of the Western Hemisphere, such as in the last few years have not only made enemies of those who should be our friends, but have rightfully discredited our country as their trusted neighbors.

Encouraged by this pronouncement, the President of Haiti asked for the withdrawal of the American marines and for the return of effective control of their country to the elected Haitian officials. The policy of the Harding administration, however, once in power, pursued substantially the policy of the Wilson administration.

The voice and the hands do not square.

The voice is Jacob's voice, but the hands are the hands of Esau.

The present administration has consistently parroted its predecessor.

Mr. KING. Mr. President, will the Senator yield?

Mr. BLAINE. For a question.

Mr. KING. I might say that quite recently, acting under the authority of the United States, in Haiti the shreds of the constitution which were left were destroyed; the courts have been made the mere tools of those in authority, and there is less liberty enjoyed by the people now than ever before.

Mr. BLAINE. I thank the Senator.

Mr. BINGHAM. Mr. President, will the Senator yield for a question?

Mr. BLAINE. If it is a very short one, Mr. President, and does not involve a long discussion.

Mr. BINGHAM. In view of what the Senator has just said about the present administration, what does he think about our action in San Domingo under this administration?

Mr. BLAINE. Mr. President, I do not expect to conclude my remarks this afternoon, as there are but a few moments left. The very question which the Senator from Connecticut has asked will be answered in the course of my remarks as they may be given in the future. I will, indeed, very gladly answer the Senator definitely and specifically. This afternoon, at this time, it is utterly impossible to review the acts of imperialism, they are so many, and they are so involved, and they involve more than imperialism by the Government alone. They involve not only imperialism by the Government acting through our temporary rulers, but also the imperialism of the dollar, as deadly, as stifling, as paralyzing, as is the imperialism of a government acting through force of arms, and sometimes more effective.

Mr. BINGHAM. Mr. President, will the Senator yield?

Mr. BLAINE. I shall discuss that question, and I shall discuss specifically the imperialism, financial and governmental, that has taken place in 14 of the 20 southern Republics. History is fertile with the facts in support of that charge.

Mr. BINGHAM. Does the Senator consider our action in getting out of Santo Domingo and handing them back their government an act of imperialism?

Mr. BLAINE. We are not out; far from it; and I shall endeavor to demonstrate that in connection with my remarks upon the specific question of imperialism as it relates to 14 southern Republics.

In the abandonment of right and international morality force has been substituted—force against weaker and smaller nations, threatened force in the collection of debts bearing usurious and unconscionable interest, intervention to protect concessions by foreign governments, and actual force by the American Government.

Why is there one rule for small and weaker governments and another rule for a strong government? What nation of the

world is landing armies in Russia? What nation has dared to send a battleship against the Russian Government? What nation has called to arms its armies and navies against the eastern giant? Are American property and American rights less sacred in Russia than in Nicaragua, in Haiti, in Venezuela, in Santo Domingo, or in any other southern neighbor? Yet Russia has repudiated all obligations held by Americans, has confiscated all the property of American nationals, and what Russia has done to America she has done to the other nations of the world.

Why has not the modern system of international immorality sent to Russia its armies, its navies, its airplanes, to demand the return of property in the fulfillment of obligations to the citizens of other countries? Ah, sirs, the answer is plain. Force! Force defies the stronger nations. Force beats back the stronger nations. Force commands the weaker nations.

Force subjugates the weaker nations, and that is the international immorality condemned by all the Presidents of the United States who believed in America, her traditions, her history, by all who hoped for her future.

Mr. President, those Presidents held as a sacred trust the destiny of America. That destiny, according to their conception, was to be one of peace, one of justice, one of equity. After all, the foundation of it all is that the strong, whether an individual or a nation, has no right to beat down the weak. That is the doctrine, as enunciated by President Monroe. It means nothing more nor less than a doctrine of self-preservation, self-preservation for America, preservation of the sovereignty and the independence of free governments in the Western Hemisphere.

Mr. President, there are but five minutes left, and there may be some other matters to come before the Senate, and I shall yield at this point, giving notice that upon the convening of the Senate, at an appropriate time, I shall undertake to discuss specifically the imperialism that has been enforced upon our southern neighbors, an imperialism of the dollar, and that imperialism is not and has not been the voice of America, it has been the voice of those who have hauled down the emblem of purity, justice, and truth and in its place have hoisted the black flag, the flag of piracy—the emblem of individual authority.

[At this point Mr. BLAINE yielded the floor for the day.]

### Friday, February 3, 1928

Mr. BLAINE. Mr. President, the other day in a colloquy with the Senator from California [Mr. SHORTRIDGE], of whom I am sorry he is not in attendance this morning—in connection with President Cleveland's message demanding the return from the Senate of the treaty for the annexation of the Hawaiian Islands on the ground that the treaty had been obtained through force and coercion, the Senator from California stated that Cleveland hauled down the American flag and that I would do so also.

Mr. President, when President Cleveland hoisted the American flag he raised it in honor and not in dishonor. As for myself, I shall raise my voice against the use of the American flag to shield the scoundrel or glorify the tyrant. That is my answer to the suggestion of the distinguished and physically towering Senator from California.

Yesterday I had proceeded in a general way to outline the traditional history of America as declared by the Presidents of the United States who thought in terms of America and the future security of our Government and sought to maintain the character that America should possess. I pointed briefly to the imperialistic voyage upon which we are now embarked through the maladministration, the misinterpretation, and the misconstruction of the fundamentals of the Monroe doctrine. This morning, sirs, it is proper to inquire wherein has America been imperialistic. The apologists for the philosophy of might amid evil will deny our imperialistic sway in beautifully spun phrases, impassioned appeals against "rebels" and "bandits," without whom America would not have been the free Republic she is to-day, with ferocious denunciation of "anarchy," under the pretense of noble sentiments, it will be asserted that the rod with which we smite our southern neighbors will do them good; that America, with her vaunted claim to holiness, must impose her will, her customs, and her standards upon weaker peoples.

Let us turn to Cuba. With our naval base there, with our marines sometimes found in the interior of that country, and with the threat of the sword held over the Cuban people, Cuba is deprived of her full right of sovereignty. Ah, but you may say Cuba entered into a treaty granting to America the right to limit and to subjugate Cuban sovereignty and to control the political and financial policy and destiny of that land through absentee landlords and American bankers. When Cuba submitted to that degradation she was incompetent and impotent to defend herself. No less authority than Dr. Charles Wilson Hackett, professor of Latin-American history in the University

of Texas, in an article in Current History in September, 1927, said—and this gives the attitude of the Cuban people to-day—

* * * the strength of nationalist and anti-American sentiment in the island was recognized by President Machado in May of this year [that is, 1927] when he admitted that on his recent visit to the United States he had proposed to the United States Government that there should be a further severance of the bonds that bind Cuba to the United States.

America is exercising a mandate over the "Pearl of the Antilles."

Imperialism: Turn to Haiti, where officers of the army and navy, backed by an American Army, govern or allegedly protect the Haitians; where an American financial adviser dictates the finances and permits loans with United States Government guaranties and where the Haitian Government was set up by force of American arms, and the Haitian constitution written by the personnel of the war-making power of America, and the adoption of that constitution ratified at an election which, if held in America under like circumstances, would be declared null and void. There was no free ballot. The polling places were in charge of American marines. That which is guaranteed to every community in the United States in the holding of free elections was denied to the Haitians. The constitution imposed upon the Haitian people denied them guaranties compatible with a free government and a free people, and its provisions were made satisfactory to American exploiters.

The presence of armed forces carried its tyranny to such excesses as to deny to an honorable and distinguished Member of this body the right of freedom of passage through that territory—his way barricaded and before him the rattle of the sabre and the menacing muzzle of the gun. Such are the consequences that flow from tyranny.

There is just one step further to be taken by the administration when tyranny will be the rule in America and when citizens of this free Republic will be denied free passage and access to every part of the United States. It takes no stretch of the imagination, if this sort of thing is to be passed by without protest, to visualize a time when we here in America may well find ourselves under the yoke of a despotism and a tyranny unequaled by the czarism of Russia.

Go to San Domingo, if you please, where an army was landed, the President of the Republic dismissed, and its Congress dissolved, and where for years the military power of an alien government administered its affairs by military decrees, enforced by a military government supported by some 2,500 marines. Of course, San Domingo may be given back her sovereignty, her independence. Under what circumstances? Providing she ratify the military misrule and allow America to collect her customs and control the finances of her country.

I was asked by the distinguished Senator from Connecticut [Mr. BINGHAM] yesterday if I approved of the act of the present administration in withdrawing from San Domingo. I do approve of the withdrawal of the marines, but America is not yet out of San Domingo by any means. I quote again from Doctor Hackett, of the University of Texas, as my authority:

In 1924, after the Dominican Government had agreed—

Note the terms imposed upon that weak people—

to ratify all the financial acts of the American military administration and to sign a new treaty—

A new treaty negotiated in order for her to gain some semblance of sovereignty—

providing for the collection and disbursement of Dominican revenues by a United States receiver general until all loans, including a new one—

The administration got out of San Domingo? No. It got in deeper with its dollar diplomacy—

not to exceed a total of $25,000,000 shall have been paid—

The United States marines were withdrawn.

But, sirs, America is still in San Domingo with a power as great as the power of force, and that is a strangle hold upon the finances of San Domingo. Let any nation have a strangle hold upon the finances of another country and that country is subjugated to the will and, perchance, to the whim of the nation which holds such strangle hold through loans, sometimes, if you please, forced upon weaker peoples.

Panama was organized by a coup d'état, engineered from the Capitol at Washington in the name of expediency.

Pass on to Nicaragua, where America has maintained an Army of some sort for the last 15 or 16 years, established a government opposed by two-thirds of the Nicaraguan people themselves, a government administered favorably to American private interests, with the approval of the State Department,

collecting the customs, owning the national bank and the railroad, and exercising complete control with imperialism at its worst.

Some of us protested when the French nation sent airplanes with death-dealing bombs to murder and kill the hill people in northern Africa. Yet from this Capital, the citadel of our Government, orders have gone forth to send airplanes to fly over the helpless people of Nicaragua with bombs to destroy innocent noncombatants.

Mr. President, if this were the year 1868 the Senate would ring with a protest from one of the most distinguished Americans who ever was privileged to occupy a seat in this body, a protest against this "dance of blood," as Senator Sumner then referred to another conflict of this character.

In Honduras the imperialism practiced consists of the acts of an American minister and two American corporations which constitute the dominating and controlling powers, sometimes assisted by marines, under the alleged claim of protection of American life and property—yes, protecting the very instrumentalities that are there for one purpose, and that is material exploitation.

What imperialism except the imperialism of Great Britain is to be compared with that now imposed on the six Republics, with the military forces to sustain alien economic and financial control?

But imperialism sometimes goes where the Army does not go. Financial imperialism denies sovereignty and destroys liberty and defeats justice quite as effectually as imperialism by the sword.

Salvador borrowed money from American bankers at the extortionate rate of 8 per cent, plus some other and extra charges, guaranteed by the customs receipts of the country, collected by the bankers; and the Secretary of State has submitted to an agreement with the bankers that when differences arise between the sovereignty of Salvador and those bankers, the question must be referred to the Chief Justice of the United States, whose decision will be final—perhaps final, but, under the modern diplomatic policy, not final until the sword has been unsheathed as the means to force payment of the debt. So they have attached the Supreme Court of the United States to this chariot of imperial despotism.

Then comes the ugly story in connection with Colombia. Having despoiled her of her territory, we flaunted our gold before her, and compounded an offense against her by settling upon her $25,000,000 balm money in payment of a wrong and in the acknowledgment of a wrong. We supervise even the expenditure of the money we have paid Colombia in compromise for the despoliation of her territory.

Less intimately connected with our Government, the financial imperialism has extended to Ecuador, and an American financial adviser has been engaged, and to Peru likewise, with an American financial adviser directing the fiscal policy of the Government, where a loan is pending or has been recently consummated by American bankers, guaranteed by the customs receipts of that sovereignty, and collected by aliens, backed by the new policy of the State Department in the supervision of foreign loans.

Bolivia, weak financially, borrows $24,000,000 under the jurisdiction of a commission of American bankers, which loan is guaranteed by all of the country's customs, the stock of the Government bank, the property of the Government railroad, and all the internal revenues of the country, if alien bankers so determine. When they make that determination, then American must, in aid of those American bankers, force compliance with the mandate of private institutions. Thus, a complete financial imperialism has driven a hard bargain with this southern Republic, so hard and so fast that alien interests may dictate Bolivia's policies, economic and financial, and that dictatorship under the new policy of our State Department.

Thus over another five countries to our south the sword of a financial Damocles hangs; and if circumstances become such that there will be default in the payment of interest or principal, then the American imperial policy of force will be brought into play and American sons will be called to foreign lands to give their blood and their lives to collect dollars for the American Shylocks.

Guatemala and Costa Rica are not without experience or without knowledge of "dollar imperialism." They likewise will feel the heavy hand of armed forces should the god of fortune cease to shine favorably upon those sun-kissed neighbors of the south.

And Mexico, the most immediate and perhaps the most promising for an American financial debauch, where a third of the nation's wealth, nearly three-fourths of the oil lands, and 54,000,000 acres of her fertile soil, an area as large as France, Spain, Portugal, and Switzerland, are in the control of foreign and alien interests, with the consent of the American Govern-

ment, and, if necessary to carry out the exploitation of those who would devastate Mexico, with the backing of the American Army.

Mr. SHORTRIDGE. Mr. President——

The PRESIDING OFFICER (Mr. BINGHAM in the chair). Does the Senator from Wisconsin yield to the Senator from California?

Mr. BLAINE. I will suggest to the Senator from California in all good nature that I sat at his feet when he gave that splendid advice not to be interrupted during the course of remarks.

Mr. SHORTRIDGE. I am about to leave the Chamber. Will the Senator permit me to ask one question?

Mr. BLAINE. I wish the Senator from California to know that he is a splendid preceptor, and he has influenced me to such an extent that I am sorry I can not yield.

Mr. SHORTRIDGE. I should like to ask one question, and the Senator can answer it in a few words.

Mr. BLAINE. I will give the opportunity, when I close, for any Senator to ask any question upon any matter which I have discussed or failed to discuss in connection with this subject. I will be very generous about it.

Mr. SHORTRIDGE. But I know the Senator would be glad if I asked this question.

Mr. BLAINE. My generosity, I assure the Senator, will exceed his demands.

We find 14 out of 20 of the Latin-American Republics to the south under the financial or military domination of alien people and alien governments, victims of the orgy of imperialism.

I do not want the proof in support of the statement of these conditions to rest upon my feeble efforts. I ask the Senate to bear with me for I know that long quotations are sometimes tedious. I hold in my hand an article written by Samuel Guy Inman. He has been instructor of international law at Columbia University, instructor at the Union Theological Seminary at Chicago; he has been connected with the Federal Council of Churches in America; secretary of the Board for Christian Work in San Domingo; and is secretary of the Commission for Cooperation in Latin America; and I submit that his experience and his broad knowledge of the affairs to the south of us are worth our consideration.

He says, in an article in the Atlantic Monthly of July, 1924:

> In these smaller countries of the south, controlled by our soldiers, our bankers, and our oil kings, we are developing our Irelands, our Egypts, and our Indias. So far they are weak and we have been able to hide them from others. But at the rate the world is moving they can hardly be expected to remain always powerless and isolated. Our North American Christian civilization will find its final test in the way we treat our next-door neighbors. We are piling up hatreds, suspicions, records for exploitation and destruction of sovereignty in Latin America, such as have never failed in all history to react in war, suffering, and defeat of high moral and spiritual ideals.

To quote further from this able author as a recapitulation of what I have indicated with respect to both military and financial imperialism on the part of the State Department and the administration at Washington:

> Out of the 20 Latin American Republics 11 of them now have their financial policies directed by North Americans officially appointed. Six of these 10 have the financial agents backed by American military forces on the ground. (This includes Cuba, which has no official financial adviser; but General Crowder has so acted during recent financial readjustments.) Four of the remaining half of these southern countries have their economic and fiscal life closely tied to the United States through large loans and concessions, giving special advantages to American capitalists.

> This leaves the six countries of Brazil, Argentina, Chile, Uruguay, Paraguay, and Venezuela as the only ones outside the circle of North American financial control. While Americans have recently made large loans or secured extensive concessions from these last-named countries, they have, so far as the author knows, not yet acquired such a preponderant influence as to dictate their fiscal policies. But these six countries—

He says, and he has observed their attitude on the ground—

> are trembling in their boots, wondering how long before the inevitable must arrive!

> Along with this economic and military dominance goes a dominance in the internal affairs of Latin America. In the Caribbean countries especially, the word of the American minister is the most important factor for any government to consider. It is impossible for anyone who has not come into close contacts with these countries to realize how completely their governments are held in the hollow of the hand of the State Department at Washington. In fact the government officials of these countries are so far accustomed to doing Washington's will that the State Department frequently finds it necessary to refuse

to do things related to internal order that native officials, often indebted to their big brother for their position, request it to do. This creates a strong inconsistency in the policy of the State Department from time to time. What one official refused to do as interference with internal order, another will do, and even the same official will judge differently at different times. At one time we allow a revolution, at another we forbid it. So it happens that, as with a fond parent who at one time will insist on making all decisions for his son, at another will throw him entirely on his own resources, at one time will pay the forged check, at another will let him go to jail, so it is with these little countries—pawns on the international chessboard, as Mr. Powers says—who never know what is to happen to them. Usually the State Department seems hesitant about making suggestions to one of these smaller governments concerning improvement in a national educational program, lest this be considered as interference in internal affairs. But it is always sure of the right to do anything that comes under the formula: "Protection of American lives and property."

The upbuilding of those people and those countries, through the aid and assistance of American educators, is denied, the subjugation of those people is compelled, by the State Department and the administration. I am not speaking of this administration alone; I am speaking of the foreign policy of this Government for the last 25 years. They demand by the sword, by the gun, when questions of finance are considered, when property belonging to American citizens is alleged to be jeopardized. Not so when it comes to the question of extending to those countries the beneficence of American educational institutions.

Since American lives seldom are in danger, American property naturally gets first place. In fact, it is only in countries where American property interests are paramount that this tutelage is employed.

Just another brief expression of the same author:

> We have invited a number of Latin-American countries, as a special work of friendship, to send their officers to West Point for further training. Our Government has never sent an educational mission to Latin America, nor offered scholarships in her scientific or cultural institutions to Latin Americans where unofficial educational missions—like the one recently going to Peru—and official educational advisers, like the one that went to Nicaragua have met with difficulties, it has let them go down in defeat and withdraw in ignominy.

He concludes by painting a picture well worth America's observation. He says:

> *     *     *     *     *     *     *

> Altogether this is a dark picture. It is a severe indictment of our imperialism—an imperialism which the author believes has not been developed deliberately, but has stolen over us as a part of the materialistic spirit of the times. It is a departure from the ideals of our fathers. The North American visitor in the Caribbean these days, sensitive to those ideals, often blushes with shame and suffers the deepest humiliation on beholding sights enacted in the name of our fair America—acts which his fellow citizens at home would deem impossible. So one who has seen much of these things and has become alarmed at their rapid spread is constrained to risk all the penalties of plain speaking in order to challenge this un-American movement—un-American although some of the finest men one can meet have been caught up in its onrush. These men have often built good roads, established sanitary codes, and enforced peace. But these are not worth the surrender of American principles, the bowing before materialistic gods, the hatreds and the sacrifice of the spiritual, which the program involves. Even if such a program should help Latin America, the people of the United States can not go on destroying with impunity the sovereignty of other peoples, however weak, cutting across the principles for which our fathers fought, without the reaction being shown throughout our whole body politic.

> Some day we shall realize that the whole rotten mess of investigation now being graced with at Washington runs directly back to the mental attitudes and the combinations involved in the policy of "cleaning up" our next-door neighbors—a phrase which may seem to have moral significance to the average innocent citizen and official, but which, for the privileged few, takes on the more modern significance of "cleaning out." No one objects to legitimate business with our neighbors. On the contrary, it is vital to all concerned. But the continuance of this dollar diplomacy, with its combination of bonds and battleships, means the destruction of our Nation just as surely as it meant the destruction of Egypt and Rome and Spain * * * and all the other nations who came to measure their greatness by their material possessions rather than by their passion for justice and by the number of their friendly neighbors.

Mr. President, when I speak I speak for my country and her honor, I speak for her future and for the generations to come. I know America is strong, I know she is powerful, I know that she can by force of arms conquer, subjugate, and annex the territories to our south and the lands to our north. Is there anyone who entertains such a doctrine or thought so contrary to the ideals of America? I hope not. I believe not, I think

Case 3:19-cr-00407-St Document 36 Filed 10/19/20 Page 19 of 66

that this whole tendency to imperialism has grown out of the philosophy so frankly stated by President Taft. It is an imperialistic philosophy; its end can be nothing but the destruction of our Government and our institutions.

European imperialism has been denounced from the floor of the Senate. Presidents of the United States have issued warnings and ultimatums against European imperialism. Yes; we have gone to war to defeat imperialism elsewhere, and continents have been drenched in blood that imperialism might not engulf the world. Yet we have projected our far-flung battle lines into Central America, beyond and over South America, into China, with our indefensible extraterritorial policy, and over the islands of the sea, until to-day our modern American statesmen, having in their hands the destiny of our Nation, stand before the nations of the world as the monsters of imperialism.

The doctrine of inherent fairness and justice that I am discussing, and in which I believe, is not of my origin. I have given the sources from which such doctrine flows.

At this time I ask unanimous consent to insert in the RECORD excerpts from an article in Foreign Affairs for January, 1927, written by Mr. Morrow, formerly of the firm of Morgan & Co., whose appointment by the President as America's ambassador to Mexico was recently confirmed by the Senate. I am not submitting this as evidence of the rectitude of the position taken by the Presidents to whom I have referred with approval, but it is advice, it is advice to the commercial interests of America, and I hope that they may heed it, so that those commercial interests may appreciate that this imperialism of the dollar, this dollar diplomacy, will not serve, by and large, the commercial interests of America.

The PRESIDING OFFICER. Is there objection?

There being no objection, the article was ordered to be printed in the RECORD, as follows:

Loans are made to foreign governments in reliance upon the capacity and the good faith of those governments. The intelligent investor recognizes that in the long run a government which defaults upon its obligations hurts itself even more than it hurts its creditors. Even in cases where specific taxes or customs are allocated for the service of a loan the main reliance of the creditor must be upon the desire of the debtor government to maintain the particular revenues and keep them available. Even when a foreign expert is placed in charge of revenues the arrangement is helpful only when made with the hearty concurrence of the debtor government and with the belief and expectation on the part of the debtor government that the fiscal arrangement will redound to its own advantage.

If the foregoing be true, how safe are these investments? To my mind that inquiry is much the same as an inquiry as to the safety of a domestic bond. Some domestic bonds turn out to be good and some turn out to be worthless. There is no reason to expect that it will be otherwise with foreign bonds. Those nations who are borrowing in America because they actually need the money for a constructive purpose, who have a solidarity of national feeling and a sense of the meaning and the value of national credit; who are not incurring obligations beyond what may fairly be considered their capacity to handle; all those nations may be expected to pay their debts. Here again the responsibility rests heavily upon the investment banker in recommending investments. The banker must never be lured, either by the desire for profit or by the desire for reputation, to recommend an investment which he does not believe to be good. But, fundamentally, the reliance of bankers and investors is upon the capacity and, above all, upon the good faith of the foreign government. The foreign government must be able to pay, and it must want to pay.

If it is true that it is upon good faith that lenders to foreign governments primarily rely, it is no less true that it is upon good faith that lenders rely in almost all of their domestic dealings. Of course, there is a sanction ultimately applicable to domestic contracts. The proper legal steps may be taken; the breach of the contract may be proved; and execution may be issued through the sheriff. But we do not put much reliance upon the help of a sheriff in enforcing contracts. We do not willingly deal with one upon whose property we expect to levy execution. When we need the sheriff to help collect a loan we recognize that our venture has turned out a failure. We are then simply trying to save some planks from a shipwreck. In the overwhelming majority of business transactions we rely upon the ability and the willingness of the debtor to pay. On no other principle could modern business be conducted.

There is no international sheriff. But there still remains our reliance upon good faith, our reliance upon that law which is older than statute law—the acknowledged custom of mankind. The credit of governments is not easily built up. It may easily be shattered. And it must never be forgotten that there are rules of conduct accepted by the silent approval of civilized man, the breach of which hurts the one committing the breach much more than the one against whom it is committed. If good faith can not be relied upon it is better that the

loan be not made. The words with which Hugo Grotius closed his great book more than 300 years ago are true: "Not only is each commonwealth kept together by good faith, but that greater society of which nations are the members. If faith be taken away the intercourse of men is abolished."

Mr. BLAINE. Mr. President, if the commercial interests can not rely on the good faith of our southern neighbors, they have no moral right to come to this Government and ask American boys to make sacrifices to protect their so-called property rights in other countries.

At this point I want to quote from that distinguished statesman, James G. Blaine. He understood the traditional policy of America. He understood the obligations resting upon American citizens in other countries. He understood the obligations of citizens of another country in America. When that very unfortunate occurrence took place in New Orleans in connection with the Mafia, where a mob, it is alleged, murdered certain Italian citizens, America was faced with the very problem which I have been discussing. A note was sent to the American Government by the Italian representatives. Mr. Blaine was then Secretary of State. That was in April, 1891. Italy had entered into a treaty with America, in 1871. To that treaty Mr. Blaine refers. The treaty extends no additional rights. It merely embodies what were well recognized principles of international law. Mr. Blaine discussed the rights of subjects of other nations in America. In his answer to the Italian representative he referred to a declaration made by Mr. Webster to the Spanish minister of Webster's time. Webster said:

This Government supposes that the rights of the Spanish consul and public officers residing here under the protection of the United States Government are quite different from those of the Spanish subjects who have come into the country to mingle with our citizens and here to pursue their private business and objectives. The former may claim special indemnity, the latter are entitled to such protection as is afforded to our own citizens.

Mr. Blaine quoted that as an authority for what he later declared to be the policy of America. He said:

The United States did not by the treaty with Italy become the insurer of the lives or property of Italian subjects resident within our territory.

No more than the Government of the United States is the insurer of the lives and property of American subjects in any other country.

No government is able, however high its civilization, however vigilant its police supervision, however severe its criminal code, and however prompt and inflexible its criminal administration, to secure its own citizens against violence prompted by individual malice or by certain popular tumult. The foreign resident must be content in such cases to share the same redress that is offered by the law to the citizen; and has no just cause of complaint or right to ask the interposition of his country if the courts are equally open to him for the redress of his injuries.

Had the President of the United States read that message, we might have had some constructive suggestion by America placed before the Pan American Congress.

Continuing Mr. Blaine said:

The treaty in the first, second, third, and notably in the twenty-third articles clearly limits the rights guaranteed to the citizens of the contracting powers in the territory of each to equal treatment and to free access to the courts of justice.

Without that provision in the treaty such would have been the custom and the law amongst civilized nations. The treaty merely contained a recognition of what then and now is the law of nations.

Foreign residents are not made a favored class.

What is the case in South America? Every foreign resident, be he an American or an alien from some other government, is put into a favored class in those countries and is given special privileges not accorded to the citizens of the country to which those aliens go. That is not the doctrine that Blaine advanced in 1891.

It is not believed that Italy would desire a more stringent construction of her duty under the treaty. Where the injury inflicted upon a foreign resident is not the act of the government or its officers but of an individual or of a mob—

And, if you please, as in Nicaragua, of the so-called bandits—it is believed that no claim for indemnity can justly be made unless it shall be made to appear that the public authorities charged with the peace of the community have connived in the unlawful act or, having

Exhibit F     Page 19 of 66

timely notice of the threatened danger, have been guilty of such gross negligence in taking the necessary precautions as to amount to connivance.

And in such cases only did Blaine advocate that the President recommend to Congress their consideration of indemnity in those cases, not upon the proposition as a matter of right but, rather, as a friendly act, the act of a government such as we profess our Government to be.

This knowledge and these convictions have not rested with Americans alone. I will take up briefly the opinions of the ablest minds in the international world in support of such doctrine. Let me go beyond America and consult distant statesmen on this proposition. Lord Palmerston, the most imperialistic of British statesmen, in a circular in 1848 addressed to the British representatives in foreign states, did not go the full gamut of imperialism, as have our modern American rulers. I quote from his memorandum to the British representatives:

It has hitherto been thought by the successive Governments of Great Britain undesirable that British subjects should invest their capital in loans to foreign governments instead of employing it in profitable undertakings at home; and with a view to discourage hazardous loans to foreign governments, who may be either unable or unwilling to pay the stipulated interest thereon, the British Government has hitherto thought it the best policy to abstain from taking up as international questions the complaints made by British subjects against foreign governments which have failed to make good their engagements in regard to such pecuniary transactions.

For the British Government has considered that the losses of imprudent men, who have placed mistaken confidence in the good faith of foreign governments, would prove a salutary warning to others and would prevent any other foreign loans from being raised in Great Britain, except by governments of known good faith and ascertained solvency.

Mr. Balfour, Prime Minister, in the British Parliament in December, 1902, in a debate relating to the British controversy with America respecting Venezuela, said:

I do not deny, in fact I freely admit, that bondholders may occupy an international position which may require international action; but I look upon such action with the gravest doubt and suspicion, and I doubt whether we have in the past ever gone to war for the bondholders, for those of our countrymen who have lent money to a foreign government; and I confess that I should be very sorry to see that made a practice in this country.

Sir Henry Campbell-Bannerman, in discussing before the House of Commons the action of the British Government in Venezuela, said:

I venture to say that nothing could be more mischievous than that we should ever seem to accept the doctrine that when our countrymen invest in risky enterprises in foreign countries and default follows, it is a duty to rescue them. Every man who invests money in a country like Venezuela knows what he is doing. It would, I suppose, not be quite accurate to say that great risks always mean high dividends, but it is more nearly accurate if you put it the other way about—that high dividends generally involve great risks.

Our American banks, in order to receive their usurious rate of interest and high dividends, are willing to take those risks in the countries to the south of us only when the Government of the United States guarantees the payment of those risks by the force of arms used against those governments. He further says:

that if the whole power of the British Empire is to be put behind the investor, his risk vanishes and the dividends ought to be reduced accordingly.

(At this point Mr. BLAINE yielded to Mr. KING, who suggested the absence of a quorum, and the roll was called.)

Mr. BLAINE. Mr. President, it must therefore be observed that the imperialism of Great Britain at the beginning of this century was less marked than that expressed by American rulers in the last quarter of a century. Even among our imperialistic advocates there has been considerable floundering, both in expression and conduct. That has been clearly demonstrated in my remarks with reference to some of the Presidents of the United States; but other American administrators have floundered about on the all-important questions confronting America.

Between 1901 and 1907, when the second Hague Conference met, America's representatives changed their ground, and the American delegates advocated the principle that national debts should be ascertained and collected by some process of law and not by arbitrary force. I quote from the instructions of Mr. Elihu Root, then Secretary of State, to the American delegates to The Hague Conference in 1907. He said:

It has long been the established policy of the United States not to use its Army and Navy for the collection of ordinary contract debts

due to its citizens by other governments. This Government has not considered the use of force for such a purpose consistent with that respect for the independent sovereignty of other members of the family of nations which is the most important principle of international law and the chief protection of weak nations against the oppression of the strong. It seems to us that the practice is injurious in its general effect upon the relation of nations and upon the welfare of weak and disordered States, whose development ought to be encouraged in the interests of civilization; that it offers frequent temptation to bullying and oppression and to unnecessary and unjustifiable warfare.

I wish that this administration might have heeded the instructions of Mr. Root as given to the American representatives at The Hague in 1907.

Secretary Root at Rio de Janeiro on July 31, 1906, incident to his visit to South America, in a public address said:

We deem the independence and equal rights of the smallest and weakest member of the family of nations entitled to as much respect as those of the greatest empire, and we deem the observance of that respect the chief guarantee of the weak against the oppression of the strong. We neither claim nor desire any rights or privileges or powers that we do not freely concede to every American Republic.

That was the traditional American doctrine until the last quarter of a century. Adherence to the traditional Monroe doctrine enunciated in the early years of the present century, lived only for a short period and consisted only of empty words. Yet Mr. Root expressed the true traditional policy of America that kept us at peace with the world for over a hundred years. He said:

The United States * * * ought to assert no rights against a small State because of its weakness which it would not assert against a great State, notwithstanding its power.

Mr. President, liberty and justice, which gave rise to America's birth, have been slaughtered in their own house, and the Declaration of Independence has been ravished by the modern diplomacy of the dollar.

Again and again either misguided or evil statecraft has engaged in conduct which Charles Sumner in his place in this Chamber so aptly described as the "dance of blood." Are we to continue this "drama of blood" against which Sumner rebelled?

I know commercial advantage may come to American business and industry by extending America's sway over our southern neighbors. To whom will that commercial advantage accrue? To the great majority of the industrial plants of America? Will it accrue to the large commercial interests of America or will it accrue only to a small group?

The advantages that come through this dollar diplomacy are limited to but a small group of industrial and commercial interests in America. This diplomacy gives no concern to the vast majority of our industrial organizations and our commercial enterprise. Moreover, this dollar diplomacy offers the opportunity for certain industrial development to be nurtured to our south by means of cheap labor, living under environments which ought not to be asked of American labor. Sirs, the whole trend of this dollar diplomacy is against the best interests both of our commercial and of our industrial development as a whole, and results only as a special benefit to those who have chosen to go to South America—and they are limited in number—only for the purpose of reaping greater dividends, instead of investing their money in constructive pursuits at home.

I know the people of America know that instead of cultivating friendships and good will in those southern Republics we have created for America, her business interests and her commerce and her industries, hatred—an unforgetting hatred.

President A. Lawrence Lowell, of Harvard, said:

Some Americans, while professing a faith in the right of all peoples to independence and self-government, are really imperialists at heart. They believe in the right and manifest destiny of the United States to expand by overrunning its weaker neighbors. They appeal to a spirit of patriotism that sees no object, holds no ideals, and acknowledges no rights or duties but * * * aggrandizement.

And so American commerce and American industry will come to grief through this process of imperialism extended by our Government to the south.

America's modern commercial, financial, and military imperialism has destroyed the constructive, far-visioned purposes of Secretary of State Blaine, who laid a foundation for national friendliness and commercial development between America and our southern neighbors, upon which foundation, had we builded, America's commercial and industrial development would have expanded as our friendships increased. Instead, the tyranny of the dollar has alienated the friendship of our neighbors and driven their commercial business to other parts of the world,

and as a result the end can be nothing other than grief for America's commercial and industrial interests.

But far worse than that is the denial of independence, of justice, of sovereignty to our weaker neighbors.

The repudiation of our American traditional policy means war, and war without the constitutional mandate of Congress. War in its simplest form is the use of violence and force against another nation. When a government's military or naval forces occupy the territory of another nation by force of arms, that is war. That is exactly the warfare in which we are engaged to-day.

America is not threatened by any nation in the Western Hemisphere. No assault has been made upon our country by any of those nations. No violence has been committed by them upon America. They are all weak, some of them disordered. American blood is being spilled. The noncombatant natives in Nicaragua have been slaughtered. Why? To beat back any assault upon us? No. To inflict punishment for any indignity toward our Nation? No. Then, for what reason this war?

Our rulers have created a state of war to the south of us, and we are in that war. That war is in violation of international morality. The high esteem in which America was held by all our southern neighbors during Secretary Blaine's efforts to bring about a harmonious American union has gone. Instead of esteem for America there is fear of America. It is not the voice of America; it is the policeman's club, the gunman's weapons. It is under the banner of bonds and bullets that all the forces of privilege march and demand that our Government guarantee their questionable and usurious loans and unconscionable exploitation of weaker people, and that American sons shall give their lives to the "drama of blood."

The traditional history of America, the respect in which America should be held, her tremendous influence and power for world peace, demand strict adherence to the doctrine of inherent fairness and justice. Applying that doctrine, interpreted for a hundred years by practical construction, national and international morality demand that American citizens engaged in trade or commerce in foreign countries must obey the laws of such countries; that no American citizen has a right to jeopardize the peace and honor of his country for gain, for pleasure, for adventure.

Every rule of action demanded of an American citizen within his own country subjects his investments to the laws of the state or territory wherein they are made. The contract itself controls; and if an American citizen is imprudent in joining in such contract the responsibility is his alone.

In our relations with foreign governments all pecuniary and financial matters should be settled by arbitration. Armies and navies should not be called out to enforce the collection of a debt, nor should there be a recourse to arms or resort to force in any manner to gain or preserve for American citizens rights and privileges in any foreign country not enjoyed by the native citizens of such country.

The attempt by other governments to extend privileges and engage in conduct not permitted to the Government of the United States or its citizens is dangerous to our peace and safety. There should be no encroachment upon the rights of small nations and the equality of nations guaranteed by the conscience of international morality and rectitude. Any attempt in any manner to extend political sway, territorial occupancy, or expansion in this hemisphere should be regarded in no other light than as the manifestation of an unfriendly disposition toward the United States.

Nothing short of these demands is a compliance with the Monroe doctrine, by its express terms and by practical construction for a hundred years, as shown by the Presidents of the United States who thought in terms of America, her peace and her independence.

Liberty and independence, justice and equality are the cornerstones upon which America was begun. They are the only cornerstones upon which we can build for an enduring peace. America can not deny to any nation, small or great, the replica of our foundation without damning the lives, the sacrifices, and the motives of a long line of patriots who designed this Republic.

To regain the character that America once possessed, and to cherish the national morality in which she had been clothed is the task before us.

Therefore, Mr. President, I have submitted, and there is upon the table, a concurrent resolution, and I ask, at this time unanimous consent to take it from the table and have it referred to the Committee on Foreign Relations.

The PRESIDING OFFICER (Mr. SACKETT in the chair). Is there objection to the request of the Senator from Wisconsin? The Chair hears none, and it is so ordered.

Mr. BLAINE. Mr. President, I have undertaken these remarks, not for the purpose of criticizing the present administration, but because I should fail in my duty if I failed to recognize the recorded facts of history. It is not my condemnation of this administration; it is the condemnation as recorded in the history of our Government. I want to see a constructive program, not a destructive one. The concurrent resolution to which I have referred may not be the proper means of reestablishing the fundamental Americanism which I have discussed. I think it is; I think it does; I believe the resolution embodies the conception of America's national entity and international morality as conceived by Washington, Monroe, Fillmore, Cleveland, Secretary of State Blaine, yes, and by Wilson during the first years of his administration.

I do not know whether or not we should presently withdraw the marines from Nicaragua. I do not say we should not withdraw them now.

I do not know whether or not we can withdraw them presently. I do know, however, that we have blundered into that situation. The responsibility for that blundering must rest directly upon this administration, and probably it may be necessary for us to blunder along until the administration can blunder out of its mistake. Presently, Mr. President, I am willing to stand by, in the hope that the administration will find an early avenue of escape from its blunder, but I propose to do my duty to my country now and to the generations to come, to the end that never again will it be possible for a President to despoil America of her character.

I know an answer will be attempted by exalting and glorifying the marines in Nicaragua. The young men who constitute that force are in the uniform of their country. They are to obey the commands of their officers. Over and above the marines and their officers is the Commander in Chief, the President. He alone is responsible for their appearance.

Mr. President, some one has blundered. This situation in Nicaragua is America's Balaklava for those soldiers and those marines. It is not for them to reason why; it is for them to do or die, until the voice of America asserts once again in terms of international morality our adherence to the doctrine of inherent right and justice, that the strong have no right to ride down the weak.

## INDEPENDENT OFFICES APPROPRIATIONS

The Senate, as in Committee of the Whole, resumed consideration of the bill (H. R. 9481) making appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices for the fiscal year ending June 30, 1929, and for other purposes.

The PRESIDING OFFICER. The question is on agreeing to the amendment proposed by the Senator from Alabama, Mr. BLACK.

Mr. WARREN. Mr. President, the absence of so many Senators from the Chamber at the present time leads me to suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, when the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Fess | McLean | Sheppard |
| Barkley | Fletcher | McMaster | Shipstead |
| Bayard | Frazier | McNary | Shortridge |
| Bingham | George | Mayfield | Smith |
| Black | Gerry | Metcalf | Smoot |
| Blaine | Gillett | Moses | Steck |
| Blease | Gooding | Neely | Steiwer |
| Borah | Gould | Norbeck | Stephens |
| Bratton | Hale | Norris | Swanson |
| Brookhart | Harris | Nye | Thomas |
| Broussard | Harrison | Oddie | Trammell |
| Bruce | Hawes | Overman | Tydings |
| Capper | Hayden | Phipps | Tyson |
| Caraway | Heflin | Pine | Wagner |
| Copeland | Howell | Pittman | Walsh, Mass. |
| Couzens | Johnson | Ransdell | Walsh, Mont. |
| Curtis | Jones | Reed, Mo. | Warren |
| Cutting | Kendrick | Reed, Pa. | Waterman |
| Deneen | Keyes | Robinson, Ark. | Watson |
| Dill | King | Robinson, Ind. | Wheeler |
| Edge | La Follette | Sackett | Willis |
| Ferris | McKellar | Schall | |

The PRESIDING OFFICER (Mr. BINGHAM in the chair). Eighty-seven Senators having answered to their names, a quorum is present.

Mr. BLACK. Mr. President, I desire briefly to explain the purpose of the pending amendment. It is an amendment which reduces the amount the Shipping Board can pay for their counsel. I offer it in connection with another which I shall send to the desk as soon as this amendment is acted upon, which will reduce the general appropriation for the Shipping Board $150,000.

I offer the amendment for the reason that I find in the report of the hearings on the bill a rather peculiar situation with reference to the number of lawyers employed and the amount of compensation paid to them. It explains, in my judgment, in part, the repeated statement which has been made on the floor

in the last few days of the great losses sustained by the Shipping Board, and is responsible in large part for those losses. I have some figures, and I shall be very brief, because I desire to explain the reason for offering the amendment and the one I am about to offer.

I find that in the year 1927, according to the hearings before the Appropriations Committee of the House, there were 48 lawyers employed by the Shipping Board. I find that the expenses of the legal department in 1926 were $404,080. I find that the salaries of the regular lawyers employed by the Shipping Board in 1927 amounted to $263,200, which does not include the stenographic expenses. I find that, in addition to that, there are a number of other lawyers employed specially, one of them being the assistant to one of the commissioners, who does not draw his salary from the legal department, another being an assistant to another commissioner, who does not draw his salary from the legal department.

I find that the work which these numerous lawyers have disposed of during one year is as follows—and I would like to have this heard, because I think it will be seen where a part of the losses of the Shipping Board come in:

It was reported to the committee that 602 cases were disposed of in New York, where there were 1,400 cases pending. An analysis of the report shows that 197 of the cases were disposed of by dismissal, which certainly required very slight services on the part of any lawyer.

One hundred and forty-seven were discontinued, which required very little service. Cases settled before and after trial were 258. That is the entire work done by the lawyers in New York so far as litigation was concerned. We find that for that work 16 lawyers were employed in New York at an expense of $88,000, not trying a single case through to completion. This is taken from the report made to the Appropriations Committee.

We find that in Washington there are a few cases tried before the Court of Claims, but the lawyers for the Shipping Board do not have charge of those trials. They are under the charge of the Attorney General, and the lawyers for the Shipping Board do not even supervise the trial of those cases. The total number of the attorneys in this city and in neighboring provinces was 180. They cost the Government for the settlement of the 180 cases, where the trials were held under the supervision of the Attorney General and not by the attorneys for the Shipping Board, the small sum of $149,000.

In addition to that we find there were special lawyers employed even where the Attorney General had charge of the trial. These special lawyers received $10,000 each. The number of those reported, though it is not claimed they are all, was three, drawing $30,000 during the year 1927. Further we find, under the report which the board made, that the lawyers for the Shipping Board have drawn $278,200 for the services they have performed.

Mr. COPELAND. Mr. President, will the Senator yield?

Mr. BLACK. Certainly.

Mr. COPELAND. Does the Senator wonder that I introduced an amendment to the bill providing $1,500,000 to take care of doctors?

Mr. BLACK. I am inclined to think from the way they are taking care of deserving lawyers that they might also take care of deserving doctors.

Mr. COPELAND. The Senator speaks about deserving lawyers. He does not think they are deserving lawyers, does he?

Mr. BLACK. I imagine that they deserved the appointments for some special reason.

Mr. COPELAND. At least they got the appointments, did they not?

Mr. BLACK. They received them. We have then, for this $278,000 which they received, the settlement, not the trial, of 438 cases in all. Any lawyer who has had any experience knows that one firm of lawyers could have handled every one of those cases without any difficulty. So we have, as one of the reasons why the Shipping Board are losing money the fact that they are employing more people than they need, just as doubtless they are doing in the department to which the Senator from New York called attention a few days ago.

Mr. COPELAND. Mr. President, will the Senator yield further?

Mr. BLACK. Certainly.

Mr. COPELAND. Of course, it is fair to say in defense of the Shipping Board that the board is operating services out of many ports of our country, three out of the Pacific coast and a great many on the Gulf and other ports. I suppose included in the item of expense for lawyers are large sums of money used in the defense of cases in those local communities.

Mr. BLACK. This amount includes the defense and prosecution of every Shipping Board case in the United States of America.

Mr. COPELAND. The Senator said a moment ago that this work could be undertaken by a very much smaller number of lawyers. I presume it would be very difficult for a lawyer to go out from the District of Columbia and try a case in Seattle. He would not be acquainted with the local procedure, perhaps, or with the ins and outs of legal methods in that particular locality. So I dare say that there is some justification for the expenditure of part of this money in remote parts of the country.

Mr. BLACK. I shall be glad to inform the Senator about that. They have spent it in remote parts of the country for the employment of special lawyers, for instance, at Seattle and at other places; and they are not included in the regular list of 46 attorneys who are employed and drawing the regular salaries. The fact remains that the Government is paying out in that department, according to the report before the House committee, the sum of $278,000, when it is wholly and completely impossible for there to be any work which anywhere near justifies the expenditure of that sum. They could employ one firm of lawyers in Washington who would dispose of every case they have here, and one firm of lawyers in New York who could likewise dispose of every case they have there, because they only settled 238 cases and did not try a single one of those cases to completion.

I simply call attention to this with reference to the first amendment which I have offered, which is that no lawyer employed by the board shall receive more than $10,000. It is my understanding that these lawyers have received their appointments by reason of political pull, some of them being very closely related to those in power. It is also my information that others have secured their appointments by reason of their influence with certain Senators and Congressmen. The work is not there for them and can not be there for them. It is impossible for any man to take this report and determine that there is any reason for the employment of 47 lawyers to perform the duties which 5 reasonably good lawyers could have performed at a reasonable compensation.

One other amendment I have is that no lawyer for the Shipping Board shall receive more than $10,000 per year. One of them is now receiving $15,000. Unless the last Congress changed it, that is as much as a Cabinet officer receives. It is more than the judges of the Supreme Court of the United States received up to the last session of the Congress. It is more than any other Assistant Attorney General receives in America. According to the book which I have here showing the salaries paid last year, the highest paid Assistant Attorney General received $10,000; and yet this $15,000-a-year man for the Shipping Board does not even argue cases in the Supreme Court of the United States.

According to this report, they are argued by the Solicitor General, who receives a $10,000 salary and who has charge of that part of the procedure. They do not turn those cases over to the $15,000 lawyer, who is one of the 47 lawyers disposing of 239 cases in 12 months.

That is the situation which exists. So far as any special or peculiar qualifications which would place this particular attorney head and shoulders over Mrs. Mabel Walker Willebrandt, who receives only half that much, over Mr. Donovan, who receives two-thirds of that amount, or over the other Assistant Attorneys General, I do not know what they are. It might be there has been a raise in salary of those Assistant Attorneys General, but according to the book which was brought to my desk, one of them receives $7,500 and one of them receives $10,000. What is it that creates such greatness in this particular lawyer that he should have a salary equal to that which Cabinet officers have been receiving and more than that which judges of the Supreme Court have been receiving, when the records show that he did not try to completion a single case in 1927? What is it that entitles this particular board to do this unless it be—and I call attention of those here who voted for the Jones shipping bill—that one of the most insistent objections raised to it is the fact that it is costing more than the people get out of it? Why is it? This is one of the reasons. Is it the desire that this department be filled up with people who are not needed in order that the Government operation of the Shipping Board for a time may be discredited? Is that the reason? Or is it merely because there are some deserving political associates who desire positions?

The fact remains that whatever answer is given, certainly prima facie it is not proper for the Shipping Board to have 47 lawyers to perform what 5 reasonably good lawyers should perform any day in any year in all the history of the country. For that reason I have offered the first amendment providing that the pay of attorneys be limited to $10,000. The next amendment I will offer is that we reduce the allowance to the Shipping Board for lawyers $150,000 per year, and if they will half try they can get four lawyers every time they need one for the appropriation which is then left.

Mr. EDGE. Mr. President, I had the privilege of listening to the larger portion of the speech of the Senator from Wisconsin [Mr. BLAINE] this morning. On portions of it I would like to comment, but I have taken the floor at this time not for that purpose, but rather to give notice that at some future time I propose to discuss various phases of the policy of the country in connection with its foreign relations, particularly with Central America.

While I am on my feet, however, I desire to make this suggestion: Of course, it goes without saying that every Senator must decide such questions entirely for himself and is in no way subject to criticism, but, speaking for myself, I realize and recognize that at the present moment the Pan American Congress is in session at Habana and we are represented there by one of the strongest delegations of outstanding Americans, I think, that has ever been called together for a similar purpose. It is a nonpartisan commission, including in its membership a former Member of this body, Senator Underwood, of Alabama; Judge O'Brien, a well-known member of the Democratic Party in New York; former Secretary of State Hughes, chairman of the commission; and educators and ambassadors who have represented the country in various parts of the world. Reading, as we do, the daily news reports from the conference in Habana, it would seem to be indicated that there is a spirit of splendid harmony existing there and that understandings are being arrived at and policies are being defined. That, I repeat, so far as we can gather from daily press reports, must mean a better understanding and a clearer understanding in the future; and, of course, all of us, no matter what our opinion may be as to policies, would subscribe to that.

So for that reason I propose to defer my discussion of this very important subject to a later date, understanding that the conference will probably be over in two or three weeks. I repeat that under all the circumstances, in dealing with foreign relations which are so distinct and so different from any domestic problems that confront us, it would seem to me wiser not to transfer the forum from Habana to Washington, at least while the conference is in session.

Mr. WARREN. Mr. President, the amendment which the Senator from Alabama [Mr. BLACK] has offered, I assume to be the one which I have in my hand and which I will read. On page 25, line 24, strike out the word "three" and insert "two"; and add at the end of line 25, page 25, the following:

*Provided,* That no attorney shall be paid more than $10,000 a year.

I understand the purpose of that provision to be to reduce the number of employees and attorneys, and to provide that none shall receive more than $10,000 per year. That is my understanding of what would occur.

Now, just a word, because I am less a lawyer than anybody else, because I am no lawyer at all. As to the record, which the Senator from Alabama has presented from the early days, I want to say to him that I was one of the members of the Committee on Appropriations, who at all times and places undertook to reduce, and I think with my colleagues did greatly reduce from time to time, all of those high salaries and large numbers of employees. But at the present time my desire is—and I believe it is also the desire of the members of the subcommittee and the full committee—to protect as well as we may the Shipping Board and the Fleet Corporation, which, combined, constitute a corporation larger perhaps than any other in the world, or, at least, in America. We desire to cut expenses to the lowest limit to which we may safely reduce them, but we can not consent to the amendment offered.

As to the number of lawyers, the compensation they should receive, and so forth, I prefer that my good friend, the Senator from Washington [Mr. JONES], who is familiar with the affairs of the Shipping Board and, of course, knows the facts as to all the attorneys and their salaries, should make a statement in reference to that matter.

Mr. JONES. Mr. President, I have not, of course, given especial study to the employees of the Shipping Board or of the Fleet Corporation, but I have learned that they have just one attorney who is receiving over $10,000. That attorney is getting $15,000 per annum. He is general counsel of the Shipping Board and of the Fleet Corporation. It seems to me that the general counsel of a concern of this magnitude, having so many and such widespread interests, is getting a very small salary when he receives only $15,000 per annum.

As the chairman of the committee, the Senator from Wyoming [Mr. WARREN], has stated, we have been reducing the compensation of the different employees of the Shipping Board and of the Fleet Corporation during the last three or four years. We have been cutting the salaries of the employees of both corporations very materially. We have cut the salaries of attor-

neys until, as I have stated, we have only one attorney, the general counsel, who is receiving over $10,000 a year, and he is getting but $15,000.

It is now proposed to reduce the salary of the general counsel of the Shipping Board and the Fleet Corporation to $10,000 a year. The business of the Fleet Corporation is very widespread; it is operating ships to all parts of the world. As has already been brought out, there are something like 25 or 30 different routes throughout the world, with almost 300 ships sailing upon them. In addition to that, there is the business coming over from the World War, and there are a good many very important cases that have come over from that war which are not as yet disposed of. There is one case in my State involving issues, taking the claims on each side, of eight or nine million dollars. I think the Government claims five or six million dollars, and the private party claims three or four million dollars.

Mr. BLACK. Mr. President, will the Senator from Washington yield to me?

Mr. JONES. I shall yield to the Senator in just a moment, if he will wait until I finish this statement.

Mr. BLACK. I merely wish to ascertain to what case the Senator from Washington refers.

The PRESIDING OFFICER. The Senator from Washington declines to yield.

Mr. JONES. I will yield to the Senator in just a moment. The case to which I refer has been pending, of course, for quite a while. I am not prepared to say that it ought not to have been brought to an issue and trial sooner, but every attorney knows how such matters of important litigation are delayed. This case has been brought to the point, however, that a master to whom the case was referred has submitted a report and, I understand, he has found in favor of the Government for $1,400,000. His findings, however, must go to the judge. As I have stated, the Government insists that it is entitled to a greater sum; the defendant claims that he is entitled to a judgment; but what the action of the judge may be upon the findings of the master we do not know. If he shall approve them, then the Government, of course, will get a judgment in his court for $1,400,000. That is merely one case.

Now I yield to the junior Senator from Alabama.

Mr. BLACK. I desire to ask the Senator from Washington what is the name of that case?

Mr. JONES. I think it is what is known as the Skinner-Eddy Co. case.

Mr. BLACK. That is the case, I think, in which special lawyers have been employed.

Mr. JONES. They have one special counsel.

Mr. BLACK. The special attorneys have charge of the case?

Mr. JONES. They have direct charge of the case, but I know that there were many important questions with reference to that particular case which were referred to the general counsel. Of course, the general counsel is not trying these cases, but he has general charge and control of them. I think it would be very unfortunate to pay the general counsel only the amount that is paid to other attorneys who have not the responsibility of looking after the various cases. There is another case, I think, involving one of the shipping plants; at any rate, there is at issue in it something like $30,000,000.

With all due consideration to my good friend from Alabama [Mr. BLACK], in the case of a great institution like this, with such important issues involved, and such large sums of money at stake, it is ridiculous that we should say that the general counsel having charge of all those matters should not receive more than $10,000 a year salary. We can not expect to get a man of the proper capacity, experience, and ability to handle business of this kind in competition with the best legal talent of the country if we pay only such a small salary. I think such action would invite the selection and the employment of inferior attorneys. While it may on paper save $5,000 a year, in the end it will, in my judgment, result in the loss to the Government of millions of dollars.

Mr. President, I think that is all I care to say in regard to the matter. I think it is a question that appeals to the business judgment of every Member of this body.

Mr. BLACK. Mr. President, will the Senator yield for another question?

Mr. JONES. Yes.

Mr. BLACK. Does the Senator think it proper that the lawyers for the Shipping Board should draw the same salary that the members of the Shipping Board themselves receive?

Mr. JONES. Oh, Mr. President, I do not think there is any comparison at all. The members of the Shipping Board have nothing like the financial responsibility upon them that the chief counsel has. They do not have to pass upon questions such as those which we presented to the general counsel.

I have no doubt that there are many corporations in this country that are paying their general counsel in salary many thousand dollars a year more than the presidents or other officers of those institutions receive. I do not think there is any comparison as to the capacity that ought to be required between the chief counsel of this institution and the members of the board.

Mr. BLACK. If the Senator will yield further, does he not believe that if a corporation that is paying its general counsel more than $10,000 a year should find that such general counsel had 46 men working under him and disposed of only 489 cases in one year they would fire him?

Mr. JONES. Oh, no; I do not think so, Mr. President. I do not think we can determine the capacity of a man by the number of cases that are disposed of.

Mr. BLACK. Very well; then, by the work that he does.

Mr. JONES. We could find many justices of the peace who are disposing of a great many cases in a day, and yet we would not think of fixing their salaries because of the number of cases which they dispose of or determining their salaries upon that basis at all. Take, for instance, the Skinner-Eddy Co. case; it has been pending ever since the war. As I have said, I do not know that it has been pressed as vigorously as it ought to have been pressed, but it is necessary to be extremely careful in gathering the testimony and in getting the data and facts in shape. My recollection is that the case before the master in the actual taking of testimony and determination of the issues has taken 8 or 10 months of steady work. The fact that it has taken in that case all that time is no reason why we should say that the general counsel, because he has not disposed of one case in a year, should get only five or ten or a few thousand dollars.

Mr. BLACK. May I suggest to the Senator that although that work has taken practically a year it was not done by any of the 46 lawyers of the Shipping Board, but was done by a special lawyer hired out in that section? None of the 46 lawyers touched it.

Mr. JONES. That may be true, Mr. President, but the result of their labors is shown by what has been accomplished. The lawyers engaged in the case were under the supervision of the general counsel; they had to submit to him from time to time many questions, and, possibly, upon the decision of those questions depended thousands and possibly hundreds of thousands of dollars. Whether or not he decided them correctly I do not know, but we ought to have a good man, a man of very great ability as chief counsel. In my judgment this Government would save hundreds of thousands of dollars if we paid the chief counsel $50,000 a year and secured one of the very highest class of attorneys in the country. I am not saying that as any reflection upon the general counsel of the Shipping Board, for he is a good lawyer. If he can not make far more than $15,000 a year in private practice, then, of course, he ought to be put out, but I am satisfied that he could do so; I am satisfied that he is really making a sacrifice in remaining in the position of general counsel of the Shipping Board.

Mr. BLACK. If the Senator thinks the general counsel is making a sacrifice will the Senator join with me in favoring a bill to provide that hereafter the general counsel shall be confirmed by the Senate, so that I may produce evidence to show the Senate whether or not he is capable of performing the duties for which he is paid $15,000 a year.

Mr. JONES. I do not think I would have any serious objection to a proposition of that kind.

Mr. BLACK. The Senator from Washington raised the question of order on an amendment having that in view.

Mr. JONES. Although I doubt the necessity of it, I would not have any serious objection to it. The mere fact that he is confirmed by the Senate would not add anything to his capacity or his ability as a lawyer or otherwise, so far as that is concerned. I think that considerable discretion ought to be left to the Fleet Corporation in the selection of the man who is really to guide and direct them in the handling of the tremendous property that is intrusted to their care.

The PRESIDING OFFICER. The question is on the amendment proposed by the Senator from Alabama.

Mr. KING. Mr. President, I rise for the purpose of supporting the amendment offered by the Senator from Alabama. Before proceeding briefly to discuss the question, I should like to ask the chairman of the committee whether the $18,000 provided for in line 24, page 35, is to pay the salary of some expert on transportation or is to be paid to some attorney?

Mr. WARREN. The distinguished Senator from Utah will note that the provision is in the negative form; that is, that there shall be no more than that amount paid. My impression is that that amount goes to the manager or to the president

of the Fleet Corporation, which would be General Dalton. I have no direct information as to that, but I believe it to be so.

Mr. JONES. I think that is correct.

Mr. KING. I think the Senator. I should like to make another inquiry. On lines 24 and 25 it is provided:

Three at not to exceed $15,000 each.

Are those three experts in shipping and transportation or are they lawyers?

Mr. JONES. They are not lawyers. My understanding is that they are at the head of the different activities, such as the traffic department, for instance. I am not exactly sure as to that, but they are not lawyers. There is only one lawyer, who is paid over $10,000.

Mr. KING. How much does he receive?

Mr. JONES. Over $10,000. He is the general counsel.

Mr. KING. Then the general counsel would be one of the three persons who is to receive $15,000.

Mr. JONES. Yes.

Mr. KING. And the other two are connected with the traffic transportation service.

Mr. JONES. One, I think, has charge probably of transportation affairs.

Mr. KING. Where is the provision for general counsel who is to receive $15,000?

Mr. JONES. That is covered in the provision which reads:

Three at not to exceed $15,000 each.

One of those is the general counsel.

Mr. KING. May I assume that there is only one lawyer to be paid $15,000?

Mr. JONES. Yes. I find on page 675 of the hearings before the House committee that inquiry was made with reference to these three at $15,000. Mr. SUMMERS asked the question:

How many are employed at $15,000?

Mr. PARKER. The legal department has only one, and that is the general counsel.

That was Mr. Parker.

Mr. SUMMERS. How many are employed at $12,000?

Mr. PARKER. None.

Mr. WOOD. That has reference not only to the legal department but to the Fleet Corporation also.

I do not see anything here telling who are the other two that get $15,000; but I know that they have a head of a traffic bureau, and I imagine he is one of the men. Possibly I shall be able to find that a little bit further on.

Mr. KING. Mr. President, I shall proceed upon the assumption that one of these three is to be paid $15,000 is a lawyer, and that no more than one is to be appointed at a salary of $15,000 or over.

I am told that the record reveals that there are 45 lawyers presently employed by the Shipping Board—permanent employees, so to speak—and, in addition, a large number of special employees. In addition, the Department of Justice, which receives a large appropriation to pay attorneys and other employees, looks after many of these cases—cases in the Court of Claims as well as cases in the nisi prius and appellate courts of the various States and the Federal Government.

The testimony before the committee, as I am advised, reveals the fact that the legal force has been increased somewhat, though the activities and assets of the Shipping Board and the Fleet Corporation have been diminished. Mr. Parker's testimony, appearing on page 666 of the House hearings, in effect is that the litigation is "in charge of the Department of Justice primarily." By that I assume he means that the Department of Justice is responsible for the litigation, and controls and handles it. Perhaps the preparation of the case and the assembling of the facts are within the competency and the activities of the agents and attorneys of the Shipping Board or the Emergency Fleet Corporation; but the actual work of the trial of the causes is, generally speaking, conducted by the Department of Justice or by special attorneys acting under the direction of the Department of Justice.

Mr. JONES. Mr. President——

Mr. KING. I yield.

Mr. JONES. I think the Senator is a little mistaken in his facts. My understanding is that the Attorney General approves the employment of the attorneys for the Shipping Board and the Fleet Corporation. In other words, the employment of this general counsel at $15,000 is approved by the Attorney General, and to that extent he is a representative of the Department of Justice; but he handles these cases. Take any one of the cases; take this case out at Seattle; one of the at-

torneys in that case is a special attorney. He was appointed by the Shipping Board with the approval of the Department of Justice. The other attorney is one of the regular attorneys of the Shipping Board; but he was appointed in the first instance with the approval of the Attorney General. The United States district attorneys, as I understand, have not anything to do with these cases. I know that our United States district attorney out at Seattle has nothing to do with this case, and I understand that that is the situation all over the country. In one sense these men are attorneys of the Department of Justice, because we expressly provided by our legislation that the Shipping Board and the Fleet Corporation could not appoint an attorney without the approval of the Attorney General, and that is always done.

Mr. BRUCE. Mr. President——

The PRESIDING OFFICER. Does the Senator from Utah yield to the Senator from Maryland?

Mr. KING. For a question.

Mr. BRUCE. Assuming that there have been too many lawyers connected with the United States Shipping Board, and that they have been paid too much in the way of compensation, does not the Senator think that those facts are probably due to the pressure brought by Members of Congress on the Shipping Board and the Emergency Fleet Corporation?

Mr. KING. Mr. President, I am not in a position to answer that question. I do not know the extent of pressure, if any, brought upon these organizations by Senators or Congressmen, or by others, to secure the appointment of employees. It is quite likely many persons have been indorsed for positions in these organizations by Senators and Congressmen, as well as by persons in official life and in political organizations, and it is quite likely that their indorsements have been considered in some appointments. But that does not absolve the directors of the board from the discharge of the duties resting upon them. I am afraid that the directors of the Shipping Board in its early existence possessed an exaggerated idea of their own importance and the importance of their work to the country. They seemed to act upon the theory that the Treasury of the United States was unlimited in its resources and that the existence of war justified improvident expenditures. Of course, it is not to be expected that in the excitement of war there would be that prudence and economy that peace demands and secures. War is a devouring monster. It takes human lives and swallows the savings and capital of men and nations. It generates extravagance and is controlled by none of these restraints which bind peoples and nations in times of peace.

Perhaps Congress was imprudent and too liberal in its appropriations, but these organizations charged with expending the appropriations made, particularly after the termination of the war, were under obligation to exercise wisdom and economy in their public service.

No doubt there were political appointments made by the board, and it is likely that some of the members of the board were political appointees, and persons were named who were not qualified to operate ships and handle a great marine enterprise.

Mr. BRUCE. I was asking the Senator whether it is not those indorsements—indorsements given by political influence in one form or another, congressional or otherwise—that really, after all, are responsible for abuses of patronage in connection with the workings of any and every branch of the Government?

Mr. KING. Mr. President, I venture to say that a comparison of the attorneys of the Shipping Board with attorneys who received their appointments under the civil service law and found places in the Government service will not be unfavorable to the former.

Mr. BRUCE. Perhaps that is because the Senator has such a poor opinion of the merit system of appointment.

Mr. KING. Mr. President, I think I have some ability to judge of the competency of lawyers; and I do not think that the fact that I have not a very high opinion of the civil-service system would prompt me to refuse to accord to a man who has a civil-service status that degree of merit which his ability deserves. There are lawyers of great ability serving in various departments of the Government who have a civil-service status, but I am inclined to think that it is not the so-called merit system that made them good lawyers.

Mr. BRUCE. There are, of course, some positions to which the merit system of appointment would be entirely inapplicable. For instance, if one of the departments should need from time to time the services of a great trial lawyer, I think it would be absurd to invite competition for the selection of such a lawyer; but the Senator knows that, so far as ordinary routine attorneys are concerned, many of them are selected for differ-

ent branches of the Government under the merit system of appointment.

Take the Patent Office; take other branches of the public service; many attorneys are so selected; and I think the Senator will agree with me that where attorneys or other subordinates of any kind are selected under the merit system of appointment there are not likely to be so many of them, and they are not likely to receive such a large measure of compensation as when they are selected simply as a result of personal or political pressure. Is not that a fact?

Mr. KING. Mr. President, I do not care to be drawn into a discussion, because it is not relevant to the question before us of the merits or the demerits of the civil-service system. I agree with the Senator, if I understand him correctly, that there are many instances in which to select a man to fill a high judicial position or to discharge the duties of a lawyer from a civil-service list would be absurd. I am sure if the Senator had some important litigation, and needed a lawyer, he would not go to a civil-service roster for the purpose of finding a lawyer to employ to conduct his business.

Mr. BRUCE. No; but if one of the departments needed just some routine attorney, a man to perform more or less routine professional functions, I think it would be a very wise thing to look to the civil-service system for an attorney of that description.

Take the Shipping Board, of which the Senator is speaking. Many of these attorneys doubtlessly discharge duties of a more or less routine character. They are not expected to be equal to the requirements of exacting trial practice and all that; but the point I make is that if that class of attorneys were selected for the Shipping Board and Emergency Fleet Corporation, or for any other branch of the Government, not so many of them would be selected, and they would be paid far less compensation than that of which the Senator is complaining.

Mr. KING. Mr. President, I respect the views of my dear friend from Maryland, and much can be said in favor of the civil-service system. But it has serious weaknesses; even in a democracy there is less reason for its establishment than in some other form of government. If the Senator or I should own or operate a newspaper, we would not ask for a civil-service rating in behalf of those who were to work upon the paper. The newspaper men who make a success are those who refuse standardization. They have initiative and genius and ambition to succeed. If success attend a reporter or writer, it is not by following set rules and archaic precedents; it is because of his departure from the rut in which so many of us travel through life. The brilliant newspaper men are those who refuse to be stereotyped and standardized and listed as measuring up to some rules or requirements made to fit all persons and apply under all conditions.

So it is with lawyers. The lawyers who succeed refuse to be stereotyped and branded and standardized. The eminent Senator from Maryland—a lawyer of ability and a historian of recognized standing—has reached the eminent station occupied by him not by a civil-service policy or a civil-service spirit but by energy and genius and courage and ambition and a refusal to be standardized by social or political or industrial conditions.

The Shipping Board has met with serious criticism ever since it was organized, and many investigations of its work and activities have justified much of the criticism, particularly that relating to its lack of business ability, and to waste, extravagance, and inefficiency.

But under the management of the most competent persons the results would have been unsatisfactory. The system of governmental operation of a merchant marine can not be economical or efficient.

The more than three and one-half billion dollars expended by the board has brought but slight results. Undoubtedly the work of the board during the war was of importance, if only in convincing the Central Powers that the United States was in the war and would spend its treasures in defeating the enemies of this Republic. The psychology of the situation was a vital force in the winning of the war. But since the war the work of the board can not be commended. It has failed to serve the people as it should, and has been inefficient if not incompetent in its activities. There has not been a session of Congress since 1918 when the Shipping Board has not come under condemnation by Congress. The animadversions reveal the fact that in both branches of Congress dissatisfaction has been expressed in regard to the activities of this organization.

It was demonstrated in the debate upon the shipping bill a few days ago that the Shipping Board has dissipated its assets—the $3,500,000,000 appropriated by Congress—and has assets of

the value of only $128,000,000. It was also shown that there are claims against this organization of more than $200,000,000.

After the Government discharges the obligations of the Shipping Board with the shrinking values of the assets of the organization, and the deterioration in the ships, it is certain that the assets of the Shipping Board will not meet its obligations.

The postwar record of the Shipping Board must be disappointing to all Americans. Senators will recall that President Harding appointed Mr. Lasker to head the board. He was given great authority, and it was declared by the administration that he would accomplish great results and place the organization upon a solid basis. Mr. Lasker asked for $50,-000,000 as a direct appropriation to meet the current expenses, which was to be supplemented by the sale of property, including ships owned by the Shipping Board. Congress acceded to his request and made large appropriations but without results. The larger the appropriations the greater the losses. Failure attended every effort to make the experiment of Government operation a success. Thousands of persons were employed, hundreds of lawyers found positions, but all efforts to make the work of the Shipping Board successful were in vain.

Persons were taken from various Government organizations and given places in the Shipping Board at salaries greatly in excess of the compensation paid them. There seemed to be no regard for economy or for the public welfare.

There has been an orgy of waste and extravagance in connection with the activities of the Shipping Board. This has been conceded by all. No one in either House of Congress has defended this organization. Its failure, its mistakes, have compelled criticism and condemnation.

I am being led far afield, however. I rose merely to support the position of the Senator from Alabama. He has called attention to the fact that, notwithstanding the Department of Justice is primarily responsible for litigation growing out of the activities of the board and that special attorneys are employed wherever suits are brought, nevertheless we are called upon now to give to the Shipping Board forty-odd lawyers, one of whom is to receive at least $15,000 a year.

Mr. JONES. Mr. President, will the Senator yield?

Mr. KING. I yield.

Mr. JONES. I can tell the Senator now that the other $15,000 men are the two vice presidents, one having charge of operations, the other of administration.

Mr. KING. I thank the Senator. I had the impression that two were to be employed in connection with the operation of ships, and one of the three was to be employed as counsel.

Mr. KING. Mr. President, if the Senator from Alabama will move to reduce the appropriations for the lawyers and restrict the number to 25, I think he will be doing a public service, and I shall be glad to support him. I shall also support him in his motion to reduce the compensation of the lawyer who is to receive $15,000 a year to $10,000 a year.

I have in the file before me—and I shall not take the time of the Senate to read it into the RECORD—the history of the activities of the Shipping Board. It reveals deficits during the past four or five years of more than two hundred and fifty-odd million dollars, and that does not include the sums of money derived from the sales of assets—ships and other property belonging to the Shipping Board. What the true figures are I am unable to state, and I believe no one else is able to accurately state the amount.

The deficits from the beginning of the operations of the board have been stupendous. Indeed, the deficits have been so great that the capital has been wiped out, and, as I said, if we should pay the debts of this organization it is doubtful whether there would be anything left.

No one knows how much will be consumed by the organization, or expended by it, during the coming year. No one knows what the deficits will be for the operations of the Shipping Board during the coming year.

The bill before us carries large appropriations for the Shipping Board—$84,000 for the commissioners; $195,750 for various activities, $172,500 of which is to be expended for personal services in the District of Columbia; $9,000 for printing and binding; $13,400,000 for administrative purposes, miscellaneous adjustments, losses due to the maintenance and operation of the ships, for the repair of ships, the carrying out of the provisions of the merchant marine act of 1920; $2,225,000 is to meet the expenses of liquidation. I am not sure just what the liquidation is.

In addition, $10,000,000 is "to enable the United States Shipping Board Merchant Fleet Corporation to operate ships or lines of ships which have been or may be taken back from purchasers by reason of competition or other methods employed by foreign shipowners or operators."

Mr. COPELAND. Mr. President——

The PRESIDING OFFICER. Does the Senator from Utah yield to the Senator from New York?

Mr. KING. I yield.

Mr. COPELAND. The Senator will not overlook the request for $12,000,000 to recondition two useless hulls. Surely the Senator will not overlook that wasteful item. Likewise, he will not fail to note $1,400,000 to enable the bankrupt bituminous coal industry of this country to export its coal at the expense of the Government.

We are going to spend $1,400,000 to help this industry, when almost every other interest of the country is in need of money. Why should this particular interest be benefited to this extent? It would be as reasonable for the automobile industry to apply for five or six millions to provide extra ships to take the products of their factories to Europe.

We sell these ship lines to private owners, and then immediately undertake to put into operation Shipping Board ships to compete with them, almost as if we wished to insure disaster.

But those items, aggregating $13,400,000, should be included in the list to which the able Senator is calling attention.

Mr. KING. Mr. President, I have not forgotten those items, but I beg to state that I am not going to be drawn into a discussion of the coal question, when I see upon my right my friend from West Virginia [Mr. NEELY], and across the aisle the Senator from Pennsylvania [Mr. REED].

Mr. NEELY. Mr. President, will the Senator yield?

Mr. KING. I yield.

Mr. NEELY. Before the distinguished Senator and equally eminent doctor from New York retires from the Chamber, I venture to say that if the coal operators of West Virginia could only discover some method whereby they could clear as much money in a year as the Senator from New York receives for broadcasting a single morning health talk, or for writing a solitary feature article in the Nation's newspapers, they would enjoy more prosperity in 1928 than they have experienced during the last four years.

Mr. COPELAND. Mr. President, will the Senator from Utah yield?

Mr. KING. I yield to the Senator from New York.

Mr. COPELAND. The Senator from New York is at the disadvantage of not having been able to put his hands into the pockets of the public through a generation, as the coal barons of West Virginia and other sections of the country have. I am seeking now to improve the health of the American people so that they will have the strength and vigor to carry the burdens of taxation placed upon them by the Senator from West Virginia and others who seek to take money out of the Treasury to bolster up a dying and bankrupt industry.

Mr. NEELY. A majority of those whom the Senator from New York calls coal barons are as poor as Lazarus and more bedeviled than that historic sufferer ever had the misfortune to be. But what the Senator from New York has lost in time he has made up in the irresistibility of his energy and efforts.

If rumor be reliable, he has, in a period of time much briefer than a generation, succeeded in an eminently proper way not only in putting his hands into the pockets of the public but in transferring from those public pockets to his own more money than the average coal operator can hope to accumulate in a lifetime as long as that of Methuselah.

If the Senator will only teach the West Virginia coal operators how to find a market for their product that will be as profitable to them as the market for the Senator's advice has been to him, he will thereby prove himself to be the greatest political economist, instructor, and financier of this or any other age or country.

Mr. COPELAND. Mr. President, will the Senator from Utah yield further to me?

Mr. KING. I hope this colloquy between my friend from New York and my friend from West Virginia will terminate, so I can conclude my speech, when the Senator concludes his observation. I yield to him, of course.

Mr. COPELAND. I thank the Senator. I would like to say to the Senator from West Virginia that my efforts are directed wholly to improving the physical condition of the people of the country. I am not seeking to teach the coal barons of West Virginia how to run their business. I am not seeking to add to the mental ability of the business men in that particular industry, who have failed so utterly as certainly the coal operators of the country have failed. It is not enough simply to give them health. They must be given gray matter, which the Senator from West Virginia has in such abundance that he is better qualified to feed it to the public than I am.

Mr. NEELY. Mr. President, will the Senator yield?

The PRESIDING OFFICER. Does the Senator from Utah yield to the Senator from West Virginia?

Mr. WARREN. Mr. President, I feel the time has come for suggesting to the Senator from Utah that, in the interest of legislation and proceeding with the appropriation bill now before the Senate, he should decline to yield any further.

Mr. KING. Let me say to my friend from Wyoming that the rather dull observations which I have been making in the interest of economy, because no one is interested when one speaks of economy, have been enlivened by the brilliant sallies of the Senator from West Virginia and the Senator from New York. I yield to the Senator from West Virginia, but I hope this will end it.

Mr. NEELY. Mr. President, I hope that the hope of the very able and accommodating Senator from Utah may be realized. But the versatile Senator from New York is so astonishingly persistent and so amazingly contentious as to make it impossible for me to promise to be silent. The Senator from New York resembles the heroine of the following ancient story:

A certain man who died left a widow and a 10-year-old son to survive him. The minister, who came to the home of the deceased to preach an appropriate funeral sermon, said to the boy, "My little man, what were your father's final words?" The boy replied: "Pa had no final words—ma was with him to the last." [Laughter.] In every senatorial discussion of the coal business the Senator from New York is with us "to the last."

The Senator declares that he does not want to tell the coal operators of West Virginia how to operate their mines. But, unfortunately, he has attempted to do that which is infinitely worse.

If he had succeeded in having enacted into law the legislation which he proposed in the last Congress, there would now be no coal business in charge of those who have spent their lives developing and establishing this great and indispensable industry. A paternalistic Federal commission would be in full control. The coal industry of West Virginia does not want the Senator's proposed legislation or his suggested commission. It does not need his assistance or advice.

If the Senator from New York will only keep the people as well with his medicine and advice as the coal operators of West Virginia will keep them warm; and the pernicious Interstate Commerce Commission will only be as just to West Virginia in the present and the future as it has been hostile to her in the past, the coal business of that great State and the millions whom it serves will once more be prosperous and happy.

Mr. McKELLAR. Mr. President——

Mr. KING. I yield to the Senator from Tennessee.

Mr. McKELLAR. In the interest of harmony, I desire to submit an amendment to the pending measure.

The PRESIDING OFFICER. The amendment will be received.

Mr. COPELAND. Mr. President——

Mr. KING. I think I shall preserve harmony by proceeding.

The PRESIDING OFFICER. The Senator from Utah declines to yield further.

Mr. KING. I shall be through in a moment, and then the Senator from New York can obtain the floor in his own right.

I was calling attention to the deficit created by the Shipping Board and the Merchant Fleet Corporation aggregating hundreds of millions of dollars. I was enumerating some of the items of expenditure called for by the bill. I had reached the item of $10,000,000 appropriated for the reconditioning of ships which were taken back because of competition.

One could talk for hours about the oppressive record of the Shipping Board in dealing with its vendees, men who in good faith purchased ships and tried to operate them in the coastwise trade as well as in the foreign trade, but the Shipping Board, without due regard to justice or the spirit of the contracts entered into, permitted competition if it did not directly engage in competition, and thus drove into bankruptcy those who purchased and attempted to operate ships. The board took possession of vessels, which they compelled those who had purchased them to surrender, and in a number of instances, as the facts have been brought to my attention, forced, by unjust and oppressive means, persons who were competent to continue the operation of ships, to surrender them. When so surrendered, in some cases, the board again sold them, or made M. O. 4 contracts, which increased the losses of the Government, and contributed to the utter failure of the organization to build up a merchant marine.

Under the M. O. 4 contracts millions and tens of millions of dollars of profit were realized by unworthy men who incurred no obligation or risk. They received enormous profits directly, and were permitted to organize companies which sold to themselves or to the Shipping Board tens of millions of dollars' worth of commodities at extortionate prices. One can not escape the conclusion, after reading the record of the activities of the Shipping Board, that incompetency and negligence and an utter disregard of the public welfare have characterized the service of the Shipping Board.

Mr. President, this bill under consideration appropriates for the purpose of reconditioning two old hulks which were constructed either in 1905 or 1906, $12,000,000. There can be no defense, in my judgment, for this waste. Think of the Government appropriating $12,000,000 for the purpose of reconditioning two old hulks! Germany and Great Britain are building new ships with a new style of architecture, with Dieselized engines, and all modern developments. The result will be that these nations will successfully compete with the United States and drive from the seas archaic and ancient ships, which can not compete with theirs. The new ships can be operated from 10 to 30 per cent cheaper than the ancient ones which we now propose to recondition.

There is no reason for this appropriation. It can not be justified. It is supported by the same mercenary spirit that pushed through the Senate the measure to embark the United States in the sea of Government-ownership operation of a merchant marine. I feel sure that the chairman of the committee having this bill in charge would not support the bill if he were free to act in this matter. But the propaganda which swept a most unwise bill through the Senate the other day has carried this provision into the pending bill. It will probably be agreed to.

In keeping with this extravagance and wastefulness we are to pay 45 lawyers large compensation, one of them $15,000.

This bill, following the record and wishes of the Shipping Board, exhibits no regard for economy. Nor does Congress show any concern in the welfare of the people. Before adjourning, Congress will appropriate at least $5,000,000,000.

In my opinion, Congress will be unable to pass any revenue bill reducing taxes if it persists in the present policy of expending millions not necessary for the public good. It appears as if Congress would adjourn without any tax reduction. We could have reduced taxes $400,000,000 without creating any deficit if we had acted with prudence during this session of Congress. But if demands are made and Congress accedes to them as it does in the pending measure, then no reduction in taxes will take place. Indeed, if the demands made on the Federal Treasury are acceded to, there will not only be no reduction in taxes but there will be an increase.

It looks as though men on both sides of the Chamber support measures which will take from the Treasury whatever surplus we had supposed would be created out of existing tax laws and render it impossible for any tax reduction to be had for the ensuing year. Five billion dollars will be appropriated for the coming fiscal year, and no one can prognosticate what will be the expenses for the fiscal year 1929.

The Senator from New York [Mr. COPELAND] spoke about giving $1,500,000 to subsidize the coal operators. If we are going to subsidize any branch of industry or business, I invite the attention of my Republican friends to the fact that in New England a number of textile mills have recently closed. The morning press states that several cotton mills closed yesterday. I ask the Senator from Massachusetts [Mr. WALSH] how many factories in his State have been closed during the past few months.

Mr. WALSH of Massachusetts. Mr. President, I will say to the Senator from Utah that it is impossible for me to give an accurate statement of the number of factories that have been closed in the immediate past. I am frank to state, however, that if the figures were available, they would be startling. A large number of factories have been closed, and an exceedingly large number are running on reduced time. I have seen statements to the effect that the textile industry is running at a production for more than a year of about 40 to 60 per cent of normal conditions. Unemployment, I regret to say, is widespread and the situation in the textile communities throughout New England and northern New York is very bad, indeed.

I note that the Senator referred to Fall River in his reference to what he had seen in the papers. In addition to the deplorable condition in the textile industry, the city to-day was visited by a devastating fire which occasioned a loss of about $25,000,000. This adds a new and very serious problem to the situation. The city is indeed entitled to our sympathy.

I can not find words to impress upon the Senate that very many of the textile industries, a large percentage of them, are passing through a grave financial depression. The situation is most unfortunate. I know not the precise words that would indicate the real conditions. It is a regrettable situation, unemployment widespread, wages reduced, and the future outlook far from encouraging.

Mr. KING. I thank the Senator, Mr. President, and I wish to say to my Republican friend that much of this so-called pros-

perity is fictitious. I am not sure to what extent brokers and certain business and banking interests are inflating the balloon and trying to make the figures relating to so-called prosperity impressive, in order to show a condition which does not exist. In my opinion, Congress should take cognizance of the financial and industrial conditions and curtail appropriations and attempt to enforce economy in the Government.

Mr. WALSH of Massachusetts. Mr. President——

The PRESIDING OFFICER. Does the Senator from Utah yield to the Senator from Massachusetts?

Mr. KING. I yield.

Mr. WALSH of Massachusetts. The Senator from Utah refers to the industrial condition. He will be interested to know that I had some figures compiled recently showing the reduction in the pay rolls of our industries in the month of November, 1927, as compared to the month of November, 1926. In the 24 leading industries of the country the average reduction in the pay rolls of wage earners was 8 per cent for the month of November, 1927, as compared with November, 1926.

UNEMPLOYMENT CONDITIONS

Mr. WALSH of Massachusetts subsequently said: Mr. President, during the debate this afternoon the Senator from Utah [Mr. KING] made some inquiry of me about unemployment conditions in the country. At the time I did not have in my possession a letter or memorandum which contains some statistics.

May I say now in reply to the inquiry submitted by the Senator from Utah that I recently had inserted in the CONGRESSIONAL RECORD a statement showing that the average pay roll for November, 1927, of the 24 leading industries of the country was a reduction of 8 per cent under the pay rolls of November, 1926.

I have been trying to get some statistics which would furnish an estimate of how much is the probable depreciation in the total pay rolls of the country and the consequent reduction in wages of employees.

The total pay roll of the country compiled two years ago by the Bureau of the Census, namely, in 1925, indicates that the total wages for that year were, in 187,390 establishments, $10,729,- 968,927, and that the number of wage earners in these establishments totaled 8,384,261. An average 8 per cent loss in wages would indicate a depreciation of $933,040,776 in one year in wages or a decrease of about $77,753,390 a month to the wage earners of the country. It is probable, however, that the real sum is a good deal more than this, because of the reduction in the pay rolls averages 8 per cent in the larger and the more prosperous industries it is likely to show a much greater percentage of reduction in the smaller and more competitive industries.

If one were to estimate that 57 per cent of the national income for 1927 was in the nature of wages, and this is the estimate generally made, the total pay roll for the country would amount in 1928 to $58,938,000,000. An average loss of 8 per cent in these pay rolls would indicate a loss to wage earners in the year 1928 of $5,125,043,478. There are no separate statistics of the decrease in wages paid in business and commercial establishments and other classes of employment. This estimate, therefore, assumes a reduction, in all pay rolls to all wage earners, averaging 8 per cent.

The estimate for the national income for 1927 was $103,400,- 000,000. If there should be a decrease of 8 per cent in this income for one year, the decrease in income would be about $10,000,000,000.

I ask that there be printed in the RECORD in connection with my remarks a letter which I have received on this subject.

The VICE PRESIDENT. Without objection, it is so ordered.

The letter is as follows:

ALEXANDER HAMILTON INSTITUTE,
*Astor Place, New York, January 21, 1928.*

Mr. DAVID WALSH,
  *United States Senate Committee on Finance,*
    *Washington, D. C.*

DEAR MR. WALSH: It was a pleasure to have your recent letter relative to figures on pay rolls as published in our Business Conditions Weekly.

The pay-roll figures which appeared in the issue of January 14 are published by us each month and are obtained from a bulletin entitled "Employment in Selected Manufacturing Industries," which is published by the Bureau of Labor Statistics in the Department of Labor. These figures do not, however, reflect total pay rolls for the country, but represent only the pay rolls for the concerns, numbering upward of 11,000, which report these data monthly to the Bureau of Labor Statistics.

There are no data available which give pay rolls for the country, but the most complete figures are the totals compiled each two years by the Bureau of the Census. The last report available is for 1925, and shows total wages for the year paid in 187,390 establishments of $10,729,- 968,927. The number of wage earners engaged in the establishments included totaled 8,384,261. These figures are from the Census of Manufactures.

The National Bureau of Economic Research estimates that there are about 41,000,000 persons gainfully employed in the United States. It is obvious from a comparison of these figures with the census data that there are a very great many persons employed in the United States in small industries which are not included and do not come within the scope of the Bureau of the Census figures.

Another method of estimating the probable total pay roll of the country is by the use of figures relating to the national income and to the percentage of national income which is received in the form of wages. From our bulletin of January 14 one may obtain the estimate of national income for 1927 of $103,400,000,000. The total proportion which wages are of national income has been estimated at from 54 to 59 per cent. If we take an average figure of 57 per cent, we would estimate that total pay rolls for the country will amount in 1928 to $58,938,000,000.

These figures will, I hope, be helpful, and if I can be of further service in any way don't hesitate to let me hear from you.

Sincerely,

WARREN T. HINKENELL.

Mr. KING. Mr. President, the prosperity of the country is measured largely by the wages paid to those who are engaged in gainful occupations, not, of course, by wages paid in inflated paper but by wages determined by the purchasing power of the dollar. I recall when I was in Russia I bought a pair of shoe laces at a cost of 600,000,000 rubles, or at par value, $300,000,000. To hire a drosky to go from the station to the hotel required something like sixteen or seventeen hundred million rubles, equivalent, at par, to seven hundred or eight hundred million dollars. So wages are determined not by the number of dollars or rubles the employee receives, but by the purchasing power of the ruble or the dollar.

Mr. NEELY. Mr. President——

The PRESIDING OFFICER. Does the Senator from Utah yield to the Senator from West Virginia?

Mr. KING. Let me finish the sentence. So we determine whether wages are high, not by the number of dollars a wage earner receives per day or per week but by the purchasing power of the dollar. That has been shown by Prof. Irving Fisher in recent statements made by him. And may I say at this time, in view of what my friend from Massachusetts [Mr. WALSH] has stated, that my recollection of a recent statement by Professor Fisher was that the average earnings of those gainfully employed in the United States did not exceed $520 per annum. Now, I yield to the Senator from West Virginia.

Mr. NEELY. Mr. President, it is fortunate that the Senator from Utah did not inform us about having paid 600,000,000 rubles for a pair of shoe laces while the Senator from New York was on the floor. Otherwise the Senator from Utah would have been accused of being a coal baron. [Laughter.]

Mr. KING. Mr. President, I come back to the bill before us, because these interruptions have led us far astray. I am supporting the Senator from Alabama [Mr. BLACK] in his opposition to one of the provisions of this bill. If he will move to reduce the number of attorneys to 25, I shall be very glad to support such an amendment.

It is manifest that Congress must take the Shipping Board in hand, because if not it will continue its extravagant course and take from the Treasury annually millions of dollars, which will be thrown into the abyss which has absorbed hundreds of millions of dollars heretofore appropriated. Mr. President, I support the amendment offered by the Senator from Alabama and hope that it will be adopted.

The PRESIDING OFFICER. The question is on the amendment offered by the Senator from Alabama [Mr. BLACK].

Mr. WARREN. Mr. President, I have only a word to say in reference to the amendment. It involves an old matter of controversy which, if the amendment shall be adopted, will come up in conference, and from there, of course, it must come back to the two bodies. I hope we may now proceed to get a full vote on the amendment, in order that when the controversy comes before the committee of conference we may know the attitude of the Senate upon it.

Mr. KING. May I inquire of the Senator from Wyoming whether he accepts the amendment offered by the Senator from Alabama?

Mr. WARREN. I am asking for a vote upon the amendment offered by the Senator from Alabama.

The PRESIDING OFFICER. The question is on the amendment offered by the Senator from Alabama.

Mr. GEORGE. Mr. President, I ask that the amendment may be stated.

The PRESIDING OFFICER. The amendment proposed by the Senator from Alabama will be stated for the information of the Senate.

The CHIEF CLERK. On page 35, line 24, the Senator from Alabama [Mr. BLACK] proposes to strike out "three" and to insert "two"; and in line 25, after the numerals "$12,000," before the period, to insert a colon and the following proviso:

*Provided,* That no attorney shall be paid more than $10,000 per year.

The PRESIDING OFFICER. The question is on the amendment proposed by the Senator from Alabama.

Mr. BLACK. I ask for a division on the amendment.

Mr. WARREN. I ask for the yeas and nays.

The yeas and nays were ordered.

Mr. WALSH of Massachusetts. I ask that the amendment may be again read.

The PRESIDING OFFICER. The amendment will be again stated.

The amendment was again stated.

The Chief Clerk proceeded to call the roll.

Mr. FLETCHER (when his name was called). I have a general pair with the Senator from Delaware [Mr. DU PONT]. In his absence, I withhold my vote.

Mr. TYSON. I have a general pair with the senior Senator from West Virginia [Mr. GOFF]. I transfer that pair to the Senator from North Carolina [Mr. SIMMONS] and vote "yea."

Mr. WALSH of Massachusetts (when his name was called). Upon this question and for the day I have a pair with the Senator from Illinois [Mr. DENEEN]. I transfer that pair to the Senator from New Jersey [Mr. EDWARDS] and vote "yea."

Mr. GERRY. I have a pair with the junior Senator from New Mexico [Mr. CUTTING] and therefore withhold my vote.

Mr. McLEAN (after having voted in the negative). I transfer my general pair with the junior Senator from Virginia [Mr. GLASS] to the junior Senator from Maine [Mr. GOULD] and let my vote stand.

Mr. REED of Pennsylvania (after having voted in the negative). I transfer my pair with the Senator from Delaware [Mr. BAYARD] to the Senator from Vermont [Mr. GREENE] and let my vote stand.

Mr. JONES. I wish to announce that the Senator from Vermont [Mr. DALE] is paired with the Senator from Maryland [Mr. TYDINGS].

Mr. GERRY. I wish to announce that the Senator from Missouri [Mr. REED], the Senator from Montana [Mr. WALSH], the Senator from Louisiana [Mr. RANSDELL], the Senator from Mississippi [Mr. STEPHENS], the Senator from Nevada [Mr. PITTMAN], the Senator from North Carolina [Mr. SIMMONS], and the Senator from Delaware [Mr. BAYARD] are detained from the Senate on official business.

The result was announced—yeas 40, nays 30, as follows:

**YEAS—40**

| | | | |
|---|---|---|---|
| Ashurst | Ferris | McKellar | Smith |
| Barkley | Frazier | McMaster | Steck |
| Black | George | Neely | Swanson |
| Blaine | Harris | Norris | Thomas |
| Borah | Harrison | Nye | Trammell |
| Bratton | Hayden | Overman | Tyson |
| Brookhart | Heflin | Robinson, Ark. | Wagner |
| Bruce | Howell | Sheppard | Walsh, Mass. |
| Caraway | King | Shipstead | Waterman |
| Dill | La Follette | | Wheeler |

**NAYS—30**

| | | | |
|---|---|---|---|
| Bingham | Fess | McNary | Schall |
| Blease | Gillett | Moses | Smoot |
| Broussard | Hale | Oddie | Steiwer |
| Capper | Hawes | Phipps | Warren |
| Copeland | Jones | Pine | Watson |
| Couzens | Kendrick | Reed, Pa. | Willis |
| Curtis | Keyes | Robinson, Ind. | |
| Edge | McLean | Sackett | |

**NOT VOTING—24**

| | | | |
|---|---|---|---|
| Bayard | Fletcher | Greene | Reed, Mo. |
| Cutting | Gerry | Johnson | Shortridge |
| Dale | Glass | Metcalf | Simmons |
| du Pont | Goff | Norbeck | Stephens |
| Edwards | Gooding | Pittman | Tydings |
| | Gould | Ransdell | Walsh, Mont. |

So Mr. BLACK's amendment was agreed to.

Mr. BLACK. Mr. President, I have another amendment, which I send to the desk and ask to have stated.

The VICE PRESIDENT. The amendment will be stated.

The CHIEF CLERK. On page 36, line 8, it is proposed to strike out "$13,688,750" and insert "$13,538,750," and to add thereto the following:

*Provided,* That not more than $113,200 be paid out of this appropriation for lawyer fees for the 12 months next following the passage of this act.

Mr. BLACK. Mr. President, I desire to explain very briefly the purpose of this amendment.

Mr. WARREN. I should be glad to have the amendment read again.

Mr. BLACK. I might state the purpose of the amendment so that the Senator can understand it better, perhaps, than from the language of the amendment itself.

The amendment provides for a reduction of the total appropriation for the Shipping Board in the sum of $150,000, and then takes that $150,000 off the amount that was spent for lawyers last year, and provides that no more than $113,000 shall be spent for lawyers' fees. That is for this purpose, which I desire very briefly to explain:

I believe that an examination of the report made to the Appropriations Committee of the House will disclose to any impartial man that there have been at least four lawyers employed by the Shipping Board when it might have done with one; and I consider that this employment of persons who have nothing to do simply amounts to taking money out of the pockets of the taxpayers in order to contribute it to some people who may have enough influence to secure positions. It does not help the shipping business. It does worse than that; it hangs an impediment around the neck of the Government by thus employing useless individuals who have nothing to do, and whose chief occupation is in drawing a monthly salary.

I consider that it is no more and no less than rank organized robbery to place people in a position where they draw public money when there is not the slightest necessity for their doing so; and to state that you can have a business which has only 438 lawsuits disposed of in one year and that it required 48 lawyers to do it, at an expense of $288,000, is entirely too much for the average individual to swallow.

In addition to that, they employ special attorneys to try every case that is tried outside of Washington and New York. That was done in my own State of Alabama. It is done, according to the report of the Shipping Board to the Appropriations Committee of the House, in every important lawsuit that they have. Not only that, but the Attorney General of the United States and his department have charge of those prosecutions and defenses, and the whole thing narrows down to this:

There has grown up an incubus there of useless lawyers, drawing enormous salaries, with nothing to do. There is no hope for the economy which has been promised by the present administration unless somebody votes to cut off these useless employees. It is simply a step to aid the Government in the operation of the ships. The chief argument used—I ask the attention of those who supported the Jones bill—to defeat that bill was the argument that Government operation is unsuccessful because it fills up all the places with useless employees. That argument is sound and good; and unless we who are here, and who believe in the virtue of the Jones bill, are willing to lop off these useless employees, then the Jones bill is wrong and we ought to reverse our position.

For that reason, I ask for this reduction of the appropriation.

Mr. FLETCHER. Mr. President——

Mr. BLACK. I yield to the Senator.

Mr. FLETCHER. This wide latitude for the employment of lawyers rather tempts them to put up some sort of a defense in every case and fight it on for years and years, always keeping these lawyers employed; and as they are drawing salaries, instead of promoting the disposition of business in an economical and sensible way, it is a temptation to prolong litigation and keep up litigation just to have lawyers employed to fight it. It looks as though $113,000 a year ought to be sufficient for lawyers' fees for this board.

Mr. ROBINSON of Arkansas. Mr. President, will the Senator from Alabama yield to me?

Mr. BLACK. I yield to the Senator from Arkansas.

Mr. ROBINSON of Arkansas. The Senator from Alabama has made a somewhat careful study of this subject. I understand that his investigation into the question disclosed that during the last year, while there were a great many lawsuits pending, there were very few actual trials. The greater number of the cases were dismissed; then a large number were discontinued, and practically the remainder settled, so that there were only a very few trials. Can the Senator state how many trials occurred?

Mr. BLACK. It is impossible to state how many trials occurred, for this reason: They have settled—this statement is made in their report—before or after trial, but before final disposition was made, 239 cases; but it is natural to suppose that not a single one of those ever reached its destination in the highest court, for the reason that they state that all of them were settled. Not a single case, according to that record, was tried through to completion, except one which was presented to the Supreme Court by the Solicitor General of the United States, not by the attorneys of the Shipping Board.

Mr. ROBINSON of Arkansas. Of course, the fact that a case is dismissed or that it is settled does not necessarily imply inefficient management of the case.

Mr. BLACK. Not at all.

Mr. ROBINSON of Arkansas. But it would seem that, considering the number of cases that were brought, and the very few that were tried, the amount which the Senator's amendment proposes should be ample under this economical administration.

Mr. BLACK. I believe that if this economical administration should go out here in Washington and New York and attempt to hire a firm of lawyers, they could get for $25,000 a good firm to try every lawsuit they have—every one of them. Here, in order that we may be liberal at this time, until the Appropriations Committee goes further into the situation, I have left the leeway of $113,000; and if that is not enough money to take care of the disposition by settlement of 430 cases in one year, then I am mistaken as to what is sufficient to employ lawyers in the United States of America.

The VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Alabama [Mr. BLACK].

The amendment was agreed to.

Mr. KING. Mr. President, I rise for the purpose of securing information.

I recall that when the committee, headed by the late Senator from Maine, Mr. Fernald, had charge of the Housing Corporation, and upon the floor he seemed to have charge of the appropriations for the Housing Corporation, he stated—that was four or five years ago—that the corporation was about to be wound up, and that it ought to be wound up, and ought to have been dissolved prior to the time he made the statement. Notwithstanding that, and the fact that years have gone by since that statement was made by a very able and very conscientious Senator, I find here an appropriation of $403,250 for a continuation of this organization for another year.

I ask, for information, as to the necessity of that appropriation, and why the Housing Corporation has not been wound up.

Mr. WARREN. Mr. President, first, let me say that the income of the Housing Corporation from various sources amounts to some six or eight or ten times the outgo—perhaps not quite so much as that. I can give the Senator the figures in a moment. The houses here, those that were particularly in the charge of the honorable Senator from Maine, are bringing in about $65,000 more than the outgo. As to the others, there are lands situated in various places, there are houses and mills and things of that kind; and the receipts from their disposition last year were something like a million and a quarter dollars.

The chairman of the Appropriations Committee took the same ground that the Senator does, that this corporation ought to be closed up. The chairman of the corporation said that he feared that in the condition in which things were, in view of the existence of certain obligations, far less than the real value would be received if the affairs were closed up at once, and that a little more time should be allowed. Of course, our committee had no authority to tell him how to proceed, but we asked that he proceed as rapidly as possible.

Mr. KING. I find here for the maintenance and operation and management of the hotels and restaurants in Washington $403,250, and $238,500 for personal services in the District of Columbia.

Mr. WARREN. The income derived from the Government hotels for the period under consideration aggregates $445,730.68, while the operating expenses for the enterprise were $393,967.47. Deposits therefore exceeded withdrawals by $51,763.21. That answers the Senator's question.

Mr. KING. Does that take into account insurance, deterioration, and interest on capital?

Mr. WARREN. Everything of every kind. But I might say that the United States does not insure, however.

Mr. KING. Is it the policy of the Government to keep this organization?

Mr. WARREN. No; it is not. It is just one of those matters which the Democratic administration initiated—I do not allege that they did wrong—and we are getting out of them as fast as we can, with proper economy, and saving as much as possible.

Mr. SMOOT. I will say to my colleague that there will be reported from the Committee on Public Buildings and Grounds, if not to-day, within a very few days, a bill to abolish the Government hotels; but up to the present time we have not been able to abolish them. We do not pay insurance and we do not take into consideration wear and tear. The sooner they are done away with the better. They ought to have been done away with some time ago.

Mr. KING. Mr. President, I knew that my colleague entertained the same idea as I did in that regard. The Senator from Wyoming was not quite accurate when he said that interest and deterioration had been taken into account.

Mr. SMOOT. That is never done in the case of the Government.

Mr. WARREN. That is a matter very much like the management of the restaurant here in the Capitol. Let me give the figures.

Mr. SMOOT. I hope that by another year those Government hotels will be out of the way and that the improvement of the plaza will at least be mapped out, so that we will know what it is going to be some time in the future.

Mr. WARREN. Mr. President, I will give the Senator a statement of the collections by the United States Housing Corporation during the fiscal year 1927. They totaled $2,288,055.04. Expenditures on account of these collections amounted to $84,872.82, or approximately 0.037 per cent.

Mr. SMOOT. Mr. President, I want to say also to my colleague that outside of the District of Columbia the Housing Corporation has a very much more difficult situation than exists here in the District. Here in the District we can tear the buildings down. During war time hundreds of houses were built and sold to individuals, to be paid for in monthly installments. I do not know how many there were of those; I can not remember, but there were many of them. My colleague will remember that little towns were built at that time. Those houses are being paid for in monthly installments. I have sometimes thought I would like to take each particular case up and examine it and see whether it would not be cheaper for the Government, in the end, to cancel the obligation, or turn it over to some other agency, and get what we could out of it.

Mr. WARREN. Let me inform the Senator that I have here the testimony on that subject given before the House Committee on Appropriations, as follows:

> Mr. WOOD. How many different pieces of property have you remaining undisposed of?
>
> Mr. WATSON. About 2,300 mortgages in force, and——
>
> Mr. REED. There are 2 houses undisposed of and about 267 pieces of vacant property.

Mr. KING. Mr. President, it seems to me this organization has existed too long, and the Government ought to have been able to dispose of its assets and wind it up long before this. I shall make no motion at this time, however, because obviously for the present the organization must exist until it makes disposition of these houses.

Mr. JONES. Mr. President, on page 17 there is a provision made for the Federal Trade Commission. The committee in the House reported a proviso to that provision, providing that none of the moneys herein appropriated shall be expended for certain purposes, and among them was a certain investigation of an economic character that apparently is being carried on by the Federal Trade Commission. That proviso went out on a point of order. The Senate committee heard testimony with reference to this matter, but we concluded not to propose an amendment, because of the language of this appropriation. The language is as follows:

> For all other authorized expenditures of the Federal Trade Commission in performing the duties imposed by law or in pursuance of law.

We thought that that language limited the expenditure of this money to purposes and objects authorized by law, and if they initiate investigations not authorized by law it is fully within the power of the Comptroller General to prevent the payment of the expenses of carrying them on. So we did not propose an amendment.

I want to call attention to this phase of the matter. In my judgment, from a hasty examination of the law, I do not believe there is any legal authority to carry on some of the investigations that have been ordered by the Federal Trade Commission without any suggestion from Congress, by resolution or otherwise, and I believe those investigations are outside of the authority reposed by law in the commission. That is a matter that must be determined by the Comptroller General.

Mr. ROBINSON of Arkansas. Mr. President, will the Senator yield?

Mr. JONES. I yield.

Mr. ROBINSON of Arkansas. Does the Senator imply that in his opinion the Federal Trade Commission has no authority to initiate an investigation?

Mr. JONES. The Federal Trade Commission I think has the authority to initiate certain kinds of investigations. I am inclined to think that they have initiated three or four kinds

of investigations that they were not authorized to carry on. But we came to the conclusion that that could be determined by the Comptroller General when the vouchers came in. There are certain investigations they have initiated which I do not believe come within the terms of the law, but not all. They may initiate some.

Mr. ROBINSON of Arkansas. The statement made by the Senator is so general that it would be difficult for the Senate to form a conclusion as to whether his position is correct or not.

Mr. JONES. That is true. I am not asking the Senate to form a conclusion about it. I am not going to propose any amendment to the bill, but I am just calling attention to that phase of it, and hope, at any rate, that the Comptroller General will investigate the vouchers pretty carefully when they come in.

Mr. KING. As I understood the Senator, neither the House nor the Senate has offered any amendment changing existing law.

Mr. JONES. No.

The VICE PRESIDENT. The bill is still as in Committee of the Whole and open to amendment. If there is no further amendment to be proposed, the bill will be reported to the Senate as amended.

The bill was reported to the Senate as amended.

Mr. KING. Mr. President, I move that the bill be recommitted to the Committee on Appropriations, with instructions to reduce the appropriation $25,000,000.

The VICE PRESIDENT. The question is on the motion of the Senator from Utah.

The motion was rejected.

The VICE PRESIDENT. The question is on concurring in the amendments made as in Committee of the Whole.

The amendments were concurred in.

The amendments were ordered to be engrossed and the bill to be read a third time.

The bill was read the third time and passed.

INTERIOR DEPARTMENT APPROPRIATIONS

Mr. SMOOT. Mr. President, I ask that the Senate proceed to the consideration of House bill 9136, making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes.

The VICE PRESIDENT. The Senator from Utah asks unanimous consent to proceed to the consideration of House bill 9136. Is there objection?

Mr. ROBINSON of Arkansas. I would like to ask whether the Senator from Utah intends to proceed with the consideration of the bill this afternoon?

Mr. SMOOT. I want to do so. I wish to get through with the committee amendments, and there are not many of them.

Mr. MOSES. How about the unfinished business?

The VICE PRESIDENT. If the bill shall be taken up by unanimous consent, it will not displace the unfinished business.

Mr. ROBINSON of Arkansas. I am not making any objection to the request. I merely wanted to understand whether the Senator in charge of the bill expected to proceed with it this afternoon.

Mr. SMOOT. Yes; I would like very much to do so.

Mr. KING. Let me ask my colleague a question. If we proceed with the bill, will he be satisfied to take up and act upon the committee amendments, but not take a vote upon the bill until to-morrow morning, giving us a chance to examine it? I have been so occupied that I have not had a chance to examine the bill. I have no objection to proceeding, but not to go to the extent of denying Senators an opportunity to examine the bill to-night, and finally act upon it to-morrow.

Mr. SMOOT. I am satisfied with that course.

Mr. KING. Then I have no objection.

The VICE PRESIDENT. Is there objection?

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill (H. R. 9136) making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes, which had been reported from the Committee on Appropriations with amendments.

Mr. SMOOT. Mr. President, I ask that the formal reading of the bill be dispensed with and that the bill be read for action on the committee amendments.

The VICE PRESIDENT. Is there objection? The Chair hears none, and it is so ordered.

The Chief Clerk proceeded to read the bill.

The first amendment of the Committee on Appropriations was, under the heading "Bureau of Indian Affairs, industrial assistance and advancement," on page 22, line 3, after the word "for," to strike out "expenses to be incurred" and insert "expenditures to be made," so as to make the paragraph read:

For transfer to the Geological Survey for expenditures to be made in supervising mining operations on restricted, tribal, and allotted Indian lands leased under the provisions of the acts of February 28, 1891, May 27, 1908, March 3, 1909, and other acts authorizing the leasing of such lands for mining purposes, $60,000 or so much thereof as may be necessary.

The amendment was agreed to.

The next amendment was, under the subhead "Irrigation and drainage," on page 33, after line 10, to strike out:

Flathead irrigation project, Montana: The unexpended balance of the appropriation for continuing construction of the irrigation systems on the Flathead Indian Reservation, Mont., contained in the act of May 10, 1926 (44 Stat. L. 464–466), as continued available in the act of January 12, 1927 (44 Stat. L. 945), shall remain available for the fiscal year 1929, subject to the conditions and provisions of said acts: Provided, That the unexpended balance of the $305,000 available for continuation of construction of a power plant may be used, in the discretion of the Secretary of the Interior, for the construction and operation of a power-distributing system and for purchase of power for said project, but shall be available for that purpose only upon execution of an appropriate repayment contract as provided for in said acts: Provided further, That the net revenues derived from the operation of such distributing system shall be used to reimburse the United States in the order provided for in said acts: Provided further, That the Federal Power Commission is authorized, in accordance with the Federal water power act and upon terms satisfactory to the Secretary of the Interior, to issue a permit or permits or a license or licenses for the use, for the development of power, of power sites on the Flathead Reservation and of water rights reserved or appropriated for the irrigation projects: Provided further, That rentals from such licenses for use of Indian lands shall be paid the Indians of said reservation as a tribe, which money shall be deposited in the Treasury of the United States to the credit of said Indians, and shall draw interest at the rate of 4 per cent: Provided further, That the public notice provided for in the act of January 12, 1927, shall be issued by the Secretary of the Interior upon the 1st day of November, 1930: Provided further, That in his discretion the Secretary of the Interior may provide in such repayment contracts for covering into construction costs the operation and maintenance charges for the irrigation season of 1928 and all undistributed operation and maintenance cost, and may extend the time for payment of operation and maintenance charges now due and unpaid for such period as in his judgment may be necessary, not exceeding five years, the charges now due so extended to bear interest payable annually at the rate of 6 per cent per annum until paid, and to contract for the payment of the construction charges now due and unpaid within such term of years as the Secretary may find to be necessary, with interest payable annually at the rate of 6 per cent per annum until paid: Provided further, That not more than $35,000 of said reappropriated balance of $305,000 shall be immediately available for operation and maintenance, and $75,000 shall be available for construction of laterals near Ronan upon the execution of appropriate repayment contract as provided for in said acts.

Mr. SMOOT. Mr. President, I ask that that amendment may go over until the Senator from Montana [Mr. WALSH] is present. I call the attention of the Senator from Wisconsin [Mr. LA FOLLETTE] to the fact that this amendment involves the Flathead project.

The PRESIDENT pro tempore. The amendment will be passed over.

The next amendment was, under the subhead "Education," on page 45, line 12, after the name "Oregon," to insert "to be immediately available," so as to read:

For construction, lease, purchase, repair, and improvement of school buildings, including the purchase of necessary lands and the installation, repair, and improvement of heating, lighting, power, and sewerage and water systems in connection therewith, $398,000: Provided, That not more than $7,500 out of this appropriation shall be expended for new construction at any one school or institution unless herein expressly authorized: Provided further, That from this appropriation new construction is authorized as follows: For central heating and power plant, Eastern Navajo School, not to exceed $37,000; for remodeling, improving, and enlarging the Rice Station Boarding School, San Carlos Reservation, Ariz., including equipment, $40,323; for a day school for the Choctaw Indians of Mississippi, $10,000; for central heating plant and water supply, Seneca Indian School, Oklahoma, $35,000; and for the construction and equipment of a school building in or near Burns, Oreg., to be immediately available, $8,000.

The amendment was agreed to.

Mr. THOMAS. Mr. President, I desire to submit an amendment on page 45.—

The PRESIDENT pro tempore. The Chair will state for the information of the Senator from Oklahoma that under the unanimous-consent agreement the Senate is considering now only committee amendments. Full opportunity will be afforded the Senator from Oklahoma later to submit his amendment.

Mr. THOMAS. Mr. President, a parliamentary inquiry.

The PRESIDENT pro tempore. The Senator from Oklahoma will state the parliamentary inquiry.

Mr. THOMAS. Will it be agreeable to have the amendment presented at our next session?

Mr. SMOOT. To-morrow?

Mr. THOMAS. Yes.

Mr. SMOOT. Certainly.

The PRESIDENT pro tempore. It may be presented at any time after the committee amendments have been disposed of.

Mr. SMOOT. We will probably not dispose of the bill to-night.

Mr. KING. Might it not be a good idea to have the amendment read so that we may be advised of its contents?

The PRESIDENT pro tempore. The Chair understands that the amendment has been printed. The clerk will state the next amendment of the committee.

The next amendment of the Committee on Appropriations was, under the subhead "Conservation of health," on page 57, line 18, after the words "for support and," to strike out "civilization" and insert "administration," so as to read:

There shall be available for health work among the several tribes of Indians not exceeding $250,000 of the tribal trust funds authorized elsewhere in this act for support and administration of Indians.

The amendment was agreed to.

The next amendment was, under the subhead "General support and administration," on page 61, line 23, after the name "Klamath," to strike out "$185,000" and insert "$164,000"; and in line 26, after the words "in all," to strike out "$224,800" and insert "$203,800," so as to read:

Oregon: Klamath, $164,000, of which $10,000 may be used for construction, repair, and improvement of buildings at the agency plant; Umatilla, $9,800; Warm Springs, $30,000; in all, $203,800.

The amendment was agreed to.

The next amendment was, on page 62, line 16, after the figures "$7,000," to strike out "may be used" and insert "shall be immediately available," so as to read:

Wyoming: Shoshone, $80,000, of which $7,000 shall be immediately available for the installation of a hydroelectric plant and appurtenances, and the wiring of buildings.

The amendment was agreed to.

The next amendment was, on page 62, at the end of line 20, to change the total appropriation for general support and administration of Indians and Indian property, etc., from $1,489,900 to $1,468,900.

The amendment was agreed to.

The next amendment was, under the subhead "Roads and bridges," on page 66, line 16, after the figures "$100,000," to insert "to be immediately available," so as to make the paragraph read:

For one-half the cost of construction of a road between Cooley and Whiteriver, on the Fort Apache Indian Reservation, Ariz., as authorized by the act of April 12, 1924 (43 Stat. L. 93), $100,000, to be immediately available, payable from funds of the Indians of said reservation on deposit to their credit in the Treasury.

The amendment was agreed to.

The next amendment was, on page 67, after line 11, to insert:

For maintenance and repair of that portion of the Gallup-Shiprock Highway within the Navajo Reservation, N. Mex., $20,000, reimbursable as provided in the act of June 7, 1924.

Mr. KING. Mr. President, may I inquire if that amendment has been accepted by the Senators from New Mexico?

Mr. SMOOT. Yes. It passed the committee of the House and the committee of the Senate, and also has been agreed upon by the full committee.

Mr. KING. Did the Senators from New Mexico agree to it?

Mr. SMOOT. Both of their propositions.

The amendment was agreed to.

The next amendment of the Committee on Appropriations was, under the subhead "Annuities and per capita payments," on page 69, line 21, before the words "per capita payment," to strike out "$100" and insert "$200"; and at the end of line 24, after the word "purpose," to insert a comma and "to be immediately available," so as to read:

The Secretary of the Interior is hereby authorized, under such rules and regulations as he may prescribe, to make a $200 per capita payment to the Menominee Indians of Wisconsin from their funds on deposit in the Treasury of the United States, a sufficient amount of which is hereby appropriated for the purpose, to be immediately available.

Mr. KING. Mr. President, may I inquire of the Senator whether it was desired by the Indians to increase the appropriation?

Mr. SMOOT. Some of the Indians requested that it be made a larger amount, but the $200 per capita payment was suggested by the Senator from Wisconsin [Mr. LA FOLLETTE] and also agreed to by all the Senators interested in the Indian affairs of the country. The Indians have sufficient money to have made this a larger amount. It is in the Treasury of the United States; but the committee unanimously decided, after the Senator from Wisconsin spoke about the matter to the committee, to increase the $100 to $200 per capita.

Mr. KING. I have no objection if it is agreeable to those who have the interests of the Indians at heart and to the Senator from Wisconsin [Mr. LA FOLLETTE].

Mr. LA FOLLETTE. Mr. President, I merely desire to state that the per capita payment comes out of the Menominee Indian fund. It is not a gratuity appropriation. It is desired by the Indians in order that they may have funds immediately available with which to prepare for their spring planting and other operations, and also to provide additional money for the aged and indigent Indians on the reservation.

The PRESIDENT pro tempore. The question is on agreeing to the amendment reported by the committee.

The amendment was agreed to.

Mr. JONES. Mr. President, I do not know whether the amendment on page 33 was passed over.

The PRESIDENT pro tempore. That amendment was passed over.

Mr. JONES. That is all right. The Senator from Montana [Mr. WALSH] is necessarily absent on official business.

The next amendment of the Committee on Appropriations was, under the heading "Bureau of Pensions, salaries," on page 70, line 16, after the numerals "1923," to strike out "$1,150,000" and insert "$1,165,000, of which $15,000 shall be immediately available," so as to read:

For the Commissioner of Pensions and other personal services in the District of Columbia in accordance with "the classification act of 1923," $1,165,000, of which $15,000 shall be immediately available.

Mr. KING. Mr. President, an examination of the activities of the Pension Bureau shows that the number of pensioners is growing less and that the work of the Pension Bureau is less now than it has been for a number of years. It does seem to me that there ought to be a diminution in the amount appropriated to pay the expenses of that bureau.

I might say, however, in passing that the Pension Bureau is to be congratulated because of its economies when we take into account that it has handled as much as $250,000,000 to $260,000,000 and distributed it among 800,000 people with an expenditure of $2,000,000 or $3,000,000 a year for the operation of that bureau. Yet in the bill which we passed a little while ago for the Veterans' Bureau $40,000,000 was appropriated in one lump sum for operating expenses and $30,000,000 plus for other operating expenses, so that out of the $497,000,000 carried by that bill approximately $70,000,000 goes for salaries and compensation and for administrative purposes in the Veterans' Bureau. I repeat that the Pension Bureau has been economically administered, if the other organization is a standard.

Mr. SMOOT. I might add to what my colleague said that all of the cases, which are virtually pension cases, coming to the Veterans' Bureau are examined by the Pension Bureau. I think myself the expenses of the Pension Bureau, taking into consideration the amount of money that they handle and the very large number of cases they have to pass upon, are as economically administered as any bureau in the Government.

Mr. KING. I share the views of my colleague. I was wondering why the Veterans' Bureau, with a smaller number of cases than the maximum number handled by the Pension Bureau, should cost nearly $70,000,000, whereas the Pension Bureau, as I recall, never exceeded more than two or three million dollars at any time when it was handling the maximum number of cases. The disparity, it seems to me, is unwarranted, and yet I am not on the committee and not able to determine whether there has been economy or not. It does seem to me, however, that in the Veterans' Bureau too much money is expended for operating expenses. General Hines, whom I know, is a man of integrity and a man pledged to economy. He is a good administrator and, of course, must have reasons for the heavy expenses. But it does seem to me that there ought to be some effort made to reduce the expenses in the Veterans' Bureau, especially the administrative expenses. Forty million dollars plus $30,000,000 for administration is too

Case 3:19-cr-00407-SI    Document 34-6    Filed 10/19/20    Page 33 of 66

much. The Pension Bureau has set a good example in economy, and I think is worthy of all praise.

The PRESIDENT pro tempore. The question is on agreeing to the committee amendment.

The amendment was agreed to.

The next amendment of the Committee on Appropriations was, under the heading "Bureau of Reclamation," on page 72, line 9, after the name "District of Columbia," to strike out "$23,000"; in all, $168,000" and insert "$27,000"; in all, $172,000," so as to read:

Commissioner of Reclamation, $10,000; and other personal services in the District of Columbia in accordance with "the classification act of 1923," $135,000; for office expenses in the District of Columbia, $27,000; in all, $172,000.

The amendment was agreed to.

The next amendment was, on page 72, line 19, after the word "exceed," to strike out "$160,000" and insert "$170,000"; in line 20, before the words "for other expenses," to strike out "$25,000" and insert "$30,000"; in line 24, before the words "for other expenses," to strike out "$30,000" and insert "$13,000"; and on page 73, line 2, after the word "exceed," to strike out "$20,000" and insert "$25,000," so as to read:

For all expenditures authorized by the act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto, known as the reclamation law, and all other acts under which expenditures from said fund are authorized, including not to exceed $170,000 for personal services and $30,000 for other expenses in the office of the Chief Engineer, $25,000 for telegraph, telephone, and other communication service, $8,000 for photographing and making photographic prints, $50,000 for personal services, and $13,000 for other expenses in the field legal offices; examination of estimates for appropriations in the field; refunds of overcollections and deposits for other purposes; not to exceed $25,000 for lithographing, engraving, printing, and binding; purchase of ice; purchase of rubber boots for official use by employees; maintenance and operation of horse-drawn and motor-propelled passenger-carrying vehicles; not to exceed $40,000 for purchase of horse-drawn and motor-propelled passenger-carrying vehicles; packing, crating, and transportation (including drayage) of personal effects of employees upon permanent change of station, under regulations to be prescribed by the Secretary of the Interior; payment of damages caused to the owners of lands or other private property of any kind by reason of the operations of the United States, its officers or employees, in the survey, construction, operation, or maintenance of irrigation works, and which may be compromised by agreement between the claimant and the Secretary of the Interior, or such officers as he may designate; payment for official telephone service in the field hereafter incurred in case of official telephones installed in private houses when authorized under regulations established by the Secretary of the Interior.

The amendment was agreed to.

The next amendment was, on page 75, line 11, after the word "maintenance," to strike out "$255,000" and insert "$280,000"; in line 12, after the figures "$20,000," to strike out "in all, $275,000" and insert "for continuation of construction of protective works at Picacho and unnamed washes, $30,000; in all, $330,000," so as to read:

Yuma project, Arizona-California: For operation and maintenance, $280,000; for continuation of construction of drainage, $20,000; for continuation of construction of protective works at Picacho and unnamed washes, $30,000; in all, $330,000.

The amendment was agreed to.

The next amendment was, in the item for the Yuma auxiliary project, on page 75, line 19, after the numerals "1929," to strike out the colon and the following additional proviso:

Provided further, That not to exceed $25,000 from the power revenues shall be available during the fiscal year 1929 for the operation and maintenance of the commercial system.

The amendment was agreed to.

The next amendment was, on page 76, line 17, after the word "works," to strike out "$29,000" and insert "$79,000"; in line 18, after the figures "$1,075,000," to strike out the colon and "Provided, That not to exceed $40,000 from the power revenues shall be available during the fiscal year 1929 for the operation of the commercial system; in all, $1,104,000," and insert "in all, $1,154,000," so as to read:

Minidoka project, Idaho: For operation and maintenance, reserved works, $79,000; continuation of construction, $1,075,000; in all, $1,154,000.

The amendment was agreed to.

Mr. KING. Mr. President, I would like to ask the Senator in charge of the bill the reason for this increase in the appropriation for the Minidoka project. That project has been re-

ceiving enormous appropriations for many years. The project when it first started was to cost $20 an acre for water for the settlers. My understanding is that that amount has been doubled and more than doubled. Probably the cost now to the settlers for drainage and for water will approximate $80 an acre. I thought this proposition had been wound up, but here we find this increased amount of $1,075,000 for continuing the work upon the Minidoka project. Is it never to end? Will it never be completed?

Mr. SMOOT. Mr. President, I do not know just how soon it will be completed, but it is not completed up to date. The authorization was made some years ago. This amount will have to be used this year for the further continuation of the construction of the project. It is one of the reclamation projects, I will say to my colleague, and they all take a lot of time. I wish we had money enough to complete them all as quickly as possible, but the money that is appropriated is paid back yearly by the farmers upon the projects, and it comes in very slowly as compared with the amount we have to expend.

The amendment was agreed to.

The next amendment was, on page 77, line 6, after the word "maintenance," to strike out "$27,000" and insert "$32,000"; and in line 7, after the words "in all," to strike out "$44,000" and insert "$49,000," so as to read:

Milk River project, Montana: For operation and maintenance, $32,000; continuation of construction, $17,000; in all, $49,000.

The amendment was agreed to.

The next amendment was, on page 78, line 19, after the names "Nebraska-Wyoming," to strike out "Not to exceed $75,000 from the power revenues shall be available during the fiscal year 1929 for the operation and maintenance of the commercial system" and insert "For operation and maintenance of reserved works, $75,000," so as to read:

North Platte project, Nebraska-Wyoming: For operation and maintenance of reserved works, $75,000.

The amendment was agreed to.

The next amendment was, on page 80, line 4, after the word "maintenance," to strike out "$30,000" and insert "$50,000"; in line 7, after the word "year," to strike out "1928" and insert "1926"; in the same line, after the word "reappropriated," to strike out the colon and "Provided, That not to exceed $20,000 from the power revenues shall be available during the fiscal year 1929 for the operation and maintenance of the commercial system; in all, $430,000" and insert "in all, $450,000," so as to read:

Riverton project, Wyoming: For operation and maintenance, $50,000; continuation of construction under force account, $400,000, together with the unexpended balance of the appropriation for this purpose for the fiscal year 1926, which is hereby reappropriated; in all, $450,000.

The amendment was agreed to.

The next amendment was, on page 80, line 14, after the figures "$25,000," to strike out "in all, $160,000," and insert "for operation and maintenance of the power plant, $20,000; in all, $180,000"; and in line 20, after the figures "$21,000," to strike out the colon and "Provided further, That not to exceed $15,000 from the power revenues shall be available during the fiscal year 1929 for the operation and maintenance of the commercial system," so as to read:

Shoshone project, Wyoming: For continuation of construction of drainage, Garland division, $115,000; Frannie division, $20,000; Willwood division, $25,000; for operation and maintenance of the power plant, $20,000; in all, $180,000: Provided, That of the unexpended balance of the appropriation for this project for the fiscal year 1927 there is reappropriated for operation and maintenance of the Frannie division, $11,000; and of the Willwood division, $10,000; in all, $21,000.

The amendment was agreed to.

The next amendment was, on page 82, at the end of line 17, to change the total appropriation from the reclamation fund from "$12,614,000" to "$12,843,000."

The amendment was agreed to.

The next amendment was under the heading "Geological Survey," on page 85, line 24, after the word "station," to strike out the comma and "including not to exceed $6,000 for additional equipment, $12,000; in all, $209,000," and insert "and other base-gauging stations in the Colorado River drainage, $50,000; in all, $247,000," so as to read:

For gauging streams and determining the water supply of the United States, the investigation of underground currents and artesian wells, and the preparation of reports upon the best methods of utilizing the water resources, $107,000; for operation and maintenance of the Lees Ferry, Ariz., gauging station, and other base-gauging stations in the Colorado River drainage, $50,000; in all, $247,000, of which amount not to exceed $70,000 may be expended for personal services in the District

of Columbia, and of which $25,000 may be used to test the existence of artesian and other underground water supplies suitable for irrigation in the arid and semiarid regions by boring wells.

The amendment was agreed to.

The next amendment was, on page 86, line 21, after the word "laws," to strike out "$160,000" and insert "$180,000"; and in line 22, after the word "exceed," to strike out "$110,000" and insert "$120,000," so as to read:

For the examination and classification of lands requisite to the determination of their suitability for enlarged homesteads, stock-raising homesteads, public watering places, and stock driveways, or other uses, as required by the public land laws, $180,000, of which amount not to exceed $120,000 may be expended for personal services in the District of Columbia.

The amendment was agreed to.

The next amendment was, on page 88, at the end of line 13, to change the total appropriation for the United States Geological Survey from $1,758,080 to $1,816,080.

The amendment was agreed to.

The next amendment was, under the heading "National Park Service," on page 96, line 9, after the word "and," to insert "$2,250," so as to make the paragraph read:

Yosemite National Park, Calif.: For administration, protection, and maintenance, including not exceeding $5,350 for the purchase, maintenance, operation, and repair of horse-drawn and motor-driven passenger-carrying vehicles for the use of the superintendent and employees in connection with general park work, not exceeding $3,200 for maintenance of that part of the Wawona Road in the Sierra National Forest between the park boundary 2 miles north of Wawona and the park boundary near the Mariposa Grove of Big Trees, and not exceeding $2,000 for maintenance of the road in the Stanislaus National Forest connecting the Tioga Road with the Hetch Hetchy Road near Mather Station, and including necessary expenses of a comprehensive study of the problems relating to the use and enjoyment of the Yosemite National Park, and the preservation of its natural features, $290,000; for construction of physical improvements, $97,250, of which not to exceed $65,000 shall be available for water supply and camp-ground facilities at Glacier Point, $8,000 for two comfort stations and two community buildings at the winter camp grounds, $6,000 for two employees' cottages, and $2,250 for the construction of a building to cover the sewage-disposal tanks; in all, $387,250.

The amendment was agreed to.

The next amendment was, on page 97, line 12, after the words "residence for the," to strike out "superintendent" and insert "custodian"; and in line 17, after the word "monument," to insert "or for the purchase and installation of a power unit for lighting the cave," so as to make the paragraph read:

Carlsbad Cave National Monument, N. Mex.: For administration, protection, maintenance, development, and preservation, including not exceeding $1,500 for the purchase, maintenance, operation, and repair of motor-driven passenger-carrying vehicles for the use of the custodian and employees in connection with general monument work, $30,500; for construction of physical improvements, $33,500, including not exceeding $2,500 for a ranger cabin, $5,000 for a residence for the custodian, to be constructed in Carlsbad, N. Mex., on a site donated therefor, $2,000 for a garage and supply room, $13,000 for construction and installation of power transmission line between Carlsbad, N. Mex., and the cave, within and without the national monument, or for the purchase and installation of a power unit for lighting the cave; in all, $70,000.

The amendment was agreed to.

The next amendment was, under the heading "Freedmen's Hospital," on page 114, in line 6, after the figures "$474,500," to strike out the comma and the words "of which amount one-half shall be chargeable to the District of Columbia and paid in like manner as other appropriations of the District of Columbia are paid," so as to read:

For officers and employees and compensation for all other professional and other services that may be required and expressly approved by the Secretary of the Interior, $142,000; for subsistence, fuel and light, clothing, to include white duck suits and white canvas shoes for the use of internes, and rubber surgical gloves, bedding, forage, medicine, medical and surgical supplies, surgical instruments, electric lights, repairs, replacement of X-ray apparatus, furniture, motor-propelled ambulance, including not exceeding $200 for the purchase of books, periodicals, and newspapers for which payments may be made in advance, and not to exceed $1,000 for the instruction of pupil nurses, and other absolutely necessary expenses, $80,500; for an addition to, and remodeling of, the nurses' home, including necessary equipment, $160,000; for remodeling and enlarging power plant, including necessary equipment, $52,000; for remodeling and enlarging dining room and kitchen, including necessary equipment, $32,000; for enlarging employees' quarters, $8,000; for installation of new elevators, $10,000; in all, $252,000, including cost of advertising for proposals, preparation of plans, and supervision of work; to be immediately available. In all, for Freedmen's Hospital, $474,500.

The amendment was agreed to.

The reading of the bill was concluded.

The PRESIDENT pro tempore. This concludes the committee amendments except the amendment passed over.

Mr. SMOOT. Mr. President, I have some other amendments which I wish to offer.

The PRESIDENT pro tempore. Further amendments on behalf of the committee are in order.

Mr. SMOOT. I submit the amendment which I send to the desk.

The PRESIDENT pro tempore. The amendment will be read for the information of the Senate.

The CHIEF CLERK. On page 46, line 17, after the numerals "$208,000," insert the following proviso:

Provided, That the Secretary of the Interior is hereby authorized and directed to change and relocate the boundaries of the old Fort Apache Military Reservation, Ariz., now occupied by the Theodore Roosevelt Indian School by transferring such areas to the Fort Apache Indian Reservation as he may deem advisable by reason of the use and/or occupancy of a part thereof by Apache Indians and to transfer an approximately equal area of lands of the Fort Apache Indian Reservation to the Theodore Roosevelt Indian School reservation, such exchanges of land to be made in accordance with surveys based upon the Salt River base and meridian, the expenses of such surveys to be paid from appropriations for the survey of Indian lands.

The PRESIDENT pro tempore. The question is on agreeing to the amendment proposed by the Senator from Utah in behalf of the committee.

Mr. LA FOLLETTE. Mr. President, I would like to ask the Senator from Utah to explain the amendment.

Mr. SMOOT. It was authorized by the committee to be reported as a committee amendment. I call the attention of the Senator from Arizona to the amendment.

Mr. HAYDEN. Mr. President, this amendment refers to an old military reservation at Fort Apache, now used as an Indian boarding school. It was found that within the limits of that old military reservation were certain lands occupied by Indians for agricultural purposes. The management of the school indicated a desire to remove some of them off their old homes. In order to correct a possible injustice the Secretary of the Interior is authorized by the amendment to rearrange the boundaries so that the agricultural lands occupied by Indians may be excluded from the reservation and other lands of equal area included for the use of the school.

Mr. LA FOLLETTE. Mr. President, with that explanation, I have no objection to the amendment.

Mr. NORRIS. Mr. President, I should like to ask the Senator from Arizona if the lands occupied by the Indians are a part of the reservation?

Mr. HAYDEN. Yes.

Mr. NORRIS. How do they happen to be occupying those lands?

Mr. HAYDEN. They were there when the military reservation was created during the Apache Indian wars. The Army post was established many years ago.

Mr. NORRIS. What is their title? How do they happen to be there?

Mr. HAYDEN. They lived there; and the War Department used as a military post an area a certain distance each way from the flagpole. The Indians were not disturbed by the soldiers after the military reservation was created.

Mr. NORRIS. Mr. President, there are so many Senators talking that, although the Senator from Arizona is speaking loud enough, we can not hear him.

The PRESIDENT pro tempore. Senators will suspend debate, and all Senators will suspend conversation. The Senator from Arizona has the floor.

Mr. HAYDEN. Mr. President, a few years ago Congress provided for the transfer of this military reservation from the War Department to the Interior Department for Indian-school purposes. When the school was established the superintendent of the school thought it desirable to use some of this land for school purposes. If that were done, it would disturb certain old Indians who had been living on the military reservation for many years; in fact, their ancestors had lived there before the reservation was established. It is not necessary to move these Indians from their lands in order that they may be used for school purposes, for other lands not occupied by Indians may be used by the school. All that this amendment proposes is to authorize the Secretary of the Interior to rearrange the boundaries so as to exclude from the military reservation and add to the Indian reservation which surrounds the lands occupied by Indians and to incorporate in the school reservation for

school purposes certain tracts of land adjacent to the school now a part of the Indian reservation.

Mr. NORRIS. As I understand, then, under this amendment, if it shall be adopted, the Indians who have been living there for several generations will still remain there?

Mr. HAYDEN. They will remain there, and have their homes on the Indian reservation, instead of within an old military reservation.

Mr. NORRIS. They will not have to be moved?

Mr. HAYDEN. No; to prevent their removal is the purpose of the amendment.

Mr. NORRIS. In other words, those Indians have a good title, I presume, by long occupancy?

Mr. HAYDEN. Yes; and one which I believe should be recognized. This amendment, if adopted, will do that.

Mr. NORRIS. This recognizes their title?

Mr. HAYDEN. Exactly so.

Mr. COPELAND. Mr. President, is this project understood by the Indians?

Mr. HAYDEN. Yes. I met the members of the tribe in council and talked the matter over with them while I was there last year. The Indians understand it; the school superintendent understands it; and the Indian agent understands it. The school is under the jurisdiction of the Secretary of the Interior, and the Indian reservation is also under his jurisdiction.

Mr. COPELAND. How did it ever happen that such a cruel thing was proposed to be done to these Indians?

Mr. HAYDEN. The school superintendent can not be justly criticized for his desire to secure the use of land within the school reservation for a school farm.

Mr. COPELAND. And it did not make any difference about the Indians, whether they suffered or not?

Mr. HAYDEN. They protested that they had lived there always, that it was not necessary to take their land from them; and I do not believe that it is necessary. At the same time, everyone who has the good of the school at heart is enthusiastic about the development of a suitable school farm, where instruction in agriculture can be given to the pupils.

Mr. COPELAND. But even Indian rights ought to be preserved.

Mr. SMOOT. That is what we are proposing to do.

Mr. SWANSON. Let me ask the Senator how much land is involved?

Mr. HAYDEN. About 1,000 acres is the area of the school reservation, which will remain about the same size after the exchanges of lands are made by the Secretary of the Interior.

Mr. SMOOT. It is worth about $1.25 an acre.

Mr. KING. Mr. President, may I ask a question of the Senator from Arizona?

Mr. HAYDEN. Certainly.

Mr. KING. There is some controversy over an item in the bill relating to the San Carlos Reservation, which is an Apache reservation. Does this amendment in any way relate to that controversy or affect the water rights upon the Apache Reservation at San Carlos?

Mr. HAYDEN. The pending amendment relates to the Fort Apache Indian Reservation. The Senator refers to the San Carlos Apache Reservation, a totally different place, the two places being about 75 miles apart.

Mr. KING. I know that they are 75 miles apart, and yet there is a controversy.

Mr. HAYDEN. There is no connection between the two propositions at all.

Mr. KING. I am very glad to be assured of that, but notwithstanding that the San Carlos Reservation is 75 miles distant from the Fort Apache Reservation, there is a controversy growing out of water rights.

Mr. HAYDEN. That is entirely another matter, which we will discuss in due time.

Mr. SMOOT. That will come up later.

Mr. BRUCE. Is this other matter dealt with in this bill?

Mr. HAYDEN. Yes; it will be reached shortly, I presume.

The PRESIDENT pro tempore. The question is on agreeing to the amendment proposed by the Senator from Utah on behalf of the committee.

The amendment was agreed to.

Mr. SMOOT. Mr. President, I offer another amendment.

The PRESIDENT pro tempore. The Senator from Utah, on behalf of the committee, proposes an amendment, which he will read for the information of the Senate.

The CHIEF CLERK. On page 50, line 12, it is proposed to strike out "in all, $83,000," and to insert a semicolon and the following:

For the purchase of additional land, $10,000; in all, $93,000.

LXIX——154

The PRESIDENT pro tempore. The question is on agreeing to the amendment offered by the Senator from Utah in behalf of the committee.

Mr. NORRIS. Mr. President, I should like to have the Senator from Utah explain the amendment.

Mr. SMOOT. It refers to the Sequoyah Orphan Training School in Oklahoma. The land proposed to be purchased is restricted in area and is farming land. The Senator from Oklahoma [Mr. THOMAS] appeared before the committee and stated that it was necessary to secure more land; that the land that it was intended to purchase was worth about $60 an acre; that it is agricultural land and will be farmed by the students at the orphan-training school. We were assured, not only by the Senator from Oklahoma but by the department itself, that if we would appropriate this money for the purchase of that land it would be of wonderful assistance in teaching the orphan Indians how to farm, and that the products of their farming would be of advantage to the Indians. We decided to give the appropriation of $10,000 for the purchase of additional land for the school, the land being worth, as I have said, about $60 an acre.

Mr. LA FOLLETTE. Is that a gratuity appropriation, may I ask the Senator?

Mr. SMOOT. It is, I will say to the Senator.

Mr. NORRIS. Mr. President, I should like to have the amendment again stated. Then I shall wish to ask the Senator from Utah a question.

The PRESIDENT pro tempore. The amendment will be again reported for the information of the Senate.

The CHIEF CLERK. On page 50, line 12, it is proposed to strike "in all, $83,000" and to insert in lieu thereof a semicolon and the words "for the purchase of additional land, $10,000; in all, $93,000."

Mr. NORRIS. Now, I should like to ask the Senator a question. I notice an item which reads—

for pay of superintendent, drayage, and general repairs, and improvements, $11,000.

How much of that $11,000 is for the pay of the superintendent?

Mr. ROBINSON of Arkansas. Mr. President, will the Senator from Utah yield to me, if he has the floor, or will the Senator from Nebraska yield to me if he is in possession of the floor?

Mr. NORRIS. I have the floor, and I yield to the Senator.

Mr. ROBINSON of Arkansas. I understand that the beneficiaries of the arrangement contemplated by this amendment are Indian orphans, that the object is to afford them opportunity for training, and at the same time to assist in their own maintenance and support?

Mr. SMOOT. That is the object of the appropriation.

Mr. ROBINSON of Arkansas. Being inmates of the orphan school, of course, they themselves are without means?

Mr. NORRIS. Yes; and it becomes quite important, I think, that all being true, to know how much money is being paid for the superintendent; what kind of a man he is, and so forth; whether he is worth the salary he is getting.

Mr. ROBINSON of Arkansas. As I understand, no part of the sum proposed to be appropriated by the amendment is available for the payment of salaries.

Mr. NORRIS. The $11,000 item is.

Mr. SMOOT. The item of $11,000 is for paying of superintendent, drayage, repairs, and improvements, but none of the $10,000 proposed by the amendment can be paid for any of those purposes.

Mr. ROBINSON of Arkansas. The sum carried by the amendment is to be devoted to the purchase of additional land. Of course, the other items, including expenses of administration, come out of the appropriation referred to by the Senator from Nebraska.

Mr. SMOOT. As I have said, $11,000 is provided for pay of superintendent, drayage, and general repairs and improvements of the school building. I will say to the Senator that the superintendent is paid $2,400.

Mr. NORRIS. Can the Senator give us an idea as to whether the superintendent is qualified to have charge of an orphan asylum of this kind?

Mr. SMOOT. I would rather have the Senator from Oklahoma [Mr. THOMAS] answer that question.

Mr. NORRIS. Very well; let us ask the Senator from Oklahoma.

Mr. SMOOT. I presume he knows the superintendent, but I do not know him.

Mr. NORRIS. Is the Senator from Oklahoma acquainted with the superintendent of this orphan school?

Mr. THOMAS. No.

Mr. NORRIS. What are his qualifications?

Mr. THOMAS. This matter comes under the Indian Bureau. The institution is, as has been said, an orphan home and school; it is limited to orphans of the restricted class of Indians. The land on which the school is now located is not good for farming purposes, and it is desired to add to the present holdings some farming land so that these orphan Indians may have the benefit of an agricultural education. At the same time it is thought that by increasing the acreage susceptible of cultivation the children may be able, at least partly, to sustain themselves by the products which may be grown on the land.

Mr. NORRIS. I will say to the Senator from Oklahoma that I am not trying to find fault or criticize the establishment or the maintenance of this orphan school, but it occurred to me that it might be well to inquire as to the qualifications of those who are in charge of it. I wanted some information in regard to the superintendent. I am wondering about his salary. Is it the regular salary paid to superintendents of such Indian institutions?

Mr. SMOOT. I think, taken as a whole, it is about the same.

Mr. NORRIS. Is he under civil service?

Mr. SMOOT. All such officers are under civil service.

Mr. NORRIS. If he is paid $2,400, what will that leave of the appropriation?

Mr. SMOOT. Deducting the $2,400 from the $11,000 appropriation would leave $8,600.

Mr. NORRIS. So that $8,600 is to be divided up amongst the items of drayage, which I suppose does not amount to very much, and general repairs and improvements.

Mr. SMOOT. Yes.

Mr. NORRIS. Can the Senator give us an idea as to what kind of improvements are contemplated?

Mr. SMOOT. I do not know whether there was a statement of that in the hearing. I will see. Nothing was said on that subject before the Senate committee. There was an average attendance of 297 during September.

Mr. LA FOLLETTE. Mr. President, we can not hear the conversation between the Senator from Utah and the Senator from Nebraska.

The PRESIDENT pro tempore. On behalf of the Senator from Wisconsin, the Chair invites the Senator from Utah and the Senator from Nebraska to raise their voices. [Laughter.]

Mr. NORRIS. Mr. President, on behalf of the Senator from Nebraska and the Senator from Utah, I should like to ask the Chair to maintain better order in the Chamber, so that the Senate may hear our melodious voices. [Laughter.]

The PRESIDENT pro tempore. The Chair accepts the suggestion. The Senate will be in order; the Senator from Nebraska will suspend; all Senators will cease conversation.

Mr. SMOOT. I quote from the House committee hearings, as follows:

> In addition to payment of salary of the superintendent and drayage, the amount requested for pay of superintendent, drayage, repairs, and improvements will be used for routine repairs, such as painting, renewing roofs and repairs to roofs, replacing defective floors, and repairs to heating, plumbing, lighting systems, etc. It is also planned to provide some increase in space in the shop building and one or two small inexpensive cottages for married employees. The cottages will take employees out of the children's quarters, releasing space required for other purposes, and will add greatly to contentment of the employees and at the same time set a better example of home life for the children.

Mr. NORRIS. I should like to inquire of the Senator from Utah, or, perhaps the Senator from Oklahoma can better answer the question, How is light supplied; what kind of lighting system does this orphan school have?

Mr. THOMAS. I am not able to answer that question, I will say to the Senator from Nebraska.

Mr. NORRIS. There are quite a number of buildings, I presume.

Mr. THOMAS. It is a small institution accommodating about 200 orphans.

Mr. SMOOT. It accommodates 297.

Mr. NORRIS. The bill says "for 300 orphan Indian children."

Mr. SMOOT. Two hundred and ninety-seven.

Mr. NORRIS. That was the attendance?

Mr. SMOOT. Yes.

Mr. NORRIS. That is practically 300.

Mr. SMOOT. Yes.

Mr. NORRIS. Can the Senator from Utah give me that information?

Mr. SMOOT. I was just looking to see whether it is here somewhere. There is nothing in the testimony in relation to how the school is lighted.

Mr. NORRIS. Has the Senator a list of the buildings there? That would probably give the information.

Mr. PHIPPS. There are 27 buildings.

Mr. NORRIS. Yes; 27 buildings.

Mr. NORRIS. I presume they are lighted by electricity; are they?

Mr. SMOOT. I can not tell the Senator whether they are or not. More than likely they are.

Mr. NORRIS. I should like to ask the Senator from Colorado as to that.

Mr. SMOOT. The number of employees is 29.

Mr. NORRIS. There are 29 employees?

Mr. SMOOT. Yes.

Mr. NORRIS. There are 300 orphan children; and how many teachers are there besides the superintendent?

Mr. SMOOT. I can not say how many there are.

Mr. NORRIS. Can the Senator give me any information about the ages of these children, and what is the regulation about the orphan asylum? How long are they kept there?

Mr. SMOOT. This school receives orphans and half orphans from the State of Oklahoma, and therefore cares for an especially needy class of Indian children, the greater number of whom would have no education if denied admission to the school. During the past four years the capacity of the Sequoyah school has been increased from 100 to 300. It is always filled. During the fiscal year 1927 the old schoolhouse was remodeled to provide a dormitory for small boys. It was completed in May, and it had an average attendance of 297 during September. I suppose it is during the school year just the same as it is in the schools of the different States.

Mr. NORRIS. I presume these children are kept there, however, the year around; are they not?

Mr. SMOOT. Yes; they are kept there, because we have the houses provided for them.

Mr. NORRIS. I judge, from what the Senator from Oklahoma has said, that they come from all parts of the State of Oklahoma.

Mr. SMOOT. The eastern half of the State.

Mr. NORRIS. Is there another Indian orphan asylum in the State of Oklahoma?

Mr. SMOOT. No; I do not think so.

Mr. NORRIS. Are not most of the Indians in the western part of Oklahoma? What happens to an Indian orphan child in the western part of Oklahoma, for instance?

Mr. THOMAS. Mr. President, Tahlequah is located in the Cherokee Nation, and this institution is mainly for the Cherokee Tribe of Indians, but other Indians are admitted. There are some small institutions on the western side that take care of other tribes. There are about 150,000 Indians in Oklahoma, and probably 50 different tribes. Each tribe has its own organization. Some of the tribes are too small to maintain an asylum for their own tribe, so they have to go together and depend upon the Government to provide an institution for them.

Mr. NORRIS. And that is how this institution originated, I suppose?

Mr. THOMAS. This institution was originated for the Cherokees, but it is now for the Indians of that State generally.

Mr. NORRIS. If I may have the attention of the Senator from Utah again about this amendment, it provides for the buying of some additional land?

Mr. SMOOT. Yes.

Mr. NORRIS. What kind of land is it, and how much is it going to cost?

Mr. SMOOT. It is going to cost approximately $60 an acre; and it is good farm land, so the testimony shows.

Mr. NORRIS. It is needed land at the present time?

Mr. SMOOT. Oh, it is privately owned land; and the school intends with this $10,000 to purchase as much land as the $10,000 will buy. The land is all farm land.

Mr. NORRIS. The intention is, I suppose, to teach these children agriculture and agricultural pursuits?

Mr. SMOOT. Yes; that is the object of it.

The VICE PRESIDENT. The question is on agreeing to the amendment.

The amendment was agreed to.

Mr. SMOOT. Mr. President, I send to the desk another amendment, which I ask to have stated.

The VICE PRESIDENT. The amendment will be stated.

The CHIEF CLERK. On page 55, in line 2, it is proposed to strike out "$1,390,000" and to insert in lieu thereof "$1,440,000."

The VICE PRESIDENT. The question is on agreeing to the amendment.

The amendment was agreed to.

Mr. SMOOT. I submit a further amendment, which I ask to have stated.

The VICE PRESIDENT. The amendment will be stated.

The CHIEF CLERK. On page 57, lines 5 and 6, it is proposed to strike out " in all, $105,000," and to insert in lieu thereof the following:

Claremore Hospital, Oklahoma, $50,000, on condition that not less than 5 acres of land shall be donated to the United States by the city of Claremore for hospital purposes; in all, $155,000.

Mr. NORRIS. Is that on page 57?

Mr. SMOOT. Yes.

Mr. NORRIS. Will the Senator explain that amendment?

Mr. THOMAS. Mr. President, if the Senator from Utah will yield, perhaps I can give some information on this item.

Mr. NORRIS. Before the Senator makes his statement, let me ask where the amendment comes in on page 57.

Mr. SMOOT. Let the amendment be stated again.

The VICE PRESIDENT. The amendment will be restated.

The Chief Clerk again stated the amendment.

Mr. NORRIS. That adds $50,000?

Mr. SMOOT. Fifty thousand dollars.

Mr. THOMAS. Mr. President, this amendment is submitted under the authority of what is known as the Snyder Act, Public, No. 85, Sixty-seventh Congress. The amendment proposes to establish a small general hospital at Claremore.

Claremore is located in the northeastern part of Oklahoma. It is a junction point of two of the main railroads in Oklahoma, the Frisco and the Santa Fe. Claremore is a town of approximately 5,000 people. It is regarded as a very healthful location. At this point they have a mineral water called radium water that has been examined and found to be very beneficial for certain disorders, such as stomach trouble and skin diseases.

Mr. CARAWAY. Mr. President, will the Senator yield to me?

Mr. THOMAS. I yield to the Senator from Arkansas.

Mr. CARAWAY. Is this locality—where Will Rogers lives?

Mr. THOMAS. It is.

Mr. CARAWAY. I am for it.

Mr. THOMAS. This hospital is in a location surrounded by numerous small tribes of Indians.

For example, the Ottawa Indians live in this locality. This tribe embraces only 264 members.

The Eastern Shawnees live in this locality—a tribe embracing 179 members.

The Osages live in this locality. There are 2,863 Indians in the Osage Nation.

The locality embraces the Quapaws, a tribe of 342 members. It embraces the Senecas, a tribe of 606 members; likewise the Wyandottes, embracing 527 members.

Adjacent to the city are perhaps some 18,000 or 20,000 members of the Five Civilized Tribes.

In all, within a radius of 100 miles of this locality, there are probably 25,000 Indians. Many of these tribes are so small that they can not by any means themselves support a hospital. Many of them have no tribal funds and no tribal lands. Of course, that does not apply to the Osages as a tribe.

The 150,000 Indians in my State do not have very good hospital facilities. In the southeastern part of Oklahoma we have a small tubercular hospital, located at Talihina. Only tubercular Indians can be admitted there. At Shawnee, in the central part of the State, is a small hospital for the Shawnee Indians. In the southwestern part of Oklahoma, at Lawton, is a small hospital for the Kiowa, Comanche, and Apache Indians.

These Indian tribes are clannish. In the first place, Indians do not like to go to any hospital very well. In former years they would hardly go to a hospital; but in recent years Indians do go to hospitals. The purpose of this amendment is to start a small general hospital for all kinds of complaints and ailments, and to locate it at a place to which these small tribes that are unable to build their own hospitals and maintain them can have access. This town of Claremore being centrally located, healthful, having this water that is pronounced wonderful, and being surrounded by so many Indians with no hospital facilities, the department is in favor of this item.

Mr. NORRIS. Mr. President, I am very much obliged to the Senator. His explanation is entirely satisfactory to me.

The VICE PRESIDENT. The question is on agreeing to the amendment.

The amendment was agreed to.

### ROBERT W. STEWART—RECUSANT WITNESS

Mr. WALSH of Montana. Mr. President, I ask unanimous consent, on behalf of the chairman of the Committee on Public Lands, to present a report, and I ask to have it read.

The VICE PRESIDENT. Without objection, the report will be received and read.

The Chief Clerk read the report (No. 229), as follows:

[S. Rept. No. 229]

DISPOSITION OF CERTAIN LIBERTY BONDS ACQUIRED BY THE CONTINENTAL TRADING CO. (LTD.)

The Committee on Public Lands and Surveys, proceeding as directed by Senate Resolution 101 to inquire into the disposition of certain Liberty bonds acquired by the Continental Trading Co. (Ltd.), and having received testimony to the effect that the said Continental Trading Co. (Ltd.), having realized upward of $2,000,000 through a contract entered into on the 17th day of November, 1921, by which it became entitled to buy and agreed to buy, 33,333,333⅓ barrels of oil from certain companies producing the same in the State of Texas, which oil it agreed the same day to sell to the Prairie Oil & Gas Co. and the Sinclair Crude Oil Purchasing Co., guarantors for it of its contract to purchase, at an advance of 25 cents per barrel, with the profits so realized purchased Liberty bonds in an amount in excess of $2,000,000 of which bonds to the amount of $230,500 were delivered by H. F. Sinclair in the month of May, 1922, to M. T. Everhart, the son-in-law of Albert B. Fall, then Secretary of the Interior, the avails of which bonds were applied to the account of the said Albert B. Fall, either in extinction of obligations due from him or from a cattle company in which he and the said M. T. Everhart were jointly interested, called to the stand as a witness one Robert W. Stewart, who participated in the negotiations leading to the said contracts and who was present at the execution of the same, representing the Standard Oil Co. of Indiana, the owner of one-half of the stock of the Sinclair Crude Oil Purchasing Co. The said witness was, on Thursday, February 2, 1928, asked by the committee through its chairman the following question, to wit:

"Mr. Stewart, do you know of anyone who received these bonds that the Continental Trading Co. are reported to have dealt in?"

Whereupon the following proceedings took place:

"Mr. STEWART. Senator NYE, I did not personally receive any of these bonds or make a dollar out of them; I personally did not make a dollar out of this transaction.

"The CHAIRMAN. That was not the question.

"Mr. STEWART. I have said that to you to make way for something else. I am a witness in a case which is now pending between the Government of the United States and some defendants. I have been interrogated in regard to these subjects by the counsel appointed to represent the United States in that case. From their interrogation of me I am of the opinion those are the issues which are going to be tried in that case, and I do not think that the line of interrogation here by this committee is within the jurisdiction of the committee under the laws of the United States. I do not think that the question is entirely pertinent to this inquiry, even.

"The CHAIRMAN. You understand, of course, that the Senate has specifically directed that we make inquiry into the transactions of bonds?

"Mr. STEWART. I have read the resolution under which you gentlemen are operating. Now, furthermore, there are others interested in this matter, and I regret it exceedingly—and I am really not doing it through any lack of respect to Mr. WALSH, or to you, or to any of the members of this committee—but I have to decline to answer.

"The CHAIRMAN. You would not desire to say you did or did not know?

"Mr. STEWART. No; I will have to content myself with this statement, by saying that personally I have never made a dollar out of this transaction; and, second, that I have never given any bonds of any description to any representative of any political party or to any public officer of the United States or of any State or Territory or any municipality inside of it.

"The CHAIRMAN. Just one more question, Colonel Stewart. Have you discussed any of these bond transactions with Mr. Sinclair or has Mr. Sinclair discussed any of these bond transactions with you?

"Mr. STEWART. Well, for those reasons, I have to decline to answer that. I will say to you that I think that is not material to any of the issues that I knew anything about.

"The CHAIRMAN. That will be all."

In explanation of the foregoing, the committee reports that the Mr. Sinclair referred to in the foregoing testimony is the same Sinclair hereinbefore mentioned, who, it was disclosed before the committee, likewise participated in the negotiations referred to and was likewise present at the time the said contracts were executed representing the Sinclair Crude Oil Purchasing Co.

The witness, Robert W. Stewart, being recalled to the stand, on Friday, the 3d day of February, 1928, Senator WALSH having referred to certain bonds, the following proceedings took place:

"Senator WALSH (interposing). The bonds I refer to and that were referred to by the chairman of the committee in his question to you yesterday are the bonds referred to in the resolution under which the committee is acting, which says as follows:

"'Whereas in the case of the United States against Harry F. Sinclair and Albert B. Fall it was disclosed upon the trial that a fraudu-

Case 3:19-cr-00407-CCC Document 34-6 Filed 10/19/20 Page 38 of 66

lent corporation, known as the Continental Trading Co., of Canada, had been organized for the purpose of using the profits of its business in the bribing of public officials of the United States and for other dishonest, dishonorable, and illegal purposes'—

" I am not asking you to subscribe to that, this is the description here——

" Mr. STEWART. Thank you, Senator; thank you.

" Senator WALSH (continuing). 'And whereas it was disclosed upon said trial that the profits of said corporation were invested in Liberty bonds of the United States and that only a portion of said Liberty bonds so invested had been definitely traced and accounted for and by the large amount of Liberty bonds coming into the hands of said fraudulent corporation and had been unaccounted for and unexplained: Therefore be it resolved '——

" Mr. STEWART. I have read that resolution, Senator.

" Senator WALSH. So that you understand that the questions of the chairman of the committee and of myself referred to those bonds?

" Mr. STEWART. Oh, I think so, Senator.

" Senator NYE. The Senate expects us to interrogate you with respect to whether or not you knew anything of this transaction in Liberty loan bonds. With that purpose in mind, I am going to repeat my question of yesterday: Do you know of anyone who received any of these Liberty bonds in which the Continental Trading Co. is represented to have dealt?

" Mr. STEWART. Senator, again, with the greatest reluctance and with great respect for the committee and for the reasons which I have already given in the course of my testimony and for other reasons which might appear later, I will have to respectfully decline to answer that question.

" Senator NYE. I shall also repeat that question of yesterday as to whether or not you have had any conversation with Mr. H. F. Sinclair with regard to this transaction in Liberty loan bonds or with regard to the Continental Trading Co.'s transactions?

" Mr. STEWART. For the same reason, sir, I shall have to decline to answer.

" Senator NYE. Have you had any conversation with Mr. O'Neil with regard to any of these transactions with the Continental Trading Co. in re these Liberty loan bonds?

" Mr. STEWART. Not to my best remembrance. I have not seen Mr. O'Neil in a great many years.

" Respectfully submitted.
" GERALD P. NYE,
" Chairman Committee on Public Lands and Surveys."

Mr. WALSH of Montana. Mr. President, the words " by H. F. Sinclair" were omitted after the word " delivered " on the first page of the report. I ask to amend by inserting those words.

The VICE PRESIDENT. Without objection, the amendment will be made.

Mr. WALSH of Montana. Mr. President, I offer the following resolution.

The VICE PRESIDENT. The clerk will read.

The Chief Clerk read the resolution (S. Res. 132), as follows:

Whereas it appears from the report of the Committee on Public Lands and Surveys that a witness, Robert W. Stewart, called before the committee making inquiry as directed by the Senate by Senate resolution 101, declined to answer certain questions relative and pertinent to the matter then under inquiry:

Resolved, That the President of the Senate issue his warrant commanding the Sergeant at Arms or his deputy to take into custody the body of the said Robert W. Stewart, wherever found, and to bring the said Robert W. Stewart before the bar of the Senate, then and there or elsewhere, as it may direct, to answer such questions pertinent to the matter under inquiry as the Senate, through its said committee, or the President of the Senate, may propound, and to keep the said Robert W. Stewart in custody to await further order of the Senate.

Mr. WALSH of Montana. I ask unanimous consent for the present consideration of the resolution.

The VICE PRESIDENT. Is there objection?

There being no objection, the resolution was agreed to.

The preamble was agreed to.

### INTERIOR DEPARTMENT APPROPRIATIONS

The Senate, as in Committee of the Whole, resumed the consideration of the bill (H. R. 9136) making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes.

Mr. SMOOT. I offer an amendment, which I send to the desk.

The VICE PRESIDENT. The Clerk will report the amendment.

The CHIEF CLERK. On page 58, after line 2, insert the following as a new paragraph:

For relief of distress among the native Indians of Turtle Mountain Band of North Dakota, $15,000.

The amendment was agreed to.

Mr. SMOOT. I also offer the amendment I send to the desk.

The VICE PRESIDENT. The clerk will read.

The CHIEF CLERK. On page 58, in line 14, after the numerals " $1,000," insert the words " to be immediately available."

The amendment was agreed to.

Mr. SMOOT. I offer also the following amendment, which I send to the desk.

The VICE PRESIDENT. The clerk will report.

The CHIEF CLERK. On page 113, after line 6, insert the following:

HOWARD UNIVERSITY

Salaries: For payment in full or in part of the salaries of the officers, professors, teachers, and other regular employees of the university, the balance to be paid from privately contributed funds, $160,000, of which sum not less than $2,200 shall be used for normal instruction;

General expenses: For equipment, supplies, apparatus, furniture, cases and shelving, stationery, ice, repairs to buildings and grounds, and for other necessary expenses, including reimbursement to the appropriation for Freedmen's Hospital of actual cost of heat and light furnished, $80,000;

For the construction and equipment of a chemistry building, $150,000; and the Secretary of the Interior is authorized to enter into contract or contracts for such building and equipment at a cost not to exceed $390,000;

Total, Howard University, $390,000.

Mr. LA FOLLETTE. Mr. President, may I ask the Senator from Utah whether this is the same amount appropriated last year?

Mr. SMOOT. It is the same amount, practically, that was appropriated last year. It was submitted by the Bureau of the Budget and recommended by the department, but it went out in the House on a point of order, as it has done for many years.

Mr. OVERMAN. Pretty nearly 10 years.

Mr. LA FOLLETTE. Mr. President, I am in favor of the amendment, but I merely wished to make sure that it was at least equal to the amount appropriated last year.

Mr. SMOOT. It is practically the same amount we appropriated before.

Mr. NORRIS. Mr. President, may I interrupt the Senator?

Mr. SMOOT. Certainly.

Mr. NORRIS. I was out of the Chamber at the beginning of the reading of the bill. Am I correct in my understanding that a unanimous-consent agreement has been reached by which the power matter contained in the Flathead Reservation provision will not be taken up to-day?

Mr. SMOOT. It goes over until to-morrow.

Mr. OVERMAN. An item for the erection of buildings was included in last year's appropriation for Howard University, was it not?

Mr. SMOOT. There was an item for a medical department building.

Mr. OVERMAN. Is that a part of this appropriation?

Mr. SMOOT. No; this is for a new building. The amount is practically what was appropriated last year. We are not asking for any additional appropriation for the medical building. Does the Senator desire that the amendment shall go over?

Mr. OVERMAN. I would like to have it go over.

The VICE PRESIDENT. The amendment will go over.

RECESS

Mr. SMOOT. I move that the Senate take a recess until 12 o'clock to-morrow.

The motion was agreed to; and the Senate (at 5 o'clock and 3 minutes p. m.) took a recess until to-morrow, Saturday, February 4, 1928, at 12 o'clock meridian.

# HOUSE OF REPRESENTATIVES

FRIDAY, February 3, 1928

The House met at 12 o'clock noon.

The Chaplain, Rev. James Shera Montgomery, D. D., offered the following prayer:

Almighty God and our Heavenly Father, Thou who are infinite in love and wisdom, in the spirit of the Teacher of Galilee we would draw near to Thee; help us to do so. We come to receive that inspiration which shall enable us to go through the duties of this day with dignity, courage, and patience. As we discharge our obligations may we weave characters on the great loom of life's activities that shall be above reproach and can be spoken of without apology and above a whisper. Permit nothing to interfere with the direct study of the problems of our Republic. Arouse within us the unquenchable ambition, in public duty and in private life, to be led and directed by Thee, through Jesus Christ, our Lord. Amen.

The Journal of the proceedings of yesterday was read and approved.

### MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate had passed the bill (S. 2301), to create a commission to be known as the commission for the enlarging of the Capitol Grounds, and for other purposes, in which the concurrence of the House of Representatives was requested.

The message also announced that the Senate had passed without amendment a joint resolution of the following title:

H. J. Res. 112. Joint resolution to amend the act of May 29, 1884, as amended, the act of February 2, 1903, and the act of March 3, 1905, as amended, to include poultry within their provisions.

### SENATE BILLS REFERRED

A bill of the following title was taken from the Speaker's table and, under the rule, referred to the appropriate committee, as follows:

S. 2301. An act to create a commission to be known as the commission for the enlarging of the Capitol Grounds, and for other purposes; to the Committee on Public Buildings and Grounds.

### CHANGE OF REFERENCE

Mr. SNELL. Mr. Speaker, House Resolution 87, introduced by the gentleman from New York [Mr. DAVENPORT], was referred to the Rules Committee. The parliamentarian submitted the report to me, and I thought at the time it belonged to the Rules Committee. Since that time I have taken it up and submitted it to the committee, and we think it properly belongs to the Committee on Foreign Affairs. The Foreign Affairs Committee has asked for it. I ask unanimous consent that House Resolution 87 be referred from the Rules Committee to the Committee on Foreign Affairs.

The SPEAKER. The Clerk will report the resolution.

The Clerk read as follows:

#### House Resolution 87

Whereas the Department of State is the sole executive agency upon which the Government relies for the efficient conduct of its relations with other Governments and for the protection of American interests throughout the world; and

Whereas the international duties and responsibilities of the United States have greatly increased in recent years, thereby throwing large additional burdens upon the Department of State: Now therefore be it

*Resolved,* That the Committee on Foreign Affairs is authorized and requested to confer with the President of the United States and the Secretary of State and ascertain whether or not the Department of State is adequately equipped for the task which confronts it, both in its foreign and domestic services, in respect to funds, material equipment, personnel and organization, and other facilities, and whether or not it is handicapped by legislative or other limitations; and to report to the present Congress the committee's findings, together with recommendations for such action as may be deemed essential in the public interest.

The SPEAKER. The gentleman from New York asks unanimous consent that the resolution that has just been read be referred from the Committee on Rules to the Committee on Foreign Affairs. Is there objection?

Mr. MOORE of Virginia. Reserving the right to object, is this a resolution introduced by the gentleman from New York [Mr. DAVENPORT]?

Mr. SNELL. It is.

The SPEAKER. Is there objection?

There was no objection.

### WITHDRAWAL OF PAPERS

Mr. CHRISTOPHERSON. Mr. Speaker, I ask unanimous consent to withdraw from the files evidence submitted in support of H. R. 5605, Sixty-ninth Congress, for the relief of Sam H. Allen, no adverse report having been made thereon.

The SPEAKER. Is there objection to the request of the gentleman from South Dakota?

There was no objection.

### HOWARD UNIVERSITY

Mr. HOWARD of Oklahoma. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on the appropriation for Howard University.

The SPEAKER. The gentleman from Oklahoma asks unanimous consent to extend his remarks in the RECORD in the manner indicated. Is there objection?

There was no objection.

Mr. HOWARD of Oklahoma. Mr. Speaker, under consent for extension of remarks granted me a few days ago, I desire to state that I favor the adoption of the conference report which recommends that the House concur in the Senate amendment to the Interior Department appropriation bill providing for an appropriation of $390,000 for the support of Howard University, and I voted for the amendment when it was before the House for vote.

I voted for this amendment for the reason that I am favorable to extending the opportunities of education to all people, regardless of race, color, or other conditions. It is my firm conviction that no public moneys expended bring greater results than those expended upon education, and it is also my firm conviction that Howard University, maintained for the higher education of men and women of the colored race, is and has been doing a great and beneficial work.

Mr. Speaker, in my own congressional district, and especially in the city of Tulsa, I have had occasion to observe some of the results of this university. I am personally acquainted with a considerable number of men and women of the colored race who have graduated at Howard University. Among them are ministers, doctors, lawyers, dentists, pharmacists, and teachers educated at this university. They have successfully practiced their professions among those of their own race, and by precept and example have made a substantial contribution to the health, industry, morality, temperance, and right living among the less fortunate of their own race. They and the others in other communities who have done likewise are to be congratulated, and in my opinion we are taking a step forward when we make this appropriation and encourage others of their race to follow their example.

The white people owe a duty to the black people. That duty is to do them no harm, to stimulate their industry, and encourage them to be temperate, sanitary, moral, honest, and useful; and to encourage them to be led by educated, honest, industrious, right-thinking, right-living, God-fearing men and women.

Mr. Speaker, the education of the colored people is not a question in which is solely involved what is best for the Negro race, but there is also involved the questions as to what is best for the white people. The negro people, numbering millions, are among us; they are a part of our country and are to remain a part of our permanent population, and I have no desire to see them or any other part of our population deprived of or denied any educational facilities. I think, on the contrary, that it is much better that we do things to bring not only the colored people but all others in any way that we can to a higher standard of citizenship. Nothing will tend to this more than extending opportunity for higher education.

Congress has been making this appropriation for nearly one-half of a century. The money granted is a small amount when consideration is given to the purpose for which it is appropriated.

All the States have not made adequate provision for the higher education of negroes, and in Howard University we have a first-class institution devoted exclusively to the better training of negroes in the trades and professions. Instead of requiring negroes, who are hungry for higher education and for instruction in the trades and professions, to get their training in second-class State institutions, why not maintain a first-class negro university which is capable of developing trained leaders for the Negro race and where the negroes can be educated among and by members of their own race?

I therefore voted to approve the report of the conference committee, which means that the pending bill, when it becomes a law, will carry an appropriation for the Howard University. The House having failed to grant this appropriation, the Senate added an amendment authorizing the appropriation. I favor this Senate amendment, and I am therefore voting to approve the conference report.

### WAR DEPARTMENT APPROPRIATION BILL

Mr. BARBOUR. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill H. R. 10286, the War Department appropriation bill.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union, with Mr. TILSON in the chair.

The CHAIRMAN. The House is in Committee of the Whole House on the state of the Union for the consideration of the bill H. R. 10286, which the Clerk will read by title.

The Clerk read the title, as follows:

A bill (H. R. 10286) making appropriations for the military and nonmilitary activities of the War Department for the fiscal year ending June 30, 1929, and for other purposes.

Mr. COLLINS. Mr. Speaker, I yield 20 minutes to the gentleman from Virginia [Mr. HARRISON].

Mr. HARRISON. Mr. Chairman and gentlemen of the committee, the very elaborate, full, and careful explanation of this bill made by the gentleman from California [Mr. BARBOUR], acting chairman of the subcommittee, will make it unnecessary for me to occupy the time of the House to any great extent.

Before making any reference to the bill I do not feel that I could preface my remarks to a better purpose than to express the regret I feel, with all his associates, that the gentleman from Kansas [Mr. ANTHONY], our chairman, has been unable to assist in the preparation of this bill on account of illness.

I deplore also his intention to retire from public life. I am sure all his colleagues on this floor, Democrats as well as Republicans, hope for his speedy restoration to health. His colleagues all hope that in the near future he may again give us the benefit of his services. [Applause.]

I have served with Mr. ANTHONY ever since I have been in Congress. I served with him on the Committee on Military Affairs and also on the Appropriations Committee, and I can bear testimony that no man in this House has rendered any more valuable service than has the gentleman from Kansas [Mr. ANTHONY]. [Applause.]

I served with him when he was on the minority side and I served with him when he was on the majority side; I served with him in the war time and I served with him in the peace time, and I have always found him the same patriotic public servant under all circumstances and under all conditions. [Applause.]

I am sure that I voice the sentiment of the Democratic side of the House when I say this much, and it gives me pleasure to make this sentiment a part of the records of this House.

I agree with the gentleman from New York [Mr. SNELL] and the gentleman from Illinois [Mr. MADDEN] when they say that the appropriations for our Military Establishment should be stabilized. I know that that has been the purpose of the subcommittee for the last several sessions. We have endeavored in each appropriation bill to create an appropriation that would stabilize the size and the condition of the Army. It is destructive of the morale of the Army to be constantly fluctuating in its support. It prevents continuity of development to be constantly changing our policy. I therefore thoroughly agree with the gentleman of New York and the gentleman of Illinois. In this matter we are obliged to be largely controlled by the Budget. The President of the United States is the Commander in Chief of both the Army and the Navy, and he speaks through the Budget. When he makes recommendations as to the necessity for appropriations along certain lines, it is natural that the committees of this House should follow as far as practical the suggestions that he has made; and when he recommends that certain other appropriations are necessary, we are forced to adopt his recommendations unless there is some very good reason why they should not be adopted. This bill is based on the recommendations of the Budget. I concur in almost all of the provisions. It is not the bill, possibly, that originally I would have drawn; but in all legislation there is necessarily a certain amount of give and take, and the compromise that is effected is generally the best legislation.

The grand total of the bill, both military and nonmilitary, reaches something like $400,000,000; and when we take that enormous sum in connection with the proposed appropriations for the Navy, carrying something like a billion dollars, we are carrying an enormous burden and the people have a right to know that it is necessary.

I do not believe that the people will begrudge the expenditure of this amount or any other amount that may be necessary to protect the vast wealth of this country and insure the liberties of the people of this country. All that they require is that the money should be carefully appropriated and that when appropriated it should be expended in the best and most economical manner.

The Army is composed of three parts, in general terms. We have the Regular Army, as it is called; we have the Organized Reserve; and we have the National Guard. Heretofore we have always provided for an Army of 118,750 men and 12,000 officers in the Regular Army. We have heretofore provided liberally for the Organized Reserve and for the National Guard. In this bill we continue this policy and we carry the appropriations which provide for a Regular Army of 12,000 officers and 118,000 men. In the Organized Reserve there are about 125,000 men. In the civil military training camps there are about 35,000 men, and in the National Guard there are close to 190,000 men, so that we have an Army of fair size, even for a population of 120,000,000 and for an empire, continental and insular, as vast as ours. The Regular Army is essential for purposes for which the National Guard and the Organized Reserve could not be used. The Regular Army is obliged to do the regular work of the Army. They protect the sea-coast defenses and the foreign possessions, and it is essential that we should have a Regular Army of the size that we have fixed in this bill.

We must remember that the 12,000 officers which we provide are not utilized for the Regular Army alone. They form an essential part of the several hundred thousand citizen soldiers who are called into the service. They officer and train the National Guard of 190,000 men, and they train and officer the Organized Reserve and also the civil military camps. It is as essential to have trained officers for these purposes as it is to have trained officers with the Regular Army. Therefore, it is not a fair criticism to say that we have 12,000 officers for 118,000 men. We have these 12,000 officers to discharge important functions and duties with the men that we are training and preparing to render service in case of national emergency.

We have in some respects altered the Budget in regard to the strength of the Regular Army. There was what was known as a munitions battalion of 250 men trained in the colleges at a cost of $1,500 for each man. This is proposed to be increased from time to time until it reaches 400 men. These men discharge no sort of function for the Army. They are under no obligation whatever in regard to that. They come in and they go out as it suits their convenience or their interest, and it does seem to us to be a far-fetched idea that these men could serve any useful purpose by the mere fact that perhaps some of them in time of war would form a contact between the Army proper and the business organizations that we would need in our service. So that feature has been eliminated.

Another feature to which I direct attention is that we have counted as a part of the 118,000 men the 1,240 men who are to be selected as a part of the air increment. The provision in the law is that 1,240 men should be each year trained as a part of the Air Corps and that that number should be independent of the Regular Army. That would amount in the five years during which this increment was supposed to run to something like 6,000 men. I speak in the rough. Those men were to be independent of the number of Regular Army and not count as a part of the Regular Army, but the Budget has undertaken to make them a part of the 118,000 men, and, as I said, we have followed the Budget; on the ground that the President, for whom the Budget speaks, is best informed whether or not the Regular Army could absorb this number without injury to the regular service.

There is another feature in respect to the Regular Army to which I direct attention, and that is to the miserable housing that is provided for the men in the barracks. I know that many Members of the House have visited these camps, and I know that they will bear testimony to what I say, namely, that the housing conditions at the Army posts are simply shocking to the better sentiment of everyone familiar with them.

In many of the posts the men are housed in old shacks that were built hastily during the war. They were built in many instances for entirely different purposes from that for which they are now used. They are veritable fire traps. They have been denied the benefit of any improvements during all these years. They are rat traps. Again and again we find in the newspapers some notice concerning a destructive fire at one of these barracks. The money that was set specially aside for these posts has all been used. The fund I refer to is the fund arising from the sale of surplus property. It was provided in the law that the proceeds from the sale of the surplus property should be dedicated to construction purposes at the posts. The last appropriation bill appropriated the last dollar that was in the Treasury for that purpose, and this bill therefore carries an independent appropriation of something like $7,000,000, in round numbers, for that purpose.

Mr. CLAGUE. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Yes.

Mr. CLAGUE. Is it not a fact that our subcommittee recommended all that we could under the authorization?

Mr. HARRISON. Yes. I am glad to be corrected on that point. The subcommittee recommended the $7,000,000, which was all that the Committee on Military Affairs had authorized to be expended along that line.

Mr. WAINWRIGHT. And the Committee on Military Affairs has authorized all that the War Department has asked for.

Mr. HARRISON. After this $7,000,000 has been expended that we appropriate for this bill, or after all the money has been applied that was in the Treasury to the credit of this special fund, there will at the end of the fiscal year remain unprovided for 3,750 officers, 3,058 noncommissioned officers, and 20,195 enlisted men, for whom no permanent housing has been provided.

Case 3:19-cr-00407-CAB Document 3-6 Filed 10/18/20 Page 41 of 66

Mr. BLAND. Mr. Chairman, will the gentleman yield there?

Mr. HARRISON. Yes.

Mr. BLAND. Referring to the statement that the Committee on Military Affairs has reported all that the War Department has asked for, we should remember that General Summerall, when he practically campaigned over the country last year in the interest of better housing for our Army, was suddenly recalled to Washington, and is it not a fair deduction to conclude that there is some pressure outside of the War Department that is limiting the recommendations that come from the War Department?

Mr. HARRISON. The record shows that we have expended all the money we are authorized to expend, according to the report of this committee, and still all these men are unprovided for, and it shows that there must be something wrong somewhere. If the administration had desired to make rectification of these conditions, General Summerall would not have been recalled from the Pacific coast. It is the false economy for which the administration stands that is back of the continuation of these conditions. A great expenditure will sooner or later be necessary, but then this administration will have passed out and the succeeding administration will be charged with the expenditures, which will be greatly increased by the delay in making.

Mr. MOORE of Virginia. Mr. Chairman, may I interrupt the gentleman?

Mr. HARRISON. Certainly.

Mr. MOORE of Virginia. I understand that the Committee on Military Affairs right now is giving careful and sympathetic consideration to proposed legislation that will authorize sufficient appropriations to take care of these men in proper housing conditions.

Mr. HARRISON. Yes; I understand the gentleman from Michigan [Mr. JAMES] made a visit to each of these camps with this purpose in view.

Mr. BLAND. My understanding is that a priority list has come from the War Department, and they are merely reporting particular provisions for each year. I want to call the attention of the gentleman to this fact, that in such a long-established place as Fortress Monroe, where there is an important military school, the officers attached to that school are living in war-time structures, whose roofs are not sufficient to protect them and their families from the rain.

Mr. HARRISON. Yes; furthermore, their families are living side by side in shacks without proper privacy. In one of the war-time buildings two or more families will be housed separated by partitions of pasteboard character. Family home life is practically destroyed.

Mr. BLAND. Yes. They are living in fire traps of war-time construction. The necessary funds should be given, whereas no dollar has been appropriated for that purpose.

Mr. JAMES. There is no priority list furnished by the department to the Committee on Military Affairs, and there is no priority list pending in the House Military Committee now. Down there at Fortress Monroe, so far as the conditions are concerned, I understand they are deplorable. Hereafter there will be substantial structures erected to take care of the commissioned officers at Langley Field. I visited Panama and Langley Field, and in the next few months I want to go down to Fortress Monroe. There are only a few places in the South and West that I have not yet seen I want to repeat that there is no priority list sent to us by the War Department.

Mr. HARRISON. What were the conditions that the gentleman found at the various posts visited by him?

Mr. JAMES. There were some regiments in Panama that have nice quarters, and some regiments that have very poor quarters. The same applies to Camp Lewis. Of course, there were some places like Benning and Bragg in the new fields where the conditions were bad. So far as the Committee on Military Affairs is concerned, we shall have a very substantial bill for housing.

Mr. HARRISON. My impression is that at these posts the conditions are simply disgraceful.

Mr. BLACK of New York. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Yes.

Mr. BLACK of New York. I want to say that recently I visited a great number of the forts around New York, and in some of them the living conditions for the men and the noncommissioned officers are worse than the slums in New York City, and the officers entitled to decent quarters are getting the worst kind of accommodations. They are living there in these war-time shacks after having served for 20 years.

The CHAIRMAN. The time of the gentleman from Virginia has expired.

Mr. HARRISON. I would like to be notified after I have used 15 minutes more.

The CHAIRMAN. The Chair will notify the gentleman in 10 minutes.

Mrs. ROGERS. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Certainly.

Mrs. ROGERS. I want to state that the conditions in Camp Devens, in my district, are extremely bad, both for the enlisted men and officers. Every year there is a fire, and there is great fear that the quarters for the officers and the barracks for the men will be quite wiped out.

Mr. HARRISON. I thank the lady for that statement. I think that statement will be borne out by everyone who has visited these barracks.

We have provided in this bill an amount which I think is wholly inadequate and which is no economy whatever, because where we do not furnish quarters we must furnish commutation, and it is more expensive to furnish commutation than it is to pay for decent quarters. The soldiers in some cases have rectified conditions, where they were given the facilities so to do. However, in many cases they have not been furnished with paint, lumber, or the necessary materials which would be required to improve conditions. I may say that there has been a great deal of improvement by virtue of the money we appropriated last year, and I hope the money we appropriate this year will bring about a further improvement in these deplorable conditions.

Mr. JOHNSON of Texas. Will the gentleman yield?

Mr. HARRISON. Yes.

Mr. JOHNSON of Texas. Whose fault is it that these conditions exist, which the gentleman is describing and with which I agree? Is it the fault of the War Department or Congress?

Mr. HARRISON. I think it is the fault of the War Department; that is, I will excuse the War Department and say it is the fault of the administration. The Budget prescribes a limitation upon the appropriations, and the officers dare not tell the truth about the conditions, because under the very Budget law they are forbidden to speak in favor of any appropriation that has not been allowed by the Budget.

Mr. JOHNSON of Texas. General Summerall regretted that he spoke about the matter, did he not?

Mr. HARRISON. General Summerall spoke the sentiment of this country.

Mr. JOHNSON of Texas. Then the gentleman does not agree with the President's reprimand of General Summerall for telling the truth about the matter?

Mr. HARRISON. I do not. I think he should be given the congressional medal.

Mr. TABER. Will the gentleman yield?

Mr. HARRISON. Yes.

Mr. TABER. Is it not a fact that this committee has very generally throughout the hearings cross-questioned the officers who came before it as to the needs of the Army, regardless of what the Budget stated?

Mr. HARRISON. Yes; and we had to cross-question them, too. If we knew what to cross-question them on, we might get the information, but we are only volunteered such information as we can screw out of them by cross-examination. It is not their fault at all, because the law forbids it.

We have provided a certain sum of money for the purchase of furniture to go into these new buildings. There has been no appropriation made for the purchase of new furniture since 1922 or 1923. In this bill we have been liberal in the amount we have provided for the purchase of new furniture. I think it would be adding insult to injury to place these men in these shacks and not give them sufficient furniture with which to make these shacks habitable.

Now, in regard to the question of horses. We have cut down the Budget estimate and we have gone below, I believe, the 1928 amount. If that is not so, I will ask to be corrected.

Mr. TABER. The amount carried in this bill is the same as the amount carried in the 1928 bill.

Mr. HARRISON. Then we have made the same appropriation that we made in 1928. Some criticism seems to have been made in regard to Army officers having horses fed at public expense. I desire to say that is strictly in accordance with the law. I have the statute here, which provides that we are required to furnish sustenance to the horses of Army officers. I read the statute, as follows:

The number of horses for which forage, bedding, shoeing, shelter, and medicines may be allowed are as follows: To a major general, 3 horses; to a brigadier general, 3 horses; to a colonel, 2 horses; to a lieutenant colonel, 2 horses; to a major, 2 horses; to a captain (mounted), 2 horses; to a lieutenant (mounted), 2 horses; to an adjutant, 2 horses.

Case 3:19-cr-00407-SI   Document 34-6   Filed 10/19/20    Page 42 of 66

All officers below the rank of major must buy their own horses. In this bill we have made the usual provision and such provision has been carried in appropriation bills ever since I have been a member of the Military Affairs Committee and of the Appropriations Committee.

For the Air Corps we have made, in my judgment, ample provision. We have appropriated $24,000,000 for the Air Corps, and at the end of 1929 it is expected we shall have over 1,300 new planes in the field.

There has been a great deal of complaint about the uniforms. I have received a great many communications from colleges in regard to the uniforms. We provide every soldier in the ranks with his uniform and we have given the boys who are in the schools the same uniforms that we give our soldiers, but we have said that if they want any better we will give them the money that the uniform costs and they could provide it themselves. It seems to me that is absolutely fair and just. Why should we give the boys in college any better uniforms than we give the ordinary soldier, who is discharging his duty as a soldier?

In regard to military training, we have increased the number to be trained at civilian military training camps by 5,000. The Budget provided for 30,000, but we have increased the number to 35,000. It seems to me that is sufficient, especially in view of the fact that that is the policy we have adopted in the past, and, as was suggested on the floor yesterday, it is the policy we should maintain, a stabilized policy.

Mr. WAINWRIGHT. Will the gentleman yield?

Mr. HARRISON. Yes.

Mr. WAINWRIGHT. Is the gentleman now referring to the civilian military training camps?

Mr. HARRISON. Yes.

Mr. WAINWRIGHT. Of course, the gentleman does not mean to inform the committee that you have increased the number over those who have been trained this year?

Mr. HARRISON. We have increased it over the Budget.

Mr. WAINWRIGHT. But you have not increased it over the provision which was made last year.

Mr. HARRISON. I understand that; but the Budget comes here from the President and says that all we ought to train are 30,000, while we have provided for 35,000, which is the number settled upon as the proper number to be trained.

Mr. WAINWRIGHT. This is a pretty important proposition, and may I ask the gentleman if he thinks we should stop at 35,000? Why should 35,000 be the mystic figure when you consider that every year we have increased the number of youths trained in the civilian military training camps, and the project, as I understand it, was to increase it, or has been, unless the precedent is made now, year by year until we get up to at least 50,000; in fact, the previous project had been to increase step by step until we had 100,000 of these splendid boys under training.

Mr. HARRISON. Does not the gentleman think that the Budget, which speaks for the President, ought to come here and ask for it? Why should he put the burden on Congress?

Mr. WAINWRIGHT. Of course, it goes without saying that the Budget can place no limitation upon us.

Mr. HARRISON. I understand; but the Budget speaks for the President, and the President is the head of the Army and of the Navy. He speaks authoritatively on matters of that character and we have gone over the Budget number by 5,000 men. We could, of course, increase it indefinitely; and I will say to the gentleman we could not spend money better.

Mr. WAINWRIGHT. That is exactly what I wished to develop from the gentleman—we could not spend money better than in this form of training.

Mr. HARRISON. I agree with the gentleman.

Mr. WAINWRIGHT. The gentleman, of course, knows that 35,000 will be almost 5,000 less than we actually trained last year?

Mr. HARRISON. I understand there was some particular reason for that last year.

The CHAIRMAN. The time of the gentleman from Virginia has again expired.

Mr. COLLINS. Mr. Chairman, I yield the gentleman 10 additional minutes.

Mr. HARRISON. We have increased the appropriations for the Organized Reserves nearly $400,000. We have not given them all they asked. We could not do this, but we have given them nearly $400,000 in addition to what we gave them last year; and in our judgment about 16,000 men will be trained and this will probably be all that will apply for training.

In regard to the National Guard, we have increased this item over $1,000,000 and we hear no complaint.

Just one word on the subject of the rifle teams. We provided in the last appropriation bill that these rifle matches should be held every two years. This is an off year. The cost of having one of these matches this year would have been $600,000. It does seem to us that the plan we adopted in the last appropriation bill of having them biennially will satisfy all the needs of the Government and the $600,000 can be applied better to other uses of the Army. We have therefore followed the policy which we adopted at the last session.

Mr. Chairman, this bill, as I have said, provides for what I think is a compact, serviceable army for the Organized Reserves, National Guard, and the Regular Army.

I do not believe it was ever the intention of the Congress to authorize the use of our military forces in any warlike demonstration without the authority of Congress. I think the gentleman from Missouri [Mr. COMBS] here on the floor eloquently expressed what is really in the hearts of the American people in regard to our proceedings in Nicaragua. There is no precedent in history for such a procedure.

It is true that President Wilson ordered General Pershing, with the consent of Mexico, to invade Mexican territory in pursuit of a bandit who had killed American citizens on American soil. There was no pretense, therefore, of anything involving the application of the Monroe doctrine, and when we had pursued them for a little distance into Mexican territory Mexico ordered the Army out of Mexico and we immediately obeyed and came back to this country. Again, at Vera Cruz, it was said that the Mexicans had insulted the flag and we sent the Navy to Vera Cruz and seized Vera Cruz with the purpose of compelling Mexico to apologize for the insult she had given the flag. When Mexico would not apologize, we came home. There was no pretense there of any application of the Monroe doctrine to that situation.

In the case of Venezuela, we never attempted to dictate to Venezuela anything with regard to her internal affairs, but Great Britain had undertaken to make certain claims against the territory of Venezuela and had refused to submit them to arbitration, and it was on that point, directly involving the Monroe doctrine, that President Cleveland protested and protested with effect. But I deny there has been any precedent whatever for this country going into any of these southern Republics and undertaking to settle their presidential contests. [Applause.]

What have we got to do with who is elected President of Nicaragua? It seems to me that, according to Latin America, the man who is in is President and the man who is out is a bandit; and when the bandit gets in he is the President, and the man who was in is a bandit. According to Mr. Will Rogers, a presidential election is rendered easy by shooting rival candidates. We have no more right to go into these territories and undertake to control their elections than they have the right to come into our territory and control our elections, and, for my part, as I have said before on this floor, I will gladly vote for any amendment providing that not a dollar of these appropriations shall be applied to the sending of troops into any foreign country to slaughter or be slaughtered unless such action is sanctioned by the Congress. I think this would be entirely within constitutional limits. Every day transports are bringing back our boys injured, and some of them to be buried, and every day we are spending thousands of dollars to clear, as it is said, Nicaraguan territory of bandits. Mr. Chairman, I desire to voice here my protest against such a procedure. [Applause.]

Mr. Chairman, I yield 30 minutes to the gentleman from Mississippi [Mr. COLLINS].

Mr. BYRNS. Mr. Chairman, the gentleman from Mississippi is about to make a very informative speech, one that I think the whole House ought to hear, and I make the point of no quorum.

The CHAIRMAN. The gentleman from Tennessee makes the point of no quorum. The Chair will count. [After counting.] Sixty Members present, not a quorum.

Mr. SNELL. Mr. Chairman, I move a call of the House.

A call of the House was ordered.

The doors were closed, the Sergeant at Arms ordered to notify absent Members, the Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 24]

| | | |
|---|---|---|
| Aldrich | Cooper, Ohio | Fitzgerald, Roy G. | Igoe |
| Anthony | Crisp | Foss | Jacobstein |
| Beck, Pa. | Cullen | French | Johnson, S. Dak. |
| Bohn | Curry | Fulbright | Jones |
| Boies | Davey | Gallivan | Kendall |
| Bowles | Deal | Garber | Ketcham |
| Britten | Denison | Golder | Klees |
| Bushong | Dickstein | Graham | Kindred |
| Carew | Douglas, Ariz. | Green, Iowa | King |
| Carley | Dowell | Hancock | Kunz |
| Clancy | Doyle | Hardy | Kvale |
| Clarke | Drane | Hangen | LaGuardia |
| Connolly, Pa. | Driver | Hull, Morton D. | Larsen |

| | | | |
|---|---|---|---|
| Leatherwood | Oliver, N. Y. | Sproul, Kans. | Underhill |
| Lindsay | Parks | Steagall | Updike |
| Linthicum | Quayle | Stedman | Weller |
| Lowrey | Reed, Ark. | Strong, Pa. | Welsh, Pa. |
| Lyon | Reed, N. Y. | Strother | Williams, Ill. |
| McMillan | Sabath | Sullivan | Williamson |
| Major, Mo. | Sanders, N. Y. | Swick | Wingo |
| Michaelson | Sanders, Tex. | Taylor, Colo. | Winter |
| Moore, N. J. | Simmons | Taylor, Tenn. | Wood |
| Nelson, Wis. | Sirovich | Temple | Woodrum |
| O'Connor, N. Y. | Sproul, Ill. | Tucker | Wyant |

The committee rose; and the Speaker having resumed the chair, Mr. TILSON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee having under consideration the bill H. R. 10286, the War Department appropriation bill, and finding itself without a quorum, it caused the roll to be called, and 338 Members had answered to their names, and he reported the names of those absent, to be entered in the Journal and the RECORD.

The committee resumed its sitting.

The CHAIRMAN. The gentleman from Mississippi is recognized for 30 minutes.

Mr. COLLINS. Mr. Chairman, a seeker for information about the War Department will have to go to some other source than the bill under consideration to find it. It is too vague and indefinite for that. Of course, a reading of the 1,500 pages of the hearings would shed light on this department's activities, but this is a task that the average Member has not time to undertake. The report of the committee also sheds considerable light upon it. The able statement of Mr. BARBOUR, the chairman of this subcommittee, likewise is full of information. Still there are activities of our Military Establishment that are not set forth, and some of them I will present to you.

Our Army is generally spoken of as a small affair—a skeleton organization, if you please—one that could be easily built to in the time of national stress. This may have been true at one time, but it is not true now. The skeleton has lots of meat on its bones. In fact, it has become rather corpulent.

The Army can be well divided into six parts—the Regular Army, the federalized National Guard, the Organized Reserves, the Reserve Officers' Training Corps, the citizens' military training corps, and national rifles matches. The last five named of these are spoken of as civilian organizations. There are, however, promoted, controlled, and instructed by Regular Army officers and enlisted men—about 2,000 officers and about 25,000 enlisted men being directly or indirectly in charge of their military training and instruction. In the main, these so-called civilian organizations are well versed in the art of warfare. They constitute a fine lot of men. The Regular Army officers largely in charge of them know what they are after. They have worked up programs of enlargement ranging from 5 to 15 years, and all of these organizations are growing in size, power, and strength like weeds in a farmer's field. Their influence is extensive and their wishes are highly respected by public officials, and with continued growth and enlargement their influence will grow with their increased size.

The beginning of another unit was proposed in this bill; in fact, the unit has now the sanction of the law. It is called the munitions unit. Congress authorized it by an amendment to the national defense act, which was approved June 8, 1926. This subcommittee, however, saw fit to prevent its beginning. The purpose of this unit was to take young men after graduation from college and give them 3 months' training in the Regular Army, then send them to college for 9 months and after this to put them in the factories of the country for 6 months, giving in all 18 months' specialized training in factory work and management, and in the event of hostilities these men would become officers and would take charge of the factories of our country and operate them under the supervision of the Regular Army. It was proposed to begin with 250 such students and later to bring them up to 400 and thence to a larger figure. The law says that one-half of 1 per cent of the enlisted strength of the Army and 2 per cent of officers can be trained annually, and with our Regular Army establishment at its present size, this would provide approximately 840 students to be trained annually and with the retirement figure at 64 years, it would be possible to have about 34,500 such officers. Of course, this figure is the outstanding one and should be reduced by one-half on account of deaths, resignations, and other causes, but even with 17,250 such officers its size and expense would be enormous. This scheme has never been tried out. No country has it now or has undertaken it. The student trained may or may not follow the work for which he was specially trained. If he did not, his training was wasted. If he did pursue the work for which he was trained, it would be foolish to let him contract with himself in the purchase of supplies for the Government or to permit him to adopt work standards, with the War Department backing him in his every whim. Aside from this, it is a dangerous undertaking in a Republic to put its

factories, including management and men, under the control of the Military Establishment.

The Regular Army has an enlisted strength of 118,750 men with 12,000 officers, and to the enlisted strength should be added the Philippine Scouts with 6,060 men. There are 1,215 warrant officers. There are also 165 retired officers on active duty. There are also thousands of civilians working for the Regular Army. Their number is becoming legion. Counting all officers, their number is 13,380, and the enlisted strength, including the Philippine Scouts, is 124,810. Of course, to the Regular Army goes the lion's share of the appropriation carried in this bill.

The actual enlisted strength of the Army is about 5,000 more than it was in 1926 and 1927. The officers are about the same. The actual increased size of the Army can easily absorb the 1,248 enlisted men that were added to the Air Corps in 1928 and the 1,248 added to the Air Corps in this bill. Personally I take it that the Air Corps increases the efficiency and effectiveness of the Army, and enlisted men who have been used in other ways have an increased value when they are transferred from a less effective service to one more modern and more serviceable in a military way. There is no loss, therefore, by the transfer, but a gain.

The federalized National Guard has grown by leaps and bounds since the war. In 1920 it had 1,039 officers and 47,019 enlisted men. On June 30, 1927, there were 12,010 officers and 182 warrant officers and 165,750 enlisted men, a total of 180,020 men. This bill carries an appropriation sufficient to increase this number to 188,000, of whom 13,630 are officers. Next year, according to General Summerall, 190,000 is the program. Gen. C. C. Hammond, Chief of the Militia Bureau, says that after that their immediate program will seek a total aggregate strength of 210,521 National Guard troops. The national defense act authorized a federalized National Guard strength of 435,000. I dare say that it will not be very long before this will be their goal.

The federalized guard is no small affair. It is a highly efficient organization. This bill provides for 48 drills a year and 16 days' intensive training at camps. Officers and men participating in these drills and taking this intensive training are paid for doing it. Quite a number of the members of the guard have yearly status and are paid accordingly. The guard is trained just the same as the Regular Army. It is organized along the same lines. It has an Air Corps, Tank Corps, engineers, field artillery, chemical warfare sections, observation sections, and so forth. Three hundred and ten of its officers and 125 enlisted men go to service schools and are there given special training. Three hundred and seventy-five thousand dollars is provided for this schooling. Guard affairs and the instruction of its officers and men are in the charge of Regular Army officers and enlisted men. One thousand and forty-four Regular Army officers and 1,316 enlisted men are specially detailed for this work. Of these specially detailed enlisted men 727 are sergeant instructors.

It has a Cavalry branch, and on March 1, 1927, had 10,420 horses. Nine thousand are federally owned and 1,400 are State owned. It has more now. It has 19 organized air squadrons, with 326 officers and 786 men. They each averaged 75 flying hours last year. Pilots in the Regular Army average around 200 hours a year. The guard acquired recently 46 primary training planes, 49 observation planes, and 22 special service or advance training planes; and this bill provides for the purchase of 15 service planes and 25 special service or advance training planes. It had on November 30, 1927, 1,266 Artillery units, of which 684 were motor drawn. These units include harbor defense, antiaircraft artillery; in fact, practically all kinds of modern artillery guns. They have ambulances, automobiles, tanks, tractors, trucks, searchlights, and motorized vehicles up to 12,666 in number as of December 31, 1927. In addition to these, the War Department has on hand 9,998 modern-drawn vehicles of various classes for free issue to the guard, and which will later be transferred to it.

The total cost to the federalized guard during the past four years has been around $52,000,000 per year. This bill carries $31,659,101, and with the State contributions and free issues the costs will be over $51,000,000. This does not mean that the appropriation is less—free issues are merely falling off.

The per capita cost of members of the guard to the Federal Government is $175.53 and to the States $77.15, or a total of $252.68. These figures do not include pay of Regular Army officers and enlisted men and many other items that could be properly charged for by the Government. Neither do they include free issues running into the millions. The federalized guard has on hand property of estimated value of $115,000,000, and most of this property is free issues. The real per capita cost of members of the guard is nearer $500 or more.

I believe I have already spoken long enough to convince the skeptical that the federalized National Guard is a highly efficient organization and growing more so daily. In some respects it is equally efficient with the Regular Army.

The Organized Reserves is largely an officer organization. It is an after-the-war thought. Its growth has also been rapid. On June 30, 1926, it had 68,232 officers and no enlisted men. On June 30, 1926, it had 103,829 officers and 5,775 enlisted men. On June 30, 1927, it had 110,014 officers and 5,735 enlisted men. Its officer strength increased 6,185 in that year, the last one for which available figures are possible.

Certain of these officers, to wit, 16,382, have been or will be given training out of funds appropriated in the 1928 bill, and of this number 627 will have more than 15 days' training. The bill now being considered is supposed to provide 15 days' training for 16,000 men and more than 15 days' training for 600 men. This committee increased the number to be trained over that recommended by the Budget by 875 officers. This bill also provides for the training of 110 Air Corps officers. They will receive one year's instruction. This number will soon increase, until the number of 350 is annually trained, and shortly afterwards the number will go to 550 annually. Reserve officers are also given correspondence courses. Under this practice up-to-date military instruction is provided to them.

These officers are likewise divided into various units, the same as the Regular Army and the federalized guard. They have Regular Army officers totaling 413 and 524 enlisted men assigned to their instruction and other activities. Of course, members of the Organized Reserves are officers to start with, and it is not necessary to furnish them with intensive training at all times.

This organization is likewise growing. In 1920 the number of officers was 68,000. It remained at this figure for two years. In 1923 it went to 70,000; 1924, 81,000; 1925, 95,000; 1926, 103,000; 1927, 110,000, in round numbers. The increase in 1927 over 1926 was 7,000, and these increases will continue at about the same rate until the goal of 125,000 is reached. This will all be done in spite of the fact that only 65,333 of these officers can possibly be used in the mobilization of three and a half million men. This is not my statement. It is the testimony of War Department officials. They are War Department studies and calculations.

The Reserve Officers' Training Corps are those young men going to college who are trained at college in the science of war under officers of the War Department. They are given four years of military training under officers and enlisted men of the Regular Army, and certain of the advanced students go to Regular Army camps, where they are given 15 days' intensive training. This bill provides for the summer training of 7,200 such advanced students.

There are now 125,141 young men who are in this Reserve Officers' Training Corps. This is an increase of 9,000 over 1928. These young men are given subsistence allowance at school and are also provided with uniforms. They are also divided into infantry, cavalry, field artillery, coast artillery, air corps, engineers, signal corps, and other corps units just the same as the Regular Army. They are young men well trained in the art of warfare by 685 Regular Army officers, 114 retired Regular Army officers, 20 warrant officers, 502 active noncommissioned officers, 26 retired noncommissioned officers, and 388 other enlisted men, all from the Regular Army.

No age limit is placed on these young men. Practically all of them are from 14 to 21 years of age.

This bill increases the uniform allowance to the advance classes. This is done to popularize military work in the schools and to induce the young college man to take the advance course and otherwise increase the number of these officer students and ultimately popularize the military idea.

Mr. SUMMERS of Washington. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. SUMMERS of Washington. What is the advance course?

Mr. COLLINS. The last two years.

General Summerall stated that it was his hope by doing this to—

stabilize the units and induce the young men to take the last two years * * * we want them to have something that will inculcate pride and make them proud to wear the uniform.

The citizens' military training camps are provided for the training of citizens generally. This activity is regarded by the War Department as the least vital from a standpoint of national defense. They are trained at Regular Army camps. Thirty-eight thousand five hundred and ninety-seven were trained in 1927. This bill provides for the training of 35,000, an increase of 5,000 over that recommended by the Budget.

An intensive campaign has to be carried on to secure the necessary number of trainees. Army officers and enlisted men are in charge of this training, all of which is paid for by the Government out of funds appropriated by Congress. One thousand three hundred and eighty-five Regular Army officers and 11,751 enlisted men have been used in connection with the yearly training of these citizens. They are likewise provided with hostesses to look after their social affairs and activities and as antidotes against homesickness. The citizens' military training corps likewise has an ambitious program. Captain Lord testifying stated that the plan is to ultimately provide for the training of 100,000 such citizens; that he hopes to reach 60,000 by 1930 or 1931.

Rifle matches are not included in this bill, but this activity will go on in 1930 and afterwards every two years under present War Department policies. However, a bill has recently passed the House proposing for these matches every year. They will cost in the neighborhood of a million dollars. The number includes 34 civilian teams of 13 men each, or 442 men. All others that attend these matches belong to the Regular Army or some other citizen branch of it, or to the Navy. Some belonging to these citizens' rifle clubs range in age between 60 and 70 years. These civilian teams come from rifle clubs all over the country.

It will be seen from the statements that I have made that we train them almost from the cradle to the grave in military science and tactics. The total number in all of the establishments is over 600,000, an army very much larger in size and equipment than the popular notion. It must be conceded, however, that some in these War Department citizens' organizations are there purely for propaganda purposes. However, this does not matter. We are face to face with the fact that we have a Military Establishment of over 600,000 men, and its gain over 1928 will be in excess of 22,000 officers and men.

Mr. SPEAKS. Will the gentleman yield?

Mr. COLLINS. I will.

Mr. SPEAKS. How many officers are there in the Regular Establishment?

Mr. COLLINS. Thirteen thousand three hundred and eighty, all told.

Mr. SPEAKS. How many in the National Guard?

Mr. COLLINS. Thirteen thousand six hundred and thirty.

Mr. SPEAKS. One hundred and eighty-five thousand enlisted men and 13,600 officers in the National Guard?

Mr. COLLINS. No; 103,000 enlisted men and 13,630 officers; but you are taking only two branches.

Mr. SPEAKS. I understand that; but the primary reliance in our national defense system is the National Guard and the Regular Army?

Mr. COLLINS. And the gentleman thinks the others ought to be abolished?

Mr. SPEAKS. No; but the gentleman stated that the skeleton organization is the basis for an Army of three and a half million with about 90,000 officers.

Mr. COLLINS. No; I said that in the mobilization of three and a half million men the War Department would use only 65,000 of the 110,000 reserve officers. I do not know anything about the truthfulness of the statement. I do not know whether it is right or wrong, but I know that the War Department makes it.

Mr. SPEAKS. I want to get into the RECORD the actual facts. The gentleman says the War Department's estimate is that 65,000 reserve officers would be required in connection with 12,000 Regular Army officers and 13,000 National Guard officers to officer an Army of three and a half million men.

Mr. COLLINS. No. Personally I do not know what officers they are taking into consideration, except that they state that with the available officers we have in the Regular Army, the National Guard, and other branches, they would use only 65,000 of the 110,000 reserve officers.

Mr. SPEAKS. If that be true, then with your 65,000 and your 12,000—

Mr. COLLINS. If the gentleman has any quarrel with anyone, it is with the War Department and not with me.

Mr. SPEAKS. I merely want to get the facts. Sixty-five thousand officers from the reserves, with 13,000 from the National Guard and 12,000 from the Regular Army, would be 90,000 officers for an Army of 3,500,000 men, according to the gentleman's figures, which actually would be less than half the number required.

Mr. COLLINS. They are not my figures; they are the War Department figures. However, the gentleman does not mention all officers. There are 125,000 Reserve Officers' Training Corps students that would possibly become officers; also those that would come from training camps.

Mr. SPEAKS. According to the figures the gentleman is quoting.

Mr. COLLINS. They are War Department figures, taken from the hearings on this bill. I am assuming that the War Department knows how it would get its officers—where they would come from and how they would be secured, and that they know that only 65,000 of these reserve officers could be used.

Mr. MOORE of Virginia. Mr. Speaker, will the gentleman yield?

Mr. COLLINS. Yes.

Mr. MOORE of Virginia. The gentleman has indicated his opposition to the force that is being maintained, and which is to be provided for by this bill. I ask the gentleman whether the bill as it stands is as it is, as the result of differences in the subcommittee in its view upon this issue which he has stated, or is to be accounted for by the fact that it is based on existing legislation.

Mr. COLLINS. Principally on existing legislation. However, I do not agree with my colleagues on increases in the size of our Military Establishment, and I also differ with them in many other items carried throughout the bill.

Mr. MOORE of Virginia. Therefore the subcommittee simply felt obliged to accept the requirements of existing legislation.

Mr. COLLINS. In the main that was true. Much legislation, however, could not be followed without imposing onerous burdens on taxpayers and the Budget recognizes this and the Appropriations Committee does, too.

It is larger than I think we need. Much larger than I think is necessary. More than half of them are officers, and a large number of these officers would not and could not be used in the mobilization for war of three and a half million men. There are just too many of them. I ask the Congress what is the good sense of blindly carrying on with the present program? The public wants a Military Establishment of reasonable size, but why maintain a top-heavy organization that carries much unusable material? Why not eliminate these unnecessary expenses? Why not maintain a skeleton military organization as we pretend we do? If we are bent on building up the world's largest military establishment, let us admit it and not try to fool ourselves and the American people.

I can see the logic in the reasoning of men who want our country to possess the world's largest Navy. I do not agree with them, but they can justly argue that this is necessary in order to keep trade routes to the world open. I can not, however, see the necessity of vieing with Great Britain, France, Russia, and Italy in maintaining large military establishments. I can see the logic in the course of these nations. They feel that such organizations are necessary to their safety because they are surrounded with powerful possible enemies and that an army is therefore necessary to prevent invasion of their territory. But this necessity does not exist with us. We have an establishment—if the figures contained in the Statesmen's Yearbook for 1927 are true—that is larger than that of Great Britain and apparently larger than that of Italy and Russia. Only France's establishment seems to exceed our Army in size.

I hope Members of Congress will carefully consider these statements. I think it is necessary that they do so, otherwise a military sentiment will soon grow up in our Republic whose power and influence will be too large to cope with, a sentiment not in keeping with American traditions and ideals. [Applause.]

Mr. HARRISON. Mr. Chairman, I yield two minutes to the gentleman from Kentucky [Mr. KINCHELOE].

Mr. KINCHELOE. Mr. Chairman, on the 19th of January my colleague, the gentleman from Kentucky [Mr. VINSON] delivered a very instructive speech during the consideration of the independent offices appropriation bill. There appeared in the Lexington (Ky.) Herald an editorial in regard to it. It consists principally of excerpts from this speech and some complimentary allusions to it. In view of that fact, I ask unanimous consent to extend my remarks in the RECORD by printing this editorial.

The CHAIRMAN. The gentleman from Kentucky asks unanimous consent to extend his remarks in the RECORD in the manner indicated. Is there objection?

There was no objection.

Mr. KINCHELOE. Mr. Speaker, under leave granted to extend my remarks in the RECORD, I insert an editorial from the Lexington Herald, of date Tuesday, January 24, 1928, of which the Hon. Desha Breckinridge is editor, commenting on the speech made by Congressman FRED M. VINSON, on the independent offices appropriation bill on the 19th of January, 1928, which editorial is as follows:

Much is heard these days of bureaucracy. Bureaucratic tendencies of the Government are bewailed in some quarters. Yet as a practical prop-

osition it seems difficult to meet new governmental duties in a more effective way than by the creation of a commission to perform the duties necessary. It is well, however, that the American citizen interested in the affairs of his Nation should have some understanding of what the independent agencies of the Government are.

It is doubtful if there ever has been presented a fairer or more definite outline of what Federal commissions are doing than was presented in Congress recently by Congressman FRED M. VINSON, of the ninth Kentucky district. Mr. VINSON was selected as a member of the Appropriations Committee of the House of Representatives at the beginning of its session this year, and was assigned with four other members to the important subcommittee which conducted hearings and presented the measure known as the independent offices appropriation bill. This made appropriations for the use and maintenance of independent Government agencies, including such boards as the Interstate Commerce Commission, the Veterans' Bureau, the Tariff Commission, the Shipping Board, the Smithsonian Institution, the Radio Commission, Power Commission, the Federal Reserve Board, the Efficiency Bureau, the Federal Board for Vocational Education, the Employees' Compensation Commission, the Civil Service Commission, the Board of Tax Appeals, the Board of Mediation, the Alien Property Custodian, the Alaskan Relief Commission, the American Battle Monuments Commission, the Public Buildings and Public Parks Commission, the Geographical Board, the Housing Corporation, the Commission of Fine Arts, and other such agencies.

There are 26 independent boards listed in the measure as requiring funds for their own maintenance and for carrying out the purposes for which they were created.

Mr. VINSON's presentation gave a thorough, though necessarily brief, review of the work, the needs and the programs of these commissions. He saw fit to let the facts speak for themselves and his report is of such graphic nature that elaboration would have been unnecessary. While a complete summary of the report made need not be attempted here, there are a number of phases in the address of Mr. VINSON which challenge more than cursory attention.

In the first place, it is pointed out that the appropriation dealing with the maintenance of the Executive Offices is reduced to $91,280 less than that of last year. Ninety thousand dollars of this went during the past year to defray the expenses of litigation in the cancellation of oil leases. For the maintenance of the Executive Mansion and grounds the measure carries a slight increase, and there is a slight increase in the salaries for the Executive personnel. There is a decrease of $2,000 in the heating system, and it is explained by Mr. VINSON that the heat for the Executive Mansion is to be obtained from the State, War, and Navy Building. Of course, this saves the Treasury nothing, but, as Mr. VINSON says, "it is merely a matter of bookkeeping."

The American Battle Monuments Commission has been empowered by Congress to construct fitting memorials in Europe in honor of the soldier dead now sleeping on foreign soil and to commemorate their sacrifices for their country. The authorization for the work is $3,000,000. For the Arlington Memorial Bridge $2,300,000 is appropriated. The United States Board of Mediation shows decided reduction in salaries, but Mr. VINSON points out that this board is now paying $13,800 for rent, or at a rate of $1.94 per square foot for the space they occupy in a Washington office building. The Civil Service Commission pays $22,092 rent and the Board of Tax Appeals $57,000. This is suggestive and, although unacquainted with the situation, it would seem at this distance that if governmental agencies are paying such high rent as this the Government might profitably provide quarters for its own commissions and thereby make a saving.

Such commissions as the Civil Service Commission, the Radio Commission, the Federal Trade Commission, the Power Commission, and the Employees' Compensation Commission certainly do necessary work, and the appropriations recommended for them do not seem to be exorbitant.

In his discussion of the appropriation of $754,000 for the Tariff Commission, Mr. VINSON introduced a table showing the reports of the Tariff Commission to the President and the action of the President thereon. In presenting this table he merely explained, "I thought it might be interesting." It certainly is most interesting to the average believer in a tariff principally for revenue that the President has seen fit to make but very few reductions under the flexible tariff act. The tariff act gives to the President the right to make reductions for the good of the country. It was believed by many of the opponents of high protection that this authority would be used by the President to reduce some of the extravagant features of the Fordney-McCumber Tariff Act. It is found, however, that the only articles upon which the President has reduced tariff duties have been paint-brush handles, bobwhite quail, and phenol.

On the matter of the Interstate Commerce Commission there seems to be a desire that sufficient funds be appropriated for this commission to carry forward its work of valuation, and there also is a decided desire that the commission may not be hampered so as to delay its decision upon the important question of freight rates now before it. Kentucky certainly is interested in seeing the freight-rate problem handled with dispatch.

In regard to the appropriation for the Veterans' Bureau, Mr. VINSON points out that while there is expected to be a reduction in the tubercular cases handled under the Veterans' Bureau, and there is a belief that the tubercular load has reached its peak, the neuropsychiatric load has not reached its peak. He, therefore, favors the appropriation for funds which will permit the immediate carrying forward of a hospitalization program. He points out that Kentucky is the center of a very large area that has no neuropsychiatric hospital facilities. Twice the World War Veterans' Committee has reported to the House a bill which would relieve this area. Once a separate bill for a Kentucky hospital was presented, and at the last session in the blanket bill there was provision for a $1,000,000 250-bed neuropsychiatric hospitalization in Kentucky. Mr. VINSON contends that if a neuropsychiatric veteran has a service-connected case he has been entitled to hospitalization all these years and is entitled to hospitalization now, and ought not to have to wait for two years or later for facilities. In Kentucky the need for such a hospital is known, and Congress certainly should not delay in meeting this need.

Mr. VINSON, honored as a young Member of Congress through appointment to the important Appropriations Committee, and further honored by appointment upon the subcommittee and through selection to prepare the report upon the activities of Federal boards, has rendered a national service in the clear and complete way in which he has presented the facts in so few words. The problems connected with these many governmental agencies must be considered in a practical way and from a businesslike standpoint.

Mr. BARBOUR. Mr. Chairman, I yield 10 minutes to the gentleman from New York [Mr. TABER].

Mr. TABER. Mr. Chairman and gentlemen of the committee, I shall take only a moment or two in respect to the building-program situation. We did not have any building program until 1926. After the war our Army was a great deal larger than it had been before the war, and, of course, we did not have housing enough to take care of that. At one time in 1919 we had over 300,000 troops, and we were housing them in the same inefficient housing that they were being housed in before the housing program of $20,000,000, which was put through by the House Military Affairs Committee, was started. In 1920, on June 30, we had 184,000 men, and on June 30, 1921, we had 213,000 men. It took some time, as we went along with the establishment of this increased Army, to get to the point where we would know what we needed to do and what we needed to build. Just as soon as we got to that point our House Committee on Military Affairs took that in charge and brought in a bill which called for an appropriation of $20,000,000. We have done that in three years, and, with the experience that the War Department had at that time, we have gone ahead as fast as was practical, and as fast as we could put up the buildings in a successful way, so that they would be permanent. On top of that we have reduced the housing shortage by transferring troops to barracks which already existed, which were satisfactory in the last year, almost as much as we have increased the housing capacity of our barracks by reason of the housing program. I just wanted to call these facts to the attention of the House and to say that I believe that the program of the House Military Affairs Committee calls for providing additional housing just as soon as they can determine after this bill is passed and know just what more is needed to complete that program and to put us in shape where we are able to take care of our Army.

Mr. BARBOUR. Mr. Chairman, I yield five minutes to the gentleman from Massachusetts [Mr. DALLINGER].

Mr. DALLINGER. Mr. Chairman, I ask unanimous consent to extend and revise my remarks in the RECORD.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. DALLINGER. Mr. Chairman, the other day when the independent offices appropriation bill was under consideration in the House, I offered an amendment striking out the annual appropriation for the Government hotels, so called, calling the attention of the House to the fact that the property between here and the station was acquired a good many years ago by eminent domain, and brick buildings were torn down for the purpose of beautifying the Nation's Capital and in order that we might have a decent approach from the Union Station to the Capitol Building and the Capitol Grounds.

No sooner had that land been cleared and the grading commenced when the war broke out, and these Government hotels, so called, were erected, which never furnished accommodations to more than 1,800 women out of 40,000 women employed. It was stated at that time that it was only a temporary matter and that the buildings would last only three years. Now 10 years have elapsed since the armistice, and every year we have an appropriation for the continuance of these Government hotels

on property that was acquired for the purpose of affording a decent approach from the Union Station to the Capitol.

The chairman of the subcommittee asked me if I wanted to turn these girls out on the streets to-morrow. I stated no; the bill did not go into effect until the 1st of July. I then asked him why the buildings were not torn down in accordance with the repeated promises of the Committee on Appropriations, and he stated that the reason was that the Government did not own the land on which some of the buildings stood, and that that matter was still in litigation.

On the strength of that information I withdrew my amendment. I have since found out that the information was erroneous, and I shall insert as part of my remarks a letter from Assistant Attorney General Farnum and two letters from the Architect of the Capitol, Mr. Lynn, in which it is stated that the Government has for almost a year owned all the land upon which these Government hotels stand and that there is no litigation in progress.

Mr. BLANTON. Mr. Chairman, will the gentleman yield on that point?

Mr. DALLINGER. Certainly.

Mr. BLANTON. That land-ownership question is not what is the matter. It is just fear of these good women down there who now occupy these Government hotels—fear that if Congress does not provide housing for them by the Government they may attack Members politically. That is what is keeping Congress from tearing down these Government hotels and going out of the business.

Mr. DALLINGER. Mr. Chairman, I trust that in the future the Committee on Appropriations will get more accurate information. I trust that we shall not continue to repeat what has been a disgrace to the National Capital in the case of these Government hotels and in the procedure that has been followed with respect to the property owned by the Government south of Pennsylvania Avenue. Twenty years ago the Government acquired by eminent domain the square occupied by Poli's Theater and the four adjoining squares between that square and the Mall. That particular square was never intended for the erection of Government buildings, but was intended to be used as a park, so that the White House could be seen as the visitor goes along Pennsylvania Avenue from the Capitol to the Treasury. And yet the disreputable looking buildings on that property still remain standing, disfiguring what ought to be the most beautiful avenue of our National Capital, simply because the Government is deriving some revenue from the tenants of the buildings in question.

Now, the people of the United States through their Representatives in Congress never authorized the taking of the property between here and the Union Station and the property south of Pennsylvania Avenue for the purpose of engaging in the hotel business or of obtaining a little revenue from the miserable buildings that encumber the land. That land was taken over for the sole purpose of beautifying the city of Washington, and it seems to me that the Committee on Appropriations should not continue this practice of blocking the beautification of the National Capital on the flimsy excuse that these temporary buildings are bringing some little revenue into the Treasury and that therefore these temporary buildings should not be torn down. The other excuse that the Government has not yet acquired complete title to the land on which the buildings stand being clearly shown to be without the slightest foundation.

Following are the letters referred to:

DEPARTMENT OF JUSTICE,
*Washington, D. C., January 25, 1928.*

Hon. FREDERICK W. DALLINGER,
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN: Pursuant to your inquiry whether there remains outstanding within the Capitol Plaza area any land to which the United States has not acquired the title, I caused an investigation to be made which discloses that the United States has possession of all the land except the following, the title to which is outstanding in the District of Columbia:

Lots 51, 52, 53, 67, 68, 69, 70, 71, 72, 73, and 74, in square 633. These premises are occupied by the Arthur Public School Building.

Parts of lots 13, 14, 30, 40, and 43 in square 722.

A small triangular strip at the northeast corner of square 682.

A triangular parcel lying south of square 721, all as shown on the accompanying white—or key print—and upon blue-print maps of said squares 633, 682, 721, and 722, and blue-print map of the United States Capitol Grounds, all of which were submitted for my examination by Mr. August Eccard, civil engineer, Architect's Office, United States Capitol, who is prepared, on request, to call upon and to furnish you such other or additional information as you may desire.

An examination of the files of the department in this case disclosed that the Plaza Commission, created for the purpose of acquiring said property, negotiated a settlement with the Commissioners of the District, who executed a deed of sundry real estate properties within the so-called Plaza area for the agreed consideration of $43,120. Their authority in the premises, however, was by the commission referred to the Attorney General for an opinion. Under date of July 17, 1916, the commission was advised "that the said commissioners are without authority to execute the deed in question, and the requisite authority to execute such a conveyance and to determine whether the consideration shall be accepted must be sought from the Congress."

The department has no information regarding the occasion for the delay which has transpired in this matter.

Respectfully,

For the Attorney General:

GEORGE R. FARNUM,
*Assistant Attorney General.*

ARCHITECT OF THE CAPITOL,
*Washington, D. C., January 26, 1928.*

Hon. FREDERICK W. DALLINGER,
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN: In response to your inquiry relating to the condition of the ground purchased for the enlargement of the Capitol grounds, I wish to say that the Government owns all of the area to the north of the Capitol originally contemplated in the acts providing for its purchase, with the following exceptions thereto:

Lots 51, 52, 53, 67, 68, 69, 70, 71, 72, 73, and 74 in square 633. These premises are occupied by the Arthur Public School Building.

Parts of lots 13, 14, 39, 40, and 43 in square 722.

A small triangular strip at the northeast corner of square 682.

A triangular parcel lying south of square 721.

These parcels are the property of the District of Columbia. None of the Government hotels are located upon any of the parcels of ground above referred to. All of the Government hotels are upon ground owned by the Government.

Respectfully,

DAVID LYNN,
*Architect of the Capitol.*

ARCHITECT OF THE CAPITOL,
*Washington, D. C., January 27, 1928.*

Hon. FREDERICK W. DALLINGER,
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN: It has occurred to me that in the letter sent you yesterday, it might have been better if I had stated the date when the last payment was made through the commission formed to complete the purchase of the land for the enlargement of the Capitol grounds. The last payment was made August 22, 1927, and the voucher drawn on that occasion was for $67,965.92.

Respectfully,

DAVID LYNN,
*Architect of the Capitol.*

Mr. HARRISON. Mr. Chairman, I yield eight minutes to the gentleman from Texas [Mr. BLANTON].

The CHAIRMAN. The gentleman from Texas is recognized for eight minutes.

Mr. BLANTON. Mr. Chairman, the Government of the United States has no business to be in the hotel business. It has no business to be renting apartment houses to anybody, and running restaurants and dining rooms for anybody. Until the recent war the Government never thought of doing anything like that. Until the recent war there was no Member of either House or Senate so bolshevistic as to propose anything of the kind. But expediency during the war caused the Government to do that thing. And Congress has not yet been brave enough to stop it. Instead of having 37,000 employees, as we did before the war here in Washington, we got up to over 100,000 employees. The new influx into the city caused housing conditions to become acute, and it was hard for our employees to find proper housing. Then Congress built these Government hotels.

I predicted at that time that we would be years in getting rid of them, and I predicted at that time that you would have to go up against the influence of the occupants of those hotels before you could ever restore that property. That is what you are meeting every year, the influence of these thousand women who occupy these hotels. It is political cowardice that keeps those hotels from being torn down. You may put it on the question of sentimentalism or humanitarianism, but if you want that property to be vacated you need not turn those women out in the cold, for they can find ample accommodations now. If you will make a survey of this District, such as I have made within the last 12 months, you will find that the housing conditions right now are better than they have been at any time within the last 12 years. You will find more desirable apartments vacant and offered for rent right now than there have been at any time in the last 12 years. You will find many desirable private resi-

dences that have been vacant for 12 months and occupants can not be found for them.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. BLANTON. Not now. I have but eight minutes.

I have just as much sympathy for the Government employees as anybody. I want to do justice to them. But there is no duty resting upon this Government to furnish Government hotels for them when housing conditions are not acute at this time.

I will tell you what we ought to do. We ought to serve notice on these good ladies who are in these buildings that at a certain time we will tear them down, and let them make preparations to find lodgings elsewhere. They have found lodgings heretofore, Mr. Chairman, during the history of this Government, during the upbuilding of the Capital established here. They have found lodging places otherwise than in Government-owned hotels, and they should do it again. I will tell you what has happened here. If you will investigate it, you will find many $4,500 employees in big jobs and drawing big salaries up to $4,000 and $5,000 in this housing corporation, and they do not want to give up their fat jobs, and such has been the case ever since we started it.

I agree with the gentleman from Massachusetts [Mr. DALLINGER] that it ought to stop. I do not accuse the chairman of the Committee on Appropriations [Mr. MADDEN] of being afraid, because he is one of the bravest men we have here. He was brave Wednesday when he came in here and helped to defeat that infamous bill the Federal reserve system was trying to cram down the throats of the American people, a bill which would have placed high-salaried members on retired pensions at $9,000 a year for life. He was brave enough to come in here and help us defeat it. But he does let these women kind of get around him. He is not afraid of men, but he is afraid of women. [Laughter.]

Mr. SCHAFER. Will the Senator, the gentleman from Texas, yield?

Mr. BLANTON. Senator is right; I yield.

Mr. SCHAFER. Does the gentleman think that the women who are staying in these hotels can afford to pay the rent charged for the private apartments and dwellings that are now vacant in the District?

Mr. BLANTON. They would have to pay no more than thousands of other Government employees here. The gentleman from Wisconsin has lots of people on Wisconsin farms and in Wisconsin cities who get less salary, and who do not get 30 days' vacation on full pay each year; they do not get 30 days' extra sick leave, on doctors' certificates, at full pay; they do not get all the holidays that so numerously occur in Washington; they do not get to live here in the Nation's Capital, the most beautiful city in the world; they do not get all of the advantages the people here in Washington get, and if the gentleman will go home to Wisconsin he will find that his people back home are not half so well looked after as these selfsame ladies in these Government hotels.

Mr. SCHAFER. I will say to the gentleman that looking at the Capitol and having 30 days' leave, and so forth, does not fill empty stomachs on salaries of $1,200 and $1,400 a year.

Mr. BLANTON. I want to say this to my friend from Wisconsin: I will guarantee that if he will investigate it he will find that these good women living in these Government hotels get more food in one day for half the price than some of his people in Wisconsin get in a week. [Laughter.] Now, investigate it. Talk about full stomachs. Just investigate that situation and you will find they are better off than the people in the State of Wisconsin.

I am not thinking so much about just one particular handful of people of the United States. I am thinking about the 110,000,000 people who ought to have an equal partnership in the Government of the United States and ought to have an equal interest in everything it does. If we are going to give housing in Government hotels to some of them, we ought to give such housing to all of them. I dare say you will find some people in the State of Wisconsin living in houses where the roofs leak, with the wind howling through the door cracks and window cracks, and with not half so many of the comforts and conveniences that these salaried people have here in Washington. And you are going to just let it continue on. I am afraid that my friend from Wisconsin is a little too much influenced by this bunch of women. [Laughter.]

Mr. SCHAFER. Some of these women have "contacted" with the gentleman from Wisconsin.

Mr. BLANTON. They may not have "contacted" with him personally, but they have through the mails and the newspapers.

The CHAIRMAN. The time of the gentleman from Texas has expired.

The CHAIRMAN. All time has expired, and the Clerk will read.

The Clerk read as follows:

### FINANCE DEPARTMENT

PAY, ETC., OF THE ARMY

For pay of officers of the line and staff, $31,168,426; pay of officers, National Guard, $100; pay of warrant officers, $2,156,880; aviation increase to commissioned and warrant officers of the Army, $1,571,326; additional pay to officers for length of service, $7,778,208; pay of enlisted men of the line and staff, not including the Philippine Scouts, $51,022,306; pay of enlisted men of National Guard, $100; aviation increase to enlisted men of the Army, $400,723; pay of enlisted men of the Philippine Scouts, $976,854; additional pay for length of service to enlisted men, $3,286,020; pay of the officers on the retired list, $7,340,729; increased pay to retired officers on active duty, $216,638; pay of retired enlisted men, $10,031,858; increased pay and allowances of retired enlisted men on active duty $9,873; pay of retired pay clerks, $6,750; pay of retired veterinarians, $3,570; pay of not to exceed 65 civil-service messengers at $1,050 each at headquarters of the several Territorial departments, corps areas, Army and corps headquarters, Territorial districts, tactical divisions and brigades, service schools, camps, and ports of embarkation and debarkation, $70,200; pay and allowances of contract surgeons, $44,556; pay of nurses, $823,780; pay of hospital matrons, $000; rental allowances, including allowances for quarters for enlisted men on duty where public quarters are not available, $6,547,010; subsistence allowance, $5,855,602; interest on soldiers' deposits, $75,000; payment of exchange by officers serving in foreign countries, and when specially authorized by the Secretary of War, by officers disbursing funds pertaining to the War Department, when serving in Alaska, and all foreign money received shall be charged to and paid out by disbursing officers of the Army at the legal valuation fixed by the Secretary of the Treasury, $1,000; additional pay to officers below the grade of major required to be mounted and who furnish their own mounts, $225,000; in all, $130,282,810; and the money herein appropriated for "Pay, etc., of the Army" shall be accounted for as one fund.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The amendment read as follows:

Amendment offered by Mr. COLLINS: On page 11, in line 12, after the comma following the word "mounts," insert "not to exceed."

Mr. COLLINS. Mr. Chairman, the purpose of the amendment is to fix it so that not to exceed $225,000 will be expended to provide for the employment of men to look after the private mounts of Army officers below the grade of major.

Mr. BARBOUR. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. BARBOUR. Does the gentleman think there would be more than $225,000 spent for that purpose when that amount is mentioned in the bill.

Mr. COLLINS. I was told by finance officers of the War Department that if it was left as it is now it would mean they could spend whatever this might amount to.

Mr. BARBOUR. More than the $225,000?

Mr. COLLINS. Yes.

Mr. BARBOUR. Mr. Chairman, I will accept the amendment.

The CHAIRMAN. The question is on agreeing to the amendment offered by the gentleman from Mississippi.

The amendment was agreed to.

The Clerk read down to and including line 6 on page 18.

Mr. BARBOUR. Mr. Chairman, on page 16, in line 24, I ask unanimous consent that the spelling of the third word in the line be corrected, changing the word from "officers" to "offices."

Mr. GARRETT of Tennessee. In line 24 of page 16?

Mr. BARBOUR. Yes.

Mr. GARRETT of Tennessee. Should the word be changed? It reads now "enlisted men and officers."

Mr. BARBOUR. The language should be "for ice issued to organizations of enlisted men and offices at such places as the Secretary of War may determine." It is not for the issue of ice to "officers" but to "offices." It is a misspelling, I will say to the gentleman from Tennessee.

The CHAIRMAN. Without objection, the correction will be made.

There was no objection.

The Clerk read down to and including line 15 on page 19.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent to correct the spelling of the next to the last word in line 19, page 18 of the bill. Instead of "storing" it should be "sorting." It is merely a transposition of one of the letters.

The CHAIRMAN. Without objection, the Clerk will correct the spelling of the word as indicated by the gentleman from California.

There was no objection.

The Clerk read as follows:

Army transportation: For transportation of the Army and its supplies, including retired enlisted men when ordered to active duty; of authorized baggage, including that of retired officers, warrant officers, and enlisted men when ordered to active duty and upon relief therefrom, and including packing and crating; of recruits and recruiting parties; of applicants for enlistment between recruiting stations and recruiting depots; of necessary agents and other employees, including their traveling expenses; of dependents of officers and enlisted men as provided by law; of discharged prisoners, and persons discharged from St. Elizabeths Hospital after transfer thereto from the military service, to their homes (or elsewhere as they may elect): Provided, That the cost in each case shall not be greater than to the place of last enlistment; of horse equipment; and of funds for the Army; for the purchase or construction, not exceeding $62,000, alteration, operation, and repair of boats and other vessels; for wharfage, tolls, and ferriages; for drayage and cartage; for the purchase, manufacture (including both material and labor), maintenance, hire, and repair of pack saddles and harness; for the purchase, hire, operation, maintenance, and repair of wagons, carts, drays, other vehicles, and horse-drawn and motor-propelled passenger-carrying vehicles required for the transportation of troops and supplies and for official military garrison purposes; for purchase and hire of draft and pack animals, including replacement of unserviceable animals; for travel allowances to officers and enlisted men on discharge; to officers of National Guard on discharge from Federal service as prescribed in the act of March 2, 1901; to enlisted men of National Guard on discharge from Federal service, as prescribed in amendatory act of September 22, 1922; and to members of the National Guard who have been mustered into Federal service and discharged on account of physical disability; in all, $17,417,701, of which amount not exceeding $2,000,000 shall be available immediately for the procurement and transportation of fuel for the service of the fiscal year 1929.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. COLLINS: On page 21, lines 8 and 9, strike out "for purchase and hire of draft and pack animals, including replacement of unserviceable animals."

Mr. COLLINS. Mr. Chairman, we have now in the Army 24,900 horses—or, at least, we had that number on hand as of July 1, 1927—24,900 horses and 14,000 mules. In the 1928 bill 2,150 additional horses was provided for and 1,450 mules. This bill carries an additional number of horses to the extent of 2,150 and 1,450 additional mules.

In the Regular Army we have 8,591 men in the Cavalry and 9,190 horses, not including mules. This statement appears on page 304 of the hearings.

In addition to the number of horses that we have on hand there are a large number of privately owned horses—fed, sheltered, bedded, and cared for out of Government funds; in fact, this bill carries an item of $225,000 for the pay of persons to take care of privately owned horses of Army officers below the grade of major. It is to be used exclusively for pay of men to look out for the horses' general welfare. Each officer draws $150 if he owns only one horse and $200 if he owns two horses. In addition to this privately owned horses are furnished with forage, bedding, shoeing, and everything else that might be necessary.

The testimony of Army officers that have appeared before the committee, summed up, is that the motor-drawn vehicle is supplanting the horse in warfare. General Fries testified that a human being could protect himself by a gas mask against a gas attack, and that his clothing could be so saturated with some sort of material that the gas could not touch his body for a long length of time; but this is not so with a horse. There is no gas mask or clothing that can be put on a horse. A horse's usefulness in modern warfare is over. He is obsolete.

A motor-drawn vehicle these days is infinitely superior, and in the event of a gas attack can be used; a horse can not. Furthermore, airplanes have taken the place of the horses in scouting work or for reaching a spot quickly. And an airplane drops gas, too. One officer said:

If you want to find out whether a horse is useful, look outdoors and see how many you see. The motor-drawn vehicle has taken its place.

Aside from all this we have more horses and mules in the Army now than we need. We have more horses in the Cavalry

than we have men, quite a large number more counting the privately owned horses. In addition, there is testimony that a motor-drawn vehicle is a cheaper implement of warfare than the horse. The upkeep is considerably less. So I do not see the necessity of carrying on a large horse-buying program.

The CHAIRMAN. The time of the gentleman from Mississippi has expired.

Mr. COLLINS. Mr. Chairman, I ask unanimous consent that I may have five minutes more.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. COLLINS. I do not see the necessity of carrying on this buying campaign when practically all of the testimony was to the effect that the horse is out of date in warfare.

Mr. HUDSON. Will the gentleman yield right there?

Mr. COLLINS. Yes.

Mr. HUDSON. And was it not also brought out before the committee that motor transportation is constantly increasing in the Army?

Mr. COLLINS. Sure.

Mr. HUDSON. And they are asking a larger item for motor transportation?

Mr. COLLINS. Sure. We have more horses and mules now than we need. There are other items that increase the number of motor-drawn vehicles. The number of new cars to be purchased is 450, and then there are 200 G. M. C. trucks that are to be provided with bodies. Also motor vehicles will be purchased. It is a waste of the people's money to expend this sum in the purchase of horses and mules. It should be expended for some useful purpose.

Mr. BARBOUR. I do not think anyone will contend that at this time the horses and mules should be discontinued in the Army. The Budget recommended 2,400 horses and 1,981 mules. The committee cut the appropriations down to 2,150 horses and 1,450 mules, the same number that were provided in the 1928 bill. This will not meet the requirements of the Army. It will not take care of the losses during the fiscal year 1929. We had on July 1, 1927, 38,900 horses and mules. If purchases are made according to the amount which we propose to appropriate in this bill, we will have on hand July 1, 1929, at the end of the fiscal year, 33,410 horses and mules, a loss of over 5,000, even with the number that will be bought with this appropriation. I do not think it is safe, I do not think anybody will feel that it is safe in the next fiscal year to reduce in the number of horses and mules that we have in the Army more than we will under this appropriation. There are places where a motor can not go.

Mr. HUDSON. Nicaragua, for instance?

Mr. BARBOUR. Yes; I do not suppose the best automobile manufactured in the gentleman's State could climb to the top of the mountain where our marines recently went.

Mr. HUDSON. Not even a Ford?

Mr. BARBOUR. Not even the new Ford. I have not had an opportunity to ride in one yet.

Mr. HUDSON. The gentleman would enjoy it.

Mr. BARBOUR. I am sure I would. I do not think, Mr. Chairman, that it would be safe to reduce this appropriation at this time.

Mr. HUDSON. Will the gentleman yield?

Mr. BARBOUR. I will.

Mr. HUDSON. In relation to the reduction that has been made in the last few years as to the number of horses and mules the gentleman says that there would be a decrease of 5,000 in here?

Mr. BARBOUR. By July 1, 1929, even with this appropriation.

Mr. HUDSON. And without the appropriation what would the decrease be?

Mr. BARBOUR. I imagine it would be about 3,600 more.

Mr. HUDSON. The committee has appropriated for increase in the motor vehicles?

Mr. BARBOUR. Yes; we have taken care of the automobiles.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Mississippi [Mr. COLLINS].

The question was taken, and the amendment was rejected.

The Clerk read as follows:

BARRACKS AND QUARTERS AND OTHER BUILDINGS AND UTILITIES

For all expenses incident to the construction, installation, operation, and maintenance of buildings, utilities, appurtenances, and accessories necessary for the shelter, protection, and accommodation of the Army and its personnel and property, where not specifically provided for in other appropriations, including personal services, purchase and repair of furniture for officers' quarters and officers' messes and wall lockers and refrigerators for Government-owned buildings as may be approved by the Secretary of War, care and improvement of grounds, flooring and

framing for tents, rental of buildings and grounds for military purposes and lodgings for recruits and applicants for enlistment, water supply, sewer and fire-alarm systems, fire apparatus, roads, walks, wharves, drainage, dredging channels, purchase of water, and disposal of sewage, $12,068,944: Provided, That this appropriation shall be available for the rental of offices, garages, and stables for military attachés: Provided further, That not exceeding $100,000 shall be available immediately for the procurement of fuel for the service of the fiscal year 1929 and not exceeding $80,000 shall be available immediately for making alterations to the barge-office slip, New York City, on Governors Island Ferry: Provided further, That not exceeding $15,000 of this appropriation shall be expended for completing work incident to and of repairing the old building known as the "Castle" at Fort Niagara, N. Y. In addition to this amount, the Secretary of War is authorized to expend such sums as may be contributed from private sources for the rehabilitation of such old building.

Mr. RAMSEYER. Mr. Chairman, I move to strike out the last word in order to ask a few questions of the gentleman from California in charge of the bill. I desire to call attention to the references to previous statutory enactments on page 24 of the bill.

On top of page 24 you refer to the act of March 3, 1927, and on the previous page you give the title of that act. That act consists of a little pamphlet which contains only one enactment. Of course, that is the law, but that same enactment appears in the Statutes at Large for the last Congress. That Statutes at Large is an official document and what it contains is the statute laws without question. I would like to know why the Appropriations Committee follows the practice of referring to acts contained in little pamphlets that are in the possession of practically nobody except the Secretary of State, and do not set out the Statutes at Large, which are in the possession of every Member of Congress, every court, and every department and bureau, and in the hands of many lawyers?

Mr. BARBOUR. I presume it is matter of custom. Provisions of that kind have been carried in appropriation bills "from the time the memory of man runneth not to the contrary."

Mr. RAMSEYER. In 1925 we adopted a code of law which is supposed to contain all the Federal statutes in force on December 7, 1925, and whatever is in there is presumed to be the law. Enactments subsequent to December 7, 1925, have to be in the Statutes at Large for the last Congress.

Mr. BARBOUR. This particular citation is of an act approved March, 1927.

Mr. RAMSEYER. Yes; that is in the Statutes at Large for the last Congress, the Sixty-ninth Congress.

Mr. BARBOUR. But it would not be in the code.

Mr. RAMSEYER. I understand that; but is in the Statutes at Large. Why does not the committee cite that which is in the possession of every Congressman and many lawyers and all the courts, so that any one interested in knowing what the law is, upon which this item of appropriation is based, can refer to a volume in his possession instead of hunting up a little pamphlet that is in the possession of very few people?

Mr. BARBOUR. That is not only perfectly agreeable to me, but I think the suggestion is a good one.

Mr. RAMSEYER. I called this to the attention of the House last week. At that time no appropriation bill was under consideration. The Members present at that time all agreed that our practice in the past in not referring to the United States Code (1925) was bad and should be corrected.

Mr. BARBOUR. If we can do that, I think it would simplify matters and furnish all the information desirable in regard to them. If that can be done it should be done. I think it would be an improvement to cite these acts as the gentleman says.

Mr. RAMSEYER. My inquiry to this point has been directed to references to enactments subsequent to the enactment of the Code, which contains all the statute laws up to December 7, 1925, and the gentleman agrees with me that, rather than to cite the date of the act, it would be better practice to cite the Statutes at Large and the place where the act can be found therein.

Mr. BARBOUR. I think so, because the date itself does not mean anything to one reading this bill.

Mr. RAMSEYER. Now, in regard to the next line, there are cited the sections of the Revised Statutes. To be sure the gentleman understands that the Revised Statutes are a codification of the United States Statutes made in 1878, and contain the enactments of Congress up to 1873. From 1878 to 1925 there was no codification of the United States Statutes. We now have this new codification of 1925. These sections, 1136 and 3734, of the Revised Statutes, referred to on page 24 of the bill, can be found in the United States Code of Laws. I know that there is some objection to making reference only to

the Code of Laws, because the enacting clause of the code recites:

The matter set forth in the code * * * shall establish prima facie the laws of the United States * * * in force on the 7th day of December, 1925.

Personally I am inclined to the opinion that it would be entirely safe to cite only the sections of the United States Code. It is very important that we should refer to the Code of Laws, because, as I stated before, this code is in the possession of every Member of Congress, the heads of the departments, the chiefs of bureaus, the courts, and in addition to that, something like seven or eight thousand copies have been sold to attorneys all over the United States. The point I have been attempting to make is that when it is necessary to refer to enactments prior to December 7, 1925, without taking any chances whatever, you can make reference to the Revised Statutes or the Statutes at Large or act of a certain date and then in parenthesis or in brackets right after the words "Revised Statutes," or "Statutes at Large" or act of a certain date you could insert " U. S. C.," the initials standing for United States Code, and the title so-and-so and the section so-and-so, so that anybody who wants to look up the statute to which reference is made and see what you have done can use the code and see exactly the statutory law on which a particular item of appropriation is based.

Mr. MADDEN. Mr. Chairman, will the gentleman yield?

Mr. RAMSEYER. Yes.

Mr. MADDEN. It is all very well to refer to the code, but we find that the code does not state the true condition in several cases where we have referred to it, that it is not the law. If we refer to the code in the act making the appropriations, then we say that that is the law. If we repeat the code and the act itself and the number of the Statutes at Large, of course, that is going to make a lot of work, with more or less cost, and the question is, Should we do it until we know definitely what the cost is?

Mr. RAMSEYER. My suggestion would not involve taking any chances, so far as the legality of the act is concerned.

Mr. MADDEN. I am afraid it would.

Mr. RAMSEYER. For instance, in the case here, in lines 1 and 2, on page 24, reference is made to section 1136 and section 3734 of the Revised Statutes. My suggestion is to let that stand and then in brackets, which would not take over an inch of space, refer to the United States Code and the title and the section, the reference could be abbreviated; and then the courts and the heads of departments and the chiefs of bureaus and the Members of Congress and all of the lawyers who have the code can easily find it.

Mr. MADDEN. If you refer to the code, we have to keep the Statutes at Large also as a reference, have we not?

Mr. RAMSEYER. No. The reference to the Statutes at Large would only be necessary to acts since December 7, 1925.

Mr. MADDEN. I mean the Revised Statutes. Are you going to ask the committee to put this in this bill as we go along now? I hope the gentleman will not do that. Suppose he gives us a chance to get ourselves adjusted to it, and let us put it in next year.

Mr. RAMSEYER. I am not going to hold up proceedings here to offer amendments. I know that it would entail a little work, but it would be work that a clerk could easily do.

Mr. MADDEN. We could do this as we are making up the bill, but it would be hard work for us to do it on this bill now.

Mr. RAMSEYER. I hope the next bill that the gentleman brings in will have it so arranged.

Mr. MADDEN. We can not do that because the bill is already made up.

Mr. RAMSEYER. Then in the next bill after that. Will the gentleman consider it at all, without making any definite promise?

Mr. MADDEN. We will consider it very carefully, and we will come and consult with the gentleman.

Mr. RAMSEYER. What would be the objection to getting unanimous consent to permit the clerk of the House, after the citations in this bill, to include in the engrossed copy of the bill the references to the United States Code whenever that is possible?

Mr. MADDEN. We would not want to take the chances on the clerk doing that. We have to know definitely what we are doing, if it ought to be done.

Mr. RAMSEYER. Then why not let one of the gentleman's own clerks do it; one in whom he has confidence?

Mr. MADDEN. I will say to the gentleman that we will study it seriously and in a friendly way.

Mr. RAMSEYER. I assure the gentleman that I am offering the suggestion in a perfectly friendly way.

Mr. MADDEN. We will study the meeting of the minds.

Mr. RAMSEYER. During most of the period between the year 1873 and the year 1925 chaos prevailed with respect to our United States statutes. You could not find without an infinite amount of work what the statute laws of the United States were. Now, we have made a start to bring about some order. If Congress does not pay any respect to its own work we will soon have the same chaos that we have had heretofore for nearly a 50-year period.

Mr. MADDEN. We might select a special committee and put the gentleman from Iowa upon it, and see what can be done in the matter.

Mr. RAMSEYER. You have had two years in which to do it.

Mr. MADDEN. We have not thought about it.

The CHAIRMAN. The time of the gentleman from Iowa has again expired.

Mr. COLLINS. Mr. Chairman, before the amendment is reported I want to call attention to line 21, page 24, to the words "purchase and." This is the first time that those words have appeared in this bill. Hence I make a point of order against them.

Mr. BARBOUR. May I suggest that the point of order has come too late? The paragraph has already been discussed. There has already been debate on it.

The CHAIRMAN. The gentleman slept on his rights.

Mr. COLLINS. I merely yielded.

The CHAIRMAN. The debate, if on any subject, has been on the subject of this paragraph. Therefore the gentleman's point comes too late.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. COLLINS: Page 24, lines 21 and 22, strike out the words "furniture for officers' quarters and officers' messes and."

Mr. COLLINS. Mr. Chairman and gentlemen of the House, what I am after is to prevent an expenditure for the first time since 1923 for furniture for officers' quarters, and then only during the war period. We are beginning a program of furnishing the homes of Army officers with furniture. There is no law for it. It is the first time regular household furniture has ever been furnished for Army officers. This is an opening wedge. It is $320,000 now. It will be more next year. If the House wants to adopt this policy it is their affair. I am calling your attention to it. I do not think it ought to be begun.

It is said that it might save us money in hauling charges. We know that that is not going to be the case. We also know that expensive furniture of all kinds in time is going to be bought; perhaps not now, but in time it will be bought; and there is no limitation whatever on the amount that can be expended for furniture. The hearings say it is to be heavy furniture—406 sets; but there is no limitation on the amount that can be expended for each article or set of furniture, and we know the kinds that will be purchased in time.

Mr. MADDEN. Does the gentleman's amendment provide that we could not buy furniture for the barracks that we are building?

Mr. COLLINS. Yes.

Mr. MADDEN. What are we going to do for furniture for the men?

Mr. COLLINS. It has never been customary to furnish quarters for Army officers.

Mr. MADDEN. I was wondering whether the building program would go that far.

Mr. BARBOUR. It will permit furniture for noncommissioned officers' quarters to be purchased.

Mr. MADDEN. Will it furnish the new quarters that we are building for the Army?

Mr. BARBOUR. Yes.

Mr. MADDEN. I think it ought to be seriously thought out.

Mr. COLLINS. I think the chairman of the subcommittee is in error. The language of the bill says, "Purchase and repair of furniture for officers' quarters and officers' messes."

Mr. MADDEN. That is different.

Mr. COLLINS. This is to be expended solely in the furnishing of officers' homes, according to the language of the bill.

Mr. BARBOUR. I submit to the gentleman from Mississippi that it includes noncommissioned officers' quarters as well as commissioned officers' quarters. We are building in our housing program a considerable number of noncommissioned officers'

quarters. Does the gentleman want these noncommissioned officers to furnish their own quarters?

Mr. COLLINS. I am taking the statement in the bill. This is to be expended in connection with the officers' quarters.

Mr. BARBOUR. You say that certain statements are in the hearings. Can you show us where they are?

Mr. COLLINS. Let us see—on page 1001 is the estimate of $326,400 for the purchase of 9,546 pieces. I think this is 408 sets.

The CHAIRMAN. The time of the gentleman from Mississippi has expired.

Mr. COLLINS. Mr. Chairman, I ask for five minutes more.

The CHAIRMAN. Is there objection to the request of the gentleman from Mississippi?

There was no objection.

Mr. COLLINS. The heading of the paragraph is "Purchase of furniture for officers' quarters, and so forth."

Mr. BARBOUR. "And so forth." There you have it.

Mr. COLLINS. No; that refers to refrigerators.

Mr. BARBOUR. A noncommissioned officer is an officer in the contemplation of the language of the bill.

Mr. COLLINS. The point I make is that none of it will be spent in furnishing noncommissioned officers' quarters.

Mr. BANKHEAD. If that construction of the language of the bill is correct, as given by the chairman of the subcommittee, would he have any objection to an amendment providing that this appropriation can only be made for the purchase of furniture for noncommissioned officers:

Mr. BARBOUR. Certainly I would have an objection.

Mr. BANKHEAD. Then that verifies the position of the gentleman from Mississippi.

Mr. BARBOUR. I do not think it affects his position at all.

Mr. COLLINS. The Secretary said, "There is quite a serious lack now, and it is a hardship to the officers."

If it were ever contemplated to furnish noncommissioned officers' quarters, he would have said so.

Mr. BARBOUR. When he says officers that includes commissioned and noncommissioned officers. I am waiting for the gentleman to point out in the hearings where it is shown that this is all to be used for commissioned officers' quarters.

Mr. McDUFFIE. As a matter of fact, is a noncommissioned officer an officer and is he treated as an officer in the Army? Do they not speak of commissioned officers as being officers in the military service?

Mr. BARBOUR. A noncommissioned officer is treated as an officer just the same as the commissioned officer in the matter of supplying furniture for quarters. We are building quarters for noncommissioned officers and commissioned officers. This is to purchase furniture for officers' quarters, and it includes noncommissioned officers just as well as commissioned officers. That is my recollection of the testimony that was given; and I am still waiting for the gentleman from Mississippi to show me that I am wrong.

Mr. McDUFFIE. I simply asked the question for information, because I have always understood that an officer in the military service was generally regarded as a commissioned officer, and that noncommissioned officers, corporals and sergeants, were treated as enlisted men.

Mr. CLAGUE. Here is what General Summerall stated before our committee. On page 23 of the hearings General Summerall testified as follows:

It furnishes 408 sets of furniture for the families of officers and married noncommissioned officers.

Mr. BARBOUR. That was my recollection of the testimony. It is clear that furniture will be furnished to noncommissioned officers who are married.

Mr. SPEAKS. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. SPEAKS. For the benefit of the gentleman from Alabama, who asked the question as to whether a corporal or sergeant is an officer or enlisted man, I will state that a corporal and sergeant are enlisted men. There is no question about it.

Mr. McDUFFIE. Not at all. A corporal and a sergeant are not officers. They are enlisted men.

Mr. COLLINS. I will admit that General Summerall stated what has been read, but at the same time I will state that everywhere else in the hearings the word "officer" has been mentioned and the word "noncommissioned" has not been mentioned. And I feel quite certain that this furniture will go into officers' homes.

Mr. BANKHEAD. Mr. Chairman, I offer a substitute for the amendment offered by the gentleman from Mississippi.

LXIX——155

The CHAIRMAN. The gentleman from Alabama offers an amendment by way of substitute, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. BANKHEAD as a substitute for the amendment offered by Mr. COLLINS: Page 24, line 21, after the word "for," add "noncommissioned," and after the word "and" add "noncommissioned."

Mr. BARBOUR. Mr. Chairman, I make a point of order against the substitute, or at least I reserve a point of order against it.

Mr. BANKHEAD. If the point of order is a good one, I wish the gentleman would state it.

Mr. BARBOUR. I withdraw the point of order, Mr. Chairman.

Mr. BANKHEAD. Mr. Chairman, I have very few words to add to what the amendment itself expresses. It has been clearly developed here, not only by the statement of the chairman of the subcommittee, but by some other gentleman just a moment ago, who read from the testimony, that it was the purpose of this language specifically and solely to provide for the purchase of furniture for the messes and quarters of noncommissioned officers.

Mr. BARBOUR. Oh, no.

Mr. BANKHEAD. That is what I understood the gentleman to read from the hearings.

Mr. BARBOUR. No.

Mr. BANKHEAD. And that has been the argument, as I understood it, that was made in justification of the appropriation. I do not know what the practice has been heretofore, but if the gentleman from Mississippi accurately stated the situation it is an absolute innovation upon legislation, in providing for the convenience of commissioned officers, to buy furniture for their homes. If that has been the practice heretofore I would raise no objection to it, but it seems from his statement that we are now proposing to embark upon the proposition of the Government just going in and furnishing the homes and messes of commissioned officers. I am not familiar with the hearings and I do not know what was contemplated by the appropriation, but it seems to me that if the purpose of this appropriation is the one that has been stated, as evidenced by a reading of the hearings, the gentleman ought to accept the amendment.

Mr. BARBOUR. Will the gentleman permit an interruption?

Mr. BANKHEAD. Yes.

Mr. BARBOUR. The question we were discussing was whether or not any money would be spent for the purchase of furniture for noncommissioned officers' quarters. It was stated there would not be any spent for noncommissioned officers' quarters. But the gentleman from Minnesota [Mr. CLAGUE] read from the hearings a statement by General Summerall to the effect that a certain amount of the money would be spent for furnishing the quarters of noncommissioned officers.

Mr. BANKHEAD. Does the gentleman propose to embark upon a new program here and furnish money for the homes of commissioned officers?

Mr. BARBOUR. It is not a new idea, I will say to the gentleman from Alabama. That has been done almost throughout the history of the country.

Mr. BANKHEAD. I was assuming that the statement made by my colleague from Mississippi accurately stated the facts and precedents, and I stated that if this has been the appropriation recognized and authorized heretofore I should not have made the suggestion in my amendment, and I was assuming that the gentleman from Mississippi, when he said that since 1923 no such appropriation had been made, was accurately stating the record.

Mr. BARBOUR. Not since 1923, but prior to that there were such appropriations.

Mr. COLLINS. The Secretary of War says:

As I recall the figures, they call for 408 sets of heavy furniture. No heavy furniture has been purchased since 1923.

And not only that, if the gentleman will permit one further statement, the language of the law has been changed in order to permit the purchase of this furniture. The word "purchase" has been written into the bill for the first time.

Mr. BANKHEAD. The law has not been changed, but it is being interpreted differently in the bill as it stands now.

Mr. COLLINS. The word "purchase" has been added to the language of the bill so as to permit this procedure.

Mr. SPEAKS. Will the gentleman yield?

Mr. BANKHEAD. Yes; I yield to the gentleman from Ohio.

Mr. SPEAKS. I think the purpose is to avoid the payment of freight charges which sometimes equal the cost of the furni-

ture. For instance, an officer may be ordered from California to New York. The Government is under the necessity of transporting his furniture. The gentleman can readily see that the freight charges might be equal to the cost of the furniture. So the purpose is to establish in the new quarters certain heavy furniture and avoid excessive freight charges. Suppose an officer is transferred from California to New York and six months later ordered from New York to Panama. The gentleman from Alabama will note that the Government is transporting a lot of heavy furniture clear across the country, then beyond the limits of the United States, and it is obvious that the freight charges might be more than the original cost of the furniture. Having this heavy furniture installed in quarters is undoubtedly a convenience and a very decided economy.

Mr. BANKHEAD. I will ask the gentleman if there is not a limitation upon the amount of freight paid on furniture in such a transfer?

Mr. SPEAKS. Yes; there is a limitation on the amount of household effects and baggage an officer can transport at public expense.

Mr. BANKHEAD. That is my information.

Mr. McDUFFIE. Mr. Chairman, I move to strike out the last word, and I would like to have the attention of the gentleman from Ohio [Mr. SPEAKS]. The gentleman has had a lot of military service and understands military terms. I call the gentleman's attention to the language here, "furniture for officers' quarters and officers' messes." Does the gentleman think that includes noncommissioned officers?

Mr. SPEAKS. It does not.

Mr. McDUFFIE. That is the point the gentleman from Mississippi [Mr. COLLINS] has been trying to make, that the noncommissioned officer is an enlisted man and will not benefit by this legislation.

Mr. BARBOUR. But the testimony shows he will, and it is so intended.

Mr. McDUFFIE. But the law shows he will not because it says "officers," and that means commissioned officers.

Mr. BARBOUR. It means commissioned officers and noncommissioned officers.

Mr. McDUFFIE. Then it should say "noncommissioned officers." I will say to the gentleman, if it means that. Here is an expert on military matters [Mr. SPEAKS] who bears out the suggestion that it means commissioned officers.

Mr. BARBOUR. I would refer the gentleman to Noah Webster.

Mr. McDUFFIE. Well, I refer the gentleman to the common practice in military circles, as testified to by General SPEAKS, the gentleman from Ohio. When you speak of an officer in the Army, you mean a commissioned officer and not an enlisted man.

Mr. CHINDBLOM. Will the gentleman yield?

Mr. McDUFFIE. Yes.

Mr. CHINDBLOM. I suggest the gentleman refer it to the Comptroller General; he will decide it eventually.

Mr. McDUFFIE. Probably so. I am trying to get some information as to the distinction between officers and noncommissioned officers from somebody, but nobody seems to be able to give it except the gentleman from Ohio.

Mr. SPEAKS. The military grades or distinctions are officer, noncommissioned officer, and private or enlisted man, and the gentleman knows the story of the wide gulf separating the officer from the enlisted man. Sergeant and corporal are merely grades of enlisted men and are not officers.

Mr. McDUFFIE. This language does not say noncommissioned officer, but simply says officers, and under the language as written in the bill it means commissioned officers.

Mr. HOWARD of Nebraska. Will the gentleman yield to me for a question?

Mr. McDUFFIE. Certainly.

Mr. HOWARD of Nebraska. Mr. Chairman, I think we can arrive at a conclusion in this matter very quickly if some military gentleman here will tell us whether or not—suppose a charge were leveled against a noncommissioned officer for an offense committed; would that charge wind up with the conclusion that he had acted out of harmony with the principles of an officer and a gentleman?

Mr. BARBOUR. Of whom are you asking that question?

Mr. HOWARD of Nebraska. Anybody who knows. That ought to settle it very clearly. Mr. Chairman, because there is the evidence of the Army officer himself, and in making a charge against a noncommissioned officer they do not charge him with having violated the precepts which ought to move and animate an officer and a gentleman. Therefore, in the eye of the Army officer, the noncommissioned man is not an officer. He might be the other thing but he is not an officer,

Mr. BARBOUR. The gentleman from Nebraska has answered his own question.

Mr. HOWARD of Nebraska. I think so.

Mr. BARBOUR. To the gentleman's satisfaction?

Mr. HOWARD of Nebraska. Entirely. [Laughter.]

Mr. CHINDBLOM. I understand no one speaks in response to the gentleman's inquiry.

Mr. HOWARD of Nebraska. Nobody answers. They stand mute.

Mr. BULWINKLE. Will the gentleman permit an interruption along the line of what the gentleman has just said?

Mr. HOWARD of Nebraska. Yes.

Mr. BULWINKLE. The manual of court-martial procedure provides for the preferring of charges against enlisted men and officers, and you would not try an enlisted man on a charge involving any one of those Articles of War.

Mr. HOWARD of Nebraska. Certainly not. That is the evidence which I sought, and there you have it, gentlemen. [Laughter.]

The CHAIRMAN. The question is on agreeing to the substitute amendment offered by the gentleman from Alabama [Mr. BANKHEAD].

The question was taken; and on a division (demanded by Mr. BANKHEAD) there were—ayes 19, noes 48.

So the substitute amendment was rejected.

The CHAIRMAN. The question now recurs on the amendment of the gentleman from Mississippi [Mr. COLLINS].

The amendment was rejected.

The Clerk read as follows:

Panama Canal: Signal Corps, $34,120; Corps of Engineers, $609,350; Ordnance Department, $329,000; Chief of Coast Artillery, $133,847; in all, $4,638,716.

Mr. COCHRAN of Missouri. Mr. Chairman, I ask unanimous consent to proceed for 10 minutes out of order in reference to a law administered by the War Department.

The CHAIRMAN. The gentleman from Missouri asks unanimous consent to speak for 10 minutes out of order. Is there objection?

There was no objection.

Mr. COCHRAN of Missouri. Mr. Chairman, I would not interrupt the reading of the bill at this time if it were not for the fact that my attention has been called to a situation which I think you will be pleased to know of. I especially ask the attention of members of the Committee on Interstate and Foreign Commerce who may be present.

We are passing monthly scores of bills by unanimous consent which permit the building of bridges over navigable streams, and a large number of such bridges have already been or will be constructed in my State. As a result of the hearings before the Senate on what is called the Walsh resolution, newspapers of St. Louis made inquiry of the Missouri public service commission and the State finance department as to whether they had any control over the holding companies for public utilities. The answer was they had absolutely no control.

Therefore, the situation that presents itself is this: You can grant the consent of Congress to build a bridge over a river, so far as my State is concerned, and that bridge might be erected for $1,000,000, but there is no provision whereby the Government or the State has any jurisdiction over the amount of bonds that may be issued to complete that project.

Now, the gentleman from Illinois [Mr. DENISON], as he usually does, gave us a detailed explanation as to the policy of Congress in reference to the building of bridges and how they protected the public from excessive tolls, and so forth. But upon this phase he did not touch.

Now, gentlemen, I serve notice, unless I am convinced that there is some protection to the people of my State and to the country, that there is a limitation somewhere upon the amount of bonds that can be issued for building bridges, I propose to object to the consideration of any bill which grants the consent of Congress to private individuals to construct a bridge. I shall object unless there is a paragraph inserted which will give the War Department or some other Government agency control over the situation.

I telephoned Major Daly, of the Engineer Corps of the War Department, and he tells me that so far as he knows there is nothing in the law which would give the War Department any power in the matter whatever.

I have had cases called to my attention whereby individuals have made a great deal of money out of the right granted them to construct bridges, and I understand other than promoting the projects do nothing. They assign their rights to others before actual construction commences. Some of the promoters live in States hundreds of miles from the location of the bridge. They are interested from a monetary standpoint only, not being

citizens of the community where the bridge is to be constructed. There is now no check on their financial operations so far as placing a limitation on the amount of bonds that can be issued. Surely, now that I call it to your attention, the Congress will not approve. You should be willing to extend some safeguard to the people who buy the bonds.

It was not so very long ago—I remember it myself—when this Congress was passing legislation by unanimous consent which extended the right to build dams over rivers for the purpose of generating electricity. The gentleman from Illinois [Mr. RAINEY] and the late Doctor Foster, from Illinois, put a stop to it, and as a result you have the Water Power Commission to-day.

I want the people of my State to be protected, especially when men from other States come there to sell securities for projects not only in Missouri but throughout the country. Part of the money to construct toll bridges in Indiana, Ohio, and other States is secured by selling bonds to the people of St. Louis. I want to see the Congress do something to protect not only the people of St. Louis but throughout the country from being sold securities for a project for which securities twice the amount of the actual cost of construction have been issued for it means eventually the promoters will default in the payment of interest and the value of the securities will fall far below the price actually paid by the public. Remember, gentlemen, there is no law which prevents a promoter from issuing $4,000,000 in securities for a $2,000,000 project either in my State or in the Federal Statutes.

Mr. NEWTON. Will the gentleman yield?

Mr. COCHRAN of Missouri. I will.

Mr. NEWTON. Does the gentleman appreciate that in bridge bills, in numerous instances, the request for the bridge comes from a municipality, a county, and sometimes the State. Does the gentleman think that under those circumstances Congress ought to pass on the question of the issue of bonds?

Mr. COCHRAN of Missouri. I eliminate such projects, but when it comes to the individuals I think the public ought to be protected. I have no objection to the building of the bridges, provided the Representative in Congress says they are necessary. A gentleman came to my city the other day and offered to construct a bridge. He was looking for the cooperation of the people in that part of the city. He said there was a certain firm in New York, White & Co., I think, that had decided to set aside $25,000,000 or $50,000,000 for the purpose of building bridges, and was backing him. I have no objection to their doing the work at a reasonable figure if the people are protected in the issue of securities. It is up to the purchasers of the securities to investigate whether they are putting their money in a proposition that will pay. What I want to do is to insist that the securities issued will not exceed the cost of construction, plus a maximum of, say, 10 per cent.

I insist as the bills read now these individuals are not limited in the amount of securities they can issue in connection with their project. If I am wrong, I will yield to any gentleman for information.

Mr. NEWTON. The gentleman does not refer to these municipally constructed bridges?

Mr. COCHRAN of Missouri. No.

Mr. NEWTON. Of course, as to these other bridges no bill is introduced unless it comes from the Member from the district where the bridge is to be constructed.

Mr. COCHRAN of Missouri. Let me illustrate that. Several friends of the gentleman, we will say, from his district send him a letter and tell him that Mr. Jones has decided to construct a bridge over a river in that district. Mr. Jones is given a letter of introduction to the gentleman from Minnesota and comes down here.

The people who write the gentleman are responsible citizens, friends of the gentleman. Would the gentleman from Minnesota introduce that bill for Mr. Jones? I admit that if the request came from my district, under similar circumstances, I would introduce it, if two responsible citizens, friends of mine, requested me to do so, and I think every other Member of the House would do the same. It has been the policy to do it. Members introduce bills for people they have never met, people who do not even live in their district or community.

Mr. NEWTON. Does not the gentleman think that the individual Member introducing a bill, who sponsors it before the committee and on the floor of the House, is going to inform himself as to whether or not the community involved wants the bridge?

Mr. COCHRAN of Missouri. I venture to say that not 1 Member in 10 does. It has not been the policy. I hope the gentleman gets my point—that there is no protection as to the amount of bonds that might be issued, no matter what the Member might do before the committee or on the floor, after the promoter has the consent of Congress to go ahead with the work. The Member then has no control over the individual and neither has the Government.

Mr. NEWTON. Does the gentleman refer only to the toll highway bridges?

Mr. COCHRAN of Missouri. Yes. As far as the railroad bridges are concerned, I understand that the Interstate Commerce Commission has control.

Mr. NEWTON. Yes. So that it is only toll highway bridges the gentleman has in mind?

Mr. COCHRAN of Missouri. Yes. I am giving information to the House. The gentleman is a member of the Committee on Interstate and Foreign Commerce.

If the gentleman thinks there is merit in my suggestion, I hope that his committee will consider it. Until I am convinced, as I said before, that there is going to be some provision in the bills to protect my people and the gentleman's people—and they sell these securities all over the United States—from inflation I propose to object to the consideration of bridge bills granting the consent of Congress to individuals to construct bridges. If you pass them you will do so over my objection, and, as you know, I spend my time on the floor while the House is in session.

Mr. NEWTON. The gentleman understands, of course, that it is the practice of the committee before favorable action is taken upon a toll bridge to not only have a written statement from the Member from the district in which the bridge is to be constructed but to be advised that the State highway commission or some other State or municipal body approves of the proposition. That is the care that the committee takes in order to keep in touch with local sentiment.

The CHAIRMAN. The time of the gentleman from Missouri has expired.

Mr. COCHRAN of Missouri. Mr. Chairman, I ask unanimous consent to proceed for one minute more.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. COCHRAN of Missouri. I might say for the benefit of the gentleman that I have personally prepared bills—not since I have been a Member of Congress but prior thereto, when acting as secretary for Representatives and Senators—and that at no time has the committee ever asked for a written expression of any kind in connection with any one of the bills I prepared, and not one of the bills I prepared ever failed to pass under the unanimous-consent agreement.

Mr. NEWTON. Is the gentleman now referring to the ordinary bridge bill, or is he referring to the toll highway bridge bill?

Mr. COCHRAN of Missouri. The toll highway bridge bill.

Mr. NEWTON. I wish to say to the gentleman that that practice has been put into effect by the committee during the present Congress.

Mr. COCHRAN of Missouri. The committee has at all times impressed me with its willingness to do everything in its power to protect the municipality or the State or the county and the Government in so far as excessive tolls are concerned, but I am calling attention to a condition in reference to the issuing of securities. The gentleman from Illinois [Mr. DENISON] has introduced a so-called blue sky bill, and if it is not in conflict with the Constitution—and I have a great deal of respect for his ability as a lawyer—I expect to vote for it, if it ever gets before this House. I feel sure that the gentleman from Illinois [Mr. DENISON] will look into the subject I advance before he calls up any more such bills.

Let me call your attention to an editorial appearing in the St. Louis Post-Dispatch, January 28, which I referred to at the outset. It follows:

MISSOURI, A HELPLESS SPECTATOR

The Jefferson City correspondent of the Post-Dispatch has been authoritatively informed that " holding companies for public utilities * * * only are beyond the control of both the Missouri Public Service Commission and the State ' blue-sky ' department."

The head of our " blue-sky " department, Securities Commissioner F. T. Stockard, says that because of legal exemptions he has no means of controlling the sale of securities in holding companies.

A great many of our public utilities are now the wards of holding companies. All our Bell telephone companies are in that position. So is the Laclede Gas Co. J. K. Newman, of New York, and his local associates are eager to put our street railway company under the control of their holding company. Samuel Insull, of Chicago, famous as a contributor to political campaign funds, has been gathering up public utilities in Missouri and tucking them under the wing of his holding companies.

None of these holding companies—in fact, no holding company—has ever applied to the Missouri Public Service Commission for permission to issue securities, for the excellent reason it does not have to ask or obtain such permission.

Again, no holding company has ever asked our "blue-sky" department for permission to sell its securities in Missouri. And, again, the reason is the same—it does not need that permission.

So, as regards the activities of holding companies, the State of Missouri is a helpless spectator. So, too, is every other State.

We speculated the other day on the "legal residence, if any," of holding companies. Is a holding company, we asked, "a fabled creature dwelling in a zone of economic neutrality in which it enjoys all the financing prerogatives and legal immunities that conduce to a happy, prosperous, and, as in the case of Mr. Munroe, of Laclede Gas Light celebrity, a get-rich-quick life?"

Pretty soft for the holding company, if that is it. And, according to our officials at Jefferson City, that is just about it.

The other editorial was from the St. Louis Star, and was published on the same day. It follows:

### WHY A BLUE SKY LAW?

The board of governors of the Investment Bankers' Association has recently gone on record against the blue sky laws as the sole means of preventing the sale of worthless securities. The board is not convinced there is a "legislative panacea" to assure sound management of any investment trust. Fraud acts with broad powers, it believes, would be more effective.

The blue sky laws in Missouri and other States were passed when it was apparent that fraud acts already on the statute books afforded little or no protection to the investor, and after the sellers of sound securities had failed to drive the sellers of fake securities out of business. Nobody familiar with administration of these blue sky laws would presume to say these laws are a "panacea." There is no panacea for fraud. The blue sky laws often fail to prevent the sale of fake stocks and bonds because the attention of administrators of these laws is not called to the sales until many persons already have been swindled. But these laws afford a measure of protection to the public, and a measure of protection is better than no protection at all.

The cure for this evil is not by repealing the blue sky laws, which the board of governors does not suggest, or in depending upon the general law-enforcement machinery and fraud acts, but in the cooperation of organizations like the Investment Bankers' Association with the blue sky law departments and prosecuting officers. All of these agencies, working together, can keep the selling of worthless stocks to the public at a minimum, even if they can not wholly suppress such sales. The blue sky law in Missouri is far from perfect, but it justifies itself every time some inexperienced and incautious citizen with a few dollars saved is kept from wasting his money on lithographed trash.

I understand the House will not be in session to-morrow. It will give me time to confer with the gentleman from Illinois [Mr. DENISON], chairman of the subcommittee on bridges of the Committee on Interstate and Foreign Commerce, and I hope to reach an agreement with him whereby he will submit an amendment to each bill to be called up Monday where consent of Congress is granted to an individual or individuals, other than the class of bridges I enumerated, to meet my views on this subject. I do not desire to obstruct legislation, but I will be forced on Monday to offer objections to every bridge bill of this class unless such an amendment is proposed.

I will submit to the gentleman from Illinois a suggestive amendment reading as follows:

*Provided*, That bonds or other securities issued against or based on the construction and revenues of said bridge and approaches shall not exceed the actual cost of such construction and operation, economically made, plus a maximum of 10 per cent added thereto; and it shall be the duty of the Secretary of War prior to the issue of any such bonds or other securities to determine the total thereof which may thus be issued.

The gentleman from Illinois [Mr. DENISON] has always shown a desire to protect the municipalities, counties, and States in connection with toll bridges, and I feel that had he known the States did not have the power to control the situation he long since would have made provisions along this line. Until a few days ago I entertained the opinion this matter was under the control of the various States, but it develops they are without power to protect the public in this connection, nor have they any control over holding companies for public utilities.

I have not examined the calendar, but I am informed close to 100 bridge bills are ready for consideration Monday. This is a most important matter, and I hope every Member of the House will be on the floor Monday, so we will be assured of a thorough discussion of the question, agree upon a proper amendment for the protection of the public, and make it unnecessary to object to the bills, which I know so many Members are very anxious to have passed.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent to return to line 10, page 27 of the bill, in order to correct the spelling of a word.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent that the word "at" be changed to "as," in line 10, page 27.

The CHAIRMAN. Without objection, the correction of the spelling will be made.

There was no objection.

The Clerk read as follows:

### ORDNANCE DEPARTMENT

### ORDNANCE SERVICE

For the current expenses of the Ordnance Department in connection with purchasing, receiving, storing, and issuing ordnance and ordnance stores, comprising police and office duties, rents, tolls, fuel, light, water, and advertising, stationery, typewriting and adding machines, including their exchange, and office furniture, tools, and instruments of service; for incidental expenses of the ordnance service and those attending practical trials and tests of ordnance small arms, and other ordnance stores; for publications for libraries of the Ordnance Department, including the ordnance office; subscriptions to periodicals, which may be paid for in advance; and payment for mechanical labor in the office of the Chief of Ordnance; and for maintenance, repair, and operation of motor-propelled or horse-drawn passenger-carrying vehicles, $1,010,430: *Provided*, That the Ordnance Department is hereby authorized to employ, under its various appropriations, not exceeding four consulting engineers as the Secretary of War may deem necessary at rates of pay to be fixed by him not to exceed $50 a day per not exceeding 50 days each and necessary traveling expenses.

Mr. SPEAKS. Mr. Chairman, I regret to do so at this hour, but I feel compelled to make a point of no quorum. I shall at this point make a proposal that will interest many Members and in addition a large number of people in every State in the Union. I have promised many Members to notify them when the subject I propose is being discussed, so I make the point of no quorum.

Mr. BARBOUR. May I inquire of the gentleman what the subject is?

Mr. SPEAKS. I will be frank with the agreeable chairman of the subcommittee. I am going to propose an amendment to the item on page 42, providing $4,000,000 for the purchase of ammunition and various other articles. I propose to offer an amendment reducing that sum by $550,000, and if successful in that effort I will then propose that the $550,000 be utilized for the national matches authorized by law and which are compulsory. Now, I do not care to make any preliminary statement relative to the matches until the Members especially interested are present.

Mr. BARBOUR. Mr. Chairman, will the gentleman yield?

Mr. SPEAKS. Yes.

Mr. BARBOUR. Would it be agreeable to the gentleman to pass over that section for the present?

Mr. SPEAKS. I will be pleased to do so, if I can have assurances that my rights and privileges will be properly protected.

Mr. BARBOUR. It will be done without prejudice. Then when we come to the national rifle practice item we can take up the two subjects together, the gentleman can offer his amendment, and we can have a proper discussion under that item.

Mr. SPEAKS. I will be very glad to do that. I withdraw my point of order that there is no quorum present, in view of the statement of the chairman of the subcommittee.

Mr. BARBOUR. Then, Mr. Chairman, I ask unanimous consent that the paragraph on page 42, "Ordnance stores, ammunition," be passed over at the present time, and that it be taken up for purpose of amendment when we reach the item regarding national rifle practice. Will that be agreeable to the gentleman?

Mr. SPEAKS. It will be.

The CHAIRMAN. The gentleman from California asks unanimous consent to pass over the first paragraph on page 42, ending with line 8, to be returned to later. Is there objection?

There was no objection.

The CHAIRMAN. The Clerk will resume the reading of the bill for amendment.

The Clerk read as follows:

### MOLINE-ROCK ISLAND BRIDGE

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

Mr. LETTS. Mr. Chairman, I make a point of order against the paragraph. It is legislation on an appropriation bill, and it is out of order.

The CHAIRMAN. The gentleman from Iowa makes a point of order against the paragraph. Does the gentleman from California [Mr. BARBOUR] wish to be heard?

Mr. BARBOUR. This item provides—

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

This bridge has been in existence for some time, and this item is merely for repairs and alterations. It is a Government-built bridge, a Government-owned bridge. It was built by the United States in 1870–1873, and undoubtedly it was authorized by law at that time.

Mr. LETTS. Mr. Chairman, the committee without question has been informed that this is in the interest of navigation, and if it were, and the project had been authorized, the appropriation would be proper. But this is an appropriation for an unauthorized project. It has never received the consideration of the Committee on Rivers and Harbors, and there has never been general legislation with respect to this matter.

The bridge in question is at the lower end of what is called Moline pool, Moline pool, in its northern part, is a part of the authorized waterway, but the waterway at this point diverges to the right, to the Iowa side, and the boats pass through the locks at the head of the island. Now, if anyone wanted to drive a boat through this bridge they would immediately have to turn around and come right back and then out through the locks.

In my judgment there can be no question about this thing. When we look at the hearings that were held before the gentlemen's committee we find that the only witnesses who appeared were asked to say what the repairs would reasonably cost, and they said $50,000, including the erection of this drawbridge; and then when they were asked what the cost of the drawbridge would be, they said that would be $50,000. I think that exactly states the truth of the matter. The only repair contemplated here is the conversion of this bridge into a drawbridge, and it is for the sole benefit of one concern, the John Deere Plow Co.

In that connection I would have this to say: If it were proper in the aid of navigation I would have no objection whatever, but for a number of years there has been a constant movement on the part of certain interests in Moline, by persuasion or otherwise, to induce a change of the watercourse through the Mississippi River at this point.

A number of years ago they started by extending a dam from the head of Rock Island up the middle of the stream, about 3 miles, and then little by little they have built from that dam toward the Iowa shore, and from the Iowa shore toward the dam, until a few years ago the citizens around there waked up to the fact that there was then only a small gap of about 400 feet between the ends of these dams, and that certain boats that were loaded with rock and other materials were ready to be dropped into this gap and effectively, without the authorization of Congress, to dam the Mississippi River; to throw the water over into the Moline pool and thereby give them such a depth of water as to compel all navigation to go that way.

Mr. BARBOUR. Will the gentleman yield?

Mr. LETTS. Yes.

Mr. BARBOUR. Is there not a dam on the Moline side of the river just below this bridge and connecting the mainland with Rock Island?

Mr. LETTS. Yes.

Mr. BARBOUR. That would prevent navigation from going down on the Illinois side?

Mr. LETTS. No; not in my judgment; because if the purposes of these gentlemen can be effectuated they will tear that dam out in 20 minutes.

I will say to the gentleman that there are two power dams in the Moline slough. One of them belongs to the United States Government and is a part of the United States arsenal at that point, and there we produce power for the use of the arsenal, and we sell the excess that is produced.

At this point I ought to say an investigation should be instituted in that regard, because we are almost giving that power away.

In addition to this power dam there is the power dam of the Moline Power Co., and it has been the boast of some gentlemen connected with that concern that sooner or later they are going to throw the main channel of the Mississippi River down the Illinois side of Rock Island rather than on the Iowa side, as it now is.

Mr. TABER. That would be a lawless procedure, would it not?

Mr. LETTS. It would not be a lawless procedure if they are able to proceed step by step, as they have done.

Mr. TABER. They would have to secure legislation to permit them to do it.

Mr. LETTS. Certainly, and this is one of the steps by which they are seeking that legislation. They know they could not come here and get a program of that kind through Congress. They realize that the only way they can effectuate their purpose is to come down and, step by step, put Congress and the Government in a position where the only logical thing to do is to go through with it, finish it up, and dredge it. Necessarily the next step would be that the bridge which now exists from the lower point of the island to the city of Rock Island would require reconstruction to be made into a drawbridge and then the Government will be called upon to do necessary dredging in that slough.

It is not an impossible thing in any sense. It is a very feasible plan, because with the dam which extends upstream at the upper end of the island and the dams on the Iowa side most of the water of the river is now thrown into the Moline pool. If these power dams were destroyed they could throw that water all down on the Illinois side.

A year ago, when this matter was in the river and harbor bill, I reached an agreement with that committee whereby they agreed to put in their bill a stipulation that no additional power wheels should be placed on the dams at the lower end of the pool. That was in order to safeguard the people of Davenport with respect to their water rights and to permit only such water to pass over the dams as was then being passed through the wheels now in use. The Davenport people and the Bettendorf people get all of their water for the purpose of the city out of the center of the stream on the other side of the island. Even now, when the water is low there is at times great uncertainty as to whether or not the intake will be sufficiently below the water to supply the people of that community with the water that is necessary. If any more water is diverted to the Moline side of the Rock Island Arsenal, the people of Davenport are going to suffer very seriously through a lack of water suitable for ordinary purposes and fire protection. The island itself is sizable, being about 999 acres and being about 2½ miles long. The channel is naturally on the Iowa side. This movement is only in line with other steps that have been taken by which it is hoped eventually to throw the waters of the Mississippi over to the Illinois side. This is not a part of the waterway project that has been adopted by Congress.

It is only true that the Moline pool is a part of the waterway in so far as it permits boats to come down through the pool and then out at the upper end of the island through the Government locks and over on the Iowa side. This bridge is below that point, and just below that are the two dams of which I have spoken, and also the plant of the John Deere Plow Co., which is the only concern that would benefit by this improvement.

I may say that it appears in the hearings that gentlemen of the committee were told that the John Deere Plow Co. was the only concern that would benefit. When asked why that company did not load above the bridge, the answer was that they would have to buy additional ground. If they did that, no other difficulty seemed to present itself, so far as navigation is concerned.

I am very serious about this thing. I wish the chairman of the subcommittee would consent that this matter should go out of the bill for the time being; that a thorough examination of this condition be made, and if it is found that navigation requires it and it is a proper matter, I at a future time would have no objection to it.

Mr. CHINDBLOM. Mr. Chairman, on the point of order, I respectfully submit that the argument which the gentleman from Iowa [Mr. LETTS] has made is almost exclusively confined to the merits of the question.

The CHAIRMAN. The Chair heard the gentleman from Iowa [Mr. LETTS], because it seemed helpful to the Chair to have the facts as far as possible on which the law or the question of order is determined, but the Chair will now hear the gentleman from Illinois on the point of order.

Mr. CHINDBLOM. Mr. Chairman, the item in question reads:

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

The Chair, as, of course, the present distinguished occupant of the Chair is well aware, can go no further than the language of the provision or paragraph or section to which the point of order is made. The point of order, if valid at all, must be directed to section 2 of rule 21, and I have here the manual, referring to page 364, of the edition of 1925, in which the Chair will find the following language with reference to the construction of the terms, work in progress or the continuation of work already done under authority of law, and near the middle of the page I read the following:

But appropriations for rent and repairs of buildings or Government roads and bridges have been admitted as in continuation of a work, although it is not in order as such to provide for a new building in place of one destroyed.

Mr. BLAND. Will the gentleman yield?

Mr. CHINDBLOM. I would like to finish what I have to say on the question of the point of order and then I will be pleased to yield.

Mr. BLAND. This is on the point of order. I want to direct the gentleman's attention to the language, "including construction of a draw or lift span," which is a new feature, as appears from the gentleman's statement, and differs from the authority which the gentleman has presented.

Mr. CHINDBLOM. The gentleman, of course, will have an opportunity to make a reply to my feeble effort to try to show that this paragraph is in order.

The manual refers specifically to volume 4 of Hinds' Precedents, on page 538 of the current edition, paragraph 3803, from which I read:

An appropriation to repair a bridge built by the Government was held in order as for continuation of a public work. On January 28, 1897, the Indian appropriation bill was under consideration in Committee of the Whole House on the state of the Union, when Mr. Frank W. Mondell, of Wyoming, moved an amendment making an appropriation for the repair of the bridge across Big Wind River, on the Shoshone Reservation in Wyoming.

Mr. Joseph G. Cannon having made a point of order against the amendment, on the ground that it was not such a public work as was contemplated by the rule, Mr. Mondell stated that the bridge was originally built by the Government.

The Chairman overruled the point of order.

It will be noted that the point of order was made by the distinguished parliamentarian, who for many years, probably subsequent to this time, was the Speaker of the House, Hon. Joseph G. Cannon. The chair was occupied at the time by another distinguished Member of the House from Illinois, the Hon. Albert J. Hopkins, who had a reputation as one of the leading parliamentarians of this House as well.

The gentleman from Virginia has suggested that the construction of the draw or lift span in aid of navigation is new work. It is part of the bridge. That is simply a detail with reference to the kind of repairs and alterations that are to be made upon the bridge.

Mr. LETTS. Will the gentleman yield?

Mr. CHINDBLOM. Yes.

Mr. LETTS. How is it a repair of that which they have had when it is supplying something entirely different and for a different purpose?

Mr. CHINDBLOM. It appears this bridge has become, at least in the opinion of the Bureau of the Budget, an obstruction to navigation.

Mr. LETTS. Will the gentleman yield again?

Mr. CHINDBLOM. And there is legislation on the statute books which prohibits all constructions in rivers and upon waters under the control of the United States to operate as obstructions to navigation.

Mr. LETTS. Will the gentleman yield?

Mr. CHINDBLOM. I yield.

Mr. LETTS. Does the gentleman contend that it gives authority to tear down and build a different kind of bridge?

Mr. CHINDBLOM. There is no showing in the language of this provision that it is proposed to tear down anything. The language is for repairs and alterations, including the construction of a draw or lift span in the aid of navigation. The bridge is there.

Mr. LETTS. Will the gentleman yield further?

Mr. CHINDBLOM. Yes.

Mr. LETTS. Will the gentleman point out any legislation that has held that this has any relation whatever to navigation in that part of the stream?

Mr. CHINDBLOM. The gentleman misapprehends the purpose of my argument. I am not arguing on the facts. I have called the attention of the Chair to what is stated in the paragraph itself. It is proposed as a part of the repairs and alterations to include the construction of a draw or lift span in the aid of navigation. It is not new construction but is a part of the bridge.

Mr. LETTS. Will the gentleman yield again at this point?

Mr. CHINDBLOM. Yes.

Mr. LETTS. Are we going to legislate, now that this is necessary, for navigation or are we going to let the proper committee deal with the subject?

Mr. CHINDBLOM. Whether it is necessary or not at this time and in this bill to make appropriations for the object in question goes to the merits. I say that it appears, from the language of the paragraph, that this draw or lift span is a part of the repairs and alterations of this bridge. This bridge was constructed by the Federal Government. It is at the location of the Rock Island Arsenal, a part of the establishment of the War Department, and most certainly Congress in passing an appropriation bill can provide for repairs and alterations made necessary by whatever cause. Something has perhaps occurred. It is suggested in the language of the provision that it is proposed that it may have become necessary in aid of navigation.

That only adds to the necessity for the work. I respectfully submit that it is not proposed here to build a new bridge. It is not proposed to erect new construction, there is nothing destroyed to be replaced, but it is for the purpose of making repairs and alterations in the present structure.

The CHAIRMAN. Can the gentleman from Illinois state to the Chair the original authority by which the bridge was built?

Mr. CHINDBLOM. Mr. Chairman, my attention has been called to the memorandum sent by the Bureau of the Budget. It is as follows:

The bridge at Moline, Ill., a Government-owned structure, crosses the south branch of the Mississippi River and connects the city of Moline, Ill., with Rock Island, upon which is located the Rock Island Arsenal of the Ordnance Department of the Army. The bridge is a fixed structure, built by the United States in 1870-1873, and has a vertical clearance of 15.5 feet at low water. The demands of present and prospective commerce render such clearance inadequate and the bridge for this reason has been decreed by the Chief of Engineers of the Army to be obstruction to navigation. The purpose of this estimate is to enable the War Department to make such changes in the bridge as will permit free and unobstructed navigation thereunder.

It appears that the Chief of Engineers has decreed that the bridge in its present shape and condition is an obstruction to navigation, and there remains nothing for the War Department to do but to blow up the bridge and remove it or come to Congress for an appropriation for the necessary alterations and repair. No private corporation, and not even the Government itself, may maintain a bridge which in its original construction or by reason of subsequent conditions becomes an obstruction to navigation. Now, you can not have a bridge without some span.

Mr. LETTS. This bridge was built as a war measure. There is no connection with the erection of this bridge and the convenience of the public. No one at that time had any idea about navigation, because there was no water over there sufficient to float any kind of a boat until the other works of which I spoke were constructed—the building of the dams. So the gentleman is mistaken when he assumes that the reconstruction of a bridge by putting in a draw has any relation to its original purpose.

Mr. CHINDBLOM. May I add, Mr. Chairman, that it is suggested that there must be a span. There is a span there now. This simply alters the span—it is an alteration and not a building of a new span. It would not be a bridge at all without a span. This is to make alterations which the War Department has found necessary under existing conditions, and it seems to me that it is clear that there is a sufficient authorization.

Mr. LETTS. I again draw attention to the fact that this is a new project with relation to the waterway of the Mississippi River at that point, and has never received the consideration of the Committee on Rivers and Harbors. There has been no legislation for it at all. If there is any authority for the appropriation as in the interest of navigation it will be because of the legislation in this provision to which I object.

Mr. ALLEN. Mr. Chairman——

The CHAIRMAN. The Chair will hear the gentleman from Illinois on the point of order.

Mr. ALLEN. I may drift away a little from the point of order, but I hope the Chair will bear with me, because the item refers to a bridge in my district. I have been surprised at Judge LETTS's remarks in regard to the feeling that prevails there. I never heard of it. This provision, as I understand it, is for the alteration and repair of a bridge that has the indorsement of the engineers and the Bureau of the Budget, and I fail to see, in my district or in Moline, where there is any disposition to take away any rights on the Iowa side. It is true that we have vast interests on the Illinois side; with these barge lines that have been started we look for wonderful results. It is true Moline will be one of the great shipping points on the Mississippi River. The John Deere Plow Co., one of the leading manufacturers of agricultural implements of the country, will furnish alone 500,000 tons. Moline has many other large industries and will be one of the largest and busiest ports on the Mississippi River.

This bridge is an obstruction to navigation, and at a point very vital to the success of the shipping on the river. I do not know that I can say anything to this committee better than what has been said by the Budget and by the Army engineers. I might read one extract from the hearing from Major Lewis:

Mr. BARBOUR. You have another bridge, have you not?

Major LEWIS. Yes, sir. There is one going to Davenport, and also a bridge over to the city of Rock Island.

The Government is in the position of owning a bridge which is obstructing navigation on the river. If that were a privately owned bridge, under the river and harbor act the Secretary of War would, when it was complained about, call a public meeting to determine whether or not it was a fact that navigation was being obstructed, and if so, under this act of Congress he would be authorized to direct the owner of the bridge to open it for navigation. We are in the position now of owning the bridge ourselves. It is a five-span bridge, and the simplest and cheapest plan is to take the island and span and make a vertical lift or draw out of it.

In conclusion, this is a step forward in the development of the Middle West. It so happens that in my district Moline and Rock Island are growing, thriving, manufacturing cities. For God's sake, let us not cripple them. Let us give them the help that seems to be due them at this time. I leave that with you, gentlemen.

Mr. LETTS. Mr. Chairman, will the gentleman yield?

Mr. ALLEN. Yes.

Mr. LETTS. Is the gentleman informed of the fact that during this last winter, because of these dams that have been built around Davenport and Bettendorf, throwing the water into the Moline pool, the manufacturing concerns at Bettendorf and Davenport had to close up because of lack of water?

Mr. ALLEN. I do not so understand it; and I say to the gentleman from Iowa that I think he has a wonderful city over there. I think that he is more scared than hurt. I think that those three cities are all going right ahead.

Mr. LETTS. The gentleman knows that when the matter was under consideration before the Committee on Rivers and Harbors last year Davenport and Bettendorf sent down a large delegation, including the mayors and some of the most prominent men there, and those interested in the water company, and that Moline sent down the strongest delegation it could get up, and I ask the gentleman whether in his heart he believes that this is just a jitter, if there is not some substance to this, and if the people on the Iowa side are not endangered in their water supply?

Mr. ALLEN. I have never been asked by any organization or by any individual in the city of Moline about this, with one exception, and that was to call attention to the opposition that the gentleman was likely to bring on the floor here, following up with the following part of this telegram, which I shall read, and that is all I have.

The telegram is to the effect that the John Deere Plow Co. expect to construct at their own expense docks and shipping facilities to connect their factories with the barge terminals, the cost of which will be at least $50,000 and probably more. That is the sort of company that is interested in the development of this barge line, but they have to have this lift in the bridge to get the barges around to their shipping point. We are going to make your city a good city too, Judge LETTS.

Mr. LETTS. When this matter was under consideration in the subcommittee, I think it was the gentleman from California [Mr. BARBOUR] himself who inquired about the authority of law for this appropriation, and the answer was that it was contained in the river and harbor act of March 3, 1899. I have asked the gentleman from Illinois and all those concerned to point out any law that is authorization for this appropriation. I have carefully read the act which was given as the authority of law, and I fail to find one word relating to the subject in the whole of the law.

Mr. ALLEN. Is the gentleman aware that the island between Moline and Davenport is the property of the United States; that the bridge connecting the island with Moline is the property of the United States; that the construction of the proposed lift is for the purpose, and the sole purpose, of aiding navigation on a navigable river of the United States? In other words, the construction of the proposed lift by the United States on a bridge owned by it and located on its property, in order to aid the navigation of its river, is questioned by the gentleman, if I understand him, on the sole ground that the United States lack power in the premises.

The products of the farms and factories of the Mississippi Valley are in immediate and pressing need of river transportation. Every hour of delay in providing that transportation means loss to the farmers and manufacturers and workmen, as well as to the merchants and other men engaged in commerce and business in that section. The situation is not one to be solved by technical quibbles but by practical sense and effort.

Mr. CHINDBLOM. Mr. Chairman, it was my purpose to call attention to the act of March 3, 1899. I have just sent for it, but I have not had time to examine it. I shall read to the Chair the language of Colonel Robbins, before the Subcommittee on Appropriations, as it appears in the hearings. The question was raised whether the Moline Power Co. or anybody else had any rights in this matter. Mr. Robbins replied and said:

They have some rights under the river and harbor act of March 3, 1899, which authorizes the Secretary of War to order a bridge altered when it interferes with navigation.

In this case the bridge happens to be owned by the Government, and they would claim the right of every other American citizen under that law, and say that because the bridge is owned by the Government does not alter the basic principle of that law.

As I say, I have not had time to examine the act of March 3, 1899.

Mr. LETTS. Mr. Chairman, I have carefully examined that act, and there is not a word in that that can be regarded as authority for an appropriation of this kind.

The CHAIRMAN. The Chair would like to know by what authority this bridge was originally built. If this bridge was built under authority of law as a Government bridge, the question is quite different from what it would be if it were built without authority of law.

Mr. CHINDBLOM. The memorandum from the Budget states that it was built by the War Department, as part of the War Establishment. There has been no dispute of that statement.

The CHAIRMAN. Assuming that this bridge was built in accordance with law, then much of the argument made by the gentleman from Iowa [Mr. LETTS], and to some extent that made by the gentleman from Illinois [Mr. ALLEN], goes entirely to the merits of the question and not to the point of order.

Mr. BARBOUR rose.

The CHAIRMAN. Does the gentleman from California wish to be heard on the point of order?

Mr. BARBOUR. Mr. Chairman, I think it advisable to look into this matter further. In order to afford time for that purpose, I move that the committee do now rise.

The CHAIRMAN. The Chair would be glad to have until the House meets again for the consideration of this bill in order to find what authority was originally given for the construction of this bridge.

The gentleman from California moves that the committee do now rise.

The motion was agreed to.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. TILSON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration the bill H. R. 10286, the War Department appropriation bill, and had come to no resolution thereon.

### ADJOURNMENT OVER UNTIL MONDAY

Mr. TILSON. Mr. Speaker, the Committee of the Whole has made very substantial progress on the War Department appropriation bill to-day. It would seem now that we shall probably finish it in one more day. In view of the state of the business of the House and the fact that many of the committees are working very hard on their bills, I think that we shall lose no time, and perhaps gain in the end, if we adjourn over until next Monday. Therefore, I ask unanimous consent that when the House adjourns to-day it adjourn to meet on Monday next.

The SPEAKER. The gentleman from Connecticut asks unanimous consent that when the House adjourns to-day it adjourn to meet on Monday next. Is there objection?

Mr. WILLIAMSON. Will this bill be in order on Monday?

Mr. TILSON. No. Monday will be Consent Calendar day. We have a very long Consent Calendar, so that it will probably take all day. This bill will be taken up again on Tuesday next.

The SPEAKER. Is there objection?

There was no objection.

### PERMISSION TO ADDRESS THE HOUSE

Mr. VESTAL. Mr. Speaker, I ask unanimous consent that on Tuesday morning, after the reading of the Journal and the disposition of papers on the Speaker's desk, I may be permitted to address the House for 35 minutes.

The SPEAKER. The gentleman from Indiana asks unanimous consent that on Tuesday morning, after the reading of the Journal and the disposal of business on the Speaker's table, he may be permitted to address the House for 35 minutes. Is there objection?

There was no objection.

## TENNESSEE WATER POWER AND MUSCLE SHOALS

Mr. GARRETT of Tennessee. Mr. Speaker, some days ago the House gave me permission to extend my remarks in the RECORD by inserting a communication from the public utilities commission of my State bearing on the water resources of Tennessee and Muscle Shoals. I have received a letter from former Senator Shields bearing on the same subject, on a live legislative matter, and I would like to insert that, too.

The SPEAKER. The gentleman from Tennessee asks unanimous consent to extend his remarks by inserting a letter from former Senator Shields, of Tennessee, in regard to the matter which the gentleman from Tennessee was privileged to extend on a former occasion. Is there objection?

There was no objection.

Mr. GARRETT of Tennessee. Mr. Speaker, under the leave to extend my remarks in the RECORD I include the following letter from former United States Senator John K. Shields upon the subject of Tennessee water-power resources and Muscle Shoals:

KNOXVILLE, TENN., January 25, 1928.

Hon. FINIS J. GARRETT,
Washington, D. C.

MY DEAR SIR: When we discussed the Madden bill (H. R. 8305), and especially the provisions providing for the construction of dams on the Clinch River, some days ago, I had not read the bill and was unable to express any opinion of how these provisions affected the sovereign and property rights of the State and people of Tennessee, but have since carefully considered the copy you gave me and come to a definite opinion in regard to these matters.

I have also carefully read the letter concerning the same matters which you received from the railroad and Public Utilities Commission of Tennessee, in which the commission ably presents the sovereign powers, rights, and interests of the State and the people in streams, in which I agree with them in the abstract, but I do not think that the opinions expressed and authorities referred to are applicable to dams constructed or authorized to be constructed by the Congress for the improvement of navigation and the national defense.

The object of the Madden bill is to authorize and direct the Secretary of War, for the United States, to execute to the Air Nitrates Corporation and American Cyanamid Co. a lease of property of the United States known as the Muscle Shoals development at Muscle Shoals on the Tennessee River, Ala., to be operated and maintained primarily for the purpose of generating and manufacturing air nitrates to be used for the national defense and agricultural fertilizers, the lessees obligating themselves to manufacture, distribute, and sell fertilizers, and for the improvement of navigation. These were the purposes for which the Muscle Shoals development was constructed by the United States.

It has been ascertained since the construction of the Wilson Dam that in dry seasons there was not sufficient water to assure the production of sufficient power and that the construction of other dams in the Tennessee River and its tributaries is necessary.

The Clinch River has been surveyed under the direction of the Secretary of War and navigation dams and storage reservoirs located which when constructed will improve navigation upon that river as well as upon the entire Tennessee River, and supply the necessary water power at Muscle Shoals in dry seasons, and therefore the United States contracts in the lease to construct the Cove Creek Dam and authorizes the Air Nitrates Corporation and American Cyanamid Co., through a subsidiary corporation, to construct three navigation dams upon this river, the power produced by the Cove Creek Dam to be covered by the lease and that produced by the other three dams to be used, owned, and enjoyed by the lessee. These four dams are all to be constructed for improvement of navigation, the national defense, and incidental power production.

The three dams below Clinton: Congress has the unquestioned power to authorize the construction of these dams for the improvement of navigation and incidental power production by persons or corporations at their own expense. This power has been frequently exercised for many years and never challenged. The Hales Bar Dam in the Tennessee River, the Keokuk Dam in the Mississippi River, Dam No. 12 in the Cosas River, and many other large dams have been constructed under acts similar to the provisions granting the lessee licenses to construct these dams. It has been a favored way of improving navigation of streams as well as developing water-power resources without cost to the United States. The permits and licenses granted under the provisions of the Madden bill are to be governed by the provisions of the Federal water power act in all things, but the lessees are to have preference over all applicants to the Federal Water Power Commission for licenses to construct them.

The incidental power generated by these dams, its distribution and sale, however, will be subject to the laws and constituted authorities of Tennessee, no question of interstate commerce being involved in the generation, use, and sale of hydroelectric power. This is conceded by the provision in the bill that the lessee shall "construct, operate, and maintain such dam or dams subject to the applicable State and Federal laws."

Section 9 of the Federal water power act under which they are to be constructed provides, in section (b), that each applicant for a license hereunder shall submit to the commission—

"(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located, with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this act."

The Madden bill does not undertake to enable the licensee at these dams to override the authority of the State but merely provides that after the lessee has complied with the laws of the State, then, so far as the Federal Government is concerned, he shall have his preliminary permit and consequent license if desired. The time allowed the lessees to construct the dams is less than that which the Water Power Commission is authorized to allow power companies applying to it for permits and licenses.

The Cove Creek Dam: Congress has the power to construct dams for navigation improvement and the national defense as here contracted and to lease the waterpower produced. This has been done in a number of cases. The act of Congress providing for the construction of the Sault Ste. Marie navigation improvement by the United States authorized the waterpower incidentally produced to be leased or disposed of, and it was sustained by the Supreme Court of the United States in the case of the United States v. Chandler, Dunbar Co. (229 U. S. 53).

The pertinent provisions of the contract of the United States to construct the Cove Creek Dam are as follows: The lessor, for the purpose of navigation improvement, national defense, incidental flood control, and to secure the maximum production of fertilizers at Muscle Shoals in time of peace, covenants and agrees to acquire and construct with reasonable promptness Cove Creek Dam on Clinch River approximately 8 miles north of Clinton; the lessor covenants and agrees to acquire by good and marketable title, free from all defects and encumbrances, all such lands, rights, easements, and servitudes as may be necessary for the construction, operation, and maintenance of said dam, and to complete the construction thereof in good faith, and with reasonable diligence, the property when completed to become a part of the properties leased.

The power produced, its distribution and sale by the lessee, is subject to the control and regulation of the laws and constituted authorities of Tennessee as in all other cases, which I think is admitted by the provisions of the lease.

With these views of the meaning and proper construction of the provisions of the proposed lease concerning dams on the Clinch River, I am of the opinion that they do not violate any of the sovereign powers, rights, and interests of the State and people of Tennessee and are constitutional and valid. If you have any doubt of this, you could offer an amendment to the bill that no provision of the lease shall violate any of the sovereign rights of the State, which will doubtless be accepted, because if it is done they will be void.

The lease contains a contract by the United States that it will not construct or allow to be constructed a dam on the Tennessee River or its tributaries that will materially impair the full enjoyment by the lessees of the property leased, which is objectionable and should be stricken out. Congress had no power to make such a contract, because it does not relate to or affect navigation, but solely to the private business of the lessees. However, it is void, meaningless, and harmless, and entitled to no serious consideration.

The chief objection, it is understood, to the Madden bill comes from the power companies, and especially those that have made application to the Federal Water Power Commission, but not to the Railroad and Public Utilities Commission of Tennessee, for permits and licenses to construct the dams on the Clinch River, as well as dams on other rivers in Tennessee, which will doubtless be granted by the Federal Water Power Commission if the Madden bill is not enacted granting such licenses to the Air Nitrates Corporation and American Cyanamid Co. by the United States.

In other words, the contest is between the United States in its effort to improve navigation and provide for the manufacture of fertilizers for the use of farmers and nitrates for national defense, and the Cyanamid Co., which owns the process for the manufacture of nitrates on the one part, and the power companies which desire by their application more than 20 dams on the Tennessee River and its tributaries in east Tennessee for power purposes, the granting of which will give them power to dispose of the hydroelectricity produced and transmitted to other States almost in their absolute discretion.

The water-power companies have long opposed the generation and sale of hydroelectricity by others than themselves. They opposed the completion of the Wilson Dam; they opposed and by delay defeated the proposition of Henry Ford to lease the Muscle Shoals development, and it is said the Fertilizer Trust joined them in this fight. The 13 associated power companies secured a similar bill to the present one and had a bill introduced granting them a lease, although they owned no processes for the manufacture of air nitrates and their proposition

to do so was of doubtful construction. They have introduced no bill to the present Congress, doubtless because of the Walsh resolution pending in the Senate for the investigation of the power companies; but there are two bills for Government operation or lease, and it is probable that they will gain control of the electric power under these if the Madden bill is not enacted. It is also quite certain if the Madden bill is not passed in the present Congress there will be no proposition from a company manufacturing fertilizers in the future, and the Muscle Shoals power will all pass into the hands of the power companies and be lost to the agricultural interests of the country.

There is another point I would call your attention to: The Air Nitrates Corporation and the American Cyanamid Co. are chemical manufacturing companies and not water-power companies. The construction of the dams on the Clinch River will assure ample power at Muscle Shoals all the year to conduct their business to produce the maximum amount of fertilizers provided for in the lease. They must dispose of the power produced by the dams on the Clinch River, and it will be more profitable for them to sell it to manufacturing companies located near the dams, which will be of very great advantage to Tennessee in the increase of population and taxable property. They in all probability will have no expensive distribution lines to transmit it a distance or out of the State.

I do not wish anything I have said in this letter to be construed as a criticism upon the members of the Railroad and Public Utilities Commission of Tennessee, for they are all gentlemen of integrity and ability and are patriotically asserting and defending the sovereign rights of Tennessee and the people in the water power resources of Tennessee and are not and can not in any way be influenced in the discharge of their duties contrary to the interests of the people of the State by anyone. I favor and approve their assertion of the State's rights which the power companies have ignored and are now attacking by a bill in the chancery court of Nashville.

I have written you quite at length about this matter because I am deeply interested in the manufacture of cheap fertilizer at Muscle Shoals, the provisions for the national defense, and the development of the water-power resources of the Tennessee River for the benefit of the people of Tennessee.

Yours truly,

JOHN K. SHIELDS.

### PERMISSION TO ADDRESS THE HOUSE

Mr. CASEY. Mr. Speaker, I ask unanimous consent that, following the special order just made, I may address the House for one hour on Tuesday on the coal-strike situation.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Tuesday, following the address of the gentleman from Indiana [Mr. VESTAL], he may address the House for one hour on the coal-strike situation. Is there objection.

Mr. BARBOUR. Reserving the right to object, Mr. Speaker, would not some other day be just as convenient to the gentleman from Pennsylvania?

Mr. CASEY. I will say to the gentleman that I had an allotment of time in the general debate on this bill, but I was compelled to postpone speaking on account of attendance on a hearing on another appropriation bill.

Mr. BARBOUR. I do not want to object to the gentleman's request, but I am very anxious to dispose of this appropriation bill at the next session of the House, and if an hour were allowed to the gentleman on Tuesday that could not be done.

Mr. TILSON. I doubt if next Calendar Wednesday will be crowded. Perhaps the gentleman might get time on Calendar Wednesday. He can get it by unanimous consent.

Mr. CASEY. Then I modify my request, Mr. Speaker, to the extent that I be given one hour on Calendar Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table, he may address the House for one hour. Is there objection?

There was no objection.

### IMMIGRATION AND THE CRIME WAVE

Mr. LANKFORD. Mr. Speaker, on January 27, 1928, my colleague, Hon. ROBERT ALEXIS GREEN, of Florida, delivered an address over the radio on the subject of "Immigration and the crime wave," which address I ask may be inserted in the RECORD by unanimous consent.

The SPEAKER. The gentleman from Georgia asks unanimous consent to extend his remarks in the RECORD by inserting an address recently delivered over the radio by the gentleman from Florida [Mr. GREEN]. Is there objection?

There was no objection.

Mr. LANKFORD. Mr. Speaker, under leave granted me today, I herewith insert in the RECORD an eloquent and patriotic address delivered by the Hon. ROBERT ALEXIS GREEN, Representative of the second congressional district of Florida, over the radio on January 27, 1928, discussing the subject Immigration and the Crime Wave. The address is instructive, entertaining, and worthy of the careful consideration of the Nation.

The address is as follows:

Friends and citizens of America, the subject of immigration is so wide in its scope that it will be impossible for me to give a detailed discussion of it in the short time which I will talk to you this evening; however, it is one of the most important subjects now affecting the citizenship of our great Nation. A high order of citizenship is vital to any nation. A nation's strength in itself and its power and position in the affairs of other nations is established and maintained solely by the stable type of citizenship comprising it.

Our Constitution vested in the Congress the power to regulate and control immigration. However, the subject of immigration was vainly attempted to be regulated by treaty up until about the year 1882, when the American Government tried to settle the Chinese question by a treaty in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the Chinese millions and the United States. Thus it was found imperative that the United States should pass her first immigration law. The influx of aliens grew steadily until by the year 1907 the high peak was reached with the admission of 1,285,349 persons.

This alarming situation brought about the passage of the illiteracy test act in 1917, which only retarded slightly the great influx of foreign hordes. In 1910, 1,041,570; in 1913, 1,197,892; and in 1914, 1,218,480 entered. The abnormal conditions during the World War period, of course, directed the attention of the world in channels other than that of immigration, but soon after the World War—during the reconstruction period—again immigrants by the hundreds of thousands turned their eyes and hopes toward the United States, causing the necessity of the 1921 numerical control act. This act was found inadequate to cope with the situation, and on May 26, 1924, Congress made its third effort to limit the annual influx of aliens. The immigration department of our Government is now working rather effectively under the provisions of this and subsequent acts of Congress, but in spite of all efforts of Congress and the diligence of immigration officials there are to-day in the United States probably 16,000,000 persons of foreign birth, 7,000,000 of whom are not American citizens. Thus you will see the necessity of all efforts at the restriction of immigration.

### NEED MORE HELP

The immigration department employs about 2,700 persons. Of this number, nearly 800 are immigrant inspectors and more than 700 are border patrolmen. It can readily be seen that this number is inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol.

If the border to be patroled could be averaged among the few patrolmen on the 8-hour basis, making allowance for sick leave and other possible absentees, it would be reasonable to approximate 25 miles of border per day to be inspected by one patrolman. Then when we consider that the quota law does not apply to Canada, Mexico, Central America, South America, and some of the islands, it is very easy to see the weakest place of our present immigration laws and their enforcement. Hundreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States. Millions of aliens come into this country either by land or sea annually; the admissibility of these people has to be passed upon by our Bureau of Immigration. Of course, this number includes tourists, students, and aliens of all classes. I merely mention this to show how impossible it is for the limited personnel of our department to cope with this tremendous situation.

### GIGANTIC TASK

Our country has a total population of more than 100,000,000, 15 per cent or possibly 20 per cent of which is foreign born, and in almost every case speaking a language foreign to ours. It is readily seen that we have a great task to Americanize, assimilate, and amalgamate these foreigners. These 15,000,000 or possibly 20,000,000 persons of foreign birth, 7,000,000 of whom are aliens, are indeed a heavy burden for American society and for American institutions to carry. These foreigners, in general, exact a tremendous toll from our civilization. In January, 1927, 113,105 aliens were inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses. The economic loss represented by these figures is appalling. Each of these aliens, considered economically, is less than zero; he is a distinct liability. The amount of money expended annually to support these aliens would, within a few years, build hard roads enough to "checker-board" the United States from the Atlantic to the Pacific and from the Rio Grande to Canada. I know of no good reason why the United States should be so foolish as to permit these conditions to continue.

There are many suggestions to the Congress which would strengthen our National immigration and deportation laws. Recently the House Committee on Immigration, of which I am a member, approved a depor-

tation law which, if passed, will help a great deal; however, my feeling in the matter is that any and all aliens in the United States who are found guilty of violating any law whatsoever of the United States or of any State of the Union, should be, without delay, deported. Aliens who are found guilty of operating gambling houses, "gun-toting," violating in any manner State or Federal prohibition laws, or any other infraction of our minor laws, should be instantly deported the same as if he had committed a graver offense. Probably 80 per cent of those who violate the laws are "repeaters." You can examine the statistics of almost any penal institution and find that a high percentage, in some cases more than 80 per cent, of those who are in prison have been convicted of offenses other than the one for which they are serving.

### ALIENS SHOULD BE REGISTERED

In my opinion all aliens, by law and practice, should be compelled to register upon entering the United States and should be compelled to carry on their person such certificate of registration. I believe further that omission of or refusal of any alien to avail himself of the United States laws of naturalization should be grounds for his deportation at the discretion of the trial court. No alien should be permitted to stay in the United States more than five years without becoming a naturalized citizen. To-day there are hundreds of thousands of foreigners in the United States who have been here for years and years, have never declared their intention of becoming citizens of the United States, do not desire to be citizens of the United States; but on the other hand many of them are ready, waiting, and willing at all times to foment trouble and disloyalty to the United States Constitution, laws, and institutions.

A few months ago the United States was brought face to face with the underhanded bolshevistic and communistic working of undesirable aliens. This was brought to a climax during and just after the notorious Sacco-Vanzetti trial. These two depraved and abhorrent murderers committed their acts some seven years before justice was administered to them. A perverted sympathizer of Sacco and Vanzetti, named Edward H. James, a socialist or Red, referring to the trial said:

"You had a crazy judge and jury in Plymouth. You had the same crazy judge and jury in Dedham. You had a crazy Supreme Court of Massachusetts sitting in the courthouse in Boston, saying it was right. The trial of these men was an infamy that cries to Heaven. Take them out from prison. Then punish those who committed the infamy. I am not telling you what to do. I am interpreting history for you. * * * Justice is terrible when it strikes. Revolutions are not made to order. Either we break the Government or the Government breaks us."

These statements of his were taken up by sympathizers of Sacco and Vanzetti and so radical did their minds incline until the courthouse, the court, and other officials had to be guarded and protected from unlawful attacks. Even the homes of the judge and attorney had to be protected by armed guards. After the conviction of these men their friends perpetrated a series of outrages all over the world, exploding bombs and blowing up buildings. So vicious were their designs until when the veterans of the Allied Armies of the World War made a pilgrimage back to Paris and other scenes of their great deeds of heroism, it was necessary for these exponents of humanity and democracy to have guards against the inroads of these numerous Reds.

A leader in the movement to set free these two murderers was Felix Frankfurter, who worked for the defense of Mooney and Billings, red murderers. Notable among this array of reds may be mentioned Charlotte A. Whitney, who was convicted of criminal syndicalism in California for advocating the overthrow of the State by force, and who was not long ago pardoned by the Governor of California. A petition purporting to contain almost half a million signatures protested the execution of Sacco and Vanzetti; thus we see there are hundreds of thousands of these reds, communists, bolshevists who are here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our schools, our homes.

It is time that the United States should have a general awakening and educate her citizens to the needs of the hour; educate them to pure Americanism and the protection of our Nation and her institutions. It is time that our immigration and deportation laws have teeth put into them whereby the courts and other officials of our country can instantly ascertain the activity of aliens in crime, lawlessness, and red propaganda and promptly deport them.

### CRIME WAVE

The crime wave is engulfing America. Almost every newspaper you pick up has a startling headline like the following: " Fireburg sets seven fires; " " Paroled moron sought as girl's slayer; " " Lost girl sought on Island; " " Hickman, fiendish slayer, captured; " " Fox (Hickman) wins plea for new judge; " " Hotelling confesses attacking and slaying 5-year-old girl; " " Hickman seeks highbrow jury; " " Remus declared insane." This, my friends, is evidence that the crime wave is sweeping the United States because the red-blooded American citizens are apparently becoming careless relative to the enforcement of the laws of the country and apparently careless relative to properly educating the rising generation.

It is time we were instilling in the youth of our land their duties as courts, as peace officers, jurors, and law-abiding citizens. The youth

of to-day will fill these places to-morrow. It is time the citizens of the United States should look with disgust and contempt upon the violation of laws and discontinue signing requests for pardons, paroles, and other impediments to the justice of the law. It is time that Americans should look upon real American laws and institutions as theirs and endeavor to protect them instead of taking the side of and protecting and shielding criminals, law violators, and enemies of society. It is time the country should denounce so-called alienists along with other deterrents to law enforcement, justice, and civilization. Often the origin of these ills can be traced to undesirable immigrants. I do not mean to say that all aliens are undesirable; some are high type, splendid people, and make good citizens.

### ACROSS THE BORDERS

From south of the Rio Grande hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises. These who would decoy to our lands and then employ undesirable alien labor in competition with the splendid American laborer surely should be stopped. Cheap labor to-day may be an expensive liability to-morrow, and surely in the Mexican peon laborer this condition has obtained. The American laborer resides among us, pays taxes, contributes to the welfare and upbuilding of society and really stands at the helm of the ship of state of our mighty Nation. On the contrary, foreign labor drifts into our country, obtains what it can for its hire, gives as little return as possible, in most cases, and then invariably thrusts itself for a charitable existence upon society, in the founding of which it has not assisted.

Another reason why the quota should apply to the country south of the Rio Grande and the islands is because their population in the main is composed of mixtured blood of white, Indian, and negro. This makes their blood a very great penalty upon the society which assimilates it. The United States already has sufficient race and blood troubles.

Influx of all types of undesirable aliens and their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization; and instead of our Nation then being the mistress of the world, leading in art, science, invention, finance, statesmanship, culture, and general civilized development, would it not be reasonable to believe that we would assume a secondary place as compared to those nations which have kept their blood white and purely Caucasian? I do not tell you that these things will come to pass, but I do say we already have enough Japanese, Chinese, Italians, Negroes, and other foreign strains. It is time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores.

### PERMISSION TO ADDRESS THE HOUSE

Mr. MORIN. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. LaGUARDIA], who is now in the coal districts investigating the conditions there, be permitted to address the House for half an hour on Monday. I do that in pursuance of a request by wire that I have just received.

Mr. GARRETT of Tennessee. The gentleman says he is in the coal districts?

Mr. MORIN. Yes. I have just received a wire from him. I did not know before that he was there.

Mr. GARRETT of Tennessee. That is the same subject that the gentleman from Pennsylvania [Mr. CASEY] wishes to speak about?

Mr. MORIN. Yes.

The SPEAKER. The Chair will endeavor to discourage unanimous consent for talking on Monday, which is set aside for the Consent Calendar.

Mr. MORIN. Then I make it Wednesday.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, at the conclusion of the speech of the gentleman from Pennsylvania [Mr. CASEY], the gentleman from New York [Mr. LaGUARDIA] may be permitted to address the House for half an hour. Is there objection?

There was no objection.

### AMENDMENT OF THE HOUSE RULES

Mr. SNELL. Mr. Speaker, I submit a privileged report from the Committee on Rules.

The SPEAKER. The gentleman from New York presents a privileged report from the Committee on Rules, which the Clerk will report.

The Clerk read as follows:

Report to accompany House Resolution 107, amending paragraph 34 of Rule XI of the Rules of the House of Representatives.

The SPEAKER. Ordered printed.

### CHANGE OF REFERENCE

Mr. ARENTZ. Mr. Speaker, I have here a bill (H. R. 6461) for the construction of an irrigation dam on Walker River, Nev. It is an Indian matter. It was referred to the Committee

on Irrigation. I have conferred with both the chairman of the Committee on Indian Affairs and with the chairman of the Irrigation Committee, and both are agreeable to the transfer of this bill to the Committee on Indian Affairs.

The SPEAKER. The Clerk will report the bill by title.

The Clerk read as follows:

A bill (H. R. 6461) for the construction of an irrigation dam on the Walker River, Nev.

The SPEAKER. The gentleman from Nevada asks unanimous consent that the bill referred to be transferred from the Committee on Irrigation and Reclamation to the Committee on Indian Affairs. Is there objection?

There was no objection.

### FURTHER MESSAGE FROM THE SENATE

A further message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate insists upon its amendments to the joint resolution (H. J. Res. 131) entitled "Joint resolution providing for a commission to investigate and report upon the facts connected with the sinking of the submarine S-4 and upon methods and appliances for the protection of submarines," disagreed to by the House of Representatives, and agrees to the conference asked by the House on the disagreeing votes of the two Houses thereon, and had appointed Mr. HALE, Mr. ODDIE, and Mr. SWANSON to be the conferees on the part of the Senate.

### ADJOURNMENT

Mr. BARBOUR. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 4 o'clock and 50 minutes p. m.) the House adjourned, pursuant to the order previously made, until Monday, February 6, 1928, at 12 o'clock noon.

### COMMITTEE HEARINGS

Mr. TILSON submitted the following tentative list of committee hearings scheduled for Saturday, February 4, 1928, as reported by clerks of the several committees:

#### COMMITTEE ON APPROPRIATIONS
(10.30 a. m.)

Department of Agriculture appropriation bill.
District of Columbia appropriation bill.

#### COMMITTEE ON WORLD WAR VETERANS' LEGISLATION—SUBCOMMITTEE ON HOSPITALS
(10 a. m.)

To authorize an appropriation to provide additional hospital and out-patient dispensary facilities for persons entitled to hospitalization under the World War veterans' act, 1924, as amended (H. R. 5604).

#### COMMITTEE ON ROADS
(10 a. m.)

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented (H. R. 358, 383, 5518, 7343, and 8832).

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented, and authorizing appropriation of $150,000,000 per annum for two years (H. R. 7019).

#### COMMITTEE ON RIVERS AND HARBORS
(11 a. m.)

A meeting to consider favorable reports from the office of the Chief of Engineers on rivers and harbors projects.

#### COMMITTEE ON FOREIGN AFFAIRS
(10.30 a. m.)

That the use of submarines be prohibited and their construction discontinued in this and every other country (H. J. Res. 139).

#### COMMITTEE ON THE DISTRICT OF COLUMBIA—SUBCOMMITTEE ON POLICE AND FIREMEN
(10.30 a. m.)

To fix the salaries of officers and members of the Metropolitan police force, and the fire department of the District of Columbia (H. R. 9346).

#### COMMITTEE ON THE POST OFFICE AND POST ROADS—SUBCOMMITTEE NO. 3
(10.30 a. m.)

To authorize the assignment of railway postal clerks and substitute railway postal clerks to temporary employment as substitute sea post clerks (H. R. 58).

To authorize the Postmaster General to require steamship companies to carry the mail when tendered (H. R. 6864).

To prescribe more definitely the rates of compensation payable to steamships of United States registry for transportation of foreign mails (H. R. 6865).

#### For Monday, February 6, 1928

#### COMMITTEE ON AGRICULTURE
(10 a. m.)

To establish a Federal farm board to aid in the orderly marketing and in the control and disposition of the surplus of agricultural commodities in interstate and foreign commerce (H. R. 7040).

#### COMMITTEE ON THE DISTRICT OF COLUMBIA
(10.30 a. m.)

To regulate the employment of minors within the District of Columbia (H. R. 6685).

#### COMMITTEE ON NAVAL AFFAIRS
(10.30 a. m.)

To provide for the increase of the Naval Establishment (H. R. 7359).

#### COMMITTEE ON APPROPRIATIONS
(10.30 a. m.)

Department of Agriculture appropriation bill.

#### COMMITTEE ON ROADS
(10 a. m.)

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented (H. R. 358, 383, 5518, 7343, and 8832).

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented, and authorizing appropriation of $150,000,000 per annum for two years (H. R. 7019).

### EXECUTIVE COMMUNICATIONS, ETC.

338. Under clause 2 of Rule XXIV a letter from the Secretary of Navy, transmitting draft of a proposed bill "To provide additional pay for enlisted men of the United States Navy assigned to duty on submarine vessels of the Navy," was taken from the Speaker's table and referred to the Committee on Naval Affairs.

### REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of Rule XII,

Mr. PEAVEY: Committee on Indian Affairs. H. R. 7207. A bill to appropriate treaty funds due the Wisconsin Pottawatomie Indians; with amendment (Rept. No. 553). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8542. A bill to provide for the construction of a hospital at the Fort Bidwell Indian School, California; without amendment (Rept. No. 554). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8543. A bill to provide for the construction of a school building at the Fort Bidwell Indian School, California; without amendment (Rept. No. 555). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8898. A bill to provide for restoration to the public domain of certain lands in the State of California which are now reserved for Indian allotment purposes; without amendment (Rept. No. 556). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 9037. A bill to provide for the permanent withdrawal of certain lands in Inyo County, Calif., for Indian use; without amendment (Rept. No. 557). Referred to the Committee of the Whole House on the state of the Union.

Mr. WASON: Committee on the Disposition of Useless Executive Papers. A report on the disposition of useless executive papers in the Department of State. (Rept. No. 558). Ordered printed.

Mr. HAUGEN: Committee on Agriculture. H. J. Res. 26. A joint resolution authorizing the Secretary of Agriculture to dispose of real property, located in Hernando County, Fla., known as the Brooksville Plant Introduction Garden, no longer required for plant introduction purposes; without amendment

(Rept. No. 568). Referred to the Committee of the Whole House on the state of the Union.

Mr. HAUGEN: Committee on Agriculture. H. J. Res. 89. A joint resolution authorizing the Secretary of Agriculture to dispose of real property, located in Loudoun and Clarke Counties, Va., known as Mount Weather, no longer required for observatory and laboratory purposes; without amendment (Rept. No. 569). Referred to the Committee of the Whole House on the state of the Union.

Mr. HAUGEN: Committee on Agriculture. H. R. 405. A bill providing for horticultural experiment and demonstration work in the southern Great Plains area; with amendment (Rept. No. 570). Referred to the Committee of the Whole House on the state of the Union.

Mr. SNELL: Committee on Rules. H. Res. 107. A resolution amending paragraph 34 of Rule XI of the Rules of the House of Representatives; without amendment (Rept. No. 571). Referred to the House Calendar.

Mr. GILBERT: Committee on the District of Columbia. H. R. 49. A bill to amend the Code of Law for the District of Columbia in relation to descent and distribution; with amendment (Rept. 572). Referred to the House Calendar.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. JAMES: Committee on Military Affairs. H. R. 1631. A bill for the relief of Vanrensleer VanderCook, alias William Snyder; with amendment (Rept. No. 551). Referred to the Committee of the Whole House.

Mr. HOFFMAN: Committee on Military Affairs. H. R. 7708. A bill for the relief of John M. Brown; with amendment (Rept. No. 552). Referred to the Committee of the Whole House.

Mr. PEAVEY: Committee on War Claims. H. R. 4229. A bill for the relief of Jennie Wyant and others; without amendment (Rept. No. 559). Referred to the Committee of the Whole House.

Mr. HARE: Committee on War Claims. H. R. 4258. A bill to authorize credit in the disbursing accounts of certain officers of the Army of the United States and for the settlement of individual claims approved by the War Department; with amendment (Rept. No. 560). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4267. A bill for the relief of Ernest J. Hiscock; without amendment (Rept. No. 561). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4268. A bill for the relief of Charles Candwell; without amendment (Rept. No. 562). Referred to the Committee of the Whole House.

Mr. PEAVEY: Committee on War Claims. H. R. 5225. A bill for the relief of Frank W. Tucker; without amendment (Rept. No. 563). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4257. A bill for the validation of the acquisition of Canadian properties by the War Department and for the relief of certain disbursing officers for payments made thereon; without amendment (Rept. No. 564). Referred to the Committee of the Whole House.

Mr. HAUGEN: Committee on Agriculture. H. R. 4068. A bill for the relief of the Majestic Hotel, Lake Charles, La., and of Lieut. R. T. Cronan, United States Army; without amendment (Rept. No. 565). Referred to the Committee of the Whole House.

Mr. HAUGEN: Committee on Agriculture. H. R. 8968. A bill to allow credit in the accounts of William A. Schoenfeld; without amendment (Rept. No. 566). Referred to the Committee of the Whole House.

Mr. ROWBOTTOM: Committee on Claims. H. R. 9385. A bill for the relief of the estate of L. Gordon Leech, bankrupt; without amendment (Rept. No. 567). Referred to the Committee of the Whole House.

## CHANGE OF REFERENCE

Under clause 2 of Rule XXII, committees were discharged from the consideration of the following bills, which were referred as follows:

A bill (H. R. 3946) for the relief of Hugo Koehn; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 3949) for the relief of Frank F. Moore; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 4056) for the relief of John E. Dolan; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 4057) for the relief of Glenn S. Fortner; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 10381) granting an increase of pension to Louise W. Koch; Committee on Pensions discharged, and referred to the Committee on Invalid Pensions.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of Rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. COLTON: A bill (H. R. 10473) to establish the Bear River migratory-bird refuge, Great Salt Lake, Utah, and for other purposes; to the Committee on Agriculture.

By Mr. GILBERT: A bill (H. R. 10474) to amend the Code of Law for the District of Columbia in relation to descent and distribution; to the Committee on the District of Columbia.

By Mr. MORROW: A bill (H. R. 10475) to authorize the Secretary of the Interior to issue a patent to the Bureau of Catholic Indian Missions for a certain tract of land on the Mescalero Reservation, N. Mex.; to the Committee on Indian Affairs.

By Mr. HAWLEY: A bill (H. R. 10476) for a fish hatchery on the Rogue River in Jackson County, Oreg.; to the Committee on the Merchant Marine and Fisheries.

By Mr. HUDSPETH: A bill (H. R. 10477) to amend the tariff act of 1922; to the Committee on Ways and Means.

By Mrs. KAHN: A bill (H. R. 10478) providing retirement for persons who hold licenses as navigators or engineers who have reached the age of 64 years and who have served 25 or more years on seagoing vessels of the Army Transport Service; to the Committee on Military Affairs.

By Mr. KNUTSON: A bill (H. R. 10479) granting double pensions to dependents under existing pension laws in all cases where an officer, warrant officer, or enlisted man or student flyer of the United States Army dies or is disabled due to aircraft accident; to the Committee on Pensions.

By Mrs. LANGLEY: A bill (H. R. 10480) to extend the provisions of the pension act of May 11, 1912, and May 1, 1920, to the officers and enlisted men of all State militia and other State organizations that rendered service to the Union cause during the Civil War for a period of 90 days or more, and providing pensions for their widows, minor children, and dependent parents, and for other purposes; to the Committee on Invalid Pensions.

By Mr. MORROW: A bill (H. R. 10481) to authorize the erection of a Veterans' Bureau hospital at Albuquerque, N. Mex., and to authorize the appropriation therefor; to the Committee on World War Veterans' Legislation.

By Mrs. ROGERS: A bill (H. R. 10482) to provide double pensions for personnel of the Army, Navy, Marine Corps, or Coast Guard who are killed or disabled as the result of accidents in the military, naval, or Coast Guard service; to the Committee on Pensions.

By Mr. SINNOTT (by departmental request): A bill (H. R. 10483) to revise the boundary of a portion of the Hawaii National Park on the island of Hawaii, in the Territory of Hawaii; to the Committee on the Public Lands.

By Mr. NELSON of Missouri: A bill (H. R. 10484) for the erection or enlargement of a Federal building at Columbia, Mo.; to the Committee on Public Buildings and Grounds.

Also, a bill (H. R. 10485) to provide for the erection of a public building in the city of Centralia, Mo.; to the Committee on Public Buildings and Grounds.

Also, a bill (H. R. 10486) for the erection or enlargement of a Federal building at Jefferson City, Mo.; to the Committee on Public Buildings and Grounds.

By Mr. GREEN of Iowa: A bill (H. R. 10487) to amend the World War adjusted compensation act, as amended; to the Committee on Ways and Means.

By Mr. WAINWRIGHT: A bill (H. R. 10488) to amend section 3, act of May 31, 1924 (43 Stat. L. 251); to the Committee on Military Affairs.

By Mr. SMITH: A bill (H. R. 10489) for the relief of Army nurses; to the Committee on Military Affairs.

By Mr. WINTER: A bill (H. R. 10490) to authorize the purchase of a site and the erection and completion of a building thereon for a post office at Worland, Wyo.; to the Committee on Public Buildings and Grounds.

By Mr. WILLIAMSON: A bill (H. R. 10491) to provide for aided and directed settlement on Federal reclamation projects; to the Committee on Irrigation and Reclamation.

Case 3:19-cr-00407-G Document 3-16 Filed 10/19/20 Page 63 of 66

By Mr. BUTLER: A bill (H. R. 10492) to provide additional pay for enlisted men of the United States Navy assigned to duty on submarine vessels of the Navy; to the Committee on Naval Affairs.

By Mr. TAYLOR of Tennessee: A bill (H. R. 10493) to relieve persons in the military and naval services of the United States during the war emergency period from claims for overpayment at that time not involving fraud; to the Committee on Military Affairs.

By Mr. ROMJUE: Joint resolution (H. J. Res. 190) calling upon the President of the United States to reduce the tariff on materials and commodities essential to and generally used by the agricultural population of the United States in carrying on the farming industry, and for lessening the burdens now imposed upon agriculture; to the Committee on Ways and Means.

By Mr. HOGG: Joint resolution (H. J. Res. 191) to amend the Constitution of the United States; to the Committee on Ways and Means.

By Mr. TILSON: Joint resolution (H. J. Res. 192) to provide for the coinage of a medal in commemoration of the achievements of Col. Charles A. Lindbergh; to the Committee on Coinage, Weights, and Measures.

By Mr. CASEY: Resolution (H. Res. 109) to investigate conditions in the coal fields of Pennsylvania, West Virginia, and Ohio; to the Committee on Rules.

## MEMORIALS

Under clause 3 of Rule XXII, memorials were presented and referred as follows:

Memorial of the Legislature of the State of Wisconsin, memorializing the Congress of the United States to create a special committee to investigate the coal strike in all its phases; to the Committee on Rules.

Memorial of the Legislature of the State of Wisconsin, memorializing the Congress of the United States to make a full survey of the Wisconsin-Fox Rivers waterway and to enact such legislation as will result in the completion of such waterway; to the Committee on Rivers and Harbors.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of Rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. ANDRESEN: A bill (H. R. 10494) for the relief of the Oscar and John Soberg Post, No. 210, of the Veterans of Foreign Wars, Lakeville, Minn.; to the Committee on Pensions.

By Mr. ARNOLD: A bill (H. R. 10495) granting an increase of pension to Drusilla Ward; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10496) granting a pension to James O. Guinn; to the Committee on Pensions.

Also, a bill (H. R. 10497) granting an increase of pension to Sarah A. Lovelady; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10498) granting a pension to Mary J. Burris; to the Committee on Pensions.

By Mr. BRIGHAM: A bill (H. R. 10499) granting an increase of pension to Clara A. Cobb; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10500) granting an increase of pension to Mary S. Walker; to the Committee on Invalid Pensions.

By Mr. BULWINKLE: A bill (H. R. 10501) to erect a marker to Maj. William Chronicle, a soldier of the Revolutionary War, who was killed at Kings Mountain; to the Committee on the Library.

Also, a bill (H. R. 10502) for the relief of J. B. Holder, to the Committee on Claims.

Also, a bill (H. R. 10503) for the relief of R. P. Washam, postmaster; F. A. Slate, former postmaster; W. H. Sanders, W. A. McGinnis, J. E. Lindsay, and J. T. Pearson; to the Committee on Claims.

By Mr. CORNING: A bill (H. R. 10504) granting an increase of pension to Elizabeth Evans; to the Committee on Invalid Pensions.

By Mr. FLETCHER: A bill (H. R. 10505) granting an increase of pension to Sarah Dearth; to the Committee on Invalid Pensions.

By Mr. GARDNER of Indiana: A bill (H. R. 10506) granting a pension to Mary C. Ingle; to the Committee on Pensions.

By Mr. GRAHAM: A bill (H. R. 10507) for the relief of Benjamin Franklin, alias William Hart; to the Committee on Naval Affairs.

By Mr. HAWLEY: A bill (H. R. 10508) for the relief of T. P. Byram; to the Committee on Naval Affairs.

By Mr. HICKEY: A bill (H. R. 10509) granting a pension to Emma M. Oberlin; to the Committee on Invalid Pensions.

By Mr. HOUSTON of Delaware: A bill (H. R. 10510) granting an increase of pension to Ruth A. Hazzard; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10511) for the relief of Horace G. Knowles; to the Committee on Claims.

By Mr. JENKINS: A bill (H. R. 10512) granting an increase of pension to Jennie Porter; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10513) granting a pension to Agnes Folger; to the Committee on Invalid Pensions.

By Mr. JOHNSON of South Dakota: A bill (H. R. 10514) granting an increase of pension to Sylvia S. Felmly; to the Committee on Invalid Pensions.

By Mrs. LANGLEY: A bill (H. R. 10515) granting an increase of pension to John Breeding; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10516) for the relief of estate of Martin Preston, deceased; to the Committee on War Claims.

Also, a bill (H. R. 10517) granting a pension to Bascom Prater; to the Committee on Pensions.

Also, a bill (H. R. 10518) granting a pension to Camillus Arnett; to the Committee on Pensions.

By Mr. MAGRADY: A bill (H. R. 10519) to correct the military record of Levi Beaver; to the Committee on Military Affairs.

By Mr. MANLOVE: A bill (H. R. 10520) granting a pension to Maud E. McFadden; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10521) granting a pension to Jacob Louis; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10522) granting an increase of pension to Caroline Owen; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10523) granting an increase of pension to Mary R. Gorham; to the Committee on Invalid Pensions.

By Mr. MERRITT: A bill (H. R. 10524) to correct the military record of Egbert L. Bennett; to the Committee on Military Affairs.

By Mr. MOORE of Virginia: A bill (H. R. 10525) for the relief of Anna Volker; to the Committee on Claims.

By Mr. PARKER: A bill (H. R. 10526) granting an increase of pension to Ann Taylor; to the Committee on Invalid Pensions.

By Mr. PURNELL: A bill (H. R. 10527) granting an increase of pension to Lucetta Hayes; to the Committee on Invalid Pensions.

By Mr. ROBINSON of Iowa: A bill (H. R. 10528) granting an increase of pension to Mary L. Jarvis; to the Committee on Invalid Pensions.

By Mr. RATHBONE: A bill (H. R. 10529) for the relief of Bernard McGlave; to the Committee on Naval Affairs.

By Mr. SCHAFER: A bill (H. R. 10530) for the relief of Harry Cinq-Mars; to the Committee on Military Affairs.

By Mr. STRONG of Pennsylvania: A bill (H. R. 10531) granting an increase of pension to Nancy Wolford; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10532) granting a pension to Sarah E. Barr; to the Committee on Invalid Pensions.

By Mr. TAYLOR of Tennessee: A bill (H. R. 10533) granting an increase of pension to Florence Witt; to the Committee on Invalid Pensions.

By Mr. UNDERHILL: A bill (H. R. 10534) for the relief of Glacier County, Mont.; to the Committee on Claims.

By Mr. WELCH of California: A bill (H. R. 10535) granting a pension to Maude E. West; to the Committee on Invalid Pensions.

By Mr. WHITTINGTON: A bill (H. R. 10536) granting six months' pay to Anita W. Dyer; to the Committee on Naval Affairs.

By Mr. WILLIAMS of Missouri: A bill (H. R. 10537) granting an increase of pension to Josephine Sullivan; to the Committee on Invalid Pensions.

By Mr. WYANT: A bill (H. R. 10538) granting an increase of pension to Alice A. Ferguson; to the Committee on Invalid Pensions.

## PETITIONS, ETC.

Under clause 1 of Rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

3078. Petition of the Antinational Origins Clause League, Detroit, Mich., protesting against the national origins method of determining quotas and urging Congress to eliminate this clause from the immigration act of 1924; to the Committee on Immigration and Naturalization.

3079. By Mr. ALMON: Petition of H. B. Miller, of Florence, Ala., and 28 other citizens, asking for an increase in the pension of needy and suffering veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

3080. By Mr. BACHMANN: Petition of Lena Vance and other citizens of Elm Grove, Ohio County, W. Va., protesting against the passage of the Lankford compulsory Sunday observance bill (H. R. 78) or any other compulsory Sunday observance bills; to the Committee on the District of Columbia.

3081. By Mr. BURTON: Resolution adopted by Massachusetts Council for International Cooperation, protesting against the proposed naval building program and urging an effort substantially to reduce it; to the Committee on Naval Affairs.

3082. Also, memorial signed by citizens of the State of Ohio, remonstrating against the passage of legislation providing for compulsory Sunday observance in the District of Columbia; to the Committee on the District of Columbia.

3083. By Mr. CARTER: Petition of Carrie Jackson and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3084. Also, petition of Al Erie and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3085. Also, petition of Emma Wickstrom, M. D., and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3086. Also, petition of Emmanuel Browne and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3087. Also, petition of L. Thompson and others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3088. Also, petition of Sena Hill and 52 others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3089. Also, petition of Alice Galer and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3090. Also, petition of Fred Fritman and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3091. Also, petition of Joseph Burry and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3092. Also, petition of Pauline O. Roberts and many others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3093. Also, petition of P. N. Harris and others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3094. Also, petition of Henry H. Nofzuff and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3095. Also, petition of C. B. Secord and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3096. Also, petition of Ida N. Peoples and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3097. Also, petition of Mrs. L. C. Morgan and others, protesting against passage of House bill 78; to the Committee on the District of Columbia.

3098. Also, petition of H. M. Monroe and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3099. Also, petition of C. E. Brown and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3100. Also, petition of Marcus C. McKeller and others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3101. Also, petition of August Glatt and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3102. Also, petition of L. E. Bake and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3103. Also, petition of W. Rimnell and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3104. Also, petition of Mary A. Halcom and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3105. Also, petition of James Harvey and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3106. Also, petition of John H. Easterly and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3107. Also, petition of Bjornstjerne Bjornson Lodge, No. 14, Sons of Norway, of Oakland, Calif., urging that the present quota for Scandinavian countries be retained; to the Committee on Immigration and Naturalization.

3108. Also, petition of Charles I. Harrison and others, of Alameda County, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3109. Also, petition of Ted Staffee and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3110. Also, petition of Frederick C. Johnson and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3111. Also, petition of D. Holland and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3112. Also, petition of Charles W. Small and others, of Alameda County, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3113. Also, petition of H. C. Groger and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3114. Also, petition of San Leandro Chamber of Commerce, of San Leandro, Calif., protesting any action on the Box bill until after a thorough investigation has been had of the Mexican immigration question; to the Committee on Immigration and Naturalization.

3115. Also, petition of Santa Barbara Post, No. 49, American Legion, Department of California, urging the passage of an appropriation for the holding of the national rifle matches of 1928; to the Committee on Military Affairs.

3116. Also, petition of General Harrison Gray Otis Post, No. 1537, urging the passage of legislation increasing the allowances to men on the retired list of services; to the Committee on Military Affairs.

3117. Also, petition of J. Baldwin and others, of Alameda County, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3118. Also, petition of Martha K. Bartl and many others, of Oakland, Calif., urging that legislation be passed granting increased pensions to veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

3119. Also, petition of Kalman Rubenstein and 55 others, of Oakland, Calif., urging the passage of legislation increasing the pensions of veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

3120. By Mr. CHAPMAN: Petition of Laura Tolliver, of Lexington, Ky., in support of legislation increasing pensions to Civil War veterans and widows of Civil War veterans; to the Committee on Invalid Pensions.

3121. Also, petition of S. G. Sharp, Pruitt Berryman, Meredith Fox, R. R. Hampton, Ernest Howard, Martin Fort, and 12 other citizens, of Clark County, Ky., protesting against the passage of any compulsory Sunday observance law or any bill giving preference to one religion over another; to the Committee on the District of Columbia.

3122. Also, petition of L. E. Morris, Joe Sibley, C. N. Crawford, G. E. Morris, J. S. Moore, Stephen Logan, and other citizens, of Sulphur, Henry County, Ky., in support of legislation increasing pensions to Civil War veterans and widows of Civil War veterans; to the Committee on Invalid Pensions.

3123. By Mr. CHRISTOPHERSON: Petition urging vote on Civil War pension bill, signed by numerous residents of Artesian, S. Dak.; to the Committee on Invalid Pensions.

3124. By Mr. COOPER of Wisconsin: Memorial of the Wisconsin Legislature, memorializing the Congress of the United States to enact necessary legislation for a survey of the Wisconsin-Fox Rivers waterway; to the Committee on Rivers and Harbors.

3125. Petition of citizens of Bristol, Kenosha County, Wis., and vicinity, protesting against passage of H. R. 78, or any other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3126. By Mr. CURRY: Petition of citizens of third district of California, against House bill 78; to the Committee on the District of Columbia.

3127. By Mr. EATON: Petition of Mrs. Lillie Headley, 225 Somerset Street, Bound Brook, N. J., and 180 other residents of Bound Brook, protesting against the passage of any compulsory Sunday observance legislation for the District of Columbia; to the Committee on the District of Columbia.

3128. By Mr. ELLIOTT: Petition of Paul Green and 500 others, of Richmond, Ind., remonstrating against the passage of the Lankford Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

Case 3:19-cr-00407-CCC Document 316 Filed 09/18/20 Page 65 of 66

3129. By Mr. ESTEP: Petition of the Rose Building and Loan Association, Pittsburgh, Pa., Jacob H. Erbe, secretary, urging the passage of the Dale-Lehlbach bill; to the Committee on the Civil Service.

3130. Also, petition of Joint Association of Postal Employees, J. F. Callagher, president, urging the passage of the Dale-Lehlbach bill; to the Committee on the Civil Service.

3131. By Mr. FENN: Petition of citizens of Hartford, Conn., and surrounding towns, protesting against the passage of House bill 78, or any other legislation providing for a compulsory observance of Sunday; to the Committee on the District of Columbia.

3132. By Mr. FRENCH: Petition of citizens of Lapwai, Idaho, urging enactment of legislation increasing pensions for Civil War veterans and for widows; to the Committee on Invalid Pensions.

3133. By Mr. GALLIVAN: Petition of William C. Adams, director department of conservation, Commonwealth of Massachusetts, recommending early and favorable consideration of House bill 15, providing for an appropriation of $150,000 to purchase certain land to be added to the Absaroka and Gallatin National Forests; to the Committee on the Public Lands.

3134. By Mr. GARNER: Letter of P. P. Claxton, superintendent city schools, Tulsa, Okla., in support of Senate bill 1731, providing for the further development of agriculture and home economics under the terms of the Federal vocational education act; to the Committee on Agriculture.

3135. Also, Letter of Union Machine Co., of Bartlesville, Okla., by Samuel T. Steel, secretary and treasurer, in protest to House bill 8125, introduced by Mr. Berger; to the Committee on Interstate and Foreign Commerce.

3136. By Mr. GARDNER of Indiana: Petition of Floyd H. Halney and 22 other citizens, of Washington County, Ind., protesting against the enactment into law of the compulsory Sunday observance bill (H. R. 78), or any similar measure; to the Committee on the District of Columbia.

3137. Also, petition of Helen L. Stepp and nine other citizens, of Washington County, Ind., protesting against the enactment into law of the compulsory Sunday observance bill (H. R. 78), or any similar measure; to the Committee on the District of Columbia.

3138. By Mr. HALL of North Dakota: Petition of 17 citizens living at Rolette, N. Dak., against the passage of any bill to cripple the corner-card stamped envelope and their sale and distribution by the Government; to the Committee on the Post Office and Post Roads.

3139. Also, petition of four citizens living at Rolette, N. Dak., against the enactment of House bill 78, or any other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3140. By Mr. HADLEY: Petition of residents of Clallam County, Wash., protesting against the Lankford Sunday closing bill; to the Committee on the District of Columbia.

3141. By Mr. HARRISON: Petition of Sam T. Kite and others, against compulsory Sunday observance; to the Committee on the District of Columbia.

3142. By Mr. HASTINGS: Petition of citizens of Bunch, Checotah, and Muskogee Counties, Okla., urging legislation in behalf of Civil War veterans and their widows; to the Committee on Invalid Pensions.

3143. By Mr. HOPE: Petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3144. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3145. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3146. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3147. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3148. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3149. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3150. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3151. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3152. By Mr. JOHNSON of Texas: Petition of Robert Nicholson Seed Co., of Dallas, Tex., favoring reduction on present postage rates; to the Committee on the Post Office and Post Roads.

3153. By Mr. HOOPER: Petition of C. H. Anderson and one other resident of Augusta, Mich., protesting against the enactment of compulsory Sunday observance legislation for the District of Columbia; to the Committee on the District of Columbia.

3154. By Mr. LEATHERWOOD: Petition of sundry citizens of Salt Lake City, Utah, protesting against compulsory Sunday observance, and especially against House bill 78; to the Committee on the District of Columbia.

3155. Also, petition of Catherine Shanklin, of Clinton, Iowa, urging that immediate steps be taken to bring to a vote a Civil War pension bill; to the Committee on Invalid Pensions.

3156. By Mr. LINDSAY: Petition of council of Brooklyn Chapter of the Reserve Officers' Association of the United States, protesting against the injustice to the Organized Reserves of charging the cost of developing the Army Air Corps against any appropriations made for carrying on the work of the Organized Reserves; to the Committee on Appropriations.

3157. By Mr. LINTHICUM: Petition of Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, requesting favorable action on House bill 25, amendments to the present retirement act; to the Committee on the Civil Service.

3158. Also, petition of Griffith & Turner Co., and the Meyer Seed Co., of Baltimore, Md., requesting favorable action on House bill 9296, reduction of postal rates; to the Committee on the Post Office and Post Roads.

3159. By Mr. LOZIER: Petition of 73 citizens of Laredo, Mo., urging enactment of pension legislation; to the Committee on Invalid Pensions.

3160. By Mr. McDUFFIE: Petition of 13 citizens of Mobile, Ala., favoring an increase of pension to Civil War veterans and their widows; to the Committee on Invalid Pensions.

3161. By Mr. MOORE of Kentucky: Petition signed by Erma Covington, Austin Davis, E. L. Merideth, and 100 other citizens, of Warren County, Ky., urging that immediate steps be taken to bring to a vote a Civil War pension bill in order that relief may be accorded to needy and suffering veterans and widows; to the Committee on Invalid Pensions.

3162. By Mr. MOORE of Virginia: Petition of citizens of Accotink and Alexandria Counties, Va., against the compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3163. By Mr. O'CONNELL: Petition of the Antinational Origins Clause League, of Michigan, protesting against the national origins method of determining quotas; to the Committee on Immigration and Naturalization.

3164. Also, petition of council of Brooklyn Chapter of the Reserve Officers' Association of the United States, protesting against the injustice of the organized reserves of charging the cost of developing the Army Air Corps against appropriation made for the carrying on the work of the organized reserves; to the Committee on Appropriations.

3165. Also, petition of the Kee Lox Manufacturing Co., Rochester, N. Y., favoring the passage of a bill relative to the Cuban parcel post legislation; to the Committee on the Post Office and Post Roads.

3166. By Mr. ROBINSON of Iowa: Petition urging the passage of a Civil War widows pension bill, signed by about 30 citizens of Waterloo, Black Hawk County, Iowa; to the Committee on Invalid Pensions.

3167. By Mr. ROMJUE: Petition of O. W. Sitton, George L. Cameron, et al., of Hannibal, Mo., against passage of House bill 78; to the Committee on the District of Columbia.

3168. Also, petition of W. H. Turner, Dick Burnham, et al, of Macon County, Mo., against passage of House bill 78; to the Committee on the District of Columbia.

3169. By Mr. STEELE: Petition of 105 citizens of Atlanta, Fulton County, Ga., protesting against the passage of the Brookhart bill pertaining to motion pictures; to the Committee on Interstate and Foreign Commerce.

3170. Also, petition of 61 citizens of Campbell County, Ga., protesting against the passage of legislation enforcing compulsory Sunday observance; to the Committee on the District of Columbia.

3171. By Mr. STRONG of Kansas: Petitions of 62 citizens of Minneapolis, Kans., protesting against the passage of the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3172. By Mr. STRONG of Pennsylvania: Petition of citizens of Blairsville, Pa., urging that immediate steps be taken to bring to a vote a Civil War pension bill for veterans and widows; to the Committee on Invalid Pensions.

3173. By Mr. TEMPLE: Petition of True Blue Commandery, Knights of Malta, and Chartiers Valley Lodge, No. 77, Amalgamated Iron and Steel Workers, of Canonsburg, Pa., in support of House bill 23 and Senate bill 1727, known as the Dale-Lehlbach retirement bill; to the Committee on the Civil Service.

3174. By Mr. WINTER: Resolution adopted by Sheridan Commercial Club, protesting against further restriction of Mexican immigration; also resolution adopted by the Kiwanis Club, of Douglas, Wyo., protesting against the further restriction of Mexican immigration; to the Committee on Immigration and Naturalization.

3175. Also, petition against compulsory Sunday observance, signed by residents of Weston County, Wyo., and the citizens of Sheridan, Wyo.; to the Committee on the District of Columbia.

3176. By Mr. WYANT: Resolution of Council of Associated Building Trades of Philadelphia and vicinity, favoring legislation to appropriate $750,000,000 for increasing the strength and efficiency of the United States Navy; to the Committee on Appropriations.

3177. Also, petition of State Council of Pennsylvania, Junior Order of United American Mechanics, indorsing House bill 3; to the Committee on Immigration and Naturalization.

3178. Also, resolution of New Kensington (Pa.) Chamber of Commerce, favoring passage of Dale-Lehlbach bill (H. R. 25 and S. 1727); to the Committee on the Civil Service.

3179. Also, resolution of the Antinational Origins Clause League, protesting against national origins method of determining immigration quotas; to the Committee on Immigration and Naturalization.

3180. Also, petition of employees of Parnassus, Pa., post office, indorsing Senate bill 2108, House bills 7473, 9058, 9059, and House Joint Resolution 159; to the Committee on the Post Office and Post Roads.

3181. Also, resolution of directors of New Kensington, Pa., Kiwanis Club, indorsing Dale-Lehlbach bill (H. R. 25 and S. 1727); to the Committee on the Civil Service.

3182. Also, petition of I. N. Simon & Son, advocating legislation for the relief of farmers and others in some classes of mail matter; to the Committee on the Post Office and Post Roads.

---

# SENATE

## SATURDAY, February 4, 1928

### (Legislative day of Wednesday, February 1, 1928)

The Senate reassembled at 12 o'clock meridian, on the expiration of the recess.

### ROBERT W. STEWART—RECUSANT WITNESS

The Sergeant at Arms (David S. Barry) appeared and said: Mr. President; acting under instructions of a warrant issued to the Sergeant at Arms by the President of the Senate, Robert W. Stewart was taken into the custody of the Senate. He has applied for and obtained a writ of habeas corpus, which is returnable Tuesday, February 7.

Mr. WALSH of Montana. Mr. President, I offer the following resolution.

The VICE PRESIDENT. The clerk will read the resolution. The Chief Clerk read the resolution (S. Res. 133), as follows:

*Resolved*, That the Committee on Public Lands and Surveys be, and it hereby is, authorized in its discretion to employ counsel to represent the Senate in any proceedings taken by Robert W. Stewart to secure his release from the custody of the Sergeant at Arms in any court.

Mr. SMOOT. Mr. President, the resolution will have to go to the Committee to Audit and Control the Contingent Expenses of the Senate.

Mr. WALSH of Montana. I trust that the Committee to Audit and Control will be able to take the matter under immediate consideration.

I submit a further resolution, in the form of a motion. I move that the President of the Senate be directed to certify to the district attorney for the District of Columbia the report made on yesterday by the Committee on Public Lands and Surveys for appropriate action by that officer.

The VICE PRESIDENT. Without objection, the motion is agreed to. Does the Senator from Montana ask for the immediate consideration of the resolution submitted by him?

Mr. WALSH of Montana. It will have to go to the Committee to Audit and Control the Contingent Expenses of the Senate.

The VICE PRESIDENT. The resolution will be so referred.

Mr. FESS subsequently said: I ask leave to report Senate Resolution 133 from the Committee to Audit and Control the Contingent Expenses of the Senate with an amendment in the nature of a substitute, and I call the attention of the Senator from Montana [Mr. WALSH] to the report.

The PRESIDING OFFICER (Mr. BINGHAM in the chair). Without objection, the report will be received and the substitute resolution will be read.

The CHIEF CLERK. Strike out all after the word "*Resolved*" and insert:

That the Committee on Public Lands and Surveys be, and it hereby is, authorized to employ counsel at a cost of not to exceed $2,500, to be paid out of the contingent expenses of the Senate, to represent the Senate in any proceedings taken by Robert W. Stewart to secure his release from the custody of the Sergeant at Arms in any court.

Mr. WALSH of Montana. I ask unanimous consent for the immediate consideration of the resolution.

The resolution was considered by unanimous consent.

The amendment was agreed to.

The resolution as amended was agreed to.

Mr. HEFLIN obtained the floor.

Mr. KING. Mr. President, may I have the attention of the Senator from Montana?

The VICE PRESIDENT. Does the Senator from Alabama yield to the Senator from Utah?

Mr. HEFLIN. I yield for a question.

Mr. KING. I just came into the Chamber and I was wondering whether the last resolution which the Senator offered contemplates the abandonment of any policy of procedure which would bring Mr. Stewart before the Senate?

Mr. WALSH of Montana. Not at all. I am very glad that question has been asked.

Mr. KING. It looks as though it might be inconsistent.

Mr. WALSH of Montana. Not at all. Under the procedure which was contemplated, should Colonel Stewart appear here he would be relieved from the custody of the Senate at any time he would signify a willingness to answer the questions which were propounded to him. Thereupon the power of the Senate is gone; we could not hold him for a moment.

But, Mr. President, this is an offense, a grave offense, punishable by imprisonment. I think that the time has come when the dignity of the Senate of the United States ought to be recognized and it ought to be appreciated that it is no trifling affair to defy its authority, however high the recusant witness may stand. I am not content at all to excuse Colonel Stewart if he should now agree to testify. His offense is properly punishable, as was the offense of Mr. Harry F. Sinclair, who was sentenced to 90 days in the common jail.

Mr. CARAWAY. Mr. President, may I ask the Senator from Montana a question?

The VICE PRESIDENT. The Senator from Alabama has the floor. Does he yield to the Senator from Arkansas?

Mr. HEFLIN. I yield just for a question. I do not want the Senator to hold the floor, however.

Mr. CARAWAY. I just came into the Chamber. I understood a motion was made to certify the matter to the district attorney of the District of Columbia. Is that the plan?

Mr. WALSH of Montana. Yes.

Mr. CARAWAY. Have we ever had anything but delay in any matter that went down to the courts? Sinclair is out, and they have been pretending to try a contempt case before Judge Siddons since the memory of man runneth not to the contrary. It seems to me that anything which is certified down there we might as well say is merely off our hands and that the parties involved are in no danger of being punished.

Mr. GEORGE. Mr. President———

Mr. HEFLIN. I yield to the Senator from Georgia.