**Alison M. Clark, OSB No. 080579**
**Assistant Federal Public Defender**
**Email: alison_clark@fd.org**
**Elizabeth G. Daily, OSB No. 111758**
**Assistant Federal Public Defender**
**Email: liz_daily@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:19-cr-00407-SI |
| Plaintiff, | |
| v. | DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT |
| AGUSTIN MACHIC-XIAP, | |
| Defendant. | |

## TABLE OF CONTENTS

                                                                                                                        **Page**

Introduction ................................................................................................................................... 1

A.     Whether the Court examines the original enactment of the crime of illegal reentry in 1929 or its later recodification in 1952, the record firmly supports a finding of anti-Latino racial animus within the meaning of *Arlington Heights*. ................................ 2

        1.     The racial animus that motivated the 1929 Undesirable Aliens Act controls the present-day 8 U.S.C. § 1326 because the crime of illegal reentry has remained continuously in effect and was never reenacted with different congressional intent. ....................................................................................... 2

        2.     Alternatively, the law's recodification in 1952 was also motivated at least in part by racial animus. .............................................................................. 6

B.     Comprising 99% of illegal reentry defendants, Latinos bear the disparate burden of the racially tainted legislation and are additionally harmed by racially skewed prosecution and sentencing outcomes compared with offenders across other offense categories. .................................................................................................................. 9

        1.     Subset disparity #1: The government is exceptionally unlikely to decline to prosecute illegal reentry cases. ............................................................... 10

        2.     Subset disparity #2: Illegal reentry offenders are dramatically less likely to exercise the right to trial. ......................................................................... 11

        3.     Subset disparity #3: Illegal reentry offenses are less severe under the Guidelines but more likely to result in incarceration. ............................. 11

        4.     Subset disparity #4: Illegal Reentry cases account for increased disparities among white and Latino defendants. ...................................................... 12

C.     This Court may grant Mr. Machic-Xiap relief and find 8 U.S.C. § 1326 unconstitutional while recognizing that Congress may enact a future illegal reentry statute that passes *Arlington Heights* review. ................................................... 13

Conclusion .................................................................................................................................. 18

**Introduction**

Following an evidentiary hearing (Docket #43, 47, 49), the defendant Agustin Machic-Xiap, through counsel, submits this Post-Hearing Brief in support of his motion to dismiss (Docket #28). The question before the Court is whether illegal reentry, 8 U.S.C. § 1326, violates the Equal Protection Clause because it was enacted with discriminatory intent and has a discriminatory impact on Mexican and other Latino individuals. *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252, 265 (1977). At this point, the Court has received extensive written arguments and comprehensive testimony from academic subject experts. Against that backdrop, Mr. Machic-Xiap's Post-Hearing Brief focuses on three objectives.

First, Mr. Machic-Xiap addresses how the current-day illegal reentry law, § 1326, fails the *Arlington Heights* intent test whether the originating intent is considered in 1929 or in 1952. On the one hand, the Court's analysis should begin and end with the intent of the original 1929 Congress because, despite formalistic recodification, the same crime has been carried forward in substantially the same form without demonstrating that Congress formulated any new intent for the reenactment. Alternatively, even if the Court considers the recodification of the law in 1952 to be the originating event, abundant historical evidence confirms that anti-Latino racial animus remained a motivating factor for the continuation of the crime. Congress never confronted or rectified the racial motivation through any subsequent legislation or reform.

Second, Mr. Machic-Xiap drives home his proof of disparate impact with additional evidence showing that § 1326 bears more heavily on Latinos as a racial group. Not only are about 99% of illegal reentry defendants Latino, but this population is subject to harsher treatment in

prosecution and sentencing outcomes under § 1326 as compared to other, more racially diverse groups of criminal defendants.

Third, Mr. Machic-Xiap answers this Court's question about how a hypothetical future statute that similarly criminalizes reentry could ever meet constitutional equal protection standards given the statutory history of racial discrimination. In short, the bar is low. Applying the equal protection test from *Arlington Heights* and its progeny, an acknowledgement of the historical animus and a purposeful reenactment of the provision for race-neutral reasons would suffice. At this point, however, Congress has not acted. It has carried the same law forward based on a historical record rife with improper racial motivation.

Because Mr. Machic-Xiap has established that § 1326 was enacted with discriminatory purpose and has a discriminatory impact, the burden is on the government to prove that 8 U.S.C. 1326 would have been similarly enacted in the absence of racial prejudice. It cannot carry that burden and, accordingly, this Court should grant Mr. Machic-Xiap's motion to dismiss.

A.  **Whether the Court examines the original enactment of the crime of illegal reentry in 1929 or its later recodification in 1952, the record firmly supports a finding of anti-Latino racial animus within the meaning of *Arlington Heights*.**

  1.  *The racial animus that motivated the 1929 Undesirable Aliens Act controls the present-day 8 U.S.C. § 1326 because the crime of illegal reentry has remained continuously in effect and was never reenacted with different congressional intent.*

The evidence of racial animus in the initial enactment of the Undesirable Aliens Act of 1929 is well established. *See* Tr. 307 (noting Court's assessment that "I feel reasonably confident that the Undesirable Aliens Act is rife with strong evidence showing that it was motivated by racial animus."). To find § 1326 unconstitutional, the Court need look no further than the intent behind the original 1929 enactment, because the same illegal reentry law has been continuously in effect.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), and *Abbott v. Perez*, 138 S. Ct. 2305 (2018), the Supreme Court has provided bookends for when courts should examine the intent of the original legislature versus a later legislature enacting a similar provision.

First, in *Underwood*, the Supreme Court struck down a 1901 Alabama constitutional provision that disenfranchised individuals convicted of crimes involving moral turpitude. 471 U.S. at 223, 232-33.[1] The Court found that the provision was originally enacted to disenfranchise blacks, *id.* at 229, but the state nevertheless argued that the "events occurring in the succeeding 80 years had legitimated the provision" because the most blatantly discriminatory crimes had been struck down. *Id.* at 232-33. The Court rejected that argument because it failed to address the intent surrounding the law's original enactment: "Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that *its original enactment was motivated by a desire to discriminate against blacks on account of race* and the section continues to this day to have that effect." *Id.* at 233 (emphasis added).

Over 30 years after *Underwood*, the Supreme Court confronted a completely different scenario in *Perez*.[2] In that case, the path that led to the high court started with Texas's 2011 redistricting plans. However, the 2011 plans were caught up in litigation over racial gerrymandering and never enacted. Instead, the Texas Legislature in 2013 adopted court-imposed interim plans. In assessing whether those 2013 plans were also racially motivated, the Supreme

---

[1] Because Victor Underwood was the named plaintiff rather than the institutional defendant, the case is referred to as "*Underwood*."

[2] Because Shannon Perez was the named plaintiff rather than the institutional defendant, the case is referred to as "*Perez*."

Court expressly distinguished *Underwood* and concluded that the intent of the Legislature in 2013 controlled:

> In these cases, we do not confront a situation like the one in [*Underwood*]. Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature. The 2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature. . . . Under these circumstances, there can be no doubt about what matters: It is the intent of the 2013 Legislature.

*Perez*, 138 S. Ct. at 2325.

The difference between *Underwood* and *Perez* lies in determining whether the legislature formed a new intent for the challenged law following the original enactment. The theory of *Arlington Heights* is that the legislature's racist intentions—combined with its racist impact—make the law unconstitutional. 429 U.S. at 264-65. In *Underwood*, simply allowing the law on the books to remain did not demonstrate any new or modified justification for its existence. Therefore, the intent of the original enactment controlled. By contrast, in *Perez*, the legislature had no choice but to enact a new redistricting plan as a replacement, with its own independent justification.

The present case falls far closer to *Underwood* than *Perez*. Although Congress reenacted the Undesirable Aliens Act in 1952, it did so as part of a global recodification of all the nation's immigration laws, bringing together in a single omnibus bill the country's more than 200 immigration and naturalization provisions previously scattered throughout the United States Code. *See* Doug Keller, *Re-Thinking Illegal Entry and Reentry*, 44 Loy. U. Chi. L.J. 65, 83 (2012); S. Rep. 82-1137, at 1 (Jan. 29, 1952). The resulting statute made "numerous technical and minor changes" to the existing laws, along with a handful of significant policy changes. S. Rep. 82-1137 at 3. In particular, the recodification of illegal reentry as 8 U.S.C. § 1326 occurred with minimal

comment or debate, either in the 925-page Senate Judiciary Committee Report or in the House and Senate floor debates.[3]

Because the 1952 reenactment was a formalistic recodification of the Undesirable Aliens Act, not a reexamination of the law's purpose, Congress was never called upon to debate the wisdom of keeping the crime of illegal reentry. As a matter of statutory interpretation principles and longstanding precedent, a formalistic recodification of the same law is presumed to lack substantive import. *See Bear Lake & River Waterworks & Irrigation Co. v. Garland*: 164 U.S. 1, 11-12 (1896) (regardless of "a formal repeal," when a later legislature reenacts a similar provision, "the new act should be construed as a continuation of the old[.]"); *United States v. Ryder*, 110 U.S. 729 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed."). A recodification, no more than a mere legislative amendment, does not signal a breaking point in the law's existence. *See, e.g.*, *Sutherland Statutory Construction* § 22:1 (7th ed.) ("[A]ny change of the scope or effect of an existing statute, . . . which does not wholly terminate its existence, . . . is treated as amendatory.").

Here, Congress in 1952 merely edited and readopted the crime that already existed as part of a larger project to reorganize the immigration laws. Because the record does not demonstrate that Congress formulated a new intent, the *Arlington Heights* analysis continues to revolve around the intent of the enacting Congress in 1929.

---

[3] The Immigration and Naturalization Systems of the United States, Report of the Committee on the Judiciary Pursuant to S. Res. 137: A Resolution to Make an Investigation of the Immigration System, S. Rep. No. 81-1515 (April 20, 1950); 98 Cong. Rec. 4296-4446, 4967-5964.

**Page 5   DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

> 2. *Alternatively, the law's recodification in 1952 was also motivated at least in part by racial animus.*

Even if this Court were to consider Congress's intent when it recodified illegal reentry in 1952, the end result should remain the same. Under the "sensitive inquiry" demanded by *Arlington Heights*, the record amply demonstrates that race remained a motivating factor for the continuation of the 1929 Act. 429 U.S. at 266. Congress in 1952 retained white-preference as a driving force in fashioning its immigration policy. The crime of illegal reentry continued to serve as a tool to marginalize Mexican and other Latino immigrants, who were deemed undesirable for permanent settlement. In keeping the law, Congress understood and intended for it to continue to serve the same purpose for which it was enacted.

As Professor Gonzalez O'Brien explained, following World War II and the Nazi holocaust, the explicit racism of the eugenicist movement had become less palatable in mainstream American politics. Tr. 192. For that reason, the McCarran-Walter Act repealed the most obvious race-based immigration classification: the complete exclusion of Asian immigrants from naturalization. Tr. 195. However, white-preference remained baked into the Act's readjusted quotas. For example, the law lumped together all of the countries comprising the Asia-Pacific Triangle into a single, miniscule quota, but provided individual, much larger quotas for European countries with primarily white populations. Tr. 157. The number of entrants permitted from all of the Asian countries together equaled the number of entrants permitted from Sweden alone. Tr. 195-96. All individuals of Asian descent counted against that small quota, regardless of their country of origin. Tr. 196.

The fact that the quota system was racially skewed to favor immigrants from predominantly white, European countries was not lost on the legislators. One Representative commented that he

**Page 6  DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

agreed "there is something to" the idea of racial origin predicting criminality, and suggested that "the Western European races have made the best citizens of America." Tr. 193-94. The bill's sponsor, Senator Patrick McCarran, a known anti-Semite, was consumed with threat of communism and viewed the 1952 Act as a necessary tool to "preserve this Nation, the last hope of Western civilization" against efforts to "overrun, pervert[], contaminate[], or destroy[]" it. Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 237 (2014) ("*Impossible Subjects*").[4] President Truman vetoed the Act "principally for its racist features," but Congress overrode his veto. *Impossible Subjects*, at 239; Ex. S. The 1952 Act reinforced the theme of the 1929 Act that immigration laws should foreclose the assimilation of "undesirable" aliens who could undermine the country's white cultural identity.

Even while Congress debated whether the national origins quota system was racially discriminatory, there was minimal if any discussion of fair and lawful policies for Mexican immigration in 1952. Instead, to the extent that Congress addressed Mexican immigration, it did so through the racialized lens of the "wetback problem." 98 Cong. Rec. 793 (Feb. 5, 1952). The term "wetback" was used to describe individuals entering the United States illegally from south of the Rio Grande River and carried many of the same negative connotations about Mexicans as a racial group that were present in the debate leading to the Undesirable Aliens Act. Tr. 180; Tr. 184-91; Tr. 225. While originating with illegal status, an early 1950s sociological study noted that

---

[4] Senator Harry Reid described Senator McCarran as "one of the most anti-Semitic . . . one of the most anti-black, one of the most prejudiced people who has ever served in the Senate." Richard N. Velotta, *Harry Reid: Pat McCarran's Name Shouldn't Be On Anything*, Las Vegas Sun (Aug. 25, 2012), http://www.lasvegassun.com/news/2012/aug/25/harry-reid-pat-mccarrans-name-shouldnt-be-anything.

**Page 7    DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

legal and illegal entrants were "lumped together as 'Mexicans' and the characteristics that are observed among the wetbacks are by extension assigned to the local people." Lyle Saunders & Olen Leonard, *The Wetback in the Lower Rio Grande Valley* 70 (1951); Tr. 184-85.

Deputy Attorney General Peyton Ford lauded search provisions in the McCarran Walter-Act as "aid[ing] in taking action against the conveyors and receivers of the wetback." Ex. X at 8. Just three months before the McCarran-Walter debate, the same Congress passed a discrete piece of alien harboring legislation referred to as the "Wetback Bill" (S.B. 1851, Mar. 20, 1952). Senator Kilgore explained that "[p]ractically every state of the Union has had the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminal. Because they are 'wetbacks,' they can be kept in a state of peonage." 98 Cong. Rec. 793. At the same time, significant barriers to lawful entry remained for those crossing the southern border, particularly as differentiated from entry at the northern border. Tr. 181, 200. Yet Congress chose to recodify and make harsher illegal reentry while knowing that the crime disparately targeted Latinos.

Under *Arlington Heights*, "[a] historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016). In this case, Congress in 1952 not only failed to repudiate the 1929 racial animus, but the broader historical record confirms that Congress continued illegal reentry to serve the same purposes. Just as in 1929, Mexican immigrants were a desired temporary labor force. When immigration from the south exceeded that permissible purpose, it became the "wetback problem," to be solved through the hammer of illegal reentry and anti-harboring laws.

The record as a whole confirms that racial animus continued to motivate Congress in 1952 when it recodified illegal reentry as 8 U.S.C. § 1326.

**B.      Comprising 99% of illegal reentry defendants, Latinos bear the disparate burden of the racially tainted legislation and are additionally harmed by racially skewed prosecution and sentencing outcomes compared with offenders across other offense categories.**

Legislation motivated in part by racial animus violates equal protection only when it also disparately impacts the disfavored group. *See Arlington Heights*, 429 U.S. at 265–68. Part of this Court's examination includes the "[t]he impact of the challenged legislation and whether it bears more heavily on one race than another." *Arce v. Douglas,* 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

In Mr. Machic-Xiap's opening brief, he provided statistical evidence establishing that 98 to 99% of illegal reentry offenders are Latino. (Docket # 28 at 27-30, *see also* Ex. T, Table 6). Additionally, Mr. Machic-Xiap offered the affidavit of Dr. Kelly Lytle Hernandez (Exhibit A at 7-8), which found that since enactment in 1929, that the illegal reentry law has been overwhelmingly applied to Latinos. Professor Gonzalez O'Brien confirmed this same disparity, stating that "[t]he majority of prosecutions and convictions under § 1326 or under even the Undesirable Aliens Act have always been disproportionately individuals who were either Latino or of Mexican descent." Tr. 205. The government has not disputed that Latinos are overwhelmingly represented among illegal reentry defendants. Just like the Supreme Court did in *Underwood* in 1985, this Court may "simply observe that [the] original enactment [of § 1326] was motivated by a desire to discriminate" and that the law "continues to this day" to have that effect. 471 U.S. at 227-28. This is enough to satisfy the discriminatory impact part of the *Arlington Heights* test.

It turns out that the extreme racial disparity in a 99% Latino defendant group also exposes a subset of racially disparate features concerning illegal reentry prosecutions. Looking deeper at the disparity, this Court will find additional racially-skewed harm that illustrates why racially-motivated legislation is so corrosive and offensive to equal justice under law. Mr. Machic-Xiap has identified at least four data subsets illustrating how the illegal reentry prosecutions disparately harm this 99% Latino group as opposed to other prosecutions for offenses with a more racially diverse defendant group.

    1.    *Subset disparity #1: The government is exceptionally unlikely to decline to prosecute illegal reentry cases.*

More than any other criminal offense category, illegal reentry offenses are the least likely to be declined for prosecution. Ex V. In fiscal year 2015, for instance, the government only concluded 0.6% of their cases involving immigration crimes with a "declined prosecution." In fiscal year 2016, the government only declined to prosecute 0.7% of immigration cases. (available at Federal Justice Statistics, 2016 Statistical Tables https://www.bjs.gov/content/pub/pdf/fjs16st.pdf). The conviction rate was around 98 percent. In cases involving guns, drugs, child pornography, fraud and other crimes, the government is far more likely to decline prosecution. The government drops cases for all kinds of reasons, including lack of evidence, death or unavailability of the defendant. This rarely happens in illegal reentry cases, which are the least likely to be voluntarily declined according to the Federal Justice Statistics. This 99% Latino group is disparately impacted.

> 2. *Subset disparity #2: Illegal reentry offenders are dramatically less likely to exercise the right to trial.*

More than any other group of alleged federal offenders, defendants accused of illegal reentry are the least likely to have a trial. Mr. Machic-Xiap identified this disparity with the assistance of Dr. Michael Light, an internationally recognized authority on sentencing demographics and immigration. *See* Dr. Light's Report and Curriculum Vitae, Ex. Y & Z.

"The only other offense that even comes close to such a small number of trials are 2A3.5 cases, 'Failure to Register as a Sex Offender' [but] even at a 1% trial rate, this means that 2A3.5 cases are over three times more likely to go to trial than 2L1.2 cases." Light Report, Ex. Y at 4. To state the obvious, illegal reentry matters are felony cases with significant punitive and administrative consequences. The waiver of rights in these cases bears significance. With fewer trials, there are fewer checks on the government's authority. Considering the racial motivations behind enactment of illegal reentry, this unusually low number of defendants asserting their trial rights raises concerns of systematic and prejudicial coercion.

> 3. *Subset disparity #3: Illegal reentry offenses are less severe under the Guidelines but more likely to result in incarceration.*

Illegal reentry cases are among the most likely to result in incarceration despite having a relatively lower offense level severity under the Federal Sentencing Guidelines. According to the statistics assembled by Dr. Light, "97% of 2L1.2 cases result in a prison sanction, a higher proportion than Drug Trafficking (2D1.1), Larceny (2B1.1), Money Laundering (2S1.1), Tax Evasion (2T1.1), and even Firearms offenses (2K2.1)." Light Report, Ex. Y at 4. Measured by offense level, cases that followed USSG 2L1.2 (which would be synonymous with all federal reentry cases) are the least severe among the top 10 most numerous types of sentencing guideline

cases, but are punished more frequently with incarceration. For example, "the average offense level for both drug trafficking (2D1.1) and money laundering (2S1.1) cases is roughly 2.5 times the average offense level for 2L1.2 cases. Yet, 2L1.2 cases are more likely to result in a prison sanction." Light Report, Ex. Y at 5.

Using a multivariate regression analysis, Dr. Light comparatively examined the illegal reentry sentencing data across other types of federal offenses controlling for the three most important determinates of sentence in U.S. Federal Courts: the final offense level, the final criminal history category, and the statutory minimum penalty. The results showed that sentencing differences for reentry offenders under USSG 2L1.2 are not driven by these factors. Instead, § 1326 defendants are effectively guaranteed to receive a prison sentence. The only exception is that Failure to Register as a Sex Offender cases under USSG 2A3.5 had a slightly higher likelihood of incarceration. Other than that, "none of the other offenses has a predicted probability above 95%, including drug trafficking, sexual exploitation of a minor, robbery, money laundering, or firearms offenses." Light Report, Ex. Y at 7.

    4.    *Subset disparity #4: Illegal Reentry cases account for increased disparities among white and Latino defendants.*

Dr. Light's final analysis accounted for how much of the sentencing gap between white and Latino offenders is attributable to illegal reentry cases. The Sentencing Commission data reveals a 13.5 percentage point gap between sentencing outcomes favoring white offenders over similarly-situated Latinos. Light Report, Ex. Y at 8. When the variable of the case being an illegal reentry (USSG 2L1.2) offense is factored in, the relative incarceration gap between white and Hispanic offenders decreases down to an 8-percentage point gap. Similarly-situated Latinos are

still more likely to be incarcerated, but isolating USSG 2L1.2 offenders decreases the amount of Hispanic-white disparity in federal sentences by roughly 40 percent.

One possible conclusion is that racially-motivated statutes are more likely to carry disparate racial harm. Presumably, most federal offense statutes do not have provably racist origins similar to illegal reentry. When the racially-motivated statute is removed from the comparative analysis, the racial skew of sentencing outcomes abates.

C. **This Court may grant Mr. Machic-Xiap relief and find 8 U.S.C. § 1326 unconstitutional while recognizing that Congress may enact a future illegal reentry statute that passes *Arlington Heights* review.**

With respect to facially neutral but racially-motivated statutes, this Court asked the parties to address whether a future illegal reentry statute could pass the muster of an equal protection review if a future Congress enacted a law similar to the racially-motivated original, particularly if the historical record demonstrates that some modicum of anti-Latino racism remains. In other words, in light of historical racism, can Congress enact a constitutional illegal reentry statute today?

The short answer is yes, and it would not be difficult for Congress to succeed. Reconciling our racist past is a quintessentially American project. As Justice Kavanaugh recently observed, "this Court has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1418 (2020) (quoting *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017)) (Kavanaugh, J., concurring). Congress has no lesser duty.

The Supreme Court's two-step burden shifting test articulated in *Arlington Heights* and again in *Underwood* is particularly apt when confronting historical and deeply-ingrained racial

**Page 13 DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

animus. Under the two-part procedure, once racial discrimination is shown to have been "a 'substantial' or 'motivating' factor behind enactments of law, the burden shifts [from the plaintiff] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Underwood*, 471 U.S. at 228. In *Arlington Heights*, the Court found no equal protection violation and pointed out that "legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." 429 U.S. at 268.

Following this Court's hypothetical, if a future litigant raised an equal protection claim concerning the history of racial discrimination, a future Congress could rely on its law-making record to rebut the inference of invidious purpose. While future courts could recognize plausible concern about the intersection of racism and immigration given the historical record, a future Congress could ensure compliance with the Constitution by conscientiously debating the question and decisively breaking from prior motivations of eugenics and so-called undesirable racial characteristics. *See, e.g.*, *Cotton v. Fordice*, 157 F.3d 388, 398 (5th Cir. 1998) (recognizing "the possibility that[,] by amendment, a facially neutral provision . . . might overcome its odious origin" and finding that occurred where a disenfranchisement law had been amended to lessen its discriminatory impact); *Hayden v. Paterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (examining the intent of a later amendment where the state made a *substantive* change in its law through a deliberative process in an atmosphere free of racial bias). All that *Arlington Heights* and *Underwood* require is for the government to demonstrate that legislation was enacted without reliance on discriminatory intent.

**Page 14 DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

There is good reason to believe Congress can rectify this unconstitutional reentry law. As Dr. Gonzalez O'Brien pointed out during his testimony, Congress exercised this method of purposeful legislation when it ended racial exclusions based on Asian ancestry and removed quotas that were harmful to Eastern Europeans and others. The scholarship of UC Davis law professor Gabriel Chin, cited by both parties, further demonstrates that Congress may acknowledge a problem of discrimination and make affirmative steps away from racism. But that has not happened yet with criminal illegal reentry codes. As explained by Professor Gonzalez O'Brien, "th[e] racial animus that was originally the motivating factor behind the passage of what would become § 1326 in 1929 . . . is never confronted. [It] is never discussed, [but] simply implemented -- codified, recodified, and then reenacted without any discussion of the history of it, without any consideration." (Tr. 211). Professor Chin also declared to this Court that he could "recall no evidence from my reading of the legislative history that Congress closely scrutinized provisions like § 1326 to ensure that they did not carry forward any discriminatory purpose or effect." Chin Declaration, Docket #38, Ex. P.

It is also not a foregone conclusion that illegal reentry would exist in similar substance to its present form in the absence of racial animus or that Congress would adopt the same legislation again, given the chance. Retributive punishment is not the only way to address illegal border entries. The Law Library of Congress has compiled an international survey of illegal entry codes. Law Library of Congress, *Criminalization of Illegal Entry Around the World* ((Aug., 2019), https://www.loc.gov/law/help/illegal-entry/illegal-entry.pdf. Globally, criminalizing illegal entry is not the exclusive means to pursue border security. It is not even the uniform mode among Western democracies. In the Czech Republic, Portugal, and Spain for instance, there are no illegal

Page 15 DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT

entry codes and border violations are often an administrative matter. *Id.* Other countries treat illegal entry offenses as punishable anywhere from days to years in custody. The United States' illegal reentry laws are on the harsher side of the survey. Combined with the fact that tens of thousands of Latinos are prosecuted every year for this offense, the scale of how we police and punish migration is exceptional.

There is nothing beyond speculation to support the conclusion that, in the absence of explicit motivations like eugenics and racialized farm labor subjugation, illegal reentry would have been criminalized in the United States in the same way with the same outcomes. Looking back, dissenting 1929 lawmakers suggested softening the law with a statute of limitations to avoid criminalizing long-time undocumented residents of the United States. (Statement of Congressman Samuel Dickstein of New York, Ex. G at 35). That would have changed things. Other alternative histories would feature a guest agricultural worker program actually commensurate with state-by-state farm labor needs or more achievable paths to citizenship. Congress could have enacted an illegal presence law that criminalized visa overstays equally to those who enter illegally over a land border. What happened instead was a 1929 criminal immigration enforcement scheme that is racially targeted and that has never been substantially changed or reconsidered in the following years.

With the historical animus and blatant disparities in implementation firmly established, there is strong reason to believe that a new Congress, in enacting a new illegal immigration deterrence statute, would fiercely debate the racial and economic equity of its policy. There is already a bill with 44 co-sponsors entitled "A New Way Forward" (H.B. 5383) that proposes major

changes to criminal border enforcement.[5] Whether that bill becomes law or something else, the Court would have the benefit of Congress's debate and the articulated reasons for its action. Although that would be a future matter for the future Court to address, when Congress articulates race-neutral reasons for a law's reenactment, while also acknowledging the law's racist history, there can be little question that Congress formulated a new intent. This would easily shifts the *Arlington Heights* test to the reenactment rather than the original law.

What remains clear is that the Court's hypothetical never came to pass in the history to date of § 1326. This Court appears to agree that the Undesirable Aliens Act of 1929 criminalized illegal reentry in part out of racial animus toward Mexicans and Latinos. In the ensuing decades, Congress has silently carried the law forward in the same basic form in which it was originally enacted, without looking back to consider or remedy the law's prejudiced origins. An extreme racial disparity shows up not only in *who* is prosecuted for illegal reentry, but also *how* this group of defendants is prosecuted: with fewer dismissals, fewer trials, and more incarceration than similarly situated non-Latino offenders. The existing version of 8 U.S.C. § 1326 violates the equal protection standard of *Arlington Heights*.

---

[5] Available at https://www.congress.gov/bill/116th-congress/house-bill/5383/text.

**Page 17 DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

**Conclusion**

For all of the foregoing reasons, Mr. Machic-Xiap respectfully requests that the Court deem 8 U.S.C. § 1326 unconstitutional and grant his motion to dismiss.

Respectfully submitted this 31st day of March, 2021.

*/s/ Elizabeth G. Daily*
Elizabeth G. Daily

*/s/ Alison M. Clark*
Alison M. Clark
Attorneys for Defendant