# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:19-cr-407-SI |
| v. | **OPINION AND ORDER** |
| **AGUSTIN MACHIC-XIAP**, | |
| Defendant. | |

Scott Erik Asphaug, Acting United States Attorney, and Sarah Barr, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Alison M. Clark and Elizabeth G. Daily, Assistant Federal Public Defenders, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Augustin Machic-Xiap is a Guatemalan national. A grand jury indicted Mr. Machic-Xiap for violating 8 U.S.C. § 1326 by unlawfully reentering the United States after having been previously arrested and denied admission, excluded, deported, or removed. Mr. Machic-Xiap moves to dismiss the indictment. He asserts that § 1326 is unconstitutional because it violates his right to equal protection of the law, as guaranteed to all persons under the Fifth Amendment to the United States Constitution. Mr. Machic-Xiap argues that Congress originally enacted the

PAGE 1 – OPINION AND ORDER

criminal offense of illegal reentry with a "discriminatory purpose" and that the law as continuously applied has a "disparate impact" against persons coming from Latin America, even though it is facially neutral.[1] Invoking the factors set out by the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ("*Arlington Heights*"), Mr. Machic-Xiap contends that the indictment must be dismissed.

Congress first criminalized illegal reentry in a law called the "Undesirable Aliens Act of 1929" (1929 Act). Twenty-three years later, Congress enacted § 1326 as part of a comprehensive overhaul of the nation's immigration laws in the Immigration and Nationality Act of 1952 (INA), also called the "McCarran-Walter Act." The INA was enacted after Congress overrode the veto of President Harry S. Truman. As discussed below, almost everyone whom the United States has prosecuted for the crime of illegal reentry under § 1326 or its predecessor laws has come from Latin America, *i.e.*, Mexico, Central America, or South America.

Also as discussed below, the Court finds that racism has permeated the official congressional debate over United States immigration laws since the late 19th and early 20th centuries, including the 1929 Act. Although some members of Congress in 1952 hoped that the INA would eliminate the bigotry of earlier immigration legislation, especially anti-Asian bigotry, other members of Congress at that time continued to express statements exhibiting overt racial, ethnic, or religious prejudices. Indeed, new expressions of prejudice, evidenced by Congress's frequent use in the 1950s of the derogatory epithet "wetback" to describe immigrants from Latin America, emerged during the debate leading to the enactment of the INA.

---

[1] In relevant part, § 1326 provides: "[A]ny alien who (1) has been denied admission, excluded, deported, or removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States," without permission from the Attorney General or an exemption from that requirement, "shall be fined under title 18, or imprisoned not more than 2 years, or both." 8 U.S.C. § 1326(a).

Proving that racism "motivated" a specific congressional act sufficient to strike down that law as unconstitutional, however, is not easy. Indeed, this district court is unaware of any federal appellate decision holding that a facially neutral act passed by Congress was motivated by racial, ethnic, or religious animus. Although the Court also finds that § 1326 disproportionately affects persons coming to the United States from Latin America, disparate impact, by itself, is not enough to strike down a facially neutral law. There also must be evidence that Congress, as a body and distinct from a handful of individual members, intended that disparate effect.

Mr. Machic-Xiap presents significant and persuasive evidence of racial animus directed against persons coming from Latin America, especially as shown in the legislative history of the 1929 Act, which is a precursor to § 1326. The Supreme Court, however, has cautioned federal courts not to attribute the unjust prejudices of certain legislators to an entire legislative body. Moreover, even the motivations of earlier legislative bodies provide only limited evidence of improper motivation for later enactments. This presents a serious hurdle for Mr. Machic-Xiap's motion. In addition, Mr. Machic-Xiap presents scant evidence showing the existence of other indicators described by the Supreme Court, such as racist statements by "many prominent" supporters of the challenged law (here, § 1326, not the 1929 Act), procedural or substantive irregularities in the enactment of the challenged law, or a "sequence of events" suggesting that racial animus motivated Congress to enact the challenged law. The lack of evidence on these points further hampers Mr. Machic-Xiap's argument.

Racism is an invidious and, unfortunately, continuing presence in the United States. Mr. Machic-Xiap has presented strong and disconcerting evidence about the role that racism has played in the enactment, reenactment, and revision of the nation's immigration laws, especially those passed in the first three decades of the 20th century. Mr. Machic-Xiap has not, however,

satisfied his heavy burden of proving that racism motivated Congress to enact § 1326 specifically. Without such evidence, the Court may not, consistent with both established Supreme Court precedent and appropriate regard for the separation of powers among the branches of government, strike down a facially neutral congressional enactment as unconstitutionally motivated. For this reason, the Court must deny Mr. Machic-Xiap's motion to dismiss the indictment. As noted below, however, when enacting future immigration legislation, especially comprehensive immigration legislation, a future Congress may explicitly disavow earlier expressions of past racism. Indeed, a healthy respect for the principle of a nation learning from its mistakes may even advise Congress to do so.

## STANDARDS

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although the words "equal protection" do not appear in the Fifth Amendment's text, the Fifth Amendment's Due Process Clause includes an equal protection component and "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). A facially neutral statute can violate equal protection principles if it both has a racially disparate impact and the legislative body was motivated to enact the statute at least in part by racism. *See Arlington Heights*, 429 U.S. at 265-66.

"Inquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Because "[r]arely can it be said that a legislature or

administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one," a more nuanced analysis is necessary. *Id*. at 265.

To assist with this delicate endeavor, the Supreme Court has provided a non-exhaustive list of factors to consider when determining whether government action has as a motivating factor an invidious purpose. First, "[t]he historical background of the decision is one evidentiary source." *Id*. at 267. Second, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.* Third, significant "[d]epartures from the normal procedural sequence" or "[s]ubstantive departures" from "the factors usually considered important by the decisionmaker" "might afford evidence that improper purposes are playing a role." *Id.* Fourth, whether the effect of the action "'bears more heavily on one race than another' may provide" evidence of animus. *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)) (citation omitted).

Finally, the legislative history of a statute, "especially where there are contemporary statements by members of the decisionmaking body" is sometimes probative. *Id.* at 268. Courts must use caution, however, when seeking to glean a *legislature's* motivations from the statements of a handful of *lawmakers*. *See O'Brien*, 391 U.S. at 383-84 (noting that although reliance on legislative history is appropriate when courts interpret ambiguous statutes, "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it"); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349-50 (2021) ("And while the District Court recognized that the [one legislator's] 'racially-tinged' video helped spur the debate about ballot collection, it found no evidence that the legislature as a whole was

imbued with racial motives."). After all, legislatures are entitled to a presumption of good faith, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018), and "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384.

The views of an earlier Congress "form a hazardous basis for inferring the intent of' a later one." *See United States v. Price*, 361 U.S. 304, 313 (1960). "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)) (alteration in original). Federal appellate courts have upheld state statutes nearly identical to statutes the same courts have previously found to be motivated by racial animus when a new legislature passed the later statute. *See, e.g.*, *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 298, 303 (4th Cir. 2020). Instead, the motivations of an earlier legislature represent historical background, which is just "'one evidentiary source' relevant to the question of intent." *Abbott*, 138 S. Ct. at 2325 (quoting *Arlington Heights*, 429 U.S. at 267).[2]

The *Arlington Heights* factors are not exhaustive and no single factor is individually dispositive. 429 U.S. at 268. "Whenever a challenger claims that a . . . law was enacted with

---

[2] The Supreme Court has not explicitly addressed the import of the motivations of an earlier legislature when a later legislature merely reauthorizes (or silently reenacts) earlier legislation. *See Abbott*, 138 S. Ct. at 2325 ("Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature."). Even in that situation, however, there is good reason to be cautious about affording significant weight to the motivations of the earlier legislature. *See Brnovich*, 141 S. Ct. at 2349 n.22 (endorsing a district court's finding that evidence of discriminatory intent by an earlier legislature "had less probative value for inferring the purpose behind [the challenged action] because the bills were passed 'during different legislative sessions by a substantially different composition of legislators'") (quoting *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 881 (D. Ariz. 2018)); *Abbott*, 138 S. Ct. at 2325-26 (criticizing the district court for looking for evidence that the new legislature had "cured" the discriminatory "taint" of earlier legislation).

discriminatory intent, the burden of proof lies with the challenger. . . ." *Abbott*, 138 S. Ct.

at 2324. If the challenger satisfies that burden, the burden then shifts to the Government to show

that "the same decision would have resulted even had the impermissible purpose not been

considered." *Arlington Heights*, 429 U.S. at 270 n.21. Both the challenger and, if necessary, the

Government satisfy their respective burdens by a preponderance of the evidence. *Hunter*, 471

U.S. at 225.[3]

### FINDINGS OF FACT[4]

Section 1326 provides that "any alien who has been denied admission, excluded,

deported or removed" from the United States and, without permission, later "enters, attempts to

enter, or is at any time found in, the United States" shall be imprisoned for up to two years. 8

---

[3] The Government argues that even if the Court finds both that racial animus motivated Congress to enact § 1326, and Congress would not have passed § 1326 absent racial animus, the Court should nevertheless uphold § 1326 if the statute survives strict scrutiny. *Hunter*, however, appears to reject the Government's approach. There, the Supreme Court affirmed a district court's decision to invalidate a provision of the Alabama constitution after the district court found both that "discriminatory intent *was* a motivating factor" in the provision's adoption and that the provision "would not have been enacted in absence of the racially discriminatory motivation." *Hunter*, 471 U.S. at 225 (emphasis original). Neither the district court nor the Supreme Court in *Hunter* discussed whether the provision survived or failed strict scrutiny.

Moreover, it is unlikely that government action that fails *Arlington Heights* could ever survive strict scrutiny. Strict scrutiny asks whether a governmental act is (1) narrowly tailored; (2) to serve a compelling governmental interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). The Government fails both inquiries when it is motivated to act by, and would not have acted absent, racial animus. Racial animus is not a compelling interest. *Cf. Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that anti-gay animus lacks "a rational relationship to legitimate state interests"). Nor is enacting a law motivated by racial animus narrowly tailored, if for no other reason than the act could be more narrowly tailored if it were passed free of racial animus. The Court need not dwell too deeply on this question, however, because the Court finds that Mr. Machic-Xiap has not established that racial animus motivated Congress to enact § 1326.

[4] The Court bases the following findings of fact on the evidentiary hearing held in this matter.

U.S.C. § 1326(a). For most of the history of the United States, illegally re-entering the country was not a crime. Congress did not enact § 1326—the statute that Mr. Machic-Xiap challenges—until 1952.[5] Congress created the crime of illegal reentry, however, in 1929.[6]

The 1929 Act was a compromise between southwestern agribusiness leaders who relied on undocumented aliens from Mexico and Central America for cheap labor and nativists in Congress who increasingly viewed immigrants from Latin America as a threat to blood purity in the United States. Congress designed much of its immigration policy in the late-19th and early-20th centuries, Professor Kelly Lytle Hernandez[7] testified, to "filter out undesirable immigrants."[8] Because eugenics—an intellectual movement that attributed biological significance to race—had gained popularity during the early-20th century, race was the dominant factor in Congress's efforts to define "undesirability." Asian immigrants were Congress's first target.[9] Immigrants from southern and eastern Europe came to be considered "undesirable" after the United States Congressional Joint Immigration Commission's 1911 Report (known as the

---

[5] *See* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (codified as amended in various sections of 8 U.S.C.).

[6] *See* Undesirable Aliens Act, Pub. L. No. 70-1018, 45 Stat. 1551 (1929).

[7] Professor Hernandez, the Tom Lifka Endowed Chair in History at the University of California at Los Angeles and a 2019 John D. and Catherine T. MacArthur Fellow, testified at an evidentiary hearing on Mr. Machic-Xiap's motion to dismiss.

[8] Hearing Tr. a 63.

[9] *See, e.g.*, Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58 (1882); *see also* Immigration Act of 1917, Pub. L. No. 64-301, § 3, 39 Stat. 874, 876 (extending the ban on Chinese immigration and expanding the ban to include immigrants from nearly all of Asia).

Dillingham Report).[10] That report, which discussed immigration in highly racialized terms,[11] found that most "new immigration" had been from southern and eastern European countries.[12] These "new immigrants" were less likely successfully to assimilate because they were "[r]acially . . . essentially unlike the British, German, and other [earlier immigrants]," and "far less intelligent."[13] Consistent with the Dillingham Report, the Immigration Act of 1924 imposed a quotas on the number of immigrants entering the United States from many countries, and this law expressly favored immigrants from northern Europe.[14]

Congress appeared unconcerned, meanwhile, with immigration from Mexico and Central America in the late-19th and early-20th centuries. Mexican[15] immigrants came into the United States "more or less freely" in the first two decades of the 20th century.[16] Moreover, at the turn

---

[10] U.S. Immigration Comm'n, Reports of the Immigration Commission: Abstracts of Reports of the Immigration Commission, S. Doc. No. 61-747 (3d Sess. 1910), *available at* https://hdl.handle.net/2027/mdp.39015015388518 (hereinafter Dillingham Rep.).

[11] *See, e.g.*, Richard A. Boswell, *Crafting an Amnesty with Traditional Tools: Registration and Cancellation*, 47 Harv. J. on Legis. 175, 181 (2010) ("[T]he Dillingham Commission, a committee comprised of House and Senate members that studied immigration to the United States, reveals a strong concern about changes in the country's racial composition.").

[12] Dillingham Rep. at 13.

[13] *Id.* at 14.

[14] *See* Immigration Act of 1924, Pub. L. No. 68-139, § 11, 43 Stat. 153, 159 ("The annual quota of any nationality shall be 2 percentum of the number of foreign-born individuals of such nationality resident in continental United States as determined by the United States census of 1890.").

[15] Congress used the term "Mexican" as a "a catch-all term for mixed race, Latin American, and Mexican immigrants crossing the border." *See* Hearing Tr. at 66. When exhibits reference Mexican immigrants, the Court construes those exhibits to refer to immigrants from Latin America absent evidence that Congress intended a more specific meaning.

[16] Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 129 (2004).

of the century, Congress classified Mexicans as white.[17] The Dillingham Report, however, contains clues that Congress considered all people from Latin America an undesirable but exploitable race. The Report described Mexicans as having "limited" "competitive ability," as "peon[s]," and "without ambition and thrift."[18] Although the report concluded that Mexicans were "less desirable as a citizen," it explained that Mexican immigrants were an ideal "transient and migratory unskilled labor supply."[19]

Leaders of the southwestern United States' agricultural industries shared the Dillingham Report's view of immigrants from Latin America as an ideal, temporary workforce. After World War I, the southwest became home to a significant percentage of the nation's larger farms.[20] These immigrants, many of whom were undocumented, fueled the growth of large farms in California, Arizona, and Texas.[21] To protect the labor source that perpetuated their growth, southwestern agribusiness leaders urged Congress not to ban or limit immigration. Mexican immigrants, one lobbyist explained, were "'bird[s] of passage' who would, at the end of each [growing] season, return to Mexico."[22]

---

[17] When the United States annexed Mexican territory after its victory in the Mexican-American War, a founding era law limiting naturalization to "free white persons," remained on the books. *See* Naturalization Act of 1790, 1 Stat. 103 (Mar. 26, 1790). Incorporating the Mexican citizens, then, required the Government to designate Mexicans as white.

[18] Dillingham Rep. at 682, 688, 689, 691.

[19] *Id.* at 41, 690.

[20] Ngai, *supra* note 16, at 129.

[21] *Id.*

[22] Hernandez Decl. (ECF 28-1) at 5.

Through the early- and mid-1920s, southwestern agribusiness got its way. Although the Immigration Act of 1917 banned contract laborers from migrating to the United States, Congress quickly exempted Mexican immigrants from the ban.[23] Similarly, although Congress imposed quotas on immigrants from Europe in the Immigration Act of 1924, it rejected some congressmen's calls to impose quotas on immigrants from Mexico and Central America.[24]

Pressure to limit immigration from Latin America, however, grew. Having excluded immigrants from Asia and limiting immigrants from southern and eastern Europe, proponents of eugenics turned their attention to the southern border. In 1925, then-Secretary of Labor James Davis, whose agency oversaw immigration at the time, commissioned a study called "The Racial Problems Involved in Immigration from Latin America and the West Indies to the United States."[25] That study emphasized the supposed danger posed by indigenous ancestry of Latin American immigrants. In 1928, the United States House of Representatives heard testimony from Dr. Harold Laughlin, a eugenicist who warned of "race mixture" between women and "inferior races" if Congress did not curb immigration from the United States' southern border.[26] Laughlin suggested that if Congress could not use a "quota system according to race" to "select superior

---

[23] *See* Gilberto Cardenas, *United States Immigration Policy Toward Mexico: An Historical Perspective*, 2 Chicano L. Rev. 66, 68 (1975).

[24] *See* § 4, 43 Stat. at 155 (excluding "immigrants who were born in . . . the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America" from the quota system).

[25] *See* Robert F. Foerster, *The Racial Problems Involved in Immigration from Latin America and the West Indies to the United States, Report to Secretary of Labor* (1925), *available at* https://curiosity.lib.harvard.edu/immigration-to-the-united-states-1789-1930/catalog/39-990048771700203941.

[26] *Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. on Immigration and Naturalization*, 70th Cong. 19 (1928) (statement of Harry H. Laughlin), *available at* ECF 28-2.

individuals" whose "offspring will tend to raise the level of American intelligence," then Congress needed to develop other methods for separating whites from those coming from Latin America.[27]

A change in how the public perceived these immigrants, fueled by an increase in deportations in the second half of the 1920s, bolstered those who argued that immigrants from Latin America were undesirable. The Immigration Act of 1924 effectively eliminated the statute of limitations for deportation.[28] Congress's creation of the Border Patrol just three days after passage of the Immigration Act of 1924 also increased deportations. The Border Patrol then "racialized"[29] the deportations. Low-income white citizens in the border areas, who were looked down upon by the region's wealthier, landowning white citizens, staffed the newly formed Border Patrol. Imbued by the federal government with expansive deportation authority, Border Patrol agents enjoyed heightened status and influence. That influence was best preserved by controlling the flow of labor (*i.e.*, immigrants illegally crossing the southern border) to the landowners. Thus, although "all kinds of people" were eligible for deportation, Border Patrol was mostly deporting "one population," immigrants from south of the border.[30] The high rates of

---

[27] *Id.* at 47.

[28] *See* § 14, 48 Stat. at 162 ("Any alien who *at any time after entering* the United States is found to have been at the time of entry not entitled under this Act to enter the United States, or to have remained therein for a longer time than permitted under this Act . . . shall be taken into custody and deported . . . .") (emphasis added).

[29] Hearing Tr. at 83.

[30] *Id.* at 96.

deportations for these immigrants, Professor Hernandez testified, created the perception of them as the "iconic illegal immigrant."[31]

Soon, congressmen were decrying the threat posed by immigration from Latin America. One representative urged Congress to "see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of [Mexican] people essentially different from us in character, in social position, and otherwise."[32] Another argued that "[Mexican] immigrants are poisoning the American citizen."[33] Still another complained that their "blood [is] a very great penalty upon the society which assimilates it," because it is "composed of mixture blood of white, Indian, and negro."[34]

Increased deportations of immigrants from south of the border also altered southwestern agribusiness' calculations. Farmers quickly realized that the threat of deportation was a strong bargaining tool that they could use for their benefit. South Carolina Senator Coleman Livingston Blease[35] saw an opportunity for compromise: Congress would not impose a quota on immigrants from Mexico or Central America, but criminalize the act of illegally reentering the United States after deportation.[36] Thus, Farmers retained their labor force and gained "the threat of

---

[31] *See* Hearing Tr. at 70-72.

[32] 70 Cong. Rec. 3619-3620 (1929) (statement of Hon. John C. Box), *available at* ECF 28-3.

[33] *Id.* at 3620 (statement of Hon. William T. Fitzgerald).

[34] 70 Cong. Rec. 2462 (1928) (statement of Hon. Robert Alexis Green read into the record), *available at* ECF 28-6.

[35] Professor Hernandez described Blease as "a special kind of white supremacist even for the 1920s." Hearing Tr. at 74-75.

[36] The text of the relevant provision of the 1929 Act reads as follows:

imprisonment in . . . negotiations" with undocumented laborers.[37] Congressmen who feared that persons from Latin America imperiled the nation's blood purity, meanwhile, gained a legal way to separate them from rest of the population. Of course, fear of blood contamination or desire for economic exploitation was not the only reason for enacting the 1929 Act.[38]

The 1929 Act also solidified perceptions of persons from Latin America as a separate, unwelcomed race. In the 1930 Census, Mexicans were no longer categorized as white, but as a distinct race.[39] Throughout the 1930s and early 1940s, "Mexican workers in the Southwest and California were racialized as a foreign people, an 'alien race' not legitimately present or intended for inclusion in the polity."[40] Moreover, "[d]uring the 1930s, . . . between 85 percent and 99 percent of the people who are in prison [for unlawful reentry] are Latin Mexican nationals."[41]

---

[I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

Pub. L. No. 70-1018 § 1, 45 Stat. 1551.

[37] Hearing Tr. at 84.

[38] *See, e.g.*, S. Rep. No. 70-1456, at 2 (1929), *available at* ECF 34-2 (suggesting that the threat of imprisonment would better deter illegal immigration than would deportation).

[39] Hearing Tr. at 65.

[40] Ngai, *supra* note 16, at 138.

[41] Hearing Tr. at 78.

The perception of persons from Latin America as "the illegal" "deepen[ed] after the passage [of the 1929 Act]."[42]

In 1942, the United States sought to limit illegal immigration through a multilateral agreement with Mexico and several Caribbean countries called the "Bracero Program." This program promised Mexican and Caribbean laborers legal admission into the country, guaranteed wages above those typically offered, and housing. Although Congress intended the Bracero Program to stem the flow of illegal immigration by creating a lawful means to enter the United States, for several reasons illegal immigration increased during the program's operation.[43]

In the early 1950s, Mexico's support for the Bracero Program waned because of the United States' failure to prevent illegal immigration and mistreatment of Mexican citizens who used the program. Congress feared that Mexico would end the program altogether unless the United States strengthened its immigration laws.[44] To preserve the program, Congress passed legislation criminalizing the "conceal[ing], harbor[ing], or shield[ing] from detection" an alien who entered the United States illegally in March 1952.[45] During the Senate's debate of the bill,

---

[42] *Id.* at 96.

[43] Those reasons include: (1) the Bracero Program did not bring enough immigrants to satisfy labor demands; (2) small-scale farmers relied on Mexican immigrants who had entered the country illegally because those immigrants undocumented status gave employers greater leverage over them; those farmers lacked similar leverage over immigrants legally admitted through a federal program; and (3) laborers who entered the United States through the program often brough their family illegally. *See* Hearing Tr.at 126, 180-183.

[44] *See* 82 Cong. Rec. 795 (1952) (statement of Hon. Allen J. Ellender) ("The enactment of this amendment is necessary, I understand, because the Mexican Government refuses to enter into another contract pursuant to existing law unless we strengthen our immigration laws.").

[45] Act of March 20, 1952, Pub. L. No. 283, 66 Stat. 26.

its sponsor called the bill the "Wetback Bill."[46] Several senators, meanwhile, suggested that the bill would help solve the "wetback problem."[47] Additionally, like the 1929 Act, the bill represented a compromise with farmers: it included a provision explaining that "employment . . . shall not be deemed to constitute harboring."[48]

Three months later, Congress passed the INA.[49] Unlike previous piecemeal immigration legislation, the INA was a comprehensive immigration statute designed to "revise the laws relating to immigration, naturalization, and nationality."[50] Indeed, the bill was Congress's response to a "massive, nine-hundred-page report that identified problems with current U.S. immigration policy and laid out recommendations for how best to address them."[51]

The INA included what is currently codified—with some minor amendments—as 8 U.S.C. § 1326. As enacted in 1952, that provision reads:

> Any alien who—
>
> (1) has been arrested and deported or excluded and deported, and thereafter
>
> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an

---

[46] 82 Cong. Rec. 791 (1952) (statement of Hon. Ernest McFarland).

[47] *See, e.g.*, *id.* at 793, 795 (statements of Hon. Dennis Chavez, Hon. Allen J. Ellender, Hon. Hubert Humphrey, Hon. Harley M. Kilgore).

[48] Act of March 20, 1952, Pub. L. No. 283, 66 Stat. 26.

[49] Immigration and Nationality Act of 1952, Pub L. No. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.).

[50] *Id.*

[51] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration 1924-1965* 155 (2020).

> alien previously excluded and deported, unless such alien shall
> establish that he was not required to obtain such advance consent
> under this or any prior Act, shall be guilty of a felony, and upon
> conviction thereof, be punished by imprisonment of not more than
> two years, or by a fine of not more than $1,000, or both.[52]

Many in Congress viewed the INA as a dramatic departure from the heavily racialized

immigration statutes of the early 1920s. The statute's architect, Senator Patrick McCarran, stated

that the statute "does not contain one iota of racial or religious discrimination."[53] The Senate

Judiciary Committee's Report, meanwhile, claimed that the INA disavowed prior immigration

legislations' belief in the superiority of northern European immigrants. It is no surprise that

drafters of the post-World War II INA sought to distance their bill from the explicitly racist

immigration bills of the early 1900s. As Professor Benjamin Gonzalez-O'Brien[54] testified, after

"the Holocaust . . . the expression of racist thoughts is no longer what is socially acceptable."[55]

The truth, however, is more complicated. Although the INA's drafters purported to

disavow the theory of Nordic superiority, the INA retained a quota system that favored

immigrants from northern Europe. Similarly, although the INA eliminated the explicit Asiatic

bar, it still imposed a more stringent quota on immigrants from Asia than from other regions. At

least one Representative, John S. Wood of Georgia, made explicitly racist statements during the

debate about the INA. He said that there was "something to" "racial origin," and, although he

was careful to note that he was "not a follower of Hitler," he insisted that "statistics would show

---

[52] § 276, 66 Stat. at 229 (codified as amended at 8 U.S.C. § 1326).

[53] Yang, *supra* note 51, at 128-129, 192.

[54] Professor Gonzalez-O'Brien, an Associate Professor of Political Science at San Diego State University, testified at an evidentiary hearing on Mr. Machic-Xiap's motion to dismiss.

[55] Hearing Tr. at 192.

that the Western European races have made the best citizens of America."[56] President Harry

Truman, however, did not agree that the INA was free of racist motivations. He vetoed the bill,

explaining that it "perpetuate[d]" "racial or national barriers to naturalization," specifically about

immigrants from southeastern Europe and Asia.[57]

The INA changed little about the how Congress defined the crime of illegal reentry. In

fact, Professor Gonzalez-O'Brien testified that "there wasn't much debate around Mexican

immigration under [the INA]." Hearing Tr. at 204. The only notable change from the 1929 Act to

§ 1326, then, was the addition of the phrase "or is anytime found in," which made explicit that

the government could prosecute immigrants who illegally re-entered the country undetected.

Deputy Attorney General Peyton Ford praised this change, noting that it would "aid in taking

action against the conveyors and receivers of the 'wetback.'"[58] For several years after the INA's

passage, the United States devoted significant resources to deporting undocumented immigrants

from Latin America explicitly named "Operation Wetback."

Congress has reauthorized § 1326 several times since passing the INA, most recently

in 1996.[59] The parties offered little evidence about these reauthorizations. Mr. Machic-Xiap,

---

[56] Professor Gonzalez-O'Brien testified to this quote by Representative Wood during the evidentiary hearing. Hearing Tr. at 194. Mr. Machic-Xiap did not provide the Court with a direct citation for the quote. The Government, however, did not object to this portion of Professor Gonzalez-O'Brien's testimony. The Court therefore accepts Professor Gonzalez-O'Brien's testimony about the quote.

[57] Harry Truman, Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality (June 25, 1952), *available at* ECF 46-1.

[58] *Joint Hearings Before the Subcommittees on the Judiciary on S. 716, H.R. 2379, and H.R. 2816 Bills to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, 82nd Cong. 716 (1951) (statement of Deputy Attorney General Peyton Ford), *available at* ECF 48-1.

[59] *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181; Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Violent Crime Control and Law Enforcement

however, presented evidence showing that, in 2010, 98 percent of those criminally charged with illegal reentry were from Latin America. [60]

## DISCUSSION

### A.  Judicial Review of Facially Neutral Immigration Statutes

The parties disagree over the Court's authority to review immigration laws passed by Congress. Mr. Machic-Xiap argues that the Court reviews his equal protection challenge to § 1326 as it would an equal protection challenge to any statute. The Government, however, argues that because § 1326 is a facially neutral immigration law, the Court can subject the statute to no more than rational basis review. Examination of Congress's motives in passing the illegal reentry statute, the Government contends, is inappropriate given the deference owed Congress's legislation in the area of immigration. The Government is mistaken.

As previously noted, the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Because the Fifth Amendment's focus is persons rather than citizens, all persons present in the United States, including noncitizens, are entitled to the Fifth Amendment's protections. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (holding that noncitizens present in the United States are entitled to the protection of the Fifth Amendment); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment . . . protects every one of these persons . . . ."). "[O]nce an alien

---

Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

[60] Mark Motivans, *Immigration Offenders in the Federal Justice System, 2010*, U.S. Dep't of Just.: Bureau of Just. Stat. 22 (2013), *available at* ECF 46-1.

arrives in the United States and begins establishing ties to the country, the [Supreme] Court has recognized certain constitutional protections extend to those persons, even if their presence is 'unlawful, involuntary, or transitory,'" *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1018 (N.D. Cal. 2020) (quoting *Mathews*, 426 U.S. at 77).

The Government cites several cases suggesting that the Court's review is more circumscribed. Each of the cases the Government cites, however, involved the political branches' authority to decide who to admit to the United States, not their authority over noncitizens already present. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2403 (2018) (executive order restricting admission to the United States from seven Muslim-majority nations); *Fiallo v. Bell*, 430 U.S. 787, 788-89 (1977) (denial of admission preference to noncitizen children of unwed fathers and noncitizen unwed fathers of citizen children); *Kleindienst v. Mandel*, 408 U.S. 753, 757-58, 760 (1972) (Attorney General's denial of a visa to a "leftist" noncitizen professor invited to speak at an American university). Courts owe exceptional deference to the political branches' exercise of their authority to admit or exclude foreign nationals because admission and exclusion of noncitizens is a "fundamental sovereign attribute exercised by the government's political departments." *Trump v. Hawaii*, 138 S. Ct. at 2418 (quoting *Fiallo*, 430 U.S. at 792). Those decisions "may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances.'" *Id.* at 2418-19 (quoting *Mathews*, 426 U.S. at 81). A noncitizen's presence in the United States, however, "ma[kes] all the difference" and triggers more searching judicial review. *Zadvydas*, 533 U.S. at 693; *see also id.* ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.").

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Government's assertion that the Court has little role in policing the Fifth Amendment's boundaries in a case where the defendant faces risk of imprisonment is without merit.

## B.  Equal Protection Analysis

Equal protection principles permit only limited review of most validly enacted statutes. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.") Laws that discriminate because of race, however, must satisfy more demanding scrutiny. *Adarand Constructors.*, 515 U.S. at 220 ("[R]acial classifications of any sort must be subjected to 'strict scrutiny.'") (quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 285 (1986) (O'Connor, J., concurring in part and concurring in judgment)). A facially neutral government action may still violate equal protection principles when it has a racially disparate impact and the government acted with a racially discriminatory purpose. *Arlington Heights*, 429 U.S. 265-66. To determine whether the government acted with a racially discriminatory purpose, a district court should consider "the historical background and the sequence of events leading to [the statute's] enactment"; evidence of "any departures from the normal legislative process"; "relevant legislative history"; and "the law's impact on different racial groups." *Brnovich*, 141 S. Ct. at 2349.

On some of these factors—most notably § 1326's historical background and its disparate impact on people from Latin America—Mr. Machic-Xiap has presented strong evidence. Mr. Machic-Xiap's strongest evidence, however, is the least valuable: the Supreme Court has counseled that neither a prior legislature's discriminatory intent nor a statute's disparate impact

are likely, alone, to support a finding that racial animus motivated the challenged statute. On the remaining factors, Mr. Machic-Xiap has almost no evidence.

### 1. Disparate Impact

Section 1326 has a disparate impact on persons coming from Latin America. Whether the effect of an official action "'bears more heavily on one race than another' may provide an important starting point" to the *Arlington Heights* analysis. 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Disparate impact is evidence, although rarely dispositive, of racial animus. *Washington*, 426 U.S. at 242. The Ninth Circuit has held that evidence of disparate impact existed where a city council approved of building nearly all of its low- to moderate-income housing mostly in an area of the city where greater than 75% of residents were of Latina American heritage, *see Avenue 6E Investments v. City of Yuma*, 818 F.3d 493, 508 (9th Cir. 2016), and where an Arizona law eliminated an educational program, 90% of whose enrollees were of Latin American heritage, *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015).

Mr. Machic-Xiap has ample evidence that § 1326 has a disparate impact on persons coming from Latin American. A 2013 Bureau of Justice Statistics report, for example, shows that 98 percent of those charged with illegal reentry in 2010 were from Latin American.[61] Professor Hernandez testified that this disparity was not unique to 2010. Under the original illegal reentry statute, Professor Hernandez testified, "Latin-Mexican nationals" comprised between 85 and 99 percent of prosecutions for unlawful reentry.[62] Professor Hernandez also testified that, although "the recordkeeping on this is not clean . . . the disparate impact upon Mexican and Latinos has

---

[61] Motivans, *supra* note 60, at 22.

[62] Hearing Tr. at 78, 80.

not shifted" in the intervening decades, including after Congress enacted § 1326.[63] Perhaps most notably, the Government does not dispute that most prosecutions for illegal reentry are against persons from Latin America.

Instead, the Government argues that Mr. Machic-Xiap's evidence is not evidence of disparate impact but a result of Mexico's proximity to the United States and other political, economic, and sociological factors. [64] The Government misdescribes disparate impact. That an innocent explanation may exist for the disparity does not eliminate the disparity. Indeed, *Arlington Heights* requires courts to look for evidence of a racially discriminatory motive because disparate impact alone might have an innocent explanation. *See* 429 U.S. at 266 n.15 ("In many instances, to recognize the limited probative value of disproportionate impact is merely to acknowledge the 'heterogeneity' of the Nation's population.") (quoting *Jefferson v. Hackney*, 406 U.S. 535, 548 (1972)). Mr. Machic-Xiap has shown that § 1326 has a disparate impact on persons from Latin America.

---

[63] *Id.* at 80.

[64] The Government seeks support from *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), in which the Supreme Court rejected an equal protection challenge to President Donald Trump's rescission of Deferred Action for Childhood Arrivals (DACA). The DACA recipients emphasized statistics showing that DACA's rescission disproportionately harmed Latinos. The Government claims that the Supreme Court held that the statistics did not show disparate impact and points to the Supreme Court's explanation that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915. The Court disagrees. The quoted text does not state that the DACA recipients had not presented evidence of disparate impact. Indeed, the Supreme Court itself characterized the DACA recipient's statistical evidence as evidence of "the *disparate impact* of the recission [of DACA] on Latinos." *Id.* (emphasis added) The Supreme Court did, of course, hold that the DACA recipients had not "establishe[d] a plausible equal protection claim." *Id.* The lack of an equal protection claim is not, however, the same as a lack of disparate impact.

### 2.  Evidence of Congress's Intent

Disparate impact is not the "sole touchstone of . . . invidious racial discrimination." *Arlington Heights*, 429 U.S. at 265 (quoting *Davis*, 426 U.S. at 242). Mr. Machic-Xiap must also present evidence that racism motivated Congress to enact § 1326. *See id.* "The historical background of the decision is one evidentiary source . . . ." *Arlington Heights*, 429 U.S. at 267. Historical background might reveal "a series of official actions taken for invidious purposes," *id.*, or that a particular discriminatory view dominated public thought at the time of the legislation's enactment. *See Hunter*, 471 U.S. at 229 ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks.").

The historical background of § 1326—particularly evidence about what motivated Congress to create the crime of illegal reentry in the 1929 Act—is Mr. Machic-Xiap's best evidence. First, eugenics, a now debunked faux science of race, heavily influenced the 1929 Act. One well-known eugenicist warned Congress in 1928 that Congress's failure to curb immigration through the United States would lead to mixing with "inferior races."[65] Similarly, in the years just before passage of the 1929 Act, the Secretary of Labor commissioned a study exploring the "[r]acial [p]roblems" of immigration from Latin America.[66] A leading Congressman, meanwhile, complained that "blood" from a person from Latin America is "a very great penalty upon the society which assimilates it," because it is "composed of mixture blood of white, Indian, and negro."[67] The prominent role that eugenics played in the original criminalization of illegal

---

[65] *See Eugenical Aspects of Deportation*, *supra* note 26, at 19.

[66] *See* Foerster, *supra* note 25.

[67] 70 Cong. Rec. 2462 (1928) (statement of Hon. Robert Alexis Green read into the record).

reentry is evidence that racial animus may have also motivated later statutes criminalizing illegal reentry.

Second, the 1929 Act served two racist purposes. It furthered nativists' desire to separate certain immigrants from the general population by attaching criminal penalties like imprisonment to conduct that American farmers implicitly encouraged those immigrants to engage in: illegally reentering the country to work. The Congressional Record teems with statements showing fear of race mixing drove the desire to imprison immigrants from Latin America.[68]

The 1929 Act gave southwestern agribusiness greater ability to exploit these immigrants. Professor Hernandez testified that farmers, who before 1929 used the threat of deportation as leverage over this immigrant labor, appreciated the added leverage afforded by the threat of imprisonment. The Government suggests that the fact that the 1929 Act was a compromise with southwestern farmers somehow mitigates the overtly racist purpose that the 1929 Act served for nativists. Marginalizing a particular population to facilitate the economic exploitation of that group, however, is evidence of more, not less, racial animus. That the original statute criminalizing illegal reentry was a compromise between two groups animated by racial animus also is evidence that later illegal reentry statutes like § 1326 may have been motivated by racial animus.

Mr. Machic-Xiap also presented historical background evidence closer in time to the passage of the INA. Most notably, Mr. Machic-Xiap demonstrated that many congressmen

---

[68] 70 Cong. Rec. 3619-3620 (1929) (statement of Hon. John C. Box) ("[S]ee what grave problems have been injected into our national life by the importation for labor purposes of great numbers of [Mexican] people essentially different from us in character, in social position, and otherwise."); *Id.* at 3620 (statement of Hon. William T. Fitzgerald) ("[Mexican immigrants] are poisoning the American citizen.").

casually used the racial epithet "wetback" when the INA was being considered. Indeed, just before Congress passed the INA, Congress passed a bill that was colloquially known as the "Wetback Bill." The Government argues that "wetback" was not a derogatory term when Congress used it in 1952 because it was an "accurate description" of Mexican immigrants whose backs were wet from having illegally entered the United States by crossing the Rio Grande River. The Court does not find this argument persuasive; reducing an entire population to a fleeting condition of a subset of that population is precisely what makes the term a slur.[69] The nonchalance with which Congress used "wetback" near the time of the INA's passage (even if not during debates expressly about § 1326) is further evidence that at least some members of Congress harbored racial animus toward immigrants from Latin America.

Although Mr. Machic-Xiap's historical background evidence is strong, historical background revealing past discrimination cannot alone "flip[] the evidentiary burden on its head." *Abbott*, 138 S. Ct. at 2325. The Court must also consider the other *Arlington Heights* factors: the sequence of events preceding, legislative history of, and existence of any procedural or substantive irregularities in § 1326's enactment. The evidence that Mr. Machic-Xiap presents on these factors does not support the conclusion that racial animus motivated Congress to enact § 1326.

The legislative history of a statute, "especially where there are contemporary statements by members of the decisionmaking body," may provide evidence of racial animus. *Arlington Heights*, 429 U.S. at 268. Both explicitly racist statements and statements that are not "overtly discriminatory" but represent a "camouflaged" "desire to discriminate against a racial minority"

---

[69] Nor is the Government's defense of the term even accurate. The "Wetback Bill" concerned all undocumented immigrants from Latin America. Not all undocumented immigrants from Latin America, however, entered the United States through the Rio Grande River.

are relevant. *Arce*, 793 F.3d at 978 (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064, 1066 (4th Cir 1982)). Statements made by opponents of a bill, however, are generally not appropriate evidence of Congress's motive for enacting legislation. *See, e.g.*, *Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008).

The legislative history of § 1326 is inconclusive. Mr. Machic-Xiap admits that there is little legislative history about the enactment of § 1326 specifically. Professors Hernandez and Gonzalez-O'Brien both testified that the legislative history of the INA was largely free of explicitly racist expressions. Mr. Machic-Xiap points to three statements he contends are evidence of racial animus. First, Mr. Machic-Xiap points to President Truman's statement from his INA veto message. President Truman explained that he believed the INA "perpetuate[d]" "racial or national barriers to naturalization."[70] President Truman's veto, however, does little to advance Mr. Machic-Xiap's argument. For one thing, courts generally should not place much weight on the statements of those who oppose the legislation. *See, e.g.*, *Fieger*, 542 F.3d at 1119. For another, the statement tells the Court nothing about what President Truman thought about § 1326 specifically. President Truman's full statement reveals that his concern with the INA mostly was about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latina America. President Truman's statements, thus, do not prove that racial animus motivated Congress to enact § 1326.[71]

_____

[70] Truman, *supra* note 57.

[71] Mr. Machic-Xiap argues that Congress's decision to enact the INA over President Truman's veto is further evidence of racial animus. The Court is not so sure. It is at least equally possible that Congress overrode President Truman's veto because they disagreed that the legislation was racially discriminatory.

Second, Mr. Machic-Xiap notes that Representative Wood, a supporter of the INA, asserted that there was "something to" "racial origin," and that "the Western European races have made the best citizens of America." That remark is unquestionably racist. Like President Truman's statement, however, the record suggests that this statement was more about the quota provisions of the INA, not § 1326 specifically. Moreover, other Congressmen said just the opposite about the new quotas. Both the INA's sponsor and the Senate Judiciary Committee Report on the INA claimed that the INA disavowed the racist motivations of past immigration legislation. Thus, Representative Wood's racial animus cannot be attributed to the entire Congress, especially when others in Congress expressed the opposite sentiment. *See Brnovich*, 141 S. Ct. at 2350 (faulting the Ninth Circuit for giving controlling weight to the motivations of one state legislator even after acknowledging that other legislators expressed sincere, non-racist reasons for supporting the challenged statute.).

Finally, Mr. Machic-Xiap points to a report from Deputy Attorney General Peyton Ford praising § 1326 for making it easier to address the "wetback problem." Again, "wetback" is a racial epithet. The epithet's presence in the Congressional Record, used specifically to discuss § 1326 is evidence of racial animus. Because Ford was not a member of Congress, however, his use of the epithet is limited evidence of Congress's purpose in enacting § 1326.

Mr. Machic-Xiap's evidence on the remaining factors is even weaker. "Departures from the normal procedural sequence" or "[s]ubstantive departures" from "the factors usually considered important by the decision maker" "might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. Mr. Machic-Xiap's evidence reveals the opposite of procedural or substantive irregularities. Procedurally, the INA followed a comprehensive review of the entire panoply of the nation's immigration laws. Congress passed

the INA after study by committee and significant debate. Nor is there anything substantively irregular about the INA or § 1326. The inclusion of a provision criminalizing illegal reentry was unsurprising; illegal reentry was, after all, already a crime.

Finally, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. A citizen-driven amendment to a state constitution permitting racial discrimination in the sale or lease of private real property added within a year of the state legislature enacting statutes banning racially restrictive covenants on real property, for example, would suggest that racial animus motivated the amendment. *See Reitman v. Mulkey*, 387 U.S. 369, 371-74 (1967). Again, Mr. Machic-Xiap presents no similar sequence of events for § 1326. Finally, because the Court finds that Mr. Machic-Xiap has not proven that racial animus was a motivating factor in the enactment of § 1326, the Court need not consider the import of later reenactments of § 1326.

### 3. Mr. Machic-Xiap's Counterarguments

Mr. Machic-Xiap argues that because the crime of illegal reentry changed so little between its creation in the 1929 Act and the enactment of § 1326, the Court should find that the motivations of the Congress that passed the 1929 Act control absent evidence that the Congress who passed the INA or the Congresses that later reauthorized § 1326 affirmatively disavowed those motivations. Mr. Machic-Xiap's argument, however, is contrary to everything the Supreme Court has instructed lower courts about imputing the motivations of earlier legislatures to later ones. "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (quoting *Mobile*, 446 U.S. at 74 (plurality opinion) (alterations in original)). The views of an earlier Congress "form a hazardous basis for inferring the intent of a later one." *See Price*, 361 U.S. at 313. Similarly, "any procedural irregularities in" prior legislation have "less probative value" of the motivations of a different

legislature. *See Brnovich*, 141 S. Ct. 2349 n.22. Mr. Machic-Xiap argues that the Court should look for evidence that the 1952 Congress that passed the INA cured the discriminatory taint of the 1929 Act, but that is exactly what the Supreme Court in *Abbott* criticized a district court for doing. *See Abbott*, 138 S. Ct. at 2325 ("[The district court erroneously] imposed on the state the obligation of proving that the [later] Legislature had experienced a true change of heart.") (cleaned up).

Mr. Machic-Xiap also contends that § 1326 is not a new statute but a silent reenactment of the 1929 Act and therefore the motivations of the Congress that passed the 1929 Act must be the focus of the Court's *Arlington Heights* analysis. The INA did not, however, silently reenact the 1929 Act; it created a new provision of the United States code: § 1326. *Arlington Heights* and its progeny speak of the government's motivations for the "challenged action." *See, e.g.*, 429 U.S. at 266; *Arce*, 793 F.3d at 977. Mr. Machic-Xiap alleges that § 1326 violates the equal protection clause. Thus, the action Mr. Machic-Xiap challenges is the enactment of § 1326, not the 1929 Act.

It is true that the 1929 Act and § 1326 are similar (although not identical). Federal appellate courts, however, have upheld state statutes nearly identical to statutes the same courts have previously found to be motivated by racial animus when a new legislature passed the later statute. *See, e.g.*, *N.C. State Conf. of the NAACP*, 981 F.3d at 298, 303 (explaining that "*Abbott* could not be more clear" that "[a] legislature's past acts do not condemn the acts of a later legislature").

Finally, Mr. Machic-Xiap attempts to analogize this case to three Supreme Court decisions involving provisions of state constitutions. Each is distinguishable. First, Mr. Machic-Xiap points to *Hunter*, in which the Supreme Court held that a provision of Alabama's

constitution disenfranchising persons convicted of crimes involving moral turpitude violated the equal protection clause. 471 U.S. at 233. Alabama argued that the Supreme Court should consider whether subsequent legislative changes had eliminated the discriminatory motivation behind the constitutional provision. *Id.* at 232-33. The Supreme Court disagreed, noting that the original constitutional provision remained on the books and therefore the motivations animating that provision's adoptions were the subject of the *Arlington Heights* analysis. *Id.* This case, however, is not like *Hunter*, because unlike Alabama's moral turpitude provision, the 1929 Act does not remain on the books. Indeed, *Hunter* confirms that later enactments alter the *Arlington Heights* analysis, noting that the moral turpitude provision would perhaps survive "if enacted today without any impermissible motivation." 471 U.S. at 233.

Even less persuasively, Mr. Machic-Xiap cites *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), in which the Supreme Court held that provisions of several state constitutions violated the Sixth Amendment (*Ramos*) and First Amendment (*Espinoza*), respectively. In both cases, the Supreme Court acknowledged that bigotry influenced the initial adoption of the provisions at issue and that the provisions were readopted absent impermissible motives. *See Espinoza*, 140 S. Ct. at 2293 n.2 (Sotomayor, J. dissenting); *Ramos*, 140 S. Ct. at 1401 n.44. Mr. Machic-Xiap argues that the Supreme Court's discussion of the prejudice that animated the provisions' initial enactments when invalidating the provisions suggests that this Court should give greater weight in the *Arlington Heights* analysis to the prejudice that animated § 1326's precursor in the 1929 Act. Neither *Espinoza* nor *Ramos*, however, turned on the discriminatory intent of those provisions. Rather, in both cases, the Supreme Court emphasized that the provisions were unconstitutional under even the purest of intentions. *See Espinoza*, 140 S. Ct. at 2267 (Alito, J., concurring);

*Ramos*, 140 S. Ct. at 1401 n.44. Mr. Machic-Xiap's efforts to shift the Court's analysis from 1952 to 1929 fail.

## CONCLUSION

Under existing Supreme Court precedent, the fact that racial prejudice played an invidious and overwhelming role in the creation of the Undesirable Aliens Act of 1929 does not compel the Government today to prove that Congress expressly disavowed all prior improper motives when defending a later-enacted law against an equal protection challenge, even when the historical foundation of the current law can be traced back to the earlier statute. The Court notes, however, that nothing restrains a future Congress from explicitly disavowing earlier expressions of racism when passing future immigration legislation, especially comprehensive immigration legislation. Indeed, that may be a tangible, responsible, and meaningful sign of progress, but it is a decision for Congress to make, rather than for a court to impose.

The Court DENIES Mr. Machic-Xiap's Motion to Dismiss the Indictment (ECF 28).

**IT IS SO ORDERED**.

DATED this 3rd day of August, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge